1   Tamany J. Vinson Bentz (CA SBN 258600)
    tamany.bentz@us.dlapiper.com
2   Jonathan D. Kintzele (CA SBN 316482)
    jonathan.kintzele@us.dlapiper.com
3   **DLA PIPER LLP**
    2000 Avenue of the Stars
4   Suite 400 North Tower
    Los Angeles, California 90067-4704
5   Tel:  310.595.3022
    Fax:  310.595.3300
6
    Attorneys for Plaintiff
7   BREAKING CODE SILENCE,
    a California 501(c)(3) nonprofit
8

9               **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12  BREAKING CODE SILENCE, a            **CASE NO.  2:22-cv-002052**
    California 501(c)(3) nonprofit,
13                                      **COMPLAINT FOR DAMAGES:**
                  Plaintiff,
14                                      1.  **Computer Fraud and Abuse Act,**
          v.                                **18 U.S.C. § 1030,** *et seq.***;**
15
                                        2.  **California's Computer Data**
16  KATHERINE MCNAMARA, an                  **Access and Fraud Act, Cal. Penal**
    individual, JEREMY WHITELEY            **Code § 502,** *et seq.*
17  an individual, and DOES 1 through 50,
    inclusive,
18
                  Defendants.
19                                      **DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

**COMPLAINT**

Plaintiff Breaking Code Silence ("BCS"), by and through its undersigned attorneys, brings this suit against Defendants Katherine McNamara and Jeremy Whiteley and alleges as follows:

**INTRODUCTION**

1.      BCS is a California 501(c)(3) nonprofit organization that represents children, youth, and adults who are/were incarcerated in the U.S. troubled teen industry ("TTI"), a network of privately-owned, powerfully punitive, and often wilderness-based therapy programs, residential treatment centers, therapeutic boarding schools, group homes, boot camps, and faith-based academies.

2.      Breaking Code Silence intends to be a vehicle for the TTI-survivor community–ever striving to uplift, organize, and inspire present and future generations, while promoting youth rights and evidence-based alternatives to the troubled teen industry.  BCS cannot do any of these things for the TTI victims or survivors if it cannot communicate with the community and the people, like attorneys, who share in BCS's mission of ending TTI abuses.

3.      Unfortunately, Defendants Katherine McNamara and Jeremy Whiteley, both former BCS board members, are attempting to silence BCS and prevent BCS from communicating with the TTI-survivor community.  In particular, Defendant Katherine McNamara has exhibited a pattern and practice of maliciously accessing materials, social media accounts, third party platform accounts, and a website all belonging to BCS in an attempt to shut down BCS.

4.      This conduct has left BCS with no other choice but to bring this complaint for damages and injunctive relief.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(a) as those claims are so related

to Plaintiff's federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.     This Court has personal jurisdiction over Defendant McNamara because, on information and belief, McNamara is a resident of California, and this lawsuit arises out of McNamara's purposeful and unlawful conduct occurring within the State of California and in this District.

7.     This Court has personal jurisdiction over Defendant Whiteley because this lawsuit arises out of Whiteley's purposeful and unlawful conduct knowingly directed to BCS within the State of California and in this District.  Specifically, this Court has jurisdiction over Whiteley, because, on information and belief, Whiteley, *inter alia*, has engaged in acts of cyber hacking directed to BCS in California and in this District, including but not limited to the unauthorized accessing of servers and networks that, upon information and belief, are located in the County of Los Angeles, and purposefully directed his activities at residents of California and this District. As such, Whiteley's conduct has established that he would reasonably and fairly anticipate being called into court in this District.

8.     Venue is further proper in this District under 28 U.S.C. § 1391(b)(2) because the acts, liabilities, and events claimed in this action arose in and were directed at Plaintiff within this District, in Los Angeles County. Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant McNamara resides in this district.

## THE PARTIES

9.     Plaintiff Breaking Code Silence is, and at all times relevant herein was, a 501(c)(3) nonprofit organization formed and existing under the laws of the State of California and having a principal place of business at 1005 E. Las Tunas Dr., #104, San Gabriel, California 91776.  BCS was founded in California by six women in 2019, including Defendant Katherine McNamara, and incorporated as a

501(c)(3) nonprofit with the California Secretary of State on March 22, 2021.

10.     Defendant McNamara is, and at all times relevant herein was, a U.S. citizen domiciled in California.  Defendant McNamara served as a board member and BCS's IT person, which aligned with her professional skills and experience as a cybersecurity systems engineer.  Defendant McNamara managed many of BCS's accounts because she helped the organization set up its information technology accounts and maintained the administrative privileges to those accounts.  Defendant McNamara voluntarily terminated her relationship with BCS on or around December 9, 2021, after a dispute regarding the direction and professionalism of the organization and concerns over Defendant McNamara's behavior in the survivor community.  Defendant McNamara formally resigned, and on information and belief, she is currently operating an identical organization known as Unsilenced. Unsilenced has and continues to use many of the materials developed and written by BCS's employees and volunteers, an issue that BCS was trying to work out amicably with UnSilenced despite ongoing attacks by Defendant McNamara that maliciously targeted online platforms that are critical components of BCS's means of communicating with the TTI-survivor and victim community. However, Defendant McNamara's escalation of these attacks to target the BCS Website has proven continued discussions would be futile.

11.     Defendant Whiteley is, and at all times relevant herein was, a U.S. citizen domiciled in Arizona.  Defendant Whiteley was also a former BCS board member.  He joined the BCS board on or around March 22, 2021 and voluntarily terminated his relationship with BCS on or around June 28, 2021.  Mr. Whiteley, in partnership with Ms. McNamara, originally set-up the website infrastructure for BCS to use with its domains. He also set up the hosting account for the BCS website through Cloudways, which he returned to the organization after resigning per the agreement established with all board members.

12.     BCS does not know the true names or capacities, whether individual, partner or corporate, of the defendants sued herein as DOES 1 through 50, inclusive, and for that reason, said defendants are sued under such fictitious names, and BCS will seek leave to amend this complaint, if necessary, when true names and capacities are known.  BCS is informed and believes and based thereon alleges that each of said fictitious defendants was responsible in some way for the matters alleged herein and proximately caused BCS and members of the general public to be subject to the illegal actions, wrongs, and injuries complained of herein.

13.     Upon information and belief, each of the Defendants was the agent, principal, employee, representative, or alter ego of the other Defendants and/or acted with one or more of the other Defendants' knowledge, consent and approval, and acted within the course and scope of their agency or representative capacity. As such, each of the Defendants is responsible for the actions of the other Defendants, as alleged herein.

14.     Upon information and belief, at all times pertinent hereto, each of the Defendants was an aider, abettor, or co-conspirator of each of the other Defendants. Each of the Defendants acted within the course and scope of such conspiracy or in the course and scope of a common plan and scheme described below; and each of the Defendants was in some manner responsible for the acts and omissions alleged in these causes of action.  Upon information and belief, each of the Defendants has ratified and/or approved each of the acts and omissions of each of the other Defendants.

15.     Upon information and belief, in taking the actions described in this complaint, Defendants acted intentionally, in concert, and pursuant to an agreement between and among them, the purpose of which was to obtain and convert secret, confidential, and proprietary information, documents, data, work product, business opportunities, business relationships, and other property belonging to BCS, to use

such property for their own benefit and for their own competitive advantage, and to deprive BCS of the use of such property in its business.  Upon information and belief, each of these Defendants knew of and agreed to both the objective and course of action to deprive BCS of such property and to cause injury to BCS.  The wrongful acts and damage caused to BCS as a result of Defendants' conduct are set forth in detail below.

## FACTUAL BACKGROUND

16.     Six women, including Defendant McNamara, founded BCS. Plaintiff's mission is to prevent institutional child abuse and empower survivors to promote positive social change through self-advocacy.  Accomplishing this mission depends principally on BCS's ability to contact, engage, and mobilize the survivor community by using its company assets, including its contact and donor lists, and repository of confidential client information contained in BCS's databases.

17.     In 2019, the founding members of BCS started setting up various social media accounts and registered the domain name <breakingcodesilence.net>. At all times this work was done on behalf of BCS and not for the individuals' benefit.  This work continued on behalf of the organization into 2020, at which time Defendant McNamara registered the domain <breakingcodesilence.org> for the organization.

18.     Defendant McNamara was requested to secure the registration of the <.org> domain, and she acquired and paid for the domain on March 11, 2020. In March 2021, BCS launched the URL <breakingcodesilence.org>  to correspond with the signing of Utah SB 127, which was based on the model legislation created while participating in the RISE Justice Labs program. Another founding board member secured and paid for hosting services for the website in March 2021.

19.     Communicating via its website and social media accounts is critical to BCS's ability to serve its community.  BCS's charitable operations are virtually all

online, including, but not limited to, advertising, communications, marketing, and donation transactions, are conducted exclusively online using a variety of software programs and social media accounts, including, but not limited to, Google, which hosts the email address info@breakingcodesilence.org; Google/Adwords; PayPal; Zotero; Hootsuite; Twitter; TikTok; Youtube; Instagram/Facebook; Slack; and the use of BCS's compiled mailing lists of just under 1,000 individuals.

20.     In September 2020, the six original founders of BCS jointly filed for a federal trademark registration for BREAKING CODE SILENCE.  This application has not been granted and, since the original filing, some of the original founders have filed competing applications, none of which have been granted.

21.     On March 22, 2021, BCS was formally incorporated as a 501(c)(3) nonprofit organization in California.

22.     On April 6, 2021, Josh Scarpuzzi, creator of the memoir book *Breaking Code Silence* and owner of the domain <breakingcodesilence.com> and the breakingcodesilence Facebook page, assigned his rights to the domain name and Facebook page to BCS.

23.      A few months after BCS was incorporated, Defendant McNamara submitted reimbursement requests for several items, including certain costs associated with the <breakingcodesilence.org> domain and email accounts.  By submitting her costs for reimbursement, she reiterated that these accounts were not her personal assets but instead for the benefit of BCS.  BCS for its part agreed to reimburse Defendant McNamara when it was "fully funded." This was the same agreement finalized with each of the three other board members who provided funds toward the organization's initial establishment and growth, none of whom have been reimbursed yet, as the organization is not fully funded.

24.     In addition to the domain name and social media accounts, it was BCS's understanding that it owned any and all credentials, passwords, and login

information for the same properties, and any and all credentials, passwords, and login information associated with its free access, use, and control of its website, online platforms, and social media accounts.

### Defendant Whiteley Resigns From BCS

25.     In June 2021, Defendant Whiteley voluntarily resigned from BCS's board of directors.

26.     Within weeks, Defendant McNamara (who was still on the BCS board) demanded that Defendant Whiteley turn over any administration credentials or information he had relating to BCS's domain and social media accounts. Specifically, Defendant McNamara stated, in writing, that any accounts Defendant Whiteley had created for BCS's use were for the benefit of BCS and belonged to BCS.

### Defendant McNamara Resigns From BCS

27.     Beginning in the fall of 2021, Defendant McNamara started creating tension on BCS's board and began regularly spreading gossip and slanderous lies about fellow board members among volunteers and in the survivor community. The parties engaged in a conflict resolution process with a consultant.  The conflict resolution process was unsuccessful in large part because Defendant McNamara would not accept the consultant's proposal that she step down from the board.

28.     On December 9, 2021, Defendant McNamara voluntarily resigned from BCS's board.

29.     However, after resigning from BCS's board, Defendant McNamara continued to undermine BCS's mission to assist the TTI-survivor and victim community.

30.     On or around December 10, 2021, McNamara conspired with other volunteers and employees of BCS, including Mary "Meg" Appelgate (neé Gochnauer) and Caroline (Cole) Lorson, to download BCS's files and confidential

data, including an entire Google Drive, without BCS's authority or permission, and in specific instances, even tamper with, destroy, and deny access to portions of BCS data from such Google Drive, including but not limited to the permanent theft of the entire Legislative Google Drive folder and all documents in its contents, the majority of which BCS did not and does not have copies of anymore.

31.   Other files stolen by McNamara, Appelgate, Cole, and others they coerced, many of which they also attempted to permanently delete, were inaccessible to BCS for up to 25 days before BCS personnel were successfully able to manually override the deletion request and recover the data.

32.   Once Defendant McNamara was satisfied that she had gutted the entirety of BCS's electronically stored information, she encouraged additional volunteers and board members to leave BCS under false pretenses.

### Defendants Form Unsilenced and Begin Withholding Access to BCS Accounts

33.   Sometime after December 2021, Defendant McNamara and former BCS volunteers, formed UnSilenced, a nonprofit corporation that purports to serve the same survivor community as BCS, and seeks to achieve the identical objectives as BCS.  It is clear that stealing BCS's electronic materials was intended to allow Defendant McNamara to avoid the cost, time, and risk of building a competing nonprofit from scratch and to appropriate the years of goodwill built by the BCS name and brand.

34.   Defendant McNamara also started accessing BCS's critical social media accounts without authorization and changing passwords so BCS can no longer control the accounts.  For instance, on January 9, 2022, upon information and belief, Defendant McNamara maliciously gained access to @BreakingCodeSi1, the Twitter account used by BCS to communicate with survivors, victims currently suffering from abuse, and attorneys and other advocates trying to help victims. Upon information and belief, Defendant McNamara changed the name of the

Twitter account to "Go-ACCA" before deleting the account in its entirety.  She then secured a new Twitter account under the now available handle "breakingcodesi1" and described it as "Just Another Twitter Account". Defendant McNamara's actions denied BCS not only access to the account but also the benefit of years of connections and communications with the community.

35.     Defendant McNamara also refused to return her administrative credentials to BCS's YouTube channel and actively denied them access to the account.  While Defendant McNamara represented to BCS that she did not have administrative privileges on this account, the administrative information available from YouTube listed Defendant McNamara as the "Primary Account Owner" of the BCS YouTube account. The account was also registered to her personal email address "iristheangel@gmail.com." Defendant McNamara finally returned only this one account to BCS, but only after multiple requests by BCS. On or around January 9, 2021, and again on January 28, 2021 BCS requested that Defendant McNamara return their administrative credentials for the BCS TikTok account.  Defendant McNamara represented to BCS that she had no control over the account because it belongs to BCS and was registered to Defendant McNamara's BCS email account ("kmcnamara@breakingcodesilence.org").  Defendant McNamara's representation was again false, as the TikTok account is not registered to her BCS email account, but on information and belief, Defendant McNamara maintains control over BCS's TikTok account and freely has access to its followers under the guise that UnSilenced is related to BCS.

### Defendants Escalate McNamara's Conduct and Hack Into BCS's Website

36.     On or around March 10, 2022, using Defendant Whiteley's former administrative credentials, both Defendants exercised an extreme act and maliciously accessed BCS's account with Google via the Google Search Console and possibly the back end of BCS's Website (which includes both the

www.breakingcodesilence.org  and www.breakingcodesilence.com domains) without permission or authorization from BCS and caused the website to be deindexed on Google.  The effect of being deindexed is that no one could find BCS's Website on the largest search engine.[1]

37.    The timing of the deindexing was critical.  Earlier that day BCS had been featured on the TV show *The Doctors* and expected a rise in website traffic. In addition, around this same time, Lifetime was promoting a made-for-TV film based on the true stories of two TTI survivors, which was scheduled to debut on March 12 and highlighted BCS's work on the TTI-survivor and victim communities.  Defendants' conduct prevented BCS from being able to promote the documentary, as Lifetime expected, and blocked the distribution of its message to people who viewed the documentary and tried to look up their website.

38.    From the date of Defendants' deindexing, Google Analytics reports for the website reflect a significant and dramatic drop in traffic. The deindexing of the BCS website blocked its primary and largest source of traffic, organic searches, cutting off the website's main source of exposure. For example, as a result of the deindexing requests from Defendants, the Google Search Console for the BCS website shows zero user traffic for the dates of March 10 and March 11, 2022, the same or nearly the same days of the *The Doctors'* feature piece and right before the Lifetime documentary promoting BCS to nation-wide audiences. On information and belief, these temporary deindexing requests last up to 6 months.

39.    Concurrently with successfully deindexing the BCS website, Defendants repeatedly, relentlessly, and maliciously attempted to remove and/or gain control of the BCS Website and corresponding Google Webmaster Central permissions on the day of the March 12, 2022, Lifetime documentary premiere.

---

[1] BCS only knew its website had been deindexed by accident.  One of its current board members was making changes to the site and wanted to see how the changes were reflected in a Google search.  When she searched, she could not find the site.

40.     BCS immediately engaged forensic data privacy experts to look into these issues.  These experts found a malicious tag attached to the BCS website, which allowed Defendants to wrongfully claim ownership of the site and deindex it. These experts were able to gain access to Google Search Console and could see three requests to deindex the website had been made – two on March 8 and one on March 9.

41.     The experts then accessed the website's WordPress account to manage the administrative privileges and were able to remove the tag, but they noticed a deeper problem. There was a malicious TXT record on the DNS entry that was controlled by Defendant McNamara.  This prevents BCS from being able to permanently stop the intrusion to its Google account.

42.     After a few days of this, Defendant McNamara escalated yet again and began alternating between requesting that Defendant Whiteley be given administrative privileges using a <medtexter.com> email account and then requesting that access be granted to two <Whitehouse.gov> email accounts: president@whitehouse.gov and comments@whitehouse.gov. The forensic experts conveyed concerns that, given Defendant McNamara's information security expertise, including accounts belonging to the federal government was an indicator that she was intentionally attempting to sabotage the account.  The experts further realized that removing the malicious tag was not enough to prevent the hacking – Defendants actually maintained administrative privileges to the site and were possibly accessing the back-end of the site without BCS's knowledge or permission.

43.     In addition to Defendants' causing the BCS website to be deindexed, they have attempted or succeeded at changing the content of the website. They also have the capacity to change the Google AdWords associated with the account, as shown by the Defendants' previous engagement in hacking actions and by, but not

limited to, Defendant McNamara's unauthorized access of the BCS AdWords account in January 2021.

44.     There is no means by which BCS can prevent Defendants from accessing and controlling their website.  Given Defendant McNamara's erratic and escalating harassment of BCS and attempts to interrupt its ability to service the TTI-survivor and victim community, BCS is concerned it will suffer further damage without injunctive relief from the Court.

45.     In some cases, the harm caused by Defendants is irreparable, e.g., the breach of the trust of the public sought to be served by BCS, the unknown extent to which they have reviewed and destroyed BCS confidential information, emails, intellectual properties, and other files, and damaged relationships after Defendant McNamara and her colleagues at UnSilenced made defamatory statements to valued partners, resulting in strained and, in some cases, terminated valued relationships.  In this lawsuit, BCS seeks an injunction to regain control of its digital assets and properties, as well as to recover damages, including statutory damages and penalties, resulting from Defendants' intentional, wrongful, and unlawful conduct.

46.     BCS's ability to communicate with, educate, and convey information to the survivor community is the lifeblood of the organization's operations and its service to the public.  Preventing BCS from being able to do so poses a severe and malicious threat to public health and well-being, particularly to the uniquely vulnerable persons that BCS was formed to serve and help where no other such organization existed. Defendants have acted intentionally, and with wanton and reckless disregard for the members of the public that their conduct has and continues to harm, by commandeering BCS's communications tools and ability to convey information across all of its core online channels.

47.     As a direct and proximate result of Defendants' wrongful conduct, BCS has suffered extensive damages in excess of $5,000 and in an amount to be proven at trial.  Such damages include the expenses associated with investigating Defendants' wrongful conduct and engaging forensic experts, lost business opportunities and monetary donations, and disclosure of misleading information to the public.

48.     BCS also seeks recovery for lost goodwill as a result of Defendant's dissemination of false information by impersonating BCS. Defendants have also greatly and unjustly enriched themselves using BCS's social media accounts and proprietary information at BCS's expense.

49.     BCS demands immediate injunctive relief requiring Defendants to immediately return all BCS credentials, passwords, and login information, as well as any and all of BCS's proprietary information in Defendants' possession, custody, and control.

50.     BCS further demands the right to inspect McNamara's personal computer and cloud based personal accounts to determine with whom and to what extent she has shared BCS's proprietary and sensitive information.

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of the Computer Fraud & Abuse Act (18 U.S.C. § 1030 et seq.)**
**(Against All Defendants)**

51.     BCS incorporates the preceding allegations as if fully set forth herein.

52.     At all relevant times herein, BCS's computer system or systems constituted a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2), in that they were used in or affecting interstate or foreign commerce or communication, and each company that BCS has an account with, including but not limited to the Google accounts, BCS Website and social media accounts, maintains a network of computers and servers that store all information and data related to the

BCS account and allows BCS to engage in interstate and foreign commerce and communication.

53.     At all relevant times herein, BCS maintained a policy, which prohibits, among other things, accessing data, a server, a network or an account for any purpose other than conducting approved BCS business; revealing BCS system passwords to others or allowing use of the individual's account by others; circumventing user authentication or security; providing information about, or lists of, BCS users to parties outside BCS; and effecting security breaches or disruptions of BCS system resources, including but not limited to accessing data of which the individual is not an intended recipient or logging into a server or account that the individual is not expressly authorized to access.

54.     Through Defendant McNamara's pattern and practice of repeatedly denying to BCS, including its owners and personnel, access to BCS's accounts including, but not limited to: Slack; Google Drive; Hootsuite; Zotero; Twitter; TikTok; YouTube; Instagram/Facebook; and the BCS Website, she intentionally accessed and used protected computers without authorization, or in excess of its authority, in violation of 18 U.S.C. §§ 1030 (a)(2)(C) and 1030 (a)(5)(c).

55.     Defendant McNamara also violated the CFAA by intentionally accessing a computer used for interstate commerce or communication without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a computer, including but not limited to, (1) accessing BCS's electronic systems and the information contained therein, including without limitation its proprietary, sensitive, and confidential information; and (3) accessing BCS's internet/intranet/extranet-related systems, including without limitation the social media accounts, Google accounts, and BCS Website.

56.     Defendant Whiteley violated the CFAA by intentionally accessing a computer used for interstate commerce or communication without authorization or

by exceeding authorized access to such a computer, and by obtaining information from such a computer, including but not limited to, accessing BCS's Google accounts to cause the website to be deindexed.

57.    During the period between at least March 8, 2022 and today, access to BCS's Website, information, and data was interrupted by Defendants, and they have refused to return the company's access and control of its online properties back to BCS.

58.    During the period between December 2021 and today, access to BCS's social media accounts was interrupted by Defendant McNamara as she refused to return the company's access and control back to BCS.  All of these accounts are still inaccessible to BCS (other than the YouTube account that Ms. McNamara returned in February 2022).

59.    Defendants' continued interruption of service and ongoing denial of BCS's owners and personnel access to the BCS website and the social media accounts have caused and continue to cause damage to BCS, and has caused BCS to suffer losses in excess of $5,000, and Defendants did so by intentionally accessing and using protected computers to obtain information from a protected computer without authorization, or in excess of its authority, in violation of 18 U.S.C. §§ 1030 (a)(2)(c).

60.    BCS has suffered and will continue to suffer immediate and irreparable harm, including but not limited to impairment of data damage caused by Defendants' extended period of exclusive control over BCS's online accounts, investigation and recovery losses involved in hours of past and continued efforts to secure the restoration of BCS and its data and information, as well as the time and services expended to conduct damage assessments and use forensic experts to investigate Defendants' CFAA and CDFA violations, and interruption of services and losses resulting from the loss of control and deindexing of the BCS Website.

BCS will continue to suffer such harm until Defendants' access to its property, accounts, and networks are preliminarily and permanently enjoined, and BCS's full and unlimited access is restored.

61.     As a proximate result of Defendants' conduct, BCS has suffered, and will continue to suffer, actual damages, and Defendants will be unjustly enriched, in amounts to be proven at trial.

62.     The acts of Defendants were intentional, malicious, and in bad faith and have subjected and will continue to subject BCS to cruel and unjust hardship in conscious disregard of BCS's rights, so as to justify an award of exemplary and punitive damages.

## SECOND CAUSE OF ACTION
### Violation of California Penal Code § 502
**(Against All Defendants)**

63.     BCS incorporates the preceding allegations as if fully set forth herein.

64.     At all times relevant herein, BCS owned the computer systems, computer network, computer data, and computer security credentials and login information used without permission or authorization by Defendants in the course of the conduct at issue.

65.     Defendants have violated California Penal Code § 502 by knowingly accessing, copying, using, making use of, interfering, and/or altering data belonging to BCS: (1) in and from the State of California; (2) in the home state of BCS; and upon information and belief (3) in the state in which the servers that provided the communication link between BCS and its social media accounts, Google accounts, and Website are located.

66.     Through Defendant McNamara's pattern and practice of repeatedly denying BCS access to its accounts, including, but not limited to: Hootsuite; Twitter; TikTok; YouTube; Instagram/Facebook; Zotero; Slack; Google; and the BCS Website, as well as the continued denial to the owners and personnel of BCS,

she has intentionally accessed and used protected computers without permission to alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network belonging to or licensed to BCS in order to wrongfully control or obtain money, property, or data, in violation of California Penal Code §§ 502(c)(1).

67.    Through Defendant McNamara's pattern and practice of repeatedly denying BCS access to its accounts after December 2021, including, but not limited to: Google; Hootsuite; Twitter; TikTok; YouTube; Instagram/Facebook; Zotero; Slack; and the BCS website, as well as the continued denial to the owners and personnel of BCS, she has intentionally accessed and used protected computers without permission to take, copy, or otherwise use any data, computer, computer system, or computer network of belonging to or licensed to BCS, in violation of California Penal Code §§ 502 (c)(2).

68.    Defendants have intentionally accessed and used without permission to use or cause to be used computer services belonging to or licensed to BCS, in violation of California Penal Code §§ 502 (c)(3).  Defendant McNamara violated California Penal Code §§ 502 (c)(3) when she accessed and altered BCS's social media accounts, other online accounts, and the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(3) when he accessed BCS's Website without permission and caused it to be deindexed.

69.    Defendants have intentionally accessed and used protected computer services without permission to alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network which resides or exists internal or external to a computer, computer system, or computer network belonging to or licensed to BCS, in violation of California Penal Code §§ 502 (c)(4).  Defendant McNamara violated California Penal Code §§ 502 (c)(4) when she accessed and altered BCS's social media accounts, other online accounts, and

the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(4) when he accessed BCS's Website without permission and caused it to be deindexed.

70.     Defendants have intentionally and without permission, disrupted or caused the disruption of computer services and/or denied or caused the denial of computer services to the authorized users of BCS's computer, computer systems, or computer networks, including the owners of BCS, in violation of California Penal Code §§ 502 (c)(5).  Defendant McNamara violated California Penal Code §§ 502 (c)(5) when she accessed and altered BCS's social media accounts, other online accounts, and the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(5) when he accessed BCS's Website without permission and caused it to be deindexed.

71.     Defendants have intentionally accessed a computer, computer system, or computer network of BCS, in violation of California Penal Code §§ 502 (c)(7).  Defendant McNamara violated California Penal Code §§ 502 (c)(7) when she accessed and altered BCS's social media accounts, other online accounts, and the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(7) when he accessed BCS's Website without permission and caused it to be deindexed.

72.     During the period between December 2021 and today, access to BCS's information and data by BCS and its owners was interrupted by Defendants as they refused to return the company property back to its owners.  By locking BCS out of its accounts and deindexing the BCS Website, Defendants created an interruption of service, preventing BCS from accessing or using the accounts as well as the data and information contained therein and blocking search traffic to its website.  Defendants' actions caused BCS's data and programs to be not readily obtainable to it, and Defendants continue to refuse to return such access to BCS.

73.     During this period of service interruption, BCS suffered losses of revenue and donations as well as costs incurred and other consequential damages as a result of Defendants' refusal to return the organization's control of its online properties. Lost revenues include unrealized revenues, such as those lost revenues BCS suffered beginning in March of 2022, because Defendants intentionally shut off all search traffic to BCS's website at the same time as BCS's multiple high-profile public relations and television events, as described herein.  Because BCS's website was deindexed, BCS could not interact with or reach its community, intake donor contributions through its online payment portals, generate new followers for its online accounts, or otherwise operate whatsoever, and as a result, BCS lost thousands of dollars in donations, revenues, and in potential future growth of the same due to the Defendants' unauthorized commandeering of BCS's network and computer service platforms.

74.     At all times relevant herein, BCS owned the computer systems, computer networks, and data at issue.

75.     Defendants' unauthorized access to BCS's computer systems and data was not carried out within the course and scope of their employment with BCS, and Defendants were not accessing the electronic files in order to perform acts that were reasonably necessary to their performance of work assignments for BCS.

76.     Defendants did the acts and things herein alleged pursuant to, and in furtherance of, the above alleged misconduct aimed at harming BCS and permanently damaging BCS's reputation and goodwill with the public, as well as with the intention of causing BCS monetary losses by way of this same conduct.

77.     Defendants' conduct was willful and malicious, performed with the intent to do harm.  Therefore, under Penal Code Section 502(e)(4), BCS is entitled to an award of punitive and exemplary damages.

78.     As outlined in the foregoing paragraphs, BCS has been damaged as a result of Defendants' violations of Section 502, in an amount to be proven at trial, including but not limited to the costs of the time and expense of recovering the company and determining the damage caused by Defendants.

79.     Defendants have been unjustly enriched as a result of their violations of Section 502, in an amount to be proven at trial.

80.     Under Penal Code Section 502, BCS is entitled to an award of damages against Defendants for injuries suffered to date by Defendants' unlawful access, as well as equitable relief or restitution, and BCS is entitled to a permanent injunction against Defendants, enjoining the ongoing conduct and restoring the accounts and returning all account credentials referenced herein to BCS.

81.     As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused loss to BCS in an amount to be proven at trial and discovery is ongoing. BCS is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code § 502(e).

## **PRAYER FOR RELIEF**

WHEREFORE, BCS prays for judgment and relief against Defendants as follows:

1.     For judgment in favor of BCS and against Defendants on all causes of action in the Complaint;

2.     For an Order directing Defendants to return all of BCS's information, credentials, and property in their possession, custody, or control;

3.     For Orders temporarily, preliminarily, and permanently enjoining Defendants and all persons or entities acting in concert with them, from directly or indirectly:

(a)     obtaining, using, or disclosing any of the company data, including

DLA Piper LLP (US)
Los Angeles

COMPLAINT FOR DAMAGES

any and all sensitive confidential and proprietary information, and any and all donor contact information, belonging to BCS for any purpose whatsoever;

(b)   accessing, retrieving, copying, deleting, destroying, altering, or disseminating any hard or electronic copies of documents containing BCS's confidential and proprietary information; and

(c)   using, on their own behalf or on behalf of Defendants, or providing Defendants' or their employees, or any other third party, with BCS donor-specific or employee-specific information, not independently readily available to Defendants' personnel, in order to enable them to solicit BCS's donors, or potential donors, including but not limited to any information downloaded from BCS's computers, networks, or online accounts, which have been subsequently uploaded to Defendants' computers, networks, or online accounts.

4.   For an order to inspect Defendants' personal and/or business computer systems to determine where and to whom BCS's proprietary and confidential information has been disseminated;

5.   For three times the amount of actual damages, including lost income, according to proof, as set forth herein, in an amount in excess of the jurisdictional requirements;

6.   For restitution and disgorgement of all ill-gotten gains as set forth herein, in an amount to be proven at trial, but at least in excess of the jurisdictional requirements;

7.   For punitive and exemplary damages, according to proof at trial, for all causes of action for which such damages are authorized;

8.   For reasonable attorneys' fees and costs incurred herein,

DLA Piper LLP (US)
Los Angeles

-21-

9.      For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which BCS has suffered as a result of Defendants' wrongful and unlawful acts; and

10.     For any other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff BCS demands a trial by jury.


Dated:  March 28, 2022              **DLA PIPER LLP (US)**


                                    By: /s/ Tamany J. Vinson Bentz

                                    TAMANY J. VINSON BENTZ
                                    JONATHAN D. KINTZELE

                                    Attorneys for Plaintiff
                                    BREAKING CODE SILENCE

DLA Piper LLP (US)
Los Angeles

-22-