TAMANY J, VINSON BENTZ (SBN 258600)
*tamany.bentz@us.dlapiper.com*
JASON T. LUEDDEKE (SBN 279242)
*jason.lueddeke@us.dlapiper.com*
BENJAMIN GRUSH (SBN 335550)
*benjamin.grush@us.dlapiper.com*
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4735
Telephone:   310.595.3000
Facsimile:   310.595.3300

Attorneys for Plaintiff
BREAKING CODE SILENCE

DIRK O. JULANDER (SBN 132313)
*doj@jbblaw.com*
CATHERINE A. CLOSE (SBN 198549)
*cac@jbblaw.com*
M. ADAM TATE (SBN 280017)
*adam@jbblaw.com*
**JULANDER, BROWN & BOLLARD**
9110 Irvine Center Drive
Irvine, California 92618
Telephone:   949.477.2100
Facsimile:   949.477.6355

Attorneys for Defendants
KATHERINE MCNAMARA and
JEREMY WHITELEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREAKING CODE SILENCE, a California 501(c)(3) nonprofit,<br><br>             Plaintiff,<br><br>        v.<br><br>KATHERINE MCNAMARA, an individual; JEREMY WHITELEY, an individual; and DOES 1 through 50, inclusive,<br><br>             Defendants. | Case No. 2:22-cv-02052-MAA<br><br>**STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION** |

1

### 1.   INTRODUCTION

2      Plaintiff and Defendants (collectively, the "Parties") mutually agree to the

3  following protocol ("Protocol") regarding the discovery of electronically stored

4  information ("ESI") and hard copy documents in the above-captioned case.  This

5  Protocol is intended to provide for effective and efficient discovery in accordance

6  with the Federal Rules of Civil Procedure.  Nothing in this Protocol alters either

7  Party's rights, obligations, and responsibilities under the Federal Rules of Civil

8  Procedure.

9

### 2.   DEFINITIONS

10      2.1   Action:  the above captioned matter, *Breaking Code Silence vs.*

11  *Katherine McNamara et al.*, Case No. 2:22-cv-02052-MAA (C.D. Cal.).

12      2.2   Document:  a collection of pages, or a digital file, constituting a

13  logical single communication of information produced or inspected as a single

14  record pursuant to Federal Rules of Civil Procedure 26 and 34, including hard copy

15  and ESI.

16      2.3   Electronically Stored Information or "ESI":  any information or

17  data that is originally created, manipulated, or used, communicated, and stored in

18  digital format.  This definition expressly excludes information that was prepared or

19  previously available in hard copy but which converted and now maintained in digital

20  format for reasons of business convenience or as otherwise may have been

21  necessary.

22      2.4   Native Format:  the associated file format defined by the original

23  application with which an electronic file was created.

24          2.4.1   Native File: ESI that is stored and produced in the file

25  format in which it was originally created, such as .DOCX, .XLSX, .PPTX, etc., as

26  opposed to a Processed File.

27

28

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

2.4.2    Processed File: a Native File that has been processed into a .PDF file, a .TIFF file, a .CSV file, a .TXT file, or a similar format used for document productions allowing for searchable ESI.

2.5    Hard Copy Document:  any Document that, in the usual course of business, is kept in physical or paper form, as opposed to as ESI.

2.6    Metadata: (i) all information embedded in or associated with a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File which describes the characteristics, origins, usage or validity of the electronic file or (ii) all information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

2.7    Bates Number:  a page level unique alpha-numeric identifier associated with every document produced, including physical sheets of paper, electronically stored TIFF images, PDF pages, or other tangible thing, consisting of (1) an alphabetic portion identifying the Producing Party and/or other characteristics of the production; and (2) a numeric portion incremented according to a scheme defined at the Producing Party's discretion to ensure that the alphanumeric identifier for each page of physical sheets of paper, electronically stored TIFF images, or other tangible thing is unique.  Parties producing Documents as Native Files will assign a single Bates number to the Native File, in sequence with the other numbers in the production of Documents.

2.8    Extracted Text:  the text extracted from a Document, and includes all header, footer, and document body information when available.

2.9    OCR Text:  searchable text from a Document generated by means of optical character recognition performed using appropriate software.

2.10    Load File:  an electronic file containing information identifying a set of paper-scanned images or Processed Files and indicating where individual

pages or files belong together as documents, including attachments, and where each document begins and ends.  A Load File should also contain data relevant to the individual Documents, including extracted and user-created Metadata as required by Exhibit A.

2.11   <u>Forensic Copy or Clone</u>:  a bitsream image, i.e., an exact, bit-for-bit copy of a digital file storage device, such as, without limitation, computer hard drive, mobile device flash memory, USB drives, external hard disk drives, and any other device that stores digital data, in which every bit of data is written onto a new file storage device.

2.12   <u>Discoverable Information</u>:  all documents and ESI that are discoverable in this litigation pursuant to the Federal Rules of Civil Procedure.

2.13   <u>Party</u>:  any party to this Action, including all its officers, directors, employees, consultants, retained experts, and Outside Counsel (and their support staffs).

2.14   <u>Custodian</u>:  the person from whom a Document was collected.

2.15   <u>Non-Custodial Sources</u>:  shared data repositories maintained in the ordinary course of business and not necessarily associated with the individual Custodian(s).  Examples of Non-Custodial Sources may include, but are not limited to, shared file cabinets, shared network drives or fileservers, electronic document management systems, or databases.

2.16   <u>Outside Counsel</u>:  the attorneys and employees of any external law firm representing a Party to this Action.

2.17   <u>Producing Party</u>:  a Party which is producing Discoverable Information.

2.18   <u>Receiving Party</u>:  a Party which is receiving Discoverable Information.

1    2.19   <u>Privileged Information</u>:  Documents or ESI protected from

2  disclosure by the attorney client privilege, work production protection, or other

3  applicable protections or privileges.

4    2.20   <u>Sensitive Personal Identifying Information ("PII")</u>:  includes

5  information protected from disclosure by specific laws or standards as well as

6  sensitive personal information which is not likely to be relevant to the issues in this

7  matter, including:

8    2.20.1   Protected Health Information ("PHI") includes

9  information protected from public disclosure by the Health Insurance Portability and

10 Accountability Act of 1996 ("HIPAA"), pursuant to Title 45, Chapter 164 of the

11 Code of Federal Regulations;

12    2.20.2   Payment Card Information ("PCI") that identifies

13 payment card details, account numbers of individual customers; and

14    2.20.3   Social Security numbers, driver's license number, tax

15 payer identification numbers, passport numbers, state-issued identification numbers,

16 financial account numbers, dates of birth, home address, personal mobile telephone

17 number, or personal email address.

18  **3.    PRESERVATION**

19    3.1   <u>What and Whose Devices</u>.  Each Party represents that it has

20 taken reasonable steps to preserve reasonably accessible sources of ESI with respect

21 to the Custodians set forth in paragraph 4.3 and the data sources set forth in

22 paragraph 4.4

23    3.2   <u>Interdiction of any Document Destruction Program</u>.  To the

24 extent the Parties have not already done so, they agree to disable any automatic

25 deletion program with respect to discoverable sources of ESI.

26    3.3   <u>Preservation Does Not Affect Discoverability or Claims of</u>

27 <u>Privilege</u>.  By preserving documents or ESI for the purposes of this Action, the

28

1 Parties are not conceding that such material is discoverable, nor are they waiving
2 any claim of privilege.

3 **4.     SEARCH PROTOCOL**

4     4.1     Production in Accordance with Federal Rules.  The Parties agree
5 to identify, collect, and produce responsive documents and ESI in accordance with
6 the Federal Rules of Civil Procedure.

7     4.2     Date Range.  The Parties agree that the applicable date range for
8 ESI searches is January 1, 2021 through the present.

9 **The parties disagree as to Section 4.2.**

10 **Plaintiff's position:**

11     Plaintiff contends the applicable date range for ESI searches should be
12 February 1, 2020 through the present.  Plaintiff alleges that Defendant McNamara
13 registered the BCS website domain in March 2020.  Notwithstanding that the
14 alleged cyber misconduct began occurring in 2021, ownership of BCS accounts,
15 such as the website, is a core issue that relates to the elements of Plaintiff's claims.
16 Therefore, documents and communications leading up to and concerning the
17 origination and registration of the BCS website dating back to March 2020 are
18 reasonably calculated to lead to the discovery of admissible evidence.  Defendants'
19 proposed start date of January 1, 2021 would eliminate all such discovery to the
20 prejudice of Plaintiff.

21 **Defendants' position:**

22     Defendants contend that the applicable date range for ESI collection and
23 searches should be January 1, 2021.

24     BCI was formed in March 2021 and the vast majority of documents that may
25 lead to the discovery of admissible evidence center on the cyber hacking allegations.
26 Even taking the allegations as true, the cyber hacking did not occur until after
27 Defendants' resignations from Plaintiff.  In Plaintiff's responses to Interrogatories,
28 BCS responded that the earliest cyber hacking incident was approximately

1   December 9, 2021.  Thus, there is no likelihood that documents or ESI that would

2   lead to the discovery of relevant evidence would exist or have been created at any

3   time prior to 2021.

4          4.3   Custodians.  Plaintiff designates Vanessa Hughes, Jennifer

5   Magill, Katherine McNamara, and Jeremy Whiteley as Custodians whose ESI it will

6   search.  Defendants designate Breaking Code Silence ("BCS"), Vanessa Hughes,

7   Jennifer Magill, Jesse Jensen, Noelle Beauregard, Lenore Silverman, Eugene

8   Furnace, the entire BCS Board of Directors, Bobby Cook, Megan Hurwitt, Arianna

9   Conroyd, Shelby Kirchoff and anyone else who had administrative permissions on

10  the website or any of BCS's accounts or systems at the time the alleged hacking

11  took place.

12         **The parties disagree as to Section 4.3.**

13         **Plaintiff's position:**

14         Plaintiff designated four custodians whose ESI it would search and chose

15  those custodians based on their reasonable belief that they would have responsive

16  information and that additional custodians would be duplicative.  Defendants have

17  indicated they will only designate two custodians whose ESI they would search (the

18  two individual Defendants).  Nonetheless, Defendants are demanding that Plaintiff

19  also search the ESI of at least *11 additional custodians*, including "the entire BCS

20  Board of Directors" (who are unidentified) and "anyone else who had administrative

21  permissions on the website or any of BCS's accounts or systems" (who are

22  unidentified).  Defendants' request is overly burdensome, needlessly costly, and

23  disproportionate to the needs and issues of the case.  Searching the devices of at

24  least *15 custodians* is unreasonable under Fed. R. Civ. P. 26(b), particularly in light

25  of the fact that Plaintiff is a nonprofit.  Plaintiff is willing to meet and confer on

26  additional custodians if there is an indication that its collection was inadequate or

27  incomplete.

28

**Defendants' position:**

Defendants identified only themselves as custodians as they are the only persons who are likely to have documents or ESI that would lead to the discovery of admissible evidence.  Defendants have no control over the devices of any third parties.

As is normal in a cyber hacking case, Defendants are requesting documents and ESI from all persons at Plaintiff who had administrative access to the particular accounts and domain that Plaintiff alleges were hacked.  Defendants are not presently aware of which specific persons at Plaintiff may have administrative access and may have relevant documents.  Plaintiff's interrogatory responses, however, identify the custodians who may have knowledge and information regarding the cyber hacking incidents and allegations.  Plaintiff is an organization and, as an organization (in contrast to Defendants who are individuals), is likely to have a greater number of custodians with documents or ESI that may lead to the discovery of admissible evidence.  Plaintiff brought this action, and it has the obligation to produce relevant evidence in its possession, custody or control.

4.4   <u>Data Sources</u>.  The Parties agree that the data sources include the following, so long as they are in the possession, custody, or control of any of the Parties and reasonably accessible:  E-mail accounts, cell phones, Facebook accounts, Twitter accounts, Skype accounts, and Slack accounts, Google Drives, cell phones and backups, text messages, Apple Messages, computers, Zoom accounts, Hootsuite logs, Hootsuite audit data, Hootsuite billing history, Instagram logs, Instagram audit history, PayPal audit logs, Slack audit logs, server logs, Cloudways logs, server and backups, WordPress logs, databases and server backups, WhatsApp chat logs, Telegram chat logs, Google admin audit logs, AdWords audit logs, iCloud, Box.net, Google admin security logs, system logs, TikTok audit logs, Facebook messages, Facebook audit logs for BCS page, YouTube audit logs, WordPress audit logs, WordPress access logs, Cloudways server database, Linux

1   Cloudways server audit and access logs, Signal chatlogs and any other tech-based

2   communications exchanged between the custodians pertinent to this matter or the

3   alleged hacking incident.  To the extent a Party determines that any source is outside

4   its possession, custody, or control or reasonably searchable, the Parties agree to

5   meet and confer regarding any such source.

6       **The parties disagree as to Section 4.4.**

7       **Plaintiff's position:**

8       Defendants request that, in addition to the extensive list of data sources to be

9   searched and collected from, Plaintiff also search and collect from backups of

10  several of those data sources as set forth above.  Defendants' demand is overly

11  burdensome, needlessly costly, and disproportionate to the needs and issues of the

12  case, and therefore unreasonable under Fed. R. Civ. P. 26(b).  Plaintiff proposes

13  that, in the first instance, backups not be searched because of the burden and cost

14  associated with doing so.  Rather, if either party can show a need for certain backups

15  to be searched, the parties can meet and confer regarding the issue at that time.

16  Searching backups at the outset of ESI collection and production is unnecessary and

17  duplicates work with very likely no benefit.

18      **Defendants' position:**

19      Defendants believe that server and cellphone backups are critical in this

20  action.  Defendants reasonably believe that Plaintiff is in possession of such backups

21  because Defendants established the backup procedures during their tenure at BCS.

22  Plaintiff has been under a litigation hold since it filed the civil action entitled

23  *Breaking Code Silence v. Papciak, et al.,* SDCA Case No. 3:21-CV-00918, which

24  overlapped the filing of this action, so the backups should be preserved.  If Plaintiff

25  believes that its systems and accounts were hacked, backups may provide critical

26  information that leads to the discovery of relevant evidence.  It is important to

27  compare backups preserved at various points in order to identify any changes, and

28  possibly who made those changes.

1    Further, in a March 28, 2022 preservation letter sent to Defendants' former

2  counsel, counsel for Plaintiff specifically demanded that Defendants preserve

3  "servers, archives, backup and disaster recovery systems," "archived data (i.e., data

4  residing in backup tapes or other storage media)" and "deleted data (i.e., data that

5  has been deleted from a computer hard drive but is recoverable through computer

6  forensic techniques)."  Plaintiff should have likewise preserved these items, and

7  therefore, they should be readily accessible.

8    4.5    <u>Searching ESI for Responsive Information</u>.  Each Producing

9  Party shall design and implement the industry standard and approved methods it

10  uses to identify, cull, and review its potentially responsive ESI based on its

11  knowledge and understanding of its own data, the facts and issues involved in the

12  Action, and the Receiving Party's discovery requests.  ==The Parties will jointly agree==

13  ==on a single set of search terms that the Parties will use to identify potentially==

14  ==relevant documents for production.==  The Producing Parties also have the right to

15  utilize predicative coding or technology assisted review, filters, email threading, or

16  other analytics to identify and review potentially responsive ESI to identify relevant

17  Documents.  A Producing Party may also conduct a targeted collection of sources

18  likely to contain responsive materials (e.g., file folders on a given hard drive).  In

19  the event one Party has a good faith belief the other Party has violated this Order,

20  the Parties agree to mutually disclose the methods used to identify and cull

21  potentially responsive ESI, including but not limited to search term syntax, sources

22  searched, predictive coding, technology assisted review or other analytics.

23    **The parties disagree as to Section 4.5.**

24    **<u>Plaintiff's position:</u>**

25    Defendants request that the parties agree on a single set of search terms for

26  Plaintiff and Defendants to run.  Plaintiff disagrees with this approach.  Crafting

27  search terms is an inherently iterative process that requires repeated trial and error to

28  identify and cull a document review set.  That process is significantly hampered by

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

1   coordinating every step with opposing counsel, and even more when both parties are

2   required to use the same search terms.  Search terms are not one-size-fits-all; each

3   side has its own considerations and different document requests to which it must

4   respond.  The parties have a discovery obligation to craft and run appropriate search

5   terms, and they should do so.

6           **Defendants' position:**

7           Defendants are requesting that counsel confer on a joint set of mutually-

8   agreeable search terms for the ESI production (Phase II).  Defendants desire to

9   ensure that Plaintiff is searching for the terms Defendants want it to search for, and

10  vice versa.  If Plaintiff is permitted to select its own search terms, it may exclude

11  terms that Defendants believe to be critical.  Drafting joint search terms is common

12  in heavy ESI cases and there is no reason to deviate from this practice in this case.

13      **5.      NOT REASONABLY ACCESSIBLE ESI**

14          5.1    <u>Not Reasonably Accessible ESI</u>.  The Parties need not preserve,

15  collect, produce, or identify on a privilege log the following categories of ESI for

16  this Action:

17          (a)    Data stores in backup system for purposes of system recovery or

18  information recovery, including but not limited to, disaster recovery back up

19  tapes, continuity of operations systems, and data or system mirrors or

20  shadows except to the extent that such sources are known to be the only

21  sources of Discoverable Information;

22          (b)    Common system and program files as defined by the NIST

23  library (which is commonly used by discovery vendors to exclude system and

24  program files from document review and production) need not be processed,

25  reviewed, or produced.

26          (c)    Deleted, erased, or overwritten computer files, whether

27  fragmented or whole which were deleted in the regular course of business

28  before there was a duty to preserve ESI.

1        (d)    Data stored in random access memory ("RAM"), cache memory,

2   or in temporary or cache files, includes internet history, web browser cache

3   and cookie files wherever located.

4        (e)    Data stored on photocopiers, scanners, and fax machines;

5        (f)    Server, system, or network logs, except as set forth in Section

6   4.4.

7   **The parties disagree as to Section 5.1(a), (c), and (d).**

8   <u>**Plaintiff's position:**</u>

9        The three parts at issue concern data sources that Plaintiff deems inaccessible

10  and therefore not subject to the parties' collection efforts, but that Defendants

11  contend must be collected from.  Part (a) concerns backup sources of data, which

12  Plaintiff addressed in connection with Section 4.4, *supra*.  Parts (c) and (d) concern

13  deleted/overwritten files and data stored in temporary memory formats, such as

14  RAM.  Plaintiff's counsel consulted with ESI discovery experts on this issue and

15  were informed that (i) agreeing to collect from these data sources creates

16  impossible-to-comply-with obligations, and (ii) as a result, these data sources are

17  typically deemed inaccessible in ESI protocols.  There is no reason such collection

18  is necessary here and any such collection is unreasonable under Fed. R. Civ. P.

19  26(b), particularly in light of the fact that Plaintiff is a nonprofit.

20  <u>**Defendants' position:**</u>

21       Defendants disagree that data stores, deleted files and data stored in memory

22  or temporary files are not reasonably accessible.  If Plaintiff truly believes that it

23  was hacked, data stores and deleted or erased files are critical to determine: whether

24  hacking/intrusion occurred and, if so when; or whether nothing occurred.  There is

25  always a way to tell from these resources and it is how CFAA cases are very often

26  made.  The fact that Plaintiff does not want to collect data from these sources this is

27  troubling.  If Plaintiff was truly hacked, then the backups and data stores may likely

28  have relevant information or documents and ESI that will support its claim and/or

1  identify the true cause.

2      Further, Defendants have good reason to believe that these types of data are

3  reasonably accessible to Plaintiff because Defendants built the computing systems

4  for Plaintiff during their tenure.  Moreover, as stated above in support of

5  Defendants' position vis-à-vis Section 4.4, *supra*, counsel for Plaintiff demanded

6  that Defendants preserve "servers, archives, backup and disaster recovery systems,"

7  "archived data (i.e., data residing in backup tapes or other storage media)" and

8  "deleted data (i.e., data that has been deleted from a computer hard drive but is

9  recoverable through computer forensic techniques)."  Plaintiff should have likewise

10 preserved these items, and therefore, they should be readily accessible.

11      5.2   <u>Other Types of ESI May Not Be Reasonably Accessible</u>.

12 Nothing in this Protocol prevents any Party from asserting, in accordance with the

13 Federal Rules of Civil Procedure, that other categories of ESI are not reasonably

14 accessible within the meaning of Rule 26(b)(2)(B).

15 **6.   PROPORTIONALITY**

16      6.1   The Parties agree to take into account the proportionality

17 considerations addressed in Federal Rules of Civil Procedure for purposes of

18 preservation and production of ESI and hard copy documents in this Action.  This

19 Protocol is not intended to expand the Parties' obligations under Federal Rules of

20 Civil Procedure 1, 26, and 34.

21      6.2   The Parties agree to meet and confer regarding any

22 disagreements that arise as a result of the implementation of this Protocol.

23 **7.   PHASING**

24      7.1   The Parties agree to phase ESI production as follows:

25 <u>Phase I</u>:  The Parties will immediately produce all Hard Copy Documents

26 responsive to any Requests for Production of Documents previously propounded

27 prior to the date of this Stipulated Order.

28 <u>Phase II</u>:  The Parties will produce, on a rolling basis, ESI from the data

1  sources and Custodians identified in paragraphs 4.3 and 4.4.

2      Phase III:  To the extent that a Party requests that the other Party search

3  additional data sources or Custodians, the Parties agree to meet and confer regarding

4  any such request.

5      **8.  PRODUCTION**

6          8.1  Production Format and Metadata.   Where practicable, the Parties

7  shall produce documents and ESI, including metadata, according to the format

8  specified in Exhibit A, attached hereto.  To the extent a Producing Party reasonably

9  expects production of specific documents or ESI in the format described in Exhibit

10  A will be impractical or unduly burdensome, the Parties will meet and confer in

11  good faith to attempt to agree on an acceptable format for production pursuant to

12  Federal Rule of Civil Procedure 34(b)(2)(E).  The Parties will transmit production

13  files digitally, via download from a password-protected file-store.

14          8.2  Privacy Redactions.   Producing Parties may redact Protected

15  Personally Identifying Information from responsive Documents prior to production.

16  If Personally Identifying Information is redacted, the Producing Party will label the

17  redactions as "Redacted-PII."  Any Receiving Parties who receive Documents

18  including Protected Personally Identifying Information shall treat such documents as

19  Confidential pursuant to the Stipulated Protective Order entered in this matter.

20          8.3  Deduplication.  Each Party shall remove duplicate ESI (based on

21  MD5 or SHA-1 hash values at the parent document level), including without

22  limitation electronic mail, to reduce unnecessary cost of reviewing and producing

23  duplicative ESI.

24      **The parties disagree as to Section 8.3.**

25      **Plaintiff's position:**

26      Deduplication is standard, textbook procedure in ESI protocols.  Defendants

27  requested that this provision be deleted.  There is no reason why the parties should

28  have to collect, review, and produce multiple copies of the same document.  Doing

1   so needlessly increases the cost and time of review for no benefit, which is

2   unreasonable under Fed. R. Civ. P. 26(b), particularly in light of the fact that

3   Plaintiff is a nonprofit.

4       **Defendants' position:**

5       Deduplication produces only one copy of a relevant document or ESI.

6   However, the fact that multiple custodians may have certain documents or ESI is as

7   relevant as the substance.  The only way to determine which custodians had access

8   to a particular document or ESI is based on their possession of the document or ESI

9   as a custodian.

10      Further, it is standard ESI procedure to produce all duplicates of a document.

11  If Plaintiff decides to deduplicate Defendants' production before reviewing it,

12  Plaintiff may do so using its e-discovery tools.  But duplicates are crucial to

13  determining, *inter alia*, who knew, or did, what, and when.

14      8.4   <u>Review and Production of Hard Copy Documents</u>.  Each

15  Producing Party is entitled to collect, scan, and review its hard copy documents

16  before producing only those documents which are responsive and not privileged or

17  subject to other protection in the document production format described in Exhibit

18  A.

19  **9.    PRIVILEGE**

20      9.1   <u>Non-Waiver</u>.  Pursuant to Fed. R. Evid. 502(d), the production of

21  a privileged or work-product-protected document, whether inadvertent or otherwise,

22  is not a waiver of privilege or protection from discovery in this case or in any other

23  federal or state proceeding. For example, the mere production of privileged or work-

24  product-protected documents in this case as part of a mass production is not itself a

25  waiver in this case or in any other federal or state proceeding.

26      9.2   <u>Privilege Logs</u>.  The parties shall comply with the Federal Rules

27  of Civil Procedure regarding the production of privilege logs, as set forth more fully

28  below. With the exception of those materials described in paragraph 9.3 that need

not be logged, any document falling within the scope of any request for production or subpoena that is withheld on the basis of a claim of privilege, work product, or any other legal privilege is to be identified by the Producing Party in a privilege log, which the Producing Party shall produce in an electronic format (i.e., Excel format) that allows text searching, sorting, and organization of data.

9.3     The parties may elect to produce a categorical privilege log, a metadata privilege log, or a log in any other format, provided that the parties include the information required by Fed. R. Civ. P. 26(b)(5) in a manner that will enable the Receiving party to assess the claim.

9.4     No privilege log entries shall be required as to the following categories of materials, and any applicable privilege or protection shall be preserved even if such materials are not listed on a Producing Party's privilege log:

(a)     Attorney-client communications between a party and its counsel after the start of litigation as to that party. For purposes of this Order only, the litigation is deemed to have started on the day that a party first consulted an attorney regarding any of the issues out of which this lawsuit arises.

(b)     Attorney work product created after the Party's retention of counsel.

(c)     Internal communications within a law firm or the legal department of a party after the start of litigation.

(d)     Documents and communications between outside counsel or outside counsel and in-house counsel for the parties after the start of the litigation.

(e)     Documents and communications between and/or among outside counsel that has been retained by a party to this litigation and the party, litigation technology consultants or providers, any non-testifying experts, and, with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts.

(f)     Communications between Parties and their respective spouses.

(g)     Documents and Communications between Parties and their respective medical providers.

(h)     Tax returns and related documents.

(i)     Privilege redactions made on the face of produced documents, provided that the redaction clearly indicates that privilege is being asserted and the context of the document enables the Receiving party to reasonably assess the claim.

**10.     FORENSIC EXAMINATION**

10.1    The Parties will preserve one Forensic Copy of the entirely of each device or drive with potentially responsive or relevant data, files, or information for the purpose of a forensic examination, should one become necessary.  The Parties will ensure the Forensic Copy remains intact and accessible throughout the duration of this litigation and any appeals thereto.

**The parties disagree as to Section 10.1.**

**Plaintiff's position:**

Defendants added this section, which Plaintiff contends is improper. Preserving the *entirety* of every single device or drive with potentially responsive ESI is overly burdensome, needlessly costly, and disproportionate to the needs and issues of the case, and therefore unreasonable under Fed. R. Civ. P. 26(b).  If a forensic examination is required, the examination may be conducted on the relevant devices and drives as they exist at that time.  Plaintiff is a nonprofit, and paying for the creation of duplicate copies of many data sources, and paying to host that data, is unworkable and far too great a cost to bear.

**Defendants' position:**

Forensic copies are the quickest and most efficient copies you can make. Contrary to Plaintiff's assertion that it would be overly costly, to store one forensic copy of each device is a relatively low cost compared with the amount of money the

1 | parties will spend on e-discovery. The Forensic Copies can also be stored as inactive
2 | data at an even lower rate.

3 | Further, since this action alleges cyber hacking, it may become necessary to
4 | inspect a Forensic Copy of a device to determine information about who may have
5 | used it, who may have deleted files off of it, and what those deleted files were.
6 | Plaintiff should be prepared to preserve the evidence necessary to support this very
7 | serious cyber hacking claim.  It is standard practice and is critical in a case like this.

8 | Moreover, the only way to ensure that everyone has appropriately preserved
9 | their data in the event malfeasance is later uncovered is to go back to the Forensic
10 | Copy.  Additionally, if a database crashes or files get corrupted, going back to the
11 | Forensic Copy is the only way to restore the files.

12 | 10.2   The parties will meet and confer if any party believes that a
13 | forensic examination of any device(s) is necessary to recover latent data (e.g.,
14 | deleted or partially overwritten data). If the parties agree that a forensic examination
15 | is appropriate, they will select a third-party neutral qualified to perform the forensic
16 | examination. The neutral will prepare a detailed forensic examination protocol for
17 | each type of device to be examined. The parties will meet and confer to resolve any
18 | objections to the protocol. Each party will receive a complete copy of all forensic
19 | images and any accompanying report prepared by the neutral.  If the parties are
20 | unable to agree on either the need for a forensic examination or any part of the
21 | protocol prepared by the third party neutral, the party requesting the forensic
22 | examination or objecting to the protocol shall file a motion within 10 days of the
23 | parties' conference, including a written statement by each party of its position
24 | concerning the matter.  The cost of any forensic examination will be borne by the
25 | Party requesting it, unless the forensic examination reveals the other Party has
26 | violated this agreement or any other statute or Federal Rule of Civil Procedure, in
27 | which case the Party violating this agreement or any statute or Rule will bear the
28 | cost of the audit.

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

**The parties disagree as to Section 10.2.**

**Plaintiff's position:**

Plaintiff contends the last sentence of this section should end at "requesting it."  If a party believes that another has violated this protocol or any other statute or Federal Rule of Civil Procedure, that party may seek relief from the Court.  It should not be up to the parties to decide whether a rule has been violated and then purport to enforce the rule.

**Defendants' position:**

Defendants are hopeful that this will never become an issue.  But, in the unlikely event that it does, and the parties are required to conduct a forensic examination, the cost should be borne by the party that caused the forensic examination to happen.  If Plaintiff has not violated any discovery rule or this stipulated order, Plaintiff should not be concerned about such a provision.

**11.   MODIFICATION**

This Stipulated Order may be modified by a Stipulated Order of the parties or by the Court for good cause shown.

**IT IS SO STIPULATED**, through Counsel of Record.

Dated:  August 12, 2022                */s/ Tamany J. Vinson Bentz*
                                        Counsel for Plaintiff

                                        */s/ Catherine Close*
                                        Counsel for Defendants

**IT IS SO ORDERED** that the foregoing Stipulation is approved.

Dated: _____, 2022     _____

                                        HON. MARIA A. AUDERO

DLA Piper LLP (US)
WWW.DLAPIPER.COM

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

**EXHIBIT A**

**Production of Data**

## I.      **Hard Copy Documents:**

1.      All hard copy documents should be scanned and produced as single-page, Group IV, 300 DPI TIFF images with an image load file (.OPT file and/or .LFP file) and a delimited database/metadata load file (.DAT). The database/metadata load file should contain the metadata fields listed below in Section I.A. All documents are to be provided with per document searchable text (.TXT) files that contain full text extraction. In the event a document is scanned into TIFF format, the text file should contain that document's OCR text. the OCR software should maximize text quality over process speed. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

2.      All image files and text files shall be named the same as the starting bates number for each document.  Each TIFF image shall be endorsed with bates numbers that increment by one for each page.

3.      The documents should be logically unitized (i.e., distinct documents should not be merged into a single record, and a single document should not be split into multiple records) and should be produced in the order in which they are kept in the usual course of business. The text and image load files should indicate page breaks. The Producing Party is not required to unitize if the documents are not kept that way in the ordinary course of business.

4.      Documents shall be produced as black and white TIFF images. Upon written request, a party shall produce color images for a reasonable number of selected documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting 75% or higher. Each color document image file shall be named with the unique Bates Number of the first page of the document in question followed by the file extension JPG. This includes, but is

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

1  not limited to, color on graphs, charts, presentations, edits, or highlights that were

2  made by hand, or electronically, on the original.

3       5.    **Database/Metadata Fields for Hard Copy Documents**:

4  1.    Production Number Begin

5  2.    Production Number End

6  3.    Production Attachment Range Number Begin

7  4.    Production Attachment Range Number End

8  5.    Confidentiality Designation

9  6.    Production Doc Page Count

10  7.    All Custodians

11  8.    Source

12  9.    Volume

13  **II.    Electronically Stored Information:**

14       6.    With the exception of Section VII, below, all Electronically Stored

15  Information ("ESI") that is deemed responsive and not privileged is to be produced

16  in 300 DPI Group IV black and white Tagged Image File Format (.TIFF or .TIF)

17  files. The TIFF files shall be produced in single-page format along with image load

18  files (.OPT file and/or .LFP file). Document images should reveal or show all

19  hidden information. Upon written request, a party shall produce color images for a

20  reasonable number of selected documents. Documents produced in color shall be

21  produced as single page, 300 DPI, color JPG images. with the quality setting 75% or

22  higher. Each color document image file shall be named with the unique Bates

23  Number of the first page of the document in question followed by the file extension

24  JPG.

25       7.    Any document that cannot be converted to TIFF format shall be

26  represented in the production with a placeholder TIFF image that bears the legend

27  "This document cannot be converted to TIFF," along with its corresponding

28  metadata in the Concordance DAT file.

8.      During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed and/or modified to TIFF, metadata values should be extracted and produced in the database/metadata load file.

9.      The metadata values that are to be extracted and produced in the database load files (.DAT file using concordance standard delimiters) are those maintained in the usual course of business and are identified in Section XII.

10.     No Party will have the obligation to manually generate information to populate metadata fields if such fields cannot be reasonably extracted or generated from the document using an automated process, except that parties will generate Confidentiality, Bates fields, and Native/Text Link fields.  The Producing Party may redact or remove from production protected or privileged metadata.

11.     To the extent reasonably available, the "Custodian" fields with respect to ESI gathered from an individual's hard drive will provide metadata sufficient to identify the individual custodian from whose hard drive such ESI has been gathered.

### III.    Families of Documents:

12.     For any documents that contain an attachment (for example, email), to the extent available, the fields listed in Section XII should be produced as part of the metadata load file for both the parent and child documents.

13.     To the extent a document is part of a "document family" with a combination of responsive, privileged, and/or non-responsive documents: (i) the privileged documents will be represented in the production with a placeholder TIFF image that bears the legend "Document Withheld as Privileged"; and (ii) the non-responsive documents will be represented in the production with a placeholder TIFF image that bears the legend "Non-Responsive Document." The TIFF image(s) shall be endorsed with a sequential Bates number.

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

**V.**   **Handwritten Notes or Other Alterations:**

14.   If there are any handwritten notes, or any other markings, on a document, it shall not be considered a duplicate. Any document that contains an alteration, marking on, or addition to the original document shall be treated as a distinct version, and shall be produced as such. These alterations include, but are not limited to, handwritten notes, electronic notes/tabs, edits, highlighting or redlining. If such markings/alterations are made in color, the documents shall be produced in color upon reasonable request.

15.   If the producing party becomes aware of any file that was incorrectly filtered during the de-duplication process, the producing party shall promptly notify the other party and produce the incorrectly filtered file.

**VI.**   **Last-in-time Production:**

16.   A party may produce a single copy of a responsive document insofar as no non-duplicative information is lost as a result. For emails with attachments, the hash value is generated based on the parent/child document grouping. A party may also de-duplicate email threads as follows: in an email thread, only the last-in-time portion of the thread that is relevant needs to be produced if all previous emails in the thread are contained within the final message(s). Where an email is not last-in-time and contains an attachment, that email and its attachment shall be produced if relevant and non-privileged.

**VII.**   **Production of Excel, Other Spreadsheets and PowerPoints:**

17.   Excel spreadsheets, CSV files, and other spreadsheet type files shall be produced in native format with a TIFF placeholder bearing the legend "Produced in Native File Format." The TIFF image shall be endorsed with a sequential Bates number and the produced native file named to match this Bates number. The metadata load file shall contain a link to the produced native file via data values called "Native Link." The Native Link values should contain the full directory path and file name of the native file as contained in the produced media.

18.     To the extent MS-Excel spreadsheets contain information subject to a claim of privilege they should be redacted natively, and the redacted native copy should be produced in accordance with Paragraph 14.

19.     PowerPoint files shall be imaged with speaker notes showing in the image, as well as any hidden content displayed in the image.  The Producing Party may produce PowerPoint files in native format with a TIFF placeholder bearing the legend "Produced in Native File Format."  The TIFF image shall be endorsed with a sequential Bates number and the produced native file named to match this Bates number.  The metadata load file shall contain a link to the produced native file via data values called "Native Link."  The Native Link values should contain the full directory path and file name of the native file as contained in the produced media.

**VIII.   Production of Database or Structured Data:**

20.     If a database or other source of structured data contains responsive information, the parties will produce reports or exports from those data sources in a reasonable usable electronic file to the extent practicable.  Otherwise, the parties may meet and confer regarding such format of production.

**IX.     Production of Audio and Video Files:**

21.     If audio and/or video recordings are responsive, the parties should meet and confer to determine a mutually agreeable format for producing the audio and/or video recording.  Before meeting and conferring, the producing party will have information sufficient to identify responsive audio and/or video recordings.

**X.     Bates Numbering:**

22.     Bates number and any confidentiality designation should be electronically branded on each produced TIFF image of ESI but should not be included in the extracted text of ESI, unless the document is a scanned copy of a hard copy document, or the document has been redacted.  For documents produced in native format, the original file name and the Bates number for each native file

1  shall be produced, and the native files shall be named the same as the starting Bates

2  number for that document or file.

3  **XI.**   **Redactions:**

4       23.     In accordance with the Stipulated Protective Order entered for this

5  matter, each redaction on a document shall be completed using white or colored

6  boxes that contain the word "Redacted" at the point of each redaction on each page

7  of the redacted document.  The redacted image file should be produced along with

8  OCR text of the redacted file.  If metadata displayed in the imaged document was

9  redacted, then that metadata should be excluded from the load file.  The reason for

10  redaction (privilege, privacy, non-responsive business information etc.) shall be

11  provided on the face of the redaction or in accompanying metadata.

12  **XII.**  **Metadata Fields:**

| Field Name | Description | Example / Format |
|---|---|---|
| PRODBEG | The Document ID number of first page of the document. | ABC0000001 |
| PRODEND | The Document ID number of the last page of a document. | ABC0000003 |
| PROD BEGATTACH | The Document ID number of the first page of the parent document. | ABC0000001 |
| PROD ENDATTACH | The Document ID number of the last page of the last attachment. | ABC0000008 |
| CONFIDENTIALITY DESIGNATION | The level of confidentiality assigned to the document by Counsel | Confidential, Highly Confidential |
| PGCOUNT | The number of pages in a document. (image records) | Numeric |

DLA Piper LLP (US)
www.dlapiper.com

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

| Field Name | Description | Example / Format |
|---|---|---|
| ALL CUSTODIANS | All of the custodians / sources of a document from which the document originated. | Smith, Joe; Doe, Jane |
| EMAIL SUBJECT | The subject line of the e-mail. | |
| EMAIL AUTHOR / FROM | The display name and e-mail of the author of an e-mail. | Joe Smith <jsmith@email.com> |
| EMAIL RECIPIENTS / TO | The display name and e-mail of the recipient(s) of an e-mail. | Joe Smith <jsmith@email.com>; tjones@email.com |
| EMAIL CC | The display name and e-mail of the copy(ies) of an e-mail. | Joe Smith <jsmith@email.com>; tjones@email.com |
| EMAIL BCC | The display name and e-mail of the blind copy(ies) of an e-mail. | Joe Smith <jsmith@email.com>; tjones@email.com |
| EMAIL ATTACHMENT COUNT | The number of attachments to a parent. | Numeric |
| EMAIL ATTACHMENT NAME | The original file name of attached record. | Attach1.doc |
| RECEIVEDDATE | The date the document was received. | MM/DD/YYYY |
| RECEIVED TIME | The time the document was received. | HH:MM |
| SENT DATE | The date the document was sent. | MM/DD/YYYY |
| SENT TIME | The time the document was sent. | HH:MM |
| TIME OFFSET VALUE / TIMEZONE PROCESSED | The time zone that the data is set to when processed. | PST, CST, EST, etc. |
| FILE NAME | The file name of a native document. | Document Name.xls |

| Field Name | Description | Example / Format |
|---|---|---|
| FILE AUTHOR | The author of a document from extracted metadata. | jsmith |
| DOC TITLE | The extracted title of the document. | Table of Contents |
| FILE MANAGER / APPLICATION DESCRIPTION | Native file application. | Microsoft Excel, Word, etc. |
| FILE EXTENSION | The file extension of a document. | XLS |
| FILE CREATE DATE | The date the document was created. | MM/DD/YYYY |
| FILE CREATE TIME | The time the document was created. | HH:MM |
| FILE LAST MODIFICATION DATE | The date the document was last modified. | MM/DD/YYYY |
| FILE LAST SAVED BY | The last individual to save the file. | jsmith |
| DATE APPOINTMENT START | Date of calendar appointment entry. | MM/DD/YYYY |
| TIME APPOINTMENT START | Start time of calendar appointment entry. | HH:MM |
| DATE APPOINTMENT END | End date of calendar appointment entry | MM/DD/YYYY |
| TIME APPOINTMENT END | End time of calendar appointment entry. | HH:MM |
| FILESIZE | The file size of a document (including embedded attachments). | Numeric |

DLA Piper LLP (US)
www.dlapiper.com

| Field Name | Description | Example / Format |
|---|---|---|
| FILE PATH / ORIGINAL PATH | Location of the original document / location in the ordinary course of business. This field should be populated for email and e-files. | Joe Smith/E-mail/Inbox Joe Smith/E-mail/Deleted Items |
| MD5HASH | The MD5 Hash value or de-duplication key assigned to a document. | |
| NATIVELINK | The full path to a native copy of a document. | D:\NATIVES\ABC000001.xls |
| TEXTLINK | The full path to a text copy of a document. | D:\TEXT\ABC000001.txt |

DLA Piper LLP (US)
www.dlapiper.com

STIPULATED ORDER RE: JOINT E-DISCOVERY PLAN AND
PROTOCOL FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION