1

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3

BREAKING CODE SILENCE,          )  Case No. 2:22-CV-02052-MAA
4                               )
                Plaintiff,      )
5                               )
vs.                             )  Los Angeles, California
6                               )
                                )  Monday, April 24, 2023
7  KATHERINE MCNAMARA, et al    )
                                )
8               Defendants.     )
9                               )

10

11     TRANSCRIPT OF TELEPHONIC INFORMAL DISCOVERY CONFERENCE
            BEFORE THE HONORABLE MARIA AUDERO
12              UNITED STATES DISTRICT COURT

13

   Appearances:              See next page.
14

   Court Reporter:           Recorded; Telephonic (XTR)
15

   Courtroom Deputy:         Narissa Estrada
16 Transcribed by:           Lynn Hill
                             Huntington Court Reporters
17                              and Transcription, Inc.
                             1 South Fair Oaks Avenue
18                           Suite 200
                             Pasadena, California  91105
19                           (800) 586-2988

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
              (800) 586-2988

2

1    APPEARANCES:

2

3    For the Plaintiff            JONATHAN DUSTIN KINTZELE, ESQ.
     BREAKING CODE                Miller Barondess, LLP
     SILENCE:                     2121 Avenue of the Stars
4                                 Suite 2600
                                  Los Angeles, California  90067
5                                 (424) 278-2262

6

7    For the Plaintiff            TAMANY VINSON BENTZ
     BREAKING CODE                JASON LUEDDEKE
8    SILENCE:                     DLA Piper LLP US
                                  North Tower
9                                 2000 Avenue of the Stars
                                  Suite 400
10                                Los Angeles, California  90067
                                  (310) 595-3300
11

12   For the Defendant            ADAM J. SCHWARTZ, ESQ
     KATHERINE MCNAMARA:          Adam J. Schwartz, Attorney at
13                                Law
                                  9465 Wilshire Boulevard
14                                Suite 300
                                  Beverly Hills, California 90212
15                                (323) 455-4016

16                                CATHERINE ANN CLOSE, ESQ.
17                                Julander Brown & Bollard,
                                  9110 Irvine Center Drive
18                                Irvine, California 92618
                                  (949) 477-2100
19
                                  M. ADAM TATE, ESQ.
20                                Julander Brown & Bollard
                                  9110 Irvine Center Drive
21                                Irvine, California  92618
                                  (949) 477-2100
22

23

24

25

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

3

1        Los Angeles, California; Monday, April 24, 2023

2                        --o0o--

3                    (Call to Order)

4        THE CLERK:  Please come to order.  This United

5   States District Court is now in session.  The Honorable

6   Maria A. Audero, United States Magistrate Judge presiding.

7   Calling case number 22-cv-02052-MAA, Breaking Code Silence

8   vs. Katherine McNamara et al.

9        Counsel, please state your appearances starting,

10  with the plaintiff.

11       MS. BENTZ:  Tammany Vincent Bentz from DLA Piper

12  for the Plaintiff.

13       MR. KIKER:  Good afternoon, Jason -- sorry.

14       THE COURT:  Go ahead.

15       MR. LUEDDEKE:  Jason Lueddeke, DLA Piper on behalf

16  of plaintiff.

17       THE COURT:  Okay.  Good afternoon, Mr. Lueddeke.

18       MR. KIKER:  And Dennis Kiker of DLA Piper for the

19  plaintiff.

20       THE COURT:  Good afternoon, Mr. Kiker.

21       MR. TATE:  This is Adam Tate on behalf of the

22  defendants.

23       THE COURT:  Good afternoon, Mr. Tate.

24       MS. CLOSE:  Catherine Close, for the defendant.

25       THE COURT:  Good afternoon, Ms. Close.



4

1          MR. SCHWARTZ:  Adam J. Schwartz, on behalf of the

2     defendant.

3          THE COURT:  Okay.  We are here --

4          MR. SCHWARTZ:  Thank you, Your Honor.

5          THE COURT:  -- we are on -- we are trying to

6     finish up, wrap up the issues that were left unwrapped up,

7     if you will, that remain pending, what I -- what I named

8     IDC2 and what I named IDC3.

9          So IDC2 is the depositions of most Ms. Hughes and

10    Ms. Magill, of which only Ms. Hughes is left at issue.

11    And then IDC3 was with respect to plaintiff's searches and

12    document production, which would then in turn inform the

13    deposition dates for depositions that haven't been set.

14          So let's first -- let's turn to the deposition of

15    Ms. Hughes.  And I see that, despite my order, plaintiff

16    have not provided an updated declaration from Ms. Hughes's

17    doctor, and instead have provided the original

18    declaration, which I said was insufficient, and the

19    questions that I posed for Ms. Hughes's doctor have not

20    been answered.

21          I understand from a communication that was sent to

22    my chambers, cc'ing defendants' side, that the VA, I

23    guess, Ms. Hughes sorry, I guess Ms. Hughes's doctor has

24    taken the position that she's not going to speak with

25    defendants -- sorry, plaintiff's counsel about this and



5

1    has directed plaintiff's counsel to speak directly with

2    counsel for the Veterans Administration where she works,

3    which is an interesting turn of events.

4            And, in addition, despite what Dr. Calong --

5    Calonga is the treating physician has said that she could

6    never ever be deposed again.  She now can be deposed.  And

7    what plaintiffs are offering is the deposition that would

8    go two hours per day with a one-hour break in between the

9    two hours, I guess for as long as it takes to conclude the

10   seven hours of deposition, which by my count is three and

11   a half days.

12           Have I accurately understood the circumstances that

13   we're looking at with respect to Ms. Hughes's deposition?

14     Can I hear from Breaking Code Silence?

15           MS. BENTZ:  I think you have, Your Honor.

16           THE COURT:  Okay.  All right.

17     Can I hear from defendants, what say you, given

18     these -- accepting terms of the --

19           MR. TATE:  Your Honor, Your Honor, I think you're

20   missing just one small data point.  Dr. Calonga has given

21   two declarations.  The original declaration says that Ms.

22   Hughes can be deposed for four hours in a day and she was

23   allegedly hospitalized and we got the second declaration

24   where it says that she cannot be deposed at all.

25           Of course, as you noted in an email (indiscernible)



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

6

1   is now stating that Dr. Hughes can be deposed for two

2   hours a day, and I'll let these guys explain how or why

3   they came to that number as it doesn't match either

4   declaration from Ms. Hughes's doctor.

5          THE COURT:  I think that's a very valid question.

6   Can we hear from --

7          MS. BENTZ:  Sure.  I can -- yes, sure, Your Honor.

8   This is Tamany for the -- for BCS.

9          So as I understood our conversation at the last

10  IDC, the options for Dr. Hughes were she either could be

11  deposed in some fashion or she could not give any evidence

12  in this case.  That's how I understood our discussion.

13         So when -- in discussing that with her, she

14  discussed it with her doctor and made the decision that

15  she would like to try the one-hour deposition, one-hour

16  break, one-hour deposition to fulfill the seven hours of

17  her personal deposition.  She still will not be a designee

18  for BCS, however.

19         THE COURT:  But she can be called by your side?

20         MS. BENTZ:  Yes, and that -- that is in an effort

21  to, you know, both give them the ability to cross-examine

22  her, which I understood what, Your Honor, was saying

23  during the last IDC, but also do what we could to try to

24  limit the amount of deposition time she would have to

25  have.  But she will not be a designee.

1          Your Honor, I -- I -- I would like very much to

2     work -- to talk to the VA attorneys and see what kind of

3     statement we can get for, Your Honor, to support those

4     limitations for her deposition.

5          THE COURT:  That -- that's the concern.  I -- I

6     don't understand.  I don't understand what the limitations

7     are.  These aren't limitations.  These are she has now

8     changed her mind and is willing to be deposed, but only

9     under the conditions that she chooses and that's not what

10    we're talking about here.  What I ordered you to do --

11    what I ordered the Breaking Code Silence to do was to get

12    me a declaration from a doctor.

13         Clearly the doctor has the ability to make this

14    decision because you're saying Ms. Hughes talked to her

15    doctor.  So somewhere along the way the doctor is giving

16    indications to Ms. Hughes -- I don't know what they are.

17    Defendant doesn't know what they are.  All we know is that

18    her doctor went from she's allowed to be deposed -- and

19    then she could only do it for four hours a day to no, she

20    can't ever be deposed ever again.  And now, we don't know

21    what her doctor's saying.

22         We just know that Ms. Hughes herself, is willing to

23    offer something that falls far -- far short of what she is

24    required to do.  So I -- I am not convinced that I

25    shouldn't just set her deposition under 30(b)(1), where

1    she was deposed for seven hours.  So let me hear from

2    defendant.

3          MR. TATE:  And I don't know if I have anything

4    else to add to the summary.  I think you hit it on the

5    head.  THE COURT:  Okay.  So what -- what are we're going

6    to do here, Ms. Bentz?

7          MS. BENTZ:  What -- what I would like to do --

8          THE COURT:  Okay.

9          MS. BENTZ:  -- I mean, what I -- what I would like

10   to do is set a deposition date.  We proposed some to

11   defendants so they could let us know if these work for

12   them and that I get you a declaration that answers your

13   questions and supports these limitations.

14        I -- I can't just get a declaration from any

15   doctor, I think as you recognize, because it needs to be

16   from a treating physician of hers, and she is treated at

17   the VA.  I apparently need to go through the VA legal

18   department in order to get that.

19        THE COURT:  Okay.  I -- I'm not inclined to agree

20   -- to -- to -- to agree with Miss -- Ms. Hughes that she

21   gets to set the dates and that she gets to set the

22   limitations on her deposition.  So we are not in a

23   position -- I -- I don't know if defendants want to take

24   the offer, they can take the offer.  I certainly, I can

25   tell you, I will not order this.  I don't think that

1    plaintiffs have done what they were ordered to do so that

2    we could set this deposition.

3          So when will you provide to us the information

4    that I have ordered?

5          MS. BENTZ:  Your Honor, as soon as I can, but I

6    cannot force a -- a doctor at the VA to sign a declaration

7    for me, if she's telling me that I need to go through the

8    legal department at the VA.  The -- the answer is I'm

9    diligently trying to get Your Honor what you are asking

10   for and ordered, but it's a -- a large piece of this is

11   out of my control in terms of timing of it.

12         THE COURT:  Okay.  Let me hear from defendants on

13   what -- what do you want to do?

14         MR. TATE:  Your Honor, I think that this is

15   (indiscernible) probably should be.  I'm not willing to

16   accept the proposal blind, having not seen a declaration

17   to support this from the patient.

18         (Indiscernible) prospectively noticed the

19   deposition.  She failed to attend.  They didn't bring the

20   motion for protective order before the deposition like

21   they were required to do so.  It should be a pretty

22   straightforward motion that I should bring and I should

23   (indiscernible) attention.

24         THE COURT:  Okay.  Okay.

25         Well, then, let's -- I'm going to set a time on



10

1    this and plaintiff and the parties can report that and if

2    we have progress, we have progress, and if we don't, then

3    there's going to be a point at which Ms. Hughes will be

4    ordered to sit for her deposition in a seven-hour block as

5    she was required -- not a seven-hour block, exactly.

6         Obviously, there'll be a lunch break, and there'll

7    be breaks along the way, but without any such limitations,

8    because what we now have is we have a representation from

9    Ms. Hughes's counsel saying -- or at least Breaking Code

10   Silence's counsel saying that she can sit for a deposition

11   but she won't, except under these other circumstances.

12        I don't have anything from her doctor, and to the

13   extent that Ms. Hughes's decision to sit for a deposition,

14   you know, two two hours per day is based on a doctor

15   recommendation, I don't have it in front of me and what it

16   tells me is her doctor has now changed her mind.

17        And so, we don't have limitations for Ms. Hughes.

18   We just have desires by Ms. Hughes to not sit for a

19   deposition other than two hours a day with an hour in

20   between.

21        So let's tee this up for a week from today.

22        Are the parties available at 3:00?

23        Plaintiff?  Hello?

24        MS. BENTZ:  Sorry, Your Honor, I had you on mute.

25        Yes.  It does work for me.



11

1          MR. TATE:  Your Honor, plaintiff has noticed the

2     deposition of Google for 10:00 a.m. that day.  I'm

3     assuming that deposition that will (indiscernible)

4     authenticate some documents (indiscernible).  Plaintiff

5     can represent we can make 3:00 work.

6          MS. BENTZ:  And can represent us, yes.

7          THE COURT:  Okay.  All right.

8           So -- and defendants are fine with that time,

9     then?

10          MR. TATE:  That's fine, Your Honor.  I'm a little

11     unclear of what the 3:00 o'clock is.  Is it a further IDC?

12     Is there a motion to conserve -- I'm not entirely sure.

13          THE COURT:  I need to hear from the VA, and there's

14     going to be a point, as I said, where if I don't hear from

15     the VA, it's going to be very clear what's going to happen

16     here and Ms. Hughes will sit -- will be ordered to sit for

17     a deposition as any other deponent.

18           So I need to hear from the VA and because this is

19     not moving forward, as I ordered, then I -- I understand

20     the limitations, but I don't have a sense of -- Ms. Bentz,

21     I understand.

22           I don't know when Dr. Hughes told you this.  I

23     don't know what efforts you have made to reach the VA, but

24     I want answers to that on May 1st.  I want to know -- I --

25     I want a timeline.  I want to know all the efforts that

12

1    are being made.

2         I think you can sense my frustration on this.

3    There's no reason at this deposition, at least what is

4    before me now, that Dr. Hughes's doctor has now changed

5    her mind but is not willing to sign a declaration about

6    it.

7         Now I know that -- what I know is that she just --

8    that Ms. Hughes can sit for a deposition.  So that's

9    what's going to happen here.  I want to be very, very

10   clear because this case has been going on long enough.

11   This deposition was noticed a while back, as Mr. Tate has

12   said, and this is starting to look like gamesmanship.  I'm

13   not going to say it is yet, but it's starting to look like

14   that.

15        So okay.  Anything else on this Mr. Tate?

16        MR. TATE:  No.  No, Your Honor.  Thank you.

17        THE COURT:  Okay.  So Ms. Vinson, do you have any

18   questions about what my expectations are by May 1st?

19        MS. BENTZ:  No, Your Honor.

20        THE COURT:  Okay.  Thank you very much.

21        Okay.  Let's move on to what was named Informal

22   Discovery Conference Number 3, and I want to say thank you

23   to plaintiff for the table that they put together. I don't

24   have a sense -- I'm sure Mr. Tate will have a better sense

25   of the scope and the magnitude of what is left to be done,



1    and I would like to have a conversation about this do that

2    depositions of the various deponents that remain

3    outstanding, which appears to be everybody, can be set.

4         I'm not convinced by the dates that are proposed by

5    the plaintiff, but -- but I -- I would certainly open for

6    discussion about it.

7         So Mr. Tate, I saw that once the -- once the email

8    sending these spreadsheets about plaintiff's searches were

9    circulated, including to you, I believe it was you or one

10   of your -- one of the attorneys on your team sent a

11   question.

12        I don't -- I've been on the bench and I haven't

13   been able to keep up with it, nor should I, but I don't

14   know if you've had your question answered.  And I guess

15   I'd like to hear from you on your response to the

16   information that has now been presented?

17        MR. TATE:  Yes.  And I apologize, Your Honor, I --

18   I did not know that -- did not pay enough attention to

19   realize that you were still copied on that email, if not

20   (indiscernible) --

21        THE COURT:  Okay.

22        (AUDIO INTERFERENCE.)

23        MR. TATE:  -- indiscernible).

24        THE COURT:  I'm sorry.  My phone seems to be

25   ringing.  I don't know why, because there's no line on



14

1   there.

2         Okay.  Everybody's still there?

3         MR. TATE:  Yeah.

4         THE COURT:  Okay.

5         MR. TATE:  I'm here, Your Honor.

6         MS. BENTZ:  Yes, Your Honor.

7         THE COURT:  Okay.  Sorry about that.  Technical

8   difficulties, but we're good.

9         Okay.  So can I hear from Mr. Tate on your

10  thoughts regarding the information that has been provided

11  to you by plaintiffs regarding their production, their --

12  their searches, their gathering of documents, their review

13  of documents, and their proposed dates for depositions.

14        By the way, thank you very much, again, to

15  plaintiffs for their work on putting this together.

16        MR. TATE:  Sure.  I want to start as you'll see --

17        (AUDIO INTERFERENCE.)

18        THE COURT:  Sorry.  Hold on.  Hold on, Mr. Tate.

19  My phone is doing a very strange thing.  Okay.  Let's try

20  that again.  Okay.

21        MR. TATE:  So they -- they've marked for almost

22  all of the data sources for the custodians in gray, that

23  those documents are outside the possession, custody, and

24  control of BCS and therefore exclude the collection under

25  the ESI order Section 4.4.

1        What I'd like the Court to look at is what the

2   language of 4.4 says.  It includes the (indiscernible) the

3   data sources include the following so long as they are in

4   possession, custody, and control of any of the parties.

5        The word parties is a capitalized defined term.

6        And then, if you go to Section 2.3, the term party

7   is defined as any party to the faction, including all of

8   its officers, directors, employees, consultants,

9   (indiscernible) experts, and outside counsel.

10       To my reading, as to the discovery order that we

11  signed on and that Your Honor ordered is that

12  (indiscernible) in the possession, custody, and control

13  of any of BCS's officers or directors, BCS has an

14  obligation to collected and to produce it.

15       Every one of these custodians was, at the time

16  that the order was made, either an officer or director of

17  BCS.  So I think it is entirely inappropriate for BCS to

18  not -- (indiscernible) plaintiff does not have to collect

19  from these data sources.

20       I understand that three persons left BCS last month

21  in March without having their information collected. That

22  creates a whole new set of problems that BCS is going to

23  have to figure out a way around.  So that is the biggest

24  issue that I have of what I've received from BCS.

25       The second issue, really just scratch my head at,



1   is if you look at their -- if I'm reading this Excel sheet

2   correctly, and maybe I'm just reading it wrong, but if you

3   look -- you've got rows for reviews and you've got a row

4   for produced.  And almost without exception, those rows --

5   and there's a few exceptions, I guess, but the vast

6   majority of the (indiscernible) most match up.

7           That suggests to me that BCS has reviewed

8    documents, have been ready for production, and for

9    reasons I don't understand won't give them to me.  And

10   that is beyond worrisome.

11          Finally, there was an issue that this chart does

12   not display, but certainly part of my IDC and has been

13   discussed at length and, in fact, Mr. Jensen informed the

14   BCS team to stop using their normal BCS emails, to start

15   using their personal emails.

16          I'm aware of at least three 9th Circuit cases that

17   all states that a party cannot avoid producing documents

18   because they were sent by personal emails (indiscernible)

19   emails that they were using for work purposes.

20          My understanding is that BCS has collected emails

21   of Ms. McGill and is reviewing them, but has not collected

22   the emails of anybody else other than perhaps Ms. Hughes.

23   And Ms. Bentz, or somebody on her side, needs a decision

24   that there are no relevant non-frivolous emails in the

25   entirety of that email.  That kind of privilege log or

1    anything (indiscernible) in that statement.

2         I -- I got more to say, Your Honor, but I think

3    I've thrown a lot out at the moment and I'm worried that

4    if we continue on that things will get lost and we won't

5    have a very good record.

6         THE COURT:  Okay.  Well, thank you for that.  I

7    understand that there are at least three issues for now

8    that you want to discuss, and once we resolve those, we

9    can come back to whatever else -- whatever other concerns

10   you have.  But let me tell you what I understand and that

11   is that the definition of party for whom plaintiffs have

12   agreed to collect documents is much broader than just BCS

13   itself, and it includes its directors and officers.

14        And yet, they are -- it appears from this table, at

15   least, that BCS is taking the position that it will not

16   gather documents from those -- from their -- at least

17   their directors and officers under the theory that they

18   are -- the legal theory that those documents are outside

19   of their possession, custody, and control.

20         Did I accurately state that first issue?  Because

21   we're going -- we're on very linear -- we're going to take

22   these one at a time.

23        MR. TATE:  Yes, Your Honor.  And once we continue,

24   I don't know, if BCS is ready, as a matter of law, but

25   when you have a signed Court order, that would circumvent

```
 1    whatever the law may say or was stipulated and agreed
 2    upon.
 3          THE COURT:  Okay.  So let me hear from Breaking
 4    Code Silence on that, please.
 5          MS. BENTZ:  Yes.
 6          MR. LUEDDEKE:  Sorry.  I was on mute.
 7          THE COURT:  That's okay.  I can hear you now.
 8          MR. LUEDDEKE:  So I -- I guess what I'm unclear
 9    about is what exactly it is that defendants are asking us
10    to collect; right?  So what -- as we -- as it's reflected
11    on this chart here, we've collected emails.  We've
12    collected some cell phones from the -- from certain number
13    of witnesses.  We've collected some various BCS accounts.
14          Is it plain -- is it defendants position that for
15    every custodian listed here that we are to collect their
16    personal -- from their personal Twitter accounts, from
17    their personal TikToks, and their personal Facebook
18    accounts, from all of their cell phones, from their --
19    from all the accounts here, we are supposed to collect
20    from their personal devices?  Is that the position that
21    the defendants are taking?
22          THE COURT:  I believe so, but let me ask Mr. Tate.
23          MR. TATE:  The answer to that is yes, and the time
24    to state that that is unreasonable, but I don't want to
25    (indiscernible) or that is outside possession, custody,
```



1    and control.  The time to do that is when we negotiated

2    the eDiscovery order.  And -- but once we agreed that this

3    is what we were going to do, and the Court ordered BCS to

4    do it, and BCS hasn't.

5         MR. LUEDDEKE:  Okay.  Our reading of the order, and

6    the reason that we included this language in the order,

7    this is negotiated language, wants to prevent this exact

8    scenario where we don't have the ability to compel former

9    members, former volunteers of this organization, to hand

10   over their passwords and their personal devices.

11        She counseled for the organization that they used

12   to volunteer for.  Now, we discussed this when we were

13   putting this order together.  We specifically added this

14   language to avoid this scenario, and it seems like the

15   defendants are mincing words now and -- and -- and coming

16   up with -- I mean, I see what the definition of parties

17   is, but I do not think that that was the intent of this

18   language here.

19        We would maintain that the devices at issue and the

20   accounts at issue that we're talking about right here, the

21   personal accounts, are outside of the possession, custody,

22   and control of the organization.

23        I think -- I just -- I -- we don't have the means

24   under the applicable legal standard that is applied in the

25   9th Circuit to compel the production -- sorry, I'm getting

20

1    an -- an echo here -- to compel the production and

2    collection of personal devices from people that we do not

3    control and do not have the legal right to mandate that

4    they turn over that information.

5         So it's our -- it's our position that those --

6    those devices and accounts are outside the possession,

7    custody, and control of BCS as we've included in the chart

8    here.

9         THE CHART:  So I -- I have a question, then,

10   Mr. Lueddeke.

11        Every time the word -- the defined term party is

12   used, you're now saying that it does not include the

13   officers and directors and employees and consultants and

14   retained experts and outside counsel?

15        MR. LUEDDEKE:  No.  No.  I don't think I

16   would go that far.  I would -- I would just say the

17   language in 4.4 was negotiated between the parties, and I

18   believe the intention and the spirit behind it was to, as I

19   said, prevent this exact scenario that we're dealing with

20   now, because we knew from our side this was going to be an

21   issue, given the legal standard that is applied in the

22   9th Circuit and the fact that we are dealing with

23   volunteers of an organization here.

24        These are not employees.  We foresaw this issue and

25   we discussed it with the other side.  That was the import of



1    adding -- that was the import of the intention of adding this

2    language at the outset of 4.4.

3         THE COURT:  But 4.4 says, the parties agree that the

4    data sources include the following, so long as they're in the

5    possession, custody, and control of any of the parties and are

6    reasonably accessible.

7         And so when you read parties, it means its officers,

8    directors, employees, consultants.  So how I interpret this

9    agreement is the parties agree, all of these people who are

10   named as a party agree, including defendant, of course, that

11   the data sources includes the following so long as they are

12   in the possession, custody, and control of any party to this

13   action, including all of its officers, directors, employees,

14   consultants, retained experts, and outside counsel.

15        That's how I read this, because of how party is

16   defined.  That's how I read it.

17        So you're saying that you discuss this issue with

18   the other side, and that may very well be, but unless the

19   terms of the agreement are vague and ambiguous, which I

20   don't think they are, based on how I am reading it, I don't

21   think any kind of parole evidence is going to come in with

22   respect to what third parties agreed to.

23        And so I just -- I'm not -- I'm not persuaded by

24   defendants' argument, given the language that they signed

25   off on.



1        MR. TATE:  You meant plaintiff's argument?

2        THE COURT:  Sorry.  Sorry.  Plaintiff's argument.

3    That's what I -- I apologize.

4        MR. LUEDDEKE:  I understand, Your Honor.  I -- I

5    just --  I don't think that that was the intention behind

6    this language.  I will also point out that many of the

7    custodians listed in 4.3 were not officers or directors

8    of BCS.

9        THE COURT:  Okay.

10        MR. LUEDDEKE:  Therefore, so I -- I just want to

11    be clear that I know there's a lot of names within the 4.3,

12    but I -- not all of them are subject to this discussion we're

13    having right now.

14        THE COURT:  Yeah.  I understand that.  That's fair

15    enough.  So let's do this.  If you could clarify for me,

16    please, all of these custodians on this table who were or

17    continue to be people who fall into the definition of

18    parties, because, remember, parties is broad; right?

19    Parties include employees, consultants, not just officers

20    and directors, but employees, consultants, retained

21    experts, and outside counsel.

22            So who of all of these custodians don't fall

23    within a position that was an officer or director, an

24    employee or consultant or retained expert or outside

25    counsel of Breaking Code Silence?



23

1           And we can take them one at a time. I have the list

2      in front of me.

3           MR. LUEDDEKE:  Okay.

4           MS. BENTZ:  Go -- go ahead, Jason.

5           I just -- I guess I got confused, Your Honor.  Do

6      you want us to name the ones who do not fall within that

7      category or the ones who do?

8           THE COURT:  Either way.

9           MS. BENTZ:  The definition of party, I'm sorry.

10          THE COURT:  Okay.  Let me just do this.

11          Was Mary Applegate -- does Mary Applegate fall into

12     the definition of party?

13          MS. BENTZ:  No, Your Honor.

14          THE COURT:  Why not?

15          MS. BENTZ:  She was not -- she was no longer

16     associated with BCS when the order was entered into.

17          THE COURT:  Okay.

18          MR. LUEDDEKE:  We're not including 4.3?  Never

19     mind.

20          MS. BENTZ:  We're using it -- the judge is looking

21     at the chart.

22          THE COURT:  Okay.  Let's see -- let's see what's

23     happening.  We shouldn't be looking at the chart.

24          Hold on.  You point -- you're pointing to 4.6,

25     Mr. Tate?  Is that where you want me to go look?



1          No.  There is no --

2          MR. TATE:  Your Honor, the facility is listed in

3     4.3 and the data source is listed in 4.4.

4          THE COURT:  Okay.  All right.  So -- so -- so --

5          MR. TATE:  If it would be helpful to the Court,

6     the titles of each of these persons.

7          THE COURT:  Okay.  Well, let's -- let's just do it

8     that way.

9          Who is Mary Applegate?  Who was she at the time

10    that this order was entered into?

11         MR. LUEDDEKE:  Mary Applegate, I do not believe,

12    based on the list that I'm looking at right now, was an

13    officer or director, but she was a volunteer of -- of BCS.

14    And I don't know when she was --

15         THE COURT:  Quick clarification.  She was not a

16    volunteer when the order was entered into?

17         Was she a volunteer --

18         MR. LUEDDEKE:  That's not what --

19         THE COURT:  Was she a volunteer before and then --

20    and she no longer was a volunteer, and then the order came

21    in to me, or are you trying to get a snapshot on the date

22    that the order was entered into?  Was she -- was she a

23    volunteer after?

24         MS. BENTZ:  No, she was not -- I'm sorry, Your

25    Honor.  She was not a volunteer after she left, you know,



1    left working with BCS in 2021.

2         THE COURT:  So before the order?  Okay.

3         MS. BENTZ:  Long before the order, Your Honor.

4         THE COURT:  What about Noelle Beauregard?

5         MR. LUEDDEKE:  Noelle Beauregard is the -- was the

6    Chief Communications Officer up until March.  I don't know

7    the exact date, but March -- March -- end of March.

8         THE COURT:  Okay.  So -- so she is -- she is

9    someone who would be a party; do you agree?

10        MR. LUEDDEKE:  That -- that would be defendants'

11   position.

12        THE COURT:  I'm asking -- okay.  I'm asking

13   plaintiff.

14        MS. BENTZ:  She would -- she would fall in the

15   definition she was a volunteer.  I actually don't agree --

16        THE COURT:  She's a --

17        MS. BENTZ:  -- that a volunteer would fall into the

18   definition of -- of party in the order, Your Honor.

19        THE COURT:  Yeah, I'm not -- I'm not debating that

20   point.  We'll cross that bridge if and when we get to it,

21   but isn't she an officer -- Chief Communication Officer?

22   She was a chief communication officer until last month.

23   That's what I heard; is that wrong?

24        MS. BENTZ:  I don't believe that that is wrong for

25   her title, Your Honor, but she was not a paid employee of



1    BCS at any point in time and was a volunteer.  So what I'm

2    saying is -- is -- is I do not believe that the definition

3    of an officer would incorporate a volunteer.

4            THE COURT:  Okay.

5            MS. BENTZ:  So title may say officer, but I do not

6    believe for purposes -- particularly purposes of a court

7    order requiring somebody to produce something, that that

8    definition of party would include people who are truly

9    volunteers, who are not receiving compensation from BCS.

10           THE COURT:  So BC -- well, I don't -- I don't

11   think that your definition of party, when it says

12   officers, is saying on, you know, only paid officers.

13           Was she an officer of BCS?

14           MS. BENTZ:  That was her title.  Yes.  But I would

15   disagree that legally she is an officer of BCS because she

16   is not a paid employee and she was a volunteer.

17           THE COURT:  Your position is that only a paid

18   person can be an officer?

19           MS. BENTZ:  So, Your Honor, especially -- yes.

20   Especially when you're talking about requiring that these

21   individuals produce their personal devices and their

22   personal discovery in a case.

23           THE COURT:  No.  Well, that wasn't my question.

24   My question was --

25           MS. BENTZ:  Yes.



1          THE COURT:  -- is it your position that only a paid

2     officer -- only a paid person can be an officer?

3          MS. BENTZ:  Yes.  My understanding of officer is

4     that you are an executive, an employee of an entity.

5          THE COURT:  Okay.

6          MS. BENTZ:  You're not a volunteer.

7          THE COURT:  Okay.  Mr. Tate, I'll hear from you in

8     a moment.  I -- I -- I can tell that something is

9     probably going to be said about this.

10         Okay.  What about Ariana Conroid (ph)?

11         MR. TATE:  Your Honor, Ariana Conroid was the Chief

12    Administrative Officer.  My understanding is that she

13    still is.

14         THE COURT:  Okay.  Was that Mr. Tate?

15         MR. TATE:  My understanding is that she is the

16    Chief Administrative Officer and that she is still at BCS?

17         THE COURT:  Right.  That was Mr. Tate saying that?

18         MR. TATE:  Yes.  Yes.

19         THE COURT:  Okay.  So let me hear from plaintiff

20    and Mr. Tate.  If you disagree with what plaintiff say,

21    then chime in other than the legal arguments.  Okay?  I

22    just -- let me hear plaintiff who these people are.

23         Plaintiff, who is Ariana Conroid?

24         MS. BENTZ:  I believe she's still a volunteer.  I

25    do not have her title, Your Honor.



1        THE COURT:  Mr. Lueddeke, do you know who these

2    people are?

3        MR. LEUDDEKE:  I do not know Ariana Conroid's

4    title, Your Honor.

5        THE COURT:  Is there anybody who represents

6    Breaking Code Silence who knows who these people are?

7    I -- I don't think (indiscernible) I don't understand how

8    we can --

9        MR. LEUDDEKE:  I was just going to say --

10        THE COURT:  All right.  Hold on.  Hold on.  Hold

11    on.  Please hear me out for just one moment, and I -- I

12    promise you, I'll let you speak.

13        I am having a hard -- a hard time understanding

14    how it is that defendants are -- sorry, the plaintiffs are

15    here, taking a legal position, but don't know the facts

16    that support that position.

17        MR. LEUDDEKE:  This argument, Your Honor about

18    parties was only just raised ten minutes ago.  We had not

19    discussed this with the other side.  Offhand, I don't know

20    the titles of these 15 people.

21        Had we known that this was the argument the other

22    side was raising, we could have -- well, I'm sure we know

23    the titles of some of them.  I don't personally know the

24    title of Ariana Conroid.

25        THE COURT:  Do you have reason to believe that



1    Ms. Conroid is not the Chief Administrative Officer?

2         MR. LEUDDEKE:  I don't have reason to believe that

3    that title is incorrect.  I don't know that she still

4    holds it.  It's possible that she held it at some point.

5    I don't have a reason to dispute that.

6         THE COURT:  Okay.  All right.  Well, then this

7    exercise is fruitless.

8         Mr. Tate, I'm wondering if it would make sense to

9    send plaintiffs to the drawing board to figure out who

10   their clients are and then to come back and have this

11   discussion.

12        MR. TATE:  Your Honor, if -- if that makes sense, I

13   am happy to -- to work with them.  I can give them the

14   list of what I understand their title could be, and we can

15   continue (indiscernible) Your Honor.  In general, I think

16   the harder issue to pin down is who is right as far as

17   obligations to the --

18        THE COURT:  I agree.  I -- I -- I wholeheartedly

19   agree, but I think we still -- we need to know who is

20   being fought about; right?  Unless -- unless it's going to

21   be plaintiff's position that everybody is a volunteer and,

22   therefore, when they included the terms officer and

23   director and employee they knew that there were no such

24   people because other -- because I don't understand why --

25   why officers and directors and employees are included here

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

30

1    if -- if plaintiff is now going to take the position no

2    such -- no such thing:  We have no officers.  We have no

3    directors.  We have no employees.  Everybody is a

4    volunteer.

5         So maybe answer that for me, Mr. Lueddeke.

6         MS. BENTZ:  Your Honor, this is Tamany, and I'm

7    sorry.  I know you were directing it at Jason, but I think

8    maybe I can clarify --

9         THE COURT:  Okay.

10        MS. BENTZ:  -- our -- our position a little bit.

11        So our -- when we entered into the order and the

12   language that Mr. Lueddeke had been pointing you to, our

13   understanding that the standards for possession, custody,

14   and control would overlay all of this.  So while we had no

15   objection to -- to collecting things that were in our

16   possession, custody, and control, whether they belong to

17   an officer or a volunteer or an executive or anything like

18   that, what we thought was at the bounds of the order would

19   be the standard for possession, custody, and control,

20   which in the 9th Circuit is the legal ability to compel

21   it.

22        THE COURT:  I understand --

23        MS. BENTZ:  And so our position from -- from my

24   point of view at that time was fairly logical.  If you

25   were legally able to do it, we were willing to do it.  And



31

1    so, I don't think, you know, while I -- while I do stand

2    behind what I said about volunteer, I actually think our

3    position was a little bit of a setback, which is there's a

4    standard for possession, custody, and control.  The

5    section of the EDO references possession, custody, and

6    control and that we would not be compelled to collect

7    things that illegally we're not able to, because we

8    legally couldn't compel these people to give them to us.

9         THE COURT:  I think you're misreading this in so

10   many ways.  What 4.4 says is, so long as they are in the

11   possession, custody, and control of any of the parties,

12   which you defined, or at least you agreed, BCS agreed,

13   included officers, directors, employees, consultants.

14        So to the extent you have an officer and that

15   officer has possession, custody, and control of his or her

16   own documents, 4.4 indicates an agreement that this will

17   be prepared.  That's how I read 4.4.  And so that's number

18   one.

19        Number two, who -- name me one officer that was,

20   as you're saying, employed by Breaking Code Silence?

21        MS. BENTZ:  There was not a single officer who was

22   employed by Breaking Code Silence.

23        THE COURT:  So why would you include officer -- an

24   officer as a definition of party?

25        MS. BENTZ:  Again, because if there were to be



1    somebody who was in fact employed as an officer, you would

2    have some legal ability to collect their information as it

3    related to this dispute.

4         THE COURT:  Okay.  We're either going to have to

5    brief this issue, the parties are going to have to brief

6    this issue, or -- and -- and it's certainly up to you

7    folks, I don't -- you know, I'm not ruling on anything

8    today, but I am telling you that as I read this agreement,

9    Breaking Code Silence is under an obligation to collect

10   this information from its officers, directors, employees,

11   consultants, retained experts, and outside counsel.

12        That's what Breaking Code Silence signed on to do.

13   And so I'm having a hard time finding that it is okay,

14   that it's permissible, for Breaking Code Silence to now

15   take the position we don't have to collect anything from

16   these people.  We don't even have to try.  So --

17        MS. BENTZ:  Just a clarification, it is not our

18   position that we don't have to collect anything from the

19   people as the chart shows we've collected quite a bit.

20        THE COURT:  I'm looking at the gray area.  I'm

21   looking at all the gray area, which is the vast majority

22   of this chart.

23        Now, I'm not suggesting that everybody, all of

24   these custodians have every type of account that's listed

25   here, but I would beg to differ, Ms. Vinson, that the gray



1    area is not the vast majority.

2         So let me hear from Mr. Tate about where you want

3    to go with this because I think we may have exhausted

4    this, and it may be time to -- to file a motion to

5    compel.

6         MR. TATE:  That's kind of what I -- where I'm at,

7    Your Honor.  We've raised the issue many times that we're

8    not collecting from all the data sources.

9         THE COURT:  Okay.  I'm going to give -- okay.  Let

10   me just give plaintiff one final shot at this.

11        Are you unwilling to ask your officers and directors

12   and employees and everybody listed as party to provide for

13   you their account -- their -- any responsive documents

14   that they may have?

15        MS. BENTZ:  Your Honor, by responsive documents,

16   are you talking about every single source?  So, for

17   instance, I'd have to collect their personal Twitter

18   account, their -- you know, if they have a Zoom account,

19   their personal Zoom account, their Instagram logs?

20        I can run down the list, but by responsive

21   documents, is that what you were referring to?

22        THE COURT:  Well, we started -- as I understand it,

23   the parties have agreed that they are going to gather

24   documents from these sources.

25        Am I incorrect that then --  that there's a next

1   step, which is that they're going to be reviewed for

2   relevance and responsiveness?  Or is it that every

3   document that hits on the search terms from these data

4   sources is discoverable?

5         I think it's the former, but I just want to make

6    sure.

7         MS. BENTZ:  Our understanding is it's the former,

8   Your Honor.

9         THE COURT:  Mr. Tate, is -- is that your

10   understanding as well?  I think we discussed this at the

11   last IDC.

12         MR. TATE:  Yes, Your Honor, if you collect the

13   sources and we have agreed upon search terms, and then

14   only the relevant and nonpublic communications or

15   documents are produced.

16         THE COURT:  Okay.  So that -- okay.  So does that

17   answer your question?  Well, let me restate my question

18   then to be absolutely clear.

19         Is it -- is it plaintiff's position that they will

20   not ask -- forget -- forget whether they're required to,

21   because it sounds like that's something that you folks are

22   going to end up briefing but to try to avoid that -- that

23   they will not ask these custodians to provide documents

24   that hit on the search terms from whatever of these many

25   types of sources they may have.

1        I -- I'm not saying that they have every single one

2    of them, but are you folks just not even willing to ask

3    them?

4        MS. BENTZ:  So, Your Honor, if I thought that it

5    was a source that was -- was going to have responsive

6    information, for instance, there's a tab in here of the

7    things that are not required in the order that we

8    collected, because based on our interviews and discovery

9    in this case, it's -- it's -- we thought those sources

10   might have responsive information.

11       So if I thought any of these individuals, in any of

12   these accounts that we do not collect would have

13   responsive information, we would ask them.

14       The thing, though, that I want to at least convey

15   to Your Honor is that these accounts that you're talking

16   about, the personal accounts, not the BCS accounts, the

17   personal accounts, for instance, you know, we'll just take

18   Meg Applegate's WhatsApp chat logs.

19       Would actually not -- is not actually an account

20   that is at all at issue in this case; right?  Nobody has

21   made an allegation that Ms. Applegate's personal chat was

22   hacked, and so to produce a log from her personal account

23   is not going to result in responsive information.

24       THE COURT:  I don't even see WhatsApp on here, to

25   tell you the truth.  Where --

36

1          MS. BENTZ:  WhatsApp's chat log is in Column W.

2     If you scrolled a little -- scroll bar over.

3          I mean, let me just say, Your Honor, in total --

4          THE COURT:  (Indiscernible).

5          MS. BENTZ:  -- with that --

6          THE COURT:  I see it.  I found it.  I'm sorry.  Go

7     ahead.

8          MS. BENTZ:  Yeah.  So, in total, if you were to --

9     to do that, I believe we calculated you'd be collecting

10    from 520 different sources for this case.  The vast

11    majority of those are sources that have not been

12    identified as having or even likely to have responsive

13    information.  And so I -- I want Your Honor to understand:

14    This is not us taking a position that there's some

15    responsive or relevant information that we're -- that we

16    do not want to produce to the other side.

17         We've taken very much the opposite approach, in

18    this case, to -- to give them information that will be

19    responsive.  It turns out it's a lot more data than we

20    were expecting at the outset, but we have been working to

21    do that.

22         My concern is that the case not get bogged down in

23    our -- or delayed further in having to collect sources

24    that are not likely going to resort -- result in anything

25    relevant or fruitful for either side, and so that's my

```
1    concern.

2         I don't want to blanket, Your Honor, no, I'm not

3    going to ask anybody because if there were a reason why

4    somebody might have an account, responsive information or

5    material information to this dispute we, would definitely

6    ask, as a show.

7         The scope of sources here is -- is very broad,

8    and so a lot of them are not going to result in that.

9         THE COURT:  What -- on what basis do you say that?

10   Have you asked Ms. Applegate if she has a Facebook account

11   or a Twitter account or a Skype account or a Slack account

12   or a text message or Apple messages or computers or --

13   have you asked that?

14        MS. BENTZ:  Well, Ms. Applegate does not work for

15   us anymore?  So no, we have not -- or does not volunteer

16   with us anymore.  So no, we haven't asked her.

17        But what I'm saying is, nobody is accusing -- has

18   alleged that that Ms. Applegate's personal Facebook

19   account is at all -- is at all at issue here -- was -- was

20   -- was -- was accessed without authority or is one of the

21   accounts that the claims are based on here.  It is truly

22   an irrelevant account if she has one.

23        THE COURT:  According to you.

24        Mr. T. -- hold on, hold on, please.  You're making

25   -- Ms. Vinson, you're making statements about what you
```



1    deem to be relevant in this case as if that is the end all

2    and be all of this discussion, and it's not.

3         So I'd like to hear from Mr. Tate.

4         MR. TATE:  Yes, Your Honor, and -- and, well,

5    perhaps it's unfair to say that (indiscernible) is the

6    case.  Noelle Beauregard and Jesse (indiscernible) are the

7    two persons had investigated, the principle allegation

8    that my clients indexed BCS's website.

9         Both of those persons conducted the investigation

10   on their personal computers.  BCS itself, I understand,

11   doesn't have any computers except for one that it bought

12   for one person.  I've asked that those computers be

13   searched for documents, and what I'm seeing from BCS is

14   that they're not going to look on those computers for

15   documents because that is one of the questions in gray.

16        THE COURT:  Okay.  Let me -- let me --

17        MR. TATE:  My understanding --

18        THE COURT:  -- let me stop you there.  I -- I have

19   a question for you.  My -- my question was a little bit

20   more refined.  So let me try that again and hopefully,

21   it'll be clearer.

22        Do you believe or are you in any way interested in

23   what may be found in Meg Applegate's personal accounts,

24   any of them that she may have?  And if so, why?

25        Okay.  Why?



39

1      MR. TATE:  So, again, I think Meg Applegate has

2  probably -- not the best example, because she is not --

3  she was not at BCS at that time. But as a general

4  principle, if you go down the list I think there's

5  potential for each data source to have relevant documents,

6  and I'm happy to explain the relevance for each one of

7  those, if it's worth the Court's time, but the short

8  answer is yes.  I do believe that responsive documents can

9  be found for each of these categories.

10      THE COURT:  Okay.  So I'm trying to figure out what

11  we are -- how to handle the fact that plaintiff has not

12  asked Meg Applegate whether she has any of these types of

13  accounts, it sounds like.  But -- but plaintiff is saying

14  why should we?  There is nothing -- Meg Applegate can add

15  nothing relevant to this case and that's the question I'm

16  asking you, Mr. Tate.

17      Do you believe that Miss -- is it -- are we going

18  to fight over some -- are the parties going to fight over

19  something -- collecting documents from somebody who is

20  likely not to have anything relevant?  You have the -- you

21  have the right to do that.

22      The question is, let's -- let's get real about, you

23  know, how people are spending resources and -- and if you

24  could please answer my question as to Meg Applegate.  I'll

25  go down the -- the line in a minute, but just answer my

1   question regarding Miss -- Ms. Applegate, why -- why do

2   you believe that she may have documents that are relevant

3   to this case?

4        MR. TATE:  Sure, Your Honor.

5        My understanding is that Meg Applegate volunteered

6   for some period of time at BCS and that -- and she has

7   since left BCS and that she is working on -- at On Silence

8   now and one of the principle allegations in the complaint

9   is that my clients stole information from BCS through

10  these unauthorized access to use it for On Silence

11  benefits.

12       So I think that it's very likely that Meg

13  Applegate likely has text messages on her cell phone and

14  Facebook messages of others that are relevant.  I don't

15  know -- I have not specifically looked at her Twitter

16  data, but there's -- you know, there's potential that

17  she's tweeted about this or made messages to persons about

18  this.

19       Certainly, I would expect that (indiscernible)

20  she has Slack communications -- that she'd have Slack

21  communications that are relevant.  I -- I -- I do believe

22  that Meg Applegate is an important person in this case as

23  do I agree that every person on this list and that's why

24  we included them on the list.

25       THE COURT:  Okay.  Okay.  That's what I wanted to

41

1    understand.  All right.

2         Now, I'm going to turn back to plaintiff.

3         Have you asked these people if they have any of

4    these types of accounts that are named as the sources of

5    information or data that Breaking Code Silence has agreed

6    to provide?

7         MS. BENTZ:  I disagree with the premise that we

8    agreed to provide it for all the reasons we argued, but I

9    won't provide there.  But to answer your question, some of

10   them we have.  We talked to Dr. Gene, we talked to Mr.

11   Johnson.  We talked to Ms. Magill.

12        THE COURT:  Magill, those -- all these people

13   you've asked -- you've spoken with three people to find

14   out if they have any documents, if they have any of the

15   data sources, if you will, that are listed on --

16        MS. BENTZ:  That's correct, Your Honor, identified

17   through our interviews about were responsive information

18   about this (indiscernible) lies.  So they were not

19   arbitrarily picked.  They were picked based on our

20   discussions about who would have responsive information in

21   this case.

22        THE COURT:  Can you tell me why you did not ask

23   these other people?

24        MS. BENTZ:  Because --

25        THE COURT:  Is it based on some interview that you



1    did with them or if it was on interview -- based on

2    interviews that you did with other people, who for

3    whatever -- whatever it is that they said to you, led you

4    to conclude that these other people that -- Meg Applegate

5    and Noelle Beauregard and Ariana Conroid and everybody

6    except Vanessa Hughes Jesse Jensen, and Magill, Jennifer

7    would not have responsive documents?

8         MS. BENTZ:  So the answer to that is it was based

9    on our interviews of Mr. Jensen, Dr. Hughes, and Ms.

10   McGill.  I'm trying to think if we did any others.  I may

11   have talked to Ms. Beauregard early on in this case.  So

12   it was based on discussions with those individuals.  Some

13   of the individuals on this list are no longer with BCS, so

14   we wouldn't have talked to them, for instance, Meg

15   Applegate.

16        THE COURT:  Okay.  How about we take it a step

17   back --

18        MS. BENTZ:  Just to -- just to make my -- sorry,

19   Your Honor, just to make my statement clear, we did

20   collect the information from these custodians that was in

21   our possession, custody, and control, if that helps, Your

22   Honor.

23        THE COURT:  Yeah.  No, I -- I did see that Ms.

24   Vinson.  I'm concerned about the grayed out part.  So

25   that's what I'm focusing on right now and I think that is



1     Mr. Tate's concern so that's why I'm focusing on it.

2          So how about we just take a step back and make this

3     simple?  Why don't you go ask each of these custodians if

4     they have any of these data sources, and if they don't,

5     like, if any -- well, all -- no -- no one's going to be

6     able to say that they don't have any data -- any of the

7     data sources, because I imagine, everybody has a cell

8     phone account and everybody has an email account, but it's

9     altogether possible that somebody doesn't have a Facebook

10    account or a Twitter account or a Skype account or a Slack

11    account.

12         And so we resolve the issue just by getting --

13    getting those people to tell us what they have and what

14    they don't have.  Then step two becomes, okay, as to what

15    they have, is plaintiff willing to ask them to search

16    those for the hit terms -- for the search terms, or is

17    plaintiff going to take the position that they're not even

18    going to ask?

19         MS. BENTZ:  So I -- I have no problem asking if

20    they have these data sources, Your Honor, with the caveat

21    that I can't force them to respond, so I can't guarantee

22    that that will be a fruitful exercise.

23         I can also tell, Your Honor, that the search term

24    list is very voluminous.  And so I do not think it's

25    something that they can do without those devices being

1    forensically collected.  I just don't think that's -- I

2    want to be transparent with Your Honor.

3          THE COURT:  Sure.

4          MS. BENTZ:  I don't think that that's a realistic

5    solution to the issue.  I have no problem asking and

6    seeing what sources we can -- we can check off the list

7    because they're not -- they don't have those things, but

8    the next step of actually collecting it, I think is where

9    you get into this issue of spending resources on things

10   that are not likely to lead to responsive information.

11         THE COURT:  Okay.  But that's not the standard

12   anymore; right?  As of 2015, the standard is not likely to

13   lead to discoverable or admissible information; right?

14   It's -- what do you have that is relevant to the claims or

15   defenses?  And so it's a smaller subset, I would say, but

16   counsel's decision, unilateral decision, I might add, that

17   these people are unlikely to have information is not at

18   all close to meeting counsel's obligation in eDiscovery.

19         So we have to find a way to get this done, but

20   what you have mentioned  Ms. Vinson, is helpful

21   information.

22         And so, Mr. Tate, let me ask you this.  Are you

23   willing to refine your search terms for these custodians

24   to apply, or not?

25         If you're not, you're not, and then, you know, the



1    fight will be fought over whether -- whose obligation it

2    is to gather this information, given the eDiscovery order.

3         MR. TATE:  I'm always willing, Your Honor, to work

4    to narrow discovery.  It's (indiscernible) going to narrow

5    the search terms.  Eventually, we can come to an agreement

6    on that, but I'd be willing to work towards that effort.

7         THE COURT:  Okay.  And then at the end of the day,

8    there's always the subpoena power; right?  And so, even if

9    Ms. Vinson is unable to get their cooperation, they're

10   going to have to cooperate one way or the other, assuming

11   Mr. Tate is going to issue subpoenas.  I don't know.  But

12   if -- if subpoenas are issued, they're going to have to

13   cooperate.

14        And so I'm just wondering if there is an incentive,

15   Mr. Tate, that you can give to these people or that you

16   can create so that these people will have an easier time

17   to search for -- to search their devices and their data

18   sources for things that are responsive, at least as a

19   starting point, and that then --

20        MR. TATE:  Yes, ma'am.

21        THE COURT:  -- will eliminate Ms. Vinson's concern

22   that it's way too difficult for them to do.

23        MR. TATE:  I'm -- I'm happy to have those

24   conversations, Your Honor.

25        THE COURT:  Okay.  And so how about then we do



1    this.  How about, Ms. Vinson, you go to each of these

2    people, and then, of course, you'll have to convince Mr.

3    Tate that you've done this; right?  But you go to each of

4    these people and you say, hey, please tell me if you have

5    an email account or a Google Drive or a cell phone or a

6    Facebook account.

7         Let's start with that.  And if they do, then let's

8    address your next concern, Ms. Vinson, which is it's too

9    difficult for them to search, because if -- if Mr. Tate is

10   willing to make it easier, then doesn't that resolve the

11   problem?

12        MS. BENTZ:  Well, not necessarily, Your Honor.

13   Somebody has to review the information that hits on the

14   search term --

15        THE COURT:  Oh, okay.

16        MS. BENTZ:  -- to produce it.  So there's still a

17   burden issue here where I -- I will tell you I believe the

18   burden of that exercise for these accounts outweighs the

19   likelihood because of all the information.

20        THE COURT:  Well, but --

21        MS. BENTZ:  But --

22        THE COURT:  -- you don't have that information to

23   support a burden argument yet; right?  Because you don't

24   know whether these people have accounts or not.

25        So okay.  Fair enough.  So that's the third hurdle



1    that has to be overcome here -- right? -- is number one,

2    do they have these accounts; number two, if they do will

3    they be willing to give it to you or under subpoena, you

4    know, whichever way they want as to particular search

5    terms.

6         I imagine, you know, Mr. Tate, may be more -- may

7    be more willing to reduce the scope of the search terms if

8    they're willing to cooperate, but if you have to issue a

9    subpoena, who knows; right?  So there's kind of an

10   incentive for them to cooperate.  And then depending on

11   the number of documents that may turn up, I mean,

12   according to you, Ms. Vinson, they're very unlikely to

13   have responsive information; right?

14        So even -- even, according to your words, the

15   burden is probably not going to be very high; right?

16        MS. BENTZ:  No. I disagree with that, because the

17   search terms are broad.  So my -- my concern is that he

18   has search terms like confidential, for instance, is a

19   search team.

20        THE COURT:  Mm-hmm.

21        MS. BENTZ:  And that you will collect a lot of

22   totally irrelevant information that has to be reviewed.

23        THE COURT:  Okay.  It sounds like you've now done

24   an about face, and now you're -- before you were saying,

25   based on the information we've gathered, these people are



48

1    very unlikely to have any information but now you're

2    saying, wow, they're likely to have a lot of information.

3         MS. BENTZ:  No, Your Honor.  First of all, I --

4    what I'm saying is, yeah, if you're going to collect from

5    all of this long list of sources from this long list of

6    custodians --

7         THE COURT:  Uh-huh.

8         MS. BENTZ:  -- then -- then you are going to have

9    -- I think we calculated 520 sources that you are

10   collecting from.  You're then going to -- none of which

11   were identified in any scope in discovery in this case as

12   likely to have relevant information.  Then maybe we can

13   narrow the search terms to something meaningful, and that

14   would perhaps, perhaps -- and you're right, what the

15   search terms would hit on would be miniscule, and then

16   there's not a burden.

17        My concern is that the search terms as they are

18   all resulting in information that's not relevant to this

19   dispute, and you're running them on accounts that haven't

20   been identified as relevant.  So that this is a burden

21   that's not likely to -- that is outweighing the benefit of

22   -- of doing it.

23        THE COURT:  All right.  Well, I'm going to set

24   aside your about face because it -- it doesn't seem to

25   matter if you're willing to work with the proposal that I

49

1   am making, which is let's go ask them.  Why don't you ask

2   every single one of them, get a declaration from them as

3   to what of these accounts they have or they don't have,

4   and then that -- so -- so that can go parallel to your

5   meet and confer discussions with Mr. Tate regarding the

6   revision to the search terms, as will be applied only by

7   these people to their -- these -- these accounts that are

8   grayed out in your table so that by the time you get

9   information from these people as -- these custodians as to

10  what data sources they have, hopefully, you will have

11  narrowed down the search terms of Mr. Tate and have

12  reached an agreement on that and then that search can be

13  run by each of these people, and then we can talk about

14  burden.

15       I think it's premature to have a discussion about

16  burden right now, because if I go by what you said

17  earlier, they're very unlikely to have anything.  So I

18  don't see the burden, but let's cross that bridge when we

19  get to it.

20       How is that as a plan as a starting point for this

21  process?  Mr. Tate?

22       MR. TATE:  That is fine, Your Honor.

23       THE COURT:  Okay.  Ms. Vinson?

24       MS. BENTZ:  So as a starting point we will be do

25  it, Your Honor.



50

1          THE COURT:  Okay.  Okay.  So how long do you think

2     it will take -- can you get a declaration from each of

3     these people by May 1st?

4          MS. BENTZ:  Well, again, some of them are out of

5     my control.  So I cannot guarantee that.  I did -- what I

6     would like to do if Your Honor is amenable to it is

7     basically prepare a document that could be sent to them

8     where they could indicate the relevant information about

9     the account.

10          So if they have an account, you know, and we can

11     collect those forms from them, so to speak, I know you

12     reference a declaration, but I'm hoping maybe we could

13     streamline it as a (indiscernible) and maybe I can have

14     them sign the form too if Your Honor would like.  I can

15     certainly say we can get that form out to them this week

16     and ask for them to return it by the 1st.

17          THE COURT:  I -- I think that that would be a good

18     starting point.  I think that's a smart -- making it easy

19     for them rather than difficult; right?  The question would

20     be, do you have one or more of each of the below and then

21     you list it and you do yes or no; right?  That would be --

22     that would be a good starting point.

23          You know, if you're willing to get them to sign

24     it, why not just get it under oath?

25          MS. BENTZ:  I mean, I -- I can -- I don't know,



51

1    you know, I have no idea what that -- is more or less

2    likely to respond to me if I'm asking them that, to be

3    honest, Your Honor, but I'm happy to do it that way, if

4    you would like for us to.

5        THE COURT:  Well, Mr. Tate, do you have a

6    preference -- do you care?

7        MS. TATE:  I -- I don't care, Your Honor.

8        THE COURT:  Okay.

9        MR. TATE:  I will take counsel at her word, if

10   there's --

11       THE COURT:  Okay.

12       MR. TATE:  -- (indiscernible) persons.

13       THE COURT:  Okay.  So Ms. Vinson, if you think that

14   asking somebody to find something under oath reduces the

15   chances that they'll respond to you then -- and if Mr.

16   Tate doesn't care, then just get them to sign it and

17   that'll be that.

18       MS. BENTZ:  Okay.

19       THE COURT:  Okay.  So that's step one.

20       While that is happening in parallel form, the

21   parties will work on search terms, a revision of the

22   search terms to be applied by these individuals,

23   hopefully, or under subpoena, whatever their choice is.

24       And Mr. Tate, I don't want to suggest that you

25   would limit the search terms if you had to get this new

1  subpoena.  The limitation or the reduction of the search

2  terms or the narrowing of the search terms or making them

3  easier to apply, as I see it, is kind of an incentive for

4  them to work together with counsel rather than to force

5  you to issue a subpoena, which at the end of the day, will

6  probably cost them a lot more to respond to.

7         I leave it to the parties to work that out.  Okay.

8  So that's a good starting point, and I think we can move

9  on to the next issue, which, unfortunately, I believe that

10 I did not capture because I did not save it and my

11 document closed on me, but I have my law clerk, who has

12 been taking notes.  But Mister -- do you have it, what the

13 second issue was?  No?

14        Mr. Tate, can you tell us what the second issue

15 was?

16        MR. TATE:  I believe this is probably the third

17 issue, but if --

18        THE COURT:  Okay.

19        MR. TATE:  -- if you look at the chart, in rows,

20 as an example, rows 7 and 8, you get the list of the

21 documents that have been reviewed.

22        THE COURT:  Oh.  Okay.

23        MR. TATE:  So 7 documents -- no, 8.

24        THE COURT:  Okay.

25        MR. TATE:  And ((indiscernible) an example appears



53

1    that they've reviewed no more than 3,400 documents or

2    3,300 documents that they've reviewed, but for some reason

3    they haven't produced --

4         THE COURT:  Right.  I see that.  I see that.  Okay.

5         So, Ms. Vinson, do you have an answer to that?

6    What's happening?  Why is it that the documents have been

7    reviewed but not produced yet?

8         MS. BENTZ:  We do.  Mr. Kiker is going to answer

9    that question, Your Honor.

10        THE COURT:  Okay.  Thank you.

11        MR. KIKER:  Sure.  Thank you, Your Honor.

12        As we discussed earlier, we are reviewing documents,

13   encoding them as responsive and then producing the

14   responsive documents.  So the difference is documents that

15   were coded not responsive.  So -- and this is as defense

16   counsel has indicated they are doing likewise, we review

17   the total population, tag them for responsiveness, and

18   produce responsive documents.

19        THE COURT:  Okay.  So -- so -- okay.

20        So does that answer your question, Mr. Tate?

21        MR. TATE:  I think it raises more questions than it

22   answers, Your Honor.  So for instance, Mr. Jensen and Ms.

23   (indiscernible) testified that they communicated regarding

24   the allegations against my client on Slack.  If we look

25   (indiscernible), it indicates BCS reviewed 1,148 documents

54

1  and --

2      THE COURT:  Uh-huh.

3      MR. TATE:  I assume that they had reviewed it and

4  those 1,148 were coming to me.  Now it sounds like they

5  reviewed it and I'm not going to get any of them.  That's

6  more concerning -- I'm more concerned now than I was 35

7  minutes ago.

8      THE COURT:  Understood.  So can I hear from --

9      MR. KIKER:  Your Honor, this is Dennis Kiker.

10  That is simply a snapshot of the statement I made this

11  search over the weekend.  It was not (indiscernible)

12  review responsive documents had not yet been produced.  So

13  this is an indication of trying to show how many were

14  coded responsive and non-responsive.  It's just showing

15  the current state and the total number of documents, how

16  many we reviewed.  In the case of Slack, we reviewed all

17  of them, but they have not gone through the production

18  process of the responsive documents.

19      THE COURT:  Okay.  So that's different from what

20  you said earlier.  Okay.

21      MR. KIKER:  No, Your Honor, it's a -- and I

22  apologize if I confused folks with my chart.  Let me try

23  to again.  So what I tried to do is show, okay, we ran our

24  search terms.  The green was the defendants, and I've

25  given you the total number of documents based on search

1      terms.   A snapshot in time, as of this weekend, I

2      identified how many of those documents have been reviewed

3      to date. And in the case of Slack, we reviewed all of

4      them.

5           The third line is how many of those documents have

6      we produced to date.  In the case of Slack, we haven't

7      produced any yet because they've not gone through the

8      production process.  Once that's done, a number would be

9      populated in row 8.  And then row 9 will remain zero

10     because there's none remaining and time would remain zero

11     because there's no time left to review.

12          So that's what -- that's what I'm -- and each of

13     these rows is consistent in that regard of total search

14     term hits, how many have we reviewed, how many have we

15     produced, how many do we have left to review, which is

16     remaining, and the time we estimate to complete that

17     review.

18          THE COURT:  Okay.  So remaining means left to

19     review, not the difference between reviewed and produced?

20          MR. KIKER:  That is correct, Your Honor.

21          THE COURT:  Okay.  So -- okay.

22          So when are you going to produce the document --

23     the Slack account documents?

24          MR. KIKER:  They're in queue to be produced this

25     week, Your Honor.



56

1          THE COURT:  Okay.  This week.  Okay.

2      When are you going to produce -- I guess everything

3  else has been produced.  Slack is -- it looks like

4  everything has been produced.

5          MR. KIKER:  I think there are -- there are items

6  in there where there are documents that are into -- to be

7  produced for a number of different items in there.

8  Particularly, in the -- I'm trying to find out where we

9  have -- we do have documents in queue.  We're continuing

10 review, even today, additional documents will have been

11 reviewed.  And so we're -- we're making our best effort to

12 get a production out each week with the documents that

13 have been completed that week.

14         And then, as we've indicated in the separate

15 review plan chart, we are pivoting this week to focus --

16 the Court suggested on individual custodians in order so

17 that we can get those out.  So far, we've been reviewing

18 in not -- not in that fashion, in a different fashion.  So

19 we'll be pivoting, but we're doing some to continue to

20 make production sequence.

21         THE COURT:  Okay.  So I -- okay.

22         So this chart is misleading then.  This chart is

23 not what it says to be, unless you're going to tell me

24 that I've misunderstood and I'm happy to be convinced --

25 convinced of that, but so let's look at the big numbers.

1    Of the 305 CloudWave documents, it says 305 were produced.

2    Have they been produced?

3         MR. KIKER:  Yes, Your Honor.

4         THE COURT:  Okay.  Of the 26 Google Admin Logs,

5    have they been produced?

6         MR. KIKER:  Yes, Your Honor.

7         THE COURT:  Okay.  Of the 32 AdWords logs, have

8    they been produced?

9         MR. KIKER:  Yes, Your Honor.  Everywhere you see a

10   value in produced, it means the documents have, in fact,

11   been produced.  With Slack, you see a zero there because

12   they have not yet been produced.

13        THE COURT:  Oh, okay.  So I misunderstood.  I

14   thought that you just said that the row produced means

15   either they were produced or they were in queue to be

16   produced.

17        MR. KIKER:  No, I apologize, Your Honor.

18        THE COURT:  Okay.

19        MR. KIKER:  And again, I apologize for misstating

20   what I've said is that row 8 represents documents that

21   have been produced, they're out the door and they're in

22   defendant's possession.

23        Row 7 are the documents that we've completed review

24   of.

25        THE COURT:  Mm-hmm.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1       MR. KIKER:  And of those ones we've completed

2   review, some or all will be produced based on

3   responsiveness or, in the case of audit logs, and those

4   sorts of things we're just producing about -- we're --

5   we're just giving them everything in the logs, because

6   we're not scanning them or we're not keyword searching

7   them or anything; we're just turning them over.

8       THE COURT:  Okay.  With respect to the documents

9   from custodian Breaking Code Silence, not everybody else,

10  the only thing that's left to be done is produce the 1,148

11  or whatever will be produced others this set of 1,148

12  documents; is that correct?

13      MR. KIKER:  Yes, that's correct.

14      THE COURT:  And that will happen this week?

15      MR. KIKER:  That is correct.

16      THE COURT:  Okay.  Mr. Tate, do you have any

17  concerns with that?

18      MR. TATE:  If I can ask some questions.  Maybe I'm

19  still not understanding the chart.

20      As I'm understanding where it says to reviewed

21  5,609 review now on Google chat but you've only produced

22  2,272 that there's -- I'm not expecting any more

23  production that, you know, the difference between those

24  are just non-responsive documents?

25      MR. KIKER:  Non-responsive and billboards, yes.



1      MR. TATE:  And then the PayPal audit log, as

2   indicated there, you reviewed one and produced zero?  Is

3   that another one where I should be expecting something or

4   you've decided that that's not relevant, for some reason?

5      MR. KIKER:  No.  Thank you for pointing that one

6   out.  I -- I neglected that one.  That is -- the -- the

7   PayPal logs, audit logs on the Slack data are the last two

8   items for Breaking Code Silence that are queued for

9   production.

10      MR. TATE:  Then the Signal chat logs, you've

11   indicated that as -- and this might open another can of

12   worms here, but you've indicated that one is something

13   that is an MA, but I've heard testimony from multiple

14   witnesses now that -- that BCS's leadership used Signal to

15   discuss the allegations of this case.

16      MR. KIKER:  And again, we're -- we're focusing

17   right now on rows 6 through 10, which is custodian,

18   Breaking Code Silence, which is an entity that doesn't

19   have a mobile device or a Signal or anything like that. So

20   it can't produce Signal data because it doesn't have --

21   you know, it's an entity.

22      The individual custodian's data from Signal would

23   be a separate discussion, and I think we've -- we've

24   talked about that one in the gray box, but for Breaking

25   Code Silence, the entity, it doesn't have a Signal

60

1    account.

2          MR. TATE:  Okay.  And I think I'm understanding

3    Signal (indiscernible) take us back to another argument

4    that we previously had.

5          And then I don't understand the TikTok or the

6    Twitter.  Your -- your footnotes indicate that BCS doesn't

7    have those accounts, but one of the central allegations of

8    the complaint is that my clients illegally accessed those

9    accounts.  I'm struggling to understand that.

10         MR. KIKER:  Yeah.  Our understanding is that your

11   clients control those accounts.  We don't have access to

12   the -- to them or their audit logs or anything like that.

13         MR. TATE:  So it's not that they don't have them;

14   it's that they can't access them?

15         MR. KIKER:  Well, they're not ours.  They were

16   created by your clients and they maintain -- maintained in

17   the control of your clients.

18         MR. TATE:  Can I get that in stipulation so I can

19   use it in my motion for summary judgment?

20         MS. BENTZ:  No.  We continue to (indiscernible)

21   from our collection perspective.  We can't collect from

22   it.  We don't have administrative authority to the

23   account.

24         MR. TATE:  Well, I mean, (indiscernible) having

25   all of this.  When it's an allegation against my clients.



1    it's all BCS's property, but when I want you produce the

2    documents, it's no longer BCS's property and you don't

3    have access to it.

4          THE COURT:  So -- so what is it?  Does BCS have a

5    Twitter account?

6          MS. BENTZ:  Your Honor, the allegation is we had

7    one.  We did -- the entity did not -- it was not set up

8    with an entity email.  It was set up with an individual's

9    email and that when individuals left in December of 2021,

10   they did not turn over the administrative credentials to

11   the account to BCS.  So while we maintain the digital

12   assets should belong to the entity BCS, BCS does not

13   currently have administrative credentials that would be

14   required to collect those logs from the account.

15         THE COURT:  Okay.  So I think that what Mr. Tate is

16   saying is that your footnote 5 says BCS does not have a

17   Twitter account.  Is that an incorrect statement?

18         MS. BENTZ:  Yeah.  It could be more nuanced, Your

19   Honor.  I think we were trying to make it clear from a

20   collection perspective.  We did not have access to an

21   account from which we collect that log.

22         THE COURT:  Okay.  And is that the same for --

23   what's Number 6?

24         Now this is raising all sorts of questions about

25   your table and the representations you're making to the



1   Court.  What about a Skype account?  Is it -- is it

2   inaccurate that BCS does not have a Skype account?

3        MS. BENTZ:  No.  I -- I do not think BCS has a

4   Skype account.

5        THE COURT:  Okay.  So 6 is accurate, 5 is not.

6        Are there any other of these footnotes 1 through

7   26 that are not accurate?

8        MS. BENTZ:  I think 24 with the TikTok account is

9   the same issue as Twitter.

10       THE COURT:  So 24 is not an accurate statement?

11       MS. BENTZ:  It -- it should be the same as

12  (indiscernible) which we don't have administrative access

13  to the account to collect from it.

14       THE COURT:  Okay.  Is there any other 1 through 28

15  that is not an -- an accurate statement?

16       MS. BENTZ:  To my knowledge, no.

17       THE COURT:  Okay.  Mr. Tate, does that satisfy

18  you?

19       MR. TATE:  If I can talk about one more of these

20  things, though.  (Indiscernible) 8.

21       I'm concerned.  I sent an email to opposing

22  counsel indicating that I don't believe that the Slack

23  audit logs have been produced, notwithstanding what this

24  chart says, and I've asked -- you know, we can avoid this

25  whole thing if he'd just tell me where the Bates number is



1     that has Breaking Code Silence on that.

2          THE COURT:  Okay.  Can you folks answer that

3     question?  What are the Bates numbers to the four produced

4     documents in the category of Slack audit logs taken from

5     custodian Breaking Code Silence?

6          MR. KIKER:  Your Honor, this is Mr. Kiker.  I don't

7     have those at my fingertips, but I'm more than happy to

8     send those Bates numbers over to counsel.

9          THE COURT:  Perfect.  Thank you.  Okay.

10         Mr. Tate, anything else that is of concern to you

11    with respect to custodian Breaking Code Silence?

12         MR. TATE:  With respect to custodian Breaking Code

13    Silence, no, Your Honor.

14         THE COURT:  Okay.  All right.  Well, that -- this

15    is very helpful.  Thank you to both parties on that.

16         I guess the next thing is, we -- we have the same

17    -- I guess the same issues appear to arise with respect to

18    reviewed and produced and remaining for all of these

19    custodians.

20          So it looks like I'm trying to match this to the

21    other table -- hold on -- Ms. Applegate remaining -- okay.

22    So -- so these numbers on this table as to what's

23    reviewed, produced, and remaining is what was transferred

24    over to the other table by custodian with the proposed

25    review completion dates and depo dates; is that right?

1          MR. KIKER:  Yes.  That is accurate.

2          THE COURT:  Okay.  So that's very helpful.

3          So we know that what's in the gray box of the first

4     table and the outcome of obtaining the information from

5     each of these custodians is going to change what is also

6     in the table of what's remaining and left to do and -- and

7     therefore the completion dates.

8          So Mr. Tate, I guess the question for you right

9     now is where would you like to go from here?  I don't know

10    that -- how the order of these depositions has come about,

11    and I don't know that other than wanting to take Ms.

12    Hughes's deposition and Ms. Magill's deposition as the

13    30(b)(6) of Breaking Code Silence.

14         I think you mentioned that that should go first,

15    in your mind, and I -- that's fine, whatever you folks

16    agree to.  What are your thoughts regarding the order of

17    these other custodians?

18         MR. TATE:  Your Honor, my preference would be to

19    do BCS first, do Hughes and Magill and then we're probably

20    going to have to do Jensen again because we didn't have a

21    lot of the documents and then evaluate from there.  I --

22    my hope would be that I don't have to depose many of these

23    other custodians.

24         THE COURT:  Okay.  Okay.

25         So we have a June 1 discovery cut-off.  And I guess

1    the question is what are these -- at least these three

2    people; right? -- Hughes Magill, and Jensen -- the

3    proposed date for -- I guess let's not talk about

4    Hughes right now because there -- there's work to be

5    done on that, but the proposed date for Magill would be

6    sometime in the middle of July, which, as plaintiffs

7    well know, is past the discovery cut-off, but it

8    appears that that might -- some extension might be

9    necessitated because there's 34,598 documents still to

10   be reviewed and produced and there may be more once she

11   -- or -- or is her answer going -- going -- is her

12   answer to the question do you have documents from any

13   of these data sources, is it possible that you're going

14   to gather more documents from Ms. Magill, depending on

15   what the answer is, if she answers yes to any of the

16   data sources?

17        MS. BENTZ:  We may, because although we have

18   selected from personal sources with Ms. Magill, they were

19   the sources that we had identified.  So, for instance, I

20   don't -- if she has a personal Facebook, we don't have

21   that log.  If she has a personal Slack account, I don't

22   have that.  So there may be additional sources there.

23        THE COURT:  Okay.  Here's what we should do.

24   Here's what -- how -- I think the parties are going to

25   have to keep moving as though June 1 is still the date



1    because I'm not convinced that that date should be changed

2    yet, especially if Mr. Tate is saying that there is a

3    possibility he may not need to depose some of these other

4    custodians, because then the question becomes just how

5    quickly can we get Ms. Magill's deposition?

6         I mean, Mr. Tate, her deposition originally was

7    set for May 1.  I think it's still set for May 1, per my

8    last order.  What are your thoughts about that and the

9    discussion that we've had so far today?

10        MR. TATE:  Yes, Your Honor, one of the unknowns

11   about it is how many more documents are -- are going to be

12   reviewed evidence of this.  But at least, according to the

13   chart we're looking at, BCS is indicating that it has

14   about 47,000 more documents to review which they --

15   DLA Piper assigned a document review team of

16   (indiscernible) persons and still get that done in less

17   than two weeks.

18        And so my proposal would be to have them produce

19   those -- you know, can the Court (indiscernible) a date

20   certain on when those documents are going to be produced

21   by and then we can take (indiscernible) that shortly

22   follow.

23        (Indiscernible) the last time you see, I am not

24   overly interested in dragging this out any longer than has

25   to be so that my clients can move on with their careers.



67

1          THE COURT:  Okay.  Well, let me ask you this.  With

2     respect to re-deposing Mr. Jensen -- well, we don't -- we

3     still -- he may have more documents.  That's the problem;

4     right?  We right now really can't do anything.

5          So okay.  Here's what I -- here's what I think we

6     should do.  It looks like Breaking Code Silence needs to

7     go back to the drawing board and figure out what these

8     custodians have and how this changes -- how this could

9     possibly change, right, these numbers.  And then I think

10    we need to regroup and figure out how this discovery is

11    going to go forward with the limited time that's left and

12    go from there.  But right now, it's all very much -- it's

13    all a hypothetical question, right, to try to figure out

14    where to go from here.

15         I am a little bit disturbed that Breaking Code

16    Silence knowing that we have a June 1 discovery cut-off

17    has put dates out until August 4th.  So that's not going

18    to work, but I'd like to have a better sense of what we're

19    working with.

20         Mr. Tate, you -- you have no interest in taking any

21    of these deponents -- any of these custodians' depositions

22    just as to the documents that you have received and based

23    on the possibility that you may receive more from the

24    column at least with what is known now that is remaining?

25         MR. TATE:  As to Gene something, I've already



1    deposed Mr. Cook.  I'm obviously not going to depose

2    another client, Ms. McNamara, and the other individuals I

3    do not believe we need that.  Our plan is, at this moment,

4    is to depose them.  Obviously, in the production of

5    documents that could change.  But at this moment I'm not

6    anticipating Ms. Conroid or Ms. Kershaw for this -- or

7    Applegate.

8         THE COURT:  What about Herwig (phonetic)?

9         MR. TATE:  Not at this moment.  You know, again,

10   that could change.  At this moment I don't have any

11   intention to -- to depose (indiscernible).

12        THE COURT:  Okay.  So these -- and -- and Mr.

13   Cook, you're fine with what you have?  You don't -- you're

14   not going to request a second deposition, given that you

15   weren't given documents?

16        MR. TATE:  Your Honor, (indiscernible) that could

17   change, but at the moment, I'm pretty content with Mr.

18   Cook's deposition (indiscernible).

19        THE COURT:  Okay.  All right.

20        Okay.  Well, I think that what we need to do is we

21   need to regroup and we can do all of this on May 1st for

22   Ms. -- for defendant or, sorry, for Ms. Hughes; we need to

23   get that information from her doctor.  Otherwise, you

24   better start, you know, thinking about the fact that she's

25   going to get deposed for seven hours per code.



1          And are -- are there any other limitations?  Let me

2     -- let me go back to Ms. Hughes.

3          So it's your understanding then, Ms. Vinson -- I

4     just want to have clarity on this and I apologize if

5     you've already said it -- but is it your understanding

6     that the limitation of one hour on, one hour off, one hour

7     on per day is something that Ms. Hughes made up or that

8     her doctor said?

9          MS. BENTZ:  So I don't know the answer to that

10    because there was a conversation between her and her

11    doctor, which I was not a part of.

12         THE COURT:  Okay.

13         MS. BENTZ:  I know it came out of a conversation

14    that they had, but I do not know, you know, the -- the

15    exact answer to the question.

16         THE COURT:  Okay.  All right.

17         Well, I guess, Mr. Tate, the issue for you becomes

18    if something were to be brought to us, to the Court and

19    therefore to you with a doctor's opinion substantiated,

20    but in answering all the questions I asked, by the way,

21    the -- that -- that, in fact, Ms. Hughes really needs --

22    her deposition needs to go forward an hour on, an hour

23    off, an hour on, for three and a half days, then I guess

24    the question is, what is your position and are there any

25    concerns that this raises for you?

1       We don't have to talk about it now.  We can talk

2   about it, unless you want Ms. Vinson to start thinking

3   about it.  I'm happy to have you put that information in

4   front of Ms. Vinson so that they can start thinking about

5   it.  It's up to you.

6       MR. TATE:  I'm not sure what can be done at that

7   point, so I think it's best that we see what the actual

8   limitations as prescribed by the doctor are.  I said this

9   before: I a hundred percent mean I have no interest in

10  endangering the health --

11      THE COURT:  Sure.

12      MR. TATE:  But I'm not a doctor, and I don't know

13  what she can and cannot do.

14      THE COURT:  No.  Understood.  You said that.  You

15  put that on the record last time and I -- and I heard you

16  last time.  I don't think anybody has an interest in

17  endangering her health.  On the other hand, she is a key

18  witness and I'm just not yet convinced that -- that there

19  are any limitations at this time that are suggested by her

20  doctor because it seems like her doctor has now changed

21  her mind.

22      So in any event, enough said on that.  You folks

23  have my requests on what to do and what I need to see by

24  May 1st.  And then let's -- let's figure out this gray

25  area before depositions start going forward.  Although Ms.



1    Magill actually is being deposed as the PMQ; right?  She's

2    a 30(b)(6).

3        Do you -- do you need her personal documents for

4    this 30(b)(6) deposition, Mr. Tate?

5        MR. TATE:  I -- I'd imagine so.

6        THE COURT:  Her -- her personal documents?

7        MR. TATE:  Well, I guess, depending on the term

8    personal documents.  At a minimum, I would need her

9    personal email because, as I've mentioned, Mr.

10   (indiscernible) instructed her to stop using her BCS email

11   and start using her personal.

12       THE COURT:  Yeah.  Okay.  All right.

13       Well, let's see -- let's see what -- where we go

14   from here.  Let's gather the information that needs to

15   inform the missing information in the gray cells, and

16   let's meet up again on May 1st and let's see how we can

17   move this forward.

18       MS. BENTZ:  Your Honor, just to -- this is Tamany

19   with the question.  So is Ms. Magill's deposition is not

20   moving forward on May 1st?  That's how I understand this,

21   but I want to make sure.

22       THE COURT:  That's a very valid question.

23       So Mr. Tate, it sounds like that's what -- that's

24   what you would like at this point?

25       MR. TATE:  That -- that is correct, Your Honor, and



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1   I don't know if it's even worth the discussion, but I --
2   one of the issues on the docket today that I understood
3   we're going to discuss why Ms. Magill couldn't have been
4   deposed during the entirety of the month of April.  We
5   didn't discuss it.  I don't know if it's too late in the
6   day, but now it's -- that simple conversation that just
7   needs to be teed up for next week.
8           THE COURT:  But what if -- what -- happy -- this
9   is -- this is your request for informal discovery
10  conference, and I'm happy to discuss whatever subjects you
11  would like, Mr. Tate, but what is the benefit of that
12  discussion, because by then April will have been done.
13          MR. TATE:  I agree, Your Honor.  Probably not
14  happen at this point.
15          THE COURT:  Okay.  All right.
16          Let's go -- oh, let me ask you this, just -- just
17  to make sure -- and, in fact, I think I'm going to order
18  this.
19          Ms. Vinson and -- and everybody on the BCS team
20  for the deponents Hughes, Magill, Jensen, McNamara, please
21  bring their availability calendars, not just what you
22  would like for their deposition dates to be but what they
23  are unavailable for between May 1 and June 1.
24          MR. TATE:  Your Honor, Ms. McNamara is my client.
25  Did you mean to --



1          THE COURT:  Oh.

2          MR. TATE:  -- include her on that list?

3          THE COURT:  I'm sorry.  I'm sorry.  You're right.

4     You're totally right, sorry.

5          So as to Ms. Hughes, Ms. McGill, Mr. Jensen -- I

6     guess that's it -- bring their availability calendars; in

7     other words, every day that is available between now and

8     June 1st.

9          I'm wondering if Mr. Jensen -- we might be able to

10    take care of his deposition right away because he has very

11    few documents to review, left to review, depending on how

12    many he may have personally, but I'm just wondering if it

13    makes sense to have Mr. Jensen deposed for a little bit

14    more time, before Ms. Magill.

15         I don't know.  I'm just kind of thinking out loud.

16    I'm trying to keep this moving so that we don't run into

17    problems or have to extend the discovery cut-off for too

18    long, because I do want this case to continue to move

19    forward and it sounds like both sides want it to continue

20    to move forward. So all of that can be discussed when we

21    meet again on May 1st.

22          Is there anything else, Mr. Tate, that we should be

23    discussing today while we have everybody here?  That is --

24    and I will limit it to the subject of your request for

25    informal discovery conference.

74

1        MR. TATE:  No, Your Honor, the only caveat happens

2    when we figure all this out, we'll probably need to adjust

3    it -- adjusting the discovery cut-off date.  I would also

4    request that we adjust my MSJ date, but that is -- we're

5    not going to know that until we know, when we review the

6    documents, the sum of it all.

7        THE COURT:  Yes, absolutely.  I'm not going to

8    conduct an extended discovery cut-off and not give you

9    time to use that information.  So it -- I would just -- I

10   would extend all of the dates that make sense to extend,

11   if we do extend the discovery cut-off.

12       MR. TATE:  Thank you, Your Honor.  That's all I

13   have to say.  Thank you for your time.

14       THE COURT:  All right.

15       Ms. Vinson, anything else for -- that you would

16   like to discuss while we're here that -- that relates to

17   the informal discovery conference that is before me now,

18   the two of them?

19       MS. BENTZ:  No, Your Honor.

20       THE COURT:  Okay.  When would it be helpful to

21   know -- what I don't have -- I'm looking at this chart one

22   more time, and I apologize, but it looks to me like this

23   chart with the review completion date I don't -- I see

24   that the review completion date from Ms. Hughes would be

25   May 1st, and then you -- the next column offers Ms. Hughes

1    depositions and then from Ms. Magill is June 30th, and

2    then the next column offers her depo dates, available depo

3    dates.

4         I don't see completion dates for any of the

5    other -- for Mr. Jensen or Mr. -- or any of the others. I

6    just see depo dates.  And so I'm a little bit confused as

7    to what might have happened with their -- what looks to be

8    missing is their -- the completion date for the review of

9    these documents, and it seems that we were --

10        MR. KIKER:  Actually, Your Honor, yeah, this is Mr.

11   Kiker, I apologize.  What you're actually seeing are the

12   completion dates.  Those individuals, Jensen, McNamara,

13   Conroid, we haven't inserted deposition dates for them.

14   Those are going to be the subject of discussion with

15   counsel.

16        THE COURT:  Okay.  All right.

17        Well, I will tell you that these dates really don't

18   make sense to me.  So let's -- let's look at these again.

19   I don't understand how it could take you a week to review

20   907 documents for Mr. Jensen.  That -- that -- that makes

21   no sense to me at all.

22        MS. BENTZ:  Well, Your Honor, to -- to be fair, we

23   -- we prioritize (indiscernible) using Ms. Magill.  I want

24   to make sure that that's clear.  Your Honor might recall

25   requesting that we prioritize the witnesses that were



1    still remain to be deposed so that we can get documents

2    out and -- and depose them.

3         THE COURT:  All right.

4         MS. BENTZ:  So that's the only reason that those

5    dates are like that.

6         THE COURT:  So what you're saying is it would take

7    you a week to review 907 documents?

8         MS. BENTZ:  No.  What we're saying is -- is that

9    we would prioritize the 4,013 documents that are remaining

10   for Hughes; right?  And then there's about 34,500 for

11   Magill, but those would actually be seen to review before

12   we ever got to the 907.

13        THE COURT:  That's -- that exactly what I'm --

14   that's exactly --

15        MS. BENTZ:  But Ms. Magill --

16        THE COURT:  -- that's exactly what I'm saying.

17        MS. BENTZ:  -- would be thrown in there.

18        THE COURT:  That's exactly what I'm saying.  You

19   finish reviewing Magill on June 30th, and you won't finish

20   reviewing 907 documents for Jensen for another week.

21   That's the week that I'm talking --

22        MS. BENTZ:  Well, sorry to interrupt, Your Honor.

23   Review and produce, basically.  So they will be out the

24   door 2.5 within that week.

25        MR. KIKER:  And that number also includes



77

1   McNamara's 695 below, and both of them will be done by the

2   end of the week.  We could, you know, if we're doing it in

3   this order, which we will, we would finish Jensen's before

4   McNamara's.  So technically, things would be done before

5   July 7th from both of them, or just for clarity, put on

6   the schedule for end of that week.

7          THE COURT:  I see.  I see.  Okay.

8          MR. TATE:  Can I just give my two cents here?

9   There's obviously maybe many more documents coming, but

10  the 47,000 that BCS knows about, like I said, I think that

11  that could be done in two weeks, and I -- I don't see any

12  reason why the Court can't, you know, direct BCS to do it

13  within two weeks' time.

14         THE COURT:  We -- yeah.  We haven't crossed that

15  bridge, Mr. Tate, and I don't disagree with you.  I think

16  August 4th date makes no sense.  I'll just leave it at

17  that.

18         And so yeah, there's 47,000 documents is not earth

19  shattering.  So anyway, we can talk about that next week.

20  I would -- I would request that Breaking Code Silence take

21  a realistic view of the 47,000 documents and -- and really

22  look at its resources.

23         I just don't -- I don't understand a review of

24  47,000 documents taking until August 4th, but I would -- I

25  would suggest that you be a little bit more realistic,

1    because otherwise you're leaving me no choice but to pick

2    the dates myself, which I will do, but I just -- it seems

3    to me that it would make more sense for you folks to just

4    get realistic.

5           Also, I don't understand what August 4th is,

6    because it's a row that goes with the 47,352, which is

7    nothing more than a total.  So I don't know what August

8    4th is.

9           MR. KIKER:  (Indiscernible) discussed initially,

10   but not talked about today, but BCS has to go through and

11   fix this confidentiality and produce duplicates --

12          THE COURT:  I see.

13          MR. KIKER:  (Indiscernible).

14          THE COURT:  I see.  No, you're right.  I see that

15   at the top, at the header, confidentiality downgrade.

16          Okay.  Okay.  There's -- okay.  But -- so you're

17   going to wait until the very -- so BCS is contending that

18   it needs to wait until the very, very end of its

19   production to go through its confidentiality?

20          It seems to me that as to the documents that still

21   need to be produced, which is 47,352, you wouldn't have a

22   need to downgrade anything if you -- if BCS is already

23   agreeing that it has over -- over designated documents as

24   confidential, but with that, I think that you're talking

25   about the 48,702; right?  So what --

1      MS. BENTZ:  Sorry for that confusion, Your Honor,

2   We're not talking about the 47,362.  The only thing that

3   is being down -- that needs to be downgraded will be

4   initial to production.

5      THE COURT:  Which is 48,702?

6      MS. BENTZ:  No.  The 47,362 is what's remaining to

7   be reviewed.

8      THE COURT:  Exactly.  So those are not going to

9   have a problem with over designation?  I'm trying to

10   understand, isn't it then the 48,702 that you folks need

11   to review and decide whether you're going to downgrade on

12   the confidentiality designation?

13      MS. BENTZ:  No, I believe it's actually less than

14   that, Your Honor, because it was just the first two

15   productions.

16      THE COURT:  So how many are we talking --

17      MS. BENTZ:  Mr. Kiker -- Mr. Kiker can weigh in if

18   he has a number.  I'm not sure what the number of those

19   productions were.

20      MR. KIKER:  Yeah.  I don't have that figure

21   immediately, Your Honor, but it's -- it's a smaller

22   number.  The reason for postponing it until the end has to

23   do with the technology that we're using for this.  When we

24   do that downgrade production, and most -- most of that has

25   been reviewed already -- the challenge is that we have to

80

1    reproduce everything.  We can't just reproduce those

2    individual documents and provide an overlay for counsel.

3    We have to reproduce the entire two productions, and it's

4    just a resource constraint that's going to take time away

5    from getting through the 47,000.

6            So our suggestion was, at the end of the process,

7    unless there's some need for those downgrades before then,

8    at the end of this process, we would then re-run those two

9    volumes of productions and at the same time essentially

10   re-duplicate the produced data set by bringing back the

11   documents for -- that are -- that we had reduplicated.

12           So we produce all that once, and both of those

13   require a substantial reproduction of previously produced

14   documents.  So we're trying to save resources, put that at

15   the end, and minimize the impact to the ongoing review.

16           THE COURT:  Okay.  But isn't Mr. Tate supposed to

17   be taking depositions before, according to your schedule,

18   at least, before August 4th?  So isn't this forcing Mr.

19   Tate to take depositions with documents that perhaps

20   should not be designated as confidential?

21           MR. KIKER:  They would -- that's true, but it

22   doesn't prevent him from using them in depositions

23   nonetheless.  I mean, there's no -- (indiscernible) the

24   documents we've produced, whether confidential or not, are

25   available for use in deposition.

81

1        THE COURT:  Uh-huh.  And then it's just a matter of

2    getting them de-designated before they have to be used in,

3    for example, motion for summary judgment; right?

4        MS. KIKER:  Exactly.  And if there -- if there --

5    if there are individual documents that counsel wants to

6    address today, or next week, or if he's going to file a

7    motion, you know, in a few weeks, more than happy to

8    address those individually.  I'm just trying to avoid

9    re-running those two relatively large productions because

10   that will take resources away from -- from getting to the

11   documents that are still in queue.

12       THE COURT:  Isn't -- isn't the work that's done to

13   do that -- isn't it automated?  Isn't that the reason that

14   you're -- you're saying it's going to take so long,

15   because it's the technology is holding you back, which to

16   me says that the process is automated, not done by a

17   human.

18       MR. KIKER:  Yeah. I wish that were so there.  There

19   -- there are project managers and technologists who

20   actually run the software and do the work behind the

21   scenes to execute on the coding decisions that we make.

22   So it does, in fact, take resources away from ongoing

23   activities.  And it -- it's one of those things -- it's a

24   matter of trying to apply our resources where we hope that

25   they're needed most at this time.

1          If defense counsel feels that he needs those

2    downgrade productions before he can, you know, and delay

3    some of the document review and future productions, we're

4    willing to, you know, take that direction.  Our assumption

5    was that wasn't the case, since all of the documents are

6    available for use now and -- and then we could just do the

7    one large reproduction at the end of the matter, but we're

8    willing to have that conversation.  We're trying to

9    construct this to minimize disruption going forward.

10          THE COURT:  Okay.  All right.

11          Mr. Tate, do you have any concerns that you think

12    will not be adequately handled for further meet and

13    confer?

14          MR. TATE:  No, Your Honor.  I don't think -- it

15    looks like we're going to have this solved by issues, but

16    I think we ought to pick this back up next week and having

17    the parties discuss with them, maybe internally, what is

18    the right approach.

19          THE COURT:  Okay.  Okay.  Well, that makes sense

20    to me as well.

21          So thank you, Mr. Kiker, for your explanation on

22    that.

23          All right.  Anything else before we go off the

24     record?

25          MR. KIKER:  No, Your Honor.  Thank you for your



1    time.

2         THE COURT:  All right.

3         MS. BENTZ:  No, Your Honor.  Thank you.

4         THE COURT:  Thank you, folks.

5         Hold on.  Hold on.

6         Oh, yes.  Ms. Vinson, I don't have -- do I have an

7    answer for when I -- maybe it's in an email?

8         Do I have an answer for when Ms. Hughes returns

9    from her cruise?

10        MS. BENTZ:  Oh, yes.  I believe it was in the

11   email, Your Honor.

12        THE COURT:  Okay.

13        MS. BENTZ:  I want to say it's July 4th, but I

14   thought it was an email we sent.

15        THE COURT:  I think so.  I think so.  Okay.  Okay.

16   So I think we now have what we need.

17        Thank you folks very much.  I appreciate all your

18   time on this, and I appreciate your hard work and your

19   willingness to be flexible so that we can keep this moving

20   forward.

21        We will set a May 1 -- what did we say? --  May 1

22   at 2:00 p.m. or 3:00 p.m., sorry, and we'll go as long as

23   we need to go to keep this moving.

24        So thank you, folks, and I will speak with you

25   again on May 1st, and Court is adjourned and we're off the

1    record.

2                    (Proceedings concluded.)

3                        -o0o-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    TRANSCRIPTIONIST'S CERTIFICATE

2        I certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in

4     the above-entitled matter.

5

6

7     *Lynn Hill*                          June 20, 2023

8     _____        _____

9     Transcriber                          Date

10

11    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

12    /s/Ann Bonnette_____

13    ANN BONNETTE, CSR. NO. 6108, President

14    Huntington Court Reporters and Transcription, Inc.

15

16

17

18

19

20

21

22

23

24

25