1

1      UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3
                                ) Case No. 2:22-cv-02052-MAA
4    BREAKING CODE SILENCE,      )
                                )
5              Plaintiff,        )
                                )
6    vs.                         ) Los Angeles, California
                                )
7    KATHERINE MCNAMARA, et      ) Tuesday, April 18, 2023
     al.,                        )
8                                )
               Defendant.        )
9

10

11    TRANSCRIPT OF TELEPHONIC INFORMAL DISCOVERY CONFERENCE
            BEFORE THE HONORABLE MARIA AUDERO
12                UNITED STATES DISTRICT COURT

13

14   Appearances:              See next page.

15   Court Reporter:           Recorded; Telephonic (XTR)

16   Courtroom Deputy:         Narissa Estrada

17   Transcribed by:           Jast Felix
                               Huntington Court Reporters
18                               and Transcription, Inc.
                               1 South Fair Oaks Avenue
19                             Suite 200
                               Pasadena, California  91105
20                             (800) 586-2988

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
                (800) 586-2988

2

APPEARANCES:

| | |
|---|---|
| For the plaintiff<br>BREAKING CODE<br>SILENCE: | TAMANY VINSON BENTZ, ESQ.<br>-and-<br>JASON LUEDDEKE, ESQ.<br>-and-<br>DENNIS KIKER, ESQ.<br>DLA Piper LLP US<br>North Towers<br>2000 Avenue of the Stars<br>Suite 400<br>Los Angeles, California  90067<br>(310) 595-3300 |
| For the defendant<br>KATHERINE MCNAMARA,<br>et al.,: | M. ADAM TATE, ESQ.<br>-and-<br>CATHERINE ANN CLOSE, ESQ.<br>Julander Brown Bollard<br>9110 Irvine Center Drive<br>Irvine, California  92618<br>(949) 477-2100 |
| | ADAM J. SCHWARTZ, ESQ.<br>Adam J. Schwartz, Attorney at Law<br>9445 Wilshire Boulevard<br>Suite 300<br>Beverly Hills, California 90212<br>(323) 455-4016 |

3

| | |
|---|---|
| 1 | Los Angeles, California; Tuesday, April 18, 2023 |
| 2 | --o0o-- |
| 3 | THE COURT:  Please come to order.  This United |
| 4 | States District Court is now in session.  The Honorable |
| 5 | Maria Audero, United States Magistrate Judge, presiding. |
| 6 | Calling case number CV 22-02052, Breaking Code |
| 7 | Silence, v. Katherine McNamara, et al. |
| 8 | Counsel, please state your appearance, beginning |
| 9 | with the plaintiff. |
| 10 | MS. BENTZ:  Tamany Vinson Bentz from DLA Piper |
| 11 | for the plaintiff. |
| 12 | THE COURT:  Good morning, Ms. Bentz.  No, good |
| 13 | afternoon. |
| 14 | MS. BENTZ:  Good afternoon, Your Honor. |
| 15 | MR. LUEDDEKE:  Good afternoon, Your Honor.  This |
| 16 | is Jason Lueddeke of DLA Piper on behalf of the plaintiff. |
| 17 | MR. KIKER:  Good afternoon, Your Honor.  This is |
| 18 | Denis Kiker with DLA Piper on behalf of the plaintiff. |
| 19 | THE COURT:  Good afternoon, Mr. Kiker, and I'm |
| 20 | sorry. I think I just made a mistake in my notes here. |
| 21 | Okay.  Ms. Bentz, sorry, I put you in the wrong |
| 22 | column.  I know that means nothing to you other than I'm |
| 23 | trying to keep track of everybody's names. |
| 24 | Okay.  All right. |
| 25 | MS. BENTZ:  Quite all right, Your Honor. |



4

1          THE COURT:  Okay.  So all of the plaintiff's

2    counsel have made their appearances.  If we could now turn

3    to defendants.

4          MR. TATE:  Yes, Your Honor.  This is Adam Tate

5    on behalf of the defendants.

6          THE COURT:  Good afternoon, Mr. Tate.

7          MR. TATE:  Good afternoon.

8          MS. CLOSE:  Good afternoon, Your Honor.

9    Catherine Close appearing on behalf of the defendants.

10          THE COURT:  Good afternoon, Ms. Close.

11          MR. SCHWARTZ:  Good afternoon, Your Honor.

12    Adam J. Schwartz for the defendant.

13          THE COURT:  Okay.  Good afternoon, Mr. Schwartz.

14          So we are here on two informal discovery

15    conference requests.  We're going to take the first one.

16    We'll do the deposition, and then the other one will be --

17    will follow, and it will be regarding the production of

18    documents.

19          But here's what I understand.  There are two

20    issues in what I will call informal discovery conference

21    number 2, which is the deposition of Vanessa Hughes in

22    both her representative PMQ capacity for Breaking Code

23    Silence as well as her personal capacity and then the PMQ

24    deposition of Jennifer McGill.

25          So let's talk about Ms. Hughes.

1  My understanding is, from what I've read, and I'm only

2  repeating to you what's already in the paper.  I just want

3  to make sure we have a good record of it, because your

4  request for informal discovery conference doesn't make its

5  way to the docket.

6          So Ms. Hughes, according to defendant, is the

7  most important Breaking Code Silence witness.  She

8  originally was designated as the deponent on 40 of the PMQ

9  topics. She had some kind of a condition that required

10 some special attention during the deposition.

11         Ms. Hughes was deposed for four hours, in

12 keeping with her doctor's limitations.  And even though it

13 was done under her doctor's care and apparently for a

14 short period, four hours, she still had to be admitted to

15 the hospital.

16         I am told as a result -- question mark on that,

17 we'll come back to it in a moment -- but defendants still

18 want to depose Ms. Hughes, but apparently her doctor is

19 saying she cannot be deposed, not now, not ever.  And so

20 we have a problem.

21         Now, plaintiffs are explaining that she

22 suffers from a chronic illness and that her doctor says

23 she just simply can't participate in another deposition

24 without significant risk to her and to possible

25  hospitalization.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1          And so plaintiffs have proposed that she be

2    deposed by written questions, or welcomes other solutions

3    that may be discussed today.

4          And the flip side of the coin of what defendant

5    is asking, which is to compel her deposition, is to seek a

6    protective order.

7          So since this is defendants' request, did I

8    generally get this right?

9          MR. TATE:  I think so. I would only add that we

10   did suggest our own alternatives.  We suggested that she

11   be deposed under a doctor's care, or if that didn't work,

12   that she just not be permitted to testify in the action,

13   whether that's at trial or by declaration.

14          And we also asked -- you know, it's our

15   understanding that Ms. Hughes has now left the country and

16   she's going to be gone for three months traveling

17   internationally.

18          We felt it was reasonable to ask for a doctor's

19   note saying that she's healthy enough to travel

20   internationally but not to be deposed, and that proposal

21   was also rejected by BCS.

22          THE COURT:  You asked the question that I was

23   going to ask.  Did you say she has now left the country or

24   she has not left the country yet?

25          MR. TATE:  No.  (Indiscernible) recently took a



1    deposition of one of the other PMKs and he confirmed that

2    she is gone, she's on a cruise, but she's still doing

3    business and appearing via Zoom, apparently conducting

4    work on her cruise.

5              THE COURT:  Okay.  Okay.

6              Let me hear from plaintiff on this, plaintiff's

7    counsel.

8              MS. BENTZ:  Thank you, Your Honor. This is

9    Tammy Vinson Bentz for the plaintiff.

10             So Ms. Hughes -- I can confirm that Ms. Hughes

11   has left the country.  She is on a Holy City tour.  Her

12   husband is a pastor of a church, and this is part of his

13   education and his job.

14             Her symptoms, her flare-up, she has MS.  Her

15   flare-up of MS was triggered by the deposition, the

16   four-hour deposition.  She spent five days in the

17   hospital.

18             Our concern is that we not have a situation

19   where we obviously trigger another significant flare-up of

20   her symptoms.

21             Our proposal was that she provide only written

22   evidence in this case, written testimony in this case.

23             I can tell you she would not be a witness who

24   would testify live at trial, but we would like her to be

25   able to be a witness that could submit declarations.



1          I believe both parties intend to file motions

2     for summary judgment.

3          THE COURT:  Okay.  So I chuckle because I was a

4     little bit surprised by the fact that she is unable to

5     do -- to fix her deposition but she is able to travel.

6          And now I'm even more surprised by the fact that

7     she apparently is working and is appearing via Zoom and

8     conducting work apparently via Zoom.

9          So what about that, Ms. Bentz?

10          MS. BENTZ:  Sure.  So, first of all, a bit of

11     clarification.  BCS is a nonprofit, and it is a volunteer

12     organization.

13          So to say that she is working, just understand

14     she's not an employee of BCS.  She may be responding to

15     emails as a volunteer of BCS, but BCS does not employ her.

16          I want you to understand the context of saying

17     that she's doing work does not mean that she's doing a

18     9:00 to 5:00 job for BCS.

19          THE COURT:  What is she doing?

20          MS. BENTZ:  She's a volunteer.  She's a member

21     of the board.

22          So if there's a board meeting, I believe she

23     would attend the board meeting.  If there are questions

24     about funding or grants, she's responding -- I would

25     believe she's responding to those.



1        She responds to questions about the litigation.

2   She does respond to questions via email -- via email.

3        THE COURT:  She doesn't work via Zoom?  Is the

4   defendant misinformed?

5        MS. BENTZ:  I don't know that.  I -- the only

6   thing I know that has happened by Zoom, Your Honor, is a

7   board meeting, which was less than an hour.

8        So she can go -- I believe she can do something

9   an hour at a time.  She did attend a board meeting that

10  was less than an hour.

11       I'm not a -- you know, I'm not a doctor.  My

12  understanding from her doctor is there are concerns that

13  the stress of applying at a deposition will trigger more

14  in that symptom.

15       THE COURT:  Okay.  So I guess I draw on my

16  knowledge of the ADA and all of the leave laws.  One of

17  the things that strikes me is the Courts never allow

18  conclusory statements from doctors saying she's too sick

19  to work.

20       And I understand you're saying she doesn't want

21  to work, but she's too sick to work.  But what is welcomed

22  is actual information about, like, what is it exactly that

23  she can't do?  Because sometimes, you know, you can work

24  around these problems.

25       For example, if, you know, she can't sit in a



1    room with a ring light -- and I'm making this up, okay,

2    and I'm -- so I'm not implying this is the case, but if

3    she can't sit in a room with a ring light facing her for

4    more than an hour and a half at a time, the answer would

5    be, okay, so you set up the ring light so it doesn't face

6    her, or she doesn't use the ring light, or it doesn't go

7    for an hour and a half.

8         But to say that somebody is not going to respond

9    to her legal obligation because a doctor is simply saying

10   she's not going to do, it strikes me as a little bit odd

11   and conclusory and not -- off the top of my head, not a

12   proper basis for allowing somebody to not have to fix

13   their deposition.

14        I'm not aware of any case law on this.

15        Are you, Ms. Bentz?

16        MS. BENTZ:  I don't have a specific case to

17   cite.  I can clarify, the issue is stress and stress

18   triggering MS symptoms.  And that is the concern.

19        THE COURT:  So what exactly is it that she

20   cannot do?

21        MS. BENTZ:  She cannot engage in a level of

22   stress that's going to trigger her MS symptoms.

23        So to give Your Honor a bit of context, when we

24   first addressed this, the reason we had the doctor set up

25   boundaries which was two hours on the record, an hour



1    break, and two hours on the record to manage her level of

2    stress and that clearly didn't work, that clearly didn't

3    work.  Because she spent five -- she lost her vision, she

4    lost some cognitive capabilities, and she spent five days

5    in the hospital getting treatment.

6              THE COURT:  Uh-huh.

7              MS. BENTZ:  So obviously we know for a fact that

8    that was too much.

9              What we're all struggling with is, is there any

10   amount that she's going to be able to do, or is anything

11   going to trigger five days in the hospital?

12             THE COURT:  And what does the doctor say?

13             MS. BENTZ:  The doctor has said any amount will

14   -- may trigger five days in the hospital, may trigger

15   another flare-up.

16             THE COURT:  And is the defendants' position that

17   they don't believe this?  I'd like to hear from the

18   defendant.

19             MR. TATE:  I don't want to go as far as say I

20   don't believe this because I am not a doctor.

21             I don't even know what the symptoms of MS are.

22             I will note that the last (indiscernible)

23   declaration that we received with no foundation to me is

24   insufficient, and I am just struggling very mightily with

25   the idea that it is safe for her to travel internationally



12

1    but not sit for a deposition, especially when I offer to

2    do the deposition with the doctor present, if necessary.

3            I don't want to put her in the hospital.  That's

4    not what I'm trying to do here.  But she's one of the most

5    important witnesses of this case, and I can't -- the

6    situation is that my clients have to prove the negatives.

7    My clients are alleged to doing stuff they strongly

8    believe they did not do.

9            And if she is one of the persons who has

10   knowledge of the stuff that my clients apparently did, I

11   need to know what she knows so that I can bring my motion

12   for summary judgment.

13           THE COURT:  All right.  Well, I get it.  I

14   understand your case.  I understand the allegations. I

15   understand very much, certainly.

16           Well, we have to find a way to do this because

17   she -- I think I read in the Rule 26 Report isn't she the

18   first named witness by plaintiff?

19           So clearly, she's important here.  And I also

20   struggle with the question of how come it's okay for her

21   to be away from her doctor for three months but she can't

22   sit for, I don't know, a half-hour deposition?

23           I mean, I just don't -- I guess it's not that I

24   don't believe it.  I am not convinced by what is being

25    said to me, that all efforts have been made to have



1   this person comply with her legal obligations.

2           And again, I am not aware of any case law that

3   supports the position that on conclusory alleg- -- not

4   allegations but on a conclusory declaration that I

5   understand this (indiscernible).

6           So, you know, I don't have it in front of me but

7   that nothing can be done to make this deposition go

8   forward; right?

9           I mean, have the parties explored?  You know,

10  even though, I mean, there's obviously Wi-Fi, and she's

11  able to communicate from the cruise; right?

12          So why couldn't a deposition that lasts, I don't

13  know, half an hour at a time go forward?  Why is that?

14          Why -- what is it that the doctor is saying that

15  she is unable to sit for half an hour and yet she's able

16  to sit for a board meeting and talk about this case, as

17  Ms. Bentz has said, for an hour?

18          MS. BENTZ:  To be clear, Your Honor, I did not

19  say that.  I just want to clarify.  I said she was

20  responding to emails about the case.

21          I did not say -- I did not say that she attended

22  a board meeting for almost an hour and talked about the

23  case. I just want to be clear.

24          THE COURT:  Okay.  Thank you for that

25  clarification.



14

1        How do we get this deposition to happen, in a

2   sense?

3        MS. BENTZ:  It sounds like I need to speak again

4   with her and with her doctor and see if there are some

5   bounds on which it can go forward.

6        THE COURT:  I think that's a really good idea.  I

7   think that, at the very least, the parties, you know, or

8   the defendant and the Court has to be convinced that it is

9   really an impossibility.

10        And then we can figure out -- obviously, you

11   know, you have no intent of having her testify, nor would

12   she under my -- in my trial, can I imagine, who knows

13   about what facts could be presented otherwise, but can I

14   imagine a circumstance where she would be allowed to not

15   be deposed but then show up at trial.

16        So it seems like that's not going to be an

17   issue, but to defendants' concern, we're not going to

18   decide that today.  That would be a pretrial decision.

19   Okay?

20        MS. BENTZ:  So that's understood, Your Honor.  I

21   will say that to extent that the answer from the doctor is

22   no, there are no bounds under which she could move

23   forward, then we would -- we would provide more specifics

24   on that in a declaration.

25        I can't say what -- I guess what I'm saying is,



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

15

1  as I sit here today, I can't say what that answer is going

2  to be, but I hear what Your Honor is saying.  If that's

3  the answer, then it needs to be more built into the

4  rationale for that and more information from the doctor.

5          THE COURT:  All right.

6          MR. TATE:  Any reason why that declaration could

7  not come from whatever doctor admitted her to the

8  hospital?  It seems one of the problems I have with the

9  declaration is that I just don't understand the foundation

10  for it.  It seems to me, you know, being candid, that she

11  went to her primary physician or a friend and got the

12  declaration, not the person who actually saw the symptoms

13  of her being in the hospital for five days.

14          MS. BENTZ:  So since you're not a doctor nor an

15  expert on MS, nor am I, I think it is 100 percent

16  incorrect to say that she went to a friend.

17          She did go to her treating physician.  I do not

18  think you can say that that treating physician was not

19  aware of her symptoms when she was in the hospital.

20          THE COURT:  But would it be possible to get a

21  declaration from the doctor who treated her?

22          MS. BENTZ:  So I guess what I'm saying is I'm

23  not sure that that declaration is the most appropriate way

24  to set forth what she can and can't do.

25          A doctor that treats her in the hospital is not



1   her neurologist nor her treating physician who treats her,

2   in essence, on a regular basis.

3            If it were the same person, then that wouldn't

4   be an issue, but I'm not going to commit that the

5   declaration should come from a specific doctor if the

6   answer I'm going to get from the doctor is no, there's a

7   better person to gauge this for you, and that's the person

8   who's been dealing with her disease for a long period of

9   time.

10           THE COURT:  Well, and I guess it will turn on

11  whether he can lay the appropriate foundation.

12           MS. BENTZ:  Correct.

13           THE COURT:  And that remains to be seen.

14           But my guess is if she had MS for some

15  appreciable amount of time, she probably can, but, you

16  know, we'll see.  We'll see.

17           Okay.  Well, I think more work has to be done on

18  this.  And, you know, my guidance to human sense is, you

19  know, we're going to have to find out exactly what she can

20  and can't do and why. And I'm just not sure that we're

21  taking up a position, a conclusory position, is going to

22  carry the day for you folks.

23           So she comes back in three months; right?

24           MR. TATE:  We will be out of discovery cut-off

25  by then.



1          THE COURT:  Don't worry about that. I can

2    control that.

3          When does she come back, Ms. Bentz?

4          MS. BENTZ:  In June, Your Honor.

5          THE COURT:  Do you have a date?

6          MS. BENTZ:  I do not have the date at my

7    fingertip.

8          THE COURT:  Okay.  Can you get that?

9          MS. BENTZ:  I can, yes.

10         THE COURT:  Okay.  All right.  Let's start a

11   list.  And I think we're going to have to circle back on

12   some of this stuff.

13         All right.  Date of return.

14         Okay.  And I guess I would need to know what she

15   is able to do on this cruise ship that is okay for her MS

16   symptoms and she is protected while she's on this cruise

17   ship but does not allow her -- but still her condition

18   doesn't allow her to sit for a very brief deposition, or

19   brief amounts of time at a time.

20         Mr. -- I guess, let me ask Mr. -- defendants'

21   counsel, how much time do you think you need?  You've

22   already taken four hours; you only have three left.

23         MR. TATE:  Your Honor, to be fair, it was two

24   two-hour stints.  I think that we probably took about

25   three and a half hours for the depo.

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    We probably need, at the minimum, to be able to

2    do her individually.

3    (Dennis Kiker with DLA Piper has left

4    the conference.)

5    MR. TATE:  Okay.  Sorry about that.

6    Your Honor, my understanding is that her

7    representative --

8    (A participant has joined the conference.)

9    THE COURT:  Mr. Kiker, is that you, Mr. Kiker?

10   MR. KIKER:  Yeah.  My apologies.  I apparently

11   lost Internet, so I've called in on my mobile device.

12   THE COURT:  No problem.  Thank you so much for

13   calling back in, and we'll pick up where we left off.

14   The amount of time needed, that's left and

15   needed, I don't know, four hours.

16   MR. TATE:  Yeah.  So my understanding is that

17   all her PMK topics have now been reassigned and it's

18   fulfilled.

19   So I don't think that I would need to give her a

20   PMK capacity.  But the questions I did ask her so far were

21   all in her PMK capacity, so I do believe that I need the

22   full seven hours to ask her questions in her individual

23   capacity.

24   THE COURT:  Okay.  Did you subpoena her?

25   MR. TATE:  No.  She is a director of the



1      company.

2              THE COURT:  So she doesn't need to be subpoenaed

3      because she is the director of defendant.  Okay.

4              Okay.  Well, let's see what we can do.

5              I mean, she needs to be, if she can be, if

6      there's any way that she can be, she has to be deposed.

7              So her deposition has been noticed.  She left

8      the country with that deposition notice out there without

9      permission of the Court.

10             And so I'm not sure that that's well taken, but

11     setting that aside for the moment, and only for the

12     moment.

13             MS. BENTZ:  Your Honor, I'd like to respond to

14     that.  It is not that she just ignored the deposition

15     notice.  She did sit for a four-hour deposition.  Her

16     defendants' request -- they started with the PMQ topics.

17     They weren't even at the time sure they would need

18     individual testimony from her once they talked to her

19     about the PMQ topics.

20             So I don't want Your Honor to think she just

21     ignored a deposition notice.  There was a plan for her to

22     be deposed in her PMQ capacity and, if necessary, in her

23     personal capacity before she left.

24             She just ended up being hospitalized and could

25     not do those things.

1          But she did know she had more time of deposition

2     left and yet she left the country.

3          Well, I mean, your comment made me think you

4     believe she just ignored it, which is not actually

5     accurate.

6          THE COURT:  No, no, no.  I never said ignored.

7     I don't believe I said ignored.  If I did, that wasn't

8     what I meant, but I'm pretty sure I didn't say ignored.

9          What I said was she left the country in light of

10    the -- despite the fact that she had a deposition notice

11    pending without permission of the Court.

12         I believe that's what I said.  But nevertheless,

13    I'm not saying she ignored it.  I understand she sat for

14    two sessions of deposition.

15         MR. TATE:  One session, Your Honor.  Two hours

16    of interim break and then two hours --

17         THE COURT:  I see.

18         MR. TATE:  And then, Your Honor (indiscernible).

19         THE COURT:  Okay.  Well, I'm not convinced that

20    she should not be compelled to finish, at the very least,

21    the personal part of her deposition.

22         I do believe that, you know, the law is very

23    clear that plaintiff, each party, can set, can designate

24    the deponent for -- of their choosing for any of the

25    30(b)(6) topics, and so certainly GLA's -- I'm sorry,



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    Breaking Code Silence has the ability to say, you know,

2    now Ms. McGill is going to be the deponent on those

3    topics.

4            And I don't think that's an issue here.  It

5    sounds like defendant understands that.  The question

6     then becomes the need for her testimony in her

7    personal capacity.

8            So there is apparently a deposition notice out

9    there for her, and she has some legal obligations.  So --

10   and so far with what I have been told, and, you know, who

11   knows what we're going to hear from the doctor, but so far

12   from what I have been told I am not convinced that she

13   should not sit for this deposition.

14           So certainly, Ms. Bentz, if you want to provide

15   some case law that supports your position, along with

16   information from -- additional information from the doctor

17   that has adequate foundation, then I think, you know,

18   that's a different conversation.

19           But as based on what I have seen --

20           MS. BENTZ:  Procedurally -- sorry to interrupt,

21   Your Honor.  I just wanted to ask procedurally, if the

22   issue is that there are constraints that can be put in

23   place and she can be deposed, I understand we'll work with

24   defendants on working that out.

25           If the answer from the doctor is no, she can't



1    be deposed, do I understand correctly our next step should

2    be a motion for protective order and proving that up to

3    Your Honor?

4              THE COURT:  Yes, but my goal here is to try to

5    resolve these things informally so that, especially I

6    understand perhaps the DLA Piper is doing this pro bono,

7    but nevertheless resources are being spent on this and so

8    will defendants' resources be spent on this and so my goal

9    is to try to resolve as much as we can without very

10   expensive motion practice.

11             So since right now we don't have the information

12   that is necessary for us to continue this discussion, then

13   I will not allow a Rule 37 or a motion for protective

14   order, I guess Rule 26, until we close the loop on this

15   informally.

16             MS. BENTZ:  Understood.  Thank you for

17   clarifying that, Your Honor.

18             THE COURT:  No.  Of course.

19             Of course.  Anytime.  Okay.

20             So let's move on to -- well, when do you think

21   you can get the information that we need to move this

22   forward this time?

23             MS. BENTZ:  I am hopeful that I can actually

24   move this forward this week and have it by early next

25   week.



```
1              THE COURT:  Okay.  How about we continue this
2     particular -- we set another informal discovery conference
3     to close the loop on this for Monday, the 24th?
4              How about we do 3:00 p.m.?  Does that work for
5     everybody?
6              MR. TATE:  That works for the defendant, Your
7     Honor.
8              THE COURT:  For defendant?
9              MR. TATE:  Yes.  That works, Your Honor.
10             THE COURT:  And can you please circulate the
11    declaration from the doctor so we can take a look at the
12    foundation and what he's saying, and defendant can decide
13    what position it's going to take.
14             So can you circulate that, let's say, by 10:00
15    a.m. on Monday the 24th?
16             MS. BENTZ:  Yes.  I will do my best to circulate
17    it by 10:00 a.m. on Monday.
18             THE COURT:  Perfect.  Thank you very much.
19             Okay.  So Mr. Tate, I think this is as much as
20    we can do on your first issue with Ms. Hughes.
21             Is there anything else you want to discuss on
22    that before we move on?
23             MR. TATE:  No, Your Honor.  I appreciate your
24    time.
25             You know, the second issue is kind of related,
```



1    but when I drafted this, it was much further from me.

2              So I don't know if there's much to discuss on

3    the second issue, but I'm happy to be heard.

4              THE COURT:  Okay.  Tell me where you folks are,

5    if you've resolved this, then I think we're in a good

6    place.

7              MR. TATE:  I don't know if we've resolved this.

8    You know, when we were first having these discussions in

9    late March, early April, I was very disappointed that I

10   couldn't depose a PMK during the entirety of the month of

11   April.

12             I think procedurally and legally, I had noticed

13   the deposition of the PMK on this.  It appeared one day,

14   and then she stopped. But I had two other days that were

15   of a PMK, and then another witness should have appeared on

16   those other two days.

17             I didn't get an objection.  I didn't get a

18   motion for a protective order.

19             I think legally they waived whatever rights they

20   had to not show up for that deposition.

21             But here we are.  It's April 18th.  And if we

22   can take her deposition, you know, very beginning of May,

23   I don't know if there's anything better than we can do.

24             The damage has already been done at this point.

25   I don't know what else I can do about it.



1           MS. BENTZ:  Well, I have a couple questions.

2           At some point, I'd like to respond to what

3   Mr. Tate just said, because (indiscernible) misconstrued

4   the parties' agreements in the record.

5           But go ahead, Your Honor.

6           THE COURT:  Why don't you go ahead, Ms. Bentz?

7           MS. BENTZ:  So it's actually inaccurate to say

8   that the PMQ was noticed for March.  It was noticed for

9   April 12th through the 14th.

10          We agreed to the topics that Dr. Hughes was

11  going to handle, that those would be handled in March and

12  that the other PMQ deponents would go at a later date.

13          So I think it's inaccurate for Mr. Tate to lead

14  you to believe that there was some agreement that the PMQ

15  in general would happen in March.

16          THE COURT:  Okay.  But the PMQ topics for Ms.

17  Hughes that have now been moved to Ms. McGill, were going

18  to happen in March; right?

19          MS. BENTZ:  Correct.

20          THE COURT:  Okay.  So is that what you were

21  saying, Mr. Tate?

22          MR. TATE:  Yes, Your Honor.  And I'm not here to

23  argue about dates or anything like that.  What I'm bumping

24  up against is the June 1st discovery cutoff and --

25          THE COURT:  (Indiscernible).



1          MR. TATE:  And the PMQ deposition, I'm supposed

2    to be able to figure out what the corporation knows so I

3    can do follow-up discovery.

4          And when we were talking about this back in

5    April, I needed that deposition.

6          But here we are.  April is more than halfway

7    over, and I think the best that we're going to be able to

8    do is pick a date certain for the deposition to go

9    forward.

10         THE COURT:  So the reasoning for this is that

11   Ms. McGill is in trial?

12         Is that what I understand, Ms. Bentz?

13         MS. BENTZ:  Correct.  She's getting divorced.

14   She has a divorce trial and a custody trial.

15         THE COURT:  When?

16         MS. BENTZ:  Starts April 20th.

17         THE COURT:  How long?

18         MS. BENTZ:  I believe that it is a week or two

19   weeks long.

20         THE COURT:  All continuous?

21         MS. BENTZ:  I do not know the answer to that,

22   Your Honor.

23         THE COURT:  The reason I ask is that my

24   under -- is she in L.A. Superior?   Yeah.  Is she in L.A.

25   Superior?



1          MS. BENTZ:  No, Your Honor.  She lives in

2   Colorado.

3          THE COURT:  Oh, she's in Colorado.  Okay.

4          So the reason I was asking this, then, is that

5   she -- here in L.A. Superior, they never -- the divorce

6   trials don't go day to day to day to day.  Most often they

7   go one day and then you come back in a couple of weeks

8   because just the docket is so heavy.

9          You're representing to the Court that she is

10  going to be in trial for the entire period.  I'd like the

11  date that it will be continuous and it will not -- there

12  won't be a day break?

13         MS. BENTZ:  So I can get specific dates for Your

14  Honor, but the issue is also one of being prepared.  She

15  is a PMQ witness on now several topics.

16         So it is, you know, I don't want to -- I don't

17  want to -- she needs to be prepared for that deposition as

18  well.

19         So she -- it takes time to prepare.  She can't

20  actually prepare while she's in a divorce trial either.

21         THE COURT:  Why not?  Obviously not --

22         MS. BENTZ:  Because she --

23         THE COURT:  (Indiscernible) the trial, but why

24  can't she -- why can't the two things move forward in

25  parallel?  Obviously not overlapping in time, but I'm just

1    not understanding why you knew she was going to be the PMQ

2    that was going to take over for Ms. Hughes but she hasn't

3    been prepared at all?

4            MS. BENTZ:  Well, Your Honor, that's actually

5    not what I said.  But my point was -- my point was to say

6    just because she may have a Thursday off from trial does

7    not mean that it would be possible for her to put in a

8    deposition on that Thursday.

9            She also has a job; right?  She's not -- again,

10   BCS is a volunteer organization, so she has a job with a

11   third party that's totally unrelated to this.

12           So I can get specific dates for the trial and

13   specific dates for her employment, if that would be

14   helpful, but we have agreed to the first week of May.

15   That's her date for her.

16           THE COURT:  Okay.  I didn't -- I didn't realize

17   that there had been an agreement.  I thought that it was

18   just a proposal.

19           MS. BENTZ:  I think defendants' issue was the

20   first week of May, but she will be prepared and is

21   available to be deposed that week.

22           So that was what plaintiff had offered for her

23   deposition.

24           THE COURT:  Okay.  Okay.

25           So, Mr. Tate, are you -- I think, are we done



29

1    with this?  You accepting the first week of May?

2              MR. TATE:  I don't know what else I can do, Your

3    Honor.  I -- I -- I hate the notion that BCS could sue my

4    clients, and then they'll be two -- the two persons --

5    there are only two more directors that made the decision

6    to beside my clients.

7              One of them decided that she can go on a cruise,

8    and the other one decided that her personal divorce is

9    more important than this case.  And that has hampered my

10   clients' ability to defend themselves.

11             (Indiscernible) practical matter, April or May,

12   I really think pick a date in May and walk away.

13             THE COURT:  I set the schedule, so don't worry

14   about that.

15             If BCS is standing in the way of your discovery,

16   you can ask for an extension of the discovery cutoff,

17   maybe just for yourself -- or not for yourself, but for

18   defendant.

19             I don't know that -- you know, I don't have a

20   sense that BCS is having trouble getting discovery from

21   defendants.  Because I don't have anything in front of me,

22   I'm not suggesting one way or another.  But when I see one

23   party having so much trouble getting basic discovery from

24   the other, you know, one of the possible outcomes is an

25   extension of the discovery cutoff for just one side.

1          But I will let you folks work that out either by

2     stipulation, or if defendants need to file a motion for an

3     extension of the discovery cutoff, I can entertain that.

4     So I leave that in your court.

5          MR. TATE:  I appreciate it, Dr. --

6          MS. BENTZ:  Just one correction.

7          THE COURT:  Hold on, Ms. Bentz.  Hold on.  I

8     think Mr. Tate wasn't finished.

9          MR. TATE:  If we could just resolve this issue,

10    I'd agree here on the record that the deposition will go

11    forward on Monday, May 1st.

12         That's, I think, the best I could do, and

13    let's -- let's go with that.

14         THE COURT:  Okay.  Ms. Bentz?

15         MS. BENTZ:  Yes, Your Honor, we can agree to

16    that.

17         THE COURT:  Perfect.  Okay.  Okay.

18         Was that Mr. Tate?  Were you going to -- I don't

19    know who was speaking.

20         MR. TATE:  It was me, and it was going to lead

21    into, I think, the documents.  You know, one of the issues

22    I've had, you know, deposing two PMQ witnesses both times

23    is neither has shown up with the documents that they were

24    supposed to.

25         And so, you know, when we go forward on May 1st,



1    I need them to actually produce the documents that are at

2    the deposition notice.

3             THE COURT:  I don't disagree.  I haven't seen

4    your deposition notice, but you're certainly -- defendant

5    certainly is entitled to that.

6             What's going on with that, Ms. Bentz?  Why -- I

7    guess Ms. McGill hasn't appeared at her deposition.

8             MS. BENTZ:  (Indiscernible.)

9             I think the issue is this does lead

10   into the document issues that I think is the second IDC

11   that you wanted to talk about, but the issue is one of

12   volume.

13            The -- if Your Honor will recall, we had worked

14   with you on an e-discovery order last year --

15            THE COURT:  I recall.

16            MS. BENTZ:  -- which required plaintiff to

17   collect from a significant number of sources.

18            Mr. Lueddeke has particular numbers for Your

19   Honor, but to give you kind of an overview of the issue.

20            THE COURT:  Uh-huh.

21            MS. BENTZ:  So we collected from a large number

22   of sources and a large number of custodians and ran the

23   search terms that were defendant-requested search terms

24   across RAD and have ended up with an extremely large

25   volume of documents to review.



1        So while we have been diligent in doing that and

2   trying to roll out production to the defendants, it is

3   just an incredible number, a large amount of data and a

4   large number of documents that we are trying our best to

5   get through.  That is the issue.

6        THE COURT:  All right.  How much?

7        MS. BENTZ:  Well, I'll defer to Mr. Lueddeke

8   because I think he has the particular numbers for Your

9   Honor.

10        THE COURT:  Okay.  Thank you.

11        MR. LUEDDEKE:  Yeah.  This is Jason.

12        Yeah.  So we've collected over 170,000

13   documents.  We've produced around 60,000 so far over the

14   course of, I believe, 11 productions.

15        We still have about 70,000 documents to review

16   that we are working on, but obviously that is a very large

17   number.

18        And these are terms -- the search terms we use

19   to generate these documents came from the defendant.  So

20   it's an extensive list, it's a long list of -- a long list

21   of search terms, it's multiple pages, and it yielded a

22   significant amount of documents, generally because we

23   collected from 18 different custodians, and we were

24   ordered to collect from nearly -- I think it's actually

25   over 30 different sources of data.

1          So the undertaking has been significant.  It has

2     taken a long time, and the volume has been, you know,

3     quite colossal.

4          I just -- just for the sake of perspective, the

5     defendants only had to collect from two custodians.  We

6     collected from 18.  So the process on our side has been --

7     it has taken longer because it takes longer to collect

8     from so many sources across so many custodians.

9          So we have been as diligent as possible with the

10    resources that we have.  I think Your Honor mentioned at

11    the outset, acknowledging that we are pro bono counsel in

12    this case, and I say that not to garner any leniency but

13    just to provide context as to the nature of our

14    representation and the resources available to us.

15         So we had to find a vendor who would work with

16    us on a pro bono basis.  We had to find contract attorneys

17    who would work with us on a pro bono basis.

18         We have done all that we could up till now to

19    collect documents, produce them as fairly as possible on

20    the schedule that has been ordered.

21         And this is actually one of the issues that we

22    want to discuss, which is, you know, I think at this point

23    we could use Your Honor's guidance with respect to the

24    remainder of our document review, given that, as I said,

25    we still have about 70,000 documents that we are

1    working our way through.

2           It is very unlikely at the pace that we are

3    going now with our contract attorney, who we only have for

4    a given number of hours per week, that we will be able to

5    complete our production by the discovery cutoff.

6           So as we see it, we think a discovery extension

7    is likely necessary.

8           How long that extension would be depends on, you

9    know, whether we are ordered to complete the remainder of

10   our review as it is, or if we are permitted to work with

11   the other side to maybe refine some of the search terms to

12   whittle down our universe so that it is not so expansive.

13          But either way, it's become clear to us that an

14   extension is likely necessary, and it may, you know --

15   hearing the parties discuss the deposition issues, it may

16   alleviate some of the disputes with respect to those as

17   well.

18          THE COURT:  In what way?

19          Well, there's a rush to, for instance, the Jenny

20   McGill deposition, I mean, there's, you know, defendants

21   are pushing to do it as soon as possible because our

22   current discovery deadline is the first week of June.

23          So that's why, you know, they're trying to

24   depose her right now.

25          If there was an extension, I think that would,



1    you know, the deposition could occur.  It could give us,

2    you know, additional time to complete our production, you

3    know, before Ms. McGill was deposed or before other

4    depositions go forward, which I believe is one of the

5    issues defendants want to discuss.  So yeah.

6              THE COURT:  Okay.

7              MR. TATE:  Your Honor, I would like to be heard,

8    obviously.  If you have follow-up questions

9    (indiscernible).

10             THE COURT:  Sure.  That's okay.

11             MR. TATE:  I just want to apprise the Court of

12   two recent depositions so that the Court can get a better

13   insight into the frustrations that I'm having.

14             As I understand it, there are two primary people

15   that conducted the, for lack of a better word, forensic

16   investigation into the allegations (indiscernible) my

17   clients:  Ms. Noelle Beauregard, who is no longer with

18   BCS, and Mr. Jesse Jensen, who recently appeared as a PMK

19   representative.

20             Ms. Beauregard testified in her deposition that

21   contemporaneous with her investigation she took

22   screenshots and she shared those screenshots on Slack and

23   that they had Slack communications between BCS's board

24   members discussing what she found.

25             The Slack communications had not been produced.



1          As of the time the deposition started, none of

2     the screenshots had been produced.

3          During the deposition, DLA Piper showed up with

4     screenshots, six screenshots that it wanted authenticated

5     that had not been produced, and that's only six of about

6     the 20 screenshots that Noelle Beauregard indicated that

7     she took.

8          Noelle Beauregard has since left BCS.  We've

9     been in contact with her.  She's indicated that she has

10    hundreds of documents that she's going to send to us that

11    were never collected by BCS.

12         The other person who did the investigation was

13    Jesse Jensen.  He's still at BCS.  What he testified is

14    that he was worried that my clients could access their

15    emails and other stuff.

16         And so he told the BCS leadership to stop

17    communicating on their BCS emails and start communicating

18    with their personal emails, and to stop using Slack and

19    start communicating over Signal, which is another

20    communication platform.

21         BCS has not produced the Signal communications,

22    which are directly relevant to this case and has not

23    produced any documents from all those personal email

24    accounts that they were all discussing this case and the

25    allegations of it.

1              Now here's where it gets really bad for BCS.

2    Mr. Jensen testified that he took those screenshots

3    contemporaneous to March 2022 and gave them to counsel in

4    April of last year.

5              To date, they have not produced any screenshots

6    from Mr. Jensen except for a small handful that were taken

7    in March of this year.

8              So as far as I can tell, DLA Piper has had

9    critical screenshots for over a year and then have not

10   been produced to me.

11             And I've now had to depose multiple witnesses

12   without the benefit of those screenshots.  It is

13   incredibly frustrating that it just seems like they are

14   purposely hiding the ball.

15             THE COURT:  Okay.  Let me hear from, I don't

16   know, Mr. Lueddeke or Ms. Bentz.

17             MR. LUEDDEKE:  Sure, Your Honor.  This is Jason.

18   I'll respond.

19             So I just want to say at the outset there's been

20   no intentional conduct to hide the ball.  I can respond in

21   turn to the two individuals that Mr. Tate just raised.

22   The first is Noelle -- I'm probably going to butcher the

23   last name -- I believe it's Beauregard.

24             We have collected Ms. Beauregard's BCS-related

25   emails, and it's my understanding that we produced them.



1          So it's possible that that collection occurred

2     after she left BCS and that's why she testified that she

3     wasn't involved in the collection, but as you know, when

4     people leave an organization, their email tends to stay

5     behind.

6          So we did collect Noelle's email.  So I just

7     feel that Mr. Tate is saying it's accurate --

8          MR. TATE:  Jason, let's just --

9          THE COURT:  Hold on.  Hold on.

10         Mr. Tate, let Mr. Lueddeke finish.

11         MR. TATE:  I apologize.

12         (Indiscernible.)

13         THE COURT:  I'll give you an opportunity.

14         MR. TATE:  Okay.

15         THE COURT:  Everybody will have a chance to

16    speak.

17         MR. LUEDDEKE:  Okay.  So that was Ms.

18    Beauregard.

19         With respect to Mr. Jensen, I believe there are

20    a few issues raised.  The first was Mr. Jensen's

21    personal -- well, not his personal emails, but the

22    personal emails of other BCS members.

23         This is an issue that we've been discussing with

24    the defendants for a while now.  I assume what Mr. Tate is

25     referring to is Vanessa Hughes and Jenny McGill's



1    personal Gmail accounts.

2           With respect to Ms. McGill, we have informed

3    defendants that we are reviewing her personal email

4    account and will produce any responsive non-privileged

5    documents that are in the account.

6           With respect to Ms. Hughes, we have also

7    informed the defendants that we have reviewed Ms. Hughes's

8    personal Gmail account and did not identify documents that

9    we believe were responsive, that were not privileged in

10   that -- in her Gmail.

11          I just want to say here, and I said this at the

12   outset, we are talking about individual sources of data

13   here.  That's what Ms. Tate is raising, just individual

14   sources.

15          For every custodian, we have been required to

16   collect at least 30 -- from 30 sources of data.  So we are

17   focusing on a very small number.

18          Now I know Mr. Tate can kind (indiscernible)

19   with the most important documents in the case, but just

20   for Your Honor's sake, we -- these are just a handful of

21   sources that we have collected for each of these people.

22          So this is being painted that we are withholding

23   massive sources of data, we're not, you know, fulfilling

24   our discovery obligations, and that is not true.  We are

25   talking about discrete accounts here.

1          So Signal is another one.  Signal just came up.

2     I believe Mr. Jensen testified about Signal in his

3     deposition.

4          We will go and collect the Signal accounts if we

5     can.  If they're accessible and we are able to do so,

6     we'll  collect from it.

7          We're not trying to hide any information here,

8     which is the accusation that continues to be levied by the

9     other side.

10          The last thing is screenshots.  Last week, we

11     produced nearly 3,000 screenshots.  And I want to just

12     talk about screenshots for a second.

13          When you load screenshots into a review

14     database, they often do not hit on search terms because

15     they're images.

16          Reviewing screenshots, especially when there are

17     several thousand of them, takes time because there's no

18     search term that can be used.  They have to be reviewed

19     individually and manually.  So we did that.

20          It took a while because there's a lot of them.

21     We have produced, I believe, close to 3,000 screenshots.

22          So the ones that Mr. Tate is referring to, I

23     would refer him to our recent production.  If they're not

24     in there, we can discuss it further. But we are not trying

25     to withhold screenshots from you.

1              THE COURT:  Okay.  Mr. Tate?

2              MR. TATE:  Your Honor, I don't know where to

3    begin.

4              My firm is pretty small. I mean, I've got, I

5    think, about five attorneys here.  We had the same

6    deadlines.

7              I plan to spend hundreds of thousands of dollars

8    hiring a team of review attorneys to be able to do this.

9              We collected 2.1 million documents and produced

10   25,000 documents.  And for DLA Piper, one of the largest

11   firms in the entire world, to tell me that they can't

12   produce documents on the same schedule as my little firm

13   doesn't make a lot of sense to me.

14             And what's really frustrating, and the reason

15   why I'm here today, is I repeatedly ask them, okay, fine,

16   I'm willing to work with you, but you need to give me an

17   estimate of when you are going to produce those documents.

18   And, to date, I have not been given an estimate of when

19   those documents are going to be produced.

20             My client has already been prejudiced, having

21   taken multiple depositions now without the benefit of

22   critical documents.

23             If you will look at the order that the parties

24   agreed to, they agreed in that order to collect documents

25   from a whole list of persons.

1          The vast majority of those persons, no documents

2     have ever been produced from those people.  And that was

3     evident by Noelle Beauregard, where she testified that

4     nobody went and got her computer.  Nobody went and got her

5     email.  No one collected her documents from her.  As far

6     as I could tell, the only thing they've done is

7     searched through the BCS emails.

8          As I discussed at the beginning of this, when I

9     rudely, frankly, rudely cut off Jason -- I apologize,

10    Jason -- they were not using those emails at the time.

11         They were using Slack communications and they

12    were using other emails.  And as a result, I'm forced to

13    try to prove the negatives for my clients without the

14    documents that I need.

15         THE COURT:  So it seems that there's been a big

16    problem that starts with a production of documents that

17    haven't been done from, it appears, from the plaintiff's

18    side.

19         I am a little bit surprised, as you are,

20    Mr. Tate, that DLA Piper, the biggest, if not one of the

21    biggest firms in the world, for which I have a great deal

22    of respect, can't seem to get a production of documents

23    done.  I understand that there is a lot, but not providing

24    information regarding when it's going to be done is not a

25    workable situation.

43

1        So I think that what we'll need to do is let's

2   resolve the immediate disputes there are about the

3   documents.  We can turn to that next.  And then we just

4   have to come up with a timeline for all of this.

5        As I said, you know, I have full consent on this

6   case, which means I set the schedule, and so I can manage

7   that.

8        And I can -- my goal here in discovery is to get

9   to -- to allow the parties to gather the information they

10  need to get to the truth.

11       Hiding documents -- or I shouldn't say hiding,

12  not producing documents in time, not producing deponents

13  in time, you know, having all of these discovery disputes

14  obviously stands in the way of getting to the truth, and

15  it's just not something that I am going to allow in this

16  case.

17       And so the documents will be produced, subject,

18  of course, to any objections and, you know, any other

19  decisions that have to be made along the way.

20       And then the depositions will go forward, and

21  there will be plenty of time for all of this.  I promise

22  you.

23       That said, I also have an obligation to the

24  Court to keep cases moving.  So this is not going to be,

25  you know, the wild, wild west of however much time



1  plaintiffs want.

2          So we're going to have to figure all of this

3  out.  But I'm sure that we can do it, and I'm sure that we

4  can keep this case moving forward.

5          I don't know enough about why the depositions

6  went forward without documents, but, you know, we can talk

7  about that, and maybe there's additional deposition time

8  granted to circle back with those people once their

9  documents are produced.

10         So, you know, there are all sorts of solutions

11 to the problems and the frustrations that I'm hearing on

12 both sides, by the way, so I think that we can make it all

13 work.  Let's just figure out.

14         I think we have to resolve the document

15 situation first, then we resolve the depositions.  And all

16 of that will be based on -- I can see it coming -- an

17 extension of time on the discovery cutoff, but if that is

18 what is necessary for the parties to get to the truth,

19 then that is what we are going to do.

20         So let's turn to -- let's turn to -- we're going

21 to circle back on these depositions in a bit.

22         But let's turn now -- I don't know if I've heard

23 everything.  My understanding of the second informal

24 discovery conference request is that there are six issues.

25  And let me tell you what I think they are, and

45

1    we'll just take them, you know, one at a time and we'll

2    work our way through it.

3             The first one is plaintiff's alleged failure to

4    produce documents responsive to discovery requests and the

5    agreed-upon search term and the failure to give an

6    estimate of when the production will be completed.

7             So I feel like that's what we've been talking

8    about so far.

9             The second one is that plaintiff has not

10   produced documents from certain Gmail accounts.  Maybe

11   that's assumed in what we just discussed.

12            The third is plaintiff has failed to collect

13   documents from custodians identified in the e-discovery

14   order.  I have the e-discovery order -- I'm trying to make

15   sure we can address those individually.

16            The fourth is the plaintiff's failure to

17   preserve logs.  I don't know what that means, so we can

18   talk about that.

19            The fifth is the plaintiff has not collected

20   duplicates as required by the e-discovery order.

21            And then the sixth is the plaintiff has marked

22   almost every document that's confidential.

23            So are one, two, and three what we have been

24   talking about so far?

25            MR. TATE:  Yes, Your Honor.  I think that they



1    are all subsumed in a general complaint that there are

2    critical documents in this case that I had not been

3    provided.

4              THE COURT:  And that includes the Gmail account,

5    and it includes documents collected from certain

6    custodians.

7              MR. TATE:  That's right.  So you can't talk

8    about those custodians in detail, but if you look at the

9    e-discovery order, there's a whole list of people --

10             THE COURT:  I have it.  I have it in front of

11   me.  It's paragraph 4.3.  And then the data sources are

12   paragraph 4.4 of the e-discovery order.

13             So all right.  Well, let's take them one at a

14   time then.

15             Have you -- I guess I'm -- I guess

16   (indiscernible).

17             So what is -- let me go back to something that

18   was just said a minute ago -- a little bit ago, which is

19   that BCS has collected 170,000 documents, produced 60-

20   over the course of 11 productions.  We still have 72- to

21   review.

22             Where are the other 40,000?

23             MR. LUEDDEKE:  Those would have been -- I

24   believe those were isolated for privilege reasons.  So, I

25    mean, we also need to review those to ensure,



1    you know, any forthcoming privilege laws.

2            But the ones that were excluded from this review

3    are ones that are on our privilege charts.  So attorney

4    names, for instance, things like that.

5            My number -- I think my numbers might be

6    slightly off.  These are just kind of -- you know, these

7    are high-level estimations.  I believe they're correct,

8    but I don't know that I can account for all the documents

9    down to the, you know, to the thousand.

10           THE COURT:  You know, I'm not asking that, but I

11   think 40,000 is a big number.

12           MR. LUEDDEKE:  That's a fair point.  That is a

13   fair point. I have Dennis on the line as well who helped

14   with it.  I don't know if he can speak to that with more

15   detail.  I see the disparity.

16           I believe a large chunk of those are documents

17   that were sucked into our public review.

18           MR. KIKER:  Yeah.  Jason, this is Dennis Kiker.

19           There are a good number of documents that have

20   been reviewed and determined to be not responsive that are

21   not included in the chart of that 40,000 as well.

22           So, I mean, during the review of the 60,000 that

23   we've produced, a good number of documents have been

24   reviewed and identified as not responsive, and I think

25   that creates most of the 40,000 you're asking



1  about, Your Honor.

2          And the balance is, as Jason said, we have a

3  number of documents that we have a very narrow set of

4  case-specific privilege terms that we have run, and we

5  need to, you know, validate those and make sure that those

6  documents are in fact privileged and that there's a log

7  for that.

8          THE COURT:  Well, so let me ask you what you

9  mean by non-responsive.  Isn't the idea of agreeing to

10  search terms that whatever comes up from those

11  search terms is responsive?

12          MR. KIKER:  Your Honor, that's not my

13  understanding.  My understanding is we run search terms to

14  decide which documents to review, and then some of those

15  documents will be responsive to issues in the case and

16  some will not.

17          I'm assuming that the defendants have proceeded

18  in the same fashion.  The search terms, there are many and

19  they're very broad, so we will have documents that hit on

20  search terms that don't have any bearing on the subject

21  matter of the case.

22          And I have to imagine that defendants have done

23  the same thing in their review.  It wasn't simply a matter

24  of run the search terms and turn over everything that you

25  got.

1              THE COURT:  Is that your understanding,

2    Mr. Tate?  If that's what it is, that's what it is.  I'm

3    just -- I've seen e-discovery agreements and orders, such

4    as this one, where you -- what makes you agree that what

5    is -- what hits on those search terms is what's going to

6    be produced?

7              But if that's a different understanding than

8    what you folks have, let's clarify that and move on.

9              MR. TATE:  No.  I think that that is generally

10   correct.  They didn't end up actually using our search

11   terms, is my understanding, but that's not --

12             MR. KIKER:  We did.  We used your exact terms.

13             Go ahead.

14             MR. TATE:  I'm not prepared to -- that wasn't

15   part of my IDC, and so I'd have to talk to my team about

16   that.

17             My understanding is that DLA Piper just used

18   their own search terms, but --

19             MR. KIKER:  That's incorrect, but we don't have

20   to talk about it.

21             THE COURT:  Okay.  So moving -- but moving

22   forward, the idea was not that either side turn over all

23   documents that fit upon the search terms.  That is just to

24   narrow the universe by agreement of the parties, and then

25   after that, the parties review the documents to find what

1    is responsive to any particular document request.  If

2    that's the agreement of the parties, I'm fine with that.

3            MR. KIKER:  That's perfect.

4            THE COURT:  Okay.  All right.  So all right.

5            So we've got some 40,000 that are either

6    privileged or nonresponsive, and under 70,000 to review.

7    How long did it take to produce and review the 60-?

8            MR. KIKER:  I believe it took -- well, we've

9    been producing on a rolling basis.  I believe we started

10   our review maybe at the end of 2022, the very beginning of

11   2023.  So four months or so.

12           THE COURT:  Four months to produce 60,000

13   documents?

14           MR. KIKER:  Well, the set was 170,000, so it was

15   a matter of reviewing, you know, as we just discussed,

16   making sure that the document -- finding the responsive

17   documents and the producing them.

18           So, for instance, one of the search terms was

19   confidential; right?  So there's going to be a ton of

20   documents that we collected that say confidential.  I'm

21   not going to do it this case, so we need to review those

22   to make sure that those non-responsive documents weren't

23   produced.

24           I mean, 60,000 dollars is -- excuse me, 60,000

25   documents is, you know, in my experience, a significant



51

1    production.

2                    MR. TATE:  Can I switch back?

3                    60,000 documents, in my experience, is nothing.

4    I'm sure the Court is aware of that.

5                    MR. KIKER:  We work on different types of cases;

6    right?

7                    MR. TATE:  Routinely -- courts routinely have

8    millions of documents.

9                    THE COURT:  I don't disagree with Mr. Tate.

10                   I was at Paul Hastings.  I was part of many,

11   many, many document reviews, and 60,000 is not a lot.

12                   In this universe, that's irrelevant.

13                   We're trying to get to how are we going to get

14   this stuff to do.

15                   It seems to me that 60,000 -- let's say you

16   produce -- you didn't review all 170,000, because you've

17   told me that you have 70,000 left to review; right?

18                   So you really, to produce 60,000, it looks like

19   you may have reviewed 100,000; right?  The 60- that you

20   produced and the 40- that you are withholding are either

21   privileged or non-responsive.

22                   MR. KIKER:  At a high level, that is likely

23   correct.

24                   THE COURT:  Okay.  So it took four months to

25   review 100,000 documents.  Okay.  Well, that is not going

1    to work; right?  Because here we are, we have to keep this

2    case moving, and there are 70,000, and, you know, that

3    means -- I don't know, I guess he would propose three

4    months to review 70,000 documents and I just made that up

5    way too much because the documents are needed for

6    depositions.

7         And, you know, I don't know if there is a

8    smarter way to do this, and I don't mean to be offensive

9    by saying smarter, but I just wonder if maybe you can time

10   the reviews by custodian, review all of their documents,

11   and then that deposition can go forward.

12        And then turn to the review from another

13   facility and review all of that person's documents

14   produced and then that deposition can go forward.

15        Or maybe you can assign, I don't know, three

16   attorneys to this who can do three custodians at a time.

17   But I don't know how you're doing it.  I'm just kind of

18   throwing out ideas to help with this.

19        But I can tell you, at the starting point, three

20   months to review and produce the next 70,000 documents is

21   not going to work.  If you do that --

22        MR. TATE:  And Your Honor, the actual number is

23   going to be much more than 70,000 because there are at

24   least one, two, three, four, five, six, seven facilities

25   they never collected from.



```
 1            MR. KIKER:  That's false.  That is false, and we
 2    can get to that issue next.
 3            MR. TATE:  Well, maybe it's (indiscernible) has
 4    never seen any documents from those people.  Maybe that's
 5    the disparity then.  But in that regard --
 6            THE COURT:  Let's go ahead and -- let's discuss
 7    that now because I think that's part of the discussion.
 8            MR. TATE:  Okay.
 9            THE COURT:  So you're protecting your thing.
10    You have collected from every single one of the custodians
11    on 4.3?
12            MR. KIKER:  With the exception of one.  Her name
13    is Lenore Silverman.  She is a volunteer at BCS.  She's
14    also an attorney.
15            I'm not sure if she had a specific BCS email
16    address.  We have not collected from her yet.
17            I think there was a question about whether, just
18    given her role at the company -- excuse me, at the
19    organization and the time she was there whether -- and the
20    nature of her status there, I just -- I don't know
21    factually all the details, but she is the only custodian
22    that we have not collected from at this time.
23            THE COURT:  Okay.
24            MR. KIKER:  Out of that list in the order.
25            THE COURT:  Okay.  So this --
```



54

1            MR. TATE:  Your Honor, can I clarify something?

2            Because it might -- I want to ask Jason a

3    question, actually.

4            THE COURT:  Okay.  Hold on one second, please.

5    Let me finish what I'm doing here.

6            This order was signed on September 13, 2022.  As

7    of that date, plaintiff had a list of all the custodians

8    from whom they had to collect documents.  Here we are in

9    April 18, and I'm fearing that the plaintiffs don't have

10   information about one of the custodians.  We've set aside,

11   whether you've collectively -- how do you not know if she

12   had a specific DCS email address?

13           MR. KIKER:  I'm sure somebody on my team knows.

14   Sitting here today, I personally don't know her exact

15   role.  I can't answer that affirmatively.

16           MS. BENTZ:  Sorry.  This is Tamany Vinson Bentz

17   for the plaintiff.

18           She is a -- her role at the organization is she

19   is a board member.  She does not have a BCS email account.

20   Okay.

21           So just to give you some context, BCS operates

22   on a G-Suite system, and so she does not have

23   (indiscernible) account on that G-Suite system.

24           THE COURT:  Doesn't have what for account?

25           MS. BENTZ:  She does not have an account or an

1    email address on that G-Suite system.

2              THE COURT:  Okay.  Whatever that means.  I am

3    not familiar with that system, but whatever that means

4    doesn't really -- the details of that don't really matter

5    to me.

6              What is important is, have you collected all of

7    her documents from all of the sources that you agreed you

8    would collect from?

9              That's the question about this person, Lenore

10   Silverman.

11             MS. BENTZ:  From what is in our collection?

12   Yes.

13             THE COURT:  Okay.  Mr. Tate?

14             MR. TATE:  Thank you, Your Honor.

15             THE COURT:  It sounds like they have collected

16   from everybody.

17             MR. TATE:  Well, I want to -- if I could, I'd

18   like to just simply ask a question.

19             Counsel, in Section 4.4, there's a list of data

20   sources.

21             Is my understanding that you collected from all

22   the custodians, you collected those data sources for each

23   of them?

24             I have the impression, at least, that the only

25   thing that you collected were their BCS emails.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

56

1          MR. KIKER:  No.  That is not true.  That is not

2     true.

3          THE COURT:  Let me hear from Mr. Lueddeke, what

4     you have done.

5          Have you, for each of these custodians, that of

6     course are your custodians, have you gone to all of their

7     email accounts, their cell phones, their Facebooks, their

8     Twitters, their Skypes, their Slacks, their Google Point,

9     their cell phone, their text messages, their Apple

10     messages, their computers, their Zoom, their Hootsuite,

11     from Hootsuite (indiscernible) -- I could go on and bore

12     you to death.  Have you done that?

13          MR. KIKER:  We have collected -- for the

14     custodians, we've collected whatever is available from

15     these sources.

16          So if there're some of these custodians, they're

17     no longer at the company.  So, you know, whether they have

18     personal Facebook accounts and we have not collected

19     personal Facebook accounts, but we've collected from BCS's

20     Facebook account, for instance.

21          We've collected BCS's Slack account, BSC's

22     Google Drive.  Again, I could go through this as well, but

23     we have done for all -- we have collected from all the

24     sources that we were able.

25          Now there's -- like I said, there's almost 30



1    sources here.  Not all of them were accessible for

2    everybody, but we have -- I believe we have collected as

3    much as we could for the custodians we have from these

4    data sources that we have access to.

5              Some of this information is held by third

6    parties -- right? -- Facebook, Twitter, those types.

7              Some of the sources are, you know, they're not

8    easy to collect from, but wherever possible we have

9    collected for the custodians that we could.

10             THE COURT:  Okay.  That is not -- and that's

11   helpful, but it doesn't tell me what I need to know.  I

12   guess -- let me do it the other way.

13             What specifically have you not collected, and

14   why not?

15             MR. KIKER:  I don't know how to answer that in

16   broad strokes.  There's really a lot here (indiscernible)

17   and 30 sources.  It's hard to do this on the fly.  It's my

18   understanding.

19             As somebody, you know, I didn't actually -- we

20   have a vendor who helps with the collection, so I wasn't

21   personally involved in all the minutiae, but I believe we

22   have complied with our discovery obligations with respect

23   to all the sources we were able to.

24             THE COURT:  Okay.  That is not complying with

25   your discovery obligation because -- maybe it is, maybe it



1    isn't, I guess I should say that.  But if you -- that you

2    may not be able to collect from something doesn't absolve

3    you of the obligation that you signed on to in paragraphs

4    4.3 and 4.4.

5           So we need to figure out what is missing, what

6    it's going to take to get it.  And maybe what we need to

7    do is let's reconvene on Monday and bring somebody who

8    knows what you folks have done.

9           MR. KIKER:  You're on a mission.

10          THE COURT:  (Indiscernible) to make this happen.

11          I really don't believe that the Court should be

12   spending resources and walking you folks through step by

13   step by step.

14          But if that's what it's going to take, then I'm

15   willing to do it.  But I need information.  And to come to

16   an informal discovery conference without information about

17   basic discovery, knowing that that is the issue that we're

18   going to be discussing is not helpful.

19          So shall we move this discussion to Monday, and

20   can you by then figure out what exactly you have done and

21   what exactly you have not done, and why not?

22          MR. KIKER:  Your Honor, this is Dennis Kiker.  I

23   might be able to help out with this a little bit.  I

24   helped coordinate some of those activities through our

25   vendor.



1          I think potentially we're conflating the concept

2     of custodians and data sources.  Not all data sources are

3     applicable to all custodians.

4          THE COURT:  All right.

5          MR. KIKER:  So, for example, you know, we did

6     not collect Skype accounts for, you know, Bobby Cook.  I'm

7     just taking the name out of 4.3 and 4.4 because I don't

8     know if Bobby Cook has a personal Skype account.

9          I do know that BCS has a Skype account and we

10    collected that.  And so we have -- with the exception of

11    Ms. Silverman, we've collected custodial data from the

12    Google Suite, as was mentioned, for all of the custodians

13    with the exception of Ms. Silverman.

14         And we've collected from each of the data

15    sources that are associated with either those custodians,

16    being their Google Drive or their mail on the BCS email

17    account, or the BCS accounts associated with Hootsuite and

18    Instagram and anywhere that we've attempted each of those

19    sources.

20         Some of them are not accessible or not available

21    or there's just no data there, but we've attempted to

22    collect each of the data sources and data for each of the

23    custodial accounts that are identified in 4.3.

24         So I think we might be conflating those two

25    things -- and we do have -- in fact, we've had some meets



1    and confers with defense counsel, and questions have come

2    up, for example, about WordPress, and we've shared our

3    forensic examiner's logs and screenshot of what he did and

4    the explanation of what he did to try to address those

5    kinds of questions as they've come up.

6          And we are more than happy to continue to do

7    that if there are questions about specific items.  For

8    example, there was a recent question about certain website

9    logs, and we're working on that now.  I wasn't aware that

10   it's -- I don't believe it's on this list here, but it's

11   additional information that they're interested in, and

12   we're trying to find out if it's available.

13         So I just -- I'm afraid that as I'm listening,

14   we're conflating some of those things, and we can

15   represent here and now that we have attempted to collect

16   from all of these data sources as applicable for each of

17   the custodians, BCS being one of those custodians.

18              THE COURT:  Okay.

19              MR. TATE:  (Indiscernible.)

20              THE COURT:  So hold on.

21              Mr. Tate, I'll give you an opportunity, but let

22   me just respond, because this is not responsive to my

23   question.

24              I don't believe I'm conflating anything.  I have

25   a visual chart in my mind that I think would be very easy



1    for you folks to follow, which is put the custodians down

2    on the Y-axis, put the data sources on the Y-axis, and

3    tell me if you have collected from those or not.

4              And to hear -- Mr. Kiker, I appreciate the

5    difficulty that is in this electronic discovery order.

6              That's how you folks (indiscernible) to it.  So

7    we're past that.

8              But to hear that at this late date plaintiff

9    still don't know if Bobby Cook, for example, has a

10   personal Skype account is not acceptable.

11             You have an obligation.  You are under a court

12   order, in fact, to produce what is available.

13             So step one, I would think, is find out what's

14   available.

15             And how we are at this late date, you know --

16   what is it? September, October, November, January,

17   February, March, April -- seven months after the signing

18   of this order and you don't know what's available is a

19   little bit problematic.

20             So what I want to know is, because it is hard

21   for me to figure out how much of an extension of time to

22   give if I don't know what is outstanding.

23             So what I would like to know, is, I guess, I

24   would like -- I would like the table that I'm envisioning

25   in my mind, and I would like to know for each cell in the



1    table, have you produced it or have you not?  And if you

2    have not -- well, not have you produced it, but have you

3    gathered any information from that person of this sort,

4    and if you have not, then why?

5              And that will tell me what is left to be done,

6    because the information that I'm receiving right now is

7    really not telling me what's been done and what hasn't

8    been done. It's all generalities.  And I can't fashion an

9    order with generalities.

10             So, Mr. Tate, you were going to say something.

11             MR. TATE:  Your Honor, I think you've said it

12   better than I could.  I think a chart is a wonderful idea

13   and we should do that and discuss it at the next IDC.

14             THE COURT:  Okay.

15             MR. LUEDDEKE:  Your Honor, can I -- this is

16   Jason.

17             Can I just say one thing?  We can put the chart

18   together, but I just want to clarify under paragraph 4.3

19   and 4.4, our reading of 4.4 was it does not obligate us to

20   collect the personal accounts of volunteers; that is, we

21   do not have possession, custody, or control of a

22   volunteer's, you know, Twitter account.

23             We have possession, custody, or control of BCS's

24   Twitter account.  But to the extent that Noelle Beauregard

25   has a Twitter account, that she has her own password and



1   her own login, that she posts pictures of her family on,

2   we don't -- that's outside of our possession, custody, or

3   control.

4          We never envisioned the order to include that

5   kind of information.

6          With respect to BCS accounts, we are happy.  I

7   mean, that's what we've done.

8          THE COURT:  Okay.  And I don't -- I have to be

9   frank with you.  When you folks, plaintiff, started

10  talking about the personal accounts of all of these

11  custodians, I myself was a little bit surprised that you

12  took me there.

13         And so the reason for not having finished

14  production that is being told to me, one of the reasons,

15  is we don't know if somebody has a personal account, w

16  haven't searched their personal account, we still have to

17  do that is the sense that I got.

18         If I misunderstood what you were saying, then

19  that's fine.  But you're the one that went down the road

20  with personal accounts.

21         So I don't know if, Mr. Tate, or if you folks

22  have met and conferred and personal accounts have come up,

23  but I understand the issue of possession, custody, and

24  control.  If you don't have possession, custody, and

25  control, then you don't, and that's the answer to why --

64

1    to not producing somebody's personal account.  I get it.

2              So, Mr. Tate, you wanted to say something?

3              MR. TATE:  Your Honor, I think that the issues

4    are pretty well keyed up.  I will only ask that the last

5    three depositions that I did of Jesse Jensen, Bobby Cook

6    and Noelle Beauregard, all the three testified that nobody

7    collected their computers.

8              That's why -- I think we need the chart to see

9    what BCS has collected and what they haven't.  And if we

10   compare that to what the deponents have told me so far in

11   a deposition -- I've only done a few of them, but I would

12   expect them to match up.

13             THE COURT:  Yeah.  I mean, look, I think the

14   plaintiff made a good point in saying that somebody might

15   have said at their deposition that no one collected their

16   computers doesn't mean that it wasn't done, number one.

17             I mean, sometimes you can collect without people

18   being aware of it. I'm very familiar with that process.

19             But number two, if the person left the

20   employment -- well, not the employment, but the

21   organization before it was collected, they would have no

22   way of -- that person would have no way of knowing.

23             So let's just get this -- let's get this chart.

24             And what I envision is a chart with the

25   custodians who are, of course, BCS's custodians; right?



1          And the data sources, and each cell is either

2   going to have a why or a no, and if it has a no, it needs

3   to have a footnote as to why not.

4          That's how I think we need to do this.  That

5   will give us -- in the process, maybe BCS will be able to

6   speak to source -- sorry, not source, but the amount of

7   time that they think it will take them to shore up this

8   production.  And then we'll figure out the amount of time

9   that I'm willing to give you folks.

10          My goal here is we're going to get to the truth

11   of whatever this case is about because they need that.

12   Obviously, that is our goal.

13          And we need documents and we need depositions to

14   do that.  And defendant is entitled to that, just as

15   plaintiff is entitled to it.

16          It sounds like the one who is having problems

17   right now is defendants so let's focus on that.  Certainly

18   plaintiffs can bring their own informal discovery

19   conference, if they want, but right now what I have is the

20   issue with the plaintiff.

21          So let's, by Monday -- let's say by Monday at

22   10:00 a.m., we circulate the chart so that we can discuss

23   it Monday in the afternoon along with the declaration --

24   I'm sorry, the deposition items that we have.

25   That will put us in a much better position.



1          I think that that resolves --

2          MR. LUEDDEKE:  Your Honor, if I may, just one

3    more point on this before we move on.

4          Is it possible to have defendants create a chart

5    as well because they're obligated to collect the same

6    sources for their witnesses?

7          And I just want to be clear how extensive this

8    collection is, and I think if we have to justify what

9    we've done, I think it should be reciprocal, because

10   they're obligated, they have the same obligations that we

11   do under this.

12         And there's a lot of sources here, and I'm not

13   sure that we've received documents from all of them, so I

14   think this should be a two-way street.

15         THE COURT:  And it can be a two-way street once

16   you bring me an informal discovery conference on that

17   issue.  Right now, we're talking about you.  We're talking

18   about the lack of production by plaintiff.

19         I don't have anything in front of me teed up to

20   discuss any problems with the defendants/ production.  I'm

21   happy to entertain it.  Just put it in front of me.

22         MR. LUEDDEKE:  Thank you, Your Honor.

23   Understood.

24         THE COURT:  Okay.  Okay.  So my belief from our

25   discussion is that we at least have teed up for



1    further discussion items one, two, and three.

2           Let's turn to -- so what's left is preserving

3    logs, but I don't know what that's about.  Somebody will

4    explain it in a second, I hope.

5           The collection of duplicates and then the

6    marking of all documents is confidential.

7           So let's turn to number 4, the preservation of

8    logs.

9           Mr. Tate, can you enlighten me as to what this

10   is about?

11          MR. TATE:  I can.

12          Mr. Schwartz, if you're more comfortable testing

13   just this topic, I'd feel better than I did the last time

14   I tried to do it.  I think I butchered it.

15          THE COURT:  Well, let me just tell you what I

16   think it means and you can tell me where I'm wrong.

17          By logs, do you mean the social media logs where

18   everything is logged on, like who posted what, where it

19   was posted on what date, and by whom?  Is that what you

20   mean by logs?

21          MR. TATE:  That is my general understanding.

22          I would defer to Mr. Schwartz, if he'd got a

23   better understanding than me, but my understanding is that

24   there was this investigation done in March of 2022.

25    It would have been very easy for them to just



1    contact the cloud-based web server and then the social

2    media companies, get logs showing who accesses when.

3            BCS did not do that (indiscernible).   In their

4    meet and confer, I had asked the DLA Piper to look into it

5    to see if they had done that, and if they did, why those

6    documents were not produced, and I just never heard back

7    from them BCS so here we are.

8            Am I misunderstanding the issue?

9    (Indiscernible).

10           MR. SCHWARTZ:   Sure.   Thank you, Adam, and thank

11   you, Your Honor.

12           It also includes, for example, IP address access

13   logs from Google at the time that the allegations are

14   alleged to have occurred, access logs at the social media

15   companies specifically showing access by our client at a

16   particular time and date. And that is something that in

17   any Section 1030 case, those are going to be preserved as

18   soon as the incident occurs.

19           It doesn't seem like that was the case here.

20   And the issue now is the logs may have been purged, they

21   may not exist for other reasons, but it is a crucial piece

22   of evidence that the plaintiff needs to prove its case is

23   through access.

24           THE COURT:   Okay.   I understand.

25           Okay.   So now I know what you mean by a social



1    media log.  I mean, are you suggesting that there was

2    spoliation?

3            I mean, because I don't know what the

4    obligations are to maintain those logs, but are we talking

5    spoliation here or are you suggesting that you don't

6    believe that these logs were preserved?

7            I don't know what the real issue is here.

8            MR. SCHWARTZ:  The alleged incidents happened in

9    March, and their complaint was also filed in March.  And

10   they had a duty at that time to contact different

11   affiliates at the end of March, and they simply never did.

12           So now a year has passed, and we can no longer

13   do so.

14           THE COURT:  Okay.  So you're suggesting

15   spoliation?

16           MR. SCHWARTZ:  Yes.

17           THE COURT:  Okay.  All right.

18           Can I hear from plaintiff on that?

19           MR. LUEDDEKE:  This is Jason, Your Honor.

20           It's my understanding that those types of laws

21   are maintained by third-party companies such as Facebook,

22   Twitter, TikTok.

23           Our clients -- I just want to be clear, and so

24   our clients took screenshots of what the -- the alleged

25   unauthorized access at the time.  Our clients took



1    screenshots of those, which is how they documented the

2    evidence.

3           We have produced those screenshots.  The logs

4    that the third-party companies maintained at that time, we

5    collected all that we could once the litigation was --

6    once the EFI order was entered, once the litigation was

7    underway.

8           I don't -- I mean, our clients, I don't believe

9    they had an obligation to contact the third parties,

10   including Facebook, and say -- I don't even think they

11   knew that that was an obligation that they had to contact

12   all the third parties that they used and ask for their

13   data at the time.

14          Now, we have collected, as part of the

15   litigation -- once the attorneys got involved, we

16   collected everything that we could collect from these

17   sources and we have produced it.

18          To the spoliation point, as I said at the

19   outset, we produced recently almost 3,000 screenshots.

20   The screenshots, as I understand them, relate to the

21   social media accounts and the unauthorized access alleged

22   on those accounts.  So there is -- I mean, there is

23   preserved evidence that relates to our claims, whether

24   it's exactly the type that the defendants want.  We've

25   collected all that we could from these companies.

1            THE COURT:  Okay.  Well, I -- okay.  I mean, if

2    you -- if you contend that you did everything that you

3    were required -- you, BCS, of course; I don't mean you

4    personally -- but that BCS collected, you know, and has

5    complied with its obligations and that's the position you

6    take, and if Mr. Tate doesn't believe it, then, you know,

7    he needs to bring whatever motion he's going to bring.

8            And if it's a spoliation motion, then it comes

9    under, you know, there are its own rules for spoliation.  I

10   think it's 37(e), and there are very severe penalties for

11   spoliation, especially if it's willful.

12           But there's nothing that I can do for you folks

13   here because there really seems to be a disagreement as to

14   whether plaintiffs have satisfied their obligations to

15   preserve electronically-stored information and what that

16   obligation -- that preservation obligation actually is;

17   right?

18           Plaintiffs are saying it's not plaintiffs

19   obligation or -- I don't know if plaintiffs are saying

20   that it's not plaintiffs' obligation, but plaintiffs'

21   counsel is saying that plaintiffs didn't know that it was

22   their obligation to gather information from the third-

23   party vendors; right?  Not vendors, but companies.

24           So, you know, I think that that's something that

25   you folks should -- Mr. Tate, if you want to bring a



1   spoliation motion, you can, but from what I'm hearing, and

2   the reason I say that is from what I'm hearing, it sounds

3   like plaintiff is saying we've given you everything we

4   have, we did not spoliate, and if you don't believe them,

5   I guess you have to bring a motion.

6           MR. TATE:  I agree, Your Honor.  I think this is

7   teed up by one of my associates.  Your Honor, we will

8   cross every "T."  We will not bring a motion unless it is

9   well-founded.  So I appreciate you taking the time to

10  discuss this issue.

11          THE COURT:  Okay.  All right.  So that takes

12  care of that issue.

13          The next issue is that plaintiff has not

14  collected duplicates as required by the electronic

15  discovery order, and I did read that it requires

16  duplicates.

17          So do you want to expand on that, Mr. Tate, or

18  is it as simple as I'm seeing it?

19          MR. TATE:  Your Honor, I don't know, and maybe I

20  misrepresented it.  I don't know if they've been collected

21  or not. They might have been collected, but they certainly

22  have not been produced.

23          THE COURT:  Okay.  Fair enough.

24          MR. TATE:  So that's -- and this is not -- it's

25  a big issue, but I think the parties agree that



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    (discernible) requires duplicates and have not been

2    produced.  And, in fact, BCS has agreed to produce the

3    duplicates.  It's kind of back to the same issue with the

4    documents.

5              I ask when, I get no response and no estimate of

6    when it's actually going to happen.  And we can believe

7    that it's not going to happen.

8              THE COURT:  Okay.  Can I hear from BCS on that,

9    please?

10             MR. LUEDDEKE:  Yes, Your Honor.  So we have

11   collected duplicates.  That was, I believe, as Mr. Tate

12   said, a misstatement in their submission.  I figured it

13   was just an error.

14             We have collected duplicates.  We have produced

15   documents, and the parties are well aware of this.  We

16   have produced documents in a form that if there are

17   duplicate copies of a particular document, we produced it

18   once, and in the metadata, it includes a list of all

19   custodians that also have that document.

20             So it is the same exact information as if we

21   produced the document four times; right?  And we

22   thought -- I mean, we thought that that was a more

23   effective and efficient way to do this because it is -- in

24   our view, it complies with the order and it is the same

25   thing; it's duplicates.

74

1          However, defendants want the same document

2     produced multiple times, and we said, okay, we'll do that.

3          I still don't understand why.  I don't think

4     we've been given a reason.  I don't understand the

5     prejudice other than to make us go back and redo our

6     productions again.

7          And I think it goes to a broader point, which is

8     we're working on getting our production done, as we've

9     been saying throughout this entire conference, but at the

10    same time, we're being pelted with requests like this that

11    really serve, in our view, no purpose but to just delay us

12    further and make more work for us.

13         So we have deprioritized producing duplicates in

14    favor of our primary review, which to us seems more

15    important than this duplicate issue.

16         So given that, we have been unable to provide a

17    firm deadline for the completion of our production, as

18    we've been talking about, we haven't been able to provide

19    a certain deadline for this task either, because, in part,

20    it depends on the completion of our production -- right?

21    -- because if we're continuing to produce documents, it

22    seems that if we are going to be producing duplicates in

23    the way defendants want, it should be done at the end,

24    once the production is complete.

25         With that said, we are working on it, as we



1    said, and in our view, there's no real dispute here other

2    than the time to do it.

3            And to us, it seems like a needless expense, and

4    I don't really know why we're doing it, to be honest.  I

5    think the problem is we agreed to do it, and we're still

6    here.  We're still talking about it in front of the Court.

7            This shouldn't be a dispute, and we don't view

8    it as one.

9            MR. TATE:  And, Your Honor, I agree on almost

10   everything that counsel has said, except for the part

11   where I don't have a date when this is going to get done

12   by.  I don't have -- as far as I don't have a date when

13   several other issues are going to get done by.

14           And I think it's not unreasonable for me to know

15   when they're going to comply with the Court's orders.

16           THE COURT:  Whether one particular person has a

17   document is sometimes evidence of something; right?

18           You, the plaintiff, agreed to this discovery

19   order, which says you're going to produce duplicates.

20           It doesn't say in lieu of duplicates go force

21   the defendant to read metadata.  It says you're going to

22   produce duplicates.

23           So I don't have any way around this for you,

24   Mr. Bentz -- or Mr. Lueddeke, I think you were the one who

25   was speaking.



1          MR. LUEDDEKE:  Yes, Your Honor.

2          THE COURT:  Other than you can have an agreement

3     with Mr. Tate that that is no longer required.  But you

4     agreed to do this, I made it an order, and failure to

5     comply with this order puts plaintiff into Rule 37(b)

6     sanctions, which are the nuclear option.

7          Because this is a court order, all right, and so

8     violation of this order is problematic.  So the question

9     is, when can we start to produce a duplicate of the

10    original?  And the answer is problematic.

11         So it sounds like plaintiff are going to produce

12    it.  The question becomes -- I guess the question becomes

13    when can it be done?  And so let's add that to the list of

14    things we are going to talk about on Monday.

15         Okay.  Moving on.  The last issue is that

16    plaintiff has marked almost every document as

17    confidential.

18         It appears that plaintiff has agreed to remove

19    the confidentiality designation as appropriate.

20         So Mr. Tate, where are you folks on that?

21         MR. TATE:  It's very similar to the last issue.

22    BCS has more or less acknowledged that they improperly

23    designated tens of thousands, if not hundreds of thousands

24    of dollars -- of documents as confidential.

25         They agree that they're going to go back and fix



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    the issue, and when I ask, okay, when is that going to

2    happen, they didn't answer.

3            I will be filing my motion for summary judgment

4    coming up here in short order.  And I don't want to

5    necessarily have to jump through all the procedures to

6    introduce documents that I've marked off to Excel if I

7    don't have to.  I don't want to incur that expense.  I

8    feel like it's not unreasonable for me to ask when they're

9    going to comply with the Court's order.

10           THE COURT:  I don't disagree.

11           So can I hear from plaintiff on that?

12           MR. LUEDDEKE:  Yes, Your Honor.  I think it's,

13   like Mr. Tate said, a similar issue with the duplicates.

14           We have agreed to de-designate documents on a

15   rolling basis.  Since the defendants raised this issue, we

16   have been -- we have designated fewer documents as

17   confidential.

18           I think there might be a dispute about what the

19   parties view as confidential under the relevant protective

20   order.  You know, a lot of these communications are

21   business communications.

22           With that said, we are going back, as we said we

23   would do, and (indiscernible) documents that do not meet

24   the standard in a good faith effort to comply with the

25   order and our agreement with the defendants.

78

1       As to when that will be done, it's the same

2   issue as the (indiscernible) tips; right?  And I guess

3   that's something we can discuss on Monday as well.  It's a

4   related issue.

5       THE COURT:  Okay.  Okay.  Understood.

6       So we've come to the end of the issue.  So now,

7   I'd like to discuss the bigger picture plan.

8       It seems to me that plaintiffs are able to

9   produce by custodian; right?  You can -- you can isolate

10  Mr. Lueddeke, I imagine, through your vendor, you can

11  isolate all the documents that belong to a particular --

12  that were collected from a particular custodian; right?

13      MR. LUEDDEKE:  That is correct, yes.

14      THE COURT:  So maybe a good approach is let's do

15  it by custodian and tell me if this is something that

16  would work, but my thought is, let's do it by custodian so

17  that we can keep the depositions moving. Because it's not

18  fair to ask Mr. Tate to take depositions without giving

19  him documents.

20      And when Mr. Tate -- I will tell you, though,

21  when Mr. Tate, if he does, files a motion for additional

22  time on the custodian for which there were no documents,

23  you know, he stands a chance.

24      I don't know what the facts are going to be. I

25  don't know anything.  But it's not an unreasonable request



1    for additional deposition time.

2           So to avoid that, as to people whose depositions

3    have not been taken, I propose, for the parties'

4    consideration -- and we can discuss the pros and cons of

5    this on Monday -- after you've had an opportunity to speak

6    with your vendor and the searches, sorry, the production

7    of data being prepared, let's do it by custodian.

8           And then that way we can come up with, okay, by

9    when can we address all these issues as to each custodian,

10   and then let's set that deposition date.

11          And I think that that's a good approach, at

12   least, I guess because I thought of it.  But I think

13   that's a reasonable approach.

14          You know, I'm open to different approaches,

15   because I don't really know what your vendor has and

16   hasn't done, and I would hate to create duplication of

17   work.  But we've got to find a way to get these

18   depositions moving.

19          You can't keep, you know, withholding documents,

20   or productions, I should say, or you can't do productions

21   in a way that halts depositions.

22          So those are my thoughts.

23          Mr. Tate, any response to that?

24          MR. TATE:  No, Your Honor, I think that's a

25   reasonable step forward.



1          The only thing that I would add, and I

2    appreciate what the Court is doing in accommodating us and

3    giving us the ability to collect the documents.  I would

4    only put out there that my clients are not openly

5    interested in continuing this out.

6          They want to seek resolution and absolve

7    themselves of these allegations.  So we're not interested

8    in doing this for years and years and years.  We want a

9    short time period on all of this.

10         THE COURT:  Yes, if it can get us to the truth.

11   But I don't disagree with you.  This has been going on

12   since at least September; right?  That's when I signed

13   this order.  So, you know, it is going to be on a tight

14   leash, what we do, you know.  The chips will fall where

15   they may if plaintiffs don't comply with a time schedule

16   that I'm going to order.

17         I am more than happy to extend discovery cutoff,

18   but I'm not going to extend it for months and months and

19   months. That's not going to happen.

20         So to DLA Piper, I would say, you know,

21   applause, applause for the fact that you've taken this on

22   as a pro bono matter. That said, you have every obligation

23   as if it was not a pro bono matter.

24         And I think maybe it was Mr. Lueddeke or

25   Mr. Kiker who acknowledged that at one point earlier

1    Today, but the fact that you folks have taken it on as a

2    pro bono matter doesn't excuse or allow for the delay of

3    discovery.

4            So I would like to reconvene on Monday the 24th

5    with a reason why we shouldn't proceed by custodian so

6    that depositions can go parallel to a continuing and

7    rolling production, which will be on a tight schedule.

8            And, in fairness, I guess before I close this

9    off, I should hear from plaintiff on that.

10           MR. LUEDDEKE:  Yes, Your Honor.  You mean with

11   respect to the custo- -- review by custodian proposal?

12           THE COURT:  Yes.

13           MR. LUEDDEKE:  I think, you know, we'll talk

14   about it internally, but I think it's -- you know, it

15   makes sense. I think it's a good proposal.

16           Like I said, I can talk to my team about the

17   nuances.  There might be some that I'm unaware of at this

18   moment, but overall, I think it makes sense.

19           THE COURT:  Okay.  So that will then -- that

20   keeps up what we need for Monday.

21           So on Monday, you folks are going to -- by

22   Monday at 10:00, you're going to send -- you're going to

23   circulate, not just to me, but also to defendants, the

24   declaration from the excused doctor as to what it is that

25   she can and can't do and an explanation of why she is able

1    to type emails related to work while she is on a cruise

2    but she's not able to sit for even small amounts for

3    deposition -- or small amounts of time for deposition.

4             Mr. Tate, my guess is -- not to rehash all of

5    what we already talked about, but my guess is you want her

6    deposition even if you have to do it half hour at a time,

7    is that --

8             MR. TATE:  Well, Your Honor, one of the things

9    that's wonderful about technology is that it's far less

10   inconvenient than it used to be.

11            THE COURT:  Okay.  Agreed.  Okay.  And can be

12   done while she's on a cruise.  And maybe she'll be very

13   relaxed.  I certainly would be.  I am very jealous about

14   the three-month cruise, but good for her.

15            So okay.  So we need a clear understanding with

16   foundation from whatever doctor you folks choose -- we'll

17   talk about the foundation later -- regarding why her

18   deposition is impossible.

19            So that will be one thing.  Then, also by

20   Monday, the plan -- the table that I requested of

21   custodians down the Y-axis and data sources across the

22   X-axis explaining what has been collected, what hasn't

23   been, and then we'll talk about production and the review

24   of that.  You know, if it's helpful -- in fact, it might

25   be helpful if you say you've collected it, it would be

1   good to know how much there is to review, because maybe we

2   could -- how many documents there are to review per

3   custodian.

4           Yeah.  Let's do that that.  If the answer is

5   yes, then let's talk about how many documents are at

6   issue.  If the answer is no, then there should be a

7   footnote as to why it hasn't been collected.

8           And then the other thing that we will discuss on

9   Monday is a custodian approach to continue to the

10  production.  And I think I have explained that already,

11  and it sounds like everybody understands.  So I don't need

12  to repeat it but -- okay?

13          And, please -- I am going to ask of DLA Piper,

14  please come with information.  There is -- anything

15  different than kind of a PMQ; right?

16          You know, she don't know the answer, that's

17  okay.  You don't have to have personal knowledge, but you

18  do need to come with information and answers.

19          MR. LUEDDEKE:  Understood, Your Honor.  Thank

20  you.

21          THE COURT:  All right.

22          Mr. Tate, these were your requests.  Anything

23  else I can do?

24          MR. TATE:  No, Your Honor.  (Indiscernible) for

25  the time that you've given us.



```
1              THE COURT:  Okay.  You're very welcome.

2              And for plaintiffs, if you have concerns, as you

3    stated, about defendants' production, please feel free to

4    submit a request for informal discovery after you folks

5    have met and conferred and then we can tee all of that up

6    and keep it all moving on one schedule.

7              MR. LUEDDEKE:  Thank you, Your Honor.

8    Understood.

9              THE COURT:  Okay.  Thank you, folks.

10             MR. TATE:  Thank you, Your Honor.

11             MR. KIKER:  Thank you.

12             MR. SCHWARTZ:  Thank you.

13                  (Proceedings concluded.)

14                       -o0o-

15

16

17

18

19

20

21

22

23

24

25
```

85

1                    TRANSCRIPTIONIST'S CERTIFICATE

2        I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in

4    the above-entitled matter.

5

6

7    *Jast Felix*                        June 20, 2023

8    _____         _____
                                              Date
9    Transcriber

10   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

11   /s/Ann Bonnette
     _____
     ANN BONNETTE, CSR. NO. 6108, President
12   Huntington Court Reporters and Transcription, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25