1

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4    BREAKING CODE SILENCE,              )    Case No. 2:22-cv-02052-
                                         )    MAA
5                    Plaintiff,          )
                                         )
6    vs.                                 )    Los Angeles, California
                                         )
7    KATHERINE MCNAMARA, et              )    Monday, May 1, 2023
     al.,                                )
8                                        )
                     Defendants.         )
9                                        )

10

11      TRANSCRIPT OF TELEPHONIC INFORMAL DISCOVERY CONFERENCE
             BEFORE THE HONORABLE MARIA AUDERO
12                UNITED STATES DISTRICT COURT

13   Appearances:                    See next page.

14   Court Reporter:                 Recorded; Telephonic (XTR)

15   Courtroom Deputy:               Narissa Estrada

16   Transcribed by:                 Kathleen Eastham
                                     Huntington Court Reporters
17                                     and Transcription, Inc.
                                     1 South Fair Oaks Avenue
18                                   Suite 200
                                     Pasadena, California 91105
19                                   (800) 586-2988

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service
25

2

```
APPEARANCES:
```
1
```
     For the Plaintiff        TAMANY VINSON BENZ, ESQ.
2    BREAKING CODE            JASON LUEDDEKE, ESQ.
     SILENCE:                 DENNIS KIKER, ESQ.
3                             DLA Piper
                             2000 Avenue of the Stars
4                             Suite 400 North Tower
                             Los Angeles, California  90067
5                             (310) 595-3000

6
     For the Defendant        ADAM J. SCHWARTZ, ESQ.
7    KATHERINE               ADAM J. SCHWARTZ, ATTORNEY AT
     MCNAMARA:               LAW
8                             9465 Wilshire Boulevard
                             Suite 300
9                             Beverly Hills, California 90212
                             (323) 455-4016
10
                             CATHERINE ANN CLOSE, ESQ.
11                            M. ADAM TATE, ESQ.
                             Julander Brown & Bollard
12                            9110 Irvine Center Drive
                             Irvine, California 92618
13                            (949) 477-2100

14
     ALSO PRESENT:            Law Clerk to Judge Audero
15

16

17

18

19

20

21

22

23

24

25
```

```
 1            Los Angeles, California; Monday, May 1, 2023
 2                          --o0o--
 3            THE CLERK:  Please come to order.  This United
 4   States District Court is now in session.  The Honorable
 5   Maria Audero, United States Magistrate Judge, presiding.
 6   Case number CV-22-02-052, Breaking Code Silence, et al.,
 7   v. Katherine McNamara, et al.
 8            Counsel, please state your appearance, beginning
 9   with the plaintiff.
10            MS. BENTZ:  Tamany Vinson Bentz, for plaintiff.
11            THE COURT:  Good afternoon --
12            MR. LUEDDEKE:  Jason Lueddeke, for plaintiff.
13            THE COURT:  Good afternoon, Mr. Lueddeke.
14            MR. LUEDDEKE:  Good afternoon, Your Honor.
15            MR. KIKER:  Dennis Kiker, for plaintiff.
16            THE COURT:  Good afternoon, Mr. Kiker.
17            MR. KIKER:  Good afternoon.
18            MR. TATE:  Adam Tate on behalf of --
19            THE COURT:  Good afternoon, Mr. Schwartz.  Is
20   that Mr. Schwartz?  I coughed over your speaking.
21            MR. TATE:  It's Mr. Tate, Your Honor.  Thank
22   you.
23            THE COURT:  I'm sorry.  Good afternoon,
24   Mr. Tate.  Excuse me.
25            MS. CLOSE:  Good afternoon, Your Honor.
```

4

1      Catherine Close, on behalf of defendants.

2              THE COURT:  Good afternoon, Ms. Close.

3              MR. SCHWARTZ:  Good afternoon, Your Honor.

4      Adam J. Schwartz, on behalf of defendants.

5              THE COURT:  Good afternoon, Mr. Schwartz.

6              All right.  And on the phone line, we also have

7      my law clerk.  And I am going to -- just a standing

8      apology for however long we go today.  I am very sick, but

9      I wanted to continue to move this forward.  So I have been

10     coughing and I lost my voice and it's a mess.  But in any

11     event, here I am so I apologize in advance to the parties

12     and everybody on the call for any coughing.  I'm going to

13     try to mute myself, but it's kind of hard to mute and take

14     notes and do everything at the same time.  So we'll do

15     what we can.

16             Okay.  So we are here on what I believe are the

17     only two remaining issues, which is the deposition of

18     Dr. Hughes, and then the document production by plaintiff

19     regarding the personal -- what do I want to call it? --

20     personal accounts of persons that they claim are not

21     employees or over whom they claim to have no possession,

22     custody, or control because they are volunteers.

23             So let's address the deposition situation first.

24     I will say thank you, Ms. Bentz.  I am -- I appreciate all

25     the work that I can see from your declarations that you've

1    done with respect to getting the declaration from

2    Dr. Calonga, who is Dr. Hughes's doctor, in response to

3    the questions that are raised about Dr. Hughes's purported

4    inability to sit for deposition.  I believe that it was a

5    lot of work, probably a lot more than you ever expected,

6    which is interesting, given the fact that Dr. Hughes gave

7    two declarations earlier, which do not appear to have gone

8    through this process.  So in response, do you have any

9    insights as to why Dr. Calonga was willing to give two

10   declarations in the past but now is not willing to do so

11   without going through the VA?  Do you have any insights?

12          MS. BENTZ:  Well, I haven't talked to her so I

13   can't speak -- you know, I can't answer that question

14   directly because I don't have a direct answer from her.

15   My understanding, though, was it was because I

16   specifically wanted to talk to her so I could run Your

17   Honor's questions by her before providing any kind of

18   draft declaration.  And my understanding is that it was

19   that request for a phone call that triggered her to go to

20   the risk management person who you saw in the

21   correspondence with my declaration and then the general

22   counsel's office.

23          THE COURT:  Right.  Excuse me.

24          Okay.  So the two declarations that Dr. Calonga

25   provided in the past were not something that you,

1    directly, had any questions of her.  It was declarations

2    that Dr. Hughes had requested of her?

3         MS. BENTZ:  Yeah.  That's how they made their

4    way to Dr. Calonga was through Dr. Hughes.  One of them,

5    if you've had a chance to look at them, you might have

6    noticed that one of them was drafted by Dr. Hughes's

7    personal attorney.  That was the first one.  And then, the

8    second one goes into the timing of her hospitalization and

9    the upcoming depo dates in our case, we actually drafted.

10        THE COURT:  I did not focus on that distinction.

11   So she has an attorney at this point?

12        MS. BENTZ:  Yes, Your Honor, because, again, she

13   is not a party in this case, and we don't -- DLA does not

14   represent her in her personal capacity.

15        There is another lawsuit that the defendants in

16   this case filed against BCS and Dr. Hughes and Ms. Miguel,

17   whose name I know you've heard, in superior court.  And in

18   that case, Dr. Hughes has her own personal attorney.  At

19   that time, at the initial time that we were talking about

20   accommodations for Dr. Hughes, and we were talking about

21   them across in both cases and that -- And so the first

22   declaration actually really arose in the state court case

23   that's in superior court.

24        THE COURT:  I've got it.  Okay.  But she is

25   not -- well, I guess right now, she is not -- she,

1    Dr. Hughes, has not taken any kind of a position because

2    there is no subpoena; right?

3              MS. BENTZ:  Right.  That's right, Your Honor.

4    There is not -- she has not been subpoenaed in this case.

5              THE COURT:  But BCS accepted the notice of her

6    deposition; right?

7              MS. BENTZ:  Yes.  At that time, she was going to

8    be a corporate designee for BCS, and we did accept a

9    deposition notice for her at that time.

10             THE COURT:  Okay.  Has there been a 30(b)(1)

11   depo notice?

12             MS. BENTZ:  I do not believe so.

13             THE COURT:  Ah.  Okay.  Let me hear from

14   defendant's counsel.

15             So really, all you have out there is the

16   30(b)(6) depo notice?

17             MR. TATE:  That is incorrect, Your Honor.  We

18   noticed --

19             THE COURT:  Okay.

20             MR. TATE:  -- she appear in her individual

21   capacity for April 4th and 6th.  She did not appear.  She

22   did not file a protective order, and then she left the

23   country.

24             THE COURT:  Okay.  Tell me that again.  You

25   issued a 30(b)(1) depo notice for her in her individual

1   capacity; right?

2            MR. TATE:  Yes, Your Honor.

3            THE COURT:  And can you remind me -- say that

4   again what the dates were?

5            MR. TATE:  Let me grab it.  April 4th and April

6   6th.

7            THE COURT:  Okay.  And she did not appear for

8   that and did not object; right?

9            MR. TATE:  No --

10           THE COURT:  And as to --

11           MR. TATE:  Sorry.  I don't -- we did not receive

12   a formal objection.  We did not receive a proposed

13   protective order.  We did receive a notice of declarations

14   from the doctor, or perhaps both of them at that point.

15           THE COURT:  How could you receive the second

16   declaration if you didn't take the first deposition?  That

17   doesn't make sense; right?  The second declaration came

18   after she had to be hospitalized.

19           MR. TATE:  The first deposition we took was in

20   her representative capacity.

21           THE COURT:  Oh, got it.  Okay.  Okay.  All

22   right.

23           Okay.  So you issued a 30(b)(1) depo notice.

24   You did not issue a subpoena; right?

25           MR. TATE:  That's correct.

1          THE COURT:  Okay.  All right.

2          Has any progress been made between the parties

3    on any of this?

4          MS. BENTZ:  This is Tamany.

5          From BCS's perspective, I mean, we were able to

6    obtain times and dates when Dr. Hughes would be able to

7    sit for a personal deposition.  We provided those to

8    opposing counsel last week.  That's -- from our

9    perspective, that's where it stands now.

10          THE COURT:  Okay.  And these depositions,

11   whenever it may be scheduled, if your -- is Dr. Hughes

12   still taking the position that she will not sit for a

13   deposition other than one hour on, one hour off, one hour

14   on, per day?

15          MS. BENTZ:  Yes.  That's my understanding.

16          THE COURT:  Okay.  Can I hear from defendant's

17   counsel?

18          I think we've pushed you about as far as we can.

19   I mean, I understand that defense has a (indiscernible),

20   counsel; right?  Is that correct?  Do I understand that

21   correctly?

22          MS. BENTZ:  You do, Your Honor.  We are

23   scheduled to speak at 11:30 tomorrow.

24          THE COURT:  And did I read correctly that it

25   sounded like you might be able to get -- excuse me --

1    Doctor -- oh, what's her name? -- Calonga to sign a

2    declaration?

3           MS. BENTZ:  Yes.  My understanding from the VA

4    general counsel's office is when presented with Your

5    Honor's questions, and an understanding for what you were

6    asking, that they are willing to have her sign a

7    declaration as long as they are given approval of it

8    before she signs it.

9           THE COURT:  Do you have any idea how long that

10   will take?

11          MS. BENTZ:  Well, my plan, Your Honor, is to

12   talk to her at 11:30 and immediately get something based

13   on her answers to your questions to the VA counsel's

14   office tomorrow afternoon and ask that they, you know,

15   review it very quickly.  They were very prompt last week

16   so I am hopeful that I could get it signed by Dr. Calonga

17   on Wednesday because my understanding from her email is

18   that she is actually not in the office Thursday or Friday

19   this week.

20          THE COURT:  Okay.  All right.

21          Can I hear -- thank you for that.  That is very

22   good in that regard so thank you for that.

23          Can I hear -- I don't know -- from Mr. Tate,

24   Mr. Schwartz, somebody on the defendant's side, what do

25   you folks want to do?

1          MR. TATE:  Yes, Your Honor.  This is Adam Tate.

2          I think the issue is pretty much teed up.  If

3     the Court wants to continue this for one more week, I

4     guess we'd be okay with that.  But at a certain point

5     there needs to be some justification for her not showing

6     up for her deposition, some explanation why she felt like

7     she could leave the country instead.

8          THE COURT:  I agree.  I don't disagree.  So I

9     think that -- and -- and -- well, I'm going to go back.  I

10    think you -- in -- asked -- you raised this issue last

11    time because we'd like to know why she hasn't shown up for

12    her deposition, without your sanction motion, I should

13    say.

14         I don't think it's going to move the ball

15    forward for you to get her deposition.  So I think that

16    what we await clarification of is really what can and

17    can't she do because it sounds like to me like this one

18    hour on, one hour off, one hour on is not any kind of a

19    medical restriction that has been imposed by her doctor.

20    At least, we'll see; we'll see.  That's one of the

21    questions that I raised, and in a sense, I want to make

22    sure that you saw that I added a question in my last order

23    for Dr. Calonga; okay?

24         MS. BENTZ:  Thank you for flagging that for me.

25    I appreciate it.  I will make sure to look at it.

1          THE COURT:  Thank you.  And it's exactly this,

2     like, whose idea was this, one hour on, one hour off, one

3     hour on; right?  Because if it's something she is focused

4     on, I do not, without any kind of medical support,

5     obviously, that's not going to be a limitation that I'm

6     going to allow.  And, you know, we'll see what her doctor

7     says, but that is the additional question.

8          So I do think that we need to -- you know, we

9     are talking about somebody's health so I do think that we

10    need to let this thing play out as much as it can.  I do

11    see that Dr. Hughes has offered some dates, which -- I

12    didn't look on the calendar, but I don't know, are they

13    weekend dates?

14          MS. BENTZ:  No, Your Honor, they are weekday

15    dates.

16          MR. TATE:  Half of them are weekends.

17          THE COURT:  Okay.  Well, that's fine.  I asked

18    for weekends as well, so that's good.  So thank you for

19    that.

20          So, you know, the question is going to be how

21    does this deposition go forward?  I think that let's just

22    wait and see what Dr. Calonga has to say.

23          And then, Mr. Tate, you folks will have to

24    decide where you want to take this.  I think that I've

25    done as much as I can to help you, short of issuing an

1    order that she must sit for deposition that I am just not

2    comfortable issuing until I hear from her doctor.

3            MR. TATE:  Understood, Your Honor.

4            THE COURT:  So let's see how this one plays out.

5    But how about we sort of table this one and we come

6    back -- is there a time, Ms. Bentz, that you feel like you

7    might have something substantive for us --

8            [MULTIPLE SPEAKERS.]

9            MS. BENTZ:  Yeah.  I'm very hopeful that I will

10   have it on Wednesday.  That's obviously contingent on the

11   VA general counsel's office reviewing it quickly so

12   Dr. Calonga can sign it Wednesday.  I am happy to provide

13   the Court and opposing counsel an update on either a

14   signed declaration from Dr. Calonga or an update on where

15   it stands on Wednesday, if that would be helpful to moving

16   things forward.

17           THE COURT:  I think it would.  Shall we -- shall

18   we set a date on this for May 3rd at 2:00 p.m.?  Does that

19   work for the parties?

20           MS. BENTZ:  I'm checking my calendar really

21   quick.  Can we -- I can make that work on my end, Your

22   Honor.

23           THE COURT:  Mr. Tate?

24           MR. TATE:  That is fine, Your Honor.

25           THE COURT:  Okay.  Let me just mark it --

14

1          MS. BENTZ:  And -- and -- just a correction,

2      Your Honor.  If I don't have a signed declaration from

3      Dr. Calonga by 2:00 p.m. on Wednesday, would it be helpful

4      for me to email the Court and let you know that so that

5      that conference can be pushed, or would you prefer to have

6      it on Wednesday?  I'm fine either way.

7          THE COURT:  Yeah.  Thank you for that.

8          I don't know that I -- that we need to have --

9      hold a conference where we don't have any new information;

10     right?  So I guess the question is the fact that you won't

11     have a -- does the fact that you won't have a declaration,

12     that's the thing.  You don't have a declaration.  Does

13     that mean that the VA has decided that nobody is giving a

14     declaration here?  Or does it mean you weren't able to

15     complete the declaration?  I think that's important for us

16     to know; right?  Because if it's the former, then I think

17     we should meet on Wednesday and figure out where we go

18     from here.  But if it's the latter and you think that you

19     can have it by, I don't know, Thursday or whatever, then

20     if you let us know that, then, you know, we can continue

21     this date to a date where we will actually be able to

22     address whatever the declaration will say.

23          Does that make sense?

24          MS. BENTZ:  It does, and that's a very fair

25     point.  I do agree, if they're not going to sign a

1   declaration, that it would be time for us that getting

2   back on the phone makes sense.  That's new information.

3   But yes, I'm happy to update the Court along those lines

4   and let you know where it stands.

5               THE COURT:  Okay.  Okay, then.  What we'll do is

6   we'll give them -- we'll work via email if we need to

7   continue the need for a date.  But for now, we'll set it

8   at May 3rd at 2:00 p.m.

9               MS. BENTZ:  Understood.  Thank you.

10              THE COURT:  All right.  Thank you.

11              Okay.  I think that's it for the deposition

12   issue as to Ms. Magill and Dr. Hughes.

13              Anything else on that, Mr. Tate, before we move

14   on to the documents --

15              MR. TATE:  I think that does cover at least

16   where we are for Ms. Hughes.  Ms. Magill, we still need to

17   be able to (indiscernible) further, you know, the idea

18   that we were going to discuss when we asked her for some

19   documents, then we could take those depositions.  And so

20   we do need to be able to schedule Ms. Magill's deposition.

21              I'm a little disappointed in the unavailability

22   list that I got from both Dr. Hughes and Ms. Magill where

23   they indicated they were unavailable on the vast majority

24   of dates because of their work or other things that

25   typically are not an excuse not to appear for a

1   deposition.

2          THE COURT:  Yeah.  I mean, you have to decide

3   how far you want to push it.  A lot of people have

4   vacation that they can use for these kinds of things.  So,

5   yeah, I'm not going to get involved at that level.  But I

6   can assure you that because I set the schedule in this

7   case, these kinds of date issues -- shall we call them

8   that -- are not going to stand in the way of the

9   discovery, and you will have time to do the discovery that

10  you need to do in this case.

11         MR. TATE:  Thank you, Your Honor.

12         THE COURT:  Okay.  All right.  Let's move on to

13  the document issue.  And I think where we left off -- and

14  thank you, by the way, to plaintiff's side for all of the

15  information that they provided, but primarily because it's

16  very helpful.

17         So I guess I'd like to hear from Mr. Tate your

18  response to what were two issues.  We've got, you know,

19  the schedule of depositions.  But more importantly is we

20  have a bunch of individual third parties who have decided

21  they are going to apparently dig their heels in and not

22  provide anything.  So you have to decide where you're

23  going to go with that.

24         I have some thoughts about how to manage this in

25  the most cost-effective way for everybody, including the

1   third parties, but let me hear from you, Mr. Tate.

2            MR. TATE:  Yes, Your Honor.

3            I feel that it's really two issues.  There's --

4   at the last IDC, BCS told us that they have about 47,000

5   documents that they've already collected, have not yet

6   produced, and they are indicating they need 70 days to be

7   able to produce those.  If that's the issue the Court

8   wants to track with first, I'm happy to tackle that.

9            The second issue is the collection of documents

10  from the custodians.  And I'll take them in whatever order

11  the Court wants to talk about them.

12           THE COURT:  Let's take I think what will be the

13  easy one, which is the 37,000 documents that have been

14  collected but have not yet been produced.

15           MR. TATE:  Yeah.  The number is actually 47,000.

16  BCS is indicating that they need 70 more days to produce

17  those.  I'm just trying to understand it with a firm of

18  DLA Piper's size.  That's the understanding of what's been

19  going on for the last three weeks that we've been having

20  these IDCs.

21           For instance, this week, today, DLA Piper

22  produced only 229 documents.  And at the last IDC, they

23  specifically told us in court they had already reviewed

24  and were ready to produce over 1100 Slack documents, and

25  for whatever reason, we didn't get the 1100 Slack

1   documents.  And it's just really frustrating to feel like,

2   you know, apparently they have documents, they've reviewed

3   documents, but for whatever reason won't produce them to

4   us.  And then, they are asking for what I think is an

5   unreasonable amount of time for the remaining documents

6   that they've already collected.

7        THE COURT:  Yeah.  Yeah.  I -- well, let me hear

8   from plaintiff first.  I think you've heard my general

9   thoughts about this kind of a delay, but let me hear from

10  Kiker.

11       MR. KIKER:  Thank you, Your Honor.  This is

12  Dennis Kiker.  And I completely understand.  There has

13  been some confusion about the way the chart was

14  represented last time with specific reference to

15  Mr. Tate's comment about the Slack account.  We had

16  reviewed 1148 documents.

17       As we discussed before, that was the number

18  reviewed.  Not all of the information is relevant.  Some

19  of the information is potentially privileged.  So we

20  produced the documents that were relevant and not

21  privileged, and that's what we produced in the production.

22  I don't believe -- and if I did, I apologize -- for

23  representing that the entire stack of 11,048 would be part

24  of that production.  It was -- those were documents that

25  were reviewed.

19

1          Just generally speaking, however, though, I

2     mean, I concede that DLA Piper's a large firm.  The issue

3     really isn't DLA's size.  It's really our client, and our

4     client's resources, which are limited and based on

5     voluntary services being provided not only by us but even

6     the people in the day-to-day work of the organization.

7     And we have leveraged, as best we can, the resources we've

8     been able to identify, including pro bono, E-discovery

9     services, collection services, document review services.

10    All of that is being done at as high a pace as we can.  In

11    fact, this week, I was able to secure double the number of

12    pro bono hours for review so hopefully we'll get through

13    some additional material this week.

14          But just to be fair, in terms of pace, we

15    produced more documents than the defendants have in the

16    same time frame.  We have -- as I understand it, they are

17    pretty much done, although they did make a production on

18    Friday.  We still have quite a bit left to do so we will

19    wind up producing, you know, probably -- easily more than

20    double the volume of documents by the time we're done.

21          We're not objecting to doing that.  We're not

22    claiming that's unduly burdensome or unreasonable to

23    finish the review and the production.  It's simply a

24    resource constraint on the part of our client to be able

25    to manage anything more than what we are doing now, and we

20

1    feel that we can complete the documents that we've

2    identified as having been selected and staged for review.

3    We just need additional time to get that done.  And that's

4    what we're requesting of the Court, and I realize that we

5    are relying so far just on cooperation with opposing

6    counsel and informal discovery process.

7            But were this a motion for an extension, that

8    would be the basis, is that this is really a resource

9    constraint.  There have been no requests for extension of

10   time at all in this case so far, and the delay is really

11   as a result of we're just having more documents than we

12   anticipated having and just have not been able to marshal

13   the resources to get through them as quickly as we would

14   have liked.

15           THE COURT:  Well, but, nevertheless, they

16   brought the lawsuit.  What did they think was going to

17   happen?

18           [MULTIPLE SPEAKERS.]

19           MR. KIKER:  I completely understand, Your Honor.

20   And I think it was really -- as I said, it really was the

21   context of the volume of documents.  And the volume of

22   documents is in part driven by the search terms, and

23   really, you know -- I accept, and we thought we would get

24   it done in this amount of time.  We just didn't realize

25   the volume of documents that were going to be there.  And

1     as I have noted, we have produced 25 percent more

2     documents already than the defendants have.  We just have

3     a far larger population, it appears, to review and fewer

4     resources to get it done.

5               THE COURT:  Okay.  I said this at one of the

6     prior informal discovery conferences, and I'm going to

7     repeat it because I think it bears repeating.  Discovery

8     is not a quid pro quo.  I'll give you as much as you give

9     me and the speed you give it to me.  That's not how it

10    works; right?  You may have produced 25 more -- percent

11    more documents because you have 25 percent more documents.

12    So that is not persuasive argument from you --

13              MR. KIKER:  Your Honor -- I apologize.  I didn't

14    mean to state that as a critical -- or anything of that

15    nature.  We expect to produce many more documents from the

16    defense.  I mean, we -- that is a fact, I think one that

17    we understand -- illustrating that it's taking us longer

18    because we have more documents, not that we shouldn't be

19    producing more documents, but it's taking more time just

20    because there are more.

21              THE COURT:  Yeah.  Fair enough.  All right.

22    We'll look.  47,000 documents -- I've done document

23    productions, both as an associate and as a partner.  I

24    don't believe that 47,000 documents can't be reviewed and

25    produced in less than, I don't know, six weeks or

1    something more.  So that reasoning is not going to work.

2    You folks are going to have to go back to the drawing

3    board.  If you want to propose something more reasonable,

4    I am more than open to hear a reasonable proposal, but I

5    can tell you that the proposal that plaintiff has made is

6    not reasonable.  It's just not.

7            And so this case has to keep moving, and what's

8    holding it up is plaintiff.  So -- in every respect.  So,

9    you know, from depositions to documents to more

10   depositions.  So, you know, and you'll need -- yeah.  I'm

11   just going to leave it there.

12           So I think I would like to have plaintiff

13   regroup with its folks who brought the case and figure out

14   a production.  I -- 47,000 documents, if you review 1500 a

15   day, that's a month -- right? -- if I did the math right.

16   So I'm not sure why 1500 documents can't be reviewed in a

17   day.  I just -- I'm not sure.  I don't understand it.

18           And I want to go back to the Slack documents.

19   So there were 1100.  You've produced 200, I think.  I

20   don't know if I caught it correctly, but plaintiff has

21   produced 219, and the explanation is some of it is not

22   relevant.  Fair enough.  Some of it is potentially

23   privileged.  I'm not sure what is potentially privileged.

24   How is it that you're reviewing documents and determining

25   that they are potentially privileged yet you're not

1    determining that they are privileged?

2         MR. KIKER:  Fair question, Your Honor.

3         I don't have those figures at my fingertips, and

4    I will, in all candor, say that those are the two reasons

5    that we would withhold documents is that they are

6    potentially privileged.  And we will always do a second

7    look at any document that's tagged during the first pass

8    review as privileged to confirm that the privilege is

9    valid and that it belongs on a privilege log.  Quite

10   often, we'll overturn those calls and produce those

11   documents.

12        I have not done that yet in this case.  And so

13   if there are documents in the set that are potentially

14   privileged, they will be reviewed again, and only if that

15   tag, that designation, is deemed to be valid would they

16   ultimately be withheld and wind up on a privilege log.

17        THE COURT:  Okay.  Well, if that is your

18   process, that is your process.  I can only tell you as to

19   this lawsuit and its movement.  So my -- if I have to

20   order something right now, I'm going to order those

21   documents, all of them, all 47,000-whatever, obviously, be

22   reviewed and production made of what is relevant and non-

23   privileged in 30 days.  You want to make a different

24   proposal, make a different proposal.  I can be convinced.

25   I'm here to hear you out, but I'm just not convinced.

24

1        And, you know, it does fall on you that you are

2   DLA Piper.  There's no way around that; right?  You're a

3   big lot, and, you know, good for you and good for the

4   community that you are taking this on pro bono.  But, you

5   know, that's not a reason to not produce, and I know you

6   know that.  And that's also not a reason for things to

7   take longer than they should.

8        So I -- that's where I am landing right now, but

9   I'm happy to reconvene on May 5th and hear your final

10  proposal.

11       MR. KIKER:  That's clear, Your Honor.  We can go

12  back and talk, and there may be some things that we can

13  do, and we'll -- if possible, we can meet with opposing

14  counsel as well, in the interim, to see if there is

15  something that we could come up with collaboratively that

16  would make this go more quickly and within the constraints

17  that we have.  But I appreciate that, Your Honor.

18       THE COURT:  Okay.  All right.

19       [MULTIPLE SPEAKERS.]

20       MR. TATE:  Before I leave this topic, can I just

21  make an inquiry.

22       Am I understanding you correctly, Mr. Kiker,

23  that all the Slack documents that we're going to get have

24  now been produced?

25       MR. KIKER:  Yes, with the exception of anything

1    there is -- was tagged privileged, and it would ultimately

2    get downgraded.  But that would be correct, yes.

3             MR. TATE:  Your Honor, we'd like permission,

4    then, to file a motion based on their refusal to produce

5    relevant documents.  Several witnesses have testified

6    that -- of communications by the Slacks, and they just

7    weren't produced.  If that's all we're going to get, then

8    I think it's time for a motion.

9             THE COURT:  Okay.  So let me hear your thoughts

10   on -- it seems that some witnesses have said that they

11   have stuff, and now you folks are going to have to educate

12   me.  But as I understand it, Slack is an app that is owned

13   by a company, an entity, not individuals.  Am I right

14   about that?

15            MR. TATE:  In part, Your Honor.  It goes both

16   ways.  I could have a personal Slack account, but in most

17   cases, it is something that is licensed by an entity.

18            In our case, there are several different levels

19   of licensing that are available on Slack.  In the case of

20   Breaking Code Silence, we have what is referred to as the

21   O license, which is the second level above the free

22   personal license, and it's provided to DPS 3 as a public

23   service by Slack.  It's for a non-profit organization.

24   There are higher levels of licensing which give you

25   greater capabilities than you get with the Pro.

1          One of the issues that's come up, you might

2     remember, was with respect to Slack audit logs.  Those

3     audit logs are only available with the Enterprise license,

4     which is designed for companies with a thousand or more

5     users.  It's not available on our particular license so

6     some of the limitations we have with Slack pertain to the

7     licensing that we have with the company.

8          THE COURT:  Okay.  But is it possible that -- so

9     Mr. Tate, why are you so sure that when they do the next

10    pass, their privilege pass, they won't be producing more

11    documents that may satisfy you?

12         MR. TATE:  Your Honor, that's why I specifically

13    asked whether this was all the documents that we were

14    going to get.  You know, it's my position -- I've heard

15    from several witnesses say that there were Slack

16    communications discussing the allegations against my

17    clients concurrent with the BCS (indiscernible).  Those

18    documents were not produced.  And I'm being told that the

19    Slack documents is all I'm going to get.  That tells me

20    that BCS is hiding the ball.  It's that simple.

21         THE COURT:  Well, hold on.  That's not what they

22    said; right?  What they said was, they have 11,000-plus

23    Slack documents, they've given you 219 that they have

24    determined are relevant and non-privileged.  We have a

25    whole bunch of other documents that may be privileged that

1    you have to go through the privilege review.  If they are

2    not deemed to be privileged, then they will be produced

3    so -- if they're relevant.  So it seems to me that there's

4    still, yet, another chance before you folks spend a lot of

5    time and effort on a motion that might be resolved if we

6    give Breaking Code Silence until May 3rd and see what they

7    give you on May 3rd.

8            Can you -- can Breaking Code Silence finish that

9    privilege review?

10            MR. KIKER:  By May 3rd, potentially?  I could

11    commit, Your Honor, to being able to resolve that question

12    and give Mr. Tate a definitive answer by the end of the

13    week.

14            THE COURT:  No.  No.  I need to know if --

15    11- -- let's assume that the 1100 documents, minus 219,

16    everything is potentially privileged.  I don't think

17    that's the case because you've said already separated

18    things that are not -- that were not relevant; right?

19    (Indiscernible.)  That just means you have to review, I

20    don't know, 800 documents.  How can you not finish this

21    review by May 3rd?  I'm sorry, not May 3rd.

22            Is May 3rd the date that you picked?

23            MR. KIKER:  Yeah.  May 3rd was the date they

24    picked for that conference about those doctor dates.

25            MR. COURT:  Okay.  So maybe May 3rd is too soon.

1          Can you commit to finishing the review by

2    May 5th?

3          MR. KIKER:  Yes.

4          THE COURT:  Okay.  I think that's a fair amount.

5    After that, Mr. Tate, if you still have reason to believe

6    that they have withheld relevant non-privileged documents,

7    enough to bring a motion, then, yes, you can bring your

8    motion on the Slack documents.  Okay?

9          MR. TATE:  Thank you.

10         Your Honor asked about the production of

11   documents that they've already collected.  I suppose we'll

12   have to see what BCS's proposal is and how that appears to

13   us.

14         Now, if I could turn our attention back to the

15   collection of documents and the custodians, my

16   understanding is the Court ordered BCS to go out and

17   obtain information from the custodians listed in the DBL

18   whether they have information or not.  BCS has to have  a

19   defense.  I don't know whether they get it.  They clearly

20   sent something to my clients and a small handful of

21   persons on the custodian list.  But of the 10 persons,

22   named persons on the custodian list, we only received five

23   from BCS.   (Indiscernible) no longer works for BCS.  And,

24   you know, we don't have any information of whether Jane

25   Magill, Oragard (spelled phonetically), Fulcomet (spelled

1    phonetically), Adam Carnright (spelled phonetically),

2    (indiscernible) Kirckhoff (spelled phonetically) or any of

3    the other current board of directors or any of the other

4    persons that have or should have accessed, we don't know

5    what sources they have.

6             What we do know is that three of the five people

7    that BCS reached out to refused to identify what accounts

8    they even have.  They just said they'll give us nothing.

9             And then, Hughes, she did identify what she has.

10   Of course, she wouldn't share anything.  Jenson, for the

11   most part, identified what he has and said he would

12   produce very little.  But we still don't know what

13   information the other custodians have or whether they'd be

14   willing to produce.

15            THE COURT:  I mean, I think we do know; right?

16   Maybe I missed it, but as I look at the documents that

17   were sent, every custodian filled out a form; right?  And

18   they said I have --

19            MR. LUEDDEKE:  But -- Your -- I'm sorry, Your

20   Honor.  This is Jason Lueddeke.

21            We sent out the form to all the custodians

22   listed in Section 4.3 of the order.  We have not heard

23   back from all of them yet.  The ones that we did hear back

24   from, their responses were provided to the Court this

25   morning.  So just to clarify Mr. Tate's point, we sent --

1  we followed the order to the letter.  We sent each

2  questionnaire to every custodian listed in Section 4.3.

3  Just to clarify.

4        THE COURT:   Thank you.  That was my mistake.

5  So we're missing -- we're missing some custodians.

6        Let's talk about this in the broader picture.

7  You alluded to this, for defendants to get the information

8  from these custodians, whether they want to cooperate or

9  not; right?  We all know that the power of a subpoena is

10  going to be apparently more powerful than what plaintiff

11  is willing to provide.

12        I don't understand why a third party, who can

13  work with plaintiff's counsel to produce documents, would

14  choose to go down the road of a subpoena rather than

15  cooperatively provide documents to plaintiff's counsel.

16  Plaintiff's counsel would review the documents, help

17  them -- help the third party screen the documents, help

18  the third party determine if there's privilege, help the

19  third party or do the production themselves.  And yet,

20  they are digging their heels in, and, of course, plaintiff

21  is not doing anything in this regard.  And this is very

22  disturbing to me.

23        You folks can decide that you are -- BCS can

24  decide that it is going to dig its heels on possession,

25  custody, or control, and spend a lot of money.  Maybe

1    they'll win, maybe they won't; right?  Maybe

2    (indiscernible) might have it right.  I don't know.  I

3    think we talked earlier about the locks.  You know,

4    Breaking Code Silence has contract.  And at the very

5    least, Breaking Code Silence has no possession, custody,

6    and control, then it's in breach of contract, could be

7    found to be in breach of contract, making a whole other

8    issue; right?

9         So I don't understand why this can't be resolved

10   the easy way.  And I just think I'd like to hear from

11   plaintiff's counsel what efforts have you made to resolve

12   this the easy way, which is to say, look, you're going to

13   get subpoenaed, and then you're going to have to, you

14   know, maybe retain your own counsel, who maybe will

15   represent you, but, you know, you couldn't get much --

16   let's not even go into the conflict of that, but let's set

17   that aside for a moment.  The possible conflict, I should

18   say, not a conflict.  It's going to be cheaper for the

19   third party.  If a motion to compel a subpoena for the

20   relevant documents is brought to me, I'm going to grant

21   this; okay?

22         And while I'm on the subject, it's relevant and

23   non-privileged -- and I would hope they haven't spoliated

24   anything; right?  Because they're on the hook.  Why?  Why

25   can't you folks figure this out, and you do right?

1      MR. KIKER:  So I think, Your Honor, I think part

2   of the issue is the number of these custodians are former

3   members who objected vigorously to us voluntarily

4   collecting their materials, as you can see from Mike

5   Hurwitz's son, which was included in my email this

6   morning.  She said she's not doing anything, not giving us

7   a piece of paper, until -- unless she is legally mandated.

8      THE COURT:  Uh-huh.

9      MR. KIKER:  So for those types of people, I

10  mean, we don't have -- they're objecting to us collecting

11  their documents; right?  And putting aside that we do

12  maintain our position that the custodians are outside our

13  possession, custody, or control, the custodians,

14  themselves, seemingly, some of them have no interest in

15  complying with our request.  So we can't make them; right?

16  That's -- we can't make them.  So -- and that's where

17  we're at.  I mean, we were ordered to find this

18  information -- find out this information, whether they had

19  these other sources, and if they did, we actually went a

20  step beyond what was in the order and asked them if they

21  would be willing to provide us those documents.  And we

22  gave you the responses.

23      We sent out the questionnaires last week.  We

24  received most service on proof last week -- or last night.

25  And we provided them.  So thus far, those are the efforts

1    that we've made.  And we believe that complied with the

2    letter of the order.

3            THE COURT:  I don't disagree.  A lot of work was

4    done between our last time together, and there is no

5    question about that.  And I am very thankful for that.

6    But how to move the ball forward but in a direction that

7    makes no sense.

8            I have said I don't disagree that if -- even if

9    you had possession, custody, and control, if they're not

10   willing to give you the documents, I don't know that you

11   can get them; right?

12           MR. KIKER:  Correct.

13           THE COURT:  I wonder if -- you certainly can

14   choose to fight the site over possession, custody, and

15   control, and you win; you could lose.  If you lose, you

16   could fight the fight over a breach of contract, based on

17   the language of the stipulation that, you know, Breaking

18   Code Silence agreed, according to the very clear language

19   of the stipulation.  Now whether they should have or not

20   is also the thing; right?  But you do have an agreement.

21   Or everybody can decide to work together, and let's see if

22   a subpoena does the trick.  Maybe those folks won't

23   respond to anything but a subpoena.  And right away;

24   right?

25           Then you've got -- then you've got contempt

1   powers; right?  You've got daily signs.  You've got -- you

2   know, you'll be in jail for every day that you don't

3   produce documents.  I mean, you've got all sorts of

4   powers.  I'm saying that's the way you should go, but the

5   contempt power of the Court is very, very high; right?

6   And very strong, I should say.

7          Should we get to that?  No, we shouldn't.  But

8   if that's the way it's going to go, then we should keep --

9   my sense is you're better off issuing the subpoena, and

10  let's see what they do.  I mean, maybe they'll produce

11  under the subpoena.

12         You've got another claim against Breaking Code

13  Silence, I think, for not complying with the stipulated

14  protective order.  That's a whole other issue, and that's

15  a whole other can of worms.  But I don't know.  It seems

16  to me, just issue your subpoenas and be done.  They're

17  telling -- counsel is saying these guys -- these people

18  are not giving us documents.

19         Now, is it believable that Magill isn't giving

20  documents; right?  I don't know about that.  That was --

21  you know, Magill is pretty high up in the ranks; right?

22  And so is -- I guess the question becomes is Breaking Code

23  Silence actually going to take the position that there

24  is -- that Dr. Hughes and Magill aren't high enough up in

25  the ranks to gather their documents upon request, given

1   their position with the company?  I mean, that would seem

2   a bit inconsistent to me with -- they are the company

3   representatives that are going to bind the company at

4   deposition; right?

5           So there's just all sorts of problems that are

6   going to take a bit of time and a lot of money to unravel,

7   and, Mr. Tate, I'm not sure they're going to get you what

8   you want in the end.

9           MR. TATE:  I hear what you are saying, Your

10  Honor.  And perhaps the appropriate method is to go

11  forward with the breach of contract.  They -- and the

12  reason is the vast majority of the custodians who we have

13  not heard from are all director -- current directors or

14  officers.  I don't think we understand why BCS can't call

15  these people who they are presumably in contact with, why

16  they can't seem to reach some.

17          For instance, Ms. Magill, we did not receive the

18  questionnaire how we can know what her availability is for

19  the entire month of May and we can't know what sources she

20  has or whether she is going to produce.

21          [MULTIPLE SPEAKERS.]

22          THE COURT:  Let me stop you there, Mr. Tate,

23  because I want to do this in bits and pieces.  So I

24  apologize for the interruption.

25          But let's talk about the people who have --

1   doesn't their (indiscernible) have said, you know what, we

2   were your volunteers.  We are -- maybe we still are.  We

3   don't care about this organization -- or I don't know what

4   they're saying.  But we're not giving you anything,

5   counsel for the organization; right?  Let's talk about

6   that because I think that those people are different, and

7   I understand that I am the one who's grabbing Ms. Magill

8   and Dr. Hughes, but they are a different situation; right?

9   And so I keep wondering if you can resolve that situation

10  more easily than the other.

11        MR. TATE:  I think it's those three persons that

12  we would probably have to issue a subpoena when the issue

13  becomes what else do we do, especially since all those

14  persons were with BCS when the EDO was submitted, when BCS

15  represented in the EDO that it took steps to preserve

16  documents for those persons.

17        But, you know, if they're not going to consent

18  now to the production of documents, then I guess I will

19  have to go force them to do so through a subpoena.  And

20  then I'll pursue other rights against BCS for breaching

21  the EDO and for breaching -- it's for misrepresenting that

22  it had to contest to preserve this data.

23        THE COURT:  Yeah.  I'm not sure that's inside

24  this case; right?  That's for the discovery motion that I

25  think would end up before me.  I think that it's just a

1   different case, which the defendants would have to thank

2   BCS.  I'm not sure that that's part of this discovery

3   matter.

4        MR. TATE:  Your Honor, it wouldn't be a proper

5   sanctions motion, however, though.  It's a Court order,

6   The EDO, it's signed by the Court.

7        THE COURT:  Right.  So it -- but that relies on

8   the idea that you are absolutely certain that you are

9   going to win possession, custody, and control; right?

10        MR. TATE:  Well --

11        THE COURT:  They -- also justification which

12   they are claiming is their possession, custody, and

13   control argument.  I'm not sure if the sanctions flow.  If

14   you are right, however, then we are talking about Rule

15   37(b) sanctions -- right? -- which could include a

16   default; right? --

17        MR. TATE:  Your Honor --

18        THE COURT:  -- because it's (indiscernible).

19        MR. TATE:  I think that's the motion that we

20   need to be able to bring.  But the least -- what I -- my

21   review of the laws is pretty clear where it comes to

22   personal communications, such as personal emails.  And at

23   least three Ninth Circuit cases address this issue, and

24   they've all held that you can't avoid discovery by just

25   having the officers or directors use their personal emails

1    instead of the company emails.

2           And if they're going to take that position, that

3    they don't have to turn over their personal emails, or the

4    Signal account, which is essentially the same thing, then

5    I think that we need to be able to bring that sanctions

6    motion.

7           THE COURT:  I think that we are at the point --

8    if we were at the point where BCS can offer nothing more,

9    then I don't disagree with you.  And then, you know, the

10   fight will be over whether BCS has possession, custody,

11   and control over the personal documents of certain people,

12   if any.

13          I think the answer is different depending on the

14   position of the people; right?  And I'm not weighing in on

15   what the answer is.  Again, they have to -- I'm interested

16   in the briefing.  I think that this is something that

17   would have to be brief.  But if BCS is not willing to

18   offer anything else, then I think we are at a 37(b)

19   motion.

20          MR. TATE:  I think, then, what I would I prefer,

21   Your Honor, is if by May 3rd, BCS can tell us for each of

22   the custodians -- because right now, I don't know for many

23   of the current officers and directors -- what the stance

24   of each of the custodians are taking and so that I can

25   weigh whether I need to bring that motion or not.  Right

1   now, I suppose there is some possibility that someone can

2   say, oh, yes, I was -- I'll produce them or I was always

3   going to.  But I just don't know because BCS hasn't told

4   us that.

5               THE COURT:  Yep.  I mean, look.  This issue of

6   possession, custody, and control is very tricky when it

7   comes to an organization that claims to -- well, that has

8   no employees, claims to ask only for volunteers, but then,

9   offer is (indiscernible) ex-representatives of the company

10  for one purpose but not another; right?  And I don't

11  know -- I mean, that just doesn't sound right to me, just

12  kind of as a step test.  But, you know, volunteer

13  situations are very, very interesting.

14              So, you know, is BCS willing to go down this

15  road?  This is what you want?  I mean, 37(b) sanctions are

16  really severe.

17              MR. KIKER:  We, obviously, don't want to be

18  sanctioned.  I don't really understand the act here.  We

19  have sent (indiscernible) and inquired of the people, of

20  the custodians -- which, by the way, many of them are no

21  longer with the company, with the organization.  Many of

22  the people who haven't responded aren't with the

23  organization.  We can't compel them to respond to us,

24  especially in the next two days, like Mr. Tate is

25  proposing.  I disagree with his contentions that we have

1    abused or violated the ESI order.

2              And I just want to make one other point.  Yes,

3    possession, custody, and control, in the general sense, is

4    relevant here, but it's not just possession, custody, or

5    control, generally; right?  We're talking about

6    possession, custody, or control over an individual's

7    ancillary, irrelevant accounts; right?  We're talking

8    about somebody's individual PayPal account, and we're

9    asking people, can we -- can you give us your PayPal logs

10   for issues that have nothing to do with this case; right?

11             So it's not just possession, custody, or control

12   in a general sense because these are volunteers.  That is

13   part of it.  But if you look at the context in which we

14   are being asked to operate here, we are talking about

15   ancillary accounts that I maintain that BCS, the

16   organization, does not have possession, custody, or

17   control over, including individual Twitter accounts, their

18   PayPal accounts, and however many other accounts are

19   listed in that questionnaire.  I think there's 36 of them.

20   So that -- I just -- (indiscernible).

21             THE COURT:  I see what you're saying; you've

22   said it before, which is this is irrelevant information,

23   and I just don't know how you know.  That's my problem;

24   right?  Is it likely irrelevant, PayPal?  Maybe.  But for

25   BCS to take the position that it's not going to produce

1    the information that BCS first identified as -- from

2    specific data that BCS itself abused this (indiscernible);

3    how do you make that jump?

4              That's not the problem I'm having.  Well, I'm

5    having several problems with this; right?  I'm not sure I

6    buy into the whole volunteer, no PCC over the -- even the

7    high-level volunteers, and yet, you're having less control

8    over them to have them sit for deposition on behalf of the

9    company.  That, to me, just doesn't make sense.  And I

10   know I keep saying it because it's just -- to me, I just

11   don't think that there is a lot that supports that.  I

12   could be convinced otherwise, if you have logs.  I've

13   asked for the log, and I've been told that you folks don't

14   know that log, but you're sure it exists.

15             So I just did a briefing on overseeing it.  But

16   to take the position that -- you know, let's set the

17   (indiscernible) aside, to take the position that BCS is --

18   isn't ordered to produce any support -- not produce, but

19   to search these accounts because BCS unilaterally has

20   decided -- and thereby usurped my role -- that these

21   documents are not relevant is not how discovery works.

22   And that's how you agreed to -- how BCS agreed to, I

23   should say.

24             So I don't know how this is going to play out.

25   There's all sorts of very interesting issues that, you

42

1    know, I think my summer externs are going to have a field

2    day with.  But, you know, we're going to have to resolve

3    this, unless BCS can impress upon the higher-level people

4    to cooperate and collect.

5              [MULTIPLE SPEAKERS.]

6              MR. TATE:  Your Honor -- sorry.

7              THE COURT:  No.  Go ahead.

8              MR. TATE:  I'm going to make a proposal if I

9    may.  I just need BCS to at least tell us, for each of the

10   custodians, and that includes the, you know, the current

11   board of directors, which I think probably should have

12   access, I've included them playing those.  But please tell

13   us who's still at BCS and what their position is and

14   whether or not -- and if they're still at BCS, then

15   counsel should call them and see if they're willing to

16   produce these documents.

17             I'm not interested in funding unnecessary

18   motions.  But I'm really struggling with the idea that

19   Magill, Jenson, and Hughes aren't going to produce their

20   official emails and their Signal accounts, even though

21   they admit that they purposely talked about the

22   allegations in this case in those personal accounts.

23             THE COURT:  Yeah.  That's crazy to me, but okay.

24             BCS, do you really want to go down this road?

25             MR. KIKER:  Just to be clear, Your Honor, what

1    road are we referring to?

2          THE COURT:  Well, I'm talking -- sure enough.

3    That's a sure enough question, and I apologize for my lack

4    of clarity.

5          A motion -- so -- in a motion for 37(b)

6    sanctions, as I understand it from defendant's counsel,

7    would be as to the high-level employees.  Not employees,

8    but quote/unquote "volunteers."

9          And then, with respect to the lower level

10   people, then, I think -- my understanding is Mr. Tate is

11   going to proceed via subpoena.  And so the question is

12   going to be, you know, if -- does BCS stand on its we have

13   no possession, custody, or control; we're not going to --

14   we're not producing this.  As to the higher-level employ-

15   -- volunteers.

16          And as I understand it -- I want to make sure I

17   have everybody -- it's Magill, Jenson, and Hughes?  Or is

18   there a fourth one?

19          MR. TATE:  No, Your Honor.  I believe -- and BCS

20   would know better than I -- but I believe that there are

21   more directors than just Magill and Hughes.  I don't

22   believe that Jenson is a director, although he was

23   certainly an officer.

24          THE COURT:  Let me ask you, does BCS have

25   insurance, E&O insurance?

44

1          MS. BENTZ:  It's my understanding, Your Honor,

2     we do.  I can't attest to what the terms are or the scope

3     of it or the limits or anything like that, but my

4     understanding is we do.

5          THE COURT:  So where are the group of people

6     that are high enough level that BCS protects them under

7     this E&O insurance?  If they doing anything wrong, they're

8     protected; right?

9          MS. BENTZ:  Actually, I may have misspoke.  I'm

10    not sure that the individuals are protected as much as BCS

11    is protected from their conduct.  I'm sorry if I misspoke.

12          [MULTIPLE SPEAKERS.]

13          MS. BENTZ:  (Indiscernible) I actually don't

14    know the answer to that.

15          THE COURT:  Well, but that's not E&O; right?

16    How can you have E&O if there --

17          MS. BENTZ:  You are --

18          THE COURT:  -- aren't any --

19          MS. BENTZ:  -- correct, Your Honor.  You are

20    correct, and I think I just misunderstood your question

21    until you actually applied it in that regard.  I actually

22    misunderstood that.  So I apologize.  I don't know about

23    the individuals' coverage.  I know that BCS, the entity,

24    has insurance coverage.

25          THE COURT:  Okay.  No, I was looking directly at

1    directors and officers because I think that's a telling

2    point, isn't it, for the organization to have E&O

3    insurance but then to say we have no directors and

4    officers.

5           All right.  So all of this, of course, will come

6    into play, which is what I -- which is the question that I

7    was asking BCS.

8           Are you sure this is the road you want to go?

9    I'm trying to find a way to avoid all of this for you

10   folks.  I would rather Mr. Tate get the information he

11   needs without having to consider whether I'm going to

12   strike any of your affirmative defenses or default you or,

13   you know, recommend a finding of contempt.  Very different

14   issues, but really -- I mean, I'm not intending to

15   threaten anyone.  I'm beside myself, and I'm not

16   understanding this position that BCS is digging its heels

17   in.  I don't know.

18          MR. LUEDDEKE:  Just so I understand Mr. Tate's

19   proposal, it's to collect from the personal account of all

20   the 36 accounts in that questionnaire for Mr. Jenson,

21   Ms. Magill, and Ms. Hughes?  Is that what's on the table?

22          MR. TATE:  That wasn't my proposal.  My proposal

23   was before the next IDC to tell us for each of the

24   custodians (indiscernible) who they -- whether they're at

25   BCS, what position they have, whether it's director or an

1    officer, and whether they're going to give us the

2    information voluntarily.  If they've got information, I

3    can verify all of those people, or do I have to issue a

4    subpoena.  But for the people that you identify as a

5    director, I think that I -- if BCS doesn't voluntarily

6    give that, I am inclined to bring a 37(b) motion.

7              THE COURT:  Does that clarify for you,

8    Mr. Lueddeke?

9              MR. LUEDDEKE:  It does.  Thank you, Mr. Tate.

10             I mean, I think, respectfully, I think I need to

11   confirm with my team about how we want to proceed here.

12   We're meeting again in two days, as I understand it.  I

13   think we could probably have a response by then.  Let's

14   see how we want to proceed.

15             MR. TATE:  Not with lead counsel here, two of

16   them, and we shouldn't need to do that.

17             THE COURT:  I'm sorry.  Who just spoke, and I

18   missed what you said.

19             MR. TATE:  It's Adam Tate.  I was explaining

20   that I think that "we need to go talk to somebody else,"

21   that's the reason why we have lead counsel at this meeting

22   so we can reach compromises.

23             MR. LUEDDEKE:  That's not what I said.

24             THE COURT:  Okay.  I agree with Mr. Lueddeke,

25   that's not what he said.  He said he needs to pow wow

1    among themselves.

2          And I think -- I think two days is a fair amount

3    of time.  You know the potential consequences are

4    continuing under this situation -- for lack of a better

5    word -- that is being created by the obstinate, I will

6    say, behavior, of the directors and officers.

7          And by the way, I would also add, we had

8    Mr. Tate can also subpoena them; right?  I mean, Mr. Tate

9    is not trying to see if he can -- as I understand -- and

10   Mr. Tate, correct me if I'm wrong -- but you're trying to

11   figure out how can we do this the nice -- the easy way

12   with people who are clearly at the high end of the --

13   right? -- at the high ranks of the organization without

14   subjecting them to the subpoena and all of that.

15         But, you know, clearly, the defendants can issue

16   subpoenas for those defendants -- for those third parties,

17   and file a 37(b) motion, and bring a breach of contract

18   motion; right?  I mean, none of these things are mutually

19   exclusive.  They can all help it.  And whether Mr. Tate --

20   I'm saying this to BCS not because I think, BCS, you don't

21   understand this, you're all seasoned lawyers, you're an

22   excellent firm, and I have a great deal of respect for you

23   and your firm, but I'm just not sure that anybody has

24   stopped to think this through until I got involved at this

25   level.  And so I just -- I think some of these

1    consequences bear repeating so indulge me while I do it.

2             No matter what happens, unless these people have

3    spoliated evidence -- and, you know, spoliation is a

4    strong word and it becomes an obligation to retain

5    documents, et cetera; right?  But unless these people have

6    destroyed documents, they're going to produce relevant

7    documents.  I can assure you of that; right?  Because I

8    don't know what, exactly, will be relevant; let me be very

9    clear -- right? -- if they -- if a subpoena is issued, I

10   am not hearing an undue burden argument.  I've heard it

11   before.  I think BCS has now stepped away from it, and

12   that's fine.  But really, they're going -- if the

13   documents are there, they're going to produce them, one

14   way or another.  And this, to me, seems like a huge, huge

15   waste of resources, number one, for BCS because if DLA

16   Piper is graciously providing all their attorneys' fees

17   for free -- right? -- this is still a drain of resources

18   on the company; right?  On the entity, I should say.  And

19   at the very least, it's keeping this business or this

20   entity from doing the good that it wants to do, at least

21   to the extent that it's spending time on this lawsuit.

22             And so I think we're -- let's -- I don't

23   understand this.  I don't understand this digging in, when

24   there are such severe consequences that could befall not

25   just BCS.  Under the right facts and under the right

49

1    circumstances, of course, it could also be individuals.

2           And I'm just wondering if they get this, if they

3    understand the severity of the situation they find

4    themselves in.  And I don't know that they do.

5           I mean, you -- only counsel, right, for BCS

6    knows the conversations that they -- no, no, no.  I don't

7    want to know, and that's not my business.  But I just

8    wonder because if I'm an individual who has been

9    volunteering my time to an organization whose mission I

10   believe in, I just don't -- I don't think I want to stray

11   too far away from the organization's warriors who will

12   help me with this production and protect me from

13   (indiscernible).  And it can involve individual third

14   parties.

15          So I just don't -- I don't see who wins here.

16   Why don't we chase this one step further?  I don't see who

17   wins in this case, to be quite honest with you.  And this

18   is when I'm going to put on my settlement officer hat and

19   suggest to you folks that this has gone really far, and

20   it's only going to get uglier before it gets better.  And

21   isn't it -- do you folks have a settlement conference

22   planned?  Is it time to actually maybe really consider

23   this before all of these resources are spent?  I don't

24   know if the parties have had discussions about this.

25          MS. BENTZ:  We do, Your Honor, have a settlement

50

1   conference scheduled.  I don't know the exact date, but

2   it's in July --

3             THE COURT:  Okay.

4             MS. BENTZ:  -- with a member of the Court

5   Mediation Panel.

6             THE COURT:  Oh, good.  Okay.

7             MS. BENTZ:  Let me just say, for purposes of

8   defendant's counsel hearing it, I think we could have

9   informal settlement discussions, you know, if it would be

10  fruitful to move the mediation up or do it sooner or do it

11  in a different context.  That's always something we're

12  willing to consider.  But as things stand right now, we're

13  doing it in July.

14            THE COURT:  Okay.  Okay.  Well, that's good

15  information for defendant's counsel.  I don't need to get

16  involved in that.  You folks can work through it.

17            But, you know, look, 95 percent of cases settle.

18  The question is, you know, do they settle at the

19  appropriate time, and what is the appropriate time?  And,

20  you know, as I thought about this case since the last time

21  we were together, I just have to make a pitch for you

22  folks to just try to resolve this case.  This is -- nobody

23  wins here.  Nobody wins here.

24            The organization doesn't win because it's

25  detracted from its mission.  The individual defendants

51

1      don't win because they're about to be hit with subpoenas

2      that they're going to have to respond to.  The upper-

3      level, you know, individuals, you know, they're going to

4      get hit with subpoenas.  And, you know, BCS is going to

5      get hit with this sanctions motion.

6              And at the end of the day, quite frankly, you

7      know, very practically speaking, you know, what is the

8      message that's being put out there as to what happens to

9      the volunteers of BCS; right?  I don't know.  That's a

10     little bit of food for thought, but it's all very nice to

11     have all these fees paid for by DLA Piper, and God bless

12     you for doing that.  And I sincerely mean that.  But at

13     the end of the day, this has -- this case that BCS brought

14     has drug in -- dragged in -- sorry -- a bunch of people

15     who are just trying to do good, and now, they're stuck in

16     this.

17             And, you know, even so, I think they're going to

18     be thrown under the bus -- right? -- you know.  Or at

19     least, that could be a perception; right?  And you're

20     going to leave their individual third parties to fend for

21     themselves.  And I understand, Mr. Lueddeke, that is

22     notwithstanding of everything up to today -- right? --

23     that some of them have dug their own heels in the sand and

24     they're not proving anything.

25             But I just wonder -- I just wonder, if you folks

1   sat them down and explained to them what's about to

2   happen; right?  And explain to them that if they play

3   nice, they get help from attorneys that they don't have to

4   pay for.  I wonder if they wouldn't rethink it.  I don't

5   know.  Maybe that's part of the discussion that

6   Mr. Lueddeke was asking for additional time on.  I sure

7   hope so.

8           So with that, anything further to add here?

9           So we are getting together on May 3rd.  By May

10  3rd, is it my understanding that defendant is going to

11  report -- aside from what we've already discussed with the

12  deposition -- is going to report in as to each of the

13  custodians listed in the e-discovery order and learn

14  whether that person is still at BCS, what position that

15  person holds, whether that position is as a director or an

16  officer, and whether they are willing to give information

17  voluntarily.  And I see that some of them already have

18  not, but my understanding is don't have officers confirmed

19  with everybody.

20          Is that what you are looking for, Mr. Tate?

21          MR. TATE:  The matter that needed clarifying, I

22  think you referenced defendant instead of plaintiff, but

23  yes, that's exactly what I want.

24          THE COURT:  Oh.  Okay.  I apologize.  I probably

25  did.

53

1          Okay.  So -- and then, by May 5th, we have the

2    production -- right? --  the information of the production

3    the Slack -- remainder of the Slack documents.

4          MR. TATE:  That is correct, Your Honor.

5          THE COURT:  Okay.  All right.

6          All right.  Well --

7          MS. BENTZ:  One just caveat on that because I

8    know I'm confused by what Mr. Kiker and Your Honor just

9    said, it's the production of any Slack documents that are

10   downgraded from privileged to not privileged.

11         THE COURT:  I agree with your clarification.

12   Thank you for that.  That's so moved, that BCS has

13   produced all the relevant documents, and all that's left

14   are relevant or not relevant that may be privileged, then

15   yes.

16         MS. BENTZ:  Makes sense, Your Honor.  Got it.

17   Thank you.

18         THE COURT:  Okay.  All right.

19         Is there anything else you can do on this one,

20   folks, right now?  It kind of feel like -- (indiscernible)

21   that BCS's counsel wants to huddle.  They'll huddle and

22   decide what they want to do.

23         MR. TATE:  The only thing, I think, Your Honor,

24   is that we're going to have to move these deadlines.  It

25   doesn't make a lot of sense to do that now because we're

1    going to learn on May 3rd but I don't think it would be

2    fair for us to be stuck behind the current deadline -- the

3    discovery cutoff deadline that's June 1st, and I see the

4    (indiscernible).

5             THE COURT:  Right.  The problem that I have --

6    I, obviously, will give you folks more time.  The problem

7    that I have is that I don't want BCS to think that they're

8    going to get a free reign.  If BCS is going to be under

9    extreme deadlines because for many months have been wasted

10   already.  And so now it's time for BCS to catch up.  And

11   so that's why, as I'm looking at this, I -- oh, when are

12   we getting the proposal for the 47,000 documents?  Is that

13   May 5th, as well?

14            MR. TATE:  What we have that is 3rd.

15            THE COURT:  Oh, okay.

16            MR. TATE:  I thought we might be able to switch

17   to it.  The only conference that we've set is May 3rd.  By

18   May 5th, I should be expecting the production, but we're

19   not necessarily going to get together and talk about it.

20            THE COURT:  Well, okay, then.  What do we do --

21   when is the information about each of the custodians --

22   that's due on May 3rd as well?

23            MR. TATE:  That was my proposal, Your Honor.

24            THE COURT:  Okay.  So by May 3rd, you're going

25   to have more information about Dr. Hughes's doctor,

1  Dr. Calonga.  We are going to have the information about

2  each of the custodians, whether they are still with BCS,

3  what position they hold, whether they're a director or an

4  officer, and whether they will give the information

5  voluntarily.  Also by May 3rd -- I guess that's it.  I

6  guess that's it.

7       And then, by May 5th, defendants will finish the

8  production of the Slack documents, whatever there may be

9  that is relevant and not privileged, between the 1100 and

10  the 200 and some, whatever that number is, by May 5th.

11  And then, if defendant is still dissatisfied and believes

12  that documents are being withheld, then you can bring your

13  motion.

14       MR. TATE:  Thank you, Your Honor.

15       THE COURT:  And then, with respect to, I guess,

16  the -- I guess the production on May 5th, is that coming

17  with a privilege log?

18       MR. TATE:  That is the position, that it should,

19  especially since -- you know, there are clearly documents

20  that I believe that people testified to, and if the reason

21  I am not getting them is because they're privileged, I

22  want to know the basis as to why.

23       MS. BENTZ:  Yeah.  I think --

24       MR. KIKER:  Your Honor, we -- we've had some

25  discussions in the past with defendant's counsel about

1    privilege logs.  Neither party has yet provided any

2    privilege logs for any of the documents they've produced,

3    and it was my understanding that we had agreed that the

4    privilege logs would come at the end of the productions

5    from both sides.  You know, I -- so that's -- that was the

6    anticipation here.  And I don't know if there's a real

7    reason to change that expectation, as we have not received

8    any privilege logs from any of the productions from

9    defendants either.

10        THE COURT:  I'll order them.  Defendant is

11   intending to bring a motion to compel -- right? -- the

12   Slack documents that -- and part of that is whether

13   they're being improperly being withheld as privileged.

14   And there's no way to do that without a privilege log.

15        MR. KIKER:  Understood, Your Honor.  And look,

16   we can -- we can meet that expectation as far as the Slack

17   documents go.

18        THE COURT:  Okay.  Okay.  All right.

19        So by May 5th, the Slack document production, to

20   the extent there are more to produce that are relevant and

21   not privileged, will be produced, along with an

22   accompanying privilege log regarding Slack documents only.

23        Okay.  All right.  I think we have a plan.  And

24   we have a date and time, May 3rd, I think it's 2:00

25   o'clock.  And I think -- oh.  No.

1          Okay.  So that leaves the Magill deposition,

2     which I already ordered off calendar -- right? -- because

3     it was supposed to happen today, I think.  But really, we

4     can't figure out -- we can't determine the appropriate

5     date until the Magill documents are produced.  The Magill

6     and whatever other documents -- right? -- that are BCS

7     documents because she said the directors aren't

8     representative of the -- aren't the entity.

9          MR. TATE:  That's correct.  And that goes for

10    pretty much any of the remaining depositions, Your Honor,

11    including when we are going to get a complete document

12    production.  It doesn't make a lot of sense to do the

13    depositions and then have to do them a second time.

14          THE COURT:  Right.  Right.

15          I will -- we've talked about a second deposition

16    for any deposition that had to be taken in the absence of

17    documents, and so we need to make -- you can provide the

18    evidence of good cause for that.  But all of that is to

19    say that I am not adverse to a second deposition when it's

20    needed because documents were not timely produced.

21          But I would like to avoid second depositions,

22    and I think everybody would.  So I think it makes sense to

23    get the document production done first.

24          MR. TATE:  I agree, Your Honor.  Like you said,

25    there are costs to the litigation now.  I don't want to

58

1    have to do a deposition twice if I don't have to.

2             THE COURT:  Right.  Right.

3             Okay.  All right, folks.

4             Well, I think we've done as much as we can, and

5    I will either see you folks on -- or talk to you on

6    May 3rd, or I will hear from plaintiff's counsel that

7    May 3rd is not possible, for whatever reason.  We'll

8    figure it out.  But if we have to continue it, the May 3rd

9    date -- no, actually, we need to get together on May 3rd

10   regardless of Dr. Calonga's declaration -- right? --

11   because other things have to happen on May 3rd.

12            MR. TATE:  (Indiscernible) that Dr. Calonga, you

13   know, can get us a declaration by May 4th, it doesn't make

14   a lot of sense to meet on May 3rd either so I don't know

15   whether, for the Court's scheduling, it would be easier to

16   have us all come back on May 3rd or to wait to see from

17   defense's counsel whether they got a declaration.  I'd

18   prefer not to do two IDCs, not only to save money for my

19   clients, but it's actually only people for some

20   (indiscernible).

21            THE COURT:  You know, I don't think we need two.

22   I think that you are making a good point, which is that

23   we're going to have to figure out what we do with the

24   Hughes deposition, but, you know, we need the Calonga

25   declaration, and then one or two days more waiting for --

59

1   to talk about the list of custodians.  That doesn't mean

2   that the information that was going to be provided on May

3   3rd shouldn't be provided on May 3rd.  But maybe we've

4   got -- you know, some portion of this gets resolved.

5          Okay.  All right.  Well, I think we have a plan

6   so I thank you all for your time.  I really appreciate it.

7          Apologies for all of the coughing.  I know this

8   was horrible, but it was necessary so that we could meet

9   to keep the ball moving.

10          MS. BENTZ:  Really appreciate it, Your Honor.

11   And I hope you feel better soon.

12          THE COURT:  Thank you very much.

13          MR. TATE:  We greatly appreciate it, and thank

14   you.

15          THE COURT:  All right.  Thanks very much, folks.

16   I appreciate all the hard work you've done to get to this

17   point.  And we'll keep the (indiscernible) on May 3rd.

18          We are ready to go off the record, Ms. Estrada.

19              (Proceedings concluded)

20                  -o0o-

21

22

23

24

25

1                 TRANSCRIPTIONIST'S CERTIFICATE

2      I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in

4    the above-entitled matter.

5

6        *Kathleen Eastham*

7

8    _____        ___June 19, 2023_____
     Kathleen Eastham                        Date
9    Transcriber

10

11   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

12   /s/Ann Bonnette_____
     ANN BONNETTE, CSR. NO. 6108, President
13   Huntington Court Reporters and Transcription, Inc.

14

15

16

17

18

19

20

21

22

23

24

25