1

1       UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3
                              ) Case No. 2:22-cv-02052-MAA
4    BREAKING CODE SILENCE,    )
                               )
5              Plaintiff,      )
                               )
6    vs.                       ) Los Angeles, California
                               )
7    KATHERINE MCNAMARA, et    ) Wednesday, May 3, 2023
     al.,                      )
8                              )
               Defendants.     )
9

10

11

12    TRANSCRIPT OF TELEPHONIC INFORMAL DISCOVERY CONFERENCE
              BEFORE THE HONORABLE MARIA AUDERO
                UNITED STATES DISTRICT COURT

13   Appearances:              See next page.

14   Court Reporter:           Recorded; Telephonic (XTR)

15   Courtroom Deputy:         NARISSA ESTRADA

16   Transcribed by:           Robert Kreb
17                             Huntington Court Reporters
                                  and Transcription, Inc.
18                             1 South Fair Oaks Avenue
                               Suite 200
19                             Pasadena, California  91105
                               (800) 586-2988
20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
                (800) 586-2988

2

```
     APPEARANCES:
1
     For the Plaintiff          TAMANY VINSON BENTZ, ESQ.
2    BREAKING CODE              DLA Piper LLP
     SILENCE:                   2000 Avenues of the Stars
3                               Suite 400, North Tower
                                Los Angeles, California 90067
4                               (310) 595-3000

5
     For the Plaintiff          DENNIS KIKER, ESQ.
6    BREAKING CODE              DLA Piper LLP
     SILENCE:                   2000 Avenues of the Stars
7                               Suite 400, North Tower
                                Los Angeles, California 90067
8                               (310) 595-3000

9
10   For the Defendants         M. ADAM TATE, ESQ.
     KATHERINE MCNAMARA,        JULANDER BROWN BOLLARD.
11   ET AL.:                    9100 Irvine Center Drive
                                Irvine, California 92618
12                              (949) 477-2100

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          Los Angeles, California; May 3, 2023

2                    --o0o--

3               (Call to Order)

4          THE CLERK:  Please come to order.  This United

5    States District Court is now in session.  The Honorable

6    Maria A.  Audero, United States Magistrate Judge

7    presiding.  Calling case number CV-22-03052, Breaking Code

8    Silence, et al., v.  Katherine McNamara, et al.

9          Counsel, please state your appearance beginning

10   with the plaintiff.

11         MS. BENTZ:  Good afternoon.  This is Tamany

12   Vinson Bentz for the plaintiff.

13         THE COURT:  Good afternoon, Vinson Bentz.

14         Is it Vinson Bentz or is your last name Bentz?

15         MS. BENTZ:  You can go with Bentz, Your Honor.

16   It's much -- it's much less of a mouthful.

17         THE COURT:  And that is especially good to hear

18   today because I have very little voice.  So thank you.  So

19   please say yes, thank you.

20         MR. KIKER:  Thank you, Your Honor.  This is

21   Dennis Kiker from the plaintiffs.

22         THE COURT:  Good afternoon, Mr. Kiker.

23         MR. TATE:  Good afternoon, Your Honor.  This is

24   Adam Tate on behalf of the defendants.

25         THE COURT:  All right.  So Mr. Luddeke is not



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

4

1    with us today?

2            MS. BENTZ:  No, Your Honor.  He won't be able to

3    make it.

4            THE COURT:  Okay.  And neither is Mr. Schwartz

5    or Ms. Close.

6            MR. TATE:  (Indiscernible).

7            THE COURT:  Okay.  All right.  Well, we are back

8    with more information than what we had before.  So, again,

9    I'm going to apologize on the record in advance for all

10   the coughing that may happen.  During this call, I'm going

11   to try to mute myself as much as possible, but it's

12   difficult to do when you're trying to take notes and talk

13   and think all at the same time.

14           So, in any event, I apologize in advance to all

15   of the parties and also to whoever in some future date may

16   have to create a transcript of today's conference.  So

17   with that said, let's turn to the issue of Ms. Hughes's

18   deposition.

19           Thank you to counsel for plaintiffs for having

20   obtained a new declaration from Dr. Calonga.  I will note

21   that it doesn't answer my question of whether she reached

22   her conclusion after having evaluated

23   Dr. Hughes.  But is -- it's a piece of information that I

24   requested but is missing.

25           I also will note that I am not sure what she's

5

1    suggesting.  What I requested was what exactly are the

2    limitations to -- what is that (indiscernible) problems

3    that she suffers?  And what I've gotten is, recently I've

4    gathered -- Ms. Bentz, please tell me if I've misread that

5    declaration, but Dr. Calonga says that plaintiff suffers

6    from stress, which could -- well, the stress that she

7    suffers could cause the following symptoms which

8    exacerbates her conditions.

9          And the stress causes the following symptoms:

10   Fatigue, pain, bladder, and bowel problems, cognitive and

11   mobility impairments, muscular changes, visual changes,

12   which also says loss of vision, difficulty with memory,

13   difficulty with recall, and numbness in the face and

14   hands.

15         And based on this, she again makes a very

16   conclusory recommendation of one hour off, one hour on --

17   one hour on of deposition, one hour off, and then one hour

18   on.  But as soon as any symptoms -- as soon as Dr. Hughes

19   begins to suffer any symptoms, then this has to end.

20         And so what I'm left with is the impression that

21   Dr. Hughes can sit through deposition and at any point in

22   time say I feel pain, we must end.  And we have nobody to

23   determine whether this really is a situation that should

24   cause the deposition to end.  Like, how much pain must

25   cause the deposition to end?  Any pain at all?

6

1    Significant pain, you know, unbearable pain.

2              And I'm not trying to be facetious, but this

3    declaration is not helpful to me, other than for its

4    conclusionary recommendation, which appears to be

5    something that Dr. Hughes might have made up herself of

6    one hour off -- sorry, one hour on, one hour off, one hour

7    on.

8              So I'm just a little bit troubled by this.  And

9    it is troubling to me that she -- that Dr. Calonga didn't

10   answer one of my questions which was, how did you come up

11   with this?  Did you actually evaluate Dr. Hughes?  And so

12   those are my preliminary thoughts.

13             Oh, the other thing I noticed is that

14   Dr. Calonga kind of punts to a neurologist, some unnamed

15   neurologist, and we don't know -- we haven't heard

16   anything from the neurologist, and I understand they're

17   going to ask for a declaration from Dr. Calonga, but I do

18   know that she punts to the neurologist.

19             So I guess I would like to hear from defendant.

20             Mr. Tate, where do you want to go with this?

21             MR. TATE:  Well, Your Honor, I have the same

22   concerns that Your Honor noticed.  I think practically

23   speaking, we're not going to allow Mr. Hughes or

24   Dr. Hughes deposition until the document production is

25   complete.  And I'm not opposed to DLA Piper making another



1    shot at this and getting us the declaration, but the most

2    important thing to me is I need to know the foundational

3    base for what she's saying.

4              I get the sense, and I could be wrong, that this

5    doctor has not seen Dr. Hughes since her flare-up, and

6    that would lead me to believe that I don't know how she

7    could make an opinion that she was planning to or not to

8    based on that notice.

9              THE COURT:  Yeah.  Okay.  Let me hear from

10   Ms. Bentz.

11             MS. BENTZ:  Thank you, Your Honor.  Your Honor

12   asked initially whether you were misreading the

13   declaration, and so I just wanted to correct maybe a

14   couple of points, because I know we've only had this

15   declaration for a short period of time.

16             And one truthfully is I think you said that the

17   declaration says that Dr. Hughes suffers from stress.

18   Dr. Hughes actually suffers from NF.  That was omitted

19   from the declaration because Your Honor had asked that the

20   actual diagnosis not be in the declaration, but it is a

21   fact that a plaintiff counsel notice the standards and

22   other declarations.

23             And so it's not just stress; it's in that --

24             THE COURT:  Right.  And I'm going to interrupt

25   you there so that we have a clear record.  I think I



8

1    caught myself, and I said she suffers -- no, that she

2    suffers from stress that complicates her underlying

3    condition, which I was very careful not to put on the

4    record, but we should now have.  But, anyway, go ahead.

5            MS. BENTZ:  Thank you.  Thank you, Your Honor.

6            The second thing is that actually the

7    neurologist is identified.  It's Dr. Steven Schreiber.

8    That's in paragraph 3 of the declaration.

9            THE COURT:  Okay.

10           MS. BENTZ:  And the other thing I will say is

11   that Dr. Calonga is Dr. Hughes' primary care physician.

12   So my understanding is that the statements in here are

13   made based on caring, providing health care to Dr. Hughes

14   and treating the complications of her illness.

15           So, you know, opposing counsel asked for the

16   foundation of why she's saying that, and Your Honor did

17   too.  And that's really the basis for it, that she is the

18   primary care physician, that she treats Dr. Hughes.  Based

19   on this declaration, treats Dr. Hughes when she has

20   complications from her condition.

21           And that one way to treat and prevent those

22   complications is to limit stress.  And I'm looking for the

23   particular paragraph.  Let me see if I can find it.

24   Paragraph 6.

25           And as for treating physician, I would argue



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

9

1    that that is foundation for the statement like doing

2    things like putting time while on deposition could help a

3    little bit those -- I'm sorry, those kind of side effects

4    of her condition.

5            THE COURT:  Yeah.  I'm a little bit -- I feel

6    like you said that already, and whatever it really is,

7    informal discovery conferences, and I appreciate that in a

8    sense, but that's precisely why I asked for her -- for

9    Dr. Calonga, to answer the specific question of whether

10   she reached a conclusion based on her evaluation or her

11   having seen Dr. Calonga after the first deposition and

12   after the hospitalization.

13           And we keep coming back to the same point, which

14   is nobody is willing to answer that question.  I

15   understand you, you know, you could answer it if you asked

16   Dr. Calonga, but certainly Dr. Calonga isn't willing to

17   answer that question, and that to me is a bit suspicious.

18           So, you know, especially with (indiscernible) to

19   the neurologist.  So I don't know.  I have to tell you, I

20   -- you can probably tell from my comments so far, all of

21   this seems very suspicious to me, just from what I've read

22   in this case, from what I have read in the allegations of

23   the State court complaint, of which I have the ability to

24   take and have taken judicial notice for purposes of this

25   informal discovery conference.

10

1              Dr. Hughes is not portrayed as somebody who, you

2    know, is so unable to handle any level of stress; right,

3    given the position that she held.  You know, allegations,

4    of course, are proof, and I recognize that.  But, you

5    know, I think the inability to handle stress because it

6    may cause -- let's go to the specifics.

7              The inability to handle stress because it may

8    cause some pain, I understand that.  How do we -- how does

9    that help me in setting this deposition?  What do I do

10   with that information other than just accept the doctor's

11   conclusory, you know, any time she feels any level of

12   pain, everything must end.

13             If your -- if the shoe were on the other foot --

14   and I know this is a hypothetical, and I recognize it as

15   such -- if the shoe were on the other foot, Ms. Bentz,

16   what would you do with this?  Because I just -- I have a

17   concern that all of this is being done to avoid Dr. Hughes

18   being deposed.

19             And Dr. Hughes, from what I've read in this

20   case, seems to be the key, if not one of the two or three

21   key witnesses in this case.  And it's -- I find it also

22   very convenient that she left town just in time; right?  I

23   mean, it's all very -- it's all very suspicious.

24             You know, what can I do with that suspicion?

25   Probably not much, you know, and it really is up to



1    defendants if somebody wants to -- what they want the

2    defendants to figure out what they want to do with this,

3    but I have to say I am just -- I am not persuaded that

4    Dr. Calonga has the foundation to make the kind of

5    recommendations of limitations to discovery since it

6    appears to me, and you correct me if I'm wrong, Ms. Bentz,

7    but it appears to me that he has not seen Dr. Hughes since

8    the hospitalization.

9              MS. BENTZ:  I don't believe that she has.  I

10   don't have any evidence that she has.

11             THE COURT:  Okay.  So then Mr. Tate is correct

12   in his suspicion.

13             All right.  So can we get some information --

14   well, let me ask you, Mr. Tate, what do you want to do

15   with this?

16             MR. TATE:  Your Honor, I don't want to bring an

17   unnecessary motion.  As I stated, I'm not going to take

18   this deposition for at least a couple of weeks or whatever

19   -- however long it takes for me to have completion of the

20   documents.  If I can get a declaration that answers the

21   Court's questions, by that time, I will bring my motion.

22             But if I don't get a declaration that says that

23   somebody has actually examined her, then I need to have

24   the authority to bring a motion.

25             THE COURT:  I understand.  I understand.  So



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    let's see if, you know, at the end of the day we do have

2    time.  In fact, her documents haven't been produced and

3    that's a whole other issue altogether that we'll deal with

4    in a moment.  But, yeah, I'm going to have to extend this

5    to discovery cutoff.

6            And I'm going to do that and that will give time

7    to see her documents and then figure out what to do about

8    her deposition, and who knows, maybe she'll be back, and

9    this cruise will have done her a world of good, and she

10   will be in a good mental space to be deposed.  Who knows?

11           After, I don't know, what is it, a three-month

12   cruise?  After three months of relaxation, hopefully that

13   will help her in her situation.  I don't know.  I'm not a

14   doctor.  One can only hope, but, you know, maybe we cross

15   the bridge of her deposition at that time.  Maybe she

16   comes back feeling well enough to be deposed.

17           MR. TATE:  You Honor, on my understanding,

18   that's not going to happen for a few more months.  My

19   proposal would be that, you know, if they're able to, that

20   we are satisfied with that declaration within the next

21   week, and if they're not able to, then I get to bring the

22   motion.

23           THE COURT:  Okay.  Well, I don't think that's an

24   unreasonable request.  So can you -- Ms. Bentz, can you

25   provide the Court with the declaration from her?



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1          MR. BENTZ:  Given the amount of time and work

2    that went into giving this declaration, I do not think I

3    can, Your Honor.

4          THE COURT:  Okay.  Mr. Tate, bring the motion.

5          MR. TATE:  Thank you, Your Honor.

6          THE COURT:  Okay.  All right.  Let's move on.

7    Let's move on then to the documents.  Let's see.  Okay.

8          So we've had lengthy conversations about

9    possession, custody, and control.  This may be something

10   that you folks decide that you want to brief, because it

11   sounds to me that plaintiffs are standing on their

12   argument that they don't control any of these people

13   because they're volunteers.

14         Now, I need to ask a couple of questions.  The

15   table that you -- that plaintiffs provided, and I thank

16   you for putting that together.  I have to kind of marry

17   the other table that plaintiffs provided.  But the table

18   says volunteers or otherwise affiliated with, associated

19   with, and then we bring that up.  What does that mean?

20         MS. BENTZ:  Oh, sorry, Your Honor.  I took --

21   sorry to interrupt.  Go ahead and finish.

22         THE COURT:  No.  I just wanted to know what does

23   or otherwise associated with mean?

24         MS. BENTZ:  So, Your Honor, that's actually

25   language that I took out of your order.



1           THE COURT:  Okay.

2           MS. BENTZ:  I said that as being, you know,

3    somebody who still does work in some manner for BCS.  So,

4    you know, maybe they're not titled volunteer, but the way

5    I took it is somebody who, like BCS, would still work with

6    in some capacity.  So I kind of took it as you not wanting

7    us to cab in volunteer into some sort of particular

8    definition.

9           You generally wanted to know who's still

10   associated with BCS and who's not.

11          THE COURT:  Okay.  Okay.  Fair enough.  Thank

12   you.  I appreciate that.

13          So let me ask you this.  Has Ms. Magill -- has

14   she ever been employed and is she now employed by BCS?

15          MS. BENTZ:  No and no.

16          THE COURT:  Okay.  The affirmative defense is

17   where -- I think it's Anna Magill.  Let me see.  Let me

18   see which one I pulled up.  I'm taking judicial notices,

19   both of the responses to the State court complaint.  But

20   I'm looking at Rebecca Magill's.

21          So explain to me the affirmative defense of

22   Rebecca Magill, where it does -- where there's an

23   employment agreement between BCS and Plaintiff Rebecca --

24   no, sorry, Ms. McNamara, that requires arbitration.  What

25   is a reference to an employment agreement, if there is no

1    employment relationship?

2            MS. BENTZ:  Your Honor, I think you have

3    Ms. McNamara and Ms. Magill confused.  Well, I don't

4    believe what you just read.  You said McNamara, that's

5    actually the defendant.  So that's not Ms. Magill.

6            THE COURT:  Okay.  So I'm looking at

7    Ms. Magill's affirmative defense in the State court

8    complaint.

9            MS. BENTZ:  Okay.

10           THE COURT:  And I think McNamara is the

11   plaintiff.  And thank you for clarifying the record to the

12   extent it was.

13           So my question is, if it is plaintiff's here,

14   Breaking Code Silence's position, that none of these

15   people were employees, they were all volunteers, everybody

16   that has done anything that in any way has touched

17   Breaking Code Silence is a volunteer, why does Ms. Magill

18   refer to employment agreements?

19           MS. BENTZ:  Your Honor, I don't know the answer

20   to that.  I'm not counsel in that case, so I'm not sure

21   what the basis of that allegation was.

22           THE COURT:  Okay.  What about in the 12th or

23   30th affirmative defense, in which, again, an employment

24   relationship is alluded to exist because of the -- as part

25   of the affirmative defense, it says the workers' comp bar

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1   applies because of the employment relationship that

2   exists.  Again, you don't know?

3            MS. BENTZ:  Correct, Your Honor.  Since I'm not

4   counsel in that case, I actually do not know what the

5   basis for those allegations is.  That is not -- that's

6   contrary to my understanding.  I'm happy to ask and sort

7   that out, but all of that is news to me, and not what I

8   was told.

9            THE COURT:  So the 29 affirmative defense, so

10   that defendant's conduct, right, Ms. Magill, was a just

11   and proper exercise of her managerial discretion.  Do you

12   know anything about that?

13            MS. BENTZ:  I don't know.  I will tell you, Your

14   Honor, I know very little about that case because I'm not

15   counsel in that case, and so I don't know that I can

16   answer very many, if any, of your questions about that

17   case.  I'm happy to try to get that information and

18   obviously see if it warrants a change in the position in

19   this case, but this is, you know, news to me, so to speak.

20            THE COURT:  Okay.  Well, let's do that.  Let's

21   have you figure out if Breaking Code Silence should change

22   its position based on its affirmative defenses in the

23   State court complaint, wherein the individual defendants,

24   and maybe Breaking Code Silence will worship both of them,

25   who knows, but are taking the position that there was an

1    employment agreement.

2         The earlier one that was talking about the 11th

3    and the 12th and the 30th affirmative defenses and also

4    the 14th and the 15th -- no, the 14th affirmative defense,

5    really were related to the claim brought by McNamara were

6    barred by certain legal theories that require the

7    existence of an employment relationship.

8         So I understand that they don't necessarily

9    imply that there was an employment relationship between

10   Breaking Code Silence and Ms. Magill, but I'm just curious

11   as to why she would think that there was an employment

12   relationship, at least as between Breaking Code Silence

13   and Ms. McNamara.

14        And then when she said to the 28th, the 29th,

15   the 32nd, and the 33rd affirmative defenses, those imply

16   that there is an employment relationship between Breaking

17   Code Silence and Ms. McNamara.

18        MS. BENTZ:  Terry.

19        THE COURT:  And Ms. Magill.  Correction.  And so

20   those are the ones I'm particularly interested in as we

21   try to unravel the situation of possession, custody, and

22   control.  Because to date, as you know, Breaking Code

23   Silence has been taking the position that these people are

24   not -- none of these people are employees.

25        They all work under some title that is, you



18

1    know, volunteer, and therefore Breaking Code Silence has

2    no possession, custody, and control of their documents, of

3    their personal documents.  So I'm curious as to that.  I

4    haven't gone through the affirmative -- the matching

5    affirmative defenses that were asserted by Ms. --

6    Dr. Hughes, but I do believe there is an answer from

7    Dr. Hughes.

8              So I don't think you need me to point out to you

9    which ones -- which affirmative defenses in the Dr. Hughes

10   answer in the State court complaint imply the existence of

11   an employment relationship.  But I would like you to come

12   back and explain this discrepancy between what you're

13   telling the Court and what is being stated to the

14   superior, which we should (indiscernible).

15             MS. BENTZ:  Certainly, Your Honor.  Happy to

16   address any discrepancy between that.  I will say, though,

17   that employees or not -- I don't believe it changes the

18   possession, custody, and control arguments with respect to

19   things like the individual's personal PayPal account, the

20   individual's personal Facebook account.

21             I do not believe even an employer under the

22   Ninth Circuit standards has the legal ability to compel an

23   employee to turn over those types of personal accounts.

24   So I understand what you're saying --

25             THE COURT:  And that --



1          MS. BENTZ:  -- and I take the discrepancy very

2     seriously, and I want you to know that, and we'll

3     definitely get to the bottom of it.

4          But I also want to flag that some of the

5     accounts at issue, perhaps all of the accounts at issue,

6     because with respect to Ms. Magill and Dr. Hughes, we did

7     collect their personal Gmail accounts.  We did collect

8     their cell phones.  We did those things because we knew

9     that they were using those sources of communication to

10    communicate about things that might be responsive in this

11    case.

12         And so I don't want Your Honor to think we're

13    drawing some unreasonable bright line rule because I don't

14    believe that we are, but I do think when it comes to some

15    of the accounts on this list, perhaps all of them for them

16    that we have not collected yet, that those are personal

17    accounts that even if we were their employer, we still

18    couldn't compel them to turn over to us.

19         THE COURT:  And is your argument the same when

20    it comes to the -- any documents that the -- any data or

21    any document that belong to BCS but that are being held in

22    their personal account?

23         MS. BENTZ:  No, but to Your Honor's point,

24    that's why we collected their cell phones and their

25    personal Gmail accounts.  That's why we went to them and



1    said we're going to need these things because you've been

2    using them to communicate for BCS purposes, and so we need

3    to collect those things.

4            I think when you're talking about something like

5    somebody's personal PayPal account that's not used for BCS

6    business that that falls into a separate category.

7            THE COURT:  But, again, I think we've said this

8    before, is those are self-imposed limitations; right?  You

9    decided, you and your team of lawyers, of course, decided

10   that you were going to only ask for email and cell phone

11   because, as I recall from the explanation that you gave

12   earlier, the -- it was unlikely that they would have any

13   responsive information.

14           And you decided that based on not interviews of

15   those persons but interviews of a couple of people.  And I

16   think -- I don't remember exactly, but I think it might

17   have been your interviews of Ms. Magill and Dr. Hughes and

18   maybe Mr. Jensen.  I don't know.  Now this goes back to

19   the point that the response to my inquiry of, oh, yes, but

20   that's why we collected their cell phone and their email

21   information, is not really responsive.

22           Because to the extent that they have any of

23   BCS's data or documents in their personal accounts, then

24   let's not talk about the lower level employees, even

25   though I think there's an argument that can be made for

1    that, but then I think a very strong argument can be made

2    that BCS does have control, because it's their documents,

3    and it's their high level, call them what you will.

4           I think you're calling them volunteers.  I now

5    have serious doubts about that.  But whatever -- in

6    whatever capacity they are -- and I do think that there is

7    law that says an entity, a nonprofit organization, can't

8    hide behind the classification of the people that it

9    brings in to do its work to avoid discovery; right?

10   Because at the end of the day, then, this would insulate

11   the organization from what I would consider to be very

12   proper discovery.

13          So that you may have gone to these people and

14   said, we think you used your email, and we think you used

15   your cell phone to conduct the business of the

16   organization.  Please give us, you know, please go through

17   your personal email, your personal cell phone, and look

18   for documents that hit on these terms, I applaud that.

19          The problem is that falls so short of your

20   obligation, of your e-discovery obligation, in a case

21   where there are a number of other data sources.  And I

22   don't think that you can, at this point, tell me with

23   certainty that there are no BCS documents or data on any

24   of these other data sources, because it does not sound to

25   me -- and correct me if I'm wrong, but it doesn't sound to

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    me like you even asked.

2          MS. BENTZ:  I would disagree that we haven't

3    even asked.  We have reviewed a significant amount of

4    documents in this case and done a significant amount of

5    work to understand the issues and the facts that are going

6    on in this case.  Throughout that process -- and there's

7    been multiple depositions in this case, and throughout

8    that process, I have no evidence, none, that would

9    indicate that something like a PayPal log from Jenny

10   Magill's personal PayPal account would include anything

11   that would be considered a BCS document or that there

12   would be a YouTube audit log that Jenny Magill would have

13   that would have something that would be considered a BCS

14   document.

15         So I understand what Your Honor is saying, and

16   if the ask of Ms. Magill, Mr. Jensen, Dr. Hughes, and all

17   of these people is, hey, go through your PayPal account

18   and see if there's anything that is BCS in it, then that's

19   a different ask than, you know, run a keyword search term

20   on those things and give us everything that hits or,

21   frankly, from what the defendant articulated in our first

22   hearing, you guys forensically collect everybody's

23   personal accounts and keyword search them.

24         THE COURT:  Well, okay.  I disagree with how

25   you're looking at your discovery obligation of the lawyer

1    in this case.  You are supposed to produce everything that

2    exists.  It is not enough for BCS or you to sign off on a

3    production and say, producing nothing because I can't

4    imagine that something would exist.  That falls so short

5    of your Rule 34 obligations.

6            So no, I don't think that what you have done is

7    sufficient.  And that's as a starting point.  And I don't

8    understand why if you were part of the parties that chose

9    to switch turns and start an e-discovery, you know,

10   (indiscernible) stipulation that you can't resist, saying

11   agreeing to (indiscernible) I don't understand why you

12   can't go to -- not why you can't, why you haven't gone to

13   all of these custodians and said do a search, look for

14   these, look for these keywords.  Give me what you have,

15   and if it's relevant in this case, we'll produce them, and

16   if not, we won't.

17           Let's set aside control; right?  Let's set aside

18   for now control, because I think, you know, maybe we're

19   just talking about these high-level "volunteers," and even

20   if you call them volunteers, I don't think the law is on

21   your side, that you're not -- that BCS doesn't have an

22   obligation, that maybe this is something that gets

23   briefed.

24           But I just don't -- saying that you haven't

25   produced something because you just don't think it exists,



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    and correct me if I have misunderstood what you said, but

2    is not sufficient.  So I'd like to hear your response to

3    that but in addition, I guess my question would be, why

4    not turn to these people and say, do these word searches?

5            We've already -- we BCS, the organization that

6    either employs you, we'll see about that; right?  I don't

7    know, or that for whom you're a high-level volunteer, has

8    already agreed are search terms that will narrow the

9    universe of potential response and documents, at least as

10   a starting point for a document review.

11           And then, you know, production of whatever's

12   relevant.  So I guess I'd like to get what you have on

13   that.

14           MS. BENTZ:  So, Your Honor, I don't have any

15   problem asking people; right?  We did take the first step

16   to ask them what they had and whether they would keyword

17   search it.  We have responses from some people, not

18   responses from others.  I'm happy to come up with a

19   keyword search and go back to people and say, okay, here

20   are the keywords, would you please search these accounts

21   and give me what hits on a search term.

22           I'm not necessarily adjusting to that process or

23   to the position that BCS would ask the question.

24           THE COURT:  Okay.

25           MS. BENTZ:  If that's right, I'm not.  So if



1   that -- I think the issue on search terms is a dispute

2   between plaintiffs and defendants, defendants proposed a

3   four-page list of single-phase search terms, which I don't

4   think is reasonable to ask individuals to do or likely to

5   get them to do it.  We proposed a shorter list of search

6   terms.

7           THE COURT:  So at one point this was discussed,

8   I think, in the last of those -- second to last meeting,

9   so many so far I've lost track, and I believe Mr. Tate

10   said that he would be willing to consider a shorter list

11   of search terms.  With the caveat, of course, that if you

12   have to go -- to have to these people with subpoena, you

13   know, he doesn't have to agree to anything, but plaintiff

14   propose.  But nevertheless, so let me hear from Mr. Tate.

15           MR. TATE:  Yes, Your Honor.  Perhaps it's unfair

16   to cherry pick an example, but I'm going to do so anyway.

17   At his deposition, Jesse Jensen testified, in concurrence

18   with their investigation into the allegations against my

19   clients.  They told everybody to stop using the BCS emails

20   and to stop using Slack and to start using Signal, which

21   is another messaging app.

22           BCS in the chart that we got two IDCs ago says

23   that it does not have any Signal records.  And based on

24   what we got this morning, only Dr. Hughes is willing to

25   provide her Signal records.  Notably, the two persons who

26

1     did the investigation, Noel Beauregard and Jesse Jensen,

2     apparently are not willing to provide those, if they even

3     have them still.

4           I just don't know how you can avoid discovery

5     through that way.  And, you know, that's really going to

6     be the position that BCS is going to take, that they can't

7     compel a person to use the communication, because they all

8     communicated with each other about my client.

9           THE COURT:  I don't know if it's just me, but

10    you're breaking up, Mr. Tate.

11          MR. TATE:  Oh, I'm sorry.  Can you hear me

12    better now?

13          THE COURT:  Hello?

14          MR. TATE:  Hello, can you hear me?

15          THE COURT:  Hello?  Yes.  Can everybody hear

16    everybody else?  This is Judge Audero.  Can everybody hear

17    me?

18          MR. TATE:  I can hear you fine, Your Honor.

19          MS. BENTZ:  Yes, Your Honor, I can.

20          THE COURT:  All right.  I think it's your

21    mobile.  Yes, I can hear both of you, so what a joy.

22          MR. TATE:  Okay.

23          THE COURT:  So what I heard you say was

24    Dr. Hughes is willing to provide hers, but regarding

25    Jensen, they're not.  And low and behold, they're the ones



27

1    who conducted the investigation.  But they're not willing

2    to pull those documents, even though it was Jensen who

3    told people to not use email and Slack, and rather just

4    start using Signal.

5              Here's the thing.  I think maybe we have to

6    figure out what is it require briefing and maybe we have

7    to take this step by step because they keep going around

8    and around in circles.  The question right now for me, and

9    I appreciate the example because, by the way, that is part

10   of the notes that I have, that I looked at who was willing

11   to produce what, and it became very evident what was

12   happening.  I got it.  I got you, Mr. Tate.  I totally

13   understand your concerns.

14             But where I'm going now is you will need to

15   brief the issue of the volunteer situation, which may or

16   may not need briefing because those events will come back

17   to us and say, oh, that's what they are, employees.  And

18   then that would be a game changer.  But if Ms. Bentz comes

19   back and says, no, they're not employees, those are

20   affirmative defenses.  You should go with them, which all

21   I can do is take judicial notice; right?

22             I -- they don't -- I don't know what has been --

23   I haven't looked at all the documents in this case because

24   there have been many.  And so I don't know what the --

25   maybe the cover claims say, you know, as far as employment

1   or defenses say, I don't know.  We'll have to look at

2   that.

3           But if Ms. Bentz comes back and says, these are

4   not employees, and okay, you have no other reason to

5   believe that they might be employees, then the question

6   is, what is defendant's -- what is plaintiff's position

7   regarding whether volunteers at the high level, which are

8   really the ones you're interested in, at least right now,

9   as I understand it, Mr. Tate, whether BCS has control over

10  BCS documents that may be found in their volunteers'

11  personal accounts; right.

12          And it's starting to feel like perhaps without

13  admitting or denying or conceiving, Ms. Bentz is willing

14  to go back and give this another try to see if these

15  people have anything that hits on search terms.  We'll

16  talk about the agreed-upon search terms and a narrower bit

17  of search terms.

18          And I just want to get to, it seems like we may

19  be over the issue of the possession, custody, and control

20  question over entity documents found in the private emails

21  of volunteers.  And maybe now we're just talking about the

22  searches.  And maybe that will take care of it.  So that's

23  really where I was going.

24          Mr. Tate, what do you -- what say you -- we'll

25  deal with the fact that -- we'll see what they're willing

29

1    to produce of Signal's and other accounts in a moment, but

2    what are your thoughts if we proceed this way?

3            Would this be -- if in fact we can get some

4    production of this way, would this at least narrow the

5    issues between the parties, move the ball forward, get you

6    closer to (indiscernible)?

7            MR. TATE:  I think it would, Your Honor.  One

8    thing that has been concerning to me, however, is that

9    paragraph 4.3 of the EDO, which lists the custodians, also

10   includes the entire board of directors and anyone else who

11   had administrative permissions on the website.  I'm aware

12   of what I believe is eight other persons that are not on

13   the opposing counsel's chart.

14           And I've asked them to at least tell me whether

15   these persons were board members at the time of the

16   discovery quarter was entered.  I didn't get a response to

17   that.  But in order to go through this process, I wanted

18   to be inclusive of everyone who's listed as a custodian.

19           THE COURT:  That's fair.

20           MS. BENTZ:  Your Honor, I think I can

21   short-circuit this, because I did get Mr. Tate's email at

22   9:00 o'clock this morning.  However, I was in in-person

23   meetings all day, so I was able to get information about

24   each of these individuals on his list but wasn't able to

25   take out an email for him.

30

1          So the answer is, of the people on Mr. Tate's

2     list, Mr. Tate, the only ones who are or were ever on the

3     board are Lenore and Gabriel, who were, as you can tell

4     from our chart, people that we reached out to.

5          The other individuals on your list -- it appears

6     that somebody has given you a list of people who were once

7     considered for -- as potential board members of the

8     organization.

9          Three of them, Kate Truitt, Roger -- I'll

10    butcher his last name -- and Rosanna, there actually was a

11    vote to extend a board seat to them, but all three of them

12    refused, for various reasons.  So none of them were

13    actually board members.

14         The other two individuals on your list who you

15    thought had administrative access to WordPress, we have no

16    record of them having administrative access to WordPress.

17         However, it is an organization that has a lot of

18    -- and has had a lot of turnover.  So, you know, if you

19    have some evidence or something that that was based on,

20    I'd like to see it, because I just want to make sure

21    that's correct.  I'm 100 percent certain with the board

22    members that that's correct, but I want to make sure with

23    the administrative access, you know, that there wasn't

24    some time period that we just don't have the right people

25    to ask any more about it.

1    MR. TATE:  Well, I'm happy to engage with that

2  with you, Ms. Bentz.  I will send you not only the

3  evidence, but the Wordpress, but the board meetings

4  showing each of the persons that I listed.

5    THE COURT:  Okay.  So you folks can figure that

6  out separately.  It sounds like that is something that you

7  don't need me on.  Okay.

8    So am I correct that we are going in the

9  direction, Ms. Bentz, of Breaking Code Silence going to

10  these individuals and asking them to do word searches for

11  documents that hit the search terms that have been agreed

12  upon, and let's say search terms for now, we'll get back

13  to agreed upon in a second.  And then having them turn

14  over those documents to you folks for a relevant and

15  privilege review.  Is that where we're going?

16    MS. BENTZ:  I believe so, Your Honor.  And

17  assuming that you folks mean plaintiff's counsel, then

18  yes, I think that that is where we are going.  I have a

19  couple questions around that, just to make sure I

20  understand it, but that is my understanding of the

21  direction we're going.

22    THE COURT:  Okay.  Mr. Tate, should we have --

23    MR. TATE:  Your Honor, I have not --

24    THE COURT:  -- something workable for you?

25    MR. TATE:  It is workable.  You know, it is



1    something that I would agree to, but I would just note

2    that this is IDC number 6, and I'm not interested in

3    indefinite IDCs on this issue.  So if we could set one

4    more IDC, and at that point, if we still don't have an

5    agreement from these persons to produce the documents that

6    I need, then I should be able to bring a motion.

7              THE COURT:  I think let's cross that bridge when

8    you get to it.  But I don't disagree -- I don't disagree

9    that Breaking Code Silence needs to just take a position.

10   And I'm trying to find one that is going to be easy for

11   everybody.  Breaking Code Silence already, in my mind, you

12   know, has taken some tenuous legal positions, and I don't

13   know how they'll do in motion practice.

14             These individuals are taking positions that make

15   absolutely no sense to me.  But, you know, and as I said

16   last time, this is, you know, subpoenas are going to go

17   out, and they're going to be in a worse situation.  It's

18   going to be more difficult for them.

19             So, you know, I don't understand any of this,

20   but, you know, I don't disagree with you, Mr. Tate, that

21   we need to move forward on this.  That said, you are going

22   to have to issue subpoenas at some point, but you can

23   decide who you want to subpoena, and depending on what you

24   get from what we are able to work out here.

25             Okay.  So -- so far then, I think the only


HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    impediment here appears to be the search terms.  Let's

2    talk about search terms and why, Ms. Bentz, you think that

3    the search terms that have been agreed to are not workable

4    here -- are no longer workable.

5            MS. BENTZ:  The answer, Your Honor, is that

6    there is a significant number of search terms that the

7    parties agreed to for what they were doing, and I don't

8    think it's feasible to ask individuals to run those search

9    terms.  Some of them are compound searches designed for

10   the review platforms that the parties were using, not

11   searches designed to be run by an individual in their

12   Facebook messages, for instance.

13           So it's not a matter of substance that I

14   necessarily think any of the search terms are

15   substantively bad.  I think we took a very broad stroke

16   with the search terms that we put together for the parties

17   to use, but I don't think is really realistic to ask

18   individuals to run.

19           And based on experience, those search terms

20   resulted in a lot of things that are not within the scope

21   of discovery in this case.  So I think if we want people

22   to run these searches effectively that we should have a

23   list of simple search terms that they could run.

24           THE COURT:  Okay.  Can I hear from Mr. Tate?

25           MR. TATE:  Your Honor, as I said I would, we



34

1    agreed to reduce the search terms by -- and we went back

2    and we proposed to reduce them by approximately 30

3    percent.  The response that we got and that DLA Piper has

4    proposed to the other side is nine search terms.

5              And just they're terribly insufficient.  You

6    know, one of the allegations is that my clients unlawfully

7    accessed Instagram, Twitter, TikTok, YouTube,

8    (indiscernible).  None of those are search terms.  I just

9    don't know how DLA Piper can suggest in good faith that

10   the terms you've been suggesting are anywhere near

11   adequate.  And if they can't come up with a better

12   proposal, I would suggest that we go back to what we

13   already agreed to.

14             THE COURT:  Okay.  And the reality is, there is

15   a reality to it's very difficult to do a manual search

16   term, right, or manual search for Boolean type search

17   terms.  Doesn't mean it can't be done.  Let's start with

18   that.

19             Number two, I think some of the obvious

20   documents that wouldn't contain anything related to this

21   case, or probably, according to Ms. Bentz, at least, the

22   vast majority of what's on these accounts so those would

23   be would be something that would be very simple to not --

24   to review very quickly -- right? -- get the reality in and

25   (indiscernible) from Ms. Bentz.  You know, they can do

1    this the easy way or they can do it the hard way because

2    if they get hit with a subpoena for this, they're going to

3    have to do the search terms.

4         Somebody's going to have to pay for it.  They're

5    not going to want to pay for it.  So at the end of the

6    day, we're going to circle back to whom?  Probably DLA

7    Piper; right?

8         And so if the concern is that these individuals

9    aren't capable of looking at a list of search terms and

10   looking at their documents and determining whether a

11   particular document hits on those particular terms, then

12   maybe the answer is those individuals give their documents

13   to DLA Piper who have a machine, right, a system, a

14   process, an electronic means of searching those documents.

15        At the end of the day that's what it's probably

16   going to come down to if you folks can't come to an

17   agreement.  So I understand the difficulty but -- and I

18   understand that Rule 45, you know, requires a review of

19   undue burden on a third party but that doesn't mean that

20   they don't have to do any work.

21        And I know you're not suggesting that they do no

22   work, but nine search terms compared -- that don't even

23   hit on the issues of the case, I'm just not sure it's the

24   answer either.

25        So Ms. Bentz, is there a way to come to an



1    agreement with Mr. Tate about what these search terms are

2    going to be, realistically taking into consideration the

3    nature of the claims and defenses that are at issue here?

4         I just -- I can't tell what the -- I don't know

5    what the nine search terms are, but I can tell you that if

6    they don't hit on any of the platforms that the defendants

7    are accused of having -- sorry, now I don't remember what

8    the terminology is, but having interfered with, if you

9    will -- I don't know how could be a proper search.

10        MS. BENTZ:  Your Honor, I don't have a

11   problem -- first of all, I don't have a problem adding the

12   names of the platforms that the defendants are accused of

13   accessing without authorization, okay, to the list.  I

14   don't.  I think that's a fair point, and I have no problem

15   adding that.  My problem really is, like, even, you know,

16   defendants propose 180 search terms.

17        So even reducing that by 30 is still 100 terms.

18   Again, I'm just trying to be realistic and practical.  I

19   really am trying to move this issue forward and resolve

20   it.  And so I'm trying to come up with a solution that is

21   not cutting out things that, you know, as I said,

22   reasonably should be on the list.  I'd be happy to add

23   those to the nine that we have.

24        The nine that we have encompass defendant's

25   names and website, and we would even agree that -- to ask

1    people to send us their communications over the key dates,

2    March 7th through the 13th, 2022.  So I'm not -- I want

3    you to understand, I'm not taking an unreasonable

4    position.  I'm happy to add that to the list.

5              I would hope that we could come to an agreement,

6    but proposing 100 search terms, I don't think is really a

7    realistic thing to ask an individual to do.

8              THE COURT:  Okay.  Do you see -- is there room

9    in your -- in how you're viewing this for you to see that

10   when there is a negotiation over search terms and you

11   propose nine, is there room in this discussion for perhaps

12   a concession that that really wasn't reasonable, and so

13   you maybe understand where Mr. Tate is coming from?

14             Because, you know, it's a meet and confer

15   process, and as you folks know, you are seasoned lawyers,

16   I have a great deal of respect for all of you, but it

17   doesn't seem to be playing out well here, for whatever

18   reason; right?  We should not be having an informal

19   discovery conference where one party says we're more than

20   happy to negotiate.

21             We've proposed nine search terms, and the other

22   side says, but they don't even include XYZ.  All of that

23   should have been part of the meet and confer process.  And

24   so there is concern, I will tell you, on my part, that the

25   meet and confer process is either not going forward well



1    or not being done in good faith.

2         And I don't know where I land on it right now,

3    but where we are at this moment just shows me that things

4    aren't moving forward, and then given the already existing

5    delay, given, you know, the fact that this discovery has

6    been going on for months, months, given the lack of

7    depositions, given the lack of document production, it's

8    just not looking really good for Breaking Code Silence.

9         And so, you know, let's see if we can move this

10   forward.  Let's give it one more shot and let's have the

11   parties come back.  Either they have an agreement or they

12   can make individual proposals for who is going to be told

13   by BCS that they need to do this search, who is going

14   to -- what the search terms are going to be, what the

15   accounts are and by when -- right? -- by when, whether the

16   individual is going to do the search themselves.

17        Ms. Bentz, are you -- is DLA Piper willing to

18   take on the expense of having these individuals turn over

19   their accounts for you to run the search terms?  Would

20   that help the situation at all?  Is that something DLA

21   Piper would be willing to offer?

22        MS. BENTZ:  Your Honor, we are pretty much at

23   our max on resources on this case, and so I will look at,

24   you know, after we have, you know, I think right now we

25   only have a few accounts that people have agreed to turn

1    over, so if it's just a few accounts, that's probably

2    something we can do.

3            If we're talking about -- at one time we were

4    talking about 520 across all the custodians and all the

5    accounts, that's not something that I think would be

6    reasonable or proportional for us to do.  But I -- can I

7    ask a question?  Because I do think that the meet and

8    confer process would be aided by some direction from Your

9    Honor and whether there's a number of search terms that

10   you think are reasonable to ask an individual to run, if

11   that's what winds up happening here?

12           THE COURT:  Look, I mean, I don't have your

13   search terms in front of me.  If what you're asking me is

14   to tell you which of those, I don't think that's -- I'll

15   do it if I have to, but I don't think it's in anybody's

16   interest for me to do that, quite frankly.  You know, the

17   responding party is always, always in the best position to

18   know, you know, the language that people speak in, right,

19   the terminology that's used that may be, you know, unique

20   to the organization.

21           So, you know, I think you're in a good position

22   to come up with what search terms.  If the question you're

23   asking me is how many, truly, just tell you that, you

24   know, I don't know.  It sounds to me like DLA Piper's not

25   willing to put their resources in it to help these people,

40

1  and so they're going to have to do it themselves.  So it's

2  in Mr. Tate's interest if he wants to avoid a motion, and

3  if he wants to avoid subpoenas to, you know, reduce the

4  number.

5          But at the end of the day you've agreed to these

6  search terms. I think you're going to have a hard time

7  making an argument that they are not relevant, although I

8  recognize that you're saying that's not your argument.

9  But, you know, something less than the 180, something way

10 more than the nine, and in the hopes that it can get it

11 done, maybe it's done in phases, I don't know, or Mr. Tate

12 just needs to pull the plug and subpoena these people and

13 let them fend for themselves; right?

14         Because then they're going to have to come talk

15 to me.  And I don't understand this.  I really don't

16 understand how an organization like Breaking Code Silence

17 would allow that to happen to their volunteers rather than

18 facilitate this process.  But it is what it is, and Mr.

19 Tate is right that he's waited long enough.

20         So is there a chance that this is going to work?

21 Because if there isn't, then Mr. Tate, serve your

22 subpoenas, bring your motions, and let's be done with

23 this.

24         I don't hear from Ms. Bentz that there's any

25 more resources to be put into this, which is not good, but



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    it is what it is, because we still haven't even talked

2    about the 49,000 documents -- right? -- which is going to

3    be a thing that we have to address today.

4            But look, if there really isn't a way to get

5    these people to play nice and cooperate, because at the

6    end of the day they're going to have to anyway, then, you

7    know, you convince me otherwise, Ms. Bentz, but isn't it

8    now, then, the time for Mr. Tate to bring his motions and

9    issue the subpoenas?

10           MS. BENTZ:  Well, look, I'm happy to try to

11   agree to search terms, and I think we need to agree to

12   search terms because some individuals have volunteered to

13   provide their information and keyword searches.  So I

14   think we have to do that step, and I'm happy to work with

15   that person -- those people on that.

16           For the rest of the people who haven't

17   responded, I mean, some people haven't responded, so I

18   don't foresee that there's going to be some magical

19   solution to those people, to either the people who said no

20   or the people who haven't responded.  So I believe with

21   respect to those individuals, you know, if Mr. Tate wants

22   to serve a subpoena, then he can do that.

23           Because obviously the people who said no, no

24   matter what the search terms are, they're not going to do

25   it.  No matter whether DLA would agree to do it for them,



42

1    they're not going to do it.  So I think we have a clear

2    answer with those individuals.

3            THE COURT:  Okay.  Mr. Tate, does that give you

4    an answer as to what you want to move to compel?  I'd like

5    to hear what that is and what subpoena, if you have an

6    answer.

7            MR. TATE:  My understanding is that the EDO has

8    several important language -- terms in it.  And one of

9    them was that BCS had already taken efforts to preserve

10   all these documents.  And another one is that BCS was

11   going to, for each of the custodians and data sources, run

12   searches on agreed-upon search terms.  And if it's the

13   case that BCS is now not willing to do what the stipulated

14   order says, I think I need to bring a motion.

15           I'll still do the subpoenas, but I don't think

16   that that prevents me from doing a motion.  And I think

17   what I'm going to discover when I go through the subpoena

18   process is that these individuals when they left BCS

19   probably deleted all their stuff, and so I'm going to have

20   to bring another motion (indiscernible).

21           THE COURT:  Wait.  Say that again.  You think

22   that these individuals have turned over their documents to

23   BCS already?

24           MR. TATE:  No, no, Your Honor.  When I see that

25   these people are unwilling to produce their documents to

1    BCS, I already know from several of them that they got rid

2    of all their stuff when they left BCS.  Notwithstanding,

3    you know, e-discovery order which said that it was going

4    to take efforts to preserve that information, and so I

5    think I have to bring a motion.

6              THE COURT:  Okay.  I am going to leave it in the

7    parties' hands to see if they can resolve some of this and

8    narrow it.  But I think we have -- I fear that we keep

9    hitting my head and other people's heads against the same

10   brick wall.  And nothing is -- I just don't think things

11   are moving forward quickly enough or in a way that gives

12   me -- and I don't want to speak for Mr. Tate -- but that

13   gives me any confidence that this discovery is going to be

14   done in a way that could minimize the impact on everybody,

15   which has been my entire effort since the beginning of our

16   discussion.

17             And I feel like I think I've hit the end of the

18   road on this.  And so I'm going to find that the parties

19   have satisfied their meet and confer obligations regarding

20   the production of documents from the individual custodians

21   -- sorry, BCS's production, let me make that clear here,

22   production of documents from the individual custodians

23   pursuant to the EDO and defendants can bring their motion.

24             MR. TATE:  Your Honor, before we move on, I

25   think there is one subset issue that I think is worth



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    talking, because I think there might be an agreement

2    there.

3              THE COURT:  Okay.

4              MR. TATE:  And it is my intent to avoid motions

5    where possible.  If I understand the chart correctly, BCS

6    has agreed to go through Ms. Hughes's personal email.

7    However, I have also heard, and I don't know if it's in

8    writing or in course, that DLA Piper has gone through her

9    email and determined that there are no relevant

10   non-privileged emails.  I would ask that -- honestly, I

11   don't believe that.

12             And I would ask that they be ordered to do a

13   privilege log so that I can assess whether is -- that

14   there is no relevant documents or if they're just taking

15   an (indiscernible) view of the work product doctrine.

16             MS. BENTZ:  Your Honor, we actually already

17   agreed to provide them a privilege log.  So I'm not sure

18   that that's actually in dispute.

19             THE COURT:  Mr. Tate, where's the dispute --

20             MR. TATE:  The privilege log, and I guess it

21   comes down to your definition of the attorney work product

22   versus ordinary work product.  You know, the privilege --

23   the EDO, you don't have to include on the privilege log

24   attorney work product.  So it is -- what I understand is

25   that there are communications between the BCS board

1    members from that email.

2         I could see the argument.  I don't think it's a

3    good one, but I could see the argument that anything that

4    was discussing the investigation into my clients was in

5    anticipation of litigation, and therefore it's a work

6    product.  Ordinary work product, it's still discoverable

7    but have to show for a good cause.

8         But what I can't have is BCS taking a position

9    that I don't have to include any of those communications

10   on my privilege log because the EDO says attorney work

11   product.  That was not my understanding of what we agreed

12   to.

13        THE COURT:  So okay.  This is something that I

14   had not focused on, as you probably can tell from the

15   latest order that I issued, which contemplates a privilege

16   log that addresses attorney client privilege as well as

17   attorney work products.  So give me one second.

18        And whatever the parties agreed to is what the

19   parties agreed to.  If the parties agreed that they don't

20   have to produce -- that they don't have to list work

21   product documents on the privilege log, then it is what it

22   is.  So hold on.

23        What document are you talking about?  Are you

24   talking about the --

25        MR. TATE:  Your Honor, it's -- in document 41.



1          THE COURT:  One second.  Sorry.  I'm having to

2     sign on all over again.  I apologize.  Okay, page 41.

3     Okay.  If you hear coughing, I apologize.

4          Okay.  Somebody point me to this provision about

5     not having to log attorney work product, what document on.

6          MR. TATE:  It begins with Section 9.4 on page

7     11, Your Honor.

8          THE COURT:  Okay.  One second.  One second.

9          No privilege log entry shall be required as to

10    the following categories of materials.  Any applicable

11    privilege or protection shall be preserved.

12          (Indiscernible) Attorney work product created

13    after the parties' retention of counsel.

14          Okay.  Is that what you're referring to, B?

15          MR. TATE:  That is what I'm referring to, and

16    Your Honor is obviously not privy to this.  BCS retained

17    counsel to my clients before the events in March.  And so

18    what I don't want to have happen is them to claim that

19    their communications with each other that relate to

20    investigation against my clients in March were done in

21    anticipation of litigation and do not need to be produced.

22          That's the only excuse I can think of for the

23    claim that Ms. Hughes doesn't have any responsive

24    documents in her emails.

25          THE COURT:  Let me hear from Ms. Bentz on this.

47

1          MS. BENTZ:  Well, I guess I'm still a little bit

2    confused as to what Mr. Tate is saying.  Is he saying that

3    he thinks we're claiming attorney work product on the

4    communication between, let's say, Dr. Hughes and Ms.

5    Magill?

6          MR. TATE:  So to answer that question, my -- it

7    is unclear to me how you could take the position that

8    there are no responsive non-privileged documents.  And so

9    my proposal was to give me a privilege log so that I could

10   figure out why that is when I've heard several deponents

11   tell me that Ms. Hughes and Ms. Magill used their personal

12   emails.

13          But I just -- and that seems to be a good

14   workaround to be able to get to the bottom of this issue.

15   And that would be my proposal.  What I'm anticipating is

16   that you're going to say that those communications are

17   attorney work products, and that could be wrong.  But

18   that's the discussion that I want to have so that, you

19   know, we can get to the bottom of this issue.

20          MS. BENTZ:  Well, so we agreed to give you a

21   privilege log, so I don't know that it's a proposal

22   anymore.  We agreed to do that.  We would log things

23   according to this.  I mean, I don't know.  I don't have

24   the email account sitting in front of me at my fingertips.

25   If there are communications where they are talking about

48

1    things I've asked them or things that they're doing for

2    me, I would argue that that is work product.

3            If there are other communications that don't

4    relate to something that would otherwise be considered

5    work product, then, you know, those I wouldn't consider

6    work product.  So I'm not sure I really understand the

7    question you're asking.

8            MR. TATE:  Well, sorry.  I think what you're

9    saying is --

10           MS. BENTZ:  Let me just say, I'm not -- I'm not

11   trying to be --, there's no, like, grand scheme to trick

12   you guys into agreeing to look at a privilege log and, you

13   know, there's a bunch of internal communications that we

14   think are privileged that wouldn't be in there, or that

15   I'm claiming privilege on communications under this work

16   product idea that in fact are not.

17           I mean, I don't have -- you know, this is -- I'm

18   not trying to -- I think it's pretty clear that we're

19   trying to do things that are reasonable and proportional

20   to this case, but have not been trying to hide information

21   from you.  You may have a different opinion from that, but

22   that's where we're at.

23           So I'm not sure -- truly, I'm not sure what

24   you're asking me.  If you're asking me if we're going to

25   log documents according to what we agreed to, we are.  If

1    you're asking me if I'm going to inappropriately not log

2    documents that aren't work product under this agreement,

3    then we're obviously not going to do that.

4            MR. TATE:  Let's just -- think we can get on the

5    same page here because maybe I'm just a poor advocate and

6    can't seem to communicate myself well.

7            My understanding is that you have told me that

8    you have already looked at the user's email and that there

9    are no documents to be produced.  I'm trying to figure out

10   how that could be.  And my -- and so my proposal is that

11   we get a privilege log, and we have a date for you to

12   provide me that privilege log so that I can assess it.

13           MS. BENTZ:  Okay.

14           MR. TATE:  When can you get me that privilege

15   log?

16           MS. BENTZ:  I would need to talk to my team and

17   ask them that, since we -- I don't know how long on this

18   system we're using it takes to pull one together.  But I

19   can ask them.  I don't think it's going to be -- you know,

20   I'm not -- it's not going to take them long or so to put

21   it together, but I do need to ask them.

22           MR. TATE:  Okay.  Can we -- you know, when we

23   get back for the next IDC, can we have a date when that's

24   going to be done?

25           MS. BENTZ:  Yeah.  I don't think we've talked



1    about when the next IDC is, but I don't expect that that

2    would be a problem.

3            MR. TATE:  Thank you for indulging me on that.

4    I just think that I can -- well, proof that maybe we could

5    get to the bottom of.

6            THE COURT:  Okay.  All right.

7            Well, so the parties are going to work on

8    this -- work this issue out.

9            Okay.  You're right, Ms. Bentz.  We don't have

10   another date yet for anything.

11           All right.  So that takes us now to the 47,000

12   documents.  I ask that the parties -- well, I ask that

13   plaintiff make a proposal that is more (indiscernible) in

14   July than the end of July date for the production of the

15   documents.

16           No such proposal has been made.  BCS is standing

17   on its position that it is impossible to do this sooner

18   than July 20 -- I guess it was July 27th or 28th.  So,

19   without a proposal, this leaves me no choice but to order

20   the production according to my own assessment.  And that's

21   what I'm going to do.

22           So one of the statements that BCS made was it's

23   going to take 1,000 hours to review 47,000 documents.

24           And is it 47,000 documents or 47,000 pages?

25           MR. KIKER:  Your Honor, this is Dennis Kiker.



1    It's 47,000 documents.

2            THE COURT:  What is the average estimate of the

3    document?

4            MR. KIKER:  Estimates vary, and the Court likely

5    knows I will typically go with an experienced team that's

6    working full-time at 50 documents per hour.  And a typical

7    rate for review with a team that is working sporadically

8    and part-time on the off hours, you just don't get the

9    same efficiency.  So I was estimating 45 documents per

10   hour, Your Honor.

11           THE COURT:  Okay.  My question was a little bit

12   different, but thank you for that.

13           How many pages, on average, per document?

14           MR. KIKER:  I apologize, Your Honor. I did not

15   understand your question.

16           THE COURT:  It's okay.

17           MR. KIKER:  I don't have an estimate based on

18   this particular data set.  I know typically in our

19   industry we will estimate different vendors doing

20   different estimates all the time, but typically you are

21   looking at somewhere between three and ten pages,

22   depending on how much of it is email versus how much of it

23   is loose documents and that sort of thing.

24           I could probably do that analysis for the Court,

25   but I think if we said somewhere along the lines of five



52

1      pages or so, six pages per document is probably accurate.

2              THE COURT:  So some production has already been

3      made.

4              Mr. Tate, do you agree that this is what the

5      size of documents is that have been produced to you so

6      far?

7              MR. TATE:  I don't, Your Honor.  Many -- well,

8      as Mr. Kiker said, that they do range considerably,

9      whether if we were to do a mode or even a median, but not

10     necessarily an average.  So it's a bit less, because a lot

11     of the documents in this case are screenshots, which are

12     one page.

13             THE COURT:  Okay.  All right.

14             Well, we're not going to go till July.  What was

15     it, 27th?  That's too much.

16             So I'm going to say by the end of June.  If they

17     have to be -- the 47,000 documents has to be -- obviously,

18     you've gathered them already, so now it's just a matter of

19     reviewing them and producing them so...

20             Yes?  Somebody wants to say something?  I can't

21     tell whose voice it is.

22             MR. KIKER:  Yeah, Your Honor.  This is Dennis

23     Kiker.  I understand what the Court is saying.  I

24     understand what the Court is ordering.  All I can tell you

25     is that we will do our best.  I'm literally working with

53

1    folks who are working on their own time after hours and

2    after their, you know, billable hour requirements and so

3    forth.

4            We've got a group of six staff attorneys who are

5    helping me with this, and they are doing -- and I'm

6    encouraging them.  They're doing the best that they can,

7    but they are literally doing this on their own time.  And

8    so we are going to do our best, Your Honor, and we'll

9    explore ways to try to make it faster.

10           MR. TATE:  Yeah.  This is a situation that I've

11   had for some time now.  You retained DLA Piper at 4,300

12   attorneys plus.  It does not matter that this is a pro

13   bono case.  If you have a document review team of 10

14   persons, they work on it full-time and have this done in

15   two weeks.

16           THE COURT:  All right, then.

17           MR. TATE:  I just don't understand.  You

18   can't -- and this is why I think I'm so upset by this, is

19   that BCS seems to have the ability to consume my clients

20   and make them spend hundreds of thousands of dollars

21   defending this, I think, is a meritless lawsuit.  And then

22   if they can't, then it goes -- because DLA Piper

23   (indiscernible) represent them for free, and DLA Piper

24   won't do its job.

25           MR. KIKER:  And, Your Honor, I just have to say



54

1    that, you know, we are just stating facts.  I'm not asking

2    for leniency or anything like that because it's a pro bono

3    case for us but that's what it is.  And I just don't have

4    the ability to order, you know, 10 lawyers to stop what

5    they're doing in their day jobs and work full time on this

6    project.  I just don't have that ability.

7            I also, frankly, don't know -- I really don't

8    understand what the urgency of end of June is.  I haven't

9    heard any indication that any party is being prejudiced.

10   If we did go to the end of July, I don't know how that

11   would prejudice anyone, particularly if defendants are

12   going to have to go out and get third-party subpoenas.

13           Some of those may be out of state.  I don't

14   anticipate those issues being resolved within -- by the

15   end of June.  So we are -- you know, all I can say is we

16   are doing our best with the resources that we have and

17   that are available.  I simply don't have the ability to

18   require people to do pro bono work.

19           MR. TATE:  Well, if Mr. Kiker does not have the

20   ability, the Court does.  The Court can issue an order

21   that a document done -- that DLA Piper has to get this

22   document production done for BCS within two weeks.

23           THE COURT:  Well, I'm certainly not going to

24   order them to do pro bono work.  That is something that

25   the State Bar of California has said every lawyer should



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

55

1   do, and the last I checked was at least 60 hours per year,

2   which I think is a low threshold, but so be it.

3          And so, you know, I am not -- I think part of

4   the problem, Ms. Bentz, I'm not persuaded by the argument

5   because the argument has changed; right?  The argument

6   sometimes is we don't have the -- we, DLA Piper, in paren,

7   the second or third largest law firm in the entire world,

8   end paren, don't have resources to do this.

9          And sometimes it's we're asking the volunteers

10  of this organization to do it, and they can't be asked to

11  do that.  And so, you know, the reasons keep going back

12  and forth.  Maybe it's a combination of everything, but

13  there is no getting around the reality that the amount of

14  delay that has existed in this discovery, I think, lies at

15  the foot of Breaking Code Silence.

16         And I agree with Mr. Tate.  And, you know, I bet

17  you would agree too, when you put on your defendant's hat,

18  that, you know, a party can't file a lawsuit and then step

19  back and say but I'm not going to do what I need to do to

20  prosecute this case.  And that's what you're bordering on

21  right now.

22         Not you personally, Mr. Kiker.  I understand you

23  and your team are working hard, but that's what Breaking

24  Code Silence is bordering on, failure to prosecute.  And I

25  think that's a very serious situation.  And so, you know,

1    I myself find myself at my wit's end.  And I -- listen, I

2    set up many pro bono projects while I was at Paul

3    Hastings.  So I understand the limitations.  But I've

4    never seen anything like this where there is just, you

5    know, there is always an excuse for something.

6              There is -- it's just all very suspicious, all

7    very suspicious.  And it's all -- when you put it all

8    together, I can understand the frustration of Mr. Tate.

9    And, quite frankly, 47,000 documents in six weeks is

10   absolutely doable.

11             You can figure out what resources you're going

12   to put on it.  I'm certainly not going to order anybody to

13   work on a case they don't want to work on it.  But I think

14   six weeks for 47,000 documents is eminently reasonable.

15   And it's an order.  So failure to do this takes you into

16   37(b) sanctions, and that's just something that you folks

17   should be aware of.

18             Quite frankly, you've already heard everything I

19   have to say about why this case should be even where it is

20   now, it should be in settlement mode.  But I, you know,

21   that's not my place, that's not my decision.  But I just

22   think -- I think I've said this before too, folks, this is

23   mutual assert destruction; nobody wins from this.

24             And you'd all be better off, I think, putting

25   your money into settling this case than to fighting these

57

1    fights.  But then I am not the stock caller, if you will.

2         Okay.  Do we have anything else?  We've dealt

3    with the 47,000 documents.  We've dealt with -- well, what

4    did we -- we've dealt with the deposition.  What did we

5    resolve on that one, by the way?  I'm sorry, but I just

6    don't -- we've been going at this so long, I don't

7    remember anymore.

8         MR. TATE:  Your Honor, the deposition of

9    Dr. Hughes, (indiscernible) time limits on this side is

10   because, you know, we're not going to take the deposition

11   until the documents were produced.  And so then, you know,

12   I was happy to wait for a declaration from them

13   (indiscernible) at the end of it (indiscernible).  So

14   that's what we're probably going to do.

15        THE COURT:  Okay.  Would it be beneficial -- and

16   I think this is a concept that DLA Piper was already in

17   agreement with at one point, but would it be beneficial to

18   prioritize Dr. Hughes's documents?  I think at one point

19   we were prioritizing Ms. Magill's documents.  But it

20   appears that Dr. Hughes is willing to provide some

21   documents, so I don't know if also --

22        MR. KIKER:  Yes, Your Honor.  Our current work

23   plan has Dr. Hughes's documents prioritized.  We've

24   produced 19,000 documents from her data set, and we're

25   doing our best to complete the balance of that this week.

1        THE COURT:  Okay.  All right.  So I guess the

2   order is going to be these (indiscernible).  The parties

3   can continue meeting and conferring, if they want, but

4   defendants can bring their deposition motion.

5        And then with respect to the 47,000 documents,

6   that will be by the end of June.

7        With respect to the privilege log, that will

8   be -- the parties will continue meeting and conferring on

9   this.

10        And then with respect to the question whether

11   Breaking Code Silence has satisfied its obligation

12   regarding its production of documents from the individual

13   custodians pursuant to the electronic discovery order, the

14   parties can continue meeting and conferring on it, if they

15   wish, and I hope that they can resolve and narrow the

16   issue.  But either way, defendant can bring their motions.

17        I think that is what we accomplished today.

18   Have I missed anything?

19        MR. KIKER:  I don't believe so.  Presumably that

20   the search terms turns into a larger conversation about

21   possession, custody, and control, I think that's what

22   (indiscernible).

23        THE COURT:  Well, you folks will do when you're

24   done -- I have officially thrown my hands up in the air.

25   I can't find a way to help you folks.  Try as I may, and

59

1    with as many hours as we've all put on this, I can't seem

2    to find a solution that is acceptable to both sides.  So

3    figure it out.  Good luck if you can.  And I don't say

4    that sarcastically.  I say it with all the good intention

5    in my heart.

6              I really hope you folks can figure it out, and I

7    wish you the best of luck on it.  But if you can't figure

8    it out, then defendant can bring the motion.

9              MR. TATE:  Thank you, Your Honor.

10             MS. BENTZ:  Your Honor, I just have a question.

11   We haven't talked about it, but I assume Your Honor will

12   issue an order on it, but it sounds like there will be

13   some of the dates -- the deadlines and the dates in this

14   case will move based on the document production deadline.

15             THE COURT:  No.  You're right.  Maybe we should

16   talk about that.

17             I think -- I am not willing to extend this

18   beyond three months and that -- for now.  I'm purely

19   willing to extend this.  This is not intended, by the way,

20   to signal to Breaking Code Silence that you have three

21   months in which to do this discovery.  You don't.  I am

22   adding time to the end of June for motion practice.

23             If the parties feel so inclined and they want to

24   stipulate to a further extension and can provide good

25   cause for it, I am more than happy to consider it.  If we



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1    has to extend further down the line, then, you know, I

2    will consider that.  But, for now, I think that the best

3    approach -- because there's lots of dates here, let's see

4    -- okay -- for reminding me of that.

5             So if I extend all deadlines to one, how does

6    that sound to you folks?  For now.  I'm not going to

7    extend the ADR cutoff.  I really think you folks need to

8    go to ADR.  So your ADR is July 30, 2023.  That won't be

9    extended.  But if I extend all other dates by three

10   months, and we can -- I think I'm going to do that

11   initially.

12            We can revisit what this means, because if I

13   extend all dates by three months, you folks are ending up

14   in trial in mid-January, which means it's ruined

15   everybody's holidays, and I have no interest in keeping

16   associates or partners or anybody working over the

17   holidays if we can avoid it.  And I think that we have

18   time on this case.

19            So we can revisit the trial date, but I think

20   that for now I'll extend all dates by three months, and

21   then we'll figure out where we go as discovery progresses.

22   Okay?

23            MS. BENTZ:  Okay.

24            MR. TATE:  Your Honor, if I may be heard, but I

25   believe the deadline should only be extended for



1    defendants and not for plaintiffs.  The only issue that's

2    been raised is the delay has been on BCS, not my clients.

3         THE COURT:  Oh, you're saying extend the

4    discovery deadline only for defendants?

5         MR. TATE:  Both the discovery deadline and the

6    (indiscernible) one.

7         MS. BENTZ:  No.  I'm not going to think that

8    that would be appropriate, Your Honor.  I'm glad.  I'm not

9    going to -- sorry.

10        THE COURT:  I -- I'll consider.  I want to hear

11   an argument.  I'll consider the fact discovery cut-off to

12   be one-sided, because so far I haven't heard any problems

13   from any concerns from plaintiffs as to defendant's

14   discovery.  And I don't know -- and I don't know yet at

15   this point if there are any issues that remain.

16        So that I'm willing to consider, but I'm not

17   going to create a situation where, you know, one side has

18   to do dispositive motions without the close of discovery.

19   I don't think that's fair.  So that I'm not going to do.

20   But I could hear argument on extending the fact discovery

21   cutoff -- and the (indiscernible) discovery cutoff I think

22   we should do as well.  Share it defendants only.

23        MR. TATE:  Your Honor, may I --

24        MS. BENTZ:  I don't want to be extending it.

25        THE COURT:  Go ahead.  Let me hear from



1    Mr. Tate, please, because he's the one who brought it up.

2         Okay.  Go ahead.

3         MR. TATE:  I think my argument is pretty

4    straightforward.  We all agreed that we would not produce

5    documents on February 28th and then do a clean-up

6    schedule.  We've been complying with that and the delay

7    here is on BCS.  It (indiscernible).

8         The problem with our discovery is

9    (indiscernible) to the Court.  I'm just -- I'm trying to

10   reduce the cost and the significant expense to my clients,

11   and I don't want to subject them to another three months

12   of discovery when they have tried their best to comply

13   with the Court's orders.

14        THE COURT:  Okay.  Ms. Bentz.

15        MS. BENTZ:  Thank you, Your Honor.

16        So discovery is an iterative process.  So to

17   have one party go forward with three months of discovery,

18   which could lead to additional questions for the

19   defendant, causes a problem that we won't be able to ask

20   those questions because you will have a different close of

21   discovery than the defendant.

22        I'll give you an example.  We would be taking

23   the deposition of defendant.  You would have to take the

24   deposition of defendant before we did other -- before our

25   people were deposed or before discovery from us was



63

1    actually even resolved.  So it seems to be an arbitrary

2    distinction simply because we haven't filed for an IDC yet

3    that there would be one-sided discovery that continues for

4    three months.

5              I'm not -- look, I have no intention of serving

6    unnecessary discovery or unnecessarily driving up

7    defendant's costs in this case.  So I don't see that as

8    much of a concern.  I think we've already made it clear to

9    Your Honor that resources on our side are fairly taxed,

10   and so there's not really the ability to do that.

11             But I do think having two different closes of

12   discovery for the parties is going to create some

13   prejudice when it comes to how discovery proceeds, because

14   it is iterative.

15             THE COURT:  But under what circumstances would

16   you -- you're the one that holds all the information and

17   all the documents.  You have theirs; right?

18             MS. BENTZ:  No --

19             THE COURT:  So what else is it you get --

20             MS. BENTZ:  No, Your Honor, that's --

21             THE COURT:  You're a month away from the

22   discovery cutoff, a month and -- well, maybe it is four

23   weeks, five weeks away from the discovery cutoff; right?

24   It's May 3rd.  Discovery cutoff is June 10th.

25             What discovery could you propound now?  None;



1    right?

2              Well, you could, but then you couldn't move to

3    compel it.  So that's fine.  I guess you could propound

4    discovery.

5              But what is it that you don't know?  You have

6    everything.  And if you don't know it, whose fault is it;

7    right?  Is it -- plaintiff isn't withholding documents

8    from you; right?  All of the discussions we've had so far

9    is plaintiffs are withholding discovery from defendants.

10   Rightly or wrongly is not the question; right?

11             At the end of the day all of the disputes are

12   that Breaking Code Silence is not producing documents; it

13   is not producing deponents.

14             MS. BENTZ:  So, Your Honor, I'm sorry if I

15   wasn't clear.  My point is, first of all, 47,000 documents

16   that by everybody's agreement we haven't looked at yet, so

17   to say that the information is in our control, there is

18   more discovery, everybody agrees, that will happen, that

19   could lead to additional questions for defendants.

20             So by creating a different close of discovery

21   for the plaintiff than the defendant, what you are doing

22   is prejudicing plaintiff's ability to ask defendants those

23   questions as discovery proceeds.

24             THE COURT:  That's what I'm asking you.  What is

25   it that you, since you have all the documents, whose fault

65

1    is it that you haven't looked at the 47,000 documents?

2    That is absolutely not something that defendants have any

3    responsibility in; right?  So, again, you have all the

4    documents albeit you are sitting on them.

5            You don't have the resources.  Fair enough.  But

6    you're sitting on them.  You don't have the resources,

7    fair enough, but you're sitting on them.

8            So what is it that you don't know or should not

9    know?  Because you know that --

10           MS. BENTZ:  Well, I can't tell you what I don't

11   know.  That's my point.  What my point is, is that it's

12   not a situation of we're sitting on documents.  The

13   situation is we have a lot more documents to go through

14   than defendants had to go through.  Mr. Kiker walked you

15   through that some when we had our chart.

16           And so it's not a quid pro quo argument.  It is

17   the volume of what we have to go through is much greater.

18   And so by giving us an earlier close of discovery, what

19   you're doing is prejudicing us because we've just told you

20   that we don't -- we've been working to go through the

21   volume of documents that we have, but we haven't been able

22   to go through all of them yet.

23           And so you're basically foreclosing our ability

24   to ask defendant's questions after we finish going through

25   this very large volume of documents that we have.



66

1          THE COURT:  Well --

2          MS. BENTZ:  Frankly, I'm believing that I don't

3     understand because there actually is no basis to argue

4     that we are unnecessarily driving up defendant's costs in

5     this litigation.  So I guess I'm a little bit unclear as

6     to why Your Honor would prejudice the plaintiff by doing a

7     different close of discovery for plaintiff than defendant.

8          THE COURT:  And this is -- now I've seen it in

9     writing, I've heard it today a couple of times, and I have

10    to tell you that I find it offensive for plaintiffs to

11    take the position that the Court is prejudicing them when

12    really this is a problem of plaintiff's own making.

13         Plaintiffs are the ones who haven't collected

14    documents.  Plaintiffs -- actually plaintiff is the one

15    that has not reviewed documents.  Plaintiff is the one

16    that has not produced documents.  Plaintiff is the one

17    that has not produced deponents.  So for plaintiff to take

18    a position that the Court is arbitrarily prejudicing them

19    by doing what the Court is supposed to be doing, which is

20    moving discovery along when a party fails to do it on

21    their own, which is what's happening here, I think that's

22    a real mischaracterization of what's happening here so...

23         MS. BENTZ:  Your Honor, giving us a different

24    close of discovery does not move discovery along any

25    faster because defendants are still doing discovery.  So



1    that's sort of my point.  There's no real -- the case

2    does not move faster just because plaintiffs have a

3    different close of discovery than defendants.

4              THE COURT:  I'm not sure I agree with that but

5    let's set that aside for a moment.

6              I am -- I am willing extend it -- I'm going to

7    extend it to both one time only.  And I'm going to say it

8    very, very clearly, and hopefully all my coughing will not

9    show up in the transcript that will be used to remind

10   everybody of this, but I am not inclined to give Breaking

11   Code Silence, who has been the cause of all of the

12   problems that we have spent hours on, for gamesmanship or

13   for not, I don't know; I'm not weighing in on that, but

14   plaintiff is the one who has caused all the problems.  And

15   so I will give plaintiff this one time, 30 -- or, sorry,

16   90-day extension along with defendant, but if defendant

17   needs more time, I'm not going to be inclined to give

18   Breaking Code Silence more time.

19             Unless there is a (indiscernible) Breaking Code

20   Silence has moved in the interim time much more diligent,

21   with much more direction, with much more interest in

22   resolving this case on the merits rather than on

23   discovery, gains, and shift.

24             I am not going to be inclined to extend Breaking

25   Code Silence's deadline absent a very strong showing of



68

1    diligence.

2            I'm going to continue for now.  I just want you

3    to just be forewarned and forearmed.  Do what you need to

4    do on discovery quickly.  Bring your discovery battles to

5    me if you have any.  I am happy to assist the parties up

6    until it makes no sense anymore, which is kind of where

7    we've gotten on a couple of issues so far.

8            And let's get this case resolved on the merits

9    with the truth being provided through discovery.

10           MR. TATE:  Your Honor, one point of

11   clarification.  The expert to disclosure has already

12   passed.  Defendant's designated experts, if it's not

13   (indiscernible) anybody today, is plaintiff's deadline to

14   give us rebuttal experts, if anyone.  I don't believe that

15   BCS should get a second shot to designate experts that it

16   didn't do so a month ago.

17           THE COURT:  Well, maybe you have no experts.  I

18   think you have no experts.  Well, hold on.

19           Ms. Bentz, you have no experts; right?

20           MS. BENTZ:  Correct.  We have no resources for

21   experts, Your Honor.  So there are no experts.

22           THE COURT:  Okay.  So I don't need to extend the

23   expert discovery cut -- well, no, because your expert is

24   going to need it.

25           MR. TATE:  Yes, Your Honor, I think my expert



1    should be able to do a report, although the general topic
2    on which he is designated is not going to change.  He just
3    would (indiscernible) more information to be able to show
4    that there was no evidence of unauthorized access.
5            THE COURT:  No.  That's fine.  The point that
6    I'm making is your expert needs the conclusion of fact
7    discovery.
8            MR. TATE:  Yes.
9            THE COURT:  Okay.  And so there is no issue
10   with -- there's plaintiff -- I mean, plaintiff is not
11   going to designate experts.  Done.  The issue is done.
12   Okay.
13           MR. TATE:  I agree, Your Honor.
14           THE COURT:  Okay.  Anything else for the
15   parties?
16           Okay.  All right.  I'll list you my order.
17   Hopefully, it will get out tomorrow, but I think everybody
18   is clear on the direction that we're going.
19           We have no new discovery or informal discovery
20   conference set to discuss anything or informal discovery
21   conference set to discuss anything.
22           You folks will either resolve what's out there
23   or feel free to reach out to me if you need my help.  But
24   I think we have now resolved -- well, we have concluded
25   our efforts on trying to resolve all of the issues.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

1          All right.  Ms.  Estrada, I think we can go off

2     the record.

3          THE CLERK:  Court is adjourned.

4               (Proceedings concluded.)

5                    -o0o-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPTIONIST'S CERTIFICATE

2         I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in

4    the above-entitled matter.

5

6

7    *Robert Kreb*                              June 21, 2023

8    _____        _____

     Transcriber                        Date
9

10   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

11   /s/Ann Bonnette
     _____
     ANN BONNETTE, CSR. NO. 6108, President
12   Huntington Court Reporters and Transcription, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25


HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
                    (800) 586-2988