1 | Dirk O. Julander, Bar No. 132313
   doj@jbblaw.com
2 | Catherine A. Close, Bar No. 198549
   cac@jbblaw.com
3 | M. Adam Tate, Bar No. 280017
   adam@jbblaw.com
4 | JULANDER, BROWN & BOLLARD
   9110 Irvine Center Drive
5 | Irvine, California 92618
   Telephone:  (949) 477-2100
6 | Facsimile:  (949) 477-6355

7 | Attorneys for Defendants
   KATHERINE MCNAMARA and
8 | JEREMY WHITELEY

9

10 |                    **UNITED STATES DISTRICT COURT**

11 |                    **CENTRAL DISTRICT OF CALIFORNIA**

12

13 | BREAKING CODE SILENCE, a          | Case No. 2:22-cv-002052-SB-MAA
   | California 501(c)(3) nonprofit,
14 |

15 |                                    | **JOINT STIPULATION RE:**
   |                                    | **DEFENDANTS KATHERINE**
16 |            Plaintiff,              | **MCNAMARA AND JEREMY**
   |                                    | **WHITELEY'S MOTION TO**
17 |                                    | **COMPEL SLACK**
   |                                    | **COMMUNICATIONS AND FOR**
18 |            vs.                     | **SANCTIONS**
19 |

20 |
   | KATHERINE MCNAMARA, an            | Date of Motion:      July 12, 2023
21 | Individual; JEREMY WHITELEY, an   | Action Filed:        March 8, 2022
   | individual; and DOES 1 through 50,| Discovery Cut-off:   August 30, 2023
22 | inclusive,                        | Pretrial Conf. Date: January 3, 2024
   |                                    | Trial:               January 16, 2024
23 |

24 |            Defendants.

25 |                                    | [*Assigned to the Hon. Maria A. Audero*]

26

27

28

`

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTORY STATEMENT ........................................................................ 1

      A.     Defendants' Introductory Statement ........................................................ 1

      B.     Plaintiff's Introductory Statement ........................................................... 2

II.    ISSUES IN DISPUTE ....................................................................................... 4

      A.     Defendants' Statement of Issues in Dispute ............................................ 4

             1.     Whether BCS Should be Compelled to Produce the Slack
                    Communications That it Has Failed to Produce ............................ 4

             2.     Whether the Court Should Impose Monetary Sanctions Against BCS
                    and its Counsel. ........................................................................... 4

      B.     Plaintiff's Statement of Issues in Dispute ............................................... 5

III.   PARTIES' CONTENTIONS AND POINTS AND AUTHORITIES ...................... 5

      A.     Issue No. 1: Whether BCS Should be Compelled to Produce the Slack
             Communications That it Has Failed to Produce ....................................... 5

             1.     Defendants' Contentions and Points and Authorities ..................... 5

                    (a)     Relevant Deposition Testimony ........................................ 5

                    (b)     Procedural History ........................................................... 6

                    (c)     There is No Dispute That Plaintiff Failed to Produce Critical
                            Slack Communications ................................................... 11

                    (d)     There is No Excuse for Plaintiff's Failure to Produce the
                            Slack Communications Because Plaintiff Could Have
                            Requested the Documents from Slack .............................. 15

                    (e)     There is No Excuse for Plaintiff's failure to produce the
                            Slack Communications Because its eDiscovery Vendor
                            Promotes That it can Collect the Messages Regardless of
                            License Level ................................................................. 17

                    (f)     There is No Other Excuse for Plaintiff's Failure to Produce
                            the Slack Communications ............................................. 18

             2.     Plaintiff's Contentions and Points and Authorities ..................... 19

      B.     Issue No. 2: Whether the Court Should Impose Monetary Sanctions Against
             BCS and its Counsel ......................................................................... 22

             1.     Defendants' Contentions and Points and Authorities ................... 22

`

1

   2.  Plaintiff's Contentions and Points and Authorities ...................................... 23

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JULANDER BROWN
— & BOLLARD —

JOINT STIPULATION RE: MOTION TO COMPEL SLACK COMMUNICATIONS

ACTIVE\900435176.3

`

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

## **CASES**

4

*Apple Inc. v. Samsung Elecs. Co.*
  No. 12-CV-0630-LHK (PSG), 2013 WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013) ........ 16

5

6

*Benebone LLC v. Pet Qwerks, Inc.*
  No. 820CV00850ABAFMX, 2021 WL 831025, at *1 (C.D. Cal. Feb. 18, 2021) ............. 15

7

*Breaking Code Silence v. Papciak, et al.*
  SDCA Case No. 21-cv-00918-BAS-DEB .................................................................. 13

8

9

*Bryant v. Mattel, Inc.*
  Case Nos. C 04-09049 SGL (RNBx), 2007 WL 5430887 at *1 (C.D. Cal. June 20, 2007)........................................................................................................................ 24

10

11

*Jadwin v. Cnty. of Kern*
  No. 107CV-0026-OWW-TAG, 2008 WL 2025093, at *5 (E.D. Cal. May 9, 2008).......... 16

12

*OpenTV v. Liberate Techs.*
  219 F.R.D. 474, 476 (N.D. Cal. 2003) .................................................................. 15

13

14

*Oppenheimer Fund, Inc. v. Sanders*
  437 U.S. 340, 358, 98 S.Ct. 2380, 2393 (1978) .................................................. 15

15

16

## **STATUTES**

17

Fed. R. Civ. P. 37(a)(5)(A)............................................................................................. 23

18

19

20

21

22

23

24

25

26

27

28



JOINT STIPULATION RE: MOTION TO COMPEL SLACK COMMUNICATIONS

ACTIVE\900435176.3

**JOINT STIPULATION OF PARTIES PURSUANT TO LOCAL RULE 37-2**

**I.    INTRODUCTORY STATEMENT**

### A.    Defendants' Introductory Statement

One of the primary allegations against Defendants (and virtually the only allegation against Jeremy Whiteley) is that Defendants were somehow responsible for "de-indexing" the breakingcodesilence.org domain (the ".Org Domain") from Google Search. The basis for Plaintiff's theory can be summarized as follows: (1) the Google Search Console allegedly shows that a request to remove the .Org Domain from Google Search was made on March 9, 2022; and (2) the Google Webmaster Central shows that Ms. McNamara delegated Google ownership capabilities for the .Org Domain to Mr. Whiteley on March 11, 2022. From these two facts, Plaintiff has made the extraordinary logical leap that Defendants must have been the ones who submitted the temporary removal request on March 9th. Plaintiff reached its conclusion even though it never saw any evidence that Defendants had access to the Google Search Console on March 9th when the removal request was allegedly made. Plaintiff also assumes, without any evidence, that both Defendants must have been involved, even though Plaintiff does not know which of the Defendants supposedly made the removal request.

Defendants strongly believe that the actual reasons Plaintiff brought the instant action was (1) because Defendants had the audacity to complain about being harassed by Plaintiff's board president, Vanessa Hughes ("Hughes"), and (2) Hughes believed that Plaintiff could obtain a windfall by suing Defendants through pro bono attorneys. In order to uncover the true reasons for the instant lawsuit, Defendants are entitled to know everything about Plaintiff's investigation into why the .Org Domain was allegedly not appearing on Google Search in March 2022.

Multiple witnesses have testified that Plaintiff's leadership team discussed the investigation on Slack in March 2022. Defendants asked Plaintiff to produce these Slack communications; Plaintiff agreed to produce these Slack communications; the

ACTIVE\900435176.3

Court ordered Plaintiff to produce the Slack communications; and yet, the vast majority of the Slack communications still have not been produced. Defendants respectfully request that the Court order Plaintiff to produce the Slack communications (for a second time) and to sanction Plaintiff and its counsel for withholding the Slack communications.

## B.   Plaintiff's Introductory Statement

Plaintiff has a Pro subscription plan to Slack. This is a free account offered to Plaintiff because it is a non-profit. Because Plaintiff's subscription plan is a Pro plan only public Slack channels can be exported by Plaintiff from Slack. Starting in November 2022, Plaintiff worked with its vendor, Consilio, to export all of the data it could from Slack and the data was exported on January 5, 2023. That data was later reviewed and produced as discussed with the Court during the May 1, 2023, IDC.

Plaintiff is not hiding evidence in Slack. Plaintiff has been transparent with Defendants' regarding the limitations of its Slack subscription. There has been repeated communication between the parties about the production of Slack communications (which is not something it appears Defendants dispute). Plaintiff has also offered to connect Defendants' counsel with Plaintiff's vendor Consilio so counsel could discuss collection efforts directly with the vendor. *See* 4/18/23 Tr. at 59:24-60:7. Through these discussions, Defendants were made aware of the limitations of the license, something they brought to the Court's attention during an IDC on May 1, 2023. *See* 5/1/23 Tr. at 2519-23.

Plaintiff's efforts to collect Slack communications started in November 2022. At that time Plaintiff was retaining Consilio, an established eDiscovery provider, on a pro bono basis. Plaintiff immediately gave Consilio access to the breakingcodesilencehq Slack account so that the forensic technician could familiarize himself with the environment and could work on exporting data from the account. Declaration of Dennis Kiker at ¶ 2  ("Kiker Decl.").  In late December,

ACTIVE\900435176.3

`

Plaintiff upgraded the Consilio forensic technician's user account to "Workspace Admin," which enabled Consilio to export available reports and public channel messages. Kiker Decl. at ¶ 3.The Slack reports were prioritized for collection and production. The reports were collected on January 4, 2023, and produced shortly thereafter. Kiker Decl. at ¶ 4. On January 5, 2023, Consilio exported all the messages that were available for export, which included messages from all public channels on Slack. In total there were 25 public channels. The messages that were collected were reviewed and responsive messages were produced on May 1, and May 4, 2023. Kiker Decl. at ¶¶ 5-6. Once Plaintiff reviewed the messages it collected, it confirmed that there were responsive messages in private channels and individual account direct messages that had not been collected. Kiker Decl. at ¶ 7.

Plaintiff continued to work with Consilio to determine the most efficient method of collecting the private channels and direct messages that had been identified through discovery or by Plaintiff's witnesses as having responsive information. Kiker Decl. at ¶ 8. While the private channels and direct messages were not available for export with Plaintiff's Slack subscription, Consilio evaluated options with Slack customer support and identified a method that allowed the forensic technician to collect the private channels and direct messages through an administrative account. Kiker Decl. at ¶ 9. Consilio collected those channels on June 27-30, 2023. The messages in those channels are in review and responsive documents will be produced by July 14, 2023.

In addition to making its own productions, during the inspection of Plaintiff's online systems on June 26, 2023, Plaintiff agreed and facilitated a direct inspection of its Slack accounts. Declaration of Michael Patrick Brown ("Brown Decl.") at ¶¶ 2-3. After Plaintiff offered to make available four of its Slack accounts for inspection, Defendants' and their expert inspected two of these Slack private channels, including the BCS account for witnesses Jenny Magill and Jesse Jensen. *Id*. ¶ 3. Defendants' inspection of these Slack channels was unfettered and lasted

`

1   more than two hours alone over the day-long inspection. *Id*. ¶ 4. In fact, Defendants

2   performed broad key word searches in Slack messages in these channels. *Id*.

3        In light of Plaintiff's efforts to collect Slack documents and communications

4   with Defendants regarding those efforts, this motion was unnecessary. Plaintiff has

5   never refused to produce these communications and, in fact, will complete its

6   production of them by July 14, 2023.

7        Furthermore, Plaintiff's efforts were compliant with the parties' agreement

8   under the EDO. The EDO is explicitly subject to the FRCP and industry standard

9   practices.  Specifically, the EDO states, "The Parties agree to take into account the

10  proportionality considerations addressed in Federal Rules of Civil Procedure for

11  purposes of preservation and production of ESI and hard copy documents in this

12  Action."  Dkt. 41 § 6.1 (emphasis added).  The EDO further states, "Each Producing

13  Party shall design and implement the industry standard and approved methods it

14  uses to identify, cull, and review its potentially responsive ESI based on its

15  knowledge and understanding of its own data, the facts and issues involved in the

16  Action," and "A Producing Party may also conduct a targeted collection of sources

17  likely to contain responsive materials (e.g., file folders on a given hard drive)."  *Id*. §

18  4.5 (emphasis added). These provisions of the EDO expressly allow Plaintiff to

19  work with its vendor on the most efficient way to collect these communications.

20  Since the documents were produced well before the close of discovery, Plaintiff's

21  efforts did not prejudice Defendants. There is accordingly no basis for sanctions

22  against Plaintiff or its counsel.

23  **II.    ISSUES IN DISPUTE**

24        A.    <u>**Defendants' Statement of Issues in Dispute**</u>

25             **1.**    Whether BCS Should be Compelled to Produce the Slack

26                    Communications That it Has Failed to Produce.

27             **2.**    Whether the Court Should Impose Monetary Sanctions Against

28                    BCS and its Counsel.

`

**B.**     **Plaintiff's Statement of Issues in Dispute**

1.     Whether the Court Should Impose Monetary Sanctions When Defendants Filed This Motion After Confirmation That the Slack Communications In Question Would Be Produced.

## III.   PARTIES' CONTENTIONS AND POINTS AND AUTHORITIES

**A.**     **Issue No. 1: Whether BCS Should be Compelled to Produce the Slack Communications That it Has Failed to Produce.**

1.     **Defendants' Contentions and Points and Authorities**

(a)     Relevant Deposition Testimony

Noelle Beauregard ("Beauregard") was the first primary investigator into the cause of the "de-indexing." Ms. Beauregard's investigation was simple. First, when she signed on to the Google Webmaster / Google Search Console she saw that Megan Hurwitt and Defendants were each listed as having access to the Google Webmaster / Google Search Console. (Tate Decl., ¶ 22, Ex. 16 [Deposition of Noelle Beauregard ("Beauregard Depo")],  22:7-23:12.) Second, Ms. Beauregard was also able to see on the Google Search Console that a request to temporarily remove the .Org Domain from Google Search was submitted March 9, 2022. (Id. at 49:10-50:6.) This was the entirety of her investigation. (Id. at 28:22-29:3.) Ms. Beauregard testified that at or about the time of her investigation, she shared her findings with Plaintiff's leadership on Slack, including by uploading approximately 25 screen shots that she took. (See id. at 42:1-43:5; 43:24-44:7.)

The second primary investigator was Jesse Jensen ("Jensen"). Mr. Jensen is the person who made an extraordinary logical leap that Defendants must have been the ones who submitted the temporary removal request on March 9th because Defendants had ownership access to the Google Search Console when he started his investigation on March 11th. (Tate Decl., ¶ 23, Ex. 17 [Deposition of Jesse Jensen ("Jensen Depo."), 149:6-150:24.) Mr. Jensen also testified that Plaintiff's leadership

`

1  team discussed the allegations against Defendants at the time of the investigation.

2  When asked to ballpark how many messages regarding the allegations by Plaintiff

3  against Defendants were sent on Slack, Jensen explained that "there was a lot of

4  information that went back and forth there" but probably less than 300 messages.

5  (Id. at 272:17-24.) At Mr. Jensen's direction, Plaintiff's leadership team later moved

6  their conversation from Slack to Signal. (Id. at 23:18-24:13.)

7      As discussed below, the Slack communications referenced by Ms. Beauregard

8  and Jesse Jensen at their depositions have not been produced. As outlined in the

9  accompanying motion, the Signal communications also have not been produced. As

10  a result, the arguably most important communications in this case are being

11  withheld from discovery.

12              (b)    Procedural History

13      Over a year ago, on June 14, 2022, McNamara propounded Requests for

14  Production of Documents (Set 1) on Plaintiff. Request No. 15 asked Plaintiff to:

15  "Please PRODUCE all Slack chat messages and logs for BCS from March 14, 2021

16  to the present, including audit logs reflecting any alterations and deletions." (Tate

17  Decl., ¶ 2, Ex. 1.) On July 29, 2022, Plaintiff responded to Request No. 15 asserting

18  a litany of boilerplate objections but stating, "Subject to and without waiving the

19  foregoing objections, Plaintiff will produce responsive, non-privileged documents

20  that relate to the claims or defenses in this action, to the extent any exist." (Tate

21  Decl., ¶ 3, Ex. 2.)

22      On September 13, 2022, the Court issued the stipulated E-Discovery Order

23  (the "EDO"). Among other things, the EDO provides that the parties would collect

24  documents from each of the data sources identified in Section 4.4, including Slack

25  communications, for each of the custodians listed in Section 4.3. (Declaration of

26  Catherine Close ("Close Decl."), ¶ 6, Ex. 25 [Dkt. 41, §4.4.]) Section 7.1 then

27  provides that "[t]he Parties will produce, on a rolling basis, ESI from the data

28  sources and Custodians identified in paragraph 4.3 and 4.4" (Id. at §7.1.) Thus,

`

Plaintiff twice agreed to collect and produce the relevant Slack communications and the Court has ordered Plaintiff to provide the relevant Slack communications. Notwithstanding the foregoing, as of April 2023, Plaintiff had not produced any Slack communications whatsoever. (Tate Decl., ¶ 5.)

On April 19, 2023, the parties attended the first of the informal discovery conferences relating to the subject motion (the "IDCs"), which the Court named "IDC 3". Following IDC 3, the Court issued an order requiring Plaintiff to provide a chart that lists the custodians identified in Section 4.3 of the EDO on one axis and the sources of documents/data identified in Section 4.4 of the EDO on the other axis and indicate whether or not the particular data sources had been searched for each custodian. (Close Decl., ¶ 4, Ex. 26 [Dkt. 52.].)

On April 24, 2023, Plaintiff provided the requested chart. (Tate Decl., ¶ 3.) According to the chart, Plaintiff had gathered and reviewed 1,148 Slack documents, but the documents had not yet been produced. Later that day, the parties attended "IDC 4," during which Dennis Kiker at DLA Piper represented that the 1,148 Slack documents would be produced within a week. Mr. Kiker also represented that Plaintiff had produced four "Slack Audit Logs." On April 25, 2022, Mr. Kiker sent an email identifying the "Slack Audit Logs" as BCS0000316 – BCS0000319. (Tate Decl., ¶ 9, Ex. 4.)

On May 1, 2023, the parties attended another IDC, which the Court named "IDC 5." Inasmuch as the Slack communications still had not been produced, the Court ordered the production of the Slack communications be produced by May 5, 2023. The Court also ordered that, "[s]hould Defendants, upon review of the production, contend, on the basis of reasonable non-speculative belief, that Plaintiff is withholding relevant, non-privileged documents, they may file a discovery motion pursuant to Federal Rule of Civil Procedure ("Rule") 37." (Close Decl., ¶ 5, Ex. 27 [Dkt. 56.].)

ACTIVE\900435176.3

`

On May 4, 2023, Mr. Kiker sent Defendants' counsel an email indicating that Plaintiff had produced a total of 35 Slack documents and that no documents were withheld on the basis of privilege. Mr. Kiker also affirmed that he personally reviewed the Slack documents and that Plaintiff was producing everything that was "even marginally relevant." (Tate Decl., ¶ 11, Ex. 5.)

Later that day, Defendants counsel sent a follow up email asking for the bates numbers of the 35 slack documents and then asking counsel to explain how there could only be 35 total Slack documents if Jesse Jensen testified to hundreds of Slack messages. (Tate Decl., ¶ 12, Ex. 6.)

The next day, Mr. Kiker identified the 35 Slack documents as BCS_0574083 - BCS_0574185; BCS_0574539 - BCS_0574545. Mr. Kiker then attempted to explain that there is a difference between "documents" and "communications," once again implying that Plaintiff's document production was complete. Importantly, Mr. Kiker did not state nor did he suggest that the relevant documents were being withheld due to an inability by Plaintiff to collect the documents. (Tate Decl., ¶ 13, Ex. 7.)

All of the 35 documents identified by Mr. Kiker are dated between May 31, 2021 and August 17, 2021 – well before the alleged "de-indexing" incident and investigation in March 2022. It also appears that all of the documents were taken from Plaintiff's "public" Slack channels. No documents appear to have been produced from the "private" Slack channels or direct messages (i.e., where you expect the relevant communications to be). (Tate Decl., ¶ 13.)

On May 18, 2023, Defendants' counsel sent an email to Mr. Kiker asking him to confirm that (1) the only communications produced were from the public Slack channels, (2) Plaintiff did not contact Slack to request the ability to export data from the private channels and direct messages, and (3) Plaintiff also did not manually pull up the private Slack channels or the direct messages in order to be able to produce the rel.evant Slack communications. Mr. Kiker did not respond to this email. (Tate

JULANDER BROWN
— & BOLLARD —

`

1    Decl., ¶ 14, Ex. 8.)

2        Having not heard anything from Mr. Kiker, and relying on Mr. Kiker's

3    statement that Plaintiff was contending that it had produced every "marginally

4    relevant document," Defendants filed a motion to compel on June 14, 2023. The

5    motion to compel largely showed that relevant Slack documents exist that are not

6    included in the 35 Slack communications identified by Mr. Kiker. (Tate Decl., ¶ 15.)

7    However, the Court struck the motion due to Defendants' failure to submit this joint

8    statement in compliance with Local Rule 37-2.

9        In anticipation of refiling the motion in the form of this Joint Statement,

10   Defendants' counsel sent an email to Plaintiff's counsel seeking to further narrow

11   the issues in dispute. In response, on June 19, 2023, ***Plaintiff completely changed***

12   ***its story.*** Instead of representing that all of the relevant documents had been

13   produced, Plaintiff's counsel, Tamany Bentz, stated, "As we have previously

14   informed you, BCS's Slack license does not provide for export of private channels

15   or DMS." (Tate Decl., ¶ 16, Ex. 9.) Ms. Bentz's statement is false. Prior to this

16   email, Plaintiff had never taken the position that it was unable to collect from the

17   private channels or direct messages and, as discussed below, Slack allows for export

18   of private channels or DMS regardless of license where there is a valid legal

19   process. (Tate Decl., ¶ 16.)

20       That same day, Defendants' counsel informed Ms. Bentz that her

21   representation was incorrect and provided a document from Plaintiff's own e-

22   discovery vendor, Consilio, stating that Consilio has the ability to produce

23   communications from private channels and direct messages regardless of what

24   license Plaintiff has. Defendants' counsel's email further asked if Plaintiff could

25   provide something from Consilio that would support the position that Plaintiff could

26   not produce the private channels and direct messages. (Tate Decl., ¶ 17, Ex. 10.)

27       Later that day, Mr. Kiker confirmed that Plaintiff had not previously taken the

28   position that it was unable to produce the Slack communications. Mr. Kiker then

JULANDER BROWN
— & BOLLARD —

`

1  pointed to a Slack webpage which supposedly showed that only entities with

2  Busin.ess+ or Enterprise Grid level Slack licenses can export private channels and

3  direct messages directly. (Tate Decl., ¶ 18, Ex. 11.)

4          In response, on June 20, 2023, Defendants' counsel pointed Mr. Kiker to

5  another portion of Slack's website which explains that, regardless of the level,

6  workplace owners may contact Slack and apply to export data from private channels

7  and direct messages when subject to a valid legal process. Defendants' counsel

8  asked whether Plaintiff had done this. Defendants' counsel also reiterated its request

9  that he be provided something from Consilio to the effect that Consilio could not

10  collect the private channel communications and direct messages. (Tate Decl., ¶ 19,

11  Ex. 12.)

12          In response, Mr. Kiker effectively dodged both questions. He did not provide

13  anything from Consilio stating that the documents could not be collected, nor did he

14  answer the question of whether anyone from BCS ever asked Slack about the ability

15  to export BCS' messages. (Tate Decl., ¶ 20, Ex. 13.)

16          On June 20, 2023, Defendants' counsel asked for the third time if Plaintiff

17  had contacted Slack to apply to export data from private channels and direct

18  messages. (Tate Decl., ¶ 21, Ex. 14.) Mr. Kiker admitted that Slack informed

19  Plaintiff that it could provide the direct messages and private channel messages for

20  an "associated cost." Apparently, Plaintiff did not even ask what the cost would be.

21  (Tate Decl., ¶ 21, Ex. 15.)

22          Finally, Defendants' counsel asked whether the cost to have Slack provide the

23  documents was the only reason why Plaintiff had failed to produce the Slack

24  documents from the private channels and direct messages. Mr. Kiker responded that

25  Plaintiff supposedly did not fail to produce the documents but that Plaintiff was

26  working to produce them.  However, when asked when Plaintiff would actually

27  produce the Slack Communications, Mr. Kiker responded that he could not give an

28  estimate of when that would be completed.  (Tate Decl., ¶ 22, Ex. 16.)

10

`

(c)   There is No Dispute That Plaintiff Failed to Produce
Critical Slack Communications

As outlined in the statement of facts above, Plaintiff originally claimed that it was producing all of the even marginally relevant Slack communications. Later, after Defendants filed a motion proving that other relevant Slack communications exist that were not produced, Plaintiff completely changed its story and started claiming instead that it could not produce the direct messages or the messages from the private channels. As such, there is no longer any dispute that Plaintiff has failed to produce all of the relevant Slack communications.

The missing Slack communications are critical to the case. Both Ms. Beauregard and Mr. Jensen testified in their respective depositions about having Slack communications relating to the allegation that Defendants supposedly de-indexed the .Org Domain. Specifically, Ms. Beauregard testified that there was a Slack communication in which she discussed the "de-indexing" with other team members of BCS. (Ex. 17, Beauregard Depo., 42:1-12.) She also testified that this Slack communication likely occurred around March 11, 2022. (Id. at 42:16-20.) Additionally, Ms. Beauregard testified that she sent all of the screenshots that she took (approximately 25) to the Plaintiff's leadership team, including Jenny Magill, through Slack. (Id. at 42:1-8; 42:23-43:5; 44:2-7.)

At his deposition as BCS' Person Most Qualified, Jesse Jensen also testified that he communicated with the leadership team via Slack. When he was asked to ballpark the number of Slack communications between BCS members relating to the allegations against Defendants, his response was "[l]ess than 300" and he went on to explain that "there was a lot of information that went back and forth there…" (Ex. 18, Jensen Depo., 272:17-24.)

Despite this testimony, ***none of the 35 Slack documents identified by Mr. Kiker include Noelle Beauregard or Jesse Jensen at all***. Further, none of the 35 Slack documents identified by Mr. Kiker are even dated in the same year that Ms.

JULANDER BROWN
— & BOLLARD —

1  Beauregard and Jesse Jensen conducted their investigation. (Tate Decl., ¶ 18.)

2      Plaintiff also produced a Slack Log bates numbered BCS000316. According

3  to this log, the following messages were sent on Slack between March 9, 2022, and

4  March 14, 2022:

| Date | Daily Active Members | Public Channel Messages | Private Channel Messages | Direct Messages | Files Uploaded |
|------|------|------|------|------|------|
| 3/9/22 | 20 | 11 | 21 | 55 | 5 |
| 3/10/22 | 21 | 7 | 10 | 200 | 36 |
| 3/11/22 | 19 | 12 | 9 | 57 | 5 |
| 3/12/22 | 15 | 0 | 18 | 84 | 55 |
| 3/13/22 | 19 | 12 | 20 | 43 | 4 |
| 3/14/22 | 19 | 16 | 73 | 48 | 7 |
| Total | N/A | 58 | 151 | 487 | 112 |

(Tate Decl., ¶ 26, Ex. 19.)

    It appears that a relatively small group of approximately twenty persons, sent
**more than six hundred** direct messages and private channel messages in the six
days following the temporary removal request allegedly made on March 9, 2022.
***None of these messages are included in the 35 documents identified by Mr. Kiker.***
(Tate Decl., ¶ 27.)

    The above documents and figures comport with Ms. Beauregard's and Mr.
Jensen's testimony that Plaintiff's leadership team was discussing the "de-indexing"
incident and sharing screenshots with one another. Aside from Ms. Beauregard's
and Mr. Jensen's deposition testimony, it stands to reason that at least some of those
messages must have related to the alleged de-indexing incident and the ensuing
investigation. Yet, Plaintiff has failed to produce any of these communications.

JULANDER BROWN
— & BOLLARD —

In addition to communications relating to the alleged de-indexing, the missing Slack communications are important to show the true reasons why Plaintiff filed the instant lawsuit. Among the most interesting documents that Plaintiff has produced in this action are the communications between Vanessa Hughes, Jennifer Magill, and Chelsea Papciak also known as Chelsea Filer ("Papciak").

By way of context, on May 13, 2021, Plaintiff initiated a lawsuit against Papciak and others which generally alleged that Papciak and her co-defendants had violated that Lanham Act by using the name "Breaking Code Silence" through the use of the domain Breakingcodesilence.net and various social media accounts. (See generally, *Breaking Code Silence v. Papciak, et al.*, SDCA Case No. 21-cv-00918-BAS-DEB.)

On August 2, 2021, Papciak and her co-defendants filed a motion to dismiss arguing that Plaintiff did not own the rights to the Breaking Code Silence mark. In conjunction therewith, Papciak submitted a declaration showing that the Breakingcodesilence.net domain and social media accounts were not created for Plaintiff's benefit as they were created well before Plaintiff was even organized. (Tate Decl., ¶ 30, Ex. 24.)

On February 11, 2022, the Southern District of California granted the motion to dismiss finding that "BCS does not plausibly allege that it is the owner of the mark through its own use." Plaintiff was given until March 4, 2022, to file an amended complaint. (*Breaking Code Silence v. Papciak*, No. 21-CV-00918-BAS-DEB, 2022 WL 432544, at *4 (S.D. Cal. Feb. 11, 2022).)

On the same day that the motion to dismiss was granted, Jennifer Magill sent an email to Jenna Bulis, Hughes, and Papciak which states in relevant part "***We set up a Slack Connect channel*** for the four of us to continue discussion and collaborate on things like this.  I sent you both an invite to join…" (Tate Decl., ¶ 28, Ex. 23, emphasis added.)

13

1 ██████████████████████████████████████████

2 ████████████████████████████████████████

3 ███████████████████████████████████████████

4 ██████████████████████████████████████████

5 █████████████████████████████████████████

6 ████████████████████████████████████████

7 ██████████████████████████████████████████

8 ███████████████████████████████████████

9 ██████████████████████████████████████████

10 █████████████████████████████████████████

11 ███████████████████████████████████████████

12 ███████████████████████████████████████████

(Tate Decl., ¶ 29.)

On March 8, 2022, the day that the first (unsuccessful) de-indexing request to the .Org Domain was allegedly submitted, the Southern District issued an order to show cause why it should not dismiss the Papciak Action. On March 9, 2022, the day that the final (successful) de-indexing request to the .Org Domain was allegedly submitted, Plaintiff filed a notice of voluntarily dismissal. (Tate Decl., ¶ 32.)

Defendants are obviously entitled to discover what was discussed in the Slack channel between Hughes, Magill, and Papciak. At a minimum, the Slack communications will help further establish that Plaintiff intended to sue Defendants long before the alleged de-indexing – thereby supporting Defendants' theory that the instant action is entirely pretextual. Given the suspicious timing of dates on which the .Org Domain was allegedly de-indexed and the date that Plaintiff dismissed its action against Papciak, there is at least some possibility that the communications will reveal not just a plot to sue Defendants, but also plot to de-index the website and blame Defendants for doing so.

(d)    There is No Excuse for Plaintiff's Failure to Produce the
Slack Communications Because Plaintiff Could Have
Requested the Documents from Slack

Defendants first requested that Plaintiff produce the Slack communications *more than a year ago* and, despite Plaintiff's promise to produce "responsive, non-privileged documents that relate to the claims or defenses in this action, to the extent any exist," Plaintiff still has not produced any Slack communications made in the private channels or through direct messages (i.e. where you would expect the relevant messages to be.) (Tate Decl.,¶ 13, Ex. 7.)

There is simply no excuse for Plaintiff's failure to produce the Slack communications. First, as conceded by Mr. Kiker, Slack informed Plaintiff that it could export the messages. This comports with Slack's public facing documents which likewise confirm that, regardless of license level, Workspace orders may contact Slack and "apply to export content from all channels and conversations, including private channels and direct messages."  (See
https://slack.com/help/articles/204897248-Guide-to-Slack-import-and-export-tools#h_01EJ96AV9MF56A2RHKES5JCWE7, last accessed June 20, 2023.)

To date, the only excuse that Plaintiff has given for its failure to ask Slack to collect the messages is that there is some unknown "associated cost." The fact that there may be some cost to produce documents, is not a sufficient grounds to refuse to produce documents. Most productions of electronically stored information have a cost associated with them and the presumption is that the responding party must bear the expense of complying with a discovery request anyway. (*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, 98 S.Ct. 2380, 2393 (1978); accord *OpenTV v. Liberate Techs*., 219 F.R.D. 474, 476 (N.D. Cal. 2003).) Indeed, this Court has ordered the production of Slack documents even where the cost to gather and produce documents is significant. (See, e.g., *Benebone LLC v. Pet Qwerks, Inc.*, No. 820CV00850ABAFMX, 2021 WL 831025, at *1 (C.D. Cal. Feb. 18, 2021)

`

1  (compelling the production of Slack communications where one party estimated that

2  it cost would between $110,000 to $255,000 to extract process and review the Slack

3  messages and the other party estimated that it would cost $22,000).)

4      Under certain limited circumstances a Court may limit the scope of a

5  production or may order the cost of the production to be shifted where the objecting

6  party can show that the discovery imposes an "'***undue*** burden or expense' that

7  outweighs the likely benefits of the discovery and after consideration of all relevant

8  factors." (*Jadwin v. Cnty. of Kern*, No. 107CV-0026-OWW-TAG, 2008 WL

9  2025093, at *5 (E.D. Cal. May 9, 2008), emphasis added.) However, in order to

10  obtain such an accommodation, the objecting party must make a "particular and

11  specific demonstration of fact, as distinguished from stereotyped and conclusory

12  statements." (*Apple Inc. v. Samsung Elecs. Co*., No. 12-CV-0630-LHK (PSG), 2013

13  WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013).) It is unclear how Plaintiff can

14  possibly meet this standard since ***Plaintiff did not even ask Slack how much the***

15  ***associated cost to export the messages would be.*** (See Tate Decl.,¶ 21, Ex. 15.)

16  Given the incredible importance of the Slack communications, Plaintiff also cannot

17  show that cost to collect the documents (whatever it is) would outweigh the benefits

18  of discovery.

19      Regardless, there is no reason to suspect that the ancillary cost would be

20  particularly great. As conceded by Mr. Kiker, Slack Business+ license holders can

21  export private channel messages and direct messages. (See Tate Decl.,¶ 18, Ex. 11.)

22  The normal cost for a business+ license on Slack is $12.50 per month per user.

23  However, Slack allows non-profit organizations to apply for an 85% discount

24  reducing the cost per user to only $1.88 per month. (See

25  https://slack.com/help/articles/204368833-Apply-for-the-Slack-for-Nonprofits-

26  discount, last accessed June 20, 2023.) The Slack log produced by Plaintiff suggests

27  that Plaintiff has had (at most) 182 members on its Slack. (See Tate Decl., ¶ 26, Ex.

28  19.) Thus, the cost to upgrade Plaintiff's license for one month so that Plaintiff can

ACTIVE\900435176.3

`

1    export the messages is only $342.16 or less. In addition, after Plaintiff's counsel

2    indicated that he did not ask Slack what the "associated cost" to export the data

3    would be, Defendants reached out to Slack directly. As shown the support ticket

4    attached as Exhibit 28 to the declaration of Katherine McNamara, ***Slack informed***

5    ***Defendants that Slack would not charge any fees for a one-time export of***

6    ***information***. (Declaration of Katherine McNamara, ¶ 3, Ex. 28.) If, Plaintiff's

7    counsel claims, Slack actually informed Plaintiff something different, Defendants

8    respectfully invite Plaintiff to provide such evidence.

9            (e)    There is No Excuse for Plaintiff's failure to produce the

10               Slack Communications Because its eDiscovery Vendor

11               Promotes That it can Collect the Messages Regardless of

12               License Level

13         In addition to working directly with Slack, Plaintiff could have obtained the

14    documents through its discovery vendor, Consilio. In this respect, Defendants

15    counsel sent Mr. Kiker a publicly facing document from Consilio indicating that

16    Consilio could ingest messages from private channels and direct messages

17    regardless of Plaintiff's license level. (See Tate Decl., ¶ 17, Ex. 10.) Defendants'

18    counsel asked (twice) to be provided something from Consilio to the contrary.

19    Despite such requests Plaintiff's counsel has failed to provide anything. (Id. at ¶ 5.)

20         To the contrary, Plaintiff's counsel's emails suggest that Consilio does have

21    the ability to collect the information, but for reasons unknown, Plaintiff has not

22    directed Consilio to do so before now. In this respect on June 20, 2023, Mr. Kiker

23    stated, "We have enquired about Slack support and are informed that there is an

24    associated cost. For this reason, we are working initially with our pro bono forensic

25    services provider on a suitable solution." (Tate Decl., ¶ 21, Ex. 15.) It is

26    inexcusable, that, over a year after receiving the document request, after multiple

27    depositions in which the Slack communications have been discussed, and after

28    multiple informal discovery conferences regarding the issue, Plaintiff is just now

`

1    working with Consilio to figure out if it can gather the documents.

2        (f)  <u>There is No Other Excuse for Plaintiff's Failure to</u>

3          <u>Produce the Slack Communications</u>

4       The final communication between the parties regarding the motion to compel

5    was an email from Defendants' counsel asking if there was any reason why the

6    Slack communications were not being produced other than the fact that Plaintiff did

7    not want to pay the "associated cost" to Slack. Again, Plaintiff's counsel failed to

8    respond to this email before this Joint Statement was circulated. (Tate Decl., ¶ 22,

9    Ex. 16.)

10      Although not raised by Plaintiff to date, it is possible that Plaintiff may

11   attempt to argue that the Slack communications are not within Plaintiff's possession,

12   custody and control. To the extent that Plaintiff makes this argument, the argument

13   should be rejected. Slack's Customer Terms of Service state in relevant part:

14       When an Authorized User (including, you) submits

15       content or information to the Services, such as messages

16       or files ("Customer Data"), you acknowledge and agree

17       that the ***Customer Data is owned by Customer and the***

18       ***Contract provides Customer with many choices and***

19       ***control over that Customer Data***. For example, Customer

20       may provision or deprovision access to the Services,

21       enable or disable third party integrations, manage

22       permissions, retention and export settings, transfer or

23       assign workspaces, share channels, or consolidate your

24       workspace or channels with other workspaces or channels,

25       and these choices and instructions may result in the access,

26       use, disclosure, modification or deletion of certain or all

27       Customer Data. (https://slack.com/terms-of-service/user,

28       last accessed June 20, 2023, emphasis added)

`

1    Thus, Slack's contract with Plaintiff expressly provides that Plaintiff is the

2  owner of the messages that Plaintiff has control over such data.

3    For all of the foregoing the reasons, there is no excuse for Plaintiff's failure to

4  produce the Slack communications and Plaintiff should be compelled to do so.

5              **2.        Plaintiff's Contentions and Points and Authorities**

6    Defendants identify two categories of Slack communications as the basis of

7  their motion. First, communications relating to Defendants' unauthorized access of

8  Plaintiff's accounts and the resulting investigation. Second, communications with

9  Ms. Papciak regarding the settlement of a lawsuit between Plaintiff and Ms.

10  Papciak. Plaintiff has not refused to produce these communications, nor failed to

11  produce them. Rather, Plaintiff has taken reasonable steps to collect these

12  communications within the bounds of its resources and the limitations of its Slack

13  license.

14    In November, 2022, BCS provided Consilio access to the

15  breakingcodesilencehq Slack account so that the forensic technician could

16  familiarize himself with the Slack environment for purposes of preparing to collect

17  documents. Kiker Decl. at ¶ 2. In December 2022, BCS upgraded the Consilio user

18  account to Workspace Admin, enabling Consilio to export available reports and

19  private channel messages.  Kiker Decl. at ¶ 3.

20    On January 4, 2023, Consilio exported four reports from Slack:

21    •      Breaking Code Silence_Enterprise Analytics.xlsx

22    •      Breaking Code Silence_Slack Channel Analytics.xlsx

23    •      Breaking Code Silence_Slack Member Analytics.xlsx

24    •      Breaking Code Silence_Slack Members.xlsx

25    These reports were included in BCS's first production of documents

26  (BCS001).  Kiker Decl. at ¶ 4. On January 5, 2023, Consilio exported messages

27  from all 25 public channels:

28

JULANDER BROWN
— & BOLLARD —

19

`

- bcs-announcements
- bcs-dc-planning
- bcs-general
- bcs-play
- bcs-wellness
- bcs-work
- breaktime
- database
- gimme-some-memes
- help
- legislation
- maplelake
- maplelakeprotest
- morning-tea
- old-general-dnu
- on-the-up-and-up
- policynews
- project-amplifying-neurodiverse-survivors
- project-tti-law-circle
- rapid-response-events
- technical-enablement
- testing
- utah
- virtual-coffee-chats
- what-the-slack

These documents were reviewed and responsive documents produced in volumes BCS013 and BCS014 on May 1, and May 4, 2023, respectively. Kiker Decl. at ¶ 5.

20

`

Plaintiff continued to work with Consilio to collect the private channels and individual account direct messages that had been identified through discovery or by Plaintiff's witnesses as having responsive information. While the private channels and direct messages were not available for export with Plaintiff's Slack subscription, Plaintiff and Consilio have since collected private Slack channels pertaining to BCS's investigation into suspected malicious activity in its environment, team-information-security, and direct messages from the accounts of the following individuals:

- Noelle Beauregard
- Bill Boyles
- Vanessa Hughes
- Jesse Jensen
- Jenny Magill
- Katie McNamara
- Jeremy Whiteley

Kiker Decl. at ¶ 9. BCS is reviewing this material and will produce responsive documents no later than July 14, 2023. As a result, this motion is unnecessary.

In addition to these productions, on June 26, 2023, Defendants and their expert directly inspected Plaintiff's Slack account. Brown Decl. at ¶ 3. As demanded by Defendants, Plaintiff provided Defendants' expert with log-in credentials to the following Slack accounts:

- info@breakingcodesilence.org
- vhughes@breakingcodesilence.org
- jjensen@breakingcodesilence.org
- nbeauregard@breakingcodesilence.org
- jmagill@breakingcodesilence.org

Defendants and their counsel spent over two hours directly reviewing Plaintiff's Slack account and had unfettered access to the accounts. *Id*. at ¶ 4. Defendants even

JOINT STIPULATION RE: MOTION TO COMPEL SLACK COMMUNICATIONS

ACTIVE\900435176.3

1    performed key word searches on Slack communications and collected copies of

2    those communications. *Id*. at ¶ 4.

3          In light of Plaintiff's efforts to collect Slack communications and Defendants'

4    unfettered direct access to the Slack communications during their inspection, this

5    motion was unnecessary. Plaintiff has never refused to produce these

6    communications and, in fact, will produce them by July 14, 2023.

7          **B.**    **Issue No. 2: Whether the Court Should Impose Monetary**

8          **Sanctions Against BCS and its Counsel**

9          **1.**    **Defendants' Contentions and Points and Authorities**

10         Rule 37(a)(5) provides that if a motion to compel is granted – or if the

11   disclosure or requested discovery is provided after the motion is filed – the Court

12   ***must*** require the party whose conduct necessitated the motion – and /or its attorney

13   – to pay the moving party's reasonable expenses in making the motion, including

14   attorney's fees, unless (i) the movant filed the motion before attempting in good

15   faith to obtain the disclosure or discovery without court action, (ii) the opposing

16   party's nondisclosure, response, or objection was substantially justified, or (iii) other

17   circumstances make an award of expenses unjust.

18         In addition, Rule 37(b)(2)(c) provides that the Court ***must*** order a party who

19   has violated a discovery order, the attorney advising that party, or both to pay the

20   reasonable expenses, including attorney's fees, caused by the failure to comply with

21   the court order, unless the failure was substantially justified or other circumstances

22   make an award of expenses unjust.

23         Pursuant to these authorities, Defendants respectfully request that the Court

24   award $18,710 in sanctions against Plaintiff and DLA Piper to cover the costs of the

25   IDCs that Defendants' counsel was forced to attend on this issue and the costs

26   associated with the instant motion to compel. (Tate Decl., ¶ 33.)

27

28

JULANDER BROWN
— & BOLLARD —

`

## 2.    Plaintiff's Contentions and Points and Authorities

Federal Rule of Civil Procedure 37 does not require, nor support, the award of sanctions in this case.  The Rule specifically states that the Court should not award monetary sanctions where, as here, "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action." Fed. R. Civ. P. 37(a)(5)(A).  Here, the motion was unnecessary and, therefore, sanctions should not be awarded.

As described in detail above, Plaintiff has been making efforts since November 2022 to produce Slack communications. Given the limits of Plaintiff's Slack license, it has not been a straightforward process. Nonetheless, at least by June 19, Defendants knew Plaintiff was willing to at a minimum take screen shots of the Slack communications regarding Defendants' unauthorized access and the resulting investigation.  *See* Tate Decl. at Ex. 9. Accordingly, this motion was unnecessary.

Moreover, Plaintiff's efforts to collect Slack communications were consistent with the EDO. The EDO is expressly subject to the FRCP and industry standard practices.  Specifically, the EDO states, "The Parties agree to take into account the proportionality considerations addressed in Federal Rules of Civil Procedure for purposes of preservation and production of ESI and hard copy documents in this Action." Dkt. 41 § 6.1 (emphasis added).  The EDO further states, "Each Producing Party shall design and implement the industry standard and approved methods it uses to identify, cull, and review its potentially responsive ESI based on its knowledge and understanding of its own data, the facts and issues involved in the Action," and "A Producing Party may also conduct a targeted collection of sources likely to contain responsive materials (e.g., file folders on a given hard drive)."  *Id*. § 4.5 (emphasis added). These provisions of the EDO expressly allow Plaintiff to work with Consilio on the most efficient way to collect Slack communications. Since the documents were produced well before the close of discovery, Plaintiff's efforts did not prejudice Defendants. There is accordingly no basis for sanctions

ACTIVE\900435176.3

` 

1  against Plaintiff or its counsel.

2  Under circumstances like these, the Court has rejected the award of sanctions.

3  In *Bryant v. Mattel, Inc.*, for instance, the Court considered whether to sanction

4  Bryant for his failure to produce communications with a third party. *Bryant v.*

5  *Mattel, Inc.*, Case Nos. C 04-09049 SGL (RNBx), 2007 WL 5430887 at *1 (C.D.

6  Cal. June 20, 2007). The Court granted the motion but denied sanctions because "[a]

7  day before the opposition brief was due, Bryant offered to produce the

8  communication ...." *Id*. at *1n.1. Here, the sanctions are less warranted than in

9  Bryant. Prior to the filing of this motion, Plaintiff confirmed to Defendants that it

10  would produce at least screen shots of the Slack communications which rendered

11  this motion unecessary.

12  **IT IS SO STIPULATED.**

13

14  DATED:  July 12, 2023          JULANDER, BROWN & BOLLARD

15

16                  By:  _____/s/ M. Adam Tate_____

17                       M. Adam Tate
                         Catherine Close
18                       Attorneys for Defendants
19                       KATHERINE MCNAMARA and
                         JEREMY WHITELEY
20

21  DATED:  July 12, 2023          DLA PIPER LLP

22

23

24                  By:  _____/s/ Tamany Bentz_____
                         Tamany Bentz
25                       Jason Lueddeke
                         Michael P. Brown
26                       Benjamin Grush
                         Attorneys for Plaintiff
27                       BREAKING CODE SILENCE
28

`

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JULANDER BROWN
—— & BOLLARD ——

## ATTESTATION

All other signatories listed, and on whose behalf the filing is submitted,
concur in the filing's content and have authorized the filing.

/s/ M. Adam Tate
M. ADAM TATE

JOINT STIPULATION RE: MOTION TO COMPEL SLACK COMMUNICATIONS
ACTIVE\900435176.3

`

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of July, 2023, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.


/s/ Helene Saller
Helene Saller