**DLA PIPER LLP (US)**
JOHN SAMUEL GIBSON (SBN 140647)
*john.gibson@us.dlapiper.com*
JASON TAYLOR LUEDDEKE (SBN 279242)
*jason.lueddeke@us.dlapiper.com*
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4735
Telephone:  310.595.3000
Facsimile:  310.595.3300

Attorneys for Plaintiff
Breaking Code Silence

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREAKING CODE SILENCE, a California 501(c)(3) nonprofit,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE MCNAMARA, an individual, JEREMY WHITELEY, an individual, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.  2:22-cv-002052-MAA<br><br>**NOTICE OF FILING OF AUGUST 9, 2023 INFORMAL DISCOVERY CONFERENCE TRANSCRIPT PER COURT ORDER**<br><br>Action Filed: March 28, 2022<br>Trial Date: Not set |

NOTICE OF FILING OF AUGUST 9, 2023 INFORMAL DISCOVERY CONFERENCE TRANSCRIPT
PER COURT ORDER

ACTIVE\1603038253.1

**TO THE COURT AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that pursuant to paragraph 7 of the Court's August 11, 2023 Minute Order (Dkt. 120), Plaintiff Breaking Code Silence hereby files the transcript from the August 9, 2023 Informal Discovery Conference conducted in this action.  A true and correct copy of the transcript is attached hereto as Exhibit A.

DATED:  September 8, 2023          DLA PIPER LLP

By:    */s/ Jason Lueddeke*
          John Samuel Gibson
          Jason Lueddeke

          Attorneys for Plaintiff
          BREAKING CODE SILENCE

1

# EXHIBIT  A

1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4   BREAKING CODE SILENCE,          ) Case No. LA CV 22-02052-MAA
                                     )
5              Plaintiff,            )
                                     ) Los Angeles, California
6   vs.                             )
                                     ) Friday, August 11, 2023
7   KATHERINE MCNAMARA, et al.,      )
                                     )
8              Defendants.           ) (1:37 p.m. to 4:31 p.m.)
    _____)

9

10

11      TRANSCRIPT OF INFORMAL DISCOVERY CONFERENCE (ECF NO. 114)
                 BEFORE THE HONORABLE MARIA A. AUDERO
12                  UNITED STATES MAGISTRATE JUDGE

13

14  Appearances:                    See next page.

15  Court Reporter:                 Recorded; CourtSmart

16  Courtroom Deputy:               Narissa Estrada

17  Transcribed by:                 Jordan Keilty
                                     Echo Reporting, Inc.
18                                   9711 Cactus Street, Suite B
                                     Lakeside, California 92040
19                                   (858) 453-7590

20

21

22

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

1  APPEARANCES:

2  For the Plaintiff:              JOHN S. GIBSON, ESQ.
                                   JASON T. LUEDDEKE, ESQ.
3                                  TAMANY VINSON BENTZ, ESQ.
                                   DLA Piper, LLP US
4                                  North Tower
                                   2000 Avenue of the Stars
5                                  Suite 400
                                   Los Angeles, California 90067
6                                  (310) 595-3171

7  For the Defendants:            ADAM J. SCHWARTZ, ESQ.
                                   Adam J. Schwartz, Attorney at
8                                    Law
                                   9465 Wilshire Boulevard
9                                  Suite 300
                                   Beverly Hills, California
10                                   90212
                                   (323) 455-4016

11

12                                 M. ADAM TATE, ESQ.
                                   CATHERINE ANN CLOSE, ESQ.
                                   Julander Brown Bollard
13                                 9110 Irvine Center Drive
                                   Irvine, California 92618
14                                 (949) 477-2100

15                                 REBEKAH G. CHAMBERLAIN, ESQ.
                                   9 Wrangler Court
16                                 Trabuco Canyon, California
                                     92679
17                                 (949) 468-6672

18

19

20

21

22

23

24

25

3

1   Los Angeles, California; Friday, August 11, 2023 1:37 p.m.

2                            --o0o--

3                       (Call to Order)

4            THE CLERK:  Calling case number CV-22-02052,

5   Breaking Code Silence, et al., v. Katherine McNamara, et al.

6            Counsel, please state your appearance beginning

7   with the Plaintiff.

8            MR. GIBSON:  Good afternoon, your Honor.  John

9   Gibson of DLA Piper for the Plaintiff, Breaking Code

10  Silence.

11           THE COURT:  Good afternoon, Mr. Gibson.

12           MS. BENTZ:  Good afternoon, Tamany Vinson Bentz.

13           THE COURT:  Good afternoon, Ms. Bentz.

14           MR. LUEDDEKE:  Good afternoon, your Honor.  Jason

15  Lueddeke on behalf the Plaintiff.

16           THE COURT:  Good afternoon, Mr. Lueddeke.

17           MR. GIBSON:  And, your Honor, if I may, we have

18  with us our client, Doctor Vanessa Hughes from Breaking Code

19  Silence.

20           THE COURT:  Okay.  And where -- good afternoon,

21  Ms. Hughes.

22           And where is Mr. Kiker?

23           MS. BENTZ:  Oh, I'm sorry.  Mr. Kiker is not here.

24  My --

25           THE COURT:  I ordered every single person who had

4

1  touched this motion in any way, and we discussed this when I

2  was setting this, to appear.  And there was even question

3  about it.

4          MR. LUEDDEKE:  Mr. Kiker resides in Virginia.

5  He's not a local attorney.  So, he was not able to be here.

6          MS. BENTZ:  Also, I'll -- I'll say that my

7  understanding of any attorney that touched the motion

8  obviously included me, because I'm named in the motion.

9          THE COURT:  Of course.

10          MS. BENTZ:  But that Mr. Kiker is not named in the

11  motion.  He is -- he is named in the Slack motion, but my

12  understanding was that was not what this hearing was about

13  today.  So, I did not understand that to be the

14  representation that it be any attorney who touched this

15  motion to include Mr. Kiker.

16          THE COURT:  Okay.  So, he has no information?

17  You're not going to say to me, as you have in the past, that

18  you don't know the answer to something and that only Mr.

19  Kiker knows it, but, oh, well, he's not here?

20          MS. BENTZ:  That's not our intent, your Honor.

21  And we've gone over the questions we think your Honor may

22  have and are prepared to answer them.

23          THE COURT:  Okay.  I will let it go for now.

24          MR. GIBSON:  Thank you, your Honor.  If need be,

25  we could get him on the phone I believe.

5

1          THE COURT:  Okay.  And can I hear appearances from

2    the Defendants, please.

3          MR. TATE:  Adam Tate on behalf of the Defendants.

4          THE COURT:  Mr. Tate, good afternoon.

5          MR. TATE:  Good afternoon.

6          MS. CLOSE:  Good afternoon, your Honor.  Catherine

7    Close on behalf of the Defendants.

8          THE COURT:  Good afternoon, Ms. Close.

9          MR. SCHWARTZ:  Good afternoon, your Honor.  Adam

10   J. Schwartz on behalf of the Defendants.

11         THE COURT:  Good afternoon, Mr. Schwartz.

12         MS. CHAMBERLAIN:  Good afternoon, your Honor.

13   Rebekah Chamberlain on behalf of Defendants.

14         THE COURT:  Good afternoon, Ms. Chamberlain.

15         Well, you may be a little bit surprised about why

16   we are here to begin with.  It is -- it's very unusual.  I

17   have rarely convened informal discovery conferences after

18   the motions have been filed, typically because by then I

19   feel like we have given it our best shot to try to resolve

20   an issue.  But, nevertheless, I've decided to do something a

21   little bit different, and we'll talk about why in a second.

22         We are here on Defendants' motion to -- that seeks

23   both monetary and evidentiary sanctions for Plaintiff's

24   failure to comply with the electronic discovery order, which

25   I will refer to as EDO.  And the obligations under that

6

1  discovery order are that -- at least as Defendants are

2  saying, are that Plaintiff, BCS, is supposed to preserve and

3  then collect and produce not only its own documents but also

4  the documents of its officers and directors from a -- I

5  don't know, 25, 35 data sources that are identified

6  specifically in the EDO.

7          And Defendants are saying -- arguing that

8  Plaintiff -- while Plaintiff has produced the ESI, if you

9  will, the electronically stored information from its own

10 data sources, it is not producing the ESI from its officers

11 and directors.  And, so, Defendants are seeking monetary

12 sanctions as well as evidentiary sanctions in -- that are

13 very -- very drastic.

14         Plaintiffs are -- Plaintiff has taken the position

15 that it has no obligation to produce under the EDO, that --

16 primarily because it has no possession, custody or control,

17 despite the very clear language of the EDO, but that is the

18 position that Plaintiff has taken.  And, on this basis,

19 Plaintiff is arguing, along with some other legal arguments

20 that it has, but Plaintiff is arguing not only is it -- not

21 only are the evidentiary sanctions not warranted, but even

22 if they were, which, of course, BCS contends they're not,

23 the specific evidentiary sanctions that Defendants are

24 seeking are improper under the facts of this case and that

25 the monetary sanctions are not warranted because BCS's

7

1  position is substantially justified under the circumstances.

2         So, as counsel know, we have tried to resolve this

3  case, and through that process, counsel knows that the

4  informal discovery conferences that I hold are less -- are

5  really informal.  They are on the phone.  We have

6  conversations, and I don't require or order the presence of

7  -- of the clients, because my hope is we can try to resolve

8  things through the informal discovery conference.

9         I've decided to address this motion a little bit

10 differently because I think that it will make -- I think it

11 will be helpful to have a representative of BCS who also

12 happens to be I think a director.

13         Ms. Hughes, you're a director, right?

14         MS. HUGHES:  Yes, your Honor.

15         THE COURT:  Okay.  And -- because I'm going to

16 tell you the bad news, which is that BCS loses, and I'm

17 going to tell you the good news, which is I brought you here

18 to see if there's a way to resolve this short of the

19 sanctions that could be imposed.

20         And, so, because of that, this is quite unusual.

21 We're not here to argue the motion.  If we don't resolve

22 this short of, you know, the motion, then we'll have oral

23 argument.  But I can't imagine that BCS is going to give me

24 anything -- well, they can't give me anything more because

25 the motion is submitted, and -- but I'm willing to hear what

8

1  you folks have to say.

2        I -- I am doing this additional informal discovery

3  conference because the financial impact on BCS can be very

4  severe, and the evidentiary impact can be even more so.

5  And, so, I -- I want t o do this out of sheer respect for

6  the mission of the organization, and I want to give you

7  folks a chance to avoid all of this, and that's why I

8  brought you in, Ms. Hughes.

9        The other reason I brought you in is because I

10  intend to make very public everything that's happening here.

11  I want your donors to know what's happening here.  I want

12  your donors, who are hard working people, who are giving you

13  money to put toward the -- the mission of this organization,

14  which, by the way, I find very laudable.  I don't think

15  there's anybody in this room that thinks otherwise.  But

16  they need to know how that money is being spent, and they

17  need to know that the officers and directors of this

18  organization are causing this organization to have to spend

19  -- will be causing -- significant amounts of money that

20  really should be going toward the mission of the

21  organization.  And, so, I want you here, and I am going to

22  have a representative of BCS here for every single discovery

23  fight that we -- we have to deal with going forward, because

24  I want the public to have a face and a name of the people

25  who are making these decisions.

9

1          You're here, and that's good.  Your name is on the
2    record.  There are plenty of records that have the names of
3    all the other officers and directors, and that's good.  And,
4    on top of that, at the end of today, I'm going to order BCS
5    to order a transcript of this -- of this hearing and to post
6    it on the docket so that any member of the public will be
7    able to read what happened here today and how the officers
8    and directors of BCS are choosing to spend BCS's money.
9          So, with that being said, I want to make sure
10   there's complete transparency.  I'm going to talk for a
11   little bit, and then I'm going to open it up for discussion.
12   Again, we're not going to argue the motion.  I'm going to
13   open it up for discussion of a proposal that I'm going to
14   make at the end of all of this.  But, before I make this
15   proposal, I want you to have complete transparency as to how
16   this is going to play out if the officers and directors
17   don't change their course.
18          So, I guess, where do I begin?  As I said, BCS
19   loses this motion.  I don't think it's worthwhile -- it's a
20   worthwhile use of our time right now to argue -- for me to
21   even give you a list of why.  Suffice it to say, the
22   language is clear, and the arguments that BCS is raising, to
23   say -- or the -- the legal constructs that BCS is raising to
24   say that the -- the clear language of the order that they
25   coauthored, I might add, is limited by these legal

10

1  constructs.  Those arguments are not persuasive to me at

2  all.  So, generally, that's how -- that's what's going to

3  happen in the end.  So, I will find that the EDO requires

4  that BCS produce the personal account information of its

5  officers as it has promised to do in the EDO, and that it is

6  the officers and directors of BDO that are impeding the

7  organization from doing so, because, as I understand it,

8  they have refused to produce their documents.  Their refusal

9  is causing problems for BDO aside and apart from the

10 problems that BDO itself is causing by not complying with

11 the order, not having preserved documents, et cetera.  At

12 least that's what it's looking like.

13          So, upon that finding that BDO -- that BD -- sorry

14 -- that BCS --

15          UNIDENTIFIED SPEAKER:  BCS.

16          THE COURT:  Thank you.  So many letters.  Upon a

17 finding that BCS has violated an agree -- an agreement

18 between the parties which they asked me to turn into an

19 order, I have no choice but to order evidentiary sanctions

20 against BCS.  I will have no choice.

21          The only question in my mind is what sanctions am

22 I going to order.  Now, I don't know if you know what

23 evidentiary sanctions are, Ms. Hughes, but they are

24 sanctions that in essence will prevent BCS from using

25 certain evidence in their future motions and in trial.  And,

11

depending on how severe those sanctions end up being, it could really hamstring BCS in winning this case or it could even result in dismissal of the case.  I don't know yet.  That's part of the reason we're here, because we're going to talk about a few things, but that's how -- that's how this is going to play out.  But I want you to be very aware that the public record that I am making is that in addition to BCS's own misconduct, it is the misconduct of its officers and directors that are causing this problem for BCS, and this problem is pretty severe.  It's a lot of money, and it could be a lot of evidence.

So, here is the situation that I find myself in, and now I'm going to turn to the Defendants.  I don't have -- in my mind, I am almost 100 percent certain that there will be evidentiary sanctions and monetary sanctions.  My problem is I don't have a clear picture of the prejudice for the Defendants.  The reason I don't have a clear picture of the prejudice to the Defendants is because the officers and directors are refusing to do what I asked.  They are refusing to answer the question that I posed and that I asked BCS to ask its officers and directors.  Do you have these systems, and if you do, will you produce voluntarily?

And what happened, Ms. Hughes -- and I don't know if you're one of them, but -- hold on.  I created a chart of all of the systems -- can I have your chart?  And can I have

12

1  the green one too?

2      (Pause.)

3          THE COURT:  I created a chart of all of the

4  systems that are listed in paragraph 4.4 of the EDO that BCS

5  agreed to produce and preserve, and then I created a chart

6  -- well, we kind of created -- I asked the Defendants to

7  create this together.  Sorry, not the Defendants.  The

8  Plaintiff.  And on the upper access and on the side access,

9  I guess on the Y access, the names of all the officers and

10 directors and people who are listed as custodians that BCS

11 agreed they would produce their documents.

12         So, the first thing I did was we were trying to

13 figure out how many people -- no -- how many documents are

14 we talking about.  And, so, I asked BCS to create this

15 chart, and -- and they did.  And they came to me with a

16 chart that looks like this.  Okay.  This gray area is what

17 BCS is refusing to produce because its officers and

18 directors are refusing to give it to BCS, despite the clear

19 language of the EDO.

20         So, then I said, Well, why don't you go find out,

21 BCS, please go talk to your officers and directors.  Go ask

22 them if they'll just produce nicely.  Just ask them if

23 they'll volunteer their documents, and then this is all

24 over, right?  Then Defendants get their documents, and BCS

25 is done.  Defendants have what they need, and everybody

13

moves on.

So, they sent out the -- a questionnaire, and you got one, and you may recall that it had a list of all the systems, and it said, Will you produce voluntarily?  I think you did respond in some way or another, and your response, Ms. Hughes, was you were only going to produce your emails and your texts.  So, to the extent that you have any other of these systems and you're just refusing to produce, you're part of the problem.  But there's lots of other people like you in this list of officers and directors.  There are people who didn't even bother to respond, and there are people who responded and said, Yeah, we have stuff or I have stuff, but I'm not going to turn it over.

So, we've tried to do this the nice way, and it didn't work.  And now we have this motion, and now we have a situation where BCS is going to lose, and it's going to be ordered to -- and it's going -- and there will be severe sanctions.

So, as I mentioned, because not everybody responded to my inquiry, what do you have, what will you produce, and I have no jurisdiction over these people.  They had no obligation to respond.  I was just trying to do it nicely to spare BCS.  But okay.  You folks chose not to produce.  So, now it leaves me in the situation -- now I turn back to Defendants -- it leaves me in the situation

14

where I just don't -- I don't have a good sense of the
prejudice, right, because there is prejudice -- there is
potential prejudice if, oh, I don't know, let's say Ms.
Hughes, has -- oh, sorry, Ms. Hughes.  I looked at what Ms.
Miguel responded.  You responded very differently.  You
responded that you had a whole bunch of these systems and
were refusing to produce.  You responded that you had email
but you would not produce, cell phone, but you would not
produce, Facebook, but you would not produce, Twitter, but
you would not produce, Google Drive, but you would not
produce, texts, but you would not produce, a computer, but
you would not produce, a Zoom account, but you would not
produce, Slack audit logs, but you would not produce.
WhatsApp you said you had, but you didn't respond whether
you would produce.

        Google administrative logs you do -- you have, but
you will not produce.  iCloud you have but you will not
produce.  And Facebook you have but you will not produce.

        So, this is an example of where the prejudice
could lie, right, where people have but won't produce.
Where people don't have, there's no prejudice.  I think we
would all agree on that.  And, so, my problem in fashioning
these sanctions and determining, Mr. Tate, if the sanctions
that you request through your motion are the appropriate
sanctions is that I don't have the picture of your

15

1  prejudice.  And, so, what I'm going to do, because I have

2  wide discretion in managing discovery, is I am going to

3  create two phases to resolve this problem.

4          Phase one is going to be a subpoena phase, and

5  Defendants are going to be given an opportunity -- I can't

6  force you -- but will be given an opportunity to subpoena

7  everybody.  Now, I know some of the subpoenas have gone out

8  I understand, and you may have a picture of prejudice.  I

9  don't know if all subpoenas have gone out.  But phase one

10  will be figuring out this prejudice through subpoena.

11          Now, lest you say, Defendants, "That doesn't seem

12  fair.  They promised us they would give us these documents,

13  and now they get to violate the EDO with complete impunity,"

14  you can rest assured that will not be the case.  Every dime

15  in attorneys' fees and costs that your side spends on these

16  subpoenas will be paid for by BCS, from preparing the

17  subpoenas to serving them if they choose to not accept

18  service the nice way, and to fighting every single motion to

19  quash, every single motion for protective order.  Every

20  single discovery fight that arises from these subpoenas, the

21  fees and costs that Defendants will incur will be paid for

22  by BCS.  That's phase one.  Okay.

23          And then once we have the entire picture of what

24  that prejudice is, then we'll go to phase two, which is

25  going to be to figure out the evidentiary sanctions.

16

Now, we're running out of time you might say, and you are correct, we are.  Discovery ends at the end of this month, except not for Defendants.  Defendants will be given an additional 60 days in discovery to conduct this discovery.  If you need more time, let me know, but I think 60 days is a good place to start, especially since you folks already have started the subpoena process.  So, we'll see how that plays out.

So, after that phase, I will have information about prejudice.  I will also have information about whether the officers and directors of the organization have destroyed evidence.  I don't know if they have.  But if they have, then the problem will get significantly bigger.  That's called spoliation, destroying evidence when you know you have an obligation to preserve it, as does EDO, because that's what it says -- sorry -- as does BCS, because that's what the EDO says, that they have to preserve.  Then it's going to get really bad.

And, so, but that's the only way I can do this.  I tried to do it the nice way.  I tried to get your cooperation, Ms. Hughes, and your fellow officers and directors, but you refused.  And, so, now, we're going to spend more time in discovery, and it's going to cost BCS a lot of money.  I don't know if you have an idea.  I know DLA Piper very generously is representing the organization pro

17

bono, and kudos to DLA Piper.  But now it's going to cost

the organization.  And given the position that DLA Piper has

taken on an order, it could cost DLA Piper in terms of

sanctions.  We'll talk about that, because the 37(b)(2)(C)

sanctions for violating a discovery order if awarded can go

to the attorneys as well.

So, that's where we are.  As you can see, Ms.

Hughes, this will be very expensive if it goes south.  It

will be very expensive.  I don't know if your attorneys have

told you, you know, how much it costs to do this kind of

discovery, but it's quite a bit of money.

The other sanction that I'm considering is to

order BCS on its website to post a notice to its donors

telling them how they spend this money, and I went on your

website, and I found the donation page, and it says, "Your

generous donation saves children and teens from senseless

abuse."  And I think that's wonderful.  It may have to say,

"and to pay for the legal fees in our opponents in

litigation, because we have taken bad legal positions."  I

don't know exactly what the wording is going to be.

So, the best way that this can turn out going down

this road for BCS is if the subpoenas get issued and you

folks cooperate, no motions, no legal fights, just turn over

your documents.  The worst way is if you folks -- if the

subpoenas get issued and you folks continue to dig in your

18

1  heels and fight a fight that I'm telling you you are very

2  very likely to lose.  But by then, it will be on an

3  individual basis.  Okay.  That's this path.  That's the hard

4  way.

5           My proposal and the reason for bringing you here,

6  Ms. Hughes, is to see if we can work it out without going

7  down that road and to give BCS one final opportunity with a

8  very short window to resolve this without causing BCS to

9  spend its money this way and without risking the outcome of

10 this lawsuit due to evidentiary sanctions.  So, that's the

11 purpose of today.  You can do it the easy way, just agree to

12 produce, just turn your stuff over to BCS, just give it to

13 them nicely.  Give it to them.  They will -- they will

14 review it.  They will do whatever they need to do as lawyers

15 of BCS, and then they'll comply with their obligations under

16 the EDO, and then we'll be done, absent, of course,

17 attorneys' fees that I will consider for their -- all of

18 their trouble in this.  So, B -- BCS is not getting out

19 without paying some attorneys' fees here.  The question's

20 going to be how much.  But that's the best scenario for you

21 folks, and I don't have to offer it to you.  I'm sitting

22 here thinking that Mr. Tate over on this table is probably

23 saying, But we tried.  You told us we could file a motion.

24 Why are you giving them another out?

25           And the reason, Mr. Tate, is, number one, I know

19

1  you want the documents.  You want -- you know, you want the

2  documents, just like the Slack documents that -- you want

3  the documents.  I bet it would be nice to have evidentiary

4  sanctions, but the reality is that the Ninth Circuit has a

5  public policy of resolving cases on their merits.  And,

6  wherever I can do that, that's my goal.  The reality also is

7  that I have a high deal of respect for the organization's

8  goal.

9         So, I'm here to open the floor to questions, not

10 to argue the motion -- we're not arguing the motion -- but

11 to open the floor to questions about how this might play

12 out.

13        Oh, the other thing that I want to do is I want to

14 know -- I would like to now turn to Defendants and see if

15 they would be willing to sweeten this deal by perhaps, you

16 know, narrowing some of what they're seeking, maybe not

17 asking for everything under 4.4, maybe not going after every

18 single director and officer, maybe shortening the time

19 period for the search, maybe -- you know, whatever.  We can

20 get creative.  But that would sweeten the deal for today,

21 and it would be without prejudice to Defendants if the

22 officers and directors continue to not play nice, to come

23 back and just do no -- no deal.  We're going for everything,

24 because you're entitled to it.

25        So, that's where we are.  This is an informal

20

1   discovery conference, kind of more formal than usual, but

2   that's where we are.

3          So, what would you folks like to do?

4          MR. GIBSON:  Your Honor, may we for the

5   Plaintiff's side just have 10 minutes to talk amongst

6   ourselves?

7          THE COURT:  Absolutely.  I think that's a very

8   fair request.  Why don't we recess for 10 minutes.

9   Everybody kind of figure out what their -- what --

10  Defendants, what you might be willing to do if they decide

11  to play nice.  You folks decide if you want to play nice,

12  and we'll go from there.

13         MR. GIBSON:  Thank you very much, your Honor.

14         THE COURT:  Thank you.

15     (Proceedings recessed briefly.)

16         THE CLERK:  Recalling case number CV 22-02052,

17  Breaking Code Silence, et al. v. Katherine McNamara, et al.

18         Counsel, please restate your names for

19  appearances.

20         MR. GIBSON:  Good afternoon again, your Honor.

21  John Gibson of DLA Piper for Plaintiff.

22         THE COURT:  Good afternoon again, Mr. Gibson.

23         MS. BENTZ:  Good afternoon, your Honor.  Tamany

24  Vison Bentz.

25         THE COURT:  Good afternoon again, Ms. Bentz.

*Echo Reporting, Inc.*

21

1          MR. LUEDDEKE:  Good afternoon, your Honor.  Jason
2   Lueddeke on behalf of Plaintiff.
3          THE COURT:  Good afternoon, Mr. Lueddeke.
4          And good afternoon again, Ms. Hughes.
5          MS. HUGHES:  Good afternoon, your Honor.
6          MR. TATE:  Good afternoon, your Honor.  Adam Tate
7   on behalf of Defendants.
8          THE COURT:  Good afternoon, Mr. Tate.
9          MS. CLOSE:  Good afternoon, your Honor.  Catherine
10  Close on behalf of Defendants.
11         THE COURT:  Good afternoon, Ms. Close.
12         MR. SCHWARTZ:  Good afternoon, your Honor.  Adam
13  J. Schwartz on behalf of Defendants.
14         THE COURT:  Good afternoon, Mr. Schwartz.
15         MS. CHAMBERLAIN:  Good afternoon, your Honor.
16  Rebekah Chamberlain for Defendants.
17         THE COURT:  Good afternoon, Ms. Chamberlain.
18         Okay.  So, what say you?
19         MR. GIBSON:  Your Honor, I'll address this first.
20  So, we heard your Honor's message loud and clear, and we
21  very much appreciate the opportunity to be here before the
22  Court today.  Your Honor said this was a bit unusual, but we
23  appreciate the opportunity to understand the Court's
24  thinking and reasoning, and we have a -- a several step
25  proposal, and the Plaintiff has been talking with the

22

1  Defendant about this, Defendant's counsel, and I think what

2  I'd like to do is state the proposal and let Defendant's

3  counsel address it and not represent that it's -- if it's

4  something that's agreed to, and we can see where we are.

5          Before I do that, your Honor, I neglected when I

6  introduced myself to say why I'm here, and I wanted to

7  explain that I'm here and I made my appearance last week in

8  the case because my law partner, Ms. Bentz is withdrawing

9  from the partnership at DLA for reasons wholly unrelated to

10 this case and this matter and --

11         THE COURT:  I would hope.

12         MR. GIBSON:  Yes -- and pursuing greener pastures

13 and something that sounds very fun and a lot more fun than

14 litigation.  But, anyway, I will be working on --

15         THE COURT:  Okay.

16         MR. GIBSON:  -- this going forward.

17         THE COURT:  All right.  Welcome.

18         MR. GIBSON:  Thank you.

19         THE COURT:  Thank you, Ms. Bentz, for your work.

20         MS. BENTZ:  Thank you, your Honor.

21         MR. GIBSON:  And Ms. Bentz is here in part because

22 she has the history and is still able to make some very

23 valuable contributions and may appear a time or two again,

24 although it's not technically an appearance.

25         But here we are, your Honor.  Here's where we're

23

heading.  The Plaintiff and its counsel would like to take
the Court's message to the 13 directors and officers on the
chart that the Court has and clarify that message.  I think
that, you know, while these are all directors and officers,
these are also trauma survivors, and it's -- in getting up
to speed here last week and looking at what was done, I
think that it's possible that some of these trauma survivors
perceived an attack when they thought that their personal
computers, for example, were going to be collected and so
forth.  But that's just a -- a little background to -- to
introduce the fact that what we now want to propose I -- I
hope will be much more attractive to those folks and that
they'll understand it a little bit better.

So, the second -- after we take the message to
those 13 directors and officers on the chart, what we would
ask them for -- and when I say we, I'm talking about the
Plaintiff and its counsel -- is for each one of them to sign
a declaration under oath that says I either used or did not
use my personal accounts in my role as a director and
officer of BCS.  And when I say -- we're not talking about a
one-line declaration.  We're talking about a declaration
that follows the EDO and particular -- in particular,
Section 4.4, data sources.  And, so, it goes account by
account, data source by data source, and says I did or did
not use this personal account in my role as a director and

24

1  officer of BCS.  That's the second step.

2          So, probably some of those declarations will come

3  back, "I didn't use any accounts," and we'll give that

4  information and those declarations to the Defendant.  Some

5  of those may come back, "Yes, I did, and here are the

6  accounts that I think I used."

7          The third step is that we, the Plaintiff and its

8  counsel, will be asking those directors and officers to then

9  provide us with documents starting with screenshots.  So, if

10 they identify accounts that they did use in their role as

11 directors and officers of the company, why, then they'll

12 give us screenshots.  We'll go through those, and we'll

13 produce those to the Defendant.

14         And our understanding or I guess our proposal is

15 that the -- the period would be December 2021 to the

16 present, and a couple of further things.  One is we're not

17 asking -- we're not even proposing that the Defendant waive

18 any of its rights with respect to discovery.  This is just a

19 proposal we're making.  We hope that the screenshots or

20 whatever information and documents -- documentation we get

21 and produce to the Defendant will be satisfactory.  If it's

22 not, then we can go from there.  And I'm -- I found out here

23 that we've got a Paul Hastings alumni club going between --

24         THE COURT:  You know, let me -- let me just -- you

25 are absolutely right.  Mr. Schwartz, I was looking at the

25

1  attorneys' fees portion while we were -- and I'm like, Look

2  at this.  And I think we actually overlapped.

3          MR. SCHWARTZ:  I was there '07 to '12.

4          THE COURT:  Oh, yeah.  We overlapped.

5          MR. SCHWARTZ:  I was -- I was in the D.C. office,

6  your Honor.

7          THE COURT:  Oh, okay.

8          MR. SCHWARTZ:  Yeah.

9          THE COURT:  Okay.  That's why.  My -- my clerk was

10  like, Does he even look familiar to you?  I'm like, No.

11  Okay.  Yes, I just realized that myself.

12          MR. GIBSON:  And I'm afraid to say I was there

13  from 1995 --

14          THE COURT:  Really?

15          MR. GIBSON:  -- 1995 to 2008, in the Los

16  Angeles --

17          THE COURT:  We overlapped.

18          MR. GIBSON:  We did overlap, your Honor.

19          THE COURT:  For four years.

20          MR. GIBSON:  We did.

21          THE COURT:  I got there in 2004.

22          MR. GIBSON:  Yes.  So, anyway --

23          THE COURT:  Wait.  Where were you?

24          MR. GIBSON:  I was in Los Angeles mostly and a

25  little bit in Orange County.

26

1          THE COURT:  In the litigation department?

2          MR. GIBSON:  In litigation and real estate -- real

3  estate litigation.

4          THE COURT:  Oh, okay.

5          MR. GIBSON:  Right.

6          THE COURT:  So, yeah, no, totally different

7  floors.

8          MR. GIBSON:  Right.

9          THE COURT:  Never the twain shall meet.

10          MR. GIBSON:  That's right.

11          THE COURT:  You know how that goes.  Okay.  Well,

12  hello.

13          MR. GIBSON:  Thank you, your Honor.  So, just a

14  way of saying we're going to be working together on this.

15          And the final thing I think is that subject to

16  anything that Ms. Bentz may want to add is we're going to be

17  asking the Defendant to tell us any responses they receive

18  to the subpoenas, subpoenas that were already issued, so

19  that we can coordinate on that and that the Plaintiff is

20  asking the right questions and asking the -- you know, the

21  folks who haven't responded to a subpoena for information

22  and maybe asking the folks who have responded to -- to do

23  something further.  So, we're going to be -- we propose that

24  we coordinate in that way, and I think I'll stop there

25  unless there's anything else from our side and -- and let

27

1   the Defendant address that.

2          THE COURT:  Let me ask one quick question.  What's

3   the timing of all of this?

4          MR. GIBSON:  Yeah, that's an excellent question,

5   your Honor.  It certainly would be as soon as possible.  We

6   don't want to carve into the 60 days that the Defendant has

7   for additional discovery, but our hope is that this achieves

8   the discovery that they are looking for.  And, so, I would

9   just say we're going to do it on an expedited basis.  I --

10  we -- I think we haven't thought about particular deadlines

11  or dates, but we could certainly, I think, say that we would

12  make outreach, you know, after coordinating with the

13  Defendant on who's been served and who hasn't and who's

14  responded to a subpoena on outreach by a certain time.

15         THE COURT:  Well, we can talk about that.  If you

16  -- if you're not prepared to talk about that, let's -- we

17  can table that for the moment.

18         Let me just let you know my concern.  As you can

19  imagine or maybe you've heard, Mr. Gibson, this has been

20  going on for a very long time, and every time we have an

21  IDC, DLA Piper, the second largest firm in the world, said

22  they didn't have resources to put to this beyond what was

23  already there.  So, I understand the pro bono situation.

24  Please believe me.  I know, as -- as a partner of Paul

25  Hastings, I know all about how pro bono cases are staffed.

28

1   I know the limitations, et cetera.  That said, it made me --
2   it really made me kind of take a breath.  And -- and based
3   on that representation, everything kept getting delayed and
4   delayed and delayed, and that's why we're here.

5           And, so, while I certainly cannot order DLA Piper
6   to put more resources into this, I would like DLA Piper to
7   consider putting more resources into this.  You don't have
8   to give me an answer.  I'm just putting it out there.

9           MR. GIBSON:  Thank you, your Honor.

10          THE COURT:  Okay.  All right.  So, thank you for
11  that, Mr. Gibson.

12          Let me hear -- I guess I'm hearing from Mr. Tate?

13          MR. TATE:  Yes, your Honor.

14          THE COURT:  Okay.

15          MR. TATE:  And --

16          THE COURT:  And could you speak into the mic,
17  please?

18          MR. TATE:  Of course, your Honor.  I think that
19  Plaintiff's proposal comes a long way, and I think it's
20  hedging on something that we would be agreeable to.  I have
21  three main concerns about what they presented.  The first
22  is, if I understood correctly, they're limiting it to the 13
23  officers and directors that are on the chart that they
24  submitted.  As you saw in our motion, we believe that there
25  are several individuals that -- that are not on that chart

29

 1  that should have been on that chart.  And, so, that's --

 2  that's one issue that I have.

 3          THE COURT:  And can I interrupt you there?  And I

 4  apologize for interrupting, but, as I recall, the EDO says

 5  something about like administrators, like the techy people,

 6  and I apologize, that is so -- that's a term of art for

 7  discovery, but it's -- I think it's like the administrators

 8  who touched this -- these systems at any point, something

 9  like that.

10          MR. TATE:  There were two -- there are two

11  catchall provisions in the EDL.  One was the board of

12  directors.

13          THE COURT:  Right, yeah.

14          MR. TATE:  That was the one that I have, I

15  believe, good evidence that these people were board of

16  directors, and BCS is contending otherwise.

17          There is a second catchall for people that have

18  administrative access to those accounts.

19          THE COURT:  Okay.

20          MR. TATE:  That issue I don't believe has been met

21  and conferred on or litigated in any meaningful way.  But,

22  you know, I think that the order would be that, you know,

23  the proposal of going with a declaration should be for

24  everybody that falls within the -- within the definition of

25  custodian, not just the 13 people that are in the chart, and

30

1    I understand that there's a -- there's a dispute as to who

2    those people are, but I don't want to be reserving -- I

3    don't want to be waiving any rights, you know, by limiting

4    myself to those 13 people.

5            The second concern I have with the proposal that I

6    heard is the e-discovery puts forth a method of collecting

7    relevant documents once they're identified.  I am supportive

8    and I actually love the idea of a declaration that says, I

9    used this for BCS or I did not."  I have no intention of

10   forcing anybody to collect and search stuff if they never

11   used that for BCS.  But if they did use it for BCS, I think

12   that they have to follow the EDO, use the search terms that

13   we all agreed upon and actually do a thorough search as

14   opposed to relying on these individuals to take screenshots.

15   I just don't think that that's what the EDO contemplated,

16   and I don't think that that is enough.

17           And then the third concern I have is -- and maybe

18   I just misheard, but I think counsel was limiting the -- the

19   dates to December 2020.  The EDO says February 1st, 2020.

20   And, so, I don't want to temporarily limit myself either.

21           THE COURT:  So, let me -- let me stop you there.

22   I thought I heard December 2021.  Did I hear that correctly,

23   Mr. Gibson?

24           MR. GIBSON:  Yes, your Honor.

25           MR. TATE:  Even worse.

*Echo Reporting, Inc.*

31

1          THE COURT:  Okay.  And remind me the EDO says what

2   period?

3          MR. TATE:  February 1st, 2020.  And if I recall

4   correctly, although I was not there, this was one of the

5   issues that was brought up on the -- at the IDC for when we

6   got -- when we entered the EDO in the first place, and this

7   was what we landed on.

8          THE COURT:  So, this is an effort to compromise

9   without waiving any rights.  So, I guess I -- and I

10  understand that's what the EDO says, but what I was hoping

11  was -- and this does go a long way, but I -- what I was

12  hoping is that in exchange for everybody just moving on with

13  -- frankly, you folks should settle this case, but that's

14  neither here nor there.  But in exchange for everybody

15  moving on from life, as it relates to this motion, I was

16  hoping to compromise and -- and see if we could reach an

17  agreement that doesn't require everything.

18         MR. TATE:  Your Honor, if I may address that, I

19  think that what both counsel and I proposed does do that.

20  Instead of collecting and searching everything, we're going

21  to get declarations from people.  And then if they did not

22  ever use that data source for BCS purposes, they don't have

23  to collect it, and they don't have to search it.  So, that

24  should narrow it.

25         As I understand, Plaintiff's primary concern is if

32

1  somebody was using their own personal Facebook and they

2  never used it for BCS, they don't want BCS, you know, to

3  look at that.  And I, frankly, don't want to look at that.

4  But I do want to be able to get any documents related to

5  this case.  I'm -- and I expressed this to counsel.  I'm

6  open to other proposals that get me to the same point.  I

7  just couldn't think of any other way to get there other than

8  asking them, Did you use this data source for BCS, and if

9  you did, then let's search it, and let's produce documents.

10 And if you didn't, just sign a declaration to that effect

11 and hope that I don't have something in my pocket to come

12 back and prove otherwise, because then I --

13             THE COURT:  Right.

14             MR. TATE:  -- then there's going to be a problem.

15             THE COURT:  Right.  Of course.  Then all bets are

16 off at that point.  I agree.  But -- but you are preserving

17 that right?

18             MR. TATE:  Yes.

19             THE COURT:  That's fine.  That's not a problem,

20 and I believe Mr. Gibson understands that.  In fact, you --

21 Mr. Gibson stated that.

22             So, let's go to this issue -- have you -- my

23 understanding is you folks have been kind of going back and

24 forth on this.  What -- so, I guess there's a disagreement

25 as to the limit of the 13 people on the chart.  What's the

33

1    issue there?

2           MR. GIBSON:  Yes, your Honor.  I -- I'd actually

3    like to let Ms. Bentz respond to those -- the three issues

4    here.

5           THE COURT:  Okay.

6           MS. BENTZ:  So, to -- to clarify the chart that

7    Mr. Gibson is referring to is -- it was titled Response to

8    1(b).  It was one of the charts that we put together for

9    your Honor during an IDC.

10          THE COURT:  Isn't that the Exhibit 5 that is in

11   the motion that I said was too small to be read and it had

12   to be refiled?

13          MS. BENTZ:  No, your Honor.  That's --

14          THE COURT:  No.  Okay.

15          MS. BENTZ:  -- the Excel spreadsheet.

16          THE COURT:  Okay.

17          MS. BENTZ:  You might recall that we did a chart.

18   You wanted to know if the individuals on that big chart that

19   was too small to read were officers and directors and what

20   their title was and -- and --

21          THE COURT:  Oh, yeah.

22          MS. BENTZ:  -- who they were and what dates they

23   were there.

24          THE COURT:  Um-hmm.

25          MS. BENTZ:  We put together a chart like that.

34

1          THE COURT:  Okay.

2          MS. BENTZ:  So, it's those, it's the people who

3    are in 4.3.

4          Now, there is, of course, a disagreement about

5    whether three individuals were directors or not.  Now, in --

6    as an offer to compromise and move this forward, without

7    waiving any arguments that they're not directors, you know,

8    I don't have an objection to reaching out to them and asking

9    them these questions.  Now, we maintain these three

10   individuals that are raised in this motion for sanctions are

11   not directors and do not fall within Section 4.3.  But for

12   purposes of compromise, I'm willing to ask them these

13   questions so we know if we're even fighting over anything or

14   not.

15         THE COURT:  Well, so, ask them this question and

16   stop there or -- or actually follow this procedure?

17         MS. BENTZ:  Follow the procedure Mr. --

18         THE COURT:  Okay.

19         MS. BENTZ:  -- Gibson has proposed.

20         THE COURT:  Okay.

21         MS. BENTZ:  Yes.  All I'm saying is they're not on

22   that list of 1(b).  If the issue is these three individuals,

23   in order to  move this forward, we can add those three

24   individuals to the list.  I don't -- I don't have a problem

25   with that.

35

1          THE COURT:  And I believe that would be Denette

2     Boyd-King, Dorit Saberi, and Deanna Hassanpour?

3          MS. BENTZ:  Correct.

4          THE COURT:  What about April Alexander, for whom

5     BCS has taken the position that she was not on the board of

6     directors at the time of the event?

7          MS. BENTZ:  She actually is on the list in 1(b).

8     She's included in the 13, your Honor.

9          THE COURT:  Okay.  And then Lenore Silverman?

10          MS. BENTZ:  Also on the list and included.

11          THE COURT:  Okay.  So -- okay.  Thank you for

12     that.  Let's take them one -- one step.  My brain kind of

13     thinks very linearly.

14          So -- so, does that resolve the list?

15          MR. TATE:  That resolves the list, your Honor.

16          THE COURT:  Good job.  Thank you.  Okay.

17          All right.  So, the second -- oh, by the way, one

18     of you is going to give me a proposed order on this.  So --

19     but I am taking notes.  Okay.  So, includes the three

20     people.

21          Okay.  Issue number two, the method of collection.

22     What is BCS's response to Defendant's concern?

23          MS. BENTZ:  So, my -- my first concern is that the

24     response we will get is more likely to be no if the question

25     asked is can we have our forensic collection team access

36

your account and forensically collect these messages.  And, so, my concern is that it's going to be counterproductive to ask that question first, which is why we thought asking the first question of, "Okay.  Do you mind sending us those documents, those communications that you had as your role with BCS," so that we can look at them, so that -- and we can share them with the other side.  And if it is actually something that would be responsive, that then we talk about forensically collecting that, because we can go back to them and say, you know, we see these five emails in your Gmail account.  We'd like to forensically collect from your Gmail account.  We'd like to forensically collect from your Gmail account.  Here's what we propose to do.

THE COURT:  And then you would follow the EDO in that collection period -- process?

MS. BENTZ:  Well, again, we'd have to ask for permission because -- but, yes, that would be the idea because for many of these people, the answer may be no.  For many of these people, the documents may not be things that Mr. Tate and his team care about.  So, the -- the goal is to try to funnel down some of the -- the issues that we have with these third parties, and this was the idea of how to do that.

THE COURT:  So, I don't remember the -- the complete list of search terms.  So, you're saying you're not

37

1  going to ask them to do search terms.  You're saying just

2  send me every -- all pieces of paper that show that you did

3  business through -- any business for BCS?

4          MS. BENTZ:  Yes.  So, the -- so, the search term

5  isl -- the search term list is quite long.  So, to ask an

6  individual to do it I think would -- they're going to --

7  you're going to get an immediate no.  So, again, we're kind

8  of in this --

9          THE COURT:  Um-hmm.

10          MS. BENTZ:  Now we're counterproductive.  So, that

11  wouldn't be the goal.

12          Now, I will tell you if somebody's response was, I

13  have thousands of messages in my personal Gmail account,

14  well, then we -- you know, then it's not productive to say,

15  Well, send me those thousands of messages, right.

16          THE COURT:  Right.

17          MS. BENTZ:  Then it's more productive to say,

18  Okay.  Well, let's make this easy on you.  You know, we can

19  do this.  Here's the search terms we're going to run.  You

20  know, can we do this, and have that kind of dialogue with

21  them.  But it's kind of hard at the outset without really

22  knowing what it is that we're looking at to -- to say to

23  somebody, you know, here's Concilio (phonetic), a company

24  that forensically collects, and they'd like your admin

25  credentials.  I think taking it step by step may be the best

38

1  way to deal with some of these individuals.

2          THE COURT:  And, but -- but there is no

3  disagreement that once you send those screenshots to

4  Defendants and Defendants say, We believe this shows that

5  there is responsive information, then the search goes to the

6  big search?

7          MS. BENTZ:  Just reserving the point that I can't

8  force these people to do it, but right.  Nobody disagrees

9  that there was a search protocol in the EDO.  Yeah.

10         THE COURT:  Yeah.  So -- so, let's -- let's talk

11  about this as -- as -- let's talk about this for the people

12  who are going to cooperate.  And if they're not going to

13  cooperate, we're going to go back, right, with subpoenas and

14  they'll pay -- and then BCS will pay for whatever it costs

15  to get from those people.

16         I am hoping -- and -- and this is what I said many

17  many times.  I hope you remember, Ms. Bentz.  I don't

18  understand this attitude.  I don't understand why they don't

19  understand that either way, doing it nicely or not doing it

20  nicely, they're going to produce, right?  And, so -- and,

21  so, you know, maybe you can convince them.  Maybe, Ms.

22  Hughes, you can convince them how serious this is.  And --

23  and then, if they don't, then there's this other process in

24  place that I laid out that will be the subpoena process

25  under which they'll produce.  Right?

39

1          MS. BENTZ:  Right.  And I share your Honor's

2    frustration with some of this.  I really do.  I -- but, you

3    know, we are in a peculiar position where we have this

4    issue, but I think, you know, in talking through it, that

5    this may be the way -- the most productive way to move it

6    forward, the most likely way to get answers to the question.

7          THE COURT:  Okay.  Let me -- let me hear from Mr.

8    Tate.  Why does that not resolve the problem?  Because it

9    sounds kind of reasonable to me.

10          MR. TATE:  I'm not sure if I fully even understand

11   what the proposal is.  As I understood it, which could be

12   completely wrong, as I understood it, they're going to reach

13   out to the custodians and then ask the custodians to provide

14   them with information, and then I'm supposed to take that

15   information and then determine whether I want those accounts

16   to be forensically collected.  That's what I understood.

17          I have two concerns with that.  I can't -- I -- I

18   can't see into a sealed box, if you will.  If -- unless they

19   actually do the search right the first time, there's no way

20   for me to know what's out there.  And, so, I can't possibly

21   say, you know, go back and look at your -- your Gmail

22   account if -- you know, if they don't do a proper search the

23   first time and things were missed.  And, so, that -- that is

24   the larger problem I have.

25          And then, more fundamentally, it's just not --

40

1  there's over 150 RFP's in this case.  I have -- no offense.

2  I'm sure they're all smart people.  I have no confidence

3  that these people are going to be able to accurately

4  identify what the issues are and what type of documents

5  should be produced.  That's work that should be done by an

6  attorney because they have the ability and the capability

7  and the legal tools to be able to do it.  And, so, that's

8  why I think that we need to follow the EDO.

9          But, as I said, if they -- if they want to give us

10  a declaration that says, I never used this for BCS, then

11  take that off the list.  I'm only interested in stuff that

12  is likely to have discoverable evidence.

13          THE COURT:  Well, how do you propose to address

14  the 150 RFP's?  I -- my understanding was -- and, wow, now I

15  have a different picture of what's happening, but I thought

16  that this fight was over the failure to produce under the

17  EDO's terms, not -- and the EDO's terms are very clear,

18  right?  From these people and these data sources, right?

19  So, how do the RFP's come into this all of a sudden?

20          MR. TATE:  The RFP's come into it -- if we're

21  going to use the EDO and we use the agreed upon search

22  terms --

23          THE COURT:  Um-hmm.

24          MR. TATE:  -- those search terms are going to

25  capture everything that I need.

41

1          THE COURT:  Right.

2          MR. TATE:  Right.  If we're no longer going to be

3  using the search terms and we're going to give the custodian

4  some vague description of give me everything that's relevant

5  to this case, there's no way that those custodians are going

6  to know what's relevant to this case unless they could

7  somehow read all of the RFP's and all the issues in the case

8  and come to an understanding at the same level as an

9  attorney.  That's my concern.

10          THE COURT:  But here's the thing.  You first have

11  to cross the threshold that they used the account for the

12  business of BCS, right?  Okay.  So, you're limiting --

13  limiting it to that.  Okay.  Let me see.

14          MR. TATE:  If -- if they could run the search

15  terms, if they want to run all the search terms, then I

16  think that would get us to the same place.  But what I heard

17  from Ms. Bentz is they don't want to ask the custodians to

18  do that, and I -- I don't think it's appropriate to say just

19  give me the documents that you, custodian, think are

20  relevant to this case.

21          THE COURT:  Yeah.  That --

22          MS. BENTZ:  One point of clarification.  That is

23  not our proposal.

24          THE COURT:  Okay.

25          MS. BENTZ:  Our proposal was do you have

42

documents, communications, documents on these devices or

data sources in 4.4 that were for BCS business, in your role

as an officer or director of BCS.  If the answer is yes, we

are going to ask them to send them to us, no clarification

on only if it is responsive to RFP's or only if it relates

to this or even, frankly, a date restriction.  It would be

send it to us so that, yes, the lawyers can look at it and

make a decision about whether it is responsive to an RFP or

within the scope and then do that process.  So, it was never

our intention to propose that the individuals would be

making calls like that.  It was really just a can we get a

view?  Can we get a view?  Can they get a view?  Can we get

a view of what -- what might be in these accounts, right?

THE COURT:  Well, but it sounds like -- I -- I do

see the difference.  You're saying show me -- send me every

document that is business -- BCS business related, every

single one.  Print it out, send it to me, unless there's a

lot, in which case we need to talk about a different

approach.  Got it.

What I think Mr. Tate is saying is the search

terms were for the purpose of limiting the universe,

believing that the search terms would result in the

gathering of documents that were responsive to -- to the

RFP's.  If the search terms are gone, it's not enough to

gather that which is BCS business related because why?

43

1  Because -- because RFP -- the 150 RFP's request more than

2  business related documents?

3          MR. TATE:  I misunderstood when I said that this

4  was a real possibility.  I misunderstood what Ms. Bentz was

5  proposing.

6          If the proposal is that they -- that the -- the

7  declarants state, I used this for business, BCS, and they're

8  going to turn over everything they have for each one of

9  those things and then DLA Piper is going to run the search

10 terms on those, on what is turned over, that's fine.  I -- I

11 was understanding that the custodians themselves were going

12 to basically pick and choose what they send over based on

13 what they thought was relevant, and that was not acceptable

14 to me.  So, I think I just misunderstood what was being

15 proposed.

16         THE COURT:  Okay.  Fair enough.  We're all kind of

17 trying to figure this out and -- and this is why it's good

18 to have an informal discovery conference in a kind of a

19 formal way.

20         So -- okay.  So, the proposal then, so, that --

21 that resolves your concern?

22         MR. TATE:  I just want to make sure we're on the

23 same page.  I think it does.  As I'm understanding it,

24 they're going to send the declarations, and then if -- if

25 the declarant says that they used that data source for BCS

44

1  business, then they're going to turn over everything they

2  have for BCS business for that data source, and if that's

3  the proposal, that's wonderful and we're -- we're okay with

4  that.

5          THE COURT:  Well, one more step, and then BCS's

6  attorneys are either going to run the search -- you're going

7  to run the search terms on -- well, no, because they're

8  turning -- they're not turning over electronic documents.

9  They're turning over --

10          MR. TATE:  Screenshots.

11          THE COURT:  -- screenshots.  Thank you.

12          MS. BENTZ:  Well -- well, practically speaking, it

13  will depend on what they turn over.  If somebody sends us 50

14  emails, I can keyword search 50 emails.  If they're going to

15  screenshot text messages, we -- we cannot keyword search

16  screenshots.  So, we have to review all of those.

17          THE COURT:  So, you'll eyeball them?

18          MS. BENTZ:  Yeah.

19          THE COURT:  But one way or the other, it will be

20  screened for the -- for the search terms?

21          MS. BENTZ:  Yeah.

22          MR. TATE:  I think that's fine, your Honor.

23          THE COURT:  Okay.  All right.  Excellent.  We are

24  moving forward.  And then the dates, relevant dates.  Let me

25  hear from Plaintiff -- well, let me go back.

45

1         What -- let's -- let's talk about the dates.  Tell

2   me -- tell me why -- well, all of this -- tell me why you

3   have to go back to 2020?

4         MR. TATE:  Your Honor, that's the discussion I'm

5   having with -- with my co-counsel right now.  I don't think

6   it needs to go back to February 1, 2020.

7     (Pause to confer.)

8         MR. TATE:  So, we think that January 2021 would be

9   fine, which is much -- much further.  But I do think that

10  you need to be able -- one of the central disputes in this

11  case is that Ms. McNamara and others did stuff before BCS

12  was even incorporated, and my understanding is that BCS was

13  incorporated in March 2021.  And, so, there is, you know,

14  some dispute over who owns the stuff that Ms. McNamara made

15  before BCS was created.  So, I think you need to at least

16  capture that time period, so, which is why I think it needs

17  to start at least in January 2021.

18         THE COURT:  When did she start?

19         MR. TATE:  BCS was formed in March of 2021.  The

20  -- BC -- I -- I hate to present the other side's argument,

21  but, as I understand it, BCS is arguing that things that Ms.

22  McNamara did before BCS was formed and while Ms. McNamara

23  was working with other individuals belong to BCS.

24         THE COURT:  And when was she -- when did she start

25  at BCS?

46

1        MR. TATE:  2017 is when she first --

2        THE COURT:  Oh.

3        MR. TATE:  -- started, you know, working in -- you

4   know, the phrase, Breaking Code Silence, is a -- is a term

5   that's been used for over a decade.  And, so, she's been

6   involved in the -- in the movement since at least 2017.

7        THE COURT:  Okay.  But you're willing to go to

8   January 2021 as a compromise only.  For subpoenas that go

9   out -- let me just be very clear.  For subpoenas that go

10  out, it's everything.  There's no limit.  There won't be

11  limitations on the dates.  There won't be limitations -- the

12  EDO will be followed for subpoenas that go out, right?  So,

13  this is just a compromise position, and whoever's willing to

14  cooperate gets the benefit of this compromise position.

15  Whoever doesn't will be subpoenaed.

16        Okay.  So, January 2021 --

17        MR. GIBSON:  That's fine, your Honor.

18        THE COURT:  -- to the present.  So, I believe that

19  resolves --

20        MR. TATE:  Resolves the three issues, yes, your

21  Honor.

22        THE COURT:  I'm sorry?

23        MR. TATE:  That resolves the three issues.

24        THE COURT:  Okay.  Can you just speak into the mic

25  a little bit.  I want you to -- it's because I -- I have a

47

1  law clerk who is on the phone. And, so, she -- I don't know

2  if she could hear everything, but --

3      MR. TATE: I apologize. I'm naturally soft-spoken

4  anyway. I'll try to be, you know, louder and more direct

5  into the microphone.

6      THE COURT: Okay. So, it seems that we have

7  reached an agreement as to an approach, and hopefully it

8  will work. Yes from the Plaintiff?

9      MR. GIBSON: Yes, your Honor. And we appreciate

10 the opportunity very much.

11     THE COURT: Okay. And yes from the Defendant?

12     MR. TATE: Yes.

13     THE COURT: Without waiving any rights to --

14     MR. TATE: That's correct.

15     THE COURT: -- if this doesn't play out on a

16 person-by-person basis, right. So, the only thing that we

17 have to figure out is the timing of all of this because I'm

18 willing to reopen -- not reopen. It hasn't closed. But I'm

19 willing to extend discovery by 60 days to do this. But, you

20 know, hopefully this will work, but we've got to get to a

21 point where Mr. Tate knows whether he's going to have to

22 subpoena someone sooner rather than later. How can we do

23 that?

24     (Pause.)

25     MR. GIBSON: I'm sorry, your Honor. Just --

48

```
1          THE COURT:  That's okay.

2          MR. GIBSON:  May we just have one moment?

3     (Pause.)

4          MR. GIBSON:  Your Honor, thank you very much for

5  the time.

6          THE COURT:  Of course.

7          MR. GIBSON:  We would like to propose that the

8  declarations be submitted to Defendants' counsel 21 days

9  from today, within 21 days.  And that will give us time on

10 the Plaintiff's side to reach out to the 16 folks and say --

11 we want to set up calls next week to deliver the Court's

12 message and try to present this in a way that folks are more

13 likely to respond positively and fill out the declarations

14 timely.

15         THE COURT:  Yes.

16         MR. GIBSON:  And, so, I think that should give us

17 enough time to get the signed declarations from everyone who

18 is going to -- who is going to participate in this and

19 identify if there are any folks who -- who won't and -- and

20 why they won't and be satisfied on the Plaintiff's side and

21 the Plaintiff's counsel's side why that is and what, if

22 anything, we can do about that.

23         THE COURT:  Okay.  So, the declarations plus a

24 statement to Plaintiff's counsel as to all of those persons

25 who had some -- who did use any -- one or more of their
```

49

1   personal accounts, as to those persons who will participate

2   and who will not participate in this program, within 21 --

3           MR. GIBSON:  That's right.

4           THE COURT:  -- days?

5           MR. GIBSON:  Yes, your Honor.

6           THE COURT:  Okay.  Mr. Tate, let's take this one

7   step at a time.  And, Mr. Tate, I control the schedule.

8   Don't worry.

9           MR. TATE:  I understand that, your Honor.  It's

10  not so much the schedule.  It's -- it's the war of attrition

11  that my client has to pay my firm the longer this goes on.

12  But I don't -- I, frankly, don't care how long it takes to

13  get declarations back.  What I care is when are those

14  documents going to get to me.  But if we're focusing just on

15  the declarations, I don't know why it takes more than a week

16  to send out -- you know, to ask the people -- there's only,

17  what, 15 people -- ask them, Did you -- call them up, go

18  through each one of these data sources, ask them, Did you

19  use this for BCS, yes, no, yes, no, sign the declaration.  I

20  don't know why that would take more than a week.

21          THE COURT:  Sounds like there's a little bit more

22  going on.  It sounds like there is some special care that is

23  needed because of the very special circumstances of these

24  people.  And I -- look, I'm not a psychologist.  I don't

25  know.  But since I control the scheduling, I understand the

50

1  issue of attrition.  But at the end of the day, you know,
2  some of that, with all due respect, Mr. Tate, is I know
3  we've been trying really hard, but, you know, maybe -- maybe
4  you should have brought this as a motion a lot sooner.  And
5  I understand we were going through informal discovery
6  conferences.  But, you know, everybody has a role in -- in
7  moving things along, and I know that I requested, you know,
8  certain things that, you know, required more work, but I --
9  I think 21 days, but -- but you're not going to get after
10  that two months to gather documents, right?  I mean, this is
11  almost like the 21-day period is for the purpose of -- of
12  almost socializing this concept, right, to people who
13  heretofore have thought that they can get away with not
14  doing anything.  So, that's a big -- that's a big turning a
15  corner.  That sounds like you may need some time to get
16  done.
17          MR. GIBSON:  That's right, your Honor, and the
18  signed declarations within that period.
19          THE COURT:  Yeah.  I mean, yeah, but there's
20  email.  You can send in a declaration.  They can come back,
21  and -- you know, I -- I don't think that the signed
22  declaration -- it sounds like you just need some
23  socialization time, and -- and, so, okay.  Let's do 21 days
24  will be the declarations, and along with that, for those
25  people who declare that they did use their systems or their

51

1 accounts for BCS related business, a statement that they

2 will participate in this program or will not.

3         And then at that point, your subpoenas -- I'm not

4 ordering you to subpoena anybody.  That is on you.  You

5 decide.  But that -- at that point, you have the opportunity

6 to start the subpoena process with those people who are

7 digging in their heels or continuing to dig in their heels I

8 should say.

9         MR. TATE:  And, just so we're clear, nothing

10 prevents me -- we've already sent out subpoenas, and nothing

11 prevents me from sending out the subpoenas sooner or -- or

12 continuing with efforts to serve the subpoenas that are

13 already out?

14         THE COURT:  Yeah.  No, nothing prevents you from

15 doing that, but I -- I would like to, you know, have a --

16 have a discussion about whether that just becomes

17 counterproductive under the circumstances, right.  I mean,

18 if you have people who are going to lose their minds because

19 they receive a subpoena while their counsel are trying to

20 work with them on let's play nice, I just think it's

21 counterproductive.  So, just -- just sit tight, Mr. Tate.  I

22 promise you you will get time to do this.

23         MR. TATE:  Message heard.

24         THE COURT:  All right.  21 days, and then I -- the

25 declarations, and then you're going to identify who will

52

1  participate.

2      All right.  Now, the next step, gathering their

3  documents, which, by the way, I will say even though you --

4  if you get declarations sooner than in 21 days, just send

5  them.

6      MR. GIBSON:  Yes.

7      THE COURT:  Right.  Let's move these things along,

8  but 21 days at the latest.

9      And then with respect to, you know, if you -- if

10 the first person you speak with next week says, Yeah, I used

11 it and, yes, I will participate, then start that gathering

12 process, right, so we can move it along.  But let's set a

13 deadline for when all will be gathered and produced over to

14 Defendants.

15     (Pause.)

16     MS. BENTZ:  Okay, your Honor.  So, what we would

17 like to do is say production 30 days from today, so nine

18 days after the declarations.  The only reservation we would

19 have is that if -- if there is somebody who says, you know,

20 I have thousands of emails in my Gmail and we're going to do

21 a more fulsome -- and they're willing to do a more fulsome

22 collection, that we alert Defendants' counsel to that if it

23 can't be done within the 30 days and give them the date when

24 it will be done.  But, for most people, I suspect this is

25 going to be a much more manageable document production and

53

1  -- and agree with your Honor that it should be started on a

2  rolling basis and, so, would like to have the 30 days as a

3  goal.

4         THE COURT:  Okay.  Mr. Tate?

5         MR. TATE:  I think the 30 days is perfectly

6  reasonable, and I -- I'm not opposed to the idea that there

7  might be somebody who requires more time.  I just would like

8  a cap on what that more time would be.

9         THE COURT:  If that happens and you can't come to

10 an agreement, just come back to me.

11        Okay.  I am going to add a preliminary step to it

12 all sua sponte, and that is I would like Plaintiff's counsel

13 to send out a preservation notice to every single one of

14 these people by no later than Friday.  This is not to say,

15 Mr. Tate, that this would be -- this would limit your

16 argument.  I'm concerned about spoliation that requires that

17 there's a notice that there's a requirement to preserve,

18 right.  And, so, this is not in any way to say that this is

19 the date that triggers preservation obligations.  Mr. Tate

20 may have an argument of earlier preservation obligations.

21 But let's -- let's send this out, and let's make sure that

22 nothing is destroyed going forward.  And then we'll deal

23 with anything that has been destroyed going backward at a

24 different juncture should we need to cross that bridge.

25        (Pause.)

54

1          MR. GIBSON:  Yes, your Honor.

2          THE COURT:  Okay.  So, we have a plan.  I think

3    that takes care of the substantive portion of -- of the non-

4    attorneys' fees portion of this.

5          So, I would like, Mr. Tate, if you could please

6    take the laboring oar on working together with -- with

7    Plaintiff's counsel on a proposed order and get it to me for

8    this portion only.

9          MR. TATE:  Understood, your Honor.

10         THE COURT:  Okay.  And if you can have it to me

11   within a week.  Do you think that would work?

12         MR. TATE:  I would hope so, yes.

13         THE COURT:  Yeah.  Okay.  All right.  Well,

14   congratulations, folks.  I am very pleased to see that this

15   has been resolved.  We'll see how it plays out, but we have

16   a good step forward on that.

17         That does leave us with the attorneys' fees

18   portion of this motion, and this is an IDC.  I'm not taking

19   oral argument on it.  I will note -- okay.  So, Plaintiffs

20   are requesting almost $24,000, $23,680.  I will note that

21   Defendant -- sorry -- Plaintiff makes no argument other than

22   substantially justified.  I think you know where I'm going

23   to land on that.  And I remind you that on day one that this

24   issue was brought to me, I told you folks what I thought

25   about what the EDO said, and here we are months later.  So,

55

1 I think you have an idea of where I'm going to land on that.

2           That said, I don't know that, you know, bringing

3 you folks back to make a legal argument when you know where

4 I'm going to land on substantial justification and then

5 Plaintiffs not having made any challenge to the rate -- the

6 hourly rate or the number of hours, I think you folks know

7 how that's going to play out.

8           That said, I would say to Plaintiff, why throw

9 good money after bad?  Pick up the phone.  See if you can

10 negotiate a resolution to the attorneys' fees portion.  And

11 I'm going to give you a hint that despite the fact that

12 Plaintiff has not made any kind of an argument about the

13 number of hours, the law doesn't support all that was done

14 -- that -- all that was done and that you folks are -- the

15 hours that are requested are recoverable.  Meeting and

16 conferring is not recoverable, and appearing at an informal

17 discovery conference is not recoverable.  I would say this

18 one is because this came from the motion.

19           And, so, what would be recoverable, of course, is

20 drafting the motion, reviewing the opposition, drafting the

21 reply, coming to the anticipated hours for the hearing on

22 the motion, which, of course, I would count today as

23 recoverable.

24           The problem is I don't have a breakdown, right, as

25 to how many hours were for each of these things.  But I

56

1  would encourage the parties to take that guidance and see if

2  you can resolve this thing because, quite frankly, to come

3  show up and spend more attorneys' fees on appearing to argue

4  a motion for monetary sanctions I think is not a -- from the

5  Plaintiff's side.  I mean, I can understand why you would

6  want to do it, Mr. Tate.  But from the Plaintiff's side, I'm

7  sure, is not -- not the best -- or not the ideal way of

8  spending the donations that go to the organization.

9          So, take this $23,680.  Pick up the phone.  Make

10  an offer.  Resolve it.  Let me know you're done.  Otherwise,

11  let's set a hearing date.

12          Ms. Estrada, can you give me a hearing date --

13  let's do two weeks from today.

14          THE CLERK:  August 23 --

15          THE COURT:  Okay.  You have the calendar, so I

16  leave the -- the conversation now goes from counsel to Ms.

17  Estrada.

18          THE CLERK:  I'm sorry.  August 21, your Honor.

19      (Pause.)

20          THE CLERK:  The next available date after August

21  21 is August 28.

22          MR. GIBSON:  Okay.  Thank you.  And what time,

23  1:30?

24          THE CLERK:  Any time on August 28.

25          MR. GIBSON:  Oh, okay.

57

1        THE COURT:  What about what time on the 21st?

2        THE CLERK:  Any time on August 21st.

3        MR. TATE:  Your Honor, would that be an in-person

4   argument?

5        THE COURT:  Yes.

6        MR. TATE:  I assume you wouldn't need the full --

7        THE COURT:  No, no, no.

8        MR. TATE:  We can make either of those days work

9   as long as it's okay if either Ms. Close or myself -- so, I

10  guess it's probably going to be me.

11       MR. GIBSON:  That's fine for Plaintiff, your

12  Honor.  Either one is fine.

13       THE COURT:  Okay.  So, let's do August 21 so we

14  can keep a tight leash on this.  Hopefully you folks can

15  just resolve this and contact me and let me know -- contact

16  my chambers, please, and let me know that it's been

17  resolved, and we'll vacate.

18       MR. TATE:  Yes, your Honor.

19       THE COURT:  So, shall we do 10:00 a.m.?

20       MR. TATE:  Yes, your Honor, that works for

21  Defendant.

22       MR. GIBSON:  Yes.  Thank you, your Honor.

23       THE COURT:  Okay.  The next matter is I'm going to

24  order Plaintiff to obtain a copy of the transcript for

25  today's conference and post it on the docket.  I have no

58

1  interest in having you spend money to rush it, but let's see

2  if you can get it on the docket within 30 days.

3          MS. BENTZ:  I understand, your Honor.

4          THE COURT:  I'm sorry?

5          MS. BENTZ:  I understand, your Honor.

6          THE COURT:  Okay.  Thank you.

7          Okay.  So, that takes care of that.  And then one

8  final order of business which I need to do which is I want

9  to make a record that Mr. Kiker was, in fact, involved in

10  this -- in the discovery that -- of this -- the subject

11  matter of this discovery motion.  He appeared at the April

12  24th informal discovery conference where we discussed the --

13  the production of documents extensively.

14          As such, Mr. Kiker's absence today violates my

15  order.  And, so, I would just admonish Plaintiff's counsel

16  to figure out who it is that needs to come when I order them

17  to come, and I would appreciate it if you would bring them.

18          Okay.  I think that is everything I can think of

19  for today.  Oh, nope.  Go nowhere without your law clerk.

20          Oh, yes.  In my chambers email box today we

21  received a letter from Athena Colby, and it is related to a

22  subpoena that apparently has been served on her.  I have no

23  intention of responding to that email.  She's not a party,

24  nor should she be communicating with me.  So, I am, as a

25  courtesy, letting you folks know.  And please let her know

59

1  we will not be responding and to not send communications to

2  me.  If she needs to do -- if she needs to address issues

3  with a subpoena, there is a process for that.  And I would

4  encourage you folks to -- on the Plaintiff's side, to try to

5  convince your folks, the officers, directors, to try to

6  resolve these things in the least expensive way possible

7  because every dollar will be coming out of BCS's coffers.

8  And we can circle back on attorneys' fees or any work

9  related to subpoenas after that phase is concluded.

10             MR. TATE:  Thank you, your Honor.  One last just

11  clerical point as I think I'm -- I have to prepare the

12  proposed order.  The motion was granted in part and then

13  with a determination later on the issue of attorneys' fees

14  and evidentiary sanctions.  Is that procedurally the correct

15  way to phrase it?

16             THE COURT:  The motion I think was granted in

17  full.

18             MR. TATE:  Okay.

19             THE COURT:  With attorneys' fees to be resolved

20  subsequently.

21             MR. TATE:  Thank you, your Honor.

22             THE COURT:  Well, actually, on.  You know what?

23  No.  I -- I don't think you should say that the motion was

24  granted in full or in part or whatever because we're not

25  done here, right.  I mean, I think -- I think it's the --

60

1  this is the -- this is phase one of -- of resolving this

2  motion.  So, in fairness, I'm not sure I'm granting in part,

3  granting in full.  And it all depends on how it's going to

4  turn out, and we need to leave open the possibility that I

5  will be granting evidentiary sanctions.  So, we can't close

6  this off.

7          So, what I would propose is that instead of -- of

8  creating a proposed order that resolves this motion, it's

9  just an interim order that -- you can say the -- you know,

10 the resolution of this motion is suspended until further

11 order of the Court.  As an interim measure to -- you know,

12 to try to move this discovery dispute forward, this is the

13 order for now and -- and just kind of spell it out.

14         I know that's not very artful.  I'm sure that you

15 folks can come up with a very nice way of saying that.

16         MR. TATE:  Your Honor has issued several interim

17 orders, and I'm sure I could borrow from your language too.

18         THE COURT:  Yes, I have issued orders, haven't I?

19         Okay.  All right.  Now, from my law clerk and from

20 my courtroom deputy, have I missed anything?

21     (Pause to confer.)

22         THE COURT:  Yes, that stays on the calendar.  I

23 was asked if we were keeping -- so, Ms. Papciak filed a

24 motion to quash a while back as to the subpoena.  She now --

25 so, that was resolved informally.  She apparently sat for a

61

1 deposition, and now she wants money.

2         I would encourage counsel for Plaintiff and Ms.

3 Hughes to share with your fellow officers and directors that

4 they might want to keep an eye on what's going to happen

5 there, and -- and that will give them an idea of how

6 fighting a subpoena plays out.

7         MR. TATE:  Your Honor, just procedurally, I had

8 instructed my paralegal to file an opposition to that, and

9 then we were all here.  So, I think that an opposition has

10 been filed even though the Court took the motion off

11 calendar.  I just --

12         THE COURT:  Wait.  We took it off calendar?  Wait.

13         MR. TATE:  Did I misunderstand that?  I think you

14 -- you struck the motion.  Maybe I'm misunderstanding that.

15         THE COURT:  My goal was to set an informal

16 discovery conference on her latest request so we could see

17 if we can --

18         MR. TATE:  That's correct.  I know that the court

19 did --

20         THE COURT:  -- resolve this.

21         MR. TATE:  -- set an informal discovery

22 conference.  I just wanted to apologize if it was improper

23 to file an opposition, because we're all here, I couldn't

24 have called the paralegal off.

25         THE COURT:  Understood.  I understand what's

62

1    happening.  I hope that we can resolve that issue without

2    having to actually go into the -- the substance of the

3    motion, but we'll see.

4              MR. TATE:  Thank you.

5              THE COURT:  Okay.  Thank you, Ms. Estrada, on

6    that.  Anything else?  Am I missing anything?  Anybody?

7    Going once, going twice.

8              All right.  Well, thank you folks.  Can I just now

9    make a pitch for you folks to settle this case?  I am

10   serious.  I -- I know, Ms. Bentz, you've heard my -- my rant

11   on this during earlier discovery -- informal discovery

12   conferences.

13             I understand you folks went to mediation?

14             MS. BENTZ:  Yes, your Honor.

15             THE COURT:  Okay.  I don't know what to say about

16   that.  I don't -- I don't understand this lawsuit, to be

17   quite frank.  So, I don't know who wins here, and I won't --

18   I will tell you I know who loses, the kids.  So, anyway.

19   But you have every right to proceed with your litigation.

20   That's why we have a wonderful litigation -- legal system.

21   Everybody has a choice whether to settle or to fight.  So, I

22   respect that decision as well.  It is what it is.

23             Okay.  Anything else for the parties?  No?

24             MR. GIBSON:  Nothing for Plaintiff.  Thank you

25   very much, your Honor.

63

1          THE COURT:  Thank you.

2          MR. TATE:  Thank you for your time.

3          THE COURT:  Thank you very much, folks.

4      (Proceedings concluded.)

64

1        I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Jordan Keilty                    8/17/2023
  Transcriber                        Date

6

  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7

8

  /s/L.L. Francisco
9 L.L. Francisco, President
  Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25