Dirk O. Julander, Bar No. 132313
doj@jbblaw.com
Catherine A. Close, Bar No. 198549
cac@jbblaw.com
M. Adam Tate, Bar No. 280017
adam@jbblaw.com
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone: (949) 477-2100
Facsimile: (949) 477-6355

Attorneys for Defendants
KATHERINE MCNAMARA and
JEREMY WHITELEY



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREAKING CODE SILENCE, a California 501(c)(3) nonprofit,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE MCNAMARA, an Individual; JEREMY WHITELEY, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:22-cv-002052-SB-MAA<br><br>**DECLARATION OF KATHERINE MCNAMARA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>Date:   January 2, 2024<br>Time:   10:00 a.m.<br>Crtrm: 690<br><br>*[Assigned to the Hon. Maria A. Audero]* |

## DECLARATION OF KATHERINE MCNAMARA

I, KATHERINE MCNAMARA, hereby declare and state under penalty of perjury the following facts:

1.      I am over the age of eighteen and a defendant the within action.  I submit this Declaration in support of the Motion for Summary Judgment filed on behalf of Defendant JEREMY WHITELEY ("Whiteley"). I have personal knowledge of the following facts and, if called upon to testify, I can and will truthfully testify thereto.

2.      The "troubled teen industry" or "TTI" is a term commonly used to refer to a broad range of programs in which thousands of children annually, are branded as "problem children" for a variety of reasons are sent, often against their wills, to congregate care facilities (sometimes known as "boot camps," "behavioral modification schools," or other similar monikers). Although marketed as therapeutic treatment centers, many facilities simply collect public funding and also cruelly abuse the children, including physical, verbal, and sexual abuse, isolation, forced hard labor, chemical sedation, sleep and food deprivation, attack therapy and aversion therapy. For many years, advocates seeking to help raise attention to the issues with TTI facilities, reform them, and end institutional child abuse commonly use the phrase "Breaking Code Silence" because "Code Silence" is a common form of punishment used by many TTI facilities in which no talking is strictly enforced.

3.      As a teenager, I was sent to two such TTI facilities, including Provo Canyon School, a private congregate care facility for troubled teens in Provo, Utah, where I both suffered and witnessed terrible abuse. As a result,  I have been an active anti-TTI advocate for over five years, since approximately 2017.

4.      Because one of my skills is data-gathering, in 2017 I began mining public records for information and documents related to TTI facilities and evidence of the abuse. My goal was to gather as much data as I could to expose these TTI

1   facilities. These documents, along with the survivor data I compiled over the years,

2   is housed on my personal Google Drive, and organized on Zotero, which is an

3   opensource tool for sharing research with others. Similar to an on-line bibliography,

4   Zotero organizes the links to data which is housed somewhere else.

5       5.      In 2019, I began collaborating with other survivors about the need to

6   bring the issues to the public's attention and stop the institutional abuse. That year,

7   some of the survivors I was originally collaborating with, including Chelsea

8   Papciak, purchased the domain name <breakingcodesilence.net> (the ".Net

9   Domain") and launched a splash page for a social media campaign.

10      6.      To prevent anyone else from purchasing the similar

11  <breakingcodesilence.org> domain name (the ".Org Domain"), in March 2020, I

12  purchased the .Org Domain in my own name, with my own funds, using my own

13  personal Hover.com domain registrar account. A true and correct copy of the March

14  11, 2020 receipt from Hover reflecting my purchase of the .Org Domain is attached

15  to the Index of Exhibits as **Exhibit 5**. At the time, I feared that a TTI program would

16  purchase the .Org Domain and use it to undermine the anti-TTI movement. At this

17  point, the domain <breakingcodesilence.com> (the ".Com Domain") was already

18  owned by another survivor and activist, Joshua Scarpuzzi, who authored a book

19  titled "Breaking Code Silence" which was published in 2018.

20      7.      Since purchasing the .Org Domain in March 2020, I have since

21  renewed the .Org Domain every subsequent year, always in my own name, with my

22  own funds, and always housing the domain in my personal Hover.com domain

23  registrar account. True and correct copies of my annual renewal receipts from Hover

24  for the .Org Domain are attached collectively to the Index of Exhibits as **Exhibit 6**.

25  As seen on the initial renewal receipt, the .Org Domain first renewed on March 11,

26  2021, prior to the formation of Plaintiff BREAKING CODE SILENCE ("BCS").

27

28

MCNAMARA DECL. RE: MOTION FOR SUMMARY JUDGMENT

JULANDER BROWN
— & BOLLARD —

8.     Towards the end of 2020, I had discussions with the group of survivors that I was originally collaborating with about founding a nonprofit organization dedicated to advocating for survivors and against the institutionalized abuse. The group, which included Chelsea Papciak, decided that they would use the .Net Domain.

9.     On October 7, 2020, celebrity Paris Hilton led a protest calling for the closure of Provo Canyon School, where she was also previously "incarcerated" at the age of seventeen. The protest gained national and international media attention. Around this time, I was introduced to Whiteley, who had also been at Provo Canyon School, and Vanessa Hughes, who claimed to be a psychologist.

10.     In mid-March 2021, a schism developed among the original group that I was collaborating to found a nonprofit advocacy organization. Chelsea Papciak and her group went their separate way, and no organization or entity was ever formed from this first group's efforts. Chelsea Papciak and her group of former collaborators retained control of the .Net Domain after the split, while I retained ownership and control of my .Org Domain.

11.     After the original group of advocates that I was collaborating with disintegrated, I, together with Whiteley, Hughes, and Jennifer Magill, decided to form a nonprofit organization. Along with other new collaborators, this new group decided that the nonprofit organization would be named "Breaking Code Silence Youth Advocacy Network." Vanessa Hughes later asked me to purchase several domains that were a variation of "Breaking Code Silence Youth Advocacy Network" for the organization, which I did.

12.     BCS was incorporated on March 22, 2021. Hughes was responsible for incorporating the new entity. For reasons that were never made clear to me, I was told that we were registering the organization with the State of California under the name "Breaking Code Silence," excluding the latter half of the name, i.e., "Youth Advocacy Network," that we had previously agreed upon.

13.     I am a cyber-security technical solutions architect for a multinational technology conglomerate corporation. Whiteley also has extensive experience in information technology. Based on our technical backgrounds, Whiteley and I stood up the information technology and assurance infrastructures as well as the website and related WordPress account for BCS. We also initially set up and/or had administrative access to a number of BCS's online accounts.

14.     Prior to BCS's incorporation, and before the organization could acquire a suitable domain, Hughes wanted to have formal email addresses for conducting organizational business. Because the former group of collaborators retained control of the .Net Domain and BCS had yet to purchase its own domain, I allowed the organization to temporarily use the .Org Domain that I previously purchased in March 2020. To set up the email addresses, I was required to purchase an add-on service for my .Org Domain from Hover (the domain registrar). I later sought reimbursement from BCS for the cost of this add-on service necessary to set up the emails, but I never asked for any reimbursement for my .Org domain purchase itself, or for any subsequent registrations of the that domain. Ultimately, I was never paid, and the email inboxes were eventually migrated to a free service using Google for Nonprofits.

15.     By creating subdomains, the .Org Domain is capable of hosting multiple websites. For example, subdomain1.breakingcodesilence.org is a possible subdomain that could be registered for other uses. Notwithstanding, to date, BCS has been the only one that I have permitted to use my .Org Domain since 2021. Attached to the Index of Exhibits as **<u>Exhibit 7</u>** is a true and correct copy of a screenshot I took on October 30, 2023, which accurately depicts the Google online Search Console Help page explaining domain properties and subdomains at: https://support.google.com/webmasters/answer/34592?sjid=1232802067652262856 8-NA#domain_property&zippy=%2Cdomain-property-examplecom.

JULANDER BROWN
— & BOLLARD —

16.    On or about March 29, 2021, Whiteley paid for and set up the web hosting that the. Org Domain pointed toward (with the company Cloudways), using his own personal funds, in his own name, with his own email and home address.

17.    Pursuant to Google's Terms of Service, which I am bound to as a domain registrant, domain owners control the entire domain services property. Sometime between April and June 2021 (while I was still a BCS officer/director), I followed Google's steps to verify my ownership of the .Org Domain by:

a.    Logging into my Hover.com domain registrar account that I have had since 2016;

b.    Editing my domain's DNS services by:

i.    Clicking "add" to add a DNS entry;

ii.    Choosing a "TXT Record" which shows the third-party service that you own the domain; and

iii.    Adding the TXT Record with text verification received from Google.

c.    Attached to the Index of Exhibits as **Exhibit 8** is true and correct copy of a screenshot I took on October 30, 2023, which accurately depicts the instructions I followed from Google's online Search Console Help page at: https://support.google.com/webmasters/answer/9008080?sjid=123280206765 22628568-NA#zippy=%2Cdomain-name-provider%2Cmanual-domain-name-provider-instructions.

18.    Once I verified my identity as the domain owner to Google (through the TXT record) in 2021, it linked my email address (iristheangel@gmail.com) to all domain-related services (such as Google Webmaster Central, which is now known as Google Search Console) for single sign-on access. After this happened, I was not required to enter any special administrative credentials beyond simply signing into my own Google account since Google recognized me as the domain owner.

19.    At the first meeting of the BCS board of directors, Whiteley, Hughes, and Magill, were made interim board members, to serve temporarily without compensation until we could find qualified replacements. I was accidentally added as a board member due to an error on the original paperwork filed through Legal Zoom. Hughes later requested that I not resign and remain on the board. A fifth, permanent, board member, Bill Boyles, was later added to the BCS board of directors in May 2021.

20.    In April 2021, Hughes purchased the .Com Domain from Joshua Scarpuzzi. A true and correct copy of the April 6, 2021, Assignment and License Back Agreement between BCS and Joshua Scarpuzzi, which I voted in favor of as a member of BCS's board of directors, is attached to the Index of Exhibits as **Exhibit 9**. The .Com Domain was specifically purchased for BCS' use.

21.    Whiteley and I were the only two directors on BCS' board who identified as LGBTQ+. Almost immediately after BCS was formed, tension started developing between the members of the board when Hughes (who was the President and CEO) regularly hurled insults and homophobic epithets at Whiteley during meetings (including BCS board meetings), telephone calls, Zoom conferences, and on BCS' private Slack channel in the Breaking Code Silence workspace. Among other things, I witnessed Hughes refer to Whiteley as a "mangina" and a "queen," and I also witnessed Hughes refer to Whiteley as having "female energy."

22.    Whiteley and several others made complaints about Hughes' behavior, but BCS management ignored Hughes' conduct. After only three months of involvement with BCS, Whiteley resigned from BCS' board of directors on June 26, 2021.

23.    Immediately after the board of directors received Whiteley's notice of resignation, Hughes began pressuring myself and the other members of the board of directors to sue Whiteley. When Bill Boyles and I explained to Hughes that BCS did not have a good reason to sue Whiteley, Hughes asked us to "brainstorm" up a

1  reason to sue Whiteley. Bill Boyles and I refused. I address Whiteley's

2  relinquishment of all BCS accounts in greater detail below in Paragraph 46.

3        24.    Beginning July 4, 2021, I had very little contact with Whiteley until

4  March 2022. Although we spoke sporadically in that time period, none of our

5  conversations involved gaining unauthorized access to any BCS account or

6  computer. Other than my conversations with Whiteley on March 11th or 12th as

7  described below, prior to learning of this lawsuit, Whiteley and I never privately

8  discussed anything about any of the accounts/computers BCS is contending were

9  hacked, and I did not assist anyone in unlawfully accessing, or exceeding authorized

10  access, with respect to any BCS accounts or computers. Moreover, I never took any

11  action which would cause or contribute to the deindexing of BCS's website.

12        25.    After Whiteley's resignation in June 2021, Hughes' harassment of gay

13  volunteers did not stop. People started telling me that Hughes was making

14  comments about my sexual orientation to new BCS volunteers – indicating that

15  there was a "problem lesbian board member" (I was the only lesbian board member

16  at that time). Hughes also increased her hostility towards me. This led to my

17  decision to file a formal internal complaint against Hughes in November 2021 for

18  harassment, retaliation, and discrimination. A true and correct copy of the

19  November 26, 2021 Breaking Code Silence – Internal Complaint Form that I

20  submitted is attached to the Index of Exhibits as **Exhibit 10**.

21        26.    Shortly thereafter, I learned that Hughes and Magill were misusing

22  grant funds and hiring employees without unrestricted funds to pay them. As the

23  corporate Treasurer, I felt obligated to report this to the California Attorney General

24  and advised Hughes and Magill of my intention. The hostility that resulted and the

25  anti- LGBTQ+ culture forced me to resign from BCS on December 9, 2021.

26

27

28

27.     On the evening of my resignation, Bill Boyles Jr. took affirmative steps to revoke my authorization to BCS's WordPress console by deleting my account. I have not logged into or otherwise accessed the BCS WordPress site since my resignation, nor do I have the ability to do so.

28.     Immediately after my resignation, on or about December 9, 2021, my access to the kmcnamara@breakingcodesilence.org email account was revoked by someone at BCS and I could no longer access that account or any other BCS accounts that were linked to that email address. This includes BCS's Google Drive account, paid Hootsuite account, and TikTok account. Notwithstanding BCS's revocation of my access to these accounts, BCS never removed my credit card as the payment method for the annual renewal payments on BCS's Hootsuite account and Hootsuite has continued to charge my personal credit card for BCS's account even after this litigation was filed. Specifically, my credit card was charged $831 in May 2022 and $2,988 in May 2023 for BCS's Hootsuite account, despite the repeated requests of my counsel to remove my credit card from <u>all</u> BCS accounts.

29.     After my resignation, on December 15, 2021, Rebecca Moorman, Emily Carter, and I received an email from Jennifer Magill requesting that we each execute an Intellectual Property Assignment Agreement. A true and correct copy of the December 15, 2021 email I received from Jennifer Magill with the attached draft Assignment of Intellectual Property Agreement is attached to the Index of Exhibits as **<u>Exhibit 11</u>**. I never executed the Assignment of Intellectual Property Agreement and never otherwise transferred or assigned the .Org Domain to BCS. BCS has never paid any expenses associated with the .Org Domain, either directly or to me as reimbursement. And BCS never even contacted me after my resignation to follow up about the Assignment of Intellectual Property Agreement or otherwise ask me to turn over my .Org Domain to BCS.

30.     After my resignation from BCS, BCS failed to take any affirmative steps to remove my access to its Facebook Business Page until January 4, 2022. Regardless, since my resignation on December 9, 2021, I did not access or make any changes to BCS's Facebook Business Page.

31.     After my resignation from BCS, BCS failed to take any affirmative steps to remove my access to its Google AdWords account or its Google Analytics Account until January 12, 2022 and March 6, 2022, respectively. A true and correct copy of the January 12, 2022, email notification I received stating that my access to Google Ads was revoked is attached to the Index of Exhibits as **Exhibit 12**. As set forth in the Declaration of Clark Walton filed concurrently herewith, I learned during the forensic expert inspection which I attended on June 26, 2023 that my access to BCS's Google Analytics account was revoked on March 6, 2022 by someone at BCS. Regardless, since my resignation on December 9, 2021, I did not access or make any changes to these accounts.

32.     After my resignation from BCS, in January 2022, I learned that BCS attempted to have ownership of my UPS Box transferred out of my name. I originally rented the UPS Box on August 3, 2021, after someone posted my home address on social media and my family and I started getting dangerously harassed at home, forcing us to move. I thereafter used the UPS Box for my personal mail and, because certain government forms related to BCS could not be sent to a P.O. Box, I also allowed BCS to use the UPS Box address to receive mail.

33.     After my resignation, I was contacted by Jennifer Magill who inquired about the UPS Box. I told Magill that I pre-paid for the UPS Box for one year and would be happy to hand the UPS Box over to BCS if BCS would reimburse me for that cost. A true and correct copy of my January 5-6, 2022, emails with Jennifer Magill are attached to the Index of Exhibits collectively as **Exhibit 13**.

MCNAMARA DECL. RE: MOTION FOR SUMMARY JUDGMENT

34.    Instead of reimbursing me, I was told by employees at the UPS Store that Hughes contacted the UPS Store on multiple occasions between January and March 2022, demanding that the UPS Store give her access to my UPS Box, accusing me (and the UPS employees) of committing "mail fraud," and demanding that the UPS Store turn over any security footage of me entering and leaving the UPS Store. When the UPS Store employees refused to comply with Hughes' demands, she threatened to sue the UPS Store and the individual employees. A true and correct copy of the April 12, 2022, statement I received from UPS Store employee Lisa Chen describing the foregoing events is attached to the Index of Exhibits as **Exhibit 14**. Ms. Chen told me that she requested that Hughes not call back again.

35.    Also in January 2022, I discovered that someone was attempting to take over ownership of my survivor archive that I had been working on since 2017 (organized on Zotero). Specifically, when I logged into my Zotero account on January 9, 2022, I discovered that my entire archive was missing from the account. Shocked, I contacted the President/CEO of Zotero, who ultimately returned my archive to my account. A true and correct copy of my January 11, 2022, email exchange with the President of Zotero (which is a project of Digital Scholarship), Sean Takats, is attached to the Index of Exhibits as **Exhibit 15**. As shown in the email exchange, my Zotero library is publicly posted and BCS or anyone else is free to access it anytime.

36.    Then, on March 11, 2022, I received an email from Google informing me that a BCS email address I did not recognize was added as an "owner" to the Google Webmaster Central/Google Search Console (collectively the "Google Tools") for my .Org Domain. Panicked that someone was trying to steal my domain (like what had recently happened with my Zotero archive and UPS Box), on March

JULANDER BROWN — & BOLLARD —

11, 2022, at about 2:15 PM PST (March 12, 2022 at 9:15 PM UTC)[1], I used my own personal Google credentials at iristheangel@gmail.com to sign into my Google account, browse to the Google Webmaster Central webpage, and give Whiteley at jeremy@medtexter.com "ownership" permissions for the .Org Domain. The permissions I granted would allow Whiteley to log in using his email address and see the activity related to my .Org Domain. I added Whiteley so he could witness what was happening to the domain in real time and perhaps even explain it to me since I had limited experience with the Google Tools at the time.

37.    By way of explanation, Google Search Console (formerly known as Google Webmaster Central) is a free service that Google provides to domain owners and webmasters so that they can monitor how their site interacts with Google, measure site traffic, and troubleshoot any issues. Anyone that owns domains that are indexed on Google can have an account. In March 2022, Google Webmaster Central and Google Search Console were different, but related, services. In late July 2023, Google consolidated both services into Google Search Console. From my personal Google account, I can sign onto Google Tools and view activities and any problems with all of the domains that I either own or have permissions to access, including my network-node.com domain which I own and use for work, and the unsilenced.org domain which I monitor with the permission of the domain owner. I also access my .Org Domain through my personal Google account.

38.    What I provided to Whiteley on March 11, 2022, was administrative permissions to the .Org Domain *through my own Google account* so that he could log on and see the activity related to the .Org Domain. Because I am the person who

---

[1]    UTC is a time zone standard used as a basis for all time zones worldwide. It is a constant time scale and does not change for Daylight Saving Time. UTC is 8 hours ahead of Pacific Standard Time.

JULANDER BROWN
— & BOLLARD —

(1) registered the .Org Domain and (2) paid for the domain for more than 3 years, the .Org Domain is one of the domains that I have access to through *my own Google account*. As the owner of the domain, I have top-level privileges to the Google service to administer to my domain and, as that system owner, can grant privileges to the service or revoke them as needed. The only reason BCS even has access to the Google Tools for the .Org Domain through its own Google Tools account is because *I specifically granted BCS permission to access the domain* by pointing the .Org Domain to BCS's webserver while I was a BCS volunteer/director, which allowed BCS to be authorized.

39.    Although I could do so as the domain owner at any time, I never re-directed the .Org Domain to any other website (other than BCS's website) after my resignation or revoked BCS's privileges with respect to the .Org Domain, initially because I wanted to give BCS some time to migrate off of the .Org Domain onto its own .Com Domain, and later because of this litigation. I elected to maintain the status quo until this action could be resolved, resulting in BCS using my .Org Domain without paying anything for it for nearly two years since my resignation. Notwithstanding, I have always understood and believed, and still believe, that I own the .Org Domain and that, as the domain owner, I was entitled to delegate ownership permissions to Whiteley, or anyone else I chose.

40.    Almost immediately after I added Whiteley's email, jeremy@medtexter.com, on March 11, 2022, someone revoked his access. Then, I re-added Whiteley's email, and someone again revoked the access. This went back-and-forth several times over the next couple of days. Assuming that it was a BCS volunteer who did not realize that he or she was intruding on my domain, I tried to alert the person by granting administrative permissions to ridiculous email addresses like thisisnotyourdomainpleasestop@gmail.com. Unfortunately, because thisisnotyourdomainpleasestop@gmail.com was not an actual email address at the time, it would not work. So instead, I granted administrative permissions to

1    comments@whitehouse.gov (which I determined to be an actual email address) in

2    an effort to get the intruder's attention.

3        41.    On March 12, 2022, I also learned through my domain registrar, Hover,

4    that Jesse Jensen, a representative of BCS who was unknown to me at the time, was

5    attempting access my personal Hover account (that I have maintained since 2016) to

6    try to hijack the .Org domain. A true and correct copy of the March 12, 2022,

7    notification I received from Richard at Hover Support is attached to the Index of

8    Exhibits as **Exhibit 16**.

9        42.    Other than adding the email addresses to the Google Tools for my .Org

10   Domain as described above, I took no action whatsoever with respect to the. Org

11   Domain or BCS's website. Specifically, I did not request that the BCS website be

12   deindexed in March 2022, or any other time, I did not change or alter any portion of

13   BCS's website after my resignation, and I did not aid or assist anyone else in doing

14   such things. Notably, it is not possible to deindex a website from Google Search

15   directly through a Hover domain registrar account.

16       43.    After my resignation, BCS never requested that I transfer the .Com

17   Domain that BCS purchased from Joshua Scarpuzzi out of my Hover domain

18   registrar account. In an effort to assist BCS in migrating off of my .Org Domain, I

19   created a separate Hover domain registrar account for the .Com Domain and

20   authorized my attorney to reach out to counsel for BCS and provide BCS with the

21   login credentials for the separate Hover account. On March 18, 2022, my attorney,

22   Mandana Jafarinejad, sent a letter to DLA Piper requesting that BCS migrate its

23   website to the .Com Domain within ten days. A true and correct copy of the March

24   18, 2022 letter from Mandana Jafarinejad to Hector Corea of DLA Piper is attached

25   to the Index of Exhibits as **Exhibit 17**. Thereafter, on March 24, 2022, my attorney

26   forwarded the administrative credentials to the separate Hover account for the .Com

27   Domain (which were inadvertently omitted from the original letter) to DLA Piper

28   via email. A true and correct copy of the March 24, 2022 email from Ms. Jafarinejad

JULANDER BROWN
— & BOLLARD —

1  to Mr. Corea is attached to the Index of Exhibits as **Exhibit 18**. Aside from moving

2  the .Com domain into a separate Hover.com account and providing BCS with the

3  credentials for the account, I took no other action with respect to the .Com domain

4  and made no changes to its configuration.

5      44.    Rather than migrating its website to its own .Com Domain within ten

6  days as requested, on March 28, 2022, BCS/DLA Piper filed this lawsuit, falsely

7  alleging that Whiteley and I accessed numerous BCS accounts without

8  authorization, or exceeded authorized access to such accounts. The Complaint

9  alleges that the BCS website was not appearing on a Google Search and that

10  allegedly someone made a request to deindex the BCS website from Google Search

11  on March 10. I did not have anything to do with any deindexing request and I was

12  completely unaware of these allegations when I added Whiteley's email address to

13  the Google Tools for my .Org Domain on March 11, 2022, after the alleged

14  deindexing request was made. I only learned of these deindexing allegations for the

15  first time when I read the Complaint.

16      45.    No one accessed the Hover.com domain registrar account I created for

17  BCS to house the .Com Domain until December 2022. I would have received an

18  alert from Hover if anyone accessed the account and I never received one. Then, on

19  November 20, 2022, I received a notification from Hover that the .Com Domain was

20  coming up for renewal in 30 days. A true and correct copy of the email notification I

21  received from Hover is attached to the Index of Exhibits as **Exhibit 19**. As

22  described in the Declaration of Catherine Close filed concurrently herewith, I

23  immediately forwarded the email to my attorney, who immediately advised BCS's

24  attorneys at DLA Piper of the impending renewal of the .Com Domain. On

25  December 12, 2022, BCS (through its counsel) confirmed that it successfully moved

26  the .Com Domain to its own Hover.com domain registrar account.

27

28

MCNAMARA DECL. RE: MOTION FOR SUMMARY JUDGMENT

JULANDER BROWN & BOLLARD

46.    I am aware that BCS previously made allegations regarding unauthorized access into numerous accounts. Even though many of those accounts are no longer at issue in the case, it is important to note that, after his resignation, Whiteley went above and beyond to accommodate and assist BCS in transferring to BCS ownership and administrative credentials to the BCS accounts he had either set up or had access to. Therefore, I believe the following account of my assistance with some of those transfers and, my contemporaneous awareness of the following transfers as a member of the board of directors at the time, is important:

a.    WordPress:  WordPress is a content management software that is installed on a server. It is the application that provides the public-facing website for BCS. This is not to be confused with a domain – which is a separate, intangible, property which can point to any website or webserver that the owner of that domain wishes. During our times as volunteers, Whiteley and I had administrative access to the BCS WordPress Website for a period of time. After his resignation in June 2021, I took affirmative steps to revoke Whiteley's authorization to the BCS WordPress website in late June 2021 by changing his permissions from "Administrator" to "None" on the WordPress website, and Bill Boyles changed the email address for Whiteley's WordPress account on July 9, 2021. A true and correct of the July 9, 2021 email notification I received in the jwhiteley@breakingcodesilence.org inbox that I had access to after Whiteley's resignation is attached to the Index of Exhibits as **Exhibit 20**. I am unaware of Whiteley gaining any access to BCS' WordPress website after I revoked his authorization in June 2021.

b.    Domains:  A domain name is a human-friendly address, sometimes called a URL (Uniform Resource Locator) or web address. Domains are created to make Internet Protocol (IP) addresses more accessible and easier to remember. Domains can be pointed towards websites, applications, servers, etc. It should be noted that a domain is different and

distinguishable from a website. A domain is to a website like a street address

is to a house. Domains direct internet users to the website, host, application,

or document that they point to. Domains are purchased and reside in domain

registrar accounts such as Hover.com, which is what I use.

       i.    *The breakingcodesilence.com domain (the ".Com*

*Domain"):* The .Com Domain was transferred from Josh Scarpuzzi's

personal domain registrar account into my own personal Hover.com

domain registrar account in April 2021 after BCS purchased the

domain from Scarpuzzi. As described in detail above, after my

resignation, I transferred the .Com Domain out of my personal

Hover.com account into a new Hover.com account and my attorney

gave BCS's counsel the credentials for this new Hover.com account so

that BCS could take possession of the .Com Domain and put it into its

own domain registrar account (or just keep it in the new account I

created for the domain). Whiteley has never had access to my personal

Hover.com account or the second Hover.com account that I created for

BCS to house the .Com Domain.

       ii.    *The breakingcodesilence.org domain (the .Org Domain):*

At all times since I registered the .Org Domain, it has been housed in

my personal Hover.com domain registrar account. I have maintained

this Hover.com account since 2016 and it has housed over a dozen

different domains that I use for non-BCS-related business and personal

use. Attached collectively to the Index of Exhibits as **Exhibit 21** are

true and correct copies of my receipts from Hover.com for some of my

other domains that have been housed in my Hover.com domain

registrar account dating back to 2016. I have never granted Whiteley

any access to my personal Hover.com domain registrar account where

all of my domains, including the .Org Domain, are housed, and I have

1    received no information or alerts that would suggest that Whiteley ever

2    accessed my Hover.com domain registrar account.

3         iii.    During the course of this litigation, I have heard BCS refer

4    to my Hover.com account as a "DNS account." This is inaccurate.

5    Hover sells domains. The Hover.com domain registrar account is not a

6    "DNS account," it is an account that houses intangible domain name

7    properties. DNS stands for "Domain Name System." DNS is a

8    configuration on a domain that translates a domain name into an IP

9    address. The only DNS service that Hover.com provides is basic

10   configuration of DNS for domains that you own. As explained above,

11   my Hover.com domain registrar account houses over a dozen domain

12   names that I have purchased from Hover over the years as far back as

13   2016 for personal and non-BCS business related use.

14        c.    <u>BCS' Google Drive Account</u>: BCS uses Google Drive to share

15   documents internally and externally. During my time at BCS, documents

16   were housed both on various personal Google Drives as well as BCS' Google

17   Drive. The majority of Whiteley's access to BCS' Google Drive folders/

18   drives were linked to his BCS email address,

19   jwhiteley@breakingcodesilence.org. After his resignation from BCS, in late

20   June 2021, I revoked Whiteley's authorization to the

21   jwhiteley@breakingcodesilence.org email account.

22        d.    <u>Google Search Console/Google Webmaster Central</u>:

23        i.    *For the .Com Domain:* After BCS's purchase of the .Com

24   Domain, it largely went unused while BCS was engaged in litigation

25   over the .Net Domain. For that reason,  Google Tools was never set up

26   for the .Com Domain during my tenure at BCS. Thus, neither Whiteley

27   nor I have ever had access to the Google Tools for the .Com Domain.

28

MCNAMARA DECL. RE: MOTION FOR SUMMARY JUDGMENT

ii.    *For the .Org Domain:* As discussed in greater detail above, as the owner of the .Org Domain, Google recognizes me as the system owner for the .Org Domain. For the reasons discussed above, on the evening of March 11, 2021, I added Whiteley's email address, jeremy@medtexter.com to the Google Tools for the .Org Domain, without his prior knowledge, by clicking the "+" (addition) button on my Google account dashboard and adding his email address. Whiteley took no affirmative action to grant himself authorization to the Google Tools for the .Org Domain.

e.    Google AdWords Account: Google provides $10,000 of free ad credits to non-profits every month. This allows non-profits to direct traffic to its website. Whiteley initially set up BCS's Google AdWords Account on June 7, 2021. On June 30, 2021, Whiteley transferred administrative control of this account to me. Thereafter, on July 19, 2021, I took affirmative steps to revoke Whiteley's authorization to access this account by removing his email address as a user. Whiteley has had no access to this account since I revoked his authorization on July 19, 2021.

f.    Google Analytics: Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also mobile app traffic and events. Google gains this visibility into visitor traffic through a Google Analytics tag that is embedded into the source code of the WordPress Website. Whiteley initially set up the Google Analytics account for BCS and embedded the linked tag in April 2021. After his resignation, on August 18, 2021, I took affirmative steps to revoke Whiteley's authorization by deleting his email from this service. Attached to the Index of Exhibits as **Exhibit 22** is a screenshot which was produced by BCS in discovery in this action and Bates stamped BCS_0577327 which reflects my (iristheangel@gmail.com) changing of Whiteley's authorization on the account to none on August 18,

1  2021. After his resignation, Whiteley made no changes to the Google

2  Analytics account and he has not had access to the BCS Google Analytics

3  account since I revoked his access.

4         g.     @BreakingCodeSi1 Twitter Account: This Twitter account was

5  created and managed by Rebecca Moorman in early 2020, more than a year

6  prior to BCS's formation. To my knowledge, the email address associated

7  with this account was never a Breaking Code Silence email address.

8  Moorman permitted BCS to use this Twitter account for a period of time in

9  2021 when she was a BCS volunteer. However, Moorman expressly refused

10  to transfer the Twitter account to BCS. Attached to the Index of Exhibits as

11  **Exhibit 23** is a true and correct copy of the December 15, 2021, email from

12  Moorman to BCS, on which I was copied, indicating Moorman's refusal to

13  assign her intellectual property to BCS. To the best of my knowledge,

14  Whiteley only had administrative access to Moorman's Twitter account for a

15  very short period of time in April 2021, and has had no administrative access

16  to Moorman's Twitter account after his resignation from BCS.

17         h.     Original Paid Hootsuite Account: Hootsuite is a social media

18  management tool with features to help with planning, scheduling, and

19  syndicating social posts. Key features include automatic scheduling, social

20  media monitoring, performance reporting, basic task management and more.

21  In April 2021, I set up a nonprofit paid Hootsuite account for BCS using my

22  own credit card. This Hootsuite account was linked to my

23  kmcnamara@breakingcodesilence.org email address and required access to

24  that email address to perform the necessary two-factor authentication to login.

25  Whiteley had access to this Hootsuite account for a short period of time while

26  he was a volunteer at BCS. Even though he could not login to this account

27  without the two-factor authentication, I took the additional affirmative step to

28  revoke his authorization by changing the password on the account at the time

MCNAMARA DECL. RE: MOTION FOR SUMMARY JUDGMENT

of his resignation. Since that time, Whiteley has had no access to the paid
Hootsuite account.

      i.    <u>Zotero</u>: As discussed above, Zotero is a free, easy-to-use tool to
help you collect, organize, annotate, cite, and share links and bibliography
data. During my time as an activist, I have had several Zotero accounts. I use
Zotero to organize links to documents on my personal Google Drive and news
stories related to the TTI. Importantly, my Zotero libraries do not store any
documents, they just have just links to wherever the documents are housed. I
started collecting documents for a survivor archive in 2017 and created my
first Zotero account with the username kmcnamara013. I later created a
second public Zotero account that I allowed BCS and many others to publicly
link to. This Zotero account has always been registered to my personal email.
At no time has Whiteley ever had administrative access or authorization to
any of my Zotero accounts.

      j.    <u>Instagram</u>:

      i.    *@breakingcodesilence Instagram Account:* This Instagram
account was created by Rebecca Moorman in early 2020. Access to this
account was lost in early March 2021 prior to the incorporation of BCS
due to losing access to the phone number that was provided for two-
factor authentication. To the best of my knowledge, Whiteley has never
had access to this Instagram account.

      ii.    *@breakingcodesilenceofficial Instagram Account:* This
account was created for BCS by Hannah Kay in or about July 2021, and
registered to the email info@breakingcodesilence.org. I, as well as
many people on BCS' social media team, had access to this Instagram
account from July 2021 to December 9, 2021 when I resigned. To the
best of my knowledge, Whiteley has never had access to this Instagram
account because it was created after his resignation from BCS.

JULANDER BROWN
— & BOLLARD —

1    Regardless, BCS has continued to post on this Instagram account since
2    the start of this litigation, so BCS retains control of this account.

3        k.    <u>Facebook Group</u>: Facebook Groups are spaces on the Facebook
4    social media network for friends, acquaintances, or people with similar
5    interests to discuss or share about broad or narrow topics. This Facebook
6    group was originally created by Emily Carter in May 2019 and titled
7    "Program Legislation Change." Carter created this group prior to our
8    collaboration or even the decision to create a social media campaign. This
9    Facebook group has gone through five name changes from inception. Carter
10   was an administrator of this group throughout 2019 to present day. At one
11   point in time, Carter added many Breaking Code Silence volunteers,
12   including me, as administrators of this Facebook group. At one point,
13   Whiteley was added as an administrator of this Facebook group but, as set
14   forth in his declaration, he took affirmative steps to revoke his own access by
15   removing himself as an administrator. To the best of my knowledge, Whiteley
16   was never re-added as an administrator of the Facebook group.

17       l.    <u>YouTube</u>: Whiteley set up this brand YouTube account for BCS
18   in April 2021. At the time, he added my email address as another "owner" on
19   this YouTube account. After his resignation, I noticed that Whiteley's email
20   was still listed as the "Primary Owner" on the YouTube account. I took the
21   affirmative steps to revoke his authorization at that time by clicking on the
22   downward arrow next to my own email address and changing my role to the
23   "Primary Owner" of the YouTube account. After that, I removed Whiteley's
24   email address from the account. To the best of my knowledge, Whiteley has
25   never had access to the YouTube account after I revoked his authorization.

26       m.    BCS TikTok – Whiteley created this TikTok account for BCS in
27   April 2021. On April 18, 2021, Whiteley texted me the credentials for the
28   TikTok account and informed me that he changed the two-factor

authentication and primary communication method for the Tiktok account to my kmcnamara@breakingcodesilence.org email. True and correct copy of my April 18, 2021 chat messages with Whiteley regarding the credentials for the TikTok account are attached to the Index of Exhibits as **Exhibit 24**. After Whiteley's resignation, I took the extra affirmative step of revoking his authorization by changing the password on the TikTok account, even though he could not login without access to my email for two-factor authentication. To the best of my knowledge, Whiteley has not gained, and could not gain, administrative access to this TikTok account after April 2021.

   n. BCS Email Addresses:

    i. *jwhiteley@breakingcodesilence.org email*: Whiteley had access to this email address until the time of his resignation. After his resignation, I took affirmative steps to revoke his authorization by changing the password on the account. To the best of my knowledge, Whiteley has not accessed this account since his resignation.

    ii. *info@breakingcodesilence.org email:* Whiteley may have briefly had access to this email account during his time as a BCS volunteer/director. As a precautionary security measure, I changed the password on this email account on June 28, 2021, shortly after Whiteley's resignation. To the best of my knowledge, Whiteley has never even logged into this email account.

    iii. After Whiteley's resignation, all BCS email accounts were moved from the Hover email inboxes to fee Google inboxes which Whiteley never had access to.

   o. BCS Facebook Business Account and Page: A Facebook Business Page is a public social media profile designed for commercial organizations. Like a personal Facebook account, Facebook businesses pages allow you to make connections online. Brands use their Facebook pages to

JULANDER BROWN
— & BOLLARD —

promote products and services through links, status updates, photos, and videos. Whiteley initially set up BCS's Facebook Business page in early 2021. As described in his declaration, after his resignation, Whiteley took the affirmative steps to revoke his own authorization by removing himself as an administrator. A true and correct copy of the email that Whiteley forwarded to me on June 28, 2021 informing me that he had removed himself from the Facebook Business Page is attached to the Index of Exhibits as **Exhibit 25**. To the best of my knowledge, Whiteley never re-gained access to the Facebook Business Page after affirmative steps were taken to revoke his authorization.

　　　　p.　　Google for Nonprofits: Whiteley originally helped set up BCS's Google for Nonprofits account in May 2021. After his resignation, Whiteley took affirmative steps to revoke his own authorization by removing his email address from the administrator list. To the best of my knowledge, Whiteley did not regain access to BCS' Google for Nonprofits account after his resignation.

　　　　q.　　Slack: Slack is a cloud-based cross-platform instant messaging service. Whiteley was granted access to BCS's Slack in March 2021. As set forth in his declaration, at the time of his resignation, Whiteley took the affirmative steps to remove his own authorization by de-activating his own account. To the best of my knowledge, Whiteley never regained access to the BCS Slack after he removed himself.

47.　　On June 26, 2023, I attended the forensic expert inspection of BCS's accounts performed by Clark Walton. While attending the inspection, I witnessed Mr. Walton review the Google Search Console. Based on the information I observed from the Google Search Console, it appeared that there was a drop in search-related queries on or around March 9 or 10, 2022, but the search-queries started resuming their typical number of "clicks" and "impressions" on or around March 11, 2022.

This indicates that it was a small amount of time that the domain was either deindexed or that Google was not tracking "clicks" and "impressions" from Google Search results. However, when Mr. Walton inspected the Google Analytics console, a separate system that tracks traffic directly on the webserver itself via a plugin installed on WordPress, it appeared that the traffic dropped on March 12 and stopped being tracked entirely for the remainder of March 2022 on the Google Analytics system. The only explanation for this is that BCS was altering the Google Site Plugin on their WordPress site, which affected BCS's ability to accurately track traffic, either around the time of the alleged deindexing or shortly after. Thus, it is impossible to know whether BCS lost web traffic because they stopped tracking their traffic analytics, which I witnessed during the expert inspection.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 22nd day of November 2023.

_____
KATHERINE MCNAMARA

MCNAMARA DECL. RE: MOTION FOR SUMMARY JUDGMENT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of November 2023, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

/s/ Helene P. Saller
Helene P. Saller