1  Dirk O. Julander, Bar No. 132313
   doj@jbblaw.com
2  Catherine A. Close, Bar No. 198549
   cac@jbblaw.com
3  M. Adam Tate, Bar No. 280017
   adam@jbblaw.com
4  JULANDER, BROWN & BOLLARD
   9110 Irvine Center Drive
5  Irvine, California 92618
   Telephone: (949) 477-2100
6  Facsimile: (949) 477-6355

7  Attorneys for Defendants
   KATHERINE MCNAMARA and
8  JEREMY WHITELEY

10            UNITED STATES DISTRICT COURT
11            CENTRAL DISTRICT OF CALIFORNIA

13  BREKAING CODE SILENCE, a            Case No. 2:22-cv-002052-SB-MAA
    California 501(c)(3) nonprofit,
14
                                        **DECLARATION OF CLARK C.**
15                                      **WALTON, ESQ. IN SUPPORT OF**
              Plaintiff,                **MOTION FOR SUMMARY**
16                                      **JUDGMENT OR IN THE**
                                        **ALTERNATIVE PARTIAL**
17       vs.                            **SUMMARY JUDGMENT**
18
19  KATHERINE MCNAMARA, an
    Individual; JEREMY WHITELEY, an     Date:  January 2, 2024
20  individual; and DOES 1 through 50,  Time:  10:00 a.m.
    inclusive,                          Crtrm: 690
21
22            Defendants.
                                        [Assigned to the Hon. Maria A. Audero]
23

WALTON DECL. RE: MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF CLARK C. WALTON, ESQ.

I, CLARK C. WALTON, ESQ., hereby declare and state under penalty of perjury the following facts and opinions:

1. I am over the age of eighteen and not a party to the within action. I submit this Declaration in support of the Motion for Summary Judgment filed on behalf of Defendant JEREMY WHITELEY ("Whiteley"). I have personal knowledge of the following facts and, if called upon to testify, I can and will truthfully testify thereto.

2. I am the principal digital forensics expert for Reliance Forensics, LLC, based in Charlotte, North Carolina. Reliance Forensics is a highly experienced, specialized digital investigation and cybersecurity consulting firm (referred to herein as "Reliance Forensics" or "Reliance"). As its principal, I have conducted or overseen well over 1,750 digital investigations on behalf of legal counsel, corporate entities and individuals.

3. I was formerly employed as a cyber-threat analyst and technical project manager for the Central Intelligence Agency from 2000 through 2005. I currently teach digital forensic coursework several time per year to state and tribal judges and law enforcement officers at the National Computer Forensics Institute in Hoover, Alabama. I previously taught courses in Evidence and Cyber Crime at the Charlotte School of Law, and I have served as a graduate thesis adviser in the UNC Charlotte Department of Criminology. I have also taught computer forensics coursework at Champlain College based in Burlington, Vermont, as well as to U.S. military assets and federal law enforcement. I have an undergraduate degree from the University of North Carolina at Chapel Hill in Mathematical Sciences (Computer Science Option), and a law degree from Georgetown University Law Center. A true and correct copy of my current CV is included in the Index of Exhibits as Ex. 95.

4. I am a licensed North Carolina attorney in good standing. I am certified

by the North Carolina State Bar as a specialist in Privacy and Information Security Law and am a Certified Information Privacy Professional (CIPP/US). I was named the American Bar Association ("ABA") National Outstanding Young Lawyer for the 2012 bar year. I have substantial digital forensic, electronic discovery and evidentiary experience in both government and private practice, and I hold four current industry certifications in digital forensics.

5. On or about March 1, 2023, Reliance was contacted, and subsequently retained, by counsel to Defendants Katherine McNamara ("McNamara") and Jeremy Whiteley ("Whiteley") in this matter.

6. Reliance was initially provided with copies of the Complaint and Answer in the Matter and asked to provide digital forensic consulting services on behalf of McNamara and Whiteley (together, the "Clients") in respect of the allegations levied in the Complaint by the Plaintiff against the Clients.

7. I have been provided with documents bearing Bates stamps (beginning with one of these prefixes: "BCS," "CTRL," "DEF," and "DEFEXP") that I understand have been produced in this Matter, as well as various discovery responses I understand have been produced to Clients' counsel by BCS.

8. I also understand that there was an expectation, created in part by documents already produced, that BCS would produce to Clients' counsel additional documents containing what they will present as proof of the various digital intrusions alleged in the Complaint. Examples of some types of documents that may be produced, without limitation, are listed in a document that I have been provided titled "Appendix A to Plaintiff Breaking Code Silence's Response to Defendant Katherine McNamara's First Set of Interrogatories". Based on the evidence I have reviewed, Plaintiff has in fact, not produced such evidence.

9. I have also been provided with what is labeled as the "Jensen Forensic Report" and produced by BCS, Ex. 65 in the Index of Exhibits. This document does not appear to be a digital forensic report containing conclusions to a reasonable degree

of forensic certainty, as its title may imply, rather it contains a one-page narrative written by an employee of Plaintiff and dated March 14, 2022. Subsequent discovery has shown that this employee, while an IT professional, has no digital forensic training or experience. It is unclear if this is the reporting of the "forensic data privacy experts" whom BCS alleges that they engaged in paragraph 40 of the Complaint, or if there is other reporting and/or supplemental forensic data, separate and apart from the items discussed in paragraph 8 above in this Declaration, that was expected to have been produced but was not, bearing on the digital forensic investigation in the Matter. Typical data in that regard could include access logs, screen shots, forensic examiner notes, original emails, documents or text messages (including associated metadata, in each instance) bearing on access, results of any investigation such as IP (Internet Protocol) address tracing and/or correlation that occurred, and the like.

10. Generally speaking, evidence supporting allegations of exceeding authorized access or unathorized access to a data system may take the form of technical logs or other data collected and bearing on access to the system, as well as, if necessary, data such as IP address information potentially tying access logs to a person, subscriber, physical address, and so forth at a point in time. Such technical data collected would be critical to forming opinions regarding who accessed a particular system and when, as well as what actions that person potentially took when accessing such asset. For almost all of Plaintiff's allegations, no data in this regard appears to have been produced yet.

### Examination of Plaintiff's Online Accounts Purported to be at Issue

11. Under the observation of Plaintiff's counsel, Clients' counsel, and Clients, I was permitted with appropriate authority via Zoom to conduct an online review of various Plaintiff digital assets that they claim (or at least claimed at the time) were compromised by one or both Clients. This examination occurred remotely on June 26, 2023. The meeting was recorded by Zoom, and I have provided the entirety of such video to Clients' counsel, whom I understand have provided a copy

to counsel for Plaintiff.

12. In addition to the video recording, I also took over 340 screenshots of various account information, histories, and associated metadata to document my work (partly in the event the video recording failed, as the video file is only compiled as a file at the end of Zoom meetings) and, where possible, I downloaded "native" copies of various logs in the accounts to the extent such were available.

13. Plaintiff's online assets/accounts I examined on June 26, 2023 include, among others: (a) Google Search Console (a.k.a. Webmaster Central); (b) Google Admin Console; and (c) Google Analytics.

### Google Search Console (a.k.a., Webmaster Central)

14. I examined Google Search Console on June 26, 2023, by logging in using various administrative accounts of Plaintiff and examining the "properties" (i.e., a term of art here describing web domains or URLs) to which each account had access and the data retrievable for each property. (Google Search Console was previously known as Google Webmaster Central.)

15. My examination of Google Search Console for admin@breakingcodesilence.org showed that this account no longer has access to any of Plaintiff's properties, or for that matter any properties at all.

16. Mr. Jensen's account (jjensen) had access to only two properties, https://breakingcodesilence.org and https://www.breakingcodesilence.org.

17. Ms. Magill's account (Gmagill) had no access to Plaintiff properties in the Google Search Console.

18. Megan Hurwitt's account (mhurwitt) had access to one Plaintiff property Google Search Console, that was https://breakingcodesilence.org.

19. Noelle Beauregard's account (nbeauregard) had access to four BCS properties, https://breakingcodesilence.org, https://www.breakingcodesilence.org, http://breakingcodesilence.org and http://www.breakingcodesilence.org. Her account was the only one that at the time of inspection had access to all four properties at the

same time in Google Search Console. *See* Ex. 84 in the Index of Exhibits (Noelle2.png). Upon information and belief, it also appears that the access to the various properties has likely changed among the Plaintiff's administrative accounts since March 2022. I am further informed that Ms. Beauregard is no longer a volunteer for Plaintiff, although her administrative account continues to exist. Beauregard is a self-taught webmaster who admits having no qualifications relevant to forensic investigations.

20. The logs I observed in Google Search Console show that on March 12, 2022, iristheangel@gmail.com (the known Google account of Client McNamara) delegated ownership of two properties, https://breakingcodesilence.org and https://www.breakingcodesilence.org to jeremy@medtexter.com (the known email account of Client Whiteley). *See* Exs. 85-89 in the Index of Exhibits. Exhibits 85 (Jensen2.png), 86 (Jensen3.png), 87 (Jensen4.png), 88 (Jensen5.png), and 89 (Jensen6.png) are true and correct copies of screenshots that I personally took during my examination of Plaintiff's digital assets on June 26, 2023. Upon information and belief, this March 12, 2022 set of activity by McNamara occurred because she received a notification of unexpected activity on the breakingcodesilence.org domain indicating someone was attempting to take control of the breakingcodesilence.org domain on her Hover account, both of which I am informed she purchased and owns. As she did not want to lose control of the site, she then delegated access to Whiteley as a precautionary measure (which, as the logs show, Plaintiff subsequently removed) so that, upon information and belief, Whiteley could witness any alterations to the breakingcodesilence.org domain or the Hover account. Other than the delegation of authority to Whiteley the logs show no other actions by Whiteley or McNamara during that time period. No evidence exists that other than browsing into the Google Search Console webpage to view the strange additions and removals of permissions, Whiteley took any other actions with respect to the breakingcodesilence.org domain or BCS's website.

21. Upon my examination of the logs for these properties, logs were not available prior to March 11, 2022. During my investigation, I noted that some of that earlier activity was captured as a screenshot and uploaded to Slack by Noelle Beauregard. But for such screenshots, we do not know to what extent Plaintiff had access to and/or properly preserved historical logs (i.e., for the trailing year) prior to that timeframe. Such logs may have been available at an earlier time when litigation was either contemplated or pending and were permitted to spoil by Plaintiff.

22. Beyond my inspection and review, I am aware of several "fuzzy" screenshots submitted by Plaintiff bearing on the allegations related to the Google Search Console for the breakingcodesilence.org domain - and the allegation by Plaintiff that one or more Clients somehow submitted a de-indexing request for the Plaintiff web site on or about March 9 or 10, 2022. One such screenshot, BCS_0573687, is difficult to read, but appears to document numerous errors with indexing Plaintiff web pages submitted to Google, presumably legitimately by Plaintiff, including two URL's marked "noindex" - *meaning the party submitting the site to Google specified that such website not be indexed by Google.* The submitting party could have specified the main BCS web page was not to be indexed, which would effectively have prevented the entire site from being indexed in Google. This would amount to more likely an "unforced error" by Plaintiff in administering their property as opposed to any nefarious activity by Clients.

23. Beyond Plaintiff's own speculation, I am unaware of any proof that Plaintiff has put forward showing who may have submitted the alleged Google deindexing request or has refuted that the de-indexing was possibly triggered automatically due to issues with Plaintiff's web site. Notably, in my review of the property https://www.breakingcodesilence.org, I learned that on March 7, 2022, several "broken" site maps were submitted to Google that could not be fetched. *See* Exs. 90 and 91 in the Index of Exhibits. Exhibits 90 (Jensen60.png) and 91 (Jensen61.png) are true and correct copies of screenshots that I personally took during

my examination of Plaintiff's digital assets on June 26, 2023.

24. As I understand it, these submissions were made a day or two prior to the alleged de-indexing request. Broken sitemaps can cause substantial issues in attempting to index a web site and may have triggered an automated Google response. The sitemap issues do not appear to have been corrected until March 12, 2022.

25. Issues seem to persist with Plaintiff's web site. In fact, as of July 10, 2023, there appeared to be no sitemap in the publicly available "robots.txt" file in the property web site, which would tell a search engine "bot" (an automated piece of code crawling the Internet for purposes of search engine indexing) how to index the website. My examination on June 26, 2023, showed over 40 "alerts" for the property, the majority of which appeared to be unread or unopened until the time of my examination, dating back to the time period of the alleged de-indexing. I make the observation, based on the foregoing, that Plaintiff seemed and seems to put a low level of effort into properly maintaining its web site's search engine optimization ("SEO") and investigating issues associated with SEO.

26. Finally, related to Plaintiff's allegation that Clients submitted the deindexing request, it is unclear whether Plaintiff attempted to obtain additional information regarding the de-indexing request from Google, such as the login IP address of the account associated with the request, that could have provided more information about the identity of the requestor. If they indeed failed to collect that information, it has almost certainly spoiled with the passage of time (now well over one year ago).

### Google Admin Console

27. Here again there is a vague accusation by Plaintiff that one or more Clients may have accessed Plaintiff's Google Admin console on or before March 31, 2022. Upon information and belief, after McNamara's resignation in December 2021, only Vanessa Hughes and Jenny Magill had administrative access to the Google Admin Console. If Plaintiff's current accusation is that one or more Clients "hacked"

one of those two administrative accounts, I have seen no evidence bearing on such allegation produced by Plaintiff, and my review of the Google Admin Console did not show any proof thereof.

28. I did download and review the available administrative event log ("Google Admin Log Events.csv", a true and correct copy is Ex. 102 in the Index of Exhibits and bears the Bates stamp DEFEXP-000008) and user log ("User log events.csv", a true and correct copy is Ex. 103 in the Index of Exhibits and bears the Bates stamp DEFEXP-000087). In each case these only go back six months from the time period of my examination. It is unknown whether Plaintiff properly collected and preserved these logs that would cover the relevant time period (prior to March 31, 2022), or if Plaintiff allowed those records to spoil. To my knowledge, Plaintiff has not separately produced any such logs or records in this litigation.

29. It is possible that Plaintiff is conflating access to the Google Admin Console with Google Drive. I am aware of the document BCS_0751998 (Ex. 100 in the Index of Exhibits), which shows that a valid Plaintiff Google account shared a folder with McNamara's personal Google account on December 13, 2021, after McNamara's separation from Plaintiff, and McNamara downloaded it. This appears to be a series of valid Google transactions, however, unless there is some allegation by Plaintiff that Client McNamara "hacked" the valid Plaintiff account shown.

30. I am aware of one other document, BCS_0751994 (Ex. 101 in the Index of Exhibits), which shows McNamara viewing a publicly available document in Google Drive after her separation. Note that I only state the above two examples of what appear to be McNamara's valid access to Google Drive assets for completeness. To be clear, and to a reasonable degree of technical certainty, *I am truly at a loss for what Plaintiff is claiming is unauthorized access or exceeding authorized access to either its Google Admin Console or Google Drive.*

**Google Analytics**

31. I also examined the Plaintiff's Google Analytics (a.k.a., Google Site Kit)

account. I examined the change history in the account for potential actions taken by Clients after their separation from Plaintiff. I took over 25 screenshots documenting these logs, for ease of the reader I do not attach all here, but rather summarize the entries relevant to Clients:

    a.    June 30, 2021 - Whiteley granted access to McNamara as he was resigning; and

    b.    August 18, 2021 - Client McNamara removed Whiteley's access, and also granted access to fellow board members Vanessa Hughes and Jenny Magill.

32. Approximately three months after McNamara resigned from Plaintiff, on March 6, 2022, Magill's account removed McNamara's access to Google Analytics.

33. There appear to be no accesses by either Client after their separation. As with other accounts, it is unclear exactly what Plaintiff is claiming was accessed without, or in excess of, authorizations, but in my professional opinion to a reasonable degree of forensic certainty there is no evidence of access to this asset by either Client post-separation.

34. Notably, in my review of the Google Analytics account, there appears to be no tracked web traffic listed on the Plaintiff web site between early March to March 31, 2022. This would be indicative of some type of issue interfering with the website's ability to send tracking information to Google Analytics. I am aware of the existence of an email dating to April 13, 2022, where Beauregard admits to Jensen that she accidentally deactivated a Google plugin on the Plaintiff's WordPress website (which may have caused the issue). *See* Exs. 92-94 in the Index of Exhibits. Exhibits 92 (Jensen158.png), 93 (Jensen159.png), 94 (Jensen160.png) are each true and correct copies of screenshots that I personally took during my examination of Plaintiff's digital assets on June 26, 2023.

35. I have reviewed the deposition testimony of Jesse Jensen in this matter, which upon information and belief occurred on Friday, April 14, 2023 (the "Jensen Deposition") (Ex. 48 in the Index of Exhibits). Page and line references to the Jensen

1 | Deposition herein refer to Ex. 48.

2 |      36. From a technical perspective, many of Mr. Jensen's assertions are concerning. Jensen appears to confidently assert that he is qualified to be a "forensic data privacy expert" (*See*, e.g., Jensen Deposition at page 31, line 20 through page 32 line 6).

     37. Respectfully, there is no such thing as a "forensic data privacy expert". I have been involved in information security for over twenty years, including as a "digital forensic expert" and as a "data privacy expert". I have never heard of a "forensic data privacy expert" during my career, and indeed a Google search for the phrase at the time yielded zero results across the entire Internet.

     38. It is possible either Mr. Jensen or Plaintiff's counsel has conflated these two concepts in styling this designation. As someone who has been designated and credentialed as an expert in both fields, this is concerning regarding whether the individual has such expertise in either field.

     39. More accurately I believe what Mr. Jensen believes he conducted in this Matter would be characterized as "incident response", i.e., the response of information security professionals to a security incident or a "breach". This is typically geared toward halting and remediating information security issues, rather than performing a forensic investigation of an incident. I see nothing in Mr. Jensen's responses in this Matter, nor his stated training, experience or certifications that would qualify as true digital forensic or data privacy work.

     40. Mr. Jensen does not appear to have any formal training or certifications in either field and appears to be ignorant of the training and certification options and frameworks available to obtain knowledge and expertise. Moreover, when questioned on the subject he tended to belittle any such training or certifications as already "obsolete" when presented, and not "credible" (*see* pages 35-37 of Jensen Deposition).

     41. His statements here are simply untrue. In the digital forensic field, there are numerous "vendor specific" (related to certain forensic tools) and "vendor

agnostic" certifications that enjoy widespread credibility and demonstrate capability in expertise (for example I presently hold four such "vendor specific" certifications). There are likewise several international organizations, and numerous conferences, dedicated to developing expertise, knowledge sharing and improving the field. For one such forensic tool vendor, Cellebrite, I am an instructor for judicial courses at the National Computer Forensics Institute in Hoover, Alabama (outside of Birmingham).

42. In the data privacy field, there is, for example and without limitation, the International Association of Privacy Professionals (www.iapp.org), that is a recognized authority in credentialing and training for proficiency in a variety of privacy disciplines both in the United States and internationally. My own state bar in North Carolina recognizes the IAPP's Certified Information Privacy Professional/US (a certification in US data privacy and cross-border regulatory concepts) as a predicate to obtaining the North Carolina State Bar's "specialist" designation in Privacy and Information Security Law. In the interest of full disclosure, I am a member of the IAPP, hold a current CIPP/US certification, and sit on the board for the NC State Bar Privacy and Information Law specialization.

43. The document bearing Bates stamp DEFEXP-000132, Ex. 79 in the Index of Exhibits, is a true and correct copy of a screenshot I personally captured during my inspection of BCS's digital assets on June 26, 2023. It shows part of the ownership history (specifically events on March 11, 2022) of the Google Search Console for the "property" https://breakingcodesilence.org. By way of guiding the reader how to review such history, this exhibit shows verification of the "mhurwitt" user account, a failure to delete verification of "iristheangel@gmail.com" (Client McNamara), and ownership delegation of such property by "jeremy" (Client Whiteley).

44. The document bearing Bates stamp DEFEXP-000169, Ex. 80 in the Index of Exhibits, is a true and correct copy of a screenshot I personally captured during my inspection of BCS's digital assets on June 26, 2023. Similar to Exhibit 79,

it shows part of the ownership history (events from September 25, 2021 through March 11, 2022) of the Google Search Console for a different "property", https://www.breakingcodesilence.org. It shows various actions of users Hurwitt and Client Whiteley.

45. The document bearing Bates stamp DEFEXP-000170, Ex. 81 in the Index of Exhibits, is a true and correct copy of a screenshot I personally captured during my inspection of BCS's digital assets on June 26, 2023. It shows a continuation of the history described in paragraph 44 for the "property" https://www.breakingcodesilence.org, but for May 25, 2021, through September 22, 2021. Each of these entries represent actions/entries regarding Client Whiteley's account.

46. The document bearing Bates stamp DEFEXP-000181, Ex. 82 in the Index of Exhibits, is a true and correct copy of a screenshot I personally captured during my inspection of BCS's digital assets on June 26, 2023. It shows a listing of the "sitemaps" submitted in the Google Search Console for the "property" https://www.breakingcodesilence.org. All sitemaps depicted in this screen shot where submitted to Google between March 7 and March 12, 2022 (only one of them was submitted after March 7).

47. I am aware that around the time of the alleged deindexing, BCS requested that Google not "index" certain pages of its website. In connection with BCS's investigation, Beauregard took a screenshot of a "submitted URL marked noindex" error. That screenshot (which appears in the Memorandum of Points and Authorities and is Ex. 1 in the Index of Exhibits)) is reproduced below, and I understand that it has been authenticated by Beauregard as she is the one who captured the image.

[Screenshot of Google Search Console showing: Error 11 (3 issues), Valid with warnings 0, Valid 936, Excluded 6.64K. Details table showing three error rows: "Submitted URL marked 'noindex'" - Not Started - 7 pages; "Redirect error" - Not Started - 3 pages; "Submitted URL seems to be a Soft 404" - Not Started - 1 page.]

48. The error shown in Ex. 1 indicates that someone at BCS had submitted a WordPress command that was marking webpages as "noindex" while making changes to the website. Similar to a deindex request, marking a webpage as "noindex" through WordPress also tells Google not to include certain webpages on Google Search.

49. The only people that could have inserted an HTML "no index" tag on a page of BCS's website are people with access to BCS's WordPress account.

WALTON DECL. RE: MOTION FOR SUMMARY JUDGMENT

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 20th day of November 2023 and executed in the State of North Carolina and under the laws of the State of California.

_____
CLARK C. WALTON, ESQ.

## CERTIFICATE OF SERVICE

I hereby certify that on this _22_ of November, 2023, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

/s/ Helene Saller
Helene Saller