

1  Dirk O. Julander, Bar No. 132313
   doj@jbblaw.com
2  Catherine A. Close, Bar No. 198549
   cac@jbblaw.com
3  M. Adam Tate, Bar No. 280017
   adam@jbblaw.com
4  JULANDER, BROWN & BOLLARD
   9110 Irvine Center Drive
5  Irvine, California 92618
   Telephone: (949) 477-2100
6  Facsimile: (949) 477-6355

7  Attorneys for Defendants
   KATHERINE MCNAMARA and
8  JEREMY WHITELEY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREAKING CODE SILENCE, a California 501(c)(3) nonprofit,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE MCNAMARA, an Individual; JEREMY WHITELEY, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:22-cv-002052-SB-MAA<br><br>**DECLARATION OF BRIAN BERGMARK, MBA, CPA, ABV, ASA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>Date: January 2, 2024<br>Time: 10:00 a.m.<br>Crtrm: 690<br><br>[*Assigned to the Hon. Maria A. Audero*] |

# DECLARATION OF BRIAN BERGMARK

I, BRIAN BERGMARK, hereby declare and state under penalty of perjury the following facts:

1.  I am over the age of eighteen and not a party to the within action. I submit this Declaration in support of the Motion for Summary Judgment filed on behalf of Defendant JEREMY WHITELEY ("Whiteley"). I have personal knowledge of the following facts and, if called upon to testify, I can and will truthfully testify thereto.

2.  Since issuing my initial report dated April 3, 2023 ("Initial Report") and supplemental report dated July 10, 2023 ("Supplemental Report"), although other aspects of my background have not changed, Torrey Partners has joined Stout, where I am Managing Director. Similar to Torrey Partners, Stout provides services related to business valuation, financial disputes, claims, and investigations. In addition, Stout is a global investment bank and advisory firm offering a broad range of corporate finance, accounting and transaction advisory services, A true and correct copy of my updated CV is Exhibit 96 in the Index of Exhibits.

3.  I am licensed in the State of California as a Certified Public Accountant. I am accredited in Business Valuation by the American Institute of Certified Public Accountants and as a Senior Appraiser by the American Society of Appraisers. I attended the University of California at Los Angeles (Bachelor of Science, Economics-Systems Science graduate), and San Diego State University (Master of Business Administration, emphasis in Finance).

4.  I have extensive experience providing business analysis and qualified testimony on complex business, wage loss, wage and hour, economic, valuation, and marital dissolution matters in Federal and State Superior Courts. The scope of my involvement in litigation matters includes discovery assistance, causation analysis, damage quantification and forensic accounting / fraud investigations.

5. I have been retained on behalf of Katherine McNamara ("McNamara") and Whiteley, (collectively referred to as "Defendants") to evaluate the economic damages claims of Breaking Code Silence ("BCS" or "Plaintiff") related to the alleged actions of the Defendants.

6. My CV, Ex. 96 in the Index of Exhibits, also includes a list of my deposition, arbitration, and trial testimony since November 2020.

7. My rate for analysis and testimony is $450 per hour. I bill for my Firm's services on an hourly basis, and my fees are not dependent upon the results of this matter.

8. In connection with my continuing review and analysis, I have considered, reviewed, and relied upon materials and information that may be cited directly in this report and include without limitations: deposition excerpts from Bobby Cook, Noelle Beauregard, William Boyles, Jr., Jesse Jensen, and Vanessa Hughes, Ph.D.; Plaintiff's responses to various interrogatories and admissions; BCS's organizational budget planning and salary documents; banking documents including with Alpine Bank, US Bank, and PayPal, and various Facebook messages and emails.

9. BCS claims that it has suffered damages related to "investigating the Defendants' wrongful conduct and hiring forensic experts, lost business opportunities and monetary donations, and disclosure of misleading information to the public."

10. I have been asked to address the Plaintiff's claims related to potential economic loss resulting from the alleged actions of the Defendants. I understand that BCS is claiming economic damages associated with its claims in this matter including time spent investigating the Defendants' alleged conduct and hiring forensic experts, lost business opportunities and monetary donations, and disclosure of misleading information to the public. Upon receipt of BCS's economic damages analysis and report, I expect to prepare a supplemental rebuttal analysis and report

addressing BCS's specific claims. At this time and based on the information provided to me to date, it is my opinion that I have seen no evidence that BCS incurred any damages associated with the claims in this matter. The following is a summary of my observations supporting this opinion.

11. In order to establish any potential economic loss claim, BCS must establish that Defendants in this matter acted inappropriately. My opinions do not address these liability claims, rather they are only relevant if liability is established, or for the purpose of determining whether Plaintiff meets the statutory requirements regarding economic harm to bring a civil action against Defendants for unauthorized access or exceeding authorized access of a BCS computer.

12. Related to BCS claims related to excess time associated with the investigation of the claims:

    a. To establish damages related to this issue BCS must establish that additional costs were incurred. Accordingly, it must first establish that additional effort took place related to the claims, then that those resulted in additional expenses to BCS. Although I understand BCS has identified various employees, volunteers, agents, and lawyers who spent time to investigate the issues associated with BCS's claims, at this time, I have not been provided with any testimony or documents that establish that time was related to the investigation or in excess of time that would have normally been incurred.

    b. I understand that BCS "is a charitable organization classified as a 501(c)(3) that is run by volunteers" and that it "is unable to quantify the monetary value of the amount of time Plaintiff's employers and/or representatives, including Plaintiff's lawyers." If all of the time spent was performed by volunteers or done by lawyers on a pro bono basis and BCS did not have to pay any related costs, there is no resulting damage to BCS.

13. Related to BCS claims related to excess time associated with the investigation of the claims:

a. Bobby Cook, who performed services for BCS as scheduling coordinator, Chief Communications Officer, and Chief Operating Officer, testified that he was not paid for his work at BCS. Mr. Cook further testified that he was not aware of BCS paying any money to do an investigation into the alleged cyber hacking and that everyone at BCS was an unpaid volunteer. Additionally, Mr. Cook testified that the only expert brought on for the investigation was Mr. Jesse Jensen. Mr. Jensen testified as a Person Most Qualified for BCS that he was the only person that BCS engaged as a forensic data privacy expert.

b. Noelle Beauregard, who performed services for BCS as Director of Front End Web Development and Chief Communications Officer, testified that she was not paid for work at BCS.

c. William Boyles, Jr., a board member of BCS that performed other work with social media and technology projects, testified that he was never paid for work at BCS.

d. Vanessa Hughes, Ph.D., BCS's President, testified as Person Most Qualified for BCS that she was unsure if BCS spent any money on investigations related to various BCS accounts including Google Drive, Google AdWords, Twitter, Hootsuite, Zotero, Instagram, Facebook, YouTube and TikTok. Additionally, Mr. Jensen testified that he was not aware of BCS spending any money related to investigations of BCS accounts including AdWords, Zotero, Instagram, Facebook, and YouTube.

14. Related to other expenses incurred by BCS:

a. Ms. Beauregard testified that she was not aware of BCS paying any money related to an investigation.

b. Mr. Jensen testified that BCS lost hours of volunteer time but there was "no cash cost." Mr. Jensen further testified that there was a "cost of the efforts to recover the domain…[which] we're doing right now" and that "we bled a lot of other resources, but I don't know that we bled much cash."

15. Related to lost business opportunities:

    a. Mr. Cook further testified that the only loss was a "$70 million endorsement value of Paris Hilton['s] support," but that was related to an "organizational split that was partly headed up by Rebecca Mellinger, Caroline Cole and Jeremy [Whiteley] and Katie [McNamara]." Mr. Boyles, Jr. testified that Ms. Hilton "offered to fund [Caroline] Cole's work in particular…on legislation to the tune of something like 100- or $150,000" and that Dr. Hughes "responded with a proposed budget that was about an order of magnitude higher." Mr. Cook and Mr. Boyles Jr. provide no support for the values they attribute to Ms. Hilton.

    b. Dr. Hughes testified that the loss of the BCS Twitter account was worth approximately $75 million "alone of advertising" and "would guess a minimum of probably 7- to $10,000 in donations, if not significantly higher." Dr. Hughes references Rebecca Mellinger telling her that funding that had previously been promised would no longer be coming to BCS related to a federal legislative bill. Dr. Hughes testified that she did not recall Ms. Mellinger ever mentioning the alleged hacking incidents. To date, I have not seen any support for the basis of Dr. Hughes' valuations. Should additional relevant information regarding these valuations become available, I reserve the right to further supplement my opinion.

16. Related to potential lost donations:

    a. Mr. Cook testified that BCS was "reached out to by a Jewish Foundation in San Diego…stating that they had mailed us a check that we had never received or never deposited, and they needed a current address to mail that to."

    b. Ms. Beauregard testified that she was told that BCS was not registered with the Attorney General's office in California which would prevent BCS from legally accepting donations. Mr. Boyles Jr. additionally testified that he has been told that BCS was not legally able to accept donations.

    c. Ms. Beauregard further testified that the website was de-indexed "the day of or the day after the show on "The Doctors" on the 10th" and was re-

1  indexed prior to the "Cruel Intentions" show on the 12th." Additionally, Ms.
2  Beauregard testified that she was not aware of BCS losing any money related to the
3  de-indexing or hearing anybody at BCS state that they lost donations related to the
4  de-indexing.

5        d.    Dr. Hughes testified that BCS has been unable to transfer
6  donations made through Facebook to the BCS bank account related to Mr. Whiteley
7  not returning the financial administrator account log in. US Bank Statements for
8  BCS's Non-Profit Checking Account 157522095809 show electronic deposits from
9  Facebook payments beginning July 6, 2021, through January 4, 2022, totaling
10 $4,520.67.46 Additionally, Mr. Whiteley's access to the Facebook Business Page
11 for BCS was revoked on June 28, 2021.

12    17.    Related to other expenses incurred by BCS: to date no information has
13 been provided regarding specific expenses related to experts hired or other potential
14 costs incurred related to the alleged actions of the Defendants.

15    18.    Related to lost business opportunities: no specific business
16 opportunities have been identified as being lost due to the alleged actions of the
17 Defendants.

18    19.    Related to potential lost donations:

19        a.    BCS claims that it has lost potential donations related to the de-
20 indexing of its website. It is unclear over what time period that potential deindexing
21 occurred and BCS has not identified any specific donations that it has lost. Further,
22 the documents provided indicate that donations received by BCS are sporadic in
23 nature and it would be speculative to assume that the de-indexing over a discrete
24 period of time would result in any loss of donations.

25        b.    PayPal transaction records indicate that from June 19, 2021,
26 through March 9, 2022, the day prior to BCS's claim that its website received zero
27 traffic as a result of the de-indexing, BCS averaged approximately $37.62 per day in
28 donations and $6.59 per day in subscriptions. The PayPal records further indicate

that in that same period BCS received a donation or subscription on 59 days out of a total of 264 days, or approximately 22 percent of total days. From March 7, 2022, through March 11, 2022, BCS did not receive any donation or subscription payments. On March 12, 2022, BCS received four separate donations totaling $170.23 There is no evidence that any of the days with no donations or subscriptions received were the result of the alleged actions of the Defendants or just the result of the normal variability in donations received.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 20th day of November 2023 and executed in the State of California and under the laws of the State of California.

_____
BRIAN BERGMARK

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22 of November, 2023, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

*/s/ Helene P. Saller*
Helene P. Saller