1  JOHN S. GIBSON (SBN 140647)
   *john.gibson@us.dlapiper.com*
2  JASON T. LUEDDEKE (SBN 279242)
   *jason.lueddeke@us.dlapiper.com*
3  **DLA PIPER LLP (US)**
   2000 Avenue of the Stars
4  Suite 400 North Tower
   Los Angeles, California 90067-4735
5  Tel:   310.595.3000
   Fax:   310.595.3300
6
   Attorneys for Plaintiff
7  BREAKING CODE SILENCE

8             **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11  BREAKING CODE SILENCE, a           CASE NO.  2:22-CV-002052-SB-MAA
    California 501(c)(3) non-profit,
12                                     Hon. Maria A. Audero
                  Plaintiff,
13                                     **PLAINTIFF BREAKING CODE**
                                       **SILENCE'S OPPOSITION TO**
14        v.                           **DEFENDANT JEREMY**
                                       **WHITELEY'S MOTION FOR**
15  KATHERINE MCNAMARA, an             **SUMMARY JUDGMENT OR IN**
    individual, JEREMY WHITELEY, an    **THE ALTERNATIVE PARTIAL**
16  individual, and DOES 1 through 50, **SUMMARY JUDGMENT**
    inclusive,
17                                     Date:  April 17, 2024
                  Defendants.         Time:  9:30 a.m.
18                                     Courtroom:  880

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
WWW.DLAPIPER.COM

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

# **<u>TABLE OF CONTENTS</u>**

**Page**

I.    INTRODUCTION .................................................................................5

II.    RELEVANT FACTS ...........................................................................6

    A.    The Parties Form BCS and Establish its Website for BCS Use ..........6

    B.    Whiteley and McNamara Resign from BCS on Hostile Terms...........7

    C.    McNamara Forms Unsilenced, a Competing Organization, and Whiteley Becomes a Member .................................................................8

    D.    BCS Expects to Receive Significant Donations from Being Featured on Television and in a Film in March 2022.........................8

    E.    The Website is Deindexed, and Whiteley and McNamara Access the BCS Console in March 2022 ........................................................9

    F.    The Deindexing Causes BCS Significant Harm ...............................10

    G.    Defendants Continue Attacking BCS After It Files this Lawsuit......11

III.    LEGAL STANDARD .......................................................................11

    A.    Motion for Summary Judgment .......................................................11

    B.    CFAA and CDAFA.........................................................................12

IV.    LEGAL ARGUMENT ......................................................................13

    A.    Whiteley Fails to Shift the Evidentiary Burden to BCS ...................13

    B.    Factual Disputes Exist as to Whether Whiteley Intentionally Accessed the BCS Console Under the CFAA ..................................14

        1.    There is Sufficient Circumstantial Evidence that Whiteley Deindexed the Website ....................................................14

        2.    Whiteley's Deindexing Arguments Create Disputed Facts.....16

    C.    Factual Disputes Exist as to Whether Whiteley's Access was Unauthorized Under the CFAA ........................................................19

        1.    McNamara Does Not Own the .Org Domain .........................19

        2.    Whiteley's Subjective Belief that McNamara Owned the .Org Domain is a Question of Fact ..........................................21

    D.    Factual Disputes Exist as to Whether Whiteley's Access Caused BCS at Least $5,000 Worth of Loss Under the CFAA....................22

        1.    Lost Donations................................................................23

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

2.    BCS' Investigation.................................................................24

V.    CONCLUSION ............................................................................26

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................. 13, 16

*Apple Inc. v. NSO Grp. Techs. Ltd..*,
    2024 WL 251448 (N.D. Cal. Jan. 23, 2024) ......................... 24, 25, 27

*Bryant v. Gallagher*,
    2016 WL 739481 (E.D. Cal. Feb. 18, 2016) ................................... 23

*Cisco Sys., Inc. v. Stmicroelectronics, Inc.*,
    2015 WL 3488923 (N.D. Cal. June 2, 2015) .................................. 18

*Dominguez-Curry v. Nevada Transp. Dep't*,
    424 F.3d 1027 (9th Cir. 2005) ....................................................... 15

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) ....................................................... 25

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
    771 F.3d 1119 (9th Cir. 2014) .................................................. 12, 13

*Hidden Empire Holdings, LLC v. Angelone*,
    2022 WL 17080131 (C.D. Cal. Sept. 30, 2022) ............................ 21

*Int'l Bhd. Of Teamsters Loc. 651 v. Philbeck*,
    464 F. Supp. 3d 863 (E.D. Ky. 2020) ............................................ 21

*Kimberlite Corp. v. Does*,
    2008 WL 2264485 (N.D. Cal. 2008) .............................................. 25

*LVRC Holdings, LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) ..................................... 12, 16, 19, 20

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ......................................... 14

*Miller v. Glenn Miller Prods.*,
    318 F. Supp. 2d 923 (C.D. Cal. 2004) ........................................... 13

3

*Nelson v. Davis*,
    571 F.3d. 924 (9th Cir. 2009) ................................................................. 13, 19

*Olson v. Dias*,
    2010 WL 3787113 (N.D. Cal. Sept. 24, 2010) ...................................... 14

*Salinas v. Cornwell Quality Tools Co.*,
    2022 WL 3130875 (C.D. Cal. June 10, 2022) ...................................22, 23

*Smith v. County of Sacramento*,
    2023 WL 6387149 (E.D. Cal. Sept. 29, 2023) ............................... 13, 14

*Svanaco, Inc. v. Brand*,
    417 F. Supp. 3d 1042 (N.D. Ill. 2019) ................................................... 26

*U.S. v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016) ........................................................ 20, 21

*United States v. Middleton*,
    231 F.3d 1207 (9th Cir. 2000) ............................................ 25, 26, 27

*United States v. Millot*,
    433 F.3d 1057 (8th Cir. 2006) ............................................................... 25

*United States v. Sablan*,
    92 F.3d 865 (9th Cir. 1996) ................................................................... 25

*Van Buren v. U.S.*,
    141 S.Ct. 1648 (2021) ............................................................................ 21

**Statutes**

18 U.S.C. § 1030 ............................................................................... 13, 24

Cal. Penal Code § 502(e) ...................................................................... 14

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

# I.    <u>INTRODUCTION</u>

The central factual question to be decided in this case is whether Defendants Katherine McNamara and Jeremy Whiteley accessed Plaintiff Breaking Code Silence's ("BCS") electronic system and deindexed its website from Google on March 9, 2022, damaging BCS.[1]  Despite Defendants' self-serving declarations stating they did not do it, there is a wealth of strong circumstantial inculpatory evidence that Defendants (including Whiteley) did it.  This evidence—including Defendants' expert's conclusion that even he cannot identify the culprit—coupled with reasonable inferences the Court should make in BCS' favor at this stage, establish that there is a factual dispute for the jury as to whether Defendants did it.  Thus, the Motion should be denied.

The critical timing and effect of the deindexing was significant.  On March 10 and 12, 2022, BCS received widespread publicity from being featured on *The Doctors* show and in the Lifetime movie, *Cruel Instruction*.  BCS reasonably expected to receive significant donations from this publicity—commensurate with a comparable, but lower-publicity, media event in 2021 that generated a significant increase in donations.  However, because of the March 9 deindexing, traffic to its website plummeted, and as a result, BCS received only a fraction of the donations it expected to receive.

Suspiciously, on March 11, right in the middle of this period, Whiteley and McNamara—former BCS members who left on hostile terms and joined Unsilenced, a rival organization—together accessed BCS' system months after they quit BCS.  In so doing, Whiteley circumvented BCS' system protections by obtaining and using requisite ownership permissions.  After BCS found them out, McNamara delegated Whiteley ownership permissions *23 times* over the next 21 hours, reinstating them

---

[1] If a website is deindexed, it will not appear in a Google search.  For instance, a search on Google for "Breaking Code Silence" would not yield a hit for BCS' website.

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S MOTION FOR SUMMARY JUDGMENT

every time BCS deleted them.  Whiteley has provided no credible explanation for his indisputable unauthorized access on March 11.  The Court should reasonably infer that he also accessed BCS' system without authorization and caused the deindexing on March 9.

When viewing the evidence in the light most favorable to BCS (as it must be), the reasonable inference to be drawn in BCS' favor (as it must be) is that Whiteley, the moving party, deindexed the website.  Indeed, the evidence establishes that Whiteley had motive, access, and the technical knowledge to do it.  He has a tumultuous history with BCS (he is suing BCS in another lawsuit) and aligned himself with McNamara, who has admitted to engaging in other vindictive cyber activities against BCS.  He accessed BCS' system two days earlier on March 11.  And he has extensive experience in information technology and even helped establish BCS' electronic infrastructure.  Tellingly, McNamara did not file a motion herself, perhaps telegraphing her view that significant factual disputes exist.

Whiteley's Motion improperly flouts basic summary judgment principles that dictate it be denied.  He asks the Court to: (1) believe his version of facts over BCS' (i.e., "I didn't do it") and weigh the evidence in his favor, (2) make credibility determinations as to his state of mind, and (3) ignore or unduly discount issues that the jury could resolve in BCS' favor, such as the amount of loss BCS suffered from the deindexing.  Thus, the Court should deny summary judgment.

## II.   RELEVANT FACTS

### A.   The Parties Form BCS and Establish its Website for BCS Use.

In March 2021, Vanessa Hughes, Jennifer Magill, McNamara, and Whiteley incorporated BCS as a nonprofit organization and served as Board members. Defendants' Material Facts ("DMF") 15, 16.  All members are unpaid volunteers. Magill Decl. ¶ 3.

McNamara is "well-known in the cybersecurity field," is "considered a subject matter expert," and "holds over 30 industry certifications."  Plaintiff's

1  Material Facts ("PMF") 1.  Whiteley "also has extensive experience in information
2  technology."  PMF 2.

3       BCS relies primarily on grants and donations to sustain its operations.  Magill
4  Decl. ¶ 4.  BCS thus engages in a variety of outward-facing initiatives to raise its
5  profile within the community to help more survivors and reach more donors, who
6  are critical to its continued mission.  *Id.*

7       In March 2020, before BCS' incorporation, McNamara purchased
8  breakingcodesilence.org (".Org Domain").  DMF 12.  Since activists with whom she
9  was working had already purchased breakingcodesilence.net, she purchased the .Org
10 Domain to use for advocacy efforts and to prevent third-parties from purchasing it.
11 PMF 3.  Since then, she has housed the .Org Domain on her domain registrar
12 account (Hover) and paid for its renewal three times.  DMF 13, 19.

13      The .Org Domain has routed to BCS' website ("Website") since it was
14 established.  DMF 21; PMF 4.  As a result, BCS is able to access domain-related
15 services and Google services through its Google account, including the Google
16 Search Console ("Console"), which allows users to view how their website interacts
17 with Google.  DMF 23; Dkt. 152-4 ("McNamara Decl.") ¶ 37.

18      The Website bears BCS' name, branding, and trademark, and has been used
19 exclusively by BCS since its creation.  PMF 5, 6.  BCS uses the Website as its
20 principal means of communicating with and receiving donations from the
21 community.  PMF 7.

22     **B.**    **Whiteley and McNamara Resign from BCS on Hostile Terms.**

23      On June 26, 2021, Whiteley resigned from BCS amid significant conflict
24 between him and other BCS members.  DMF 24.  Upon his resignation, his
25 electronic access credentials to BCS accounts were revoked.  DMF 25.

26      McNamara feared he would retaliate against BCS.  PMF 8.  McNamara
27 accused Whiteley of "threats, extortion, or blackmail," "abusive behavior," and of
28 "encourag[ing] sabotage" of BCS.  PMF 9.

1   Specifically, McNamara had "a feeling he is going to nuke the website" and

2   "could find some backend way to get [the Website] off the host."  PMF 10, 13.

3   McNamara even attempted to prepare for Whiteley's adverse action by asking the

4   other members, "So if Jeremy somehow takes down the site, we can have it back up

5   with new hosting quickly, right?"  PMF 11.

6   On December 9, 2021, McNamara resigned from BCS amid her own hostile,

7   irreconcilable conflict with other BCS members.  DMF 30.  Upon her resignation,

8   her electronic access credentials to certain BCS accounts were revoked.  DMF 31;

9   McNamara Decl. ¶¶ 27-28.

10   **C.      McNamara Forms Unsilenced, a Competing Organization, and**

11   **Whiteley Becomes a Member.**

12   After resigning from BCS, McNamara was involved in forming Unsilenced, a

13   rival BCS organization.  PMF 14.  Thereafter, Whiteley became a member of

14   Unsilenced.  PMF 15.  At least as early as February 2, 2022, Defendants were listed

15   as members of Unsilenced on its website.  PMF 18.  Despite their previous conflicts

16   while at BCS, Defendants now held roles at a rival organization.  PMF 16.

17   **D.      BCS Expects to Receive Significant Donations from Being Featured**

18   **on Television and in a Film in March 2022.**

19   On March 10, 2022, the television show *The Doctors* aired an episode

20   featuring an upcoming Lifetime film titled *Cruel Instruction*.  PMF 20.  The film,

21   which concerned the troubled teen industry, was scheduled to debut on March 12,

22   2022.  PMF 21.  BCS and its work were promoted in connection with the episode

23   and film.  PMF 22.

24   BCS expected to receive not only significant publicity, but also at least

25   $5,000 in donations, consistent with previous outward facing events.  PMF 23.  For

26   instance, in October 2021, BCS appeared with Paris Hilton (herself a survivor of

27   TTI abuse) in a press conference in Washington, D.C. to introduce the

28   Accountability for Congregate Care Act.  PMF 24.  In connection with the

8

conference, BCS also sponsored related fundraising events in furtherance of ending institutional child abuse. PMF 25. In connection with these activities, BCS received donations totaling over $10,000. PMF 26.

**E. The Website is Deindexed, and Whiteley and McNamara Access the BCS Console in March 2022.**

On March 9, 2022—three days before the premiere of the film—someone accessed the BCS Console and submitted a request to deindex the Website from Google Search. PMF 27. There is no direct evidence establishing who submitted the deindexing request. PMF 28.

On March 11, 2022—one day before the premiere—McNamara accessed the BCS Console. DMF 36. She claims she accessed it because she received a notification from Google "informing [her] that a BCS email address [she] did not recognize was added as an 'owner' to the" BCS Console, and she was "panicked" that someone was trying to "steal" the .Org Domain from her. DMF 35; McNamara Decl. ¶ 36.

McNamara did not contact BCS to inquire about the circumstances, or contact Google to report an alleged theft. *See* McNamara Decl. ¶ 36. Rather, she called Whiteley, who had not been a BCS member for nine months. Dkt. 152-5 ("Whiteley Decl.") ¶ 26.

McNamara then gave Whiteley ownership permissions to the BCS Console for the Website by adding his email address, jeremy@medtexter.com, as an "owner." DMF 36. Despite her technical expertise, McNamara claims she gave Whiteley ownership permissions so that he could "perhaps even explain to [her]" what was going on. McNamara Decl. ¶ 36. Whiteley allowed McNamara to use his email address to add him as an owner. DMF 36. "At McNamara's request," Whiteley then accessed the BCS Console. DMF 42; Whiteley Decl. ¶ 27. After logging in, Whiteley's diagnosis was that there appeared to be "weird things going on with the account." Whiteley Decl. ¶ 27.

1    On the same day, BCS discovered the deindexing issue while running test

2    Google searches related to a BCS promotion for the film.  Jensen Decl. ¶ 7.  The

3    Website did not appear on Google, and a search for BCS yielded an advertisement

4    for Unsilenced.  PMF 29, 30.

5    Upon investigating, BCS volunteers Megan Hurwitt and Noelle Beauregard

6    saw that Whiteley's jeremy@medtexter.com email address was listed as an owner of

7    the BCS Console.  PMF 31.  BCS deleted Whiteley from the BCS Console at

8    approximately 9:30 p.m. on March 11.  DMF 38; Magill Decl. Ex. K.  Fifteen

9    minutes later, McNamara delegated ownership permissions back to Whiteley using

10    her email address, iristheangel@gmail.com.  DMF 39.  Over the next 21 hours, BCS

11    volunteers (Beauregard, Hurwitt, Magill, Hughes, Bobby Cook, and Jesse Jensen)

12    and McNamara engaged in an online "battle" consisting of McNamara delegating

13    BCS Console ownership to Whiteley ***23 times***, and the BCS volunteers revoking

14    that delegation.  PMF 32, 33; DMF 39.  Eventually, the exchange ceased.

15    **F.    The Deindexing Causes BCS Significant Harm.**

16    During and after the March 11 exchange, six BCS volunteers, including

17    Jensen, worked to remedy the effects of the deindexing and intrusion.  PMF 42.

18    Jensen is a software engineer with significant experience in cybersecurity issues,

19    and has conducted at least four forensic investigations in the past.  PMF 34, 35.

20    Beginning on March 11, Jensen worked through the night until late afternoon

21    March 12 (the date of the film premiere) to reindex the Website.  PMF 36, 45.  The

22    reindexing likely did not take effect until at least a day later, after the film

23    premiered.  PMF 46.  Jensen also engaged in other remedial significant measures,

24    including monitoring and securing BCS' system against future intrusions.  PMF 37-

25    39.  He estimates he spent 130 hours on the foregoing and related tasks, and his

26    hourly rate for similar work is $250 per hour (or $9,000 on a project basis).  *Id.*;

27    PMF 40, 41.  The six volunteers collectively spent at least 200 hours in response.

28    PMF 42.

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

The deindexing of the Website blocked its primary source of traffic, organic searches, cutting off the Website's main source of exposure.  Magill Decl. Ex. F. From the March 9 deindexing until March 12, Google Analytics reports for the Website reflect a dramatic drop in user traffic, with zero traffic for March 10 and March 11.  PMF 43, 44.  As a result of the deindexing, BCS received a fraction of the donations it reasonably expected to receive in connection with the show and film.  PMF 47.

**G.    Defendants Continue Attacking BCS After It Files this Lawsuit.**

BCS filed this lawsuit on March 28, 2022.  The next day, Whiteley again accessed the BCS Console "to try and determine why BCS was claiming their website was deindexed."  PUF 48.

Since then, Defendants and their affiliates have engaged in vindictive, harassing conduct toward BCS that has harmed the operation of BCS and the personal and professional reputations of its representatives.  This conduct exemplifies the degree of animus Defendants harbor against BCS and the lengths they are willing to go to harm BCS.

For instance, McNamara admitted that she specifically purchased domains bearing the names of Hughes and Magill (i.e., drvanessahughes.com), each of which routes to breakingcodesilencelawsuit.com, a website Defendants established to disparage BCS and its representatives, post nonpublic documents and correspondence, and post documents related to Hughes' business and finances. Lueddeke Decl. Ex. A.

## III.  <u>LEGAL STANDARD</u>

**A.    Motion for Summary Judgment**

A genuine dispute of material fact exists when "a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The nonmovant "need not establish a material issue of fact conclusively in its favor.  It is sufficient

1  that the claimed factual dispute be shown to require a jury or judge to resolve the

2  parties' different versions of the truth at trial."  *Smith v. County of Sacramento*, 2023

3  WL 6387149, at *2 (E.D. Cal. Sept. 29, 2023) (quotation omitted).

4      In ruling on a summary judgment motion, the Court "draws all justifiable

5  inferences in favor of the non-moving party."  *Fresno Motors*, 771 F.3d at 1125.  A

6  judge must not grant summary judgment based on his determination that one set of

7  facts is more believable than another," *Nelson v. Davis*, 571 F.3d. 924, 927 (9th Cir.

8  2009), because "[c]redibility determinations, the weighing of the evidence, and the

9  drawing of legitimate inferences from the facts are jury functions."  *Anderson v.*

10 *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, summary judgment must be

11 denied "if any rational trier of fact could resolve an issue in [the nonmovant's]

12 favor."  *Nelson*, 571 F.3d. at 927.

13     Importantly, "[s]imply because the facts are undisputed does not make

14 summary judgment appropriate.  Instead, where divergent ultimate inferences may

15 reasonably be drawn from the undisputed facts, summary judgment is improper."

16 *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 932-33 (C.D. Cal. 2004).

17     **B.    CFAA and CDAFA**

18     To establish a claim under the CFAA, a plaintiff must show that the defendant

19 (1) intentionally accessed a protected computer, (2) without authorization or in

20 excess of authorized access, and (3) caused an aggregate of at least $5,000 worth of

21 loss to a person during any one-year period.[2]  See *LVRC Holdings, LLC v. Brekka*,

22 581 F.3d 1127, 1132 (9th Cir. 2009); 18 U.S.C. § 1030.

23     The CDAFA is the CFAA's California analogue.  The elements are materially

24 the same, except that the CDAFA does not require any minimum amount of

25

26 _____

27     [2] Whiteley misstates the standard under the CFAA by stating that the loss must also have
   been intentionally or recklessly caused.  MSJ at 9.  Neither *Brekka* nor the section of the statute at

28 issue requires that the loss be caused with a requisite state of mind.  *See Brekka*, 581 F.3d at 1132;
   18 U.S.C. § 1030(a)(5)(C).

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

damages.  *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260
(N.D. Cal. 2022); Cal. Penal Code § 502(e).  Thus, BCS' reference to "CFAA"
throughout this brief shall also include reference to CDAFA.

## IV.    LEGAL ARGUMENT

### A.    Whiteley Fails to Shift the Evidentiary Burden to BCS.

On or about March 9, 2022, the Website was deindexed, causing BCS
significant loss.  Given the nature of the Website deindexing, there is no direct
evidence proving who did it.  The central question is thus whether it was
Defendants, working together, who deindexed the Website.  Whiteley says he did
not do it.  The wealth of circumstantial evidence set forth herein, however,
establishes that there is a dispute of fact as to whether he did.

Whiteley relies upon the following evidence to attempt to meet his initial
burden: "Defendants have each submitted a declaration affirmatively stating that
they did not deindex BCS's website.  Moreover, Defendants' expert Clark Walton
declares that…there is no evidence that Defendants deindexed BCS's website.
Accordingly, the evidentiary burden shifts to BCS."  Dkt. 152 ("MSJ") at 10.

This evidence is insufficient to shift the burden to BCS.  *First*, Whiteley's
declaration simply states, "I never placed a deindexing request on the .Org Domain
or BCS's website."  Whiteley Decl. ¶ 28.  This is nothing more than a conclusory,
self-serving statement.  A self-serving declaration, particularly as to the ultimate fact
to be decided in the case, is insufficient in and of itself to satisfy a movant's initial
evidentiary burden.  *See, e.g.*, *Olson v. Dias*, 2010 WL 3787113, at *2 (N.D. Cal.
Sept. 24, 2010) ("A conclusory self-serving declaration, without more, cannot
satisfy defendant's burden in moving for summary judgment pursuant to Rule 56.");
*Smith*, 2023 WL 6387149, at *4 ("The only evidence Defendant presents in support
of her contention that she did not order any examination of J.S. or V.S. [an ultimate
fact to be decided] is a self-serving declaration [saying she did not make the order],
which the Court finds insufficient to demonstrate the absence of a genuine issue of

1  material fact.").[3]

2       In the same vein, a question of credibility cannot be resolved on summary

3  judgment.  Whitely is asking the Court to believe his word—i.e., "I didn't do it"—

4  over circumstantial evidence establishing a dispute of fact as to whether he did.

5  Whether Whiteley's testimony is to be believed is up to the jury.  *See, e.g.*

6  *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005)

7  ("[C]redibility determinations must be resolved at trial, not on summary

8  judgment.").

9       *Second*, Defendants' data forensics expert's conclusion establishes a dispute

10  of material fact, not the absence of one, as to who caused the deindexing.  Indeed,

11  after an entire day's worth of unfettered access to BCS' electronic system to

12  examine it—he could not rule out that Whiteley caused the deindexing.

13  Specifically, he concluded that he is "*unaware of any proof…showing who may*

14  *have submitted the alleged Google de-indexing request.*"  Dkt. 152-7 ¶ 23

15  (emphasis added).

16       Thus, Whiteley failed to meet his evidentiary burden, it does not shift to BCS,

17  and the motion should be denied.  If the Court should find, however, that the burden

18  shifts to BCS, the evidence shows that factual disputes exist with respect to each

19  element of BCS' CFAA and CDAFA claims, as set forth below.

20  **B.    Factual Disputes Exist as to Whether Whiteley Intentionally**

21  **Accessed the BCS Console Under the CFAA.**

22  **1.    There is Sufficient Circumstantial Evidence that Whiteley**

23  **Deindexed the Website.**

24       On March 11, just two days after the Website was deindexed, McNamara

25  called Whiteley, her fellow Unsilenced member with a shared hostility toward BCS,

26

27       [3] McNamara's declaration also states, simply, that she did not deindex the Website. McNamara Decl. ¶ 24.  Notably, she does not state that Whiteley did not deindex the Website, or otherwise corroborate Whiteley's testimony regarding deindexing.

28

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

and told him she would add him as an *owner* on the BCS Console for a website of an organization to which neither belonged in months.  He did not say no; he did not ask why she called him, of all people; he did not question whether they had the right to do so.

Instead, he simply *agreed*.  He agreed to allow her to use his email address.  He agreed to allow her to grant him ownership permissions.  He agreed to access the BCS Console with those permissions.  He agreed to participate in and witness the 21-time back and forth between McNamara and BCS.  He agreed to be on the phone with her as it happened.

For the reasons below, the justifiable inference to be drawn from Whiteley's March 11 access is that he also accessed the BCS Console and participated in the deindexing of the Website two days earlier.  *See Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

*First*, Whiteley had access to the BCS Console to deindex the Website.  Defendants accessed it on March 11, and it is reasonable to infer that they had access two days earlier via McNamara's credentials.  Further, Jensen testified that only a handful of people at BCS had the requisite level of access to the BCS Console, all of whom were BCS members *except* for Defendants.  Lueddeke Decl. Ex. B (Jensen Dep.) at 150:3-151:4; 155:13-156:15.  It is similarly reasonable to infer that out of these people, Defendants were the *only ones* with any motive to deindex the Website.  *Id.*  And, after this lawsuit was filed, Whiteley used that same access weeks later on March 29 to *again* access the console.  PMF 48.

*Second*, Whiteley had motive to deindex the Website.  Defendants each left BCS on extremely hostile terms and joined a competing organization.  As of March 9, BCS was set to receive significant donations in connection with *The Doctors* and *Cruel Instruction*, and deindexing the Website would harm BCS' ability to do so.  During this time, a Google search for BCS resulted in a link to Unsilenced, which

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

had a page devoted to the film with quotes from Defendants.  PMF 30; Magill Decl. Ex. L.  Deindexing the Website is also consistent with other vindictive actions Defendants have taken against BCS, including using information technology to do so (i.e., buying domains of BCS representatives' names and routing them to breakingcodesilencelawsuit.com).

*Third*, Whiteley had the technical knowledge to deindex the Website. Defendants openly tout their extensive technical prowess, and were involved in setting up the Website and related accounts.  DMF 17.  Therefore, it is reasonable to infer that Defendants knew how to deindex the Website.[4]

## 2.    Whiteley's Deindexing Arguments Create Disputed Facts.

In the face of this evidence, Whiteley attempts to absolve himself.  However, his arguments only serve to create further questions of fact.

<u>McNamara's explanation for access is not credible</u>.  Whiteley argues that McNamara's reason for accessing the BCS Console on March 11 (and by implication, on March 9) was not nefarious because she accessed it only to "protect" the .Org Domain.  MSJ at 4.  This creates a factual dispute and calls into question her (and his) credibility.

*First*, McNamara claims she accessed the BCS Console because she was "panicked" that someone at BCS was "trying to steal [her] domain."  McNamara Decl. ¶ 36.  But McNamara *knew* BCS still had access to the console because she purposefully "never…revoked BCS's privileges with respect to the .Org Domain," so the notion that she was surprised to see BCS access it is not credible.  *Id.* ¶ 39. Further, the .Org Domain is "hous[ed] in [her] personal Hover.com domain registrar account," *id.* ¶ 7, *not* the BCS Console.  Thus, the domain cannot be "stolen" from

---

[4] *Brekka*, cited by Whiteley is distinguishable.  There, plaintiff could not establish that it was defendant who used the email address at issue to access its computer.  581 F.3d at 1136-37. By contrast, there is no mystery as to Whiteley's identity because he *admitted* to accessing the BCS Console on March 11, and for the reasons set forth herein, it is reasonable to infer he also accessed it on March 9.

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

1    the BCS Console. McNamara, given her extensive tech background, knew this.

2        *Second*, rather than contact BCS to address the issue, McNamara called

3    Whiteley—with whom she claims to have had "very little contact" *over the past*

4    *nine months*—to clandestinely access the BCS Console with her. McNamara Decl.

5    ¶ 24. McNamara claims she called Whiteley, of all people, so he could "perhaps

6    even explain" to her "what was happening to the domain." *Id.* ¶ 36. The notion that

7    McNamara, a cybersecurity expert, needed Whiteley to "explain" the domain issue

8    to her is not credible.

9        *Third*, once found out by BCS, McNamara delegated ownership permissions

10   to fictitious email accounts, and then to a governmental email account. *Id.* ¶ 40.

11   This conduct is entirely inconsistent with "protecting" the .Org Domain and is

12   indicative of McNamara's harassing conduct toward BCS.

13       <u>Whiteley acted in concert with McNamara</u>. Whiteley admits that BCS can

14   avoid summary judgment by offering evidence showing that he "worked in concert"

15   with McNamara to deindex the Website. MSJ at 10. Whiteley argues that BCS

16   cannot meet this standard because "there was no agreement between Defendants to

17   access any BCS account without authorization, or to deindex BCS's website." *Id.* at

18   20. In support, Whiteley cites his and McNamara's declarations, which both state

19   that no agreement was formed, and that they had "very little contact with" each

20   other and communicated "sporadically." *Id.*; Whiteley Decl. ¶ 25; McNamara Decl.

21   ¶ 24. The evidence contradicts these declarations and creates a factual dispute.

22       *First*, self-serving declarations attesting to ultimate facts (i.e., "I did not form

23   an agreement") should be disregarded. *See* Section IV.A, *supra*.

24       *Second*, a conspiracy need not be formed via a formal agreement, but instead

25   "may be inferred from the nature of the acts done, the relations of the parties, the

26   interests of the alleged conspirators, and other circumstances." *Cisco Sys., Inc. v.*

27   *Stmicroelectronics, Inc.*, 2015 WL 3488923, at *3 (N.D. Cal. June 2, 2015)

28   (conspiracy pled based in part on "underlying motive of the co-conspirators").

1   Given the alignment of Defendants against BCS, their motive to harm and history of

2   harming BCS, and the "nature of the acts done"—Whiteley agreeing with

3   McNamara to access BCS' system—a conspiracy may be inferred.

4       *Third*, the evidence disproves that Defendants had "very little contact" with

5   each other before the deindexing.  Indeed, in January 2022, Defendants emailed

6   trying to figure out which BCS-related accounts McNamara "owned."  PMF 17.

7   And at least as early as February 2, 2022, Defendants were listed as members of

8   Unsilenced on its website.  PMF 18.  The notion that McNamara called Whiteley

9   "out of the blue" on March 11—as he swears in his declaration—is not credible in

10  light of their ongoing relationship.  Whiteley Decl. ¶ 26.

11      <u>BCS' version of events is at least as likely as Whiteley's</u>.  Whiteley argues

12  that BCS' version of events is "impossible" because the deindexing occurred on

13  March 9 and McNamara did not give Whiteley ownership permissions until March

14  11.  MSJ at 11.  Whiteley also argues that he did not have access to BCS'

15  WordPress account, so he could not have deindexed the Website.  *Id.*  Both

16  arguments create a factual dispute.

17      *First*, the circumstantial evidence shows that BCS' version of events is not

18  only possible, but at least as likely as Whiteley's.  The fact that McNamara

19  delegated Whiteley permissions in connection with the March 11 access does not

20  mean that they did not together access the BCS Console on March 9 using, for

21  instance, McNamara's credentials.  Whiteley's argument amounts to saying that

22  there are two proposed stories, and the Court should believe his.  But the Court

23  "must not grant summary judgment based on [its] determination that one set of facts

24  is more believable than another."  *Nelson*, 571 F.3d at 927.[5]

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27      [5] Whiteley also argues that BCS cannot meet its burden because "it failed to conduct a
    proper forensic investigation."  MSJ at 10.  This is false; Jensen conducted a forensic examination
    and he was qualified to do so.  PMF 34, 35.  If Whiteley is implying that BCS can only survive
28  summary judgment by paying for a third-party analyst, he cites no authority for that proposition.

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

1    *Second*, the evidence establishes that "[i]t is not necessary to access

2    WordPress to perform the deindex attack as we described it." Dkt. 155-4 (Jensen

3    Dep.) at 82:18-19. This evidence contradicts Whiteley's evidence regarding

4    WordPress access, and thus creates a factual dispute.

5    <u>Whether BCS accidentally caused the deindexing is a question of fact</u>.

6    Lastly, Whiteley speculates that "someone at BCS" *could* have deindexed the

7    Website accidentally. MSJ at 15-17. Whiteley's evidence in support of this theory

8    is screenshots of at least one unidentified BCS volunteer accessing the BCS Console

9    *days before* the deindexing occurred. *Id.* This argument does not prove the absence

10    of a disputed fact as to who deindexed the Website, but instead creates a further

11    disputed fact as to who did it.

12    **C.    Factual Disputes Exist as to Whether Whiteley's Access was**

13    **Unauthorized Under the CFAA.**

14    Whiteley argues that BCS cannot satisfy the unauthorized access element

15    because (1) McNamara, as the owner of the .Org Domain, granted him access to the

16    BCS Console; and (2) even if McNamara was not the owner, he believed her to be

17    the owner. MSJ at 18-19. Neither argument has merit.

18    **1.    McNamara Does Not Own the .Org Domain.**

19    "Unauthorized access" under the CFAA is "an unambiguous, non-technical

20    term that, given its plain and ordinary meaning, means accessing a protected

21    computer without permission." *U.S. v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016).

22    Accordingly, a former employee, whose access credentials have been revoked upon

23    termination of his employment, does not have permission to access his former

24    employer's electronic system after his employment terminated. *See, e.g.*, *id.* at

25    1038. *Brekka*, relied upon by Whiteley, reached the same conclusion: "There is no

26    dispute that if Brekka accessed LVRC's information on the LOAD website after he

27    left the company…Brekka would have accessed a protected computer 'without

28

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

1    authorization' for purposes of the CFAA."  581 F.3d at 1136.[6]

2         Here, Whiteley resigned from BCS on June 26, 2021, and he admits his

3    access credentials to BCS electronic accounts were revoked.  Whiteley Decl. ¶¶ 21-

4    22.  Thus, at any point after his resignation—March 9 or 11, 2022, or any other date

5    after resigning—he did not have permission in the "plain and ordinary" sense to

6    access any of BCS' electronic accounts.  *See Nosal*, 844 F.3d at 1038; *Brekka*, 581

7    F.3d at 1136.

8         Whiteley does not contest this point, but instead argues that because

9    McNamara owns the .Org Domain, she could properly grant him access to the BCS

10   Console.  MSJ at 18.  Whiteley argues that McNamara owns the .Org Domain

11   because she purchased it before BCS was founded, has hosted it on her Hover

12   domain registar account since then, and has paid for its renewal since then.  *Id.*

13   Despite Whiteley's claim that McNamara owned the .Org Domain, he cites ***no***

14   ***authority*** supporting that proposition.

15        Paying for a website (or other electronic account) or exercising some

16   logistical control over it is insufficient to establish legal ownership.  Rather,

17   ownership is determined by how the account is used, for whom it was established,

18   by whom it is used, and for what purpose it was created and used.  *See, e.g.*, *Hidden*

19   *Empire Holdings, LLC v. Angelone*, 2022 WL 17080131, at *10 (C.D. Cal. Sept. 30,

20   2022) ("Courts have uniformly rejected attempts by disgruntled former

21   employees/partners/contractors to claim ownership over domains they registered on

22   behalf of their employers…"); *Int'l Bhd. Of Teamsters Loc. 651 v. Philbeck*, 464 F.

23   Supp. 3d 863, 872 (E.D. Ky. 2020) (social media accounts registered to former

24   union president were owned by the union because the pages bore the union's name

25

26   _____

27        [6] Whiteley also cites *Van Buren v. U.S.*, 141 S.Ct. 1648 (2021), which holds that the access itself must be unauthorized to violate the CFAA.  MSJ at 18.  *Van Buren* is consistent with the authorities cited herein:  for there to be CFAA liability, a defendant's access to a plaintiff's

28   electronic system must have been done without permission.

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

and were used mainly for union business).

Here, McNamara purchased the .Org Domain to use it for advocacy purposes with a to-be-formed organization, which became BCS. PMF 3. The .Org Domain has directed to the Website since it was established, and the Website has been used by BCC since then. PMF 4, 6. The Website bears BCS' name, branding, and trademark, and is the principal means by which BCS interacts with the community. PMF 5, 7. The fact that the .Org Domain for the Website is still housed on McNamara's Hover account likewise does not confer ownership because McNamara also housed the .com domain on her Hover, but never claimed ownership of it, and in fact later moved it to BCS' Hover account. DMF 46, 47.

McNamara's ownership claim is a fiction created for litigation because she never considered herself the owner until this action. While at BCS, McNamara regularly referred to the Website as BCS', not her own. For instance, in a July 4, 2021 message to the Board regarding the Website, she stated, "We [i.e., BCS, not "I"] also own the domains." PMF 12. And, upon her resignation, she did not claim ownership of the Website or try to take it from BCS, which is what she would have done had she actually believed she owned it.

### 2. Whiteley's Subjective Belief that McNamara Owned the .Org Domain is a Question of Fact.

In the alternative, Whiteley argues that even if McNamara does not own the .Org Domain, he *believed* she did. MSJ at 18-19. Whiteley's evidence in support is a single statement in his declaration that he believed McNamara owned the .Org Domain. Whiteley Decl. ¶ 14. This argument creates a factual dispute.

While the CFAA "includes a mens rea element of intentionality," Congress included it "to prohibit intentional acts of unauthorized access, rather than mistaken, inadvertent, or careless acts." *Salinas v. Cornwell Quality Tools Co.*, 2022 WL 3130875 (C.D. Cal. June 10, 2022). Whiteley relies on *Salinas* to argue that even if his belief as to McNamara's ownership of the .Org Domain was "mistaken," he

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

1    lacked the requisite intent.  MSJ at 18-19.

2        *Salinas*, which involved a motion for protective order, is inapposite.  Plaintiff

3    modified a URL to defendant's website to access part of the website and download

4    documents from it.  2022 WL 3130875, at *1.  The original URL led to a password-

5    protected login page, while the modified URL was not password protected.  *Id.*  The

6    court found that because there was nothing to indicate the documents were not

7    publicly available, such as a password requirement, plaintiff's belief that he could

8    download the documents was mistaken, and there was no intent.  *Id.* at *7.

9        Here, Whiteley's accessing the BCS Console in March 2022 was not

10   "mistaken, inadvertent, or careless."  Nearly a year after he resigned from BCS and

11   his access credentials were revoked, he purposefully accessed tools related to the

12   Website of an organization to which he no longer belonged.  To do so, he needed

13   credentials to circumvent the protections of an otherwise inaccessible BCS Console.

14       Further, by making this argument, Whiteley puts his state of mind at issue.

15   "Questions involving a person's state of mind, e.g., whether a party knew or should

16   have known of a particular condition, are generally factual issues inappropriate for

17   resolution by summary judgment."  *Bryant v. Gallagher*, 2016 WL 739481, at *5

18   (E.D. Cal. Feb. 18, 2016) (citations omitted).  Whiteley's declaration that he

19   believed McNamara owned the .Org Domain should be disregarded.  *See* Section

20   IV.A, *supra*.  In the months preceding the deindexing, emails between Defendants

21   reflect that they were uncertain which accounts McNamara "owned," which creates

22   a disputed fact as to Whiteley's belief regarding ownership of the .Org Domain.

23   PMF 17.  Whiteley's *ex post* description of his state of mind is not credible.

24       **D.    Factual Disputes Exist as to Whether Whiteley's Access Caused**

25       **BCS at Least $5,000 Worth of Loss Under the CFAA.**

26       Whiteley argues that BCS cannot meet the CFAA's $5,000 loss threshold.

27   However, BCS suffered at least $5,000 in loss by aggregating the following, each of

28   which independently satisfies the threshold: (1) lost donations it expected to receive

22

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

1  but for the deindexing; and (2) cost incurred in investigating and responding to the

2  deindexing.  The evidence establishes that BCS meets the threshold, or at a

3  minimum, creates a factual dispute.

4      The CFAA requires a plaintiff to have suffered a "loss" from the unauthorized

5  access that aggregates to at least $5,000 over a one-year period.  18 U.S.C §

6  1030(g).  "Loss" is defined as "***any reasonable cost to any victim, including the***

7  ***cost of responding to an offense***, conducting a damage assessment, and restoring

8  the data, program, system, or information to its condition prior to the offense, and

9  ***any revenue lost, cost incurred, or other consequential damages*** incurred because

10 of interruption of service."  *Id.* at § 1030(e)(11) (emphasis added).  The "loss" must

11 have some connection to the unauthorized access.  *See Apple Inc. v. NSO Grp.*

12 *Techs. Ltd..*, 2024 WL 251448, at *11-12 (N.D. Cal. Jan. 23, 2024).

### 1.    Lost Donations.

14     Lost donations, which are functionally no different than "revenue lost" under

15 the statute, may be used to meet the $5,000 threshold.  As a direct result of the

16 March 9 deindexing, traffic to the Website grinded to a halt for days, including

17 before, during, and after the premiere of *Cruel Instruction*, which indicates that

18 donors were not able to access the Website.  PMF 43, 44.  BCS reasonably expected

19 to receive at least $5,000 in donations flowing from the March 10 airing of *The*

20 *Doctors* episode and the March 12 release of *Cruel Instruction* because BCS

21 receives significantly higher donations after being the subject of high-profile

22 publicity.  PMF 23.  Just months earlier, it received over $10,000 in donations in

23 connection with its lobbying work with Paris Hilton in D.C.  PMF 26.

24     Whiteley argues that BCS' donations theory is "improbable" because (1) the

25 drop in traffic was likely caused by Beauregard changing Website settings, and (2)

26 between 6/18/21-3/9/22, BCS only received donations on 59/264 of those days,

27 which if averaged, comes out to $37.62.  MSJ at 24-25.  Neither argument has merit.

28     *First*, there is a disputed issue of fact as to the cause of the drop in traffic

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

because on March 18, Beauregard analyzed the traffic data and specifically attributed the drop to the deindexing.  Magill Decl. Ex. F.  The declaration Whiteley now submits on her behalf, in which she surmises the drop could be due to other reasons, only raises credibility issues.

*Second*, Whiteley's slicing of BCS' donations data is meaningless because it focuses on historical data without regard to spikes that occur in connection with specific events, like the D.C. event.  Whiteley's presentation of data is also skewed to make it seem like BCS never receives sizable donations.  This is incorrect; for example, BCS received a $5,000 donation on February 28, 2022.[7]  PMF 19.

## 2.    BCS' Investigation.

"Costs associated with investigating intrusions into a computer network and taking subsequent remedial measures are losses within the meaning of the statute." *Kimberlite Corp. v. Does*, 2008 WL 2264485, at *1-2 (N.D. Cal. 2008).  Such costs are wide-ranging, including those incurred by "analyzing, investigating, and responding" to the intrusion, (2) "devot[ing] personnel, resources, and time to identifying and investigating" the intrusion, and (3) "increasing security measures to detect and prevent future attacks."  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016); *Apple*, 2024 WL 251448, at *13.

While courts recognize that hours spent remedying harm is not always readily quantifiable, one method is to multiply an individual's hourly rate by the amount of hours spent.  *See United States v. Sablan*, 92 F.3d 865, 870 (9th Cir. 1996); *United States v. Millot*, 433 F.3d 1057, 1061 (8th Cir. 2006).  Importantly, "whether amount of time spent by the employees and their imputed hourly rates were reasonable for the repair tasks…are questions to be answered by" the jury.  *United States v. Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000).

---

[7] Whiteley argues that at the time of the deindexing, there was an issue with BCS' state registration such that it could not "legally accept donations."  MSJ at 25.  Whiteley advances no argument or authority as to why or how this impacts the CFAA loss analysis.

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT

Six BCS volunteers conducted a multi-day investigation into the March 9 deindexing and Defendants' March 11 intrusion, an extension of the deindexing. The March 11 intrusion alone spanned 21 hours. PMF 33. BCS' investigation consisted of at least restoring the Website's functionality, actively monitoring Defendants' access during and after March 11, and securing BCS' system against future intrusions. PMF 36-39. Jensen estimates that he alone spent 36 in direct response to the deindexing and March 11 intrusion, and an additional 100 hours monitoring and securing BCS' systems, among other measures. *Id.* Jensen's hourly rate for similar work is $250 per hour, and even if only 36 hours are considered, that totals $9,000 without valuing the other volunteers' time, which is at least 200 hours. PMF 40-42. A jury could easily quantify this total time as at least $5,000.

Whiteley argues that (1) BCS cannot claim any loss for volunteers' time because it did not pay them for their time, and (2) regardless, the only time for which BCS may claim loss is that spent to actually reindex the Website. Neither argument has merit.

*First*, an individual need not be specifically paid for remedying the harm caused for there to be loss because diversion of time suffices even if no additional costs were incurred. *See Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1059 (N.D. Ill. 2019) ("While MGI points out that the Svanaco employees who spent time responding to the attacks are salaried employees, wasted or diverted employee time falls squarely under the CFAA's definition of loss."); *Middleton*, 231 F.3d at 1214 (rejecting argument that company did not meet loss threshold because damage was remedied by salaried employees). Whiteley fails to provide any principled argument why volunteers' time should be excluded under the CFAA.

In any event, Whiteley's position would deprive nonprofit organizations—for which volunteers are the lifeblood—of any meaningful ability to bring a claim under the CFAA. Congress surely did not intend for the statute to be interpreted so narrowly. *See Middleton*, 231 F.3d at 1214 ("There is no basis to believe that

25

Congress intended the element of 'damage' to depend on a victim's choice whether to use hourly employees, outside contractors, or salaried employees to repair the same level of harm to a protected computer.").

*Second*, what time BCS spent, the value of it, and whether it was reasonable are questions of fact. *See Middleton*, 231 F.3d at 1214. Whiteley unduly limits the scope of BCS' investigation to reindexing the Website itself, but the law is clear that additional response measures, such as BCS monitoring and securing its system during and after March 11, are qualifying losses. *See, e.g.*, *Apple*, 2024 WL 251448, at *13.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, BCS requests that the Court deny the Motion.

Dated:  February 15, 2024          Respectfully submitted,

**DLA PIPER LLP (US)**

By: *<u>/s/ John Gibson</u>*
          John S. Gibson
          Jason Taylor Lueddeke

          Attorneys for Plaintiff
          BREAKING CODE SILIENCE

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S MOTION FOR SUMMARY JUDGMENT

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff BREAKING CODE SILIENCE, certifies that this brief contains 6,991 words, which complies with L.R. 11-6.1.

Dated:  February 15, 2024              Respectfully submitted,

                                          **DLA PIPER LLP (US)**

                                          By:  */s/ John Gibson*
                                                  John S. Gibson
                                                    Jason Taylor Lueddeke

                                                  Attorneys for Plaintiff
                                                BREAKING CODE SILENCE

PLAINTIFF'S OPPOSITION TO DEFENDANT JEREMY WHITELEY'S
MOTION FOR SUMMARY JUDGMENT