# EXHIBIT 77

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

BREAKING CODE SILENCE, a )
California 501(c)(3) nonprofit, )
)
        Plaintiff, )
)
vs. ) Case No.
) 2:22-cv-002052-SB-MAA
KATHERINE MCNAMARA, an )
Individual; JEREMY WHITELEY, an )
individual; and DOES 1 through )
50, inclusive, )
)
        Defendants. )
_____)

*Certified Copy*

VOLUME I

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JENNIFER MAGILL

PERSON MOST KNOWLEDGEABLE FOR BREAKING CODE SILENCE

Date and Time:   Tuesday, November 14, 2023
                  9:02 a.m - 12:38 p.m.

Location:        Remotely
                  (Via Videoconference)

Reported By:     Cailey Nelson, CSR No. 14133
                  Certified Shorthand Reporter

Job No. 28156

1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   BREAKING CODE SILENCE, a          )
     California 501(c)(3) nonprofit,   )
 6                                     )
             Plaintiff,                )
 7                                     )
     vs.                               ) Case No.
 8                                     ) 2:22-cv-002052-SB-MAA
     KATHERINE MCNAMARA, an            )
 9   Individual; JEREMY WHITELEY, an   )
     individual; and DOES 1 through    )
10   50, inclusive,                    )
                                       )
11           Defendants.               )
     _____)
12

13

14

15

16

17

18       The videotaped deposition of Jennifer Magill, taken

19   on behalf of the Defendants, before Cailey Nelson,

20   Certified Shorthand Reporter 14133, for the State of

21   California, commencing at 9:02 a.m., Tuesday, November

22   14, 2023, taken via remote videoconference.

23

24

25
```

2

1       A    I've already answered.

2       Q    John, control your client here.

3       MR. GIBSON:  Okay.  There's no need to control my

4  client, but it is -- first, objection.  Asked and

09:10  5  answered.

6       I think the question, Ms. Magill, though is -- is --

7  is the WordPress something you include in your

8  understanding of the back end?

9       THE WITNESS:  Yes.

09:10  10      MR. GIBSON:  Okay.

11  BY MR. TATE:

12      Q    I'll represent to you that Jesse Jensen, who

13  was the PMK, testified that he looked for evidence that

14  my clients accessed the WordPress, and he was unable to

09:11  15  find any.  Did Jesse Jensen tell you that?

16      MR. GIBSON:  Objection.  Again, we're going to have

17  a running objection to the extent that your testimony

18  would include attorney-client communications with BCS's

19  attorneys.  I want you to exclude that from your answer.

09:11  20      THE WITNESS:  Absolutely.

21      MR. GIBSON:  But if you can answer otherwise, you

22  may.

23      THE WITNESS:  Jesse Jensen, yes.  And Mr. Gibson's

24  question asked if it included the WordPress, not was

09:11  25  limited to.

13

1    BY MR. TATE:

2       Q     Okay.  When did Jesse Jensen tell you that he

3    could not find any evidence that my clients accessed the

4    WordPress?

09:11  5       A     I don't believe he used the exact language, but

6    it would have been sometime last spring.

7       Q     Before you filed the lawsuit?

8       A     He provided a comprehensive summary of his

9    understanding and his investigation before the lawsuit.

09:12 10       Q     Understood.  Let me be more specific in my

11    question.  Did Jesse Jensen tell you before you filed

12    the lawsuit, that he could find no evidence that my

13    clients accessed the WordPress?

14       A     I don't remember --

09:12 15       MR. GIBSON:  Objection.  Attorney-client privilege.

16    Objection.  Attorney-client privilege, but again, we're

17    into an area here, Ms. Magill, where it's running up to

18    the lawsuit.

19       If there were conversations that involved BCS's

09:12 20    attorneys, I'm instructing you not to answer with regard

21    to that, but if you had a separate conversation with

22    Mr. Jensen not involving attorneys or communications

23    from or to attorneys, then you can answer on that.

24       Would you like to have the question again?

09:12 25       THE WITNESS:  Sure.

**14**

```
 1  BY MR. TATE:
 2      Q    Let me try it differently, one way that it
 3  cannot implicate the attorney-client privilege.
 4           When did Mr. Jensen tell you that my clients
 5  did not access the WordPress?
 6      A    I do not recall the exact date last spring.
 7      Q    Was it before you filed the lawsuit?
 8      A    Yes.  Anything he spoke about the WordPress,
 9  again, I don't believe he used that exact language, but
10  yes, he provided us everything before the lawsuit.
11      Q    Then -- and then you filed a complaint saying
12  that my clients accessed the back end of the BCS
13  website, despite what Jesse Jensen told you; correct?
14      A    Correct.  As I said, back end is not limited to
15  the WordPress.
16      Q    What else does it include?
17      A    I'm not the technical expert on this case.
18      Q    Well, you're -- you just told me it does --
19  it's not limited to WordPress.  What else does it
20  include?
21      A    I'm not the technical expert --
22      MR. GIBSON:  Objection.  Let me make an objection.
23  Objection.  Asked and answered.  You can answer one more
24  time.
25      THE WITNESS:  I'm not the technical expert on this
```

09:13 (lines 5, 10, 15, 20, 25)

15

BY MR. TATE:

    Q    Did you provide your laptop to BCS's counsel or

eDiscovery vendor?

    A    Through remote access, yes.

09:22    Q    Okay.  And did they take an image of your

laptop?

    A    I don't know exactly what they did.  They were

on it for several, several hours.

    Q    And when did you do this?

09:22    A    I don't know the exact date.

    Q    Can you give me an estimate?

    A    No, sir.

    Q    Okay.  Your declaration, for some reason, even

though the court ordered to do it, does not mention

Cloudways or WordPress backups.  Do you know why that

is?

    MR. GIBSON:  Objection.  Speculation.  Also, calls

for attorney-client privileged communications.

BY MR. TATE:

09:22    Q    Go ahead.

    A    I said no.

    Q    Okay.  I'll represent to you that BCS has

provided Google -- Google Drive logs to us in discovery

that show you deleting backups of the website within the

09:22    window of the EDO.  Why were you deleting those backups?

22

1     A     Because they were already present.

2     Q     Say that one more time, they were already

3  present?

4     A     Our website is backed up in multiple locations.

09:23  5  I keep a recent set on my Google Drive as a backup of a

6  backup.  They take up a large amount of information.  So

7  the ones that were deleted are deleted as new ones come

8  in.

9     Q     So you understood that you're under a court

09:23 10  order not to delete documents and you deleted them

11  anyway; correct?

12     MR. GIBSON:  Objection.  Misstates testimony.

13     THE REPORTER:  I didn't hear the answer.

14     THE WITNESS:  I deleted a copy.

09:23 15     THE REPORTER:  Okay.  Everyone please speak one at a

16  time.

17  BY MR. TATE:

18     Q     And at the time you deleted them, you knew that

19  BCS was contemplating filing a lawsuit against my

09:23 20  clients; correct?

21     A     I don't know exactly when they were -- the

22  copies were deleted.

23     Q     Let me show you the next document in order.

24  We'll mark it as Exhibit 124.

09:24 25  //

23

BY MR. TATE:

1    Q    Okay.  Well, let's figure this out then.  When

2 did BCS discover that the website was not appearing on

3 the -- on Google Search?

09:29  5    A    I'm not the expert for this.

6    Q    And when did you learn that BCS was not --

7 BCS's website was not appearing on Google Search?

8    A    I don't remember the exact date.

9    Q    How much time did you spend investigating the

09:29 10 alleged indexing?

11    A    A year and a half ago, quite a bit.  But it was

12 a year and a half ago.

13    Q    Before you submitted this FBI request, how much

14 time did you spend investigating the issue?

09:29 15    A    I don't remember the exact amount of hours, but

16 quite a bit.

17    Q    And yet you got the dates wrong?

18    MR. GIBSON:  Objection.  Misstates testimony.

19 Speculation.

09:29 20 BY MR. TATE:

21    Q    What's the status of this FBI complaint today?

22    A    It's in the hands of the FBI.  I don't know.

23    Q    Do you know if it's still active?

24    A    It's in the hands of the FBI.  I do not know.

09:30 25    Q    When's the last time you heard anything about

26

```
 1      A    Yes.

 2      Q    Okay.  So let's try this again.  BCS

        acknowledges that McNamara registered the dot org domain

        a year before BCS was incorporated; is that true?

09:33 5    A    Mh-hmm.

 6      Q    Okay.  And BCS acknowledges that McNamara paid

        for the registration when she -- when she purchased it;

        correct?

 9      A    Correct.  When she purchased it under direction

09:33 10   from fellow BCS leadership team members.

11      Q    And BCS doesn't contend that Ms. McNamara is

12      the only one that has ever paid for the domain

13      registration?

14      A    I'm sorry, repeat the question.

09:33 15   MR. GIBSON:  Objection.  Vague.

16      BY MR. TATE:

17      Q    Let me let me try a different way.

18      Ms. McNamara has been the one that has paid to renew the

19      registration every year; correct?

09:34 20   A    To the best of my knowledge, yes.  She's also

21      asked for reimbursement for that expense.

22      Q    But she's not received it, has she?

23      A    No.  We've been decimated.

24      Q    And you believe that Ms. McNamara has asked for

09:34 25   reimbursement of the dot org domain?
```

30

1    A    Yes.

2    Q    It indicates that you signed this document on

3  July 10th, 2021.  Do you have any reason to dispute that

4  date?

09:37  5    A    No.

6    Q    And do you have any reason to dispute that

7  Ms. McNamara signed this agreement on July 4th, 2021?

8    MR. GIBSON:  Objection.  Speculation.

9  BY MR. TATE:

09:37 10    Q    Go ahead.

11    A    I said no.

12    Q    So this document was signed after Jeremy

13  Whiteley had already resigned; correct?

14    A    Yes.

09:37 15    Q    And it was signed more than a year after

16  Ms. McNamara purchased the dot org domain; correct?

17    A    Correct.

18    Q    And what, if anything, did Ms. McNamara receive

19  in exchange for signing this volunteer agreement?

09:38 20    MR. GIBSON:  Objection.  Speculation.  Calls for

21  legal conclusion.  But you can answer.

22    THE WITNESS:  Nothing, to my knowledge.  It's a

23  volunteer agreement.

24  BY MR. TATE:

09:38 25    Q    All right.  So Ms. McNamara was not paid any

33

1  money for signing this agreement; correct?

2      A    Correct.

3      Q    And you're not aware of any other consideration

4  that she got?

09:38 5      MR. GIBSON:  Objection.  Legal conclusion.

6  BY MR. TATE:

7      Q    Go ahead.

8      A    Can you clarify?  I'm not sure I understand

9  what you're asking.

09:38 10      Q    So a consideration is a legal term to indicate

11  that she got something in return for signing this

12  agreement.  Can you think of anything?

13      MR. GIBSON:  Same objection.

14      THE WITNESS:  Anything?  That's quite vague.  Do you

09:38 15  mean money, do you mean a position in the organization,

16  what exactly are you referring to?

17  BY MR. TATE:

18      Q    Anything.

19      A    I'm really not sure where this is going, what

09:39 20  you're asking.

21      MR. GIBSON:  Yeah.  Same -- same objection, and

22  vague and ambiguous as well.

23  BY MR. TATE:

24      Q    Yeah, BCS didn't give Ms. McNamara any sort of

09:39 25  property for signing this agreement; correct?

34

1      A    Not to the best of my knowledge.

2      Q    Okay.  This version of the volunteer agreement

3  that we're looking at, was it ever voted on or approved

4  by the board?

09:39  5      A    This was two and a half years ago.  I don't

6  remember.  But I would assume so.

7      Q    And what are you basing that assumption on?

8      A    The legal documents that we produced,

9  developed, edited, et cetera, with our attorneys.

09:39 10      Q    Okay.  Do you know why there's no board member

11  meeting -- minute meetings that were produced in this

12  action indicating that this agreement was ever ratified?

13      MR. GIBSON:  Objection.  Speculation.  Legal

14  conclusion.

09:39 15      THE WITNESS:  Not sure.

16  BY MR. TATE:

17      Q    Okay.  Did Jeremy Whiteley ever sign the

18  volunteer agreement?

19      A    Did he ever sign a volunteer agreement, or this

09:40 20  volunteer agreement?

21      Q    A volunteer agreement.

22      A    He signed an agreement, the same one all of us

23  did at the very beginning when the organization was

24  about to incorporate and incorporated in March --

09:40 25      Q    What was the title of that agreement?

35

1       A    It appears to be so.

2       Q    Okay.  And you received it on or about December

3   15th, 2021?

4       A    It appears so.

10:03  5    Q    And you understood that Ms. Moorman was telling

6   BCS that she would not be signing the assignment;

7   correct?

8       A    Correct.

9       Q    And you also understood that Ms. McNamara was

10:03 10   refusing to sign the assignment; correct?

11      A    Appears so.

12      Q    Okay.  Can you think of a specific writing in

13  which BCS told Ms. McNamara that BCS owned the dot org

14  domain before the complaint was filed?

10:03 15    MR. GIBSON:  Objection.  Ambiguous as to timeframe.

16  Also, calls for speculation.

17      THE WITNESS:  Well, I'm not sure I can point to an

18  exact date or exact statement at this point two and a

19  half years later.

10:04 20  BY MR. TATE:

21      Q    Okay.  Can you recall a specific conversation

22  with Ms. McNamara before the complaint was filed, in

23  which you told her the dot org domain belongs to BCS,

24  not you?

10:04 25    A    I don't believe I told her that.  She said

43

1    letters that your attorney sent to Ms. McNamara after

2    her resignation did not state that BCS was the owner of

3    the dot org domain?

4        MR. GIBSON:  Objection.  Speculation.

10:08  5        THE WITNESS:  I don't know.

6    BY MR. TATE:

7        Q    Okay.  Do you understand that the party -- just

8    recently, the parties entered into a stipulation, which

9    limits the claims in this case to just those related to

10:08 10    the alleged deindexing of BCS's website?

11        A    Yes.

12        Q    Okay.  And you understand that you were a

13    person that's been designated to talk to me about the

14    damages that BCS has allegedly suffered as a result of

10:08 15    that deindex?

16        A    Yes.

17        Q    Okay.  Show you a document, which we will mark

18    as Exhibit 131.

19            Let me know when you have it opened.

10:09 20            (Exhibit 131, Amended Responses to

21            Katherine McNamara, was marked for

22            identification.)

23        THE WITNESS:  Okay.

24    BY MR. TATE:

10:09 25        Q    Okay.  Can you turn to page 8?

47

1    not able to focus on their cases.

2        Q    Okay.  You said that the general organization

3    was harmed.

4            What did you mean by that?

10:11  5        A    We were not able to be contacted through the

6    website, we were not able to have exposure to the

7    public, as planned with the Lifetime feature.

8        Q    And how much money did BCS lose as a result of

9    that?

10:11 10        A    Impossible to --

11        MR. GIBSON:  Objection.  I'm sorry.  Objection.

12    Speculation.  And calls for a legal conclusion.

13    BY MR. TATE:

14        Q    Go ahead.

10:12 15        A    Impossible to give a specific number.

16        Q    Okay.  Let's go through the special

17    interrogatory response.  So the three things that you

18    identified, the first one is time spent by plaintiff's

19    employees/volunteers/agents.

10:12 20            At the time of the alleged deindexing, did BCS

21    have any employees?

22        A    No.

23        Q    Okay.  And then you've identified three

24    persons.  Dr. Hughes, yourself, and Jesse Jensen.

10:12 25            Do you see that?

**49**

```
 1        A     Mh-hmm.
 2        Q     And did BCS pay Dr. Hughes anything to
 3   investigate the alleged deindexing?
 4        A     Dr. Hughes herself?
10:12  5  Q     Right.
 6        A     No.
 7        Q     Did BCS pay you anything to investigate the
 8   alleged deindexing?
 9        A     No.  We are all volunteers for the
10:13 10  organization.
11        Q     Okay.  Did BCS pay Jesse Jensen anything to
12   investigate the alleged deindexing?
13        A     We are all volunteers for the organization.
14        Q     I appreciate that.  Did you pay Jesse Jensen
10:13 15  anything?
16        A     No.
17        Q     And did BCS pay anyone anything to investigate
18   the alleged deindexing?
19        A     Not at that time.  To the best of my knowledge.
10:13 20  Q     At some subsequent time, did BCS pay somebody
21   to investigate the alleged deindexing?
22        A     I don't believe so.  However, we are in a --
23   we're in litigation, and there's been multiple experts
24   and outside vendors, so.
10:13 25  MR. GIBSON:  Yeah, objection.  Calls for a legal
```

50

1    conclusion.

2    BY MR. TATE:

3        Q    Did BCS pay for any of those experts?

4        A    Again, not sure.

10:13  5        Q    Did BCS pay for any of those vendors?

6        A    Again --

7        MR. GIBSON:  Objection.  Speculation.

8    BY MR. TATE:

9        Q    Okay.  Well, is -- you're the person most

10:14 10  knowledgeable on BCS's damages.  So speak on behalf of

11    the organization, is BCS aware of it having to pay any

12    of its experts?

13        A    At what time for what?

14        Q    At any time for anything related to the alleged

10:14 15  deindexing.

16        A    I know we've had expenses related, but I don't

17    know exactly when and which vendors.

18        Q    All right.  What expenses has BCS personally

19    paid for?

10:14 20        A    I don't know exactly when and which vendors.

21        Q    Can you -- can you point me to one?

22        A    Not that I -- know for sure enough to speak

23    specifically on.

24        Q    Okay.  So let me take you back to the week that

10:14 25  the alleged deindexing occurred.

51

BY MR. TATE:

    Q    That's fine.  Let's do this.  I've put into --

copy of the complaint into the chat.  Can you please

turn to page 10?  And locate footnote number one.

10:17    Ms. Magill, you're muted.

    A    For some reason, the document is not opening.

It will download, but when I click to open, it doesn't

open.

    Q    That's okay.  Let's do this.

10:17    A    There we go.

    Q    Can you see -- can you see my screen?

    A    I've got it.  It was just downloading.  It took

a while.

    Q    Do you see the footnote on page 10?

10:17    A    Oh, yes.

    Q    Okay.  So the footnote states BCS only knew its

website had been deindexed by accident.  One of its

current board members was making changes to the site and

wanted to see how the changes were reflected in a Google

10:17 search.  Once he searched, she could not find the site.

    My question is, who is the person referenced in

this -- in this footnote?

    A    That'd be Vanessa Hughes.

    Q    Okay.  What changes was Dr. Vanessa Hughes

10:18 making to the website on or about March 11th?

53

1    A    I don't know exactly.

2    Q    You were aware that Ms. Hughes was making

3  changes to the website during that week that BCS

4  discovered that it had allegedly been deindexed;

10:18  5  correct?

6    A    Are you referring to Dr. Hughes?

7    Q    Yes.

8    A    Can you repeat the question, please.

9    Q    Yeah.  You're aware that Ms. Hughes was making

10:18  10  changes to the website --

11    A    Can you change the question if you're talking

12  about Dr. Hughes?

13    Q    I'm going to refer to her as Ms. Hughes.

14        You knew that Ms. Hughes was making changes to

10:18  15  the website during the week that BCS discovered that its

16  website was not appearing on Google Search; correct?

17    MR. GIBSON:  Objection.  I just want to fair it out.

18  Because this is in the complaint but it also occurred in

19  real life, there's a distinction between anything you

10:19  20  learned, Ms. Magill, from conversations with BCS's

21  attorney's communications.  On the one hand, which I

22  object to and instruct you not to answer, but on the

23  other hand, something you learned aside from the

24  attorneys may be communications directly with Dr. Hughes

10:19  25  not involving the attorneys or the attorney's thought

54

1    Q    Okay.  Put this document aside.

2         Do you recall if it was daytime or nighttime

3    when you discovered the -- that the website was not

4    appearing on Google Search?

10:22  5    A    I don't remember.

6    Q    Okay.  And you don't remember the date either;

7    correct?

8    A    I don't remember the exact date, no.

9    Q    Okay.  I'll represent to you that Jesse Jensen

10:22  10   testified that he was able to get the website back on

11   Google Search by midafternoon on March 12th.  Does that

12   fit your understanding?

13   A    If Jesse said that.

14   Q    So as far as I can tell, at least, the website

10:22  15   was not appearing on Google Search for less than 24

16   hours.  Do you have any reason to dispute that?

17   A    I believe that it was longer than 24 hours.

18   I'm not sure because -- (indiscernible due to

19   cross-talk) -- we were going back and forth with the

10:23  20   defendants to get ownership of the website.

21   Q    Why do you believe it was longer than 24 hours?

22   A    Because multiple days we had to take turns, and

23   with legal search counsel trying to receive ownership

24   that kept being designated to Mr. Whiteley, and then to

10:23  25   e-mails at White House dot gov.

57

1    Q    Okay.  I understand -- I think I know what

2  you're referring to.  Ownership was being delegated on

3  the Google webmaster central.  My question's more

4  specific.

10:23  5         Do you know what period of time the website was

6  not appearing on the Google Search?

7    A    I don't know specifically.

8    Q    BCS does not know specifically; correct?

9    MR. GIBSON:  Objection.  Calls for speculation.  BCS

10:23 10  has produced numerous documents.  Calls for speculation

11  from this witness.

12    MR. TATE:  Yet she's the person most knowledgeable

13  on BCS's damages, and one of the allegations is that

14  they lost web traffic during some specified period of

10:24 15  time.  And I'm trying to figure out what specified

16  period of time that is, and it sounds like BCS doesn't

17  know.

18    THE WITNESS:  (Indiscernible due to cross-talk.)

19    MR. GIBSON:  Objection -- objection.  Wait, let me

10:24 20  make an objection.

21    Objection.  Speculation.  It's not a memory test.

22  There are lots of documents that can pen down the

23  timeframe.  Speculation.

24    But you can answer.

10:24 25    THE WITNESS:  I would refer you to the documents

58

1     A    Yes, but I don't have to remember everything

2  specifically date by date, time by time, number by

3  number, as you're well aware.

4     Q    BCS does not know, does it?  As we sit here

10:26 5  today, at least, you cannot tell me?

6     A    That's not what I said.

7     MR. GIBSON:  Yeah, objection.  Asked and answered.

8  Speculation.  And, you know, it's inappropriate.  There

9  have been hundred -- thousands of documents produced on

10:26 10  this issue, but same objection.

11     You can answer one more time.

12  BY MR. TATE:

13     Q    Let me -- let me get a more clean question.

14          As the representative of BCS, can you tell me

10:27 15  today how much time Dr. Hughes spent investigating the

16  alleged deindexing from the moment she discovered the

17  issue, to when Jesse Jensen fixed the issue on March

18  12th?

19     MR. GIBSON:  Objection.  Speculation.

10:27 20     THE WITNESS:  I'm not Dr. Hughes.  I can't tell you.

21  BY MR. TATE:

22     Q    Okay.  Same question for yourself.  How much

23  time did you spend investigating the alleged deindexing

24  from the moment you learned that it was not appearing on

10:27 25  Google Search, to the moment that Jesse Jensen fixed the

61

```
 1      A    Sure.

 2      Q    Okay.  So from the evening of March 11th to

 3   midafternoon on March 12th when Jesse Jensen got the

 4   website appearing on the web -- appearing on Google

 5   Search again, how much time did Jesse Jensen spend

 6   investigating the alleged deindexing?

 7      MR. GIBSON:  Objection.  Speculation.  For all these

 8   questions, if -- if you have an estimate, I don't think

 9   there's been a description of the difference between

10   estimate and speculation, but -- but if you can give an

11   estimate, that's okay to answer.

12      THE WITNESS:  Okay.  I'd say the majority of the

13   hours within those two events.

14   BY MR. TATE:

15      Q    So your testimony is that for each of you, you

16   guys worked all the way through the night and into the

17   next day without sleep?

18      A    I said the majority.  Not all.

19      Q    Okay.  But you don't know -- you can't define

20   it any more than that?

21      A    It was a year and a half ago.

22      Q    Okay.  So these hours that I see in this

23   special interrogatory response, what are they referring

24   to?

25      MR. GIBSON:  Objection.  Speculation.  Calls for
```

10:30 — lines 5, 10, 15, 20
10:31 — line 25

**64**

1    legal conclusion, and attorney-client privilege --

2    attorney-client privilege and work product.

3    BY MR. TATE:

4        Q    Go ahead.

10:31 5        A    It's based on the data received by our

6    attorneys.

7        Q    Well, let me ask you this:

8             When you drafted this response, you were still

9    alleging all sorts of other things against, particularly

10:31 10    Ms. McNamara, relating to the TikTok, the Instagram, et

11    cetera; is that correct?

12        A    At the time, that's what reflected in the

13    complaint.

14        Q    Okay.  And so the time -- the hours that you

10:31 15    gave me here, 324 for Dr. Hughes, 368 for yourself, and

16    112 for Jesse Jensen, that's not just limited to the

17    deindexing issue, is it?

18        A    I don't know for sure.

19        Q    Okay.  Can you tell me how much time Dr. Hughes

10:32 20    spent investigating the deindexing issue?

21        A    Already answered this.

22        MR. GIBSON:  Yeah, objection.  Asked and answered.

23    I think it's vague as to timeframe, is the problem.

24    BY MR. TATE:

10:32 25        Q    Yeah, this -- this has no timeframe imposed on

65

1    it, period.

2        How much time did Dr. Hughes spend

3    investigating the alleged deindexing as opposed to the

4    other allegations that used to be in the complaint?

10:32  5        MR. GIBSON:  Objection.  Speculation.

6        THE WITNESS:  I'm not Dr. Hughes.  I don't know.

7    BY MR. TATE:

8        Q    Okay.  How much time did you spend

9    investigating the alleged deindexing, as opposed to the

10:32 10    other allegations in the complaint?

11        A    I don't remember exactly, but I know the

12    majority of the hours listed in the interrogatories were

13    related to the deindexing.

14        Q    Can you give me a ballpark of how many hours

10:32 15    you spent?

16        A    I don't feel comfortable doing that accurately.

17        Q    Can you give me a rough ballpark?

18        A    I just said no.

19        Q    Okay.  How many hours did Jesse Jensen spend

10:33 20    investigating the alleged deindexing as opposed to other

21    issues?

22        MR. GIBSON:  Objection.  Speculation.

23        But you can answer if you know.

24        THE WITNESS:  I'm not him.

10:33 25    //

66

```
  1  BY MR. TATE:

  2      Q    Do you know?

  3      A    No.  I'm not him.

  4      Q    Okay.  So we don't know how much time

10:33  5  Dr. Hughes spent alleging -- investigating the alleged

  6  deindexing, but what's the value of her time?

  7      MR. GIBSON:  Objection.  Legal conclusion.

  8      THE WITNESS:  Can you rephrase?

  9  BY MR. TATE:

10:33 10      Q    Yeah.  You're alleging that BCS should recover,

 11  as damages, Dr. Hughes's time.

 12          How much per hour should my clients have to pay

 13  for her time?

 14      MR. GIBSON:  Objection.  Speculation.  Legal

10:33 15  conclusion.  Calls for expert testimony from a lay

 16  witness.

 17      THE WITNESS:  Yeah, I'm not the person to determine

 18  that.

 19  BY MR. TATE:

10:33 20      Q    You are the person most knowledgeable, and BCS

 21  does not have an expert.  So if anyone's going to be

 22  able to prove this, it's you.  Otherwise, you're not

 23  going to be able to prove any damages whatsoever.

 24          So what's Ms. Hughes's hourly rate?

10:34 25      MR. GIBSON:  Objection.  Argumentative.
```

67

1    Speculation.

2        THE WITNESS:  I'm not the person to determine that.

3    BY MR. TATE:

4        Q    Okay.  You don't know?

10:34  5        A    I did not say that.

6        MR. GIBSON:  Objection -- objection.  Asked and

7    answered.

8    BY MR. TATE:

9        Q    Do you know?

10:34 10        A    I've already answered.

11        MR. GIBSON:  Same objections.

12    BY MR. TATE:

13        Q    I don't believe I've got an answer to my

14    question.

10:34 15        What -- BCS is attempting to recover damages

16    for Dr. Hughes' time.  How much money should my clients

17    have to pay for that?

18        MR. GIBSON:  Objection.  Calls for a legal

19    conclusion, and speculation.

10:34 20    BY MR. TATE:

21        Q    Go ahead.

22        A    Same answer.  I've already answered this

23    question.

24        Q    You have not answered this question.  And if

10:34 25    you don't know, tell me you don't know.

68

1    A    I --

2    MR. GIBSON:  Objection -- hold on.

3    Objection.  Argumentative.  Asked and answered.

4    I'll let you answer one more time, then we're going

10:35  5    to cut it off.

6    THE WITNESS:  Same answer.

7    BY MR. TATE:

8    Q    You have to answer the question.

9    A    I have.  You just don't like my answer.

10:35  10    MR. GIBSON:  Yeah, same objections.

11    MR. TATE:  John, do you really want a motion to

12    compel on this?

13    MR. GIBSON:  Well, if you can ask the question one

14    more time, cleanly, let's try it from there.

10:35  15    BY MR. TATE:

16    Q    BCS is seeking to recover damages for

17    Dr. Hughes's time.

18         What is the dollar amount of those damages?

19    MR. GIBSON:  Same objections.

10:35  20    You can answer if you know.

21    THE WITNESS:  I'm not the person to determine that.

22    BY MR. TATE:

23    Q    Do you know?

24    MR. GIBSON:  Objection.  Asked and answered.

10:35  25    THE WITNESS:  I'm not going to answer again.

**69**

1          MR. TATE:  John, what do you want to do here?

2          MR. GIBSON:  Yeah, I -- so the last question,

3    though, is, do you know, which is a little different

4    than what's the -- than the previous questions.

10:36 5          THE WITNESS:  So.

6          MR. GIBSON:  Yeah.

7          THE WITNESS:  Do I know exactly what her exact rate

8    should be?  No.

9    BY MR. TATE:

10:36 10         Q    So you're not going to tell me?

11         MR. GIBSON:  Well, she just answered it.

12         MR. TATE:  She doesn't know?  Sorry, she cut out.  I

13   didn't hear the answer.

14         THE WITNESS:  I cannot tell you exactly the exact

10:36 15   number for her rate.  That's not my role, my knowledge,

16   my specialization.

17   BY MR. TATE:

18         Q    For your time spent investigating the

19   deindexing, how much do my clients need to pay BCS for

10:36 20   your time?

21         MR. GIBSON:  Same objections.

22         But you can answer.

23         THE WITNESS:  It's not my specialty or expertise.  I

24   can tell you what I value my time at, but I don't know

10:37 25   that that's legally what my time would be valued at.

                                                              70

BY MR. TATE:

Q    Okay.  What do you value your time at?

A    At that point in my life?

Q    Sure.

10:37   A    Invaluable.  I was at a safe house with my daughter for much of this event.  I needed to be focusing on my daughter and my safety.  I should not have been focusing on this, but I had to.  I can't even put a price tag on that.

10:37   Q    Understood, but you are the person most knowledgeable for damages here, and BCS is trying to recover money.

How much money should BCS recover for the time that you spent investigating the deindexing?

10:37   MR. GIBSON:  Same objections.

But you can answer.

THE WITNESS:  Same answer.  I'm not an expert on that in a legal sense, and I've already given you my personal valuation.

10:38   BY MR. TATE:

Q    Okay.  Jesse Jensen, how much time -- how -- what is the value of the time that Jesse Jensen spent investigating the alleged deindexing?

MR. GIBSON:  Same objections.

10:38   THE WITNESS:  I don't know.  It's not my expertise.

71

```
 1    BY MR. TATE:

 2         Q    Okay.  Just a second here.  I'm just hunting

 3    down the next exhibit.

 4              You know what, before we go, looking back at

10:39  5    Exhibit 131, your -- your special interrogatory response

 6    you have -- the second category of damages is time

 7    incurred by plaintiff's lawyers.

 8              Do you see that?

 9         THE REPORTER:  You're muted, Ms. Magill.

10:39 10         THE WITNESS:  Thank you.  Sorry.  I said just one

11    moment.  I'm finding the document again.  You said

12    Exhibit 131?

13    BY MR. TATE:

14         Q    Yes.

10:40 15         A    Okay.  And what was the question?

16         Q    Okay.  Just asking, do you see where it's

17    listing the time spent by plaintiff's lawyers?

18         A    On page --

19         Q    Six.

10:40 20         A    Yes.

21         Q    I'll represent to you that under the -- the

22    applicable law, you can recover time for investigating

23    an alleged unauthorized access, but not for litigating

24    it.

10:40 25              Do you understand that difference?
```

72

1       A       Yes.

2       Q       So of the 101.6 hours that Tamany Bentz spent,

3   how much was that investigating the alleged deindexing,

4   as opposed to litigating?

10:40   5       MR. GIBSON:  Objection.  Speculation.  Also, invades

6   the attorney-client privilege.  No doubt.

7       MR. TATE:  Well, John, that's going to be a problem

8   then, right?  Because either she's going to have to --

9   if she wants to recover these times, then she's going to

10:41 10  have to waive the privilege.  You can't -- you can't

11  walk into trial and not let me ask these questions.  So

12  either she has --

13      MR. GIBSON:  Yeah.

14      MR. TATE:  -- withdraw those as damages, which she

10:41 15  can do, or she's got to answer the questions on it.

16      MR. GIBSON:  Yeah, we're not -- but not at the

17  deposition.  We're not -- there's no need to, you know,

18  withdraw anything at the deposition.

19      MR. TATE:  Then she has to -- then she has to --

10:41 20  then she has to waive the privilege.

21      MR. GIBSON:  No.  We're standing on the privilege.

22  That's something we can work out, you know, between the

23  attorneys later.

24      MR. TATE:  All right.  I guess we're going to have

10:41 25  to move to compel on this.

73

BY MR. TATE:

Q    Do -- does BCS know of the 101.6 hours that Jess -- Tamany Vinson Bentz spent, does BCS know how much time that was spent investigating the deindexing?

10:41    MR. GIBSON:  And objection.  I just want to, Ms. Magill, you to exclude from your answer anything you learn from BCS's attorneys in this case or discussed with BCS's attorneys.  If you know of your own separate knowledge apart from attorney-client communications, you

10:42    can answer.

THE WITNESS:  I don't know apart from attorney-client communications.

BY MR. TATE:

Q    And to save time, that would be the same answer

10:42    if I went down for each one of the persons listed by your attorneys; correct?

A    Correct.

Q    I believe that you testified that the majority of the 368 hours listed in special interrogatory was

10:42    time that you spent investigating the deindexing; correct?

A    Let me verify that number.

Yes.

Q    Okay.  So in the 368 -- something less than

10:42    368, but the majority of that time, did you learn what a

74

1    A    Yes.

2    Q    Do you see the three errors listed?

3    A    I see at the bottom where it says details,

4  status error, and there's three lines, yes.

10:46  5    Q    Okay.  Is it true that Ms. Beauregard sent you

6  this screenshot on or about March 14th?

7    A    I don't remember the exact date.

8    Q    Do you recall what you did during all of these

9  hours that you were investigating it to look into the

10:46 10  submitted URL marked "no index error"?

11    A    I don't remember specifically.

12    Q    Can you -- do you know what any -- do you know

13  if anybody looked into that issue?

14    A    I don't know specifically, but I would be

10:46 15  pretty sure that, yes, we looked into everything that we

16  found that could possibly be related or help us figure

17  out what was going on.

18  BY MR. TATE:

19    Q    The redirect error, can you recall what you did

10:46 20  to look into that error?

21    A    I don't remember specifically.

22    Q    Okay.  Can you recall what anybody did to look

23  into that error?

24    A    I don't remember specifically.

10:46 25    Q    The submitted URL appears to list -- appears to

77

1  be a soft 404 error.  What did you do to investigate

2  that error?

3      A    I don't remember specifically.

4      Q    What did anybody else do to investigate that

10:47  5  error?

6      A    I don't remember specifically, and I'm not the

7  technical expert here.

8      Q    But you're -- you're confident that BCS looked

9  into these errors; correct?

10:47  10     A    Yes.

11     MR. GIBSON:  Yeah, just a late objection that

12  Mr. Jensen was designated on a number of IT and

13  technical issues, I believe testified as to those.

14     MR. TATE:  Yeah, but I'm -- I'm entitled to explore

10:47  15  as the damages expert the veracity of her claim that she

16  spent 300 hours looking into this.

17  BY MR. TATE:

18     Q    So -- about your -- so my question was, you're

19  confident that BCS looked into each one of these issues;

10:47  20  correct?

21     A    Correct.

22     Q    Give me one second here.

23     A    I'm going to step away for just a moment to

24  refill my water glass.

10:48  25     MR. TATE:  Well, do you want to take -- it's been a

78

```
 1   while.  Why don't we take a ten-minute break?

 2       THE WITNESS:  I'd prefer to just get water and keep

 3   going, but if others need a break.

 4       MR. TATE:  Go ahead.  Take a -- let's take a

10:48  5   five-minute break then, and we'll come back in five

 6   minutes.

 7       THE VIDEOGRAPHER:  We are off the record at

 8   10:48 a.m.

 9           (Recess.)

10:55 10      THE VIDEOGRAPHER:  We are on the record at 10:55

11   a.m.

12   BY MR. TATE:

13       Q   Ms. Hughes -- Ms. Magill, I've put into chat a

14   document, which we'll mark as Exhibit 133.  All I need

10:55 15   you to do is look at Exhibit 133 and, you know, verify

16   that it's essentially the same exhibit as 132.  The

17   difference is this is the -- you know, poor quality

18   version that BCS produced, as opposed to the high

19   quality version that Ms. Beauregard produced.

10:56 20      A   It appears to be.

21       Q   Okay.  Let me show you now Exhibit 134.

22           (Exhibit 134, BCS Response to Whiteley's

23           Third Set of Interrogatories, was marked

24           for identification.)

10:56 25   //
```

                                                                79

1    BY MR. TATE:

2        Q    Do you have Exhibit 134 open?

3        A    Yes.

4        Q    Okay.  These are more special interrogatory

10:56  5  responses.  These ones, though, are verified by Jesse

6    Jensen, as you can see.

7            Do you see that?

8        A    Yes.

9        Q    And did you review these discovery responses

10:56  10  before they were submitted to me?

11       A    I don't believe so.

12       Q    Did Jesse Jensen come and ask you about how to

13   answer these questions?

14       MR. GIBSON:  Objection.  Just exclude from your

10:57  15  answer if that was in the context of an attorney-client

16   communication, but if you did that separately without --

17   without involving attorney communications, you can

18   answer.

19       THE WITNESS:  Yeah, I don't -- remember any

10:57  20  conversations regarding it outside of conversations with

21   our attorney.

22   BY MR. TATE:

23       Q    Okay.  Special interrogatory number 13, I asked

24   what BCS did to investigate the soft 404 error that you

10:57  25  just told me you were certain that was investigated, and

80

1    the answer is, plaintiff's response, that no

2    investigation was done.

3              So which one is inaccurate, the special

4    interrogatory responses, or your testimony?

10:57  5      MR. GIBSON:  Objection.  Argumentative and misstates

6    testimony.

7    BY MR. TATE:

8      Q    Go ahead.

9      A    Restate the question, please.

10:58 10   BY MR. TATE:

11     Q    So in the special interrogatories, BCS stated

12   under penalty of perjury that it did not investigate the

13   soft 404 error.  That is the exact opposite of what you

14   just told me, so which -- which statement is correct?

10:58 15     MR. GIBSON:  Same objections.

16     THE WITNESS:  Well, I don't believe it's the exact

17   opposite.

18   BY MR. TATE:

19     Q    Okay.  Did BCS investigate the soft 404 error?

10:58 20     A    I don't know.  I told you I did not know

21   specifically.

22     Q    And special interrogatory number 14, BCS said

23   it did not investigate the redirect error.

24              Did BCS investigate the redirect error?

10:58 25     MR. GIBSON:  Same objections.

**81**

1        THE WITNESS:  Same response.  I already told you I

2    don't know specifically.  Jesse is the expert on this.

3    BY MR. TATE:

4        Q    Well, let me ask you.  Did you investigate the

10:58 5    redirect error?

6        A    Not to my recollection.

7        Q    Okay.  And did you investigate the soft 404

8    error?

9        A    I thought I already answered this, but.

10:59 10        MR. GIBSON:  Yeah, same -- same objections.

11    BY MR. TATE:

12        Q    So going on to special interrogatory number 15,

13    the submitted URL marked no index, once again, the BCS

14    response is that no investigation was done into that

10:59 15    topic.

16            Did BCS investigate that topic?

17        MR. GIBSON:  Same objections.

18        THE WITNESS:  And same answer.

19    BY MR. TATE:

10:59 20        Q    Which is?

21            THE WITNESS:  Ms. Nelson, if you could read

22    back my previous answer.

23    BY MR. TATE:

24        Q    No, it -- it's a different question.  We need

10:59 25    to -- we need an answer to each question.

82

1    A    I said that I do not remember specifically

2  investigating it.

3    Q    Oh, okay.

4    A    Myself.  Individually.

11:00  5    Q    So in special interrogatory number 16, asked

6  you to -- to describe in detail BCS's investigation into

7  the errors that were on Exhibit 133.  And once again,

8  BCS said that no investigation into these errors was

9  done.

11:00 10        Do you -- do you have any reason to dispute

11  that special interrogatory response?

12    A    I defer to Jesse on technical issues.  He's the

13  expert.

14    Q    Okay.  But you don't recall yourself

11:00 15  investigating any of those errors in the hundreds of

16  hours that you spent supposedly investigating this

17  issue; correct?

18    MR. GIBSON:  Same objections.

19    THE WITNESS:  Same answer.  I don't remember

11:00 20  specifically investigating these errors.

21  BY MR. TATE:

22    Q    After Noelle sent you this screenshot showing

23  you these errors, was there a reason why you didn't look

24  into it?

11:01 25    A    Me specifically, or BCS?

83

1    Q    You, specifically.

2    A    I'm not the technical expert.  That wasn't my

3    role.

4    Q    And are you aware of a reason why Jesse Jensen

11:01  5    didn't look into these errors?

6    A    Seems to call for speculation.  I'm not Jesse.

7    Q    I appreciate that.  I'm asking if you are aware

8    of a reason why he didn't look into these errors?

9    MR. GIBSON:  Objection.  Speculation.

11:01 10    THE WITNESS:  I couldn't say.

11    BY MR. TATE:

12    Q    Okay.  Let's do this:

13         Let me show you the next document in order,

14    we'll mark it as Exhibit 135.

11:01 15         (Exhibit 135, Screenshot of Google Search

16          Console, was marked for identification.)

17    BY MR. TATE:

18    Q    All right.  Let me know when you have Exhibit

19    135 open.

11:02 20    A    Okay.

21    Q    I'll represent to you this is a screenshot

22    taken by my expert, and he was looking at the Google

23    Search Console through Jesse Jensen's credentials, and

24    on the right-hand side, you can see the messages that

11:02 25    Google sent to Mr. Jensen.

84

BY MR. TATE:

   Q    You, Ms. Magill, how do you believe that my client supposedly deindexed this website based on the hundreds of hours that you spent investigating it?

11:06    MR. GIBSON:  Objection.  Calls for a legal conclusion, and speculation, but you can answer to the extent you have a -- an estimate.

    THE WITNESS:  I'm going to defer to what has been stated in documents produced in that complaint.  I

11:06  wouldn't want to misstate anything.

BY MR. TATE:

   Q    No, that doesn't work, Ms. Magill.

    Based on your own understanding, how do my clients supposedly deindex the website?

11:06    MR. GIBSON:  Yeah, objection in that calls for speculation as to a technical aspects, because another witness, who's the PMK for BCS, has testified as to that, but you can state if you have a general understanding, Ms. Magill, of what happened kind of in

11:07  lay person's terms.

    THE WITNESS:  Okay.  That -- Ms. McNamara assigned Jeremy Whiteley ownership of the site within the Google Search Console, and that one of them requested that the site be deindexed on Google.

11:07  //

87

BY MR. TATE:

Q   And you don't know, you, Ms. Magill, you're not sure whether it was Katie McNamara or Jeremy Whiteley who was the one that pressed the button saying to deindex?

A   I believe that that was in multiple of these screen-shots we had provided, but I do not recall today exactly.  But I'm not the technical expert.

Q   Understood.  All right.  So going back to your discovery response regarding the potential sources of damages, the last potential source of damage that you identified was lost donations due to decreased web -- web traffic.

How much in donations did BCS lose?

MR. GIBSON:  Objection.  Speculation.  Legal conclusion.

But you can answer, if you know.

THE WITNESS:  He already asked this question.  I already answered it.

BY MR. TATE:

Q   I did not ask this question, so give me an answer.

A   You did ask this question, and I said it is impossible to give you an exact number.

Q   Can you give me a ballpark?

**88**

        1        A    Impossible to know in terms of donations.

        2   That's not how donations and fundraising works.

        3        Q    Can you identify a single person who was not

        4   able to donate due to the website not appearing on

11:09   5   Google Search?

        6        MR. GIBSON:  Objection.  Speculation.

        7   Argumentative.  Legal conclusion.

        8        But you can describe, Ms. Magill, if you have a -- a

        9   general understanding on behalf of BCS what -- what did

11:09  10   BCS miss out on as a result of this.

       11        THE WITNESS:  Yeah, I can't tell you a specific

       12   person because I don't know individuals who watched the

       13   Lifetime special, which was the major publicity at the

       14   time.

11:09  15        However, we expected with some more national

       16   publicity to when we were in Washington, D.C. in October

       17   of 2021, which showed a pretty significant correlating

       18   spike in visitors to our website, and correlating spike

       19   in donations that would be similar.  Instead, it was

11:09  20   completely flat.

       21   BY MR. TATE:

       22        Q    How -- so you -- you -- you said it should have

       23   been similar.  How much in donations did you get from

       24   that similar event?

11:10  25        A    I don't remember the exact total.

                                                                    89

1    Q    Can you give me a ballpark?

2    A    Tens of thousands of dollars, but it also lead

3    to future donations and relationships with donors who

4    ended up donating in the future, otherwise supporting

11:10  5    the organization.  It's impossible to quantify the

6    specific event.

7    Q    I just want to pin down this testimony.  So you

8    believe that your time -- the damages to the Lifetime

9    show; correct?  That if had the website been appearing

11:10  10   on Google Search during the time of the Lifetime show,

11   BCS would have received more donations.  Am I

12   understanding you correctly?

13   A    Yes, to the -- best of our knowledge.

14   Q    Was the website appearing on Google Search when

11:11  15   the Lifetime show aired?

16   A    I don't remember the specific dates.

17   Q    Jesse Jensen testified it was appearing on

18   Google Search when the Lifetime show aired.

19   A    Then I would defer to Jesse.

11:11  20   Q    Okay.  So, now that we've cleared that up, how

21   much in donations did BCS supposedly lose?

22   A    I don't know.

23   MR. GIBSON:  Objection.  Asked and answered.

24   Speculation.

11:11  25   //

90

BY MR. TATE:

1

    Q    Go ahead.

2

    A    Donations don't work like that.  It's not a

3

consistent average level.  It goes up at the end of the

4

11:12  5  year for year-end donations, it goes up for publicity,

it goes up if Paris Hilton does a press conference.  I

6

mean, there's no way to tell you that.

7

    Q    Okay.  Between March 9th and about 2 or 3

8

o'clock on March 12th, do you have any idea how many --

9

11:12 10  how much in donations BCS lost?

    MR. GIBSON:  Objection.  Speculation.  There are,

11

you know, plenty of documents that trace the various

12

volumes, and so it's not a memory test, but if you do

13

remember, you can certainly answer, Ms. Magill.

14

11:13 15    THE WITNESS:  I don't remember the specific numbers.

And you're asking me about what we lost, which asks me

16

to speculate as to what we would have gotten, which I

17

can't do.

18

BY MR. TATE:

19

11:13 20    Q    Isn't it true that it's not uncommon for BCS to

go days without receiving a single donation?

21

    MR. GIBSON:  Objection.  Vague as to timeframe.

22

    THE WITNESS:  Yeah.

23

BY MR. TATE:

24

11:13 25    Q    Go ahead.

92

1    with the allegations in the complaint, we are stating

2    not that we specifically know the exact amount of

3    donations that we missed out on, but we're comparing,

4    again, national publicity of one kind to a similar level

11:15  5    of national publicity, which showed a spike in visitors

6    to our website before, during, and after that event, and

7    we did not see any spikes, we saw a flatline in terms of

8    visitors for a significant amount of the time period in

9    question.

11:16 10   BY MR. TATE:

11       Q    That's not even close to responding to my

12   question.

13          My -- my question is, how does BCS know that

14   the lack of donations it received was caused by people

11:16 15   not donating, as opposed to the normal variations in the

16   donations that BCS received?

17       MR. GIBSON:  Objection.  Asked and answered.

18       THE WITNESS:  Yeah.  Same answer.

19   BY MR. TATE:

11:16 20      Q    Are you -- are you going to answer my question?

21   You gave me a completely different answer.

22       MR. GIBSON:  It is responsive.

23   BY MR. TATE:

24       Q    All right.  Well, let me -- let me ask this:

11:16 25          Does BCS know that the lack of donations it

95

1   received was caused by the alleged deindexing?

2       A    I mean, I think it's hard to tell the cause and

3   effect of anything that didn't happen.

4       Q    Okay.

11:17  5       A    But to the best of our knowledge, it is a very

6   reliable conclusion.

7       Q    And basically what you've done is you've looked

8   at your web traffic and you saw a drop in web traffic;

9   correct?

11:17 10       A    That's one thing, yes.

11       Q    Okay.  How does BCS track its web traffic?

12       A    Through analytics.

13       Q    You use a Google Site plugin, don't you?

14       A    That's one way, yes.

11:17 15       Q    Did you know that Ms. Beauregard deactivated

16   the Google Site plugin during that time period?

17       MR. GIBSON:  Objection.  Calls for speculation.

18   Argumentative, as well.

19       THE WITNESS:  Yeah.  I don't know what

11:17 20   Ms. Beauregard -- what you are alleging is true or not.

21   BY MR. TATE:

22       Q    This is the first time you've heard that?

23       A    There's been all sorts of wild accusations this

24   whole entire case.  I have no idea.

11:18 25       Q    Well, so let me -- let me ask you differently,

96

1       Q    Okay.  I'm only asking if this issue ever -- if

2   you became aware of it in all of your -- in all of your

3   investigation?

4       A    I don't remember.

11:20   5       Q    And apart from the Google analytics that showed

6   a drop in the web traffic, is there anything else that

7   would suggest that -- that BCS lost donations during

8   that time period?

9       A    I already answered this question.

11:21   10       Q    Go ahead.  Answer it again.

11       MR. GIBSON:  Objection.  Asked and answered, but you

12   can -- you can answer it one more time.  I think it

13   might be a little different than the question before.

14       THE WITNESS:  Then could you repeat the question?

11:21   15   Because it seemed the same.

16   BY MR. TATE:

17       Q    So apart from the Google analytics, which

18   showed a drop in web traffic, is there any other reason

19   why BCS believes that it lost donations?

11:21   20       A    I believe this is the same question, but the

21   web traffic, the correlating drop in -- and flatlining

22   of donations, the lack of contact and outreach by media

23   and donors and individuals, all of that compared to a

24   similar event with a similar level of national exposure

11:22   25   that had very, very different effects.

99

1        Q    So I -- I thought we already clarified this,

2   and maybe I'm missing something and that's why we do

3   these depositions.  You keep referring to a similar

4   event.  What -- that similar event, what was it?

11:22  5        A    Breaking --

6        MR. GIBSON:  Objection.  Asked and answered, but I

7   think you could give a little more detail on that -- on

8   that event in 2021 you referenced before.

9        THE WITNESS:  Sure.  October of 2021, Breaking Code

11:22 10  Silence was in Washington, D.C. to talk about the issues

11  that we advocate for to hold press conferences and other

12  events with Paris Hilton and her team, and to introduce

13  federal legislation and speak with legislators about the

14  legislation to protect children.

11:23 15  BY MR. TATE:

16        Q    And you're saying that that event is similar to

17  the Lifetime premier; correct?

18        MR. GIBSON:  Objection.  Misstates testimony

19  slightly.

11:23 20  BY MR. TATE:

21        Q    Well, what was it during that time period that

22  is similar to the Paris Hilton event?

23        A    The level of national media exposure.

24        Q    What -- so other than the Lifetime event, was

11:23 25  there something else that was giving all this media

                                                        **100**

1    exposure?

2        A    The Lifetime event --

3        MR. GIBSON:  Objection.  I'm sorry, just objection.

4    Vague.  I think we're maybe mixing events in the

11:23  5    question, so the question is vague as to timeframe.

6        THE WITNESS:  Can you restate the question, please?

7    BY MR. TATE:

8        Q    You keep saying that, you know, I'm -- I'm

9    comparing what should have happened due to a similar

11:23 10    event.  You just explained that one of those events is

11    the Paris Hilton involvement.

12            What was the other media exposure event in

13    March 2022 that you're referring to?

14        A    I'm sorry, I thought the event in March 2022

11:24 15    that we're talking about was in regard to Lifetime and

16    related media events.

17        Q    That's what I thought too, but we already

18    discussed that the website was showing on Google Search

19    during the Lifetime show, so that -- that's my

11:24 20    confusion.

21        A    So you're stating that a specific date and time

22    that the Lifetime premier aired.  That's not the only

23    media exposure related to that.

24        Q    What other media exposure was there that week?

11:24 25        A    One of them would be the advertising by

                                                        101

```
 1    Lifetime of the event leading up to it, which included
 2    mentions of institutional child abuse, the TTI Breaking
 3    Code Silence.
 4        Q    When did Lifetime run those advertisements?
 5        A    I don't know the exact dates.
 6        Q    Do you know that they did do it?
 7        A    Yes.
 8        Q    And can you give me a ballpark?
 9        A    No.
10        Q    Do you know if it was between March 11th and
11    March 12th?
12        A    I do not know for sure, because again, I can't
13    give you specific dates, but it was very -- fairly heavy
14    in the dates immediately leading up to the event.  So my
15    guess would be, yes.
16        Q    Let me show you Exhibit No. 136.  Or sorry,
17    Exhibit 137.
18            (Exhibit 137, BCS Official Response to
19            Recent Legal Action with K. McNamara and J.
20            Whiteley, was marked for identification.)
21    BY MR. TATE:
22        Q    Let me know when you have it opened.
23        A    Okay.
24        Q    Do you recognize this document?
25        A    Yes.
```

                                                            **102**

BY MR. TATE:

1

2    Q    Did BCS spend any donation money defending --

3    defending BCS against other survivors?

4    A    So the way this is phrased and the intention is

11:28  5    it -- is that we did not pay attorneys to help us defend

6    against and to hopefully regain our natural property, et

7    cetera.

8    Q    Okay.

9    A    And that is true.

11:29 10   Q    So let's break that down, just so we've got a

11   nice, clean record.  BCS has not paid any of its

12   attorneys for anything related to the alleged

13   deindexing.  True?

14   MR. GIBSON:  Objection.  Speculation.

11:29 15  Attorney-client privilege.  And legal conclusion.

16   BY MR. TATE:

17   Q    Go ahead.

18   A    I'm not sure if I'm even able to discuss

19   financial arrangements with attorneys.

11:29 20   Q    You are.  Has BCS paid its attorneys anything

21   related to the investigation of the alleged deindexing?

22   A    Which attorneys?

23   Q    Any attorney.

24   MR. GIBSON:  Yeah.  You -- you're asking has BCS

11:29 25  paid BCS's attorneys anything?

105

1       MR. TATE:  Yep.

2       MR. GIBSON:  Okay.  You can answer that.

3       THE WITNESS:  Related to the -- for this litigation

4   is what you're specifically stating?

11:30  5   BY MR. TATE:

6       Q    Related to the deindexing, yeah.

7       A    For this litigation, no.

8       Q    Has it paid its attorneys for anything related

9   to the deindexing whether it's a part of this litigation

11:30 10   or not?

11       MR. GIBSON:  Calls for speculation.

12       THE WITNESS:  Not that I know of.  I'm still not

13   quite sure what all you're entailing, though.

14   BY MR. TATE:

11:30 15   Q    Well, you made the -- you made the

16   clarification I was trying to figure out, you know, you

17   made -- you parsed that answer to suggest that maybe you

18   had paid the attorneys for something else, so I was just

19   trying to get to the bottom of it.  But it sounds like

11:30 20   BCS has not paid its attorneys anything for anything to

21   do with the deindexing; correct?

22       A    To the best of my knowledge, yes.

23       Q    Okay.  Has BCS paid anybody else anything

24   related to -- as a -- for investigating the alleged

11:31 25   deindexing?

**106**

```
 1   that was easily fixed.

 2        Q    Do you know how long it was down for?

 3        A    I don't remember specifically.

 4        Q    Okay.  Is BCS registered as a charity with the

11:51 5   California attorney general's registry of charitable

 6   trusts?

 7        A    Yes.

 8        MR. GIBSON:  Objection.  Vague as to timeframe.

 9        THE WITNESS:  Thank you.

11:51 10  BY MR. TATE:

 11       Q    I'm sorry, I didn't hear your answer.  Is it

 12  registered with the attorney general?

 13       A    Right now, yes.

 14       Q    When did it register with the attorney general?

11:51 15       MR. GIBSON:  Objection.  Speculation.

 16       THE WITNESS:  Yeah, I don't know the exact dates.

 17  They don't even tell you exactly what date your

 18  registration goes through.

 19  BY MR. TATE:

11:51 20       Q    Was it within the first 30 days of being

 21  incorporated?

 22       A    No.

 23       Q    Was it in 2021?

 24       A    It was supposed to be.  The person who was

11:52 25  supposed to do that did not do that.
```

                                                              **115**

1    Q    Was it registered in 2022?

2    A    We thought it was, because the person who was

3  supposed to do it in 2021 was supposed to.  We did not

4  find out that it wasn't until later.

11:52  5    Q    Okay.  So I'm assuming that it was registered

6  in 2023?

7    A    Yes.

8    Q    Okay.  And was it in -- can you give me -- tell

9  me which quarter?

11:52 10    A    I don't know.

11    MR. GIBSON:  Objection -- objection.  Speculation.

12  BY MR. TATE:

13    Q    Was it within the last few months?

14    A    Sir, we sent in the documents to register

11:52 15  multiple times that then got lost in the mail, tracking,

16  I mean, I don't even remember which time actually went

17  through -- or know, if they'd even tell us.

18    Q    And have you got a notification that you are

19  registered today?

11:53 20    A    I'm sorry, repeat the question?

21    Q    Do you know for a fact that BCS is registered

22  with the California Attorney General's Registry of

23  Trusts today?

24    A    The most recent letter we received was from

11:53 25  September, and as of the date of that letter from the

116

1  AG's Charitable Trust division, it stated that we were

2  registered.

3      Q    Did you -- how many letters did you receive in

4  September from the attorney general's office?

11:54  5      A    (Indiscernible due to cross-talk).

6      MR. GIBSON:  Objection.  Asked and answered, and

7  speculation.

8      THE WITNESS:  I don't remember.

9      MR. TATE:  Put into the chat Exhibit No. 139.

11:54 10  Please let me know when you have it opened.

11          (Exhibit 139, Delinquency Notice, was

12          marked for identification.)

13      THE WITNESS:  Okay.

14  BY MR. TATE:

11:54 15      Q    Is this the letter you're referring to?

16      A    That's one of the letters, yes.

17      Q    Okay.  And now, this letter is dated September

18  15th, 2023.  And what it's stating is that BCS is

19  delinquent with the registry of charitable trusts.

11:55 20          Is BCS delinquent with the -- with the registry

21  of charitable trusts?

22      MR. GIBSON:  Objection.  Vague as to timeframe.

23      THE WITNESS:  Can you be more specific?

24  BY MR. TATE:

11:55 25      Q    Yeah, let me -- let's try this more

**117**

1    foundationally.  Have you seen this letter before?

2        A    Yes.

3        Q    Now, what is your role at BCS?

4        A    CEO.

11:55 5      Q    All right.  So as the CEO, documents like this

6    come to your attention; correct?

7        A    Yes.

8        Q    Okay.  When you received this notice, what

9    action, if any, did you take?

11:55 10     A    Contacting the attorney general's office

11   requesting clarification, connecting the attorney

12   general's office with representatives with the IRS that

13   we are working with to catch up on 990s, but we have

14   a -- the 404.

11:56 15     Q    Did you ever provide the attorney general --

16   attorney general's office with copies of your 990s?

17       A    We're still in communication with the attorney

18   general's office with required documentation.  And

19   that's not just me.  That's also our board president,

11:56 20   so.

21       Q    Yeah.  My question was, was -- let's do this

22   year by year.

23            Did you give the attorney general's office the

24   990s for 2021?

11:56 25     A    For the calendar year ending, or starting in

                                                    **118**

1    2021?  We have a June 30th end of the school year.

2        Q    Okay.  For the fiscal year ending June 30th,

3    2021, has BCS provided those 990s to the registry of

4    charitable trusts?

11:57  5        A    I don't know specifically.  Those were created

6    by our accountant, and then mailed to various places

7    that needed them.  So.

8        Q    For the fiscal year ending June 30th, 2022, has

9    BCS provided those 990s to the registry of charitable

11:57  10   trusts?

11        A    Same thing.  I don't know specifically.  That's

12    why we're in discussions with the IRS to see what

13    they've received that we've mailed, what they -- or

14    sorry -- what the attorney general's office to see what

11:57  15    they received, what they still need, and what they would

16    like, along with the understanding of the limitations

17    with financials we have.

18        Q    As the CEO of BCS, is it your understanding

19    that BCS is delinquent with the registry of charitable

11:58  20    trusts?

21        MR. GIBSON:  Objection.  Calls for a legal

22    conclusion and speculation.

23        THE WITNESS:  Yeah, I don't know today what they

24    classify us as.  Again, we've had ongoing discussions

11:58  25    for months.

**119**

BY MR. TATE:

    Q   Has anybody told you that you're no longer delinquent?

    MR. GIBSON:  Objection.  Speculation.  It's also vague.

    THE WITNESS:  Yeah.  Can you rephrase the question?

BY MR. TATE:

    Q   All right.  You received a letter stating that BCS is delinquent with the attorney general's office; correct?

    A   Yes.  The September 15th letter.

    Q   Okay.  Have you -- has anybody told you that whether -- has anyone told you that BCS is no longer delinquent?

    A   No one has stated those specific words to me, no.

    Q   Why don't we go ahead -- I need to pull up a new document.  Why don't we go ahead and take a five-minute break, come back at 12:05.

    THE VIDEOGRAPHER:  We are off the record at 11:59 a.m.

       (Recess.)

    THE VIDEOGRAPHER:  We are on the record at 12:08 p.m.

    MR. TATE:  All right.  So during the break, what I

120

 1   did is I went onto the office attorney general's

 2   website, and I grabbed some information off that as of

 3   today.

 4        So I put into the chat, Exhibit No. 140.  Can you

12:08  5   please open that when you are ready?

 6             (Exhibit 140, Registrant Details, was

 7              marked for identification.)

 8        THE WITNESS:  Okay.

 9   BY MR. TATE:

12:09 10   Q    Again, I represent to you that this is what

 11   the -- the DOJ's website shows today, and as of today,

 12   Breaking Code Silence is listed as being delinquent in

 13   its registry status.

 14             Are you aware of any facts that would indicate

12:09 15   otherwise?

 16   A    Nope.

 17   Q    And as the CEO of Breaking Code Silence, you

 18   understand that delinquent organization is not allowed

 19   to receive any donations; correct?

12:09 20   MR. GIBSON:  Objection.  Calls for a legal

 21   conclusion and speculation.  Also, invades the

 22   attorney-client privilege.

 23   BY MR. TATE:

 24   Q    I'm just asking if you understand that or not.

12:09 25   MR. GIBSON:  And just -- exclude from your answer

                                                        121

1    any understanding you gain from counsel, BCS's counsel.

2        THE WITNESS:  Okay.  I understand that you're saying

3    that is the general policy, yes.

4    BY MR. TATE:

12:09  5        Q    Okay.  So if you look at this document, you'll

6    see four hyperlinks to different documents you can

7    download.  Just go quickly through each of those four.

8    The first one we will mark as Exhibit 141.

9            Please let me know when you have that opened.

12:10 10            (Exhibit 141, Notice to Register, was

11            marked for identification.)

12        THE WITNESS:  Okay.

13    BY MR. TATE:

14        Q    Have you seen Exhibit 141 before?

12:10 15        A    We've seen a copy of it, but we did not receive

16    the original.

17        Q    Okay.  Do you remember when you first saw a

18    copy of Exhibit 141?

19        A    I can't give you a date, hmm-mm.

12:10 20        Q    Okay.  Regardless, as the CEO of Breaking Code

21    Silence, you understood that to be able to collect

22    donations, you had to register with the attorney

23    general's office; correct?

24        A    (Indiscernible due to cross-talk.)

12:11 25        MR. GIBSON:  Objection.

122

1        THE WITNESS:  I'm sorry.

2        MR. GIBSON:  Objection.  Legal conclusion.

3        THE WITNESS:  In general, yes.

4    BY MR. TATE:

12:11  5        Q    Okay.  Let me show you Exhibit No. 142.  Please

6    let me know when you have that one opened.

7            (Exhibit 142, Final Notice to Register, was

8            marked for identification.)

9        THE WITNESS:  Okay.

12:11 10    BY MR. TATE:

11        Q    Have you seen Exhibit 142 before?

12        A    Again, I think I've seen a copy, but not the

13    original.

14        Q    Okay.  And you understood from -- well, when

12:11 15    did you understand that BCS had failed to register with

16    the attorney general's office?

17        A    Repeat the question?

18        Q    When did -- when did BCS understand that it had

19    failed to register with the attorney general's office?

12:12 20        A    I don't remember the exact date.

21        Q    Was it -- before or after you received this

22    letter?

23        A    We didn't receive this letter.  I said, I've

24    seen it, but we did not receive it.  Notice that it's --

12:12 25        THE REPORTER:  I'm sorry, can you repeat the last

123

1    Q    Okay.  Show you Exhibit 143.  Have you seen
2  Exhibit 143 before?
3    A    Most likely.  It looks like it was sent by me.
4    Q    And then you see the attachment there, CT 400
12:14  5  NTR under score breaking dot PDF?
6    A    I see that's what the name of the attachment
7  is, yes.
8    Q    Okay.  So that matches the name of the document
9  of Exhibit 141.
12:14 10        Does that help refresh your recollection that
11  as of May 11th, 2022, you knew that Breaking Code
12  Silence had not registered with the attorney general's
13  office?
14    A    There's no way I have a knowing that the
12:14 15  attachments match, despite the title.  That can be
16  edited, as you know.
17    Q    Fair enough, but I'm just trying to help
18  refresh your recollection of when you knew.  And it
19  sounds like this does not help you remember at all?
12:15 20    A    No.
21    Q    Okay.  But regardless, I think you just
22  testified that sometime in 2022, you became aware of
23  this issue; correct?
24    A    Yes.
12:15 25    Q    Okay.  Show you the next document.

125

1          Showing you Exhibit 144.  Please let me know

2   when you have it opened.

3          (Exhibit 144, Initial Registration Form,

4          was marked for identification.)

12:15  5      THE WITNESS:  Okay.

6   BY MR. TATE:

7      Q     Okay.  Do you recognize this document?

8      A     Yes.

9      Q     Okay.  These are -- is this the initial

12:16 10  registration form that you sent to the office of the

11  attorney general?

12      A     This -- this is one of them, yes.

13      Q     Okay.  Why did -- in the top right-hand corner,

14  it indicates the attorney general's office received it

12:16 15  July 18th, 2023.

16          Why did you wait so long to submit this?

17      MR. GIBSON:  Objection.  Argumentative.

18      THE WITNESS:  As I said, this isn't the only one

19  that we sent.  We sent multiple.  They kept saying they

12:16 20  hadn't received it, that it got lost in the mail, et

21  cetera.

22  BY MR. TATE:

23      Q     You understand that up until July 18th, 2023,

24  BCS was not allowed to accept any donations?

12:16 25      MR. GIBSON:  Objection.  Calls for speculation, and

                                                         126

```
 1   BY MR. TATE:

 2       Q    We'll move to compel.

 3            Has BCS ever registered as a nonprofit

 4   organization to accept donations in Colorado?

12:24  5       MR. GIBSON:  I'm sorry, can you -- I didn't quite

 6   get that.

 7   BY MR. TATE:

 8       Q    Yeah.  Has BCS registered as a nonprofit

 9   organization to accept donations in Colorado?

12:24 10       A    I completed our initial registration in

11   Colorado.  I don't remember who handled subsequent

12   registrations.

13       Q    According to BCS's verified discovery

14   responses, it has never filed, at least at the time you

12:24 15   submitted it, it has never filed a form 990 with the

16   IRS.

17            Has BCS subsequently filed those form 990s with

18   the IRS?

19       A    Can you restate the question?

12:25 20       Q    Yeah.  BCS gave me a verified discovery

21   response saying that it has not filed any form of 990s

22   with the IRS, but time has passed.  And I'm wondering if

23   BCS has subsequently done so?

24       A    I don't know where in process our 990s are.  I

12:25 25   know they've been completed by our accountants and were
```

                                                          133

1    in processing, but I have no idea where they are in the

2    chain.

3        Q    All right.  So you don't know if the IRS ever

4    received a 990 for BCS?

12:25  5        A    I cannot tell you for sure, no.

6        Q    Show you a document that was marked as Exhibit

7    No. 12.

8        A    Okay.

9        Q    Have you seen Exhibit No. 12 before?

12:26 10            Did you answer and I not hear?

11        A    Yeah, I said yes.

12        Q    Okay.  When did you see this?

13        A    When did I first see this document?

14        Q    Yes.

12:27 15        A    I can't give you a specific, but it looks like

16    I would have seen it close to -- yeah, it's not dated,

17    so impossible to know, but I knew it was filed.

18        Q    Did -- you said you knew that it was filed.

19    How did you know it was filed?

12:27 20        A    I don't remember exactly who sent it in, but --

21        Q    Do you know who prepared it?

22        A    Either myself or Bobby Cook.  I don't see it.

23        Q    Do you know if the extension was granted?

24        A    Yes.

12:27 25        Q    Now, do you see on the first page where Bobby

**134**

1                              CERTIFICATE

2                                   OF

3                     CERTIFIED SHORTHAND REPORTER

4                              *  *  *  *  *

5

6

7

8        The undersigned Certified Shorthand Reporter of the

9   State of California does hereby certify:

10       That the foregoing Proceeding was taken before me

11  at the time and place therein set forth.

12       That the testimony and all objections made at the

13  time of the Proceeding were recorded stenographically by

14  me and were thereafter transcribed, said transcript

15  being a true and correct copy of the proceedings

16  thereof.

17       In witness whereof, I have subscribed my name, this

18  date: November 17, 2023.

19

20

21

    _____
22       CAILEY NELSON, CSR NO. 14133

23

24

25

                                                         **144**