JOHN S. GIBSON (SBN 140647)
john.gibson@us.dlapiper.com
JASON T. LUEDDEKE (SBN 279242)
jason.lueddeke@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4735
Tel:   310.595.3000
Fax:   310.595.3300

Attorneys for Plaintiff
BREAKING CODE SILENCE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREAKING CODE SILENCE, a California 501(c)(3) non-profit,<br><br>                    Plaintiff,<br><br>        v.<br><br>KATHERINE MCNAMARA, an individual, JEREMY WHITELEY, an individual, and DOES 1 through 50, inclusive,<br><br>                    Defendants. | CASE NO.  2:22-CV-002052-SB-MAA<br><br>Hon. Maria A. Audero<br><br>**PLAINTIFF BREAKING CODE SILENCE'S EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA**<br><br>Date:  May 14, 2024<br>Time:  2:00 p.m.<br>Courtroom:  880 |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

Pursuant to Section 8(c)(3) of the Standing Order and the Federal Rules of Evidence, Plaintiff Breaking Code Silence ("BCS") hereby submits evidentiary objections to the Declaration of Katherine McNamara in Support of her Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (Dkt. No. 172-2) ("McNamara Declaration").

While the McNamara Declaration is replete with objectionable testimony, BCS focuses its objections on the testimony below in the interest of judicial efficiency.  BCS reserves the right to object to any of this evidence in the future, whether *in limine* or through other means, including based on how Defendants intend to use such evidence in the future or at trial.

| McNamara Declaration | Objection | Ruling |
| --- | --- | --- |
| **Objection 1**<br>11. After the original group of advocates that I was collaborating with disintegrated, I, together with Whiteley, Hughes, and Jennifer Magill, decided to form a nonprofit organization. Along with other new collaborators, this new group decided that the nonprofit organization would be named "Breaking Code Silence Youth Advocacy Network." Vanessa Hughes later asked me to purchase several domains that were a variation of "Breaking Code Silence | **Objection 1.**<br>**Relevance and confusion.  Fed. R. Evid. 401, 403**.  The "various" domains, which are not subject to this dispute, are not relevant and the probative value is outweighed by the risk of confusing the issues, misleading the jury and wasting time. | **Objection 1**.<br>Sustained /<br>Overruled. |

| | | |
|---|---|---|
| 1 | Youth Advocacy Network" for the | |
| 2 | organization, which I did between | |
| 3 | March 17 and 18, 2021. <mark>A true and</mark> | |
| 4 | <mark>correct copy of the Hover receipts</mark> | |
| 5 | <mark>for the various "Breaking Code</mark> | |
| 6 | <mark>Silence Youth Advocacy Network"</mark> | |
| 7 | <mark>domains I purchased for BCS are</mark> | |
| 8 | <mark>attached collectively to the Index of</mark> | |
| 9 | <mark>Exhibits as **Exhibit 107 (Objection**</mark> | |
| 10 | <mark>**1)**.</mark> On March 18, the new | |
| 11 | collaborators had a pre- | |
| 12 | incorporation meeting. My .Org | |
| 13 | Domain was never discussed or | |
| 14 | brought up in that pre-incorporation | |
| 15 | meeting, nor has Breaking Code | |
| 16 | Silence produced the recording of | |
| 17 | that meeting in discovery in this | |
| 18 | action. During the pre-incorporation | |
| 19 | meeting, the founders discussed | |
| 20 | their intent to incorporate and create | |
| 21 | a temporary assignment, which | |
| 22 | ultimately was never created. No | |
| 23 | decisions made during this pre- | |
| 24 | incorporation meeting were later | |
| 25 | voted on or ratified by the board | |
| 26 | post-incorporation. A true and | |
| 27 | correct copy of the meeting minutes | |
| 28 | | | |

2

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| titled "Breaking Code Silence Youth Advocacy Network Meeting Minutes 3/18/2021 are attached to the Index of Exhibits as **Exhibit 108**. | | |
| **Objection 2**<br>15. By creating subdomains, the .Org Domain is capable of hosting multiple websites. For example, subdomain1.breakingcodesilence.org is a possible subdomain that could be registered for other uses. Notwithstanding, to date, BCS has been the only one that I have permitted to use my .Org Domain since 2021. Attached to the Index of Exhibits as **Exhibit 7** is a true and correct copy of a screenshot I took on October 30, 2023, which accurately depicts the Google online Search Console Help page explaining domain properties and subdomains at: https://support.google.com/webmasters/answer/34592?sjid=1232802067652262856 8- | **Objection 2.**<br>**Improper opinion testimony by a lay witness, hearsay, lacks foundation. Fed. R. Evid. 701/702, 801, 901.** This opinion on subdomains is based on technical or specialized knowledge, the Google Search Console Help page is inadmissible hearsay and McNamara fails to lay a foundation for this opinion or the Google page. | **Objection 2.** Sustained / Overruled. |

| | | |
|---|---|---|
| NA#domain_property&zippy=%2C domain-property-examplecom. | | |
| **Objection 3** | **Objection 3.** | **Objection 3.** |
| 18. Once I verified my identity as the domain owner to Google (through the TXT record) in 2021, it linked my email address (iristheangel@gmail.com) to all domain-related services such as Google Webmaster Central and Google Search Console, which used to be separate but have since been combined (collectively the "Google Tools"), for single sign-on access. After this happened, I was not required to enter any special administrative credentials beyond simply signing into my own Google account since Google recognized me as the domain owner. And my login credentials to my Google account are automatically stored (i.e., "cached") in the Google Chrome browser which I am always signed into, meaning that I do not need to enter them to access the | **Relevance and confusion, improper opinion testimony by a lay witness, lacks foundation.  Fed. R. Evid. 401, 403, 701/702.**  The testimony about logging in to Google and the suggestion that there is no "access" is confusing as "exceeds unauthorized access" is a defined term within the Computer Fraud and Abuse Act.  18 U.S.C. § 1030(d)(6).  This opinion is also based on technical or | Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| Google Tools for any of my domains. | specialized knowledge. | |
| **Objection 4** 21. Whiteley and I were the only two directors on BCS's board who identified as LGBTQ+. Almost immediately after BCS was formed, tension started developing between the members of the board when Hughes (who was the President and CEO) regularly hurled insults and homophobic epithets at Whiteley during meetings (including BCS board meetings), telephone calls, Zoom conferences, and on BCS' private Slack channel in the Breaking Code Silence workspace. Among other things, I witnessed Hughes refer to Whiteley as a "mangina" and a "queen," and I also witnessed Hughes refer to Whiteley as having "female energy." | **Objection 4. Relevance, confusion and prejudice, and hearsay.  Fed. R. Evid. 401, 403, 801.** The alleged statements are irrelevant to this hacking dispute and any of the elements of the Computer Fraud and Abuse Act and related state claim.  18 U.S.C. § 1030.  Further, the probative value is substantially outweighed by a danger of unfair prejudice and of misleading the jury. The statements are also inadmissible | **Objection 4.** Sustained / Overruled. |

| | | |
|---|---|---|
| | hearsay. | |
| **Objection 5.** 22. <mark>Whiteley and several others made complaints about Hughes' behavior, but BCS management ignored Hughes' conduct. After only three months of involvement with BCS,</mark> Whiteley resigned from BCS' board of directors on June 26, 2021. | **Objection 5. Relevance, confusion and prejudice, and hearsay.  Fed. R. Evid. 401, 403, 801.** The alleged "complaints" and "behavior" are irrelevant to this hacking dispute and any of the elements of the Computer Fraud and Abuse Act and related state claim.  18 U.S.C. § 1030.  Further, the probative value is substantially outweighed by a danger of unfair prejudice and of misleading the jury. The statements, to the extent | **Objection 5**. Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| | incorporated from the prior paragraph of the declaration, are also inadmissible hearsay. | |
| **Objection 6.**<br>23. Immediately after the board of directors received Whiteley's notice of resignation, <mark>Hughes began pressuring myself and the other members of the board of directors to sue Whiteley. When Bill Boyles and I explained to Hughes that BCS did not have a reason to sue Whiteley, Hughes asked us to "brainstorm" up a reason to sue Whiteley. Bill Boyles and I refused</mark>. Because I was not proficient with WordPress at the time of Whiteley's resignation, based on Hughes and Magill's paranoia and the misinformation they were feeding the board, I was initially concerned that Whiteley might be able to access and interfere with the BCS website. | **Objection 6.**<br>**Relevance, confusion and prejudice, and hearsay.  Fed. R. Evid. 401, 403, 801.** The alleged investigation of wrongful conduct by Whiteley is irrelevant to this hacking dispute and any of the elements of the Computer Fraud and Abuse Act and related state claim.  18 U.S.C. § 1030.  Further, the probative value is substantially outweighed by a | **Objection 6.**<br>Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| | danger of unfair prejudice and of misleading the jury. The statements, at least those of third-party Bill Boyles, are also inadmissible hearsay. | |
| **Objection 7.** 25. After Whiteley's resignation in June 2021, Hughes's harassment of gay volunteers did not stop. People started telling me that Hughes was making comments about my sexual orientation to new BCS volunteers – indicating that there was a "problem lesbian board member" (I was the only lesbian board member at that time). Hughes also increased her hostility towards me. This led to my decision to file a formal internal complaint against Hughes in November 2021 for harassment, retaliation, and discrimination. A true and correct copy of the November 26, 2021 Breaking Code | **Objection 7.** **Relevance, confusion and prejudice, lacks personal knowledge, and hearsay.  Fed. R. Evid. 401, 403, 602 801.** The alleged statements are irrelevant to this hacking dispute and any of the elements of the Computer Fraud and Abuse Act and related state claim.  18 U.S.C. § 1030.  Further, the | **Objection 7.** Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| Silence – Internal Complaint Form that I submitted is attached to the Index of Exhibits as **Exhibit 10.** | probative value is substantially outweighed by a danger of unfair prejudice and of misleading the jury. McNamara lacks personal knowledge of statements not made to or in McNamara's presence.  The alleged statements and the Internal Complaint are also inadmissible hearsay. | |
| **Objection 8.** 26. Shortly thereafter, I learned that Hughes and Magill were misusing grant funds and hiring employees without unrestricted funds to pay them. As the corporate Treasurer, I felt obligated to report this to the California Attorney General and advised Hughes and Magill of my | **Objection 8.** **Relevance, confusion and prejudice, lacks personal knowledge.  Fed. R. Evid. 401, 403, 602.** The alleged misuse of company funds, | **Objection 8.** Sustained / Overruled. |

9

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| intention. The hostility that resulted and the anti-LGBTQ+ culture at BCS forced me to resign from BCS on December 9, 2021. | hiring practices, and alleged "hostility" and "anti-LGBTQ+ culture" is irrelevant to this hacking dispute and any of the elements of the Computer Fraud and Abuse Act and related state claim. 18 U.S.C. § 1030. Further, the probative value is substantially outweighed by a danger of unfair prejudice and of misleading the jury. To the extent this pertains to statements or treatment not about McNamara, McNamara lacks personal knowledge. | |

| Objection 9. | Objection 9. | Objection 9. |
|---|---|---|
| 27. On the evening of my resignation, Bill Boyles Jr. took affirmative steps to revoke my authorization to BCS's WordPress console by deleting my account. I have not logged into or otherwise accessed the BCS WordPress site since my resignation, nor do I have the ability to do so. | Relevance, confusion and prejudice, lacks personal knowledge, and lacks foundation. Fed. R. Evid. 401, 403, 602, 901. To the extent that McNamara is suggesting that actions about the WordPress site not primarily the subject of BCS's claims sanitizes the alleged hacking, this is irrelevant and confuses the issues. McNamara does not explain the source of knowledge for Bill Boyles Jr.'s actions and fails to lay a foundation. | Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| Objection 10. | Objection 10. | Objection 10. |
|---|---|---|
| 28. Within minutes of my resignation on December 9, 2021, my access to the kmcnamara@breakingcodesilence.org email account was revoked by someone at BCS and I could no longer access that account or any other BCS accounts that were linked to that email address. This includes BCS's Google Drive account, Cloudways account, paid Hootsuite account, PayPal account, and TikTok account. Notwithstanding BCS's revocation of my access to these accounts, BCS never removed my credit card as the payment method for several BCS accounts, including the annual renewal payments on BCS's Hootsuite account. Hootsuite has continued to charge my personal credit card for BCS's account even after this litigation was filed. Specifically, my credit card was charged $831 in May 2022 and $2,988 in May 2023 for BCS's Hootsuite account, | **Relevance and confusion and prejudice. Fed. R. Evid. 401, 403.** To the extent that McNamara is suggesting that actions about the Google Drive account, Cloudways account, paid Hootsuite account, PayPal account, and TikTok account, other not primarily the subject of BCS's claims sanitizes the alleged hacking, this is irrelevant and confuses the issues. | Sustained / Overruled. |

12

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| despite the repeated requests of my counsel to remove my credit card from <u>all</u> BCS accounts. I also continued to be charged for BCS's Cloudways web hosting from January to March 2022. But unlike Hootsuite, I was able to stop the Cloudways charges by working both with Cloudways Support and disputing the charges with my credit card company. | | |
| **Objection 11**. 34. Instead of reimbursing me, I was told by employees at the UPS Store that Hughes contacted the UPS Store on multiple occasions between January and March 2022, demanding that the UPS Store give her access to my UPS Box, accusing me (and the UPS employees) of committing "mail fraud," and demanding that the UPS Store turn over any security footage of me entering and leaving the UPS Store. When the UPS Store employees refused to comply with Hughes' demands, she threatened to | **Objection 11**. **Relevance, confusion and prejudice, and hearsay. Fed. R. Evid. 401, 403, 801.** The UPS Box ownership and claims of "mail fraud" are not at issue in this dispute and are therefore irrelevant. The statements from Ms. Chen and related | **Objection 11.** Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| sue the UPS Store and the individual employees. A true and correct copy of the April 12, 2022, statement I received from UPS Store employee Lisa Chen describing the foregoing events is attached to the Index of Exhibits as **Exhibit 14**. Ms. Chen told me that she requested that Hughes not call back again. | exhibit are inadmissible hearsay. | |
| **Objection 12.**<br>37. By way of explanation, Google Search Console (formerly known as Google Webmaster Central) is a free service that Google provides to domain owners and webmasters so that they can monitor how their site interacts with Google, measure site traffic, and troubleshoot any issues. Anyone that owns domains that are indexed on Google can have an account. In March 2022, Google Webmaster Central and Google Search Console were different, but related, services. In late July 2023, Google consolidated both services | **Objection 12.**<br>**Relevance and confusion, improper opinion testimony by a lay witness, lacks foundation. Fed. R. Evid. 401, 403, 701/702, 901.** The testimony about logging in to Google and the suggestion that there is no "access" is confusing as "exceeds | **Objection 12.**<br>Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

|   |   |   |   |
|---|---|---|---|
| 1 | into Google Search Console. Google | unauthorized access" |   |
| 2 | Tools are accessible by logging into | is a defined term |   |
| 3 | one's Google account, which is | within the Computer |   |
| 4 | usually the same as one's Gmail | Fraud and Abuse |   |
| 5 | address. When logged into one's | Act.  18 U.S.C. § |   |
| 6 | Google account, navigating to the | 1030(d)(6).  This |   |
| 7 | https://search.google.com/search- | opinion is also based |   |
| 8 | console/ permits one to access the | on technical or |   |
| 9 | Google Search Console features for | specialized |   |
| 10 | domains that the particular Google | knowledge and |   |
| 11 | account is permitted access. From | conflicts with what |   |
| 12 | my personal Google account, I can | is required for expert |   |
| 13 | sign onto Google Tools (using my | testimony. |   |
| 14 | automatically saved login for | McNamara fails to |   |
| 15 | iristheangel@gmail.com) and view | lay a foundation for |   |
| 16 | activities and any problems with all | what "Anyone" can |   |
| 17 | of the domains that I either own or | do and the source |   |
| 18 | have permissions to access, | knowledge for that |   |
| 19 | including my network-node.com | information. |   |
| 20 | domain which I own and use for |   |   |
| 21 | work, and the unsilenced.org |   |   |
| 22 | domain which I monitor with the |   |   |
| 23 | permission of the domain owner. I |   |   |
| 24 | also access my .Org Domain |   |   |
| 25 | through my personal Google |   |   |
| 26 | account. |   |   |
| 27 |   |   |   |
| 28 |   |   |   |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| **Objection 13**. | **Objection 13.** | **Objection 13.** |
| 38. What I provided to Whiteley on March 11, 2022, was administrative permissions to the .Org Domain ***through my own Google account*** so that he could see the activity related to the .Org Domain. Because I am the person who (1) registered the .Org Domain and (2) paid for the domain for more than 3 years, the .Org Domain is one of the domains that I have access to through ***my own Google account***. As the owner of the domain, I have top-level privileges to the Google service to administer to my domain and, as that system owner, can grant privileges to the service or revoke them as needed. The only reason BCS even has access to the Google Tools for the .Org Domain through its own Google Tools account is because ***I specifically granted BCS permission to access it*** by pointing the .Org Domain to BCS's webserver while I was a BCS volunteer/director, which allowed | **Relevance and confusion, improper opinion testimony by a lay witness.** Fed. R. Evid. 401, 403, 701/702. The testimony about logging in to Google and the suggestion that there is no "access" is confusing as "exceeds unauthorized access" is a defined term within the Computer Fraud and Abuse Act. 18 U.S.C. § 1030(d)(6). This opinion is also based on technical or specialized knowledge and conflicts with what is required for expert | Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| BCS to be authorized. | testimony. | |
| | | |
| **Objection 14**. | **Objection 14.** | **Objection 14.** |
| 46. I am aware that BCS previously made allegations regarding unauthorized access into numerous accounts. Even though many of those accounts are no longer at issue in the case, it is important to note that, after his resignation, Whiteley went above and beyond to accommodate and assist BCS in transferring to BCS ownership and administrative credentials to the BCS accounts he had either set up or had access to. Therefore, I believe the following account of my assistance with some of those transfers and, my contemporaneous awareness of the following transfers as a member of the board of directors at the time, is important: a.    WordPress: WordPress is a content management software that is installed on a server. It is the | **Relevance and confusion, improper opinion testimony by a lay witness.  Fed. R. Evid. 401, 403, 701/702**. To the extent that McNamara is suggesting that actions about the other accounts, which McNamara concedes are not at issue / the subject of BCS's claims, this is irrelevant and confuses the issues. There is also ample improper lay opinion testimony about technical information that should be the subject | Sustained / Overruled. |

17
EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | |
|---|---|
| application that provides the public-facing website for BCS. This is not to be confused with a domain – which is a separate, intangible, property which can point to any website or webserver that the owner of that domain wishes. During our times as volunteers, Whiteley and I had administrative access to the BCS WordPress Website for a period of time. After his resignation in June 2021, I took affirmative steps to revoke Whiteley's authorization to the BCS WordPress website in late June 2021 by changing his permissions from "Administrator" to "None" on the WordPress website, and Bill Boyles changed the email address for Whiteley's WordPress account on July 9, 2021. A true and correct of the July 9, 2021 email notification I received in the jwhiteley@breakingcodesilence.org inbox that I had access to after Whiteley's resignation is attached to the Index of Exhibits as **Exhibit 20**. | of expert testimony. |

| | | |
|---|---|---|
| 1 | I am unaware of Whiteley gaining | |
| 2 | any access to BCS' WordPress | |
| 3 | website after I revoked his | |
| 4 | authorization in June 2021. | |
| 5 | b. Domains: A domain name is a | |
| 6 | human-friendly address, | |
| 7 | sometimes called a URL (Uniform | |
| 8 | Resource Locator) or web address. | |
| 9 | Domains are created to make | |
| 10 | Internet Protocol (IP) addresses | |
| 11 | more accessible and easier to | |
| 12 | remember. Domains can be pointed | |
| 13 | towards websites, applications, | |
| 14 | servers, etc. It should be noted that a | |
| 15 | domain is different and | |
| 16 | distinguishable from a website. A | |
| 17 | domain is to a website like a street | |
| 18 | address is to a house. Domains | |
| 19 | direct internet users to the website, | |
| 20 | host, application, or document that | |
| 21 | they point to. Domains are | |
| 22 | purchased and reside in domain | |
| 23 | registrar accounts such as | |
| 24 | Hover.com, which is what I use. | |
| 25 | i. The *breakingcodesilence.com* | |
| 26 | *domain (the ".Com Domain"):* The | |
| 27 | .Com Domain was transferred from | |
| 28 | | |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

Josh Scarpuzzi's personal domain registrar account into my own personal Hover.com domain registrar account in April 2021 after BCS purchased the domain from Scarpuzzi. As described in detail above, after my resignation, I transferred the .Com Domain out of my personal Hover.com account into a new Hover.com account and my attorney gave BCS's counsel the credentials for this new Hover.com account so that BCS could take possession of the .Com Domain and put it into its own domain registrar account (or just keep it in the new account I created for the domain). Whiteley has never had access to my personal Hover.com account or the second Hover.com account that I created for BCS to house the .Com Domain.

*ii. The breakingcodesilence.org domain (the .Org Domain):* At all times since I registered the .Org Domain, it has been housed in my personal Hover.com domain

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

registrar account. I have maintained this Hover.com account since 2016 and it has housed over a dozen different domains that I use for non-BCS-related business and personal use. Attached collectively to the Index of Exhibits as **Exhibit 21** are true and correct copies of my receipts from Hover.com for some of my other domains that have been housed in my Hover.com domain registrar account dating back to 2016. I have never granted Whiteley any access to my personal Hover.com domain registrar account where all of my domains, including the .Org Domain, are housed, and I have received no information or alerts that would suggest that Whiteley ever accessed my Hover.com domain registrar account.

iii. During the course of this litigation, I have heard BCS refer to my Hover.com account as a "DNS account." This is inaccurate. Hover sells domains. The Hover.com

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

1  domain registrar account is not a
2  "DNS account," it is an account that
3  houses intangible domain name
4  properties. DNS stands for "Domain
5  Name System." DNS is a
6  configuration on a domain that
7  translates a domain name into an IP
8  address. The only DNS service that
9  Hover.com provides is basic
10  configuration of DNS for domains
11  that you own. As explained above,
12  my Hover.com domain registrar
13  account houses over a dozen
14  domain names that I have purchased
15  from Hover over the years as far
16  back as 2016 for personal and non-
17  BCS business related use.
18  c. BCS' Google Drive Account:
19  BCS uses Google Drive to share
20  documents internally and
21  externally. During my time at BCS,
22  documents were housed both on
23  various personal Google Drives as
24  well as BCS' Google Drive. The
25  majority of Whiteley's access to
26  BCS' Google Drive folders/ drives
27  were linked to his BCS email
28

1 | address,
2 | jwhiteley@breakingcodesilence.org
3 | . After his resignation from BCS, in
4 | late June 2021, I revoked
5 | Whiteley's authorization to the
6 | jwhiteley@breakingcodesilence.org
7 | email account.
8 | d. Google Search Console/Google
9 | Webmaster Central:
10 | *i. For the .Com Domain:* After
11 | BCS's purchase of the .Com
12 | Domain, it largely went unused
13 | while BCS was engaged in litigation
14 | over the .Net Domain. For that
15 | reason, Google Tools was never set
16 | up for the .Com Domain during my
17 | tenure at BCS. Thus, neither
18 | Whiteley nor I have ever had access
19 | to the Google Tools for the .Com
20 | Domain.
21 | *ii. For the .Org Domain:* As
22 | discussed in greater detail above, as
23 | the owner of the .Org Domain,
24 | Google recognizes me as the system
25 | owner for the .Org Domain. For the
26 | reasons discussed above, on the
27 | evening of March 11, 2021, I added
28 |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| 1 | Whiteley's email address, | |
| 2 | jeremy@medtexter.com to the | |
| 3 | Google Tools for the .Org Domain, | |
| 4 | without his prior knowledge, by | |
| 5 | clicking the "+" (addition) button on | |
| 6 | my Google account dashboard and | |
| 7 | adding his email address. Whiteley | |
| 8 | took no affirmative action to grant | |
| 9 | himself authorization to the Google | |
| 10 | Tools for the .Org Domain. | |
| 11 | e. Google AdWords Account: | |
| 12 | Google provides $10,000 of free ad | |
| 13 | credits to non-profits every month. | |
| 14 | This allows non-profits to direct | |
| 15 | traffic to its website. Whiteley | |
| 16 | initially set up BCS's Google | |
| 17 | AdWords Account on June 7, 2021. | |
| 18 | On June 30, 2021, Whiteley | |
| 19 | transferred administrative control of | |
| 20 | this account to me. Thereafter, on | |
| 21 | July 19, 2021, I took affirmative | |
| 22 | steps to revoke Whiteley's | |
| 23 | authorization to access this account | |
| 24 | by removing his email address as a | |
| 25 | user. Whiteley has had no access to | |
| 26 | this account since I revoked his | |
| 27 | authorization on July 19, 2021. | |
| 28 | | |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | |
|---|---|
| 1 | f. Google Analytics: Google |
| 2 | Analytics is a web analytics service |
| 3 | offered by Google that tracks and |
| 4 | reports website traffic and also |
| 5 | mobile app traffic and events. |
| 6 | Google gains this visibility into |
| 7 | visitor traffic through a Google |
| 8 | Analytics tag that is embedded into |
| 9 | the source code of the WordPress |
| 10 | Website. Whiteley initially set up |
| 11 | the Google Analytics account for |
| 12 | BCS and embedded the linked tag in |
| 13 | April 2021. After his resignation, on |
| 14 | August 18, 2021, I took affirmative |
| 15 | steps to revoke Whiteley's |
| 16 | authorization by deleting his email |
| 17 | from this service. Attached to the |
| 18 | Index of Exhibits as **Exhibit 22** is a |
| 19 | screenshot which was produced by |
| 20 | BCS in discovery in this action and |
| 21 | Bates stamped BCS_0577327 which |
| 22 | reflects my |
| 23 | (iristheangel@gmail.com) changing |
| 24 | of Whiteley's authorization on the |
| 25 | account to none on August 18, |
| 26 | 2021. After his resignation, |
| 27 | Whiteley made no changes to the |
| 28 | |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

|  |  |  |  |
|---|---|---|---|
| 1 | Google Analytics account and he |  |  |
| 2 | has not had access to the BCS |  |  |
| 3 | Google Analytics account since I |  |  |
| 4 | revoked his access. |  |  |
| 5 | g. @BreakingCodeSi1 Twitter |  |  |
| 6 | Account: This Twitter account was |  |  |
| 7 | created and managed by Rebecca |  |  |
| 8 | Moorman in early 2020, more than a |  |  |
| 9 | year prior to BCS's formation. To |  |  |
| 10 | my knowledge, the email address |  |  |
| 11 | associated with this account was |  |  |
| 12 | never a Breaking Code Silence |  |  |
| 13 | email address. Moorman permitted |  |  |
| 14 | BCS to use this Twitter account for |  |  |
| 15 | a period of time in 2021 when she |  |  |
| 16 | was a BCS volunteer. However, |  |  |
| 17 | Moorman expressly refused to |  |  |
| 18 | transfer the Twitter account to BCS. |  |  |
| 19 | Attached to the Index of Exhibits as |  |  |
| 20 | **Exhibit 23** is a true and correct copy |  |  |
| 21 | of the December 15, 2021, email |  |  |
| 22 | from Moorman to BCS, on which I |  |  |
| 23 | was copied, indicating Moorman's |  |  |
| 24 | refusal to assign her intellectual |  |  |
| 25 | property to BCS. To the best of my |  |  |
| 26 | knowledge, Whiteley only had |  |  |
| 27 | administrative access to Moorman's |  |  |
| 28 |  |  |  |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| 1 | Twitter account for a very short | |
| 2 | period of time in April 2021, and | |
| 3 | has had no administrative access to | |
| 4 | Moorman's Twitter account after his | |
| 5 | resignation from BCS. | |
| 6 | h. Original Paid Hootsuite Account: | |
| 7 | Hootsuite is a social media | |
| 8 | management tool with features to | |
| 9 | help with planning, scheduling, and | |
| 10 | syndicating social posts. Key | |
| 11 | features include automatic | |
| 12 | scheduling, social media | |
| 13 | monitoring, performance reporting, | |
| 14 | basic task management and more. In | |
| 15 | April 2021, I set up a nonprofit paid | |
| 16 | Hootsuite account for BCS using | |
| 17 | my own credit card. This Hootsuite | |
| 18 | account was linked to my | |
| 19 | kmcnamara@breakingcodesilence.o | |
| 20 | rg email address and required access | |
| 21 | to that email address to perform the | |
| 22 | necessary two-factor authentication | |
| 23 | to login. Whiteley had access to this | |
| 24 | Hootsuite account for a short period | |
| 25 | of time while he was a volunteer at | |
| 26 | BCS. Even though he could not | |
| 27 | login to this account without the | |

28

1  two-factor authentication, I took the
2  additional affirmative step to revoke
3  his authorization by changing the
4  password on the account at the time
5  of his resignation. Since that time,
6  Whiteley has had no access to the
7  paid Hootsuite account.
8  i. Zotero: As discussed above,
9  Zotero is a free, easy-to-use tool to
10  help you collect, organize, annotate,
11  cite, and share links and
12  bibliography data. During my time
13  as an activist, I have had several
14  Zotero accounts. I use Zotero to
15  organize links to documents on my
16  personal Google Drive and news
17  stories related to the TTI.
18  Importantly, my Zotero libraries do
19  not store any documents, they just
20  have just links to wherever the
21  documents are housed. I started
22  collecting documents for a survivor
23  archive in 2017 and created my first
24  Zotero account with the username
25  kmcnamara013. I later created a
26  second public Zotero account that I
27  allowed BCS and many others to
28

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

1  publicly link to. This Zotero account
2  has always been registered to my
3  personal email. At no time has
4  Whiteley ever had administrative
5  access or authorization to any of my
6  Zotero accounts.
7  j. Instagram:
8  i. *@breakingcodesilence Instagram*
9  *Account:* This Instagram
10  account was created by Rebecca
11  Moorman in early 2020. Access to
12  this account was lost in early March
13  2021 prior to the incorporation of
14  BCS due to losing access to the
15  phone number that was provided for
16  two-factor authentication. To the
17  best of my knowledge, Whiteley has
18  never had access to this Instagram
19  account.
20  ii. *@breakingcodesilenceofficial*
21  *Instagram Account:* This
22  account was created for BCS by
23  Hannah Kay in or about July 2021,
24  and registered to the email
25  info@breakingcodesilence.org. I, as
26  well as many people on BCS' social
27  media team, had access to this
28

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| 1 | Instagram account from July 2021 | |
| 2 | to December 9, 2021 when I | |
| 3 | resigned. To the best of my | |
| 4 | knowledge, Whiteley has never had | |
| 5 | access to this Instagram account | |
| 6 | because it was created after his | |
| 7 | resignation from BCS. Regardless, | |
| 8 | BCS has continued to post on this | |
| 9 | Instagram account since the start of | |
| 10 | this litigation, so BCS retains | |
| 11 | control of this account. | |
| 12 | k. Facebook Group: Facebook | |
| 13 | Groups are spaces on the Facebook | |
| 14 | social media network for friends, | |
| 15 | acquaintances, or people with | |
| 16 | similar interests to discuss or share | |
| 17 | about broad or narrow topics. This | |
| 18 | Facebook group was originally | |
| 19 | created by Emily Carter in May | |
| 20 | 2019 and titled "Program | |
| 21 | Legislation Change." Carter created | |
| 22 | this group prior to our collaboration | |
| 23 | or even the decision to create a | |
| 24 | social media campaign. This | |
| 25 | Facebook group has gone through | |
| 26 | five name changes from inception. | |
| 27 | Carter was an administrator of this | |
| 28 | | |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | |
|---|---|
| 1 | group throughout 2019 to present |
| 2 | day. At one point in time, Carter |
| 3 | added many Breaking Code Silence |
| 4 | volunteers, including me, as |
| 5 | administrators of this Facebook |
| 6 | group. At one point, Whiteley was |
| 7 | added as an administrator of this |
| 8 | Facebook group but, as set forth in |
| 9 | his declaration, he took affirmative |
| 10 | steps to revoke his own access by |
| 11 | removing himself as an |
| 12 | administrator. To the best of my |
| 13 | knowledge, Whiteley was never re- |
| 14 | added as an administrator of the |
| 15 | Facebook group. |
| 16 | l. YouTube: Whiteley set up this |
| 17 | brand YouTube account for BCS in |
| 18 | April 2021. At the time, he added |
| 19 | my email address as another |
| 20 | "owner" on this YouTube account. |
| 21 | After his resignation, I noticed that |
| 22 | Whiteley's email was still listed as |
| 23 | the "Primary Owner" on the |
| 24 | YouTube account. I took the |
| 25 | affirmative steps to revoke his |
| 26 | authorization at that time by clicking |
| 27 | on the downward arrow next to my |
| 28 | |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

1   own email address and changing my

2   role to the "Primary Owner" of the

3   YouTube account. After that, I

4   removed Whiteley's email address

5   from the account. To the best of my

6   knowledge, Whiteley has never had

7   access to the YouTube account after

8   I revoked his authorization.

9   m. BCS TikTok – Whiteley created

10  this TikTok account for BCS in

11  April 2021. On April 18, 2021,

12  Whiteley texted me the credentials

13  for the TikTok account and

14  informed me that he changed the

15  two-factor authentication and

16  primary communication method for

17  the TikTok account to my

18  kmcnamara@breakingcodesilence.o

19  rg email. True and correct copy of

20  my April 18, 2021 chat messages

21  with Whiteley regarding the

22  credentials for the TikTok account

23  are attached to the Index of Exhibits

24  as **Exhibit 24**. After Whiteley's

25  resignation, I took the extra

26  affirmative step of revoking his

27  authorization by changing the

28

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

1  password on the TikTok account,

2  even though he could not login

3  without access to my email for two-

4  factor authentication. To the best of

5  my knowledge, Whiteley has not

6  gained, and could not gain,

7  administrative access to this TikTok

8  account after April 2021.

9  n. BCS Email Addresses:

10  i.

11  *jwhiteley@breakingcodesilence.org*

12  *email*: Whiteley had access to this

13  email address until the time of his

14  resignation. After his resignation, I

15  took affirmative steps to revoke his

16  authorization by changing the

17  password on the account. To the

18  best of my knowledge, Whiteley has

19  not accessed this account since his

20  resignation.

21  ii.

22  *info@breakingcodesilence.org*

23  *email:* Whiteley may have briefly

24  had access to this email account

25  during his time as a BCS

26  volunteer/director. As a

27  precautionary security measure, I

28

1  changed the password on this email

2  account on June 28, 2021, shortly

3  after Whiteley's resignation. To the

4  best of my knowledge, Whiteley has

5  never even logged into this email

6  account.

7  iii. After Whiteley's resignation, all

8  BCS email accounts were moved

9  from the Hover email inboxes to

10  free Google inboxes which

11  Whiteley never had access to.

12  o. BCS Facebook Business Account

13  and Page: A Facebook Business

14  Page is a public social media profile

15  designed for commercial

16  organizations. Like a personal

17  Facebook account, Facebook

18  businesses pages allow you to make

19  connections online. Brands use their

20  Facebook pages to promote

21  products and services through links,

22  status updates, photos, and videos.

23  Whiteley initially set up BCS's

24  Facebook Business page in early

25  2021. As described in his

26  declaration, after his resignation,

27  Whiteley took the affirmative steps

28

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

1  to revoke his own authorization by
2  removing himself as an
3  administrator. A true and correct
4  copy of the email that Whiteley
5  forwarded to me on June 28, 2021,
6  informing me that he had removed
7  himself from the Facebook Business
8  Page is attached to the Index of
9  Exhibits as **Exhibit 25**. To the best
10 of my knowledge, Whiteley never
11 re-gained access to the Facebook
12 Business Page after affirmative
13 steps were taken to revoke his
14 authorization.
15 p. Google for Nonprofits: Whiteley
16 originally helped set up BCS's
17 Google for Nonprofits account in
18 May 2021. After his resignation,
19 Whiteley took affirmative steps to
20 revoke his own authorization by
21 removing his email address from the
22 administrator list. To the best of my
23 knowledge, Whiteley did not regain
24 access to BCS' Google for
25 Nonprofits account after his
26 resignation.
27 q. Slack: Slack is a cloud-based
28

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| cross-platform instant messaging service. Whiteley was granted access to BCS's Slack in March 2021. As set forth in his declaration, at the time of his resignation, Whiteley took the affirmative steps to remove his own authorization by de-activating his own account. To the best of my knowledge, Whiteley never regained access to the BCS Slack after he removed himself. | | |
| **Objection 15.** 47. On June 26, 2023, I attended the forensic expert inspection of BCS's accounts performed by Clark Walton. While attending the inspection, I witnessed Mr. Walton review the Google Search Console. Based on the information I observed from the Google Search Console, it appeared that there was a drop in search-related queries on or around March 9 or 10, 2022, but the search-queries started resuming their typical number of "clicks" and | **Objection 15.** **Improper opinion testimony by a lay witness, lacks foundation. Fed. R. Evid. 701/702, 901**. McNamara provides improper lay opinion testimony about technical information (an expert inspection) that should be the | **Objection 15.** Sustained / Overruled. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | |
|---|---|
| "impressions" on or around March 11, 2022. This indicates that it was a small amount of time that the domain was either deindexed or that Google was not tracking "clicks" and "impressions" from Google Search results. However, when Mr. Walton inspected the Google Analytics console, a separate system that tracks traffic directly on the webserver itself via a plugin installed on WordPress, it appeared that the traffic dropped on March 12 – after the alleged de-indexing had been resolved – and stopped being tracked entirely for the remainder of March 2022 on the Google Analytics system. The only explanation for this is that BCS was altering the Google Site Plugin on their WordPress site, which affected BCS's ability to accurately track traffic, either around the time of the alleged deindexing or shortly after. Thus, it is impossible to know whether BCS lost web traffic because they stopped tracking their | subject of expert testimony. McNamara speculates and fails to lay foundation for the asserted conclusion regarding "lost" traffic. |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

| | | |
|---|---|---|
| traffic analytics, which I witnessed during the expert inspection. | | |
| **Objection 16** | **Objection 16.** | **Objection 16.** |
| 48. With respect to BCS's alleged damages, BCS recently claimed during the deposition of its 30(b)(6) witness that it was anticipating a dramatic spike in donations at the time of the alleged deindexing by comparing the donations BCS received on other occasions in the past, none of which are comparable to the 30-second placard showing BCS's website after the conclusion of the after-show special that aired following the March 12 Lifetime show "Cruel Instruction." a. In October 2021, while I was BCS's CFO and member of the board of directors, BCS representatives and volunteers participated in a weeklong visit to Washington DC doing interviews with major media outlets along with celebrities and politicians. This generated an enormous amount of | **Lacks foundation. Fed. R. Evid. 901**. McNamara fails to establish a foundation for the statements concerning the "Cruel Instruction", the Washington DC interviews, and the Paris Hilton wedding event and the amounts and implications concerning those events. | Sustained / Overruled. |

| | | |
|---|---|---|
| 1  | articles and primetime media | |
| 2  | mentions of BCS. This resulted in a | |
| 3  | spike in traffic to the website during | |
| 4  | that week. Based on that entire | |
| 5  | week of media exposure, BCS | |
| 6  | received approximately $1,690.00 | |
| 7  | through its PayPal link on its | |
| 8  | website during that week. | |
| 9  | Separately, BCS was also holding a | |
| 10 | 5K run fundraiser in October 2021 | |
| 11 | which BCS never advertised on its | |
| 12 | website, instead only through social | |
| 13 | media. BCS received approximately | |
| 14 | $3,655.00 in donations through that | |
| 15 | Givebutter 5K Fundraiser. | |
| 16 | b. On November 11, 2021, while I | |
| 17 | was BCS's CFO and member of | |
| 18 | the board of directors, Paris Hilton | |
| 19 | (also a TTI survivor) got married. | |
| 20 | During her wedding, she informed | |
| 21 | her wedding guests that they may | |
| 22 | donate to BCS in lieu of a wedding | |
| 23 | present. This led to BCS receiving | |
| 24 | approximately $2,111.21 in | |
| 25 | donations on and around November | |
| 26 | 11 and 12, 2021 through its | |
| 27 | website/PayPal account. | |
| 28 | | |

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA

1    Dated:  March 15, 2024                    Respectfully submitted,

2

3                                             **DLA PIPER LLP (US)**

4                                             By:  */s/ John S. Gibson*

5                                                    John S. Gibson
                                                     Jason Taylor Lueddeke
6
                                                     Attorneys for Plaintiff
7                                                    BREAKING CODE SILIENCE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EVIDENTIARY OBJECTIONS TO THE DECLARATION OF KATHERINE MCNAMARA