1 | Dirk O. Julander, Bar No. 132313
*doj@jbblaw.com*
2 | Catherine A. Close, Bar No. 198549
*cac@jbblaw.com*
3 | M. Adam Tate, Bar No. 280017
*adam@jbblaw.com*
4 | JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
5 | Irvine, California 92618
Telephone:  (949) 477-2100
6 | Facsimile:  (949) 477-6355

7 | Attorneys for Defendants
KATHERINE MCNAMARA and
8 | JEREMY WHITELEY

9

10 | **UNITED STATES DISTRICT COURT**

11 | **CENTRAL DISTRICT OF CALIFORNIA**

12

13 | BREAKING CODE SILENCE, a
California 501(c)(3) nonprofit,

Case No. 2:22-cv-002052-SB-MAA

14 |

15 |                    Plaintiff,

**DEFENDANTS' RESPONSE TO
PLAINTIFF'S REQUEST FOR
DISMISSAL WITH PREJUDICE**

16 |

17 |           vs.

18 |

*[Assigned to the Hon. Maria A. Audero]*

19 | KATHERINE MCNAMARA, an
Individual; JEREMY WHITELEY, an
20 | individual; and DOES 1 through 50,
inclusive,

21 |

22 |                    Defendants.

23 |

24

25

26

27

28

JULANDER BROWN
— & BOLLARD —

1

**TABLE OF CONTENTS**

2                                                                      <u>Page</u>

3

4   I.     INTRODUCTION ................................................................ 1

5   II.    BRIEF PROCEDURAL HISTORY .................................... 1

6   III.   ARGUMENT ....................................................................... 4

7          A.   The Court is Not Required to Make a Factual Finding ......... 4

8          B.   The Court Should Not Make a Factual Finding .................... 4

9          C.   If the Court Makes Any Factual Finding, it Should Find that BCS
             is Dismissing the Case Because it is Afraid it Will Lose the
10           Pending Motions for Summary Judgment ................................ 5

11         D.   If the Court Makes a Factual Finding, it Should Find that BCS's
             Proffered Reason for the Dismissal is Pretextual ...................... 7

12

13              1.   BCS Has Known Since at Least August 2023 that it was
                  Going to Have to Pay Significant Monetary Sanctions ............ 7

14              2.   BCS's "Evidence" of Insolvency Lacks Credibility and
                  Contradicts its Prior Sworn Statements, Discovery
15                Responses, and Public Filings ................................................ 9

16                   (a)   Assets/Liabilities from Form 990s and Annual
                       Registration Renewal Fee Reports to Attorney
17                     General ............................................................... 9

18                   (b)   Bank Statements ................................................ 11

19                   (c)   US Bank Account ............................................... 12

20  IV.   CONCLUSION ................................................................ 13

21

22

23

24

25

26

27

28

ii

JULANDER BROWN
— & BOLLARD —

1

# **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page</u>

3

## <u>CASES</u>

4

*INS v. Bagamasbad*
      429 U.S. 24, 25 (1976) ........................................................................4

5

6

7

8

9

10



11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JULANDER BROWN
— & BOLLARD —

JB

## I.     INTRODUCTION

Throughout this litigation Plaintiff BREAKING CODE SILENCE ("BCS") and its counsel has flouted Court orders, blatantly lied to counsel and the Court, and taken every opportunity to needlessly drag Defendants' names through the mud. BCS's most recent submission is more of the same. Instead of complying with the Court's order to supply the Court with relevant profit-and-loss statements and balance sheets, BCS's CEO, Jennifer Magill, submitted a demonstrably false declaration which cherry picked a handful financial conditions, concealed from the Court BCS's other assets, and gratuitously suggested that Ms. McNamara is responsible for all of BCS's financial woes.

Not willing to look a gift horse in the mouth, Defendants do not oppose this action being dismissed with prejudice. However, Defendants respectfully request that the Court decline to accept the notion that BCS is dismissing this action for purely economic reasons. In fact, the Court need not make any factual determinations at all. If the Court insists on making a factual determination as to BCS's motive for dismissing this action with prejudice, the Court should determine that BCS dismissed this action because it was certain that BCS would lose the pending motions for summary judgment, or simply find that BCS's proffered reason for dismissal is pretextual. Defendants' careers and livelihood depend on it.

## II.     BRIEF PROCEDURAL HISTORY

On March 28, 2022, BCS initiated the instant action by filing the Complaint. (Dkt. 2.) Thereafter, on September 13, 2022, the Courted entered a stipulated order for an e-discovery plan (the "EDO") which required BCS to produce certain documents from certain custodians, including Slack documents. (Dkt 41.)

On July 12, 2023, Defendants filed their motion to compel the Slack communications and for monetary sanctions (the "Slack Motion") which argued that BCS had failed to produce documents from Slack in violation of the EDO. (Dkt. 94.)

1    On July 14, 2023, Defendants filed their motion for evidentiary and monetary

2    sanctions (the "Custodian Motion"), which argued that BCS failed to produce

3    documents from its custodians in violation of the EDO. (Dkt. 98.)

4    On August 8, 2023, the Court ordered BCS to complete its Slack production

5    and postponed the determination of fees and costs on the Slack Motion – *informing

6    BCS that it was going to be sanctioned.* (Dkt. 116.)

7    On August 9, 2023, the Court held an in-person informal discovery

8    conference at which the Court explicitly told BCS that *it was going to lose the

9    Custodian Motion and that it was nearly 100 percent certain that BCS was going

10   to have to pay monetary sanctions.* (Dkt. 120; Dkt. 137, Ex. A, pp. 7:13-20:2,

11   specifically p. 11:13-15.)

12   On August 22, 2023, the Court issued an interim order based on the parties'

13   stipulation that BCS would reimburse Defendants for the costs associated sending

14   subpoenas to the custodians – *reflecting BCS's agreement that it would have to pay

15   Defendants some portion of Defendants' attorneys' fees.* (Dkt. 132.)

16   On October 25, 2023, the parties filed a joint stipulation to strike allegations

17   and limit claims through which BCS abandoned the majority of the claims in its

18   Complaint and limiting its claim to the allegation that "Defendants accessed a BCS

19   computer or account — including without limitation a Hover DNS account

20   containing the domain names for breakingcodesilence.org and

21   breakingcodesilence.com, the Google Search Console, and the WordPress admin

22   dashboard/console — without authorization, or in excess of authorized access, and

23   caused BCS's website (breakingcodesilence.org and/or breakingcodesilence.com) to

24   be de-indexed." (Dkt. 147.) By this point, BCS knew for certain that it would owe

25   Defendants attorneys' fees on both the Slack Motion and the Custodian Motion as

26   well as by stipulation, yet BCS did not fully dismiss the case. (See id.)

27

28

JULANDER BROWN
— & BOLLARD —

1    On November 22, 2023, Mr. Whiteley filed his Motion for Summary

2  Judgment (the "Whiteley MSJ"). (Dkt. 152.) Mr. Whiteley's lead arguments were

3  (1) that it was impossible for him to have caused the deindexing because he did not

4  access to the Google Search Console at the time, and (2) BCS has no evidence that

5  Mr. Whiteley was responsible for the deindexing. (See generally, id.) On February

6  15, 2024, BCS filed its opposition to the Whiteley MSJ. (Dkt. 169). Critically, BCS

7  (1) essentially ignored Mr. Whiteley's argument that Mr. Whiteley did not have

8  access to the Google Search Console, and (2) plainly admitted that it did not have

9  any "direct evidence" against Mr. Whiteley. (See id. at pp. 10 and 13.)

10    On February 23, 2024, Ms. McNamara filed her Motion for Summary

11  Judgment (the "McNamara MSJ"). The McNamara MSJ also argued that (1) BCS's

12  theory of liability was impossible, and (2) BCS had no evidence that Ms. McNamara

13  was responsible for the deindexing. (See generally, id.) On March 15, 2024, BCS

14  filed its opposition to the McNamara MSJ. (Dkt. 184-2.) Once again, BCS largely

15  failed to address Ms. McNamara's impossibility argument and BCS also admitted

16  that it did not have any "direct evidence" against Ms. McNamara. (See id. at p. 9.)

17    On March 25, 2024, the Court held a second in person informal discovery

18  conference during which the Court (again) informed BCS that it was almost certain

19  to lose the pending evidentiary sanctions motion and that it was just of matter of

20  what evidentiary sanctions would be issued. At the hearing, Defendants' counsel

21  argued that, as part of the evidentiary sanctions, the Court should strike the

22  declarations of Jesse Jensen and Jennifer Magill, effectively gutting BCS's

23  oppositions to the motions for summary judgment. (Tate Decl., ¶7.)

24    On April 5, 2024, the Court ordered supplemental briefing on the Custodian

25  Motion to help the Court decide the correct evidentiary sanctions. (See Dkt. 196.)

26  Three days' later, on April 8, 2024, BCS filed its request for dismissal, with

27  prejudice. (Dkt. 198.)

28

1  **III.    ARGUMENT**

2    **A.    The Court is Not Required to Make a Factual Finding**

3        As a general rule, courts are not required to make factual findings on issues

4  where such findings are unnecessary to reach the result. *INS v. Bagamasbad*, 429

5  U.S. 24, 25 (1976). Here, BCS has requested that its case be dismissed with

6  prejudice, and Defendants do not oppose the dismissal. There is no legal reason why

7  the Court should make any factual finding as to BCS's motivation. The Court can

8  simply sign the proposed order that BCS lodged concurrently with its request for

9  dismissal.

10    **B.    The Court Should Not Make a Factual Finding**

11        This action has had a profound impact on Defendants' careers. Both

12  Defendants work in the technology sector. Ms. McNamara works in cybersecurity

13  and Mr. Whiteley is a technology entrepreneur. BCS's allegations that Defendants

14  "hacked" a non-profit organization have been devasting to their reputations and their

15  future employment opportunities. (McNamara Decl., ¶4; Whiteley Decl., ¶6.) Mr.

16  Whiteley, in particular, has been unable to engage in fundraising for his newest start

17  up until he can clear his name – meaning that this lawsuit has effectively put Mr.

18  Whiteley's career as an entrepreneur on hold for the last two years. (Whiteley Decl.,

19  ¶6.)

20        As long as the Court does not make the factual finding that the case was

21  dismissed due to BCS's financial condition, Defendants have an opportunity to

22  move forward. Defendants would be able to show any future employer or investor:

23  (1) their motions for summary judgment which persuasively show that Defendants

24  did not cause the alleged deindexing; (2) BCS's oppositions to the motions in which

25  BCS plainly admits that it has no direct evidence against Defendants; and (3) a

26  simple dismissal order (without any factual findings) which shows that BCS

27  dismissed its case with prejudice very shortly before the motions for summary

28  judgment could be decided.

JULANDER BROWN
— & BOLLARD —

1   A court order adopting BCS's pretextual reasons for dismissal would be

2   ruinous. Although Defendants cannot stop BCS from claiming that it only dismissed

3   the case for financial reasons, for the reasons set forth below, Defendants should be

4   able to show their future employers and investors that BCS's argument is pretextual.

5   However, if the Court adopts BCS's reasoning, it would lend unwarranted

6   credibility to BCS's position and unfairly suggest that BCS's case had merit.

7   Candidly, a court order granting the motions for summary judgment would be

8   better for Defendants' careers than a dismissal. However, Defendants are not aware

9   of any controlling case where a court has denied a request for dismissal with

10  prejudice. In fact, in its request for dismissal, BCS cited a few cases suggesting that

11  requests for dismissal with prejudice are mandatory, and Defendants have not been

12  able to find any controlling cases which directly stand for the opposite conclusion.

13  Given that the Court is likely to dismiss the case, the best that Defendants can do is

14  plead that the Court not make any factual findings which might harm Defendants'

15  careers.

16  **C.**   **If the Court Makes Any Factual Finding, it Should Find that BCS**

17      **is Dismissing the Case Because it is Afraid it Will Lose the Pending**

18      **Motions for Summary Judgment**

19  It is impossible to determine BCS's motivations for dismissing the case

20  without considering the pending motions for summary judgment and how

21  evidentiary sanctions would affect such motions.

22  Prior to the filing of the motions for summary judgment, BCS agreed to

23  dismiss all of its claims except for the allegation that Defendants allegedly caused

24  the "deindexing" of its website. (Dkt. 147.) Defendants then filed motions for

25  summary judgment which (at a very high level) argued that (1) there was no

26  evidence showing that they were responsible, and (2) BCS's theory of liability is

27  impossible because Mr. Whiteley did not have administrative access to the Google

28  Search Console when the alleged deindex request was made. (See generally, Dkt.

152 and 172.)

BCS's oppositions to the motions for summary judgment were anemic. BCS repeatedly admitted that it had no "direct evidence" against Defendants, and BCS largely failed to address Defendants' impossibility argument.[1] (See generally, Dkt. 169 and 184-2 [Unsealed Opposition to McNamara MSJ].) Additionally, BCS's oppositions were poorly drafted in that BCS failed to lay the requisite foundation for almost all of its "evidence," most of the evidence was inadmissible character evidence, and its evidence of damages contradicted the deposition testimony of BCS's own 30(b)(6) witness on the issue of damages. (See Dkt. 179-5 and 194-7.)

It was against this backdrop that the parties attended the second in-person informal discovery conference on March 25, 2024. At that hearing, the Court forcefully told BCS that the Court was likely to grant evidentiary sanctions and it was just a matter of what those sanctions would be. Defendants' counsel then argued that as part of the evidentiary sanctions, the Court should strike the declarations of Jesse Jensen and Jennifer Magill, effectively gutting BCS's oppositions to the motions for summary judgment and ensuring Defendants' victory. The Court entertained that as a possibility and further discussed the idea of terminating sanctions. (Tate Decl., ¶7.) If BCS had any hope of defeating summary judgment prior to the March 25, 2024 hearing, such hope evaporated then and there.

Only after it was virtually certain that BCS would lose its motions for summary judgment did BCS submit its request for dismissal with prejudice. Accordingly, if the Court decides that it must make any factual determination regarding BCS's motivation, the Court should hold that BCS only dismissed the case to avoid an adverse ruling on the motions for summary judgment.

---

[1]     BCS also apparently abandoned its claim that Defendants accessed BCS's WordPress and caused the website to be deindexed. (*cf* Dkt. 147 and Dkt. 192, p. 7:22-25 ["BCS is not claiming that Defendants improperly accessed BCS' WordPress."].)

**D.**    **If the Court Makes a Factual Finding, it Should Find that BCS's Proffered Reason for the Dismissal is Pretextual**

1.    **BCS Has Known Since at Least August 2023 that it was Going to Have to Pay Significant Monetary Sanctions**

The Court is well aware of the discovery misconduct BCS has exhibited throughout this litigation. In summary, BCS's efforts to evade discovery, and its violations of the Court's various orders include, but are not limited to:

- Indiscriminately designating the vast majority of its document production as "Confidential," including blank pages and publicly-available documents in violation of the Protective Order;

- Going to great lengths to avoid the depositions of its "Persons Most Qualified" by placing unreasonable limitations on the taking of those depositions, without supplying evidence that such limitations were necessary;

- Failing to appropriately preserve and collect documents from many of the Custodians listed in the EDO;

- Failing to appropriately preserve and collect documents from all of the agreed-upon data sources listed in the EDO;

- Failing several times to produce documents by the agreed-upon production deadlines and misrepresenting BCS's efforts to obtain documents;

- Failing to produce duplicates in violation of the EDO;

- Causing the Court to hold more than 15 IDCs, status conferences, and related telephonic hearings;

- Failing to comply with the Court's requests for further information and requests for personal appearances; and

- The three most senior members of BCS leadership (Hughes, Magill, and Jensen) continued to violate their discovery obligations under the EDO and two of them evaded service of subpoenas for documents that BCS should have collected and produced.

1  It cannot be reasonably disputed that BCS has known since at least August
2  2023, that its misconduct was going to catch up with it and that BCS would be
3  ordered to pay significant monetary sanctions. At the August 9, 2023 in-person
4  informal discovery conference, the Court informed BCS that BCS had lost the
5  Custodian Motion (Dkt. 137, Transcript p. 7:15-19) and it was "almost 100 percent
6  certain that there will be evidentiary and monetary sanctions." (Id. at p. 11:14-15.)
7  The Court further noted that unless BCS became cooperative, it was going to "cost
8  BCS a lot of money" and "[i]t will be very expensive." (Id. at 16:23-24; 17:8-9.)
9  Shortly following that in-person hearing, BCS agreed to, and the Court ordered that
10  BCS, bear the cost of "[t]he reasonable attorney's fees and costs incurred by
11  Defendants in any subpoena and related motion practice necessary to obtain compel
12  the production of the discovery at issue…" (Dkt. 132.)

13  Rather than immediately dismissing the action back in August 2023 once they
14  knew monetary sanctions would certainly be imposed, BCS's officers and directors
15  evaded service of subpoenas, BCS forced Defendants to participate in at least five
16  more IDCs and related telephonic hearings, and BCS required Defendants to file
17  two motions for summary judgment to clear their names.

18  On October 25, 2023, when it was already certain that BCS would be paying
19  "a lot of money" in sanctions, but before Defendants' motions for summary
20  judgment were filed, BCS and Defendants entered into the joint stipulation to strike
21  and limit claims whereby BCS abandoned most, but not all, of the allegations of the
22  Complaint. (Dkt. 147.) BCS could have dismissed the entire case then, but did not.
23  Instead, BCS waited until after the motions for summary judgment were fully
24  briefed and it became apparent that BCS was about to lose. The timing strongly
25  suggests that BCS only filed the dismissal to avoid an adverse ruling on the motions
26  for summary judgment.
27
28

2.   **BCS's "Evidence" of Insolvency Lacks Credibility and Contradicts its Prior Sworn Statements, Discovery Responses, and Public Filings**

The Court's most recent order required BCS to provide "profit-and-loss statements, balance sheets, and bank statements" so that the Court could evaluate BCS's reason for requesting dismissal. (Dkt. 200). As it has done throughout this case, BCS defied the Court's order and did something other than what the Court directed. Specifically, BCS had Jennifer Magill submit a declaration which cherry-picked a handful financial conditions and mostly just mounted yet another smear campaign against Ms. McNamara, essentially blaming her for all of BCS's financial woes even though she has not been involved with the organization for more than 2½ years. Regardless, the majority of the assertions made by Ms. Magill, and the scant financial information actually provided (one bank statement from a single bank account and some invoices), is demonstrably false. Below are some notable examples:

(a)   Assets/Liabilities from Form 990s and Annual Registration Renewal Fee Reports to Attorney General

Perhaps the clearest evidence that BCS lied under oath (again) is found in its most recent filings with the California Attorney General, specifically BCS's Annual Registration Renewal Fee Reports with attached IRS Form 990s for the fiscal years 2021 through June 30, 2023.[2] (Request for Judicial Notice ["RJN"], Exs. 1-3.) The information contained in those public filings, signed by Magill under penalty of perjury just last month, does not match the information in the Magill Declaration and supporting exhibits in several respects, a few of which are discussed herein.

---

[2]   These forms were signed my Ms. Magill on March 6, 2024, "under penalty of perjury" after examining the report and the accompanying documents, in this case, the attached IRS Form 990s. (See RJN, Exs. 1-3, p. 1.)

1    According to BCS's Form 990 for the fiscal year ending June 30, 2023, BCS
2    had $452,182.00 *in cash* as of June 30, 2023 (the end of fiscal year 2022). (RJN Ex.
3    3, .pdf p. 3, Part II (22) and (25); see also, .pdf p. 1, AG Renewal cover page.) Yet
4    there is no record of those funds in BCS's bank statements provided, nor any
5    indication of where those funds went. BCS also listed net assets in the amount of
6    $297,798.00 at the end of the 2022 fiscal year. (RJN Ex. 3, .pdf p. 3, Part II (27).)
7    Also, in its Registration Renewal Fee Report for the fiscal years ending June
8    30, 2022 and June 30, 2023, BCS did not list any loans, contrary to Magill's Exhibit
9    E showing loans during both of those fiscal years. (*cf* Ex. 2, AG Renewal Form, .pdf
10   p. 1, ¶1, Ex. 3, AG Renewal Form, .pdf p. 1, ¶1, and Dkt. 201, Ex. E.)
11   On BCS's Form 990 for the fiscal year ending June 30, 2022, BCS also lists
12   that it owes McNamara $103,102, not $97,131.10 as Magill now claims in her
13   declaration. (*cf* Dkt. 201, ¶3(d) and RJN Ex. 2, .pdf p. 24, Part X (4).) Similarly,
14   according to BCS's Form 990 for that year, the amount owed to Magill as of June
15   30, 2022 was stated as $4,816. (RJN Ex. 2, .pdf p. 24, Part X (3).) In her declaration,
16   Magill now claims she is owed $6,710.91. (Dkt. 201, ¶3(f).) However, in her
17   spreadsheet attached as Exhibit E to her declaration, there is not another $1,891.91
18   of expenses loaned/advanced by Magill, only $1,428.00. (See, Dkt. 201, Ex. E.)
19   Thus, Magill overstated the amount she is owed, while understating the amount BCS
20   owes to Ms. McNamara.
21   And, strangely, BCS continued to list McNamara as an officer/director of the
22   company in its Form 990 for the fiscal year ending June 30, 2023, even though she
23   resigned in 2021. (Ex. 3, .pdf p. 3, Part IV.) BCS also lists Eugene Furnace as a
24   director in its 2022 and 2023 Form 990s despite representing to the Court that
25   "Furnace was only briefly a BCS member for a few months" in its response to
26   Defendants' Phase 1 Status Report. (Dkt. 192, p. 2:27.)
27   Notably, all of the Form 990s, regardless of year, were only recently prepared
28   and filed on *March 7, 2024*, and all of them either contain inaccurate information

JULANDER BROWN
— & BOLLARD —

1  under penalty of perjury, or the information stated in Magill's current declaration

2  simply cannot be believed.

3                              (b)      Bank Statements

4          BCS's claim that it only has one deposit account (Alpine Bank) is deliberately

5  misleading at best and, at worst, intentionally disingenuous as it ignores other

6  depositories of money. In response to discovery in the State Action, BCS produced

7  account records for GiveButter, Stripe, and PayPal accounts. (Tate Decl., ¶2.)

8  Magill even relied on these accounts in her declaration in opposition to Defendants'

9  MSJs in this case. (Id.; see, e.g., Dkt. 187, ¶7, and 187-2 through 187-5.)

10         BCS also has donations stored with Facebook. While Whiteley was a

11  volunteer with BCS, he set up a Facebook for Nonprofits page for BCS, allowing

12  the organization to accept donations through Facebook. (Whiteley Decl., ¶2.) He

13  removed himself from the account on June 28, 2021, immediately after his

14  resignation from BCS. (Id. at ¶3, Ex. 7.) Since July 12, 2022, Whiteley has

15  continued to receive numerous notifications from Facebook indicating that

16  Facebook is trying to pay BCS donation money but, likely because BCS changed its

17  bank account information, Facebook is unable to do so. (Whiteley Decl., ¶4, see Ex.

18  8.) Defendants' counsel raised the issue several times with BCS's counsel, Tamany

19  Bentz, but she never responded. (Tate Decl., ¶¶5-6, see Exs. 9-10.) Defendants'

20  counsel even included the instructions for fixing the issue as an exhibit to

21  Whiteley's MSJ. (see Dkt. 152-51.) Based on Mr. Whiteley's continued receipt of

22  notifications from Facebook, it appears that BCS never took the steps necessary to

23  update its bank account information and collect its Facebook donations. (Whiteley

24  Decl., ¶5.)

25         In addition, contrary to Magill's claim that it has no access to BCS's US Bank

26  statements, BCS actually produced US Bank statements in the State Action. (Tate

27  Decl., ¶4; see Dkt. 152-121.)

28

JULANDER BROWN
— & BOLLARD —

1       Finally, in an email from Vanessa Hughes to Jesse Jensen produced in

2   discovery in this action, Hughes mentions BCS using a separate Bank of America

3   account. (Tate Decl., ¶3, Ex. 6.) Defendants have no details regarding this additional

4   account. (Id.)[3]

5       Based on the foregoing, there is good reason to believe that BCS is hiding

6   assets/accounts, or failing/refusing to transfer funds from its other accounts/revenue

7   sources into its Alpine Bank account in an effort to artificially support its assertion

8   that its dismissal is due to purely economic reasons. Tellingly, had BCS complied

9   with the Court's order to provide profit-and-loss statements and balance sheets, the

10  Court would have been able to see exactly how much money is being stored in the

11  many accounts which BCS failed to disclose (i.e. Give Butter, Stripe, PayPal,

12  Facebook, US Bank, and Bank of America) and what happened to the $452,182.00

13  in cash listed on BCS's Form 990s.

14                    (c)    US Bank Account

15      As part of BCS's most recent smear campaign, Magill states (under penalty of

16  perjury) that "Ms. McNamara set up the BCS [US Bank] bank account as a personal

17  account rather than a corporate account" and that "she refused to relinquish

18  administrative control over several of the organization's accounts, including the [US

19  Bank] bank account." (Dkt. 201, p. 2, ¶3(c).) These statements are demonstrably

20  false. Exhibit 4 is the initial May 2021 bank statement for BCS's US Bank Account.

21  (McNamara Decl., ¶2, Ex. 4.) It clearly shows the account is in the name of BCS,

22  not Ms. McNamara, and that the account was a "NON PROFIT CHECKING"

23  account. (Ex. 4, p. 1.) Within days of McNamara's resignation, McNamara

24  requested to be removed from the US Bank account and Magill met with the bank

25  manager at US Bank and was able to update the account information and remove

26  _____

27  [3]     At her deposition, Vanessa Hughes testified that BCS does not have a Bank of
    America bank account; however, her explanation for the email (that it was a ruse to
28  trick Defendants) seems implausible.

JULANDER BROWN
— & BOLLARD —

McNamara from the account. (McNamara Decl., ¶3, Ex. 5.) On December 14, 2021, Magill confirmed in an email exchange with McNamara that: "I just finished with the business banking manager, and he showed me the updated account info with you removed from the account." (See Ex. 5.)

Why Magill would lie under oath about something so demonstrably false just to further disparage Ms. McNamara is bewildering. Notwithstanding, it is one example among many that demonstrate the willingness of BCS's officers and directors to lie under oath.

## IV.   CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss the action with prejudice and make no factual finding regarding BCS's reason for dismissal. If the Court is inclined to make a factual finding, the Court should find that BCS dismissed this action because it was almost certain that BCS would lose the pending motions for summary judgment, or simply find that BCS's proffered reason for dismissal is unsupported by the evidence and/or is pretextual.

DATED: April 24, 2024               JULANDER, BROWN & BOLLARD

                                     By: _____/s/ M. Adam Tate_____
                                           M. Adam Tate
                                           Catherine Close
                                           Attorneys for Defendants
                                           KATHERINE MCNAMARA and
                                           JEREMY WHITELEY



## **L.R. 11-6.2 CERTIFICATION**

The undersigned, counsel of record for Defendants certifies that this brief contains 3,971 words, which complies with the word limit of L.R. 11-6.1.

Date: April 24, 2024                          */s/ M. Adam Tate*
                                              M. Adam Tate

RESPONSE TO REQUEST FOR DISMISSAL

**<u>CERTIFICATE OF SERVICE</u>**

 I hereby certify that on this 24th day of April, 2024, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.


     */s/ Helene Saller*
     Helene Saller

RESPONSE TO REQUEST FOR DISMISSAL