

Dirk O. Julander, Bar No. 132313
doj@jbblaw.com
Catherine A. Close, Bar No. 198549
cac@jbblaw.com
M. Adam Tate, Bar No. 280017
adam@jbblaw.com
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone: (949) 477-2100
Facsimile: (949) 477-6355

Attorneys for Defendants
KATHERINE MCNAMARA and
JEREMY WHITELEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREAKING CODE SILENCE, a California 501(c)(3) nonprofit,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE MCNAMARA, an Individual; JEREMY WHITELEY, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:22-cv-002052-SB-MAA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REDUCE FEES AND COSTS RELATED TO SUBPOENA DISCOVERY**<br><br>[*Assigned to the Hon. Maria A. Audero*] |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. RELEVANT FACTS AND COURT ORDERS .............................................. 2

    A. Background Regarding Dispute and Court's Orders ............................. 2

    B. Outcome of Phase 1 .................................................................................. 5

III. ARGUMENT ..................................................................................................... 6

    A. The Court Ordered That All Counsel Attend the August 9 IDC and Explicitly Stated That Attorneys' Fees for the IDC Would Be Recoverable ............................................................................................. 6

    B. Block Billing is Not Improper Under the Circumstances ....................... 7

    C. Subpoenas Were Only Issued to Those Identified by BCS as Either Custodians, Directors or "Persons With Knowledge" ................. 9

        1. Kirchoff .............................................................................................. 10

        2. Silverman, Saberi, Alexander, and Furnace ............................... 10

    D. Sanctions Should be Awarded Against Both BCS and its Counsel ...... 12

IV. CONCLUSION ............................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

JULANDER BROWN & BOLLARD
JBB

**CASES**

*Campbell v. Nat'l Passenger R.R. Corp.*
  718 F.Supp.2d 1093, 1103 (N.D. Cal. 2010) ...................................................... 8

*Christian Research Institute v. Alnor*
  165 Cal.App.4th 1315, 1325 (2008) ................................................................... 7

*Int'l Woodworkers, Local 3–98 v. Donovan*
  792 F.2d 762, 767 (9th Cir. 1986) ...................................................................... 7

*Langer v. 1600 E Downtown Prop., LLC*
  No. 2:14-CV-09274-CAS, 2015 WL 3649085, at *4 (C.D. Cal. June 9, 2015) .................................................................................................................. 7

*Rodriguez v. County of Los Angeles*
  No. 10–6342–CBM (AJWx), 2014 WL 8390755, at *10 (C.D. Cal. Dec. 29, 2014) ...................................................................................................... 7

*Universal Electronics, Inc. v. Universal Remote Control, Inc.*
  130 F.Supp.3d 1331, 1340 (C.D. Cal. 2015), aff'd (Fed. Cir. 2016) 669 Fed.Appx. 575 .................................................................................................. 7

*Welch v. Metro. Life Ins. Co.*
  480 F.3d 942, 948 (9th Cir. 2007) ...................................................................... 8

## I. INTRODUCTION

Plaintiff BREAKING CODE SILENCE ("BCS") challenges three aspects of the attorneys' fees and costs requested by Defendants KATHERINE MCNAMARA and JEREMY WHITELEY (collectively "Defendants"): (1) fees sought for the appearance of counsel at the Court-ordered IDCs; (2) block billed time entries, including communications related to the subpoenas; and (3) subpoenas issued to Custodians that BCS deems to be "non-material witnesses."

With regards to the fees expended for attending informal discovery conferences, the overwhelming majority of such fees were incurred in connection with the in person informal discovery conference on August 9, 2024. BCS apparently takes issue that four different attorneys attended this conference, but Defendants did not have a choice in the matter. The Court ordered all four attorneys to attend. (Dkt. 114 ["All attorneys involved in any way with the Motion and the discovery that is the subject of the Motion are ORDERED to appear in person."]) There should be no doubt that such fees are recoverable. In fact, while at the conference, the Court explicitly stated that BCS would be required to pay such attorney's fees. (Dkt. 137, Ex. A, p. 55:8-23 ["I would count today as recoverable"].) BCS's argument to the contrary is not well taken.

Concerning the block-billed time entries, BCS does not identify any time within the challenged entries that is unrelated to the Subpoena Discovery. Block billing is only problematic when the Court cannot parse out unrecoverable fees from recoverable fees. That is not an issue here since all of the time included within each challenged time entry directly relates to the Subpoena Discovery, including communications with counsel, staff, the clients, and the process servers.

Finally, the subpoenas that BCS now argues were "unnecessary" were issued to Custodians listed by name on both the Joint Proposed Order (Dkt. 128-1) and the Court's Interim Order (Dkt. 132). Thus, BCS specifically agreed to pay for the subpoenas sent to these custodians and BCS cannot now renege on its agreement by

claiming that the subpoenas were unnecessary. These were also Custodians that were identified in the EDO, and BCS either listed them as board members in discovery or identified them as "persons with knowledge" of the allegations in this action.

Practically, if it were just a matter of simply issuing nine substantively-identical subpoenas as BCS claims, the fees and costs incurred by Defendants would have been significantly less than $30,253.00. But it was BCS's own conduct in violating the EDO by failing to collect from its Custodians as agreed (which necessitated the IDCs), and the conduct of its directors and officers in first refusing to voluntarily cooperate and then subsequently evading service of the subpoenas, that caused the attorneys' fees and costs related to the Subpoena Discovery to unnecessarily skyrocket. BCS should not be rewarded for its behavior and Defendants should be fairly compensated for all of the fees and costs they necessarily incurred.

## II. RELEVANT FACTS AND COURT ORDERS

### A. Background Regarding Dispute and Court's Orders

In August 2022, the parties stipulated to a Joint eDiscovery Plan and Protocol for Discovery of Electronically Stored Information, which was issued on September 13, 2022 (the "EDO"). (Dkt. 41.) Paragraph 4.3 of the EDO required BCS to review and collect relevant ESI from the following "Custodians": "Breaking Code Silence ('BCS'), Vanessa Hughes, Jennifer Magill, Jesse Jensen, Noelle Beauregard, Lenore Silverman, Eugene Furnace, the entire BCS Board of Directors,[1] Bobby Cook, Megan Hurwitt, Arianna Conroyd, Shelby Kirchoff and anyone else who had administrative permissions on the website or any of BCS' accounts or systems at the

---

[1] According to BCS's verified discovery responses in the State Action, the Board of Directors consisted of: Apryl Alexander, Denette Boyd-King, Dee Anna Hassanpour, Dorit Saberi, Rosanna Salgado McDonald, and Lenore Silverman. (See, Dkt. 98-1, ¶3 and 98-2, Ex. 1, Response to Special Interrogatory No. 20.)

time the alleged hacking took place." (Dkt. 41, ¶4.3.) The list of data sources to be collected from for each Custodian was set forth in paragraph 4.4 of the EDO. (Dkt. 41, ¶4.4.)

After agreeing to collect and produce ESI from the foregoing Custodians, BCS only collected and produced documents from its own general use email mailboxes and limited documents from Hughes, Magill and Jensen's accounts. After taking the depositions of Noelle Beauregard, Bobby Cook, and Jesse Jensen, it became clear that all of their data sources were not collected by BCS. (Dkt. 98-1, ¶¶5-6.)

Four IDCs followed in April and May 2023 (IDCs 3, 4, 5 and 6), during which the Court endeavored to identify what data sources existed for each Custodian and which were collected from, and strongly encouraged voluntary compliance with the EDO, warning that unless they complied, the Custodians would be served with subpoenas. (Dkt. 98-1, ¶¶7, 9, 13, 18.) On May 3, 2023, the Court found that the parties had exhausted their pre-motion efforts to meet and confer on the subject and authorized the filing of a discovery motion. (Dkt. 58, p. 2, ¶2.)

The Joint Stipulation Regarding Evidentiary and Monetary Sanctions Under FRCP 37 was filed on July 14, 2023. After the Joint Stipulation was filed, on August 7, 2023, the Court scheduled an in-person IDC for August 9, 2023. (Dkt. 114.) The Court's Scheduling Notice for the August 9 IDC mandated that: "A representative of Plaintiff is ORDERED to appear in person. ***All attorneys involved in any way with the Motion and the discovery that is the subject of the Motion are ORDERED to appear in person.***" (Id. [caps in original; bold italics added].) Because attorneys Adam Tate, Catherine Close, Adam Schwartz and Bekah Chamberlin were all in some way involved in the Joint Stipulation or the discovery that was the subject of thereof, all four appeared in person at the August 9 IDC as ordered, three travelling from South Orange County. (See Dkt. 120, p. 1.) The wisdom of the decision to bring all four attorneys to the August 9 IDC was

3

confirmed when the Court admonished BCS for failing to comply with its mandate by not bringing Dennis Kiker. (Dkt. 137, Exhibit A Transcript p. 58:7-17.)

At the August 9 IDC, the Court advised BCS that it was going to lose the motion but afforded BCS with an option to resolve the issue and avoid the severe financial and evidentiary impact of the sanctions that would be awarded. (Dkt. 137, Ex. A, pp. 7:13-8:8.) The Court created a 2-phase process for attempting to obtain compliance. (Id. at p. 15:1-3.) Phase 1 would require Defendants to issue subpoenas to the BCS Custodians that were unwilling to voluntarily produce documents (including Hughes who was present in Court at the August 9 IDC). (Id. at p. 15:4-10.) The Court warned BCS that (Id. at 15:14-22):

> Every dime in attorneys' fees and costs that [Defendants] spends on these subpoenas will be paid for by BCS, from preparing the subpoenas to serving them if they choose to not accept service the nice way, and to fighting every single motion to quash, every single motion for protective order. Every single discovery fight that arises from these subpoenas, the fees and costs that Defendants will incur will be paid for by BCS.

The Court also informed BCS that the attorneys' fees for attending the August 9 in person IDC *were* also recoverable. (Dkt. 137, Ex. A, p. 55:8-23.)

After agreeing to the phased discovery process for the Subpoena Discovery, the Court issued an August 11 Minute Order which confirmed: "The reasonable attorneys' fees and costs incurred by Defendants in any necessary subpoena discovery related to obtaining the Discovery at Issue—***whether incurred as part of Phase 1 or heretofore***—shall be borne by Plaintiff, upon order of this Court on a motion by Defendants at the conclusion of Phase 1." (Dkt. 120 [emphasis added].) Thereafter, the Court issued an Interim Order based on the parties' agreement regarding the phased discovery procedure. (Dkt. 132.) Again, the Interim Order

confirmed that: "The reasonable attorneys' fees and costs incurred by Defendants in any subpoena and related motion practice necessary to obtain or compel the production of the discovery at issue in the Motion from the officers and directors of BCS—whether incurred as part of Phase 1 or heretofore—shall be borne by Plaintiff." (Id at p. 5, ¶7.)

### B. <u>Outcome of Phase 1</u>

In connection with Phase 1: Five Custodians (Apryl Alexander, Arianna Conroyd, Jennifer Magill, Vanessa Hughes, and Jesse Jensen) agreed to search for documents; three Custodians (Dee Anna Hassanpour, Dorit Saberi, and Denette King) indicated they had no documents; four Custodians (Eugene Furnace, Shelby Kirchoff, Meg Hurwitt, and Lenore Silverman) refused to participate; and two Custodians (Bobby Cook and Noelle Beauregard) already responded to deposition subpoenas and testified that relevant documents were destroyed and no longer existed. (Dkt. 168, p. 2.)

Of the Custodians that agreed to locate documents, BCS only produced documents from three of them – Hughes, Magill and Alexander – but the Hughes and Magill productions were incomplete. (Id. at pp. 3-4.) Nothing was produced from Jensen or Conroyd. (Id. at p. 3.)

Subpoenas were served (or attempted) on the Custodians that refused to participate. Of these: Hurwitt and Silverman claimed to have no records, Kirchoff never responded to the subpoena, Furnace could not be served, and Hughes and Jensen actively evaded service of the subpoenas (refused to come to the door when they were obviously home). (Id. at pp. 4-5.)

On April 5, 2024, the Court held a Status Conference and IDC re: Outcome of Phase 1, during which the Court ordered supplemental briefing on the motion by April 22. (Dkt. 196.) However, before the supplemental brief could be filed, on April 8, 2024, BCS filed a Request for Dismissal With Prejudice. (Dkt. 198.) In response, the Court issued an order requiring Defendants to submit an accounting of

5
OPPOSITION TO MOTION TO REDUCE FEES AND COSTS

their fees/costs incurred with respect to the Subpoena Discovery to BCS and inviting BCS to file a motion if it challenged those fees/costs. (Dkt. 200.)

## III. ARGUMENT

BCS does not challenge the propriety of the rates charged by Defendants' counsel. BCS's Motion challenges only three aspects of Defendants' fee/cost accounting: (1) attorneys' fees sought for the appearance of counsel at the Court ordered IDCs; (2) specific block billed time entries; and (3) fees/costs related to subpoenas issued to Custodians that, in BCS's opinion, were "non-material witnesses."

### A. The Court Ordered That All Counsel Attend the August 9 IDC and Explicitly Stated That Attorneys' Fees for the IDC Would Be Recoverable

Contrary to the assertion in the Motion, the Court's August 21 Interim Order on the parties' stipulation does not limit the recoverable fees and costs to only those incurred after its issuance. Consistent with the Court's August 11 Minute Order, the August 21 Interim Order provides that: "The reasonable attorneys' fees and costs incurred by Defendants in any subpoena and related motion practice necessary to obtain or compel the production of the discovery at issue in the Motion from the officers and directors of BCS—*whether incurred as part of Phase 1 or heretofore*—shall be borne by Plaintiff..." (Dkt. 132, p. 5, ¶7 [emphasis added]; see also Dkt. 120.) The definition of the word "heretofore" is "up to this time." (See https://www.merriam-webster.com/dictionary/heretofore#dictionary-entry-1.) Thus, fees and costs incurred in connection with the Subpoena Discovery or the motion incurred prior to the Interim Order are recoverable.

Concerning BCS's accusation of "padding" or duplicating effort by having four different attorneys attend an IDC, as set forth above, the Court specifically ordered that "[a]ll attorneys involved in any way with the Motion and the discovery that is the subject of the Motion" appear in person at the August 9 IDC. (Dkt. 114.)

Unlike BCS, Defendants took the Court's order seriously and complied, bringing all four attorneys that worked on the motion or the discovery to the hearing, three of which travelled from South Irvine. (See Dkt. 120, p. 1.) After violating the Court's mandate that all attorneys appear, BCS audaciously challenges the $10,800.00 in attorneys' fees necessarily incurred based on Defendants' compliance. (Dkt. 203, pp. 5-6.)

As the Court advised during the IDC, the attorneys' fees incurred in connection with attending the August 9 in person IDC *are recoverable* "because [they] came from the motion." (Dkt. 137, Ex. A, p. 55:8-23 ["I would count today as recoverable"].) That the attorneys travelling from South Orange County billed more time than Adam J. Schwartz (who lives in LA) does not make those travel hours any less compensable. See *Int'l Woodworkers, Local 3–98 v. Donovan,* 792 F.2d 762, 767 (9th Cir. 1986). In this District, courts generally compensate attorneys at their full hourly rate for travel time. See, e.g., *Langer v. 1600 E Downtown Prop., LLC,* No. 2:14-CV-09274-CAS, 2015 WL 3649085, at *4 (C.D. Cal. June 9, 2015); *Rodriguez v. County of Los Angeles,* No. 10–6342–CBM (AJWx), 2014 WL 8390755, at *10 (C.D. Cal. Dec. 29, 2014).

Like the August 9 IDC, the October 5 telephonic IDC also "came from the motion" because IDC 13 was specifically convened to "monitor the progress of the Phase 1 discovery production at issue in the [Joint Stipulation] ("Sanctions Motion," ECF No. 98)." (Dkt. 142, p. 1.) Thus, the additional $987.00 in fees incurred for one attorney (Adam Tate) to attend IDC 13 were reasonable and necessarily incurred.

Accordingly, there is no basis for the $11,787.00 reduction urged by BCS.

### B. Block Billing is Not Improper Under the Circumstances

Block billing is a commonly-used billing practice that is not *per se* objectionable. *Universal Electronics, Inc. v. Universal Remote Control, Inc.* 130 F.Supp.3d 1331, 1340 (C.D. Cal. 2015), aff'd (Fed. Cir. 2016) 669 Fed.Appx. 575; *Christian Research Institute v. Alnor,* 165 Cal.App.4th 1315, 1325 (2008). In ruling

1 on a motion for fees, courts "may include amounts 'block-billed' without a
2 reduction because counsel is not required to record in great detail how each minute
3 of his time was expended." *Ibid*. The only challenge block billing presents in the
4 context of a fee motion is that it makes it difficult for the Court to determine the
5 amount of time spent on specific tasks. *Welch v. Metro. Life Ins. Co.,* 480 F.3d 942,
6 948 (9th Cir. 2007). But when "individual tasks are specified" and the entries are
7 "detailed enough for the Court to assess the reasonableness of the hours billed," a
8 reduction for block-billed hours is not appropriate. *Campbell v. Nat'l Passenger R.R.*
9 *Corp.,* 718 F.Supp.2d 1093, 1103 (N.D. Cal. 2010).

10 Because each of the challenged billing entries are sufficiently detailed to
11 advise the Court of the specific tasks performed during each day so that it may
12 assess the reasonableness of the time billed, the $7,109.35 reduction in fees urged by
13 BCS is wholly inappropriate.

14 It should also be noted that, with only four exceptions, each challenged block
15 billed entry was for an hour or less. (See, Dkt. 203-3, pp. 8-11 and 14-17 [Yellow
16 highlighted entries].) Performing multiple tasks – each relating to the Subpoena
17 Discovery – in under an hour in a given day is hardly unreasonable. Those few time
18 entries that exceed one hour include tasks such as drafting (of the subpoenas,
19 attachments, or court-ordered supplemental pleadings), or legal research. (See, e.g.,
20 Dkt. 203-3, p. 7, Tate 8/18/23 entry; p. 10, Close 8/31/23 entry; p. 15, Saller 7/21/23
21 entry.)

22 BCS includes within its requested $7,109.35 fee reduction time spent on what
23 BCS perceives as "unrelated tasks," primarily focusing on communications between
24 counsel and staff, with the clients, and with the process servers related to the
25 subpoenas and service thereof. Defendants are not aware of any authority that stands
26 for the proposition that fees for communications between attorneys, staff, clients,
27 and vendors is not compensable, and BCS has not cited any. Instead, BCS argues
28 that the time spent communicating between counsel and with the clients/process

servers about the subpoenas, the status of service, etc., is not a cost "incurred by Defendants in any subpoena and related motion practice." (See Dkt. 203, p. 9.) Not surprisingly, BCS takes an overly narrow view of what that term means.

If BCS had just complied with its discovery obligations and collected from the Custodians as required by the EDO, Defendants would never have been forced to issue the subpoenas, investigate the whereabouts of each of the Custodians (with the clients' assistance since BCS never provided addresses), and served/attempted unsuccessfully to serve the various subpoenas (necessitating communications with the process servers). And Defendants' counsel would have no need to communicate regarding the status of the subpoenas or seek information from the clients regarding the Custodians. If BCS's officers/directors did not actively evade service of the subpoenas, or if they had just accepted service, these fees/costs would either be avoided entirely or significantly reduced. Regardless, because these fees were directly related to the Subpoena Discovery, BCS is required to compensate Defendants for all of them in accordance with its agreement. (Dkt. 132, p. 5, ¶7; see also Dkt. 120.)

### C. Subpoenas Were Only Issued to Those Identified by BCS as Either Custodians, Directors or "Persons With Knowledge"

Finally, BCS argues that a $2,066.50 reduction in the fees/costs requested is warranted because, in its opinion, the subpoenas to Silverman, Saberi, Alexander, Furnace, and Kirchoff were "unnecessary" since these Custodians were "not material witnesses." (Dkt. 203, p. 10-11.) As discussed below, each of these people were either named as Custodians in the EDO, identified as a board member, or identified by BCS in discovery as a "person[] with knowledge of DEFENDANTS' actions to unlawfully access or block access of BCS's account or computer," or a "Person[] with knowledge of the termination of McNamara's rights [to the accounts at issue]."

More importantly, the subpoenas that BCS now argues were "unnecessary" were issued to the Custodians listed by name on both the Joint Proposed Order (Dkt. 128-1) and the Court's Interim Order (Dkt. 132). Thus, BCS specifically agreed to pay for the subpoenas sent to these custodians. It would be entirely unfair to allow BCS to renege on its agreement after Defendants incurred the fees.

### 1. Kirchoff

In addition to being specifically listed as a Custodian in Paragraph 4.3 of the EDO, in response to Special Interrogatories in this action, Shelby Kirchoff was identified by BCS as both a "person[] with knowledge of DEFENDANTS' actions to unlawfully access or block access of BCS's account or computer," and as a "[p]erson[] with knowledge of the termination of McNamara's rights [to the accounts at issue]." (See, Dkt. 152-64, pp. 18, 22-23.) For BCS to identify a witness in a discovery response as a "person with knowledge" and later argue that a subpoena to that witness for documents related to the case is "unnecessary," or that the witness is somehow "not material," is beyond absurd. The Court should bear in mind that the Subpoena Discovery started in May 2023 and BCS did not agree to limit its claims to only the deindexing of its website until October 25, 2023, after the subpoenas were already issued and either served or out for service. (See Dkt. 146.) Accordingly, any fees/costs related to the subpoena issued to Shelby Kirchoff are compensable.

### 2. Silverman, Saberi, Alexander, and Furnace

Silverman and Furnace were specifically listed as a Custodian in Paragraph 4.3 of the EDO. (Dkt. 41, ¶4.3.) In addition, Silverman, Saberi, Alexander and Furnace were each identified by BCS as board members at or around the time this frivolous action was commenced. The members of BCS's board of directors were also listed as Custodians in Paragraph 4.3 of the EDO. (Dkt. 41, ¶4.3.)

Defendants have a right to know whether the filing and maintenance of this action was actually approved by the BCS board of directors and, if so, on what

1. basis. Defendants have a right to know whether the filing and maintenance of this action was instead purely an act of vengeance orchestrated by Hughes/Magill for daring to question their leadership. Because the latter motivation appeared highly likely (as confirmed by Chelsea Papciak in her deposition and document production), Defendants sought discovery into all board member communications regarding the allegations of BCS's complaint and the initiation and maintenance of this action from the persons identified by BCS as its board members.

As discussed above, BCS's discovery responses in the State Action, verified by Magill on December 9, 2022, state that the BCS's board of directors included Alexander, Saberi and Silverman. (See, Dkt. 98-1, ¶3 and 98-2, Ex. 1, Response to Special Interrogatory No. 20 [subsequently de-designated as Confidential].) In BCS's response served on December 16, 2022, Magill swore, under penalty of perjury, that: Dr. Apryl Alexander was a board member from "6/13/2022 to present"; Lenore Silverman was a board member from "1/18/2022 to present"; and Dr. Dorit Saberi was a board member from "6/18/2022 to present." (Id.) Though not listed in BCS's discovery responses as a board member, Eugene Furnace was also identified by BCS as a board member in 2022, along with Silverman and Alexander, in its public filings. (See Dkts. 202-13, p. 9 and 202-14, p. 4.) Silverman and Saberi were also identified in documents received in response to Freedom of Information Act requests as being board members during the relevant time period.

Accordingly, Defendants had good reason to believe – based on BCS's own public filings and verified discovery responses – that these Custodians were not "immaterial witnesses" as BCS claims. If BCS wants to claim that it lied under penalty of perjury, fine (it probably did). But that does not excuse BCS from paying fees and costs related to the issuance of subpoenas to Custodians based on BCS's lies.

Accordingly, the $2,066.50 reduction in the fees/costs requested by BCS is entirely inappropriate.

### D. Sanctions Should be Awarded Against Both BCS and its Counsel

Defendants feel compelled to advocate that it is appropriate to issue sanctions not just against BCS, but also its counsel (the Motion requested sanctions against both). This is not a request being made lightly, but given that BCS is taking the position that it has no material assets, Defendants' hands are being forced.

At the April 18, 2023 IDC Tamany Bentz, Jason Lueddeke, and Dennis Kiker all lied to the Court about having collected the documents from the Custodians. For example:

- Tamany Bentz claimed that BCS had been diligent in producing documents to defendants and she specifically represented that "we collected from a large number of sources and a large number of custodians." (Tate Decl., ¶2, Ex. 1, at pp. 30:20-32:5)

- Shortly thereafter, Jason Lueddeke elaborated on BCS's collection efforts and specifically represented that "we collected from 18 different custodians..." (Id. at 32:18-25.) Mr. Lueddeke continued, "[J]ust for the sake of perspective, the defendants only had to collect from two custodians. We collected from 18. So the process on our side has been -- it has taken longer because it takes longer to collect from so many sources across so many custodians." (Id. at 33:4-19.)

- Sometime later, Dennis Kiker cut Adam Tate off after Mr. Tate claimed that BCS had not collected from all of the custodians interjecting, "That's false. That is false…" Mr. Kiker then told the Court that BCS had collected from every single one of the custodians other than Shelby Kirchoff. (Id. at 52:22-53:14.)

- Mr. Tate then informed the Court that he suspected that BCS had only collected the BCS emails to which Mr. Kiker said "No. That is not true. That is not true." Mr. Kiker went on to tell the Court that they had collected ***from each Custodian and each data source*** listed in Section

    4.3 provided that the data sources were accessible. (Id. at 55:24-57:9.)

- Mr. Kiker specifically and falsely represented that they had collected BCS's Skype account. (Id. at 59:4-60:17 ["I know that BCS has a Skype account and we collected that."].)
- Mr. Lueddeke later clarified that he did not believe that BCS had an obligation to collect the personal accounts of the Custodians and admitted that BCS only collected from BCS accounts. (Id. at 62:17-63:7.)

Ultimately, because there was some ambiguity about what data sources BCS had actually collected from, the Court continued the conversation to another IDC and ordered BCS to prepare a chart showing what BCS had collected from each Custodian. (Dkt. 52, p. 3.)

At the next informal discovery conference on April 24, 2023, BCS presented the infamous spreadsheet with the giant grey box showing that BCS had collected virtually nothing from the Custodians. BCS's attorneys then admitted that they did not even ask many of BCS's custodians if they could collect from their data sources because, based on the attorneys' interview with three of the Custodians, BCS's attorneys did not think it was necessary to do so. (Tate Decl., ¶3, Ex. 2 at 40:25-42:15.) BCS's attorneys also repeated the argument that BCS was not under an obligation to collect from many of the data sources because they were not within BCS's possession, custody, or control. (Id. at 42:18-22.)

The Court then had BCS at least ask the Custodians whether they would be willing to produce documents. (Id. at 42:23-43:22.) At least some of the Custodians agreed to produce documents from some of their data sources, suggesting that such documents could have been produced sooner had the attorneys only asked.[2]

---

[2] The Court also inquired about the data accounts that that had not been collected from BCS (not the other custodians), including the Skype account. Ms. Bentz told the Court that BCS does not have a Skype account – directly

13
OPPOSITION TO MOTION TO REDUCE FEES AND COSTS

1    Thereafter, and up through the IDCs, BCS's attorneys continued to advocate
2 that BCS was not under an obligation to collect from the data sources belonging to
3 the Custodians because the Custodians' data sources were outside of the possession,
4 custody, and control of BCS. (See, e.g., Dkt. 98, p. 6:6-8.)

5    Based on the above, three facts are undisputable. First, at least during the
6 initial period, BCS's attorneys did not seek to collect documents from most of the
7 Custodians because *the attorneys* did not think it was necessary to do so. Second,
8 until the August 9 in-person IDC, *the attorneys* consistently argued that there was
9 no obligation to collect the data sources from the Custodians. Third, *the attorneys*
10 lied to the Court about having collected all of the data sources from all of the
11 Custodians, or at least disingenuously suggested that they had done so at the April
12 18 IDC.

13    Ultimately, someone needs to pay for the attorneys' fees expended in
14 connection with the Subpoena Discovery and it should not be Defendants.

## IV.  CONCLUSION

16    For the foregoing reasons, Defendants request that the Court deny BCS's
17 Motion in its entirety and award Defendants all of the attorneys' fees and costs
18 reasonably and necessarily incurred, totaling $30,253.00.

---

contradicting Mr. Kiker's previous statement to the Court that BCS had a Skype account and that it had already been collected. (Id. at 61:22-62:4 ["I do not think BCS has a Skype Account."].)

| | | |
|---|---|---|
| 1 | DATED: May 1, 2024 | JULANDER, BROWN & BOLLARD |
| 2 | | |
| 3 | | By: ___*/s/ M. Adam Tate*___ |
| 4 | | M. Adam Tate |
| 5 | | Catherine Close |
| 6 | | Attorneys for Defendants |
| 7 | | KATHERINE MCNAMARA and JEREMY WHITELEY |

## L.R. 11-6.2 CERTIFICATION

The undersigned, counsel of record for Defendants certifies that this brief contains 4,457 words, which complies with the word limit of L.R. 11-6.1.

Date: May 1, 2024         /s/ M. Adam Tate
                          M. Adam Tate

# CERTIFICATE OF SERVICE

I hereby certify that on this 1ST day of May, 2024, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

*/s/ Helene Saller*
Helene Saller