1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11   BREAKING CODE SILENCE,

Case No. 2:22-cv-02052-MAA

12              Plaintiff,

**ORDER GRANTING IN PART AND**
13                                           **DENYING IN PART DEFENDANTS**
        v.                                   **KATHERINE McNAMARA'S AND**
14                                           **JEREMY WHITELEY'S MOTION FOR**
15   KATHERINE MCNAMARA, et al.,             **EVIDENTIARY AND MONETARY**
                                             **SANCTIONS UNDER RULE 37 OF THE**
16              Defendants.                  **FEDERAL RULES OF CIVIL**
                                             **PROCEDURE (ECF NO. 98)**
17

18

19

20   **I.      INTRODUCTION**

21          Filed on July 14, 2023 and presently before the Court—in this now-

22   dismissed matter[1]—is Defendants Katherine McNamara's and Jeremy Whiteley's

23   Motion for Evidentiary and Monetary Sanctions Under Rule 37 of the Federal

24   Rules of Civil Procedure ("Motion").  (Mot., ECF No. 98.)  The Motion was filed

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[1] On April 8, 2024, almost eleven months after the filing of the instant motion,
27   Plaintiff BCS filed a request for voluntary dismissal of the case with prejudice
     pursuant to Federal Rule of Civil Procedure ("Rule") 41(a)(2).  (ECF No. 198.)
28   The Court granted BCS's request on May 8, 2024.  (ECF No. 210.)

jointly by Defendants Katherine McNamara ("McNamara") and Jeremy Whiteley ("Whiteley") (together "Defendants") on the one hand, and Plaintiff Breaking Code Silence ("BCS") on the other, in the form of a Joint Stipulation as required by Central District of California Local Civil Rule ("Local Rule") 37-2.  (*Id.* at 2–3.[2])  As more fully explained below, because BCS voluntarily dismissed the case before the Motion was resolved, Defendants' request for evidentiary sanctions is moot and the only question pending before the Court is Defendants' request for monetary sanctions.  (ECF No. 210.)

In support of the Motion, Defendants filed the Declaration of M. Adam Tate ("Tate Declaration") (Tate Decl., ECF No. 98-1) with Defendants' Exhibits 1 through 15 (Def. Exs., ECF Nos. 98-2–98-16), the Declaration of Catherine A. Close  (ECF No. 98-17) with Defendants' Exhibits 16 through 21 (Def. Exs., ECF Nos. 98-18–98-23), the Declaration of Jeremy Whiteley  (ECF No. 98-24), and the Declaration of Katherine McNamara  (ECF No. 98-25).

BCS opposes the Motion.  (*See generally* Mot.)  In support of its opposition, BCS filed the Declaration of Jason Lueddeke  (ECF No. 98-26) with Plaintiff's Exhibits A through I (Pl. Exs., ECF Nos. 98-27–98-35), the Declaration of Denette King ("King Declaration") (King Decl., ECF No. 98-36), the Declaration of Dee Anna Hassanpour ("Hassanpour Declaration") (Hassanpour Decl., ECF No. 98-37), the Declaration of Jennifer Magill  (ECF No. 98-38), the Declaration of Dorit Saberi ("Saberi Declaration") (Saberi Decl., ECF No.98-39), and Plaintiff's Supplemental Memorandum ("Plaintiff's Supplemental Memorandum") (Pl. Suppl. Memo., ECF No. 113).

In response to a concern expressed by the Court during an informal discovery conference held on August 9, 2024, and to request attorneys' fees expended in connection with, but after the filing of, the Motion, Defendants filed a

---

[2] Pinpoint cites citations of page numbers in the Order refer to the page numbers appearing in the ECF-generated headers of cited documents.

Supplemental Declaration of M. Adam Tate ("Tate Supplemental Declaration").
(Tate Suppl. Decl., ECF No. 129.)

In response to a request by the Court that Defendants provide updated and
detailed information regarding the requested attorneys' fees and that Plaintiff
provide its response thereto, the parties filed a Joint Stipulation re: Attorney's Fees
on Sanctions Motion ("Motion Supplement").  (Mot. Suppl., ECF No. 211, at 4–5.)
In support of the Motion Supplement, Defendants filed another Declaration of M.
Adam Tate ("Tate Third Declaration") (Tate Third Decl., ECF No. 211-1), with
Defendants' Exhibits 1-2 through 12-2[3] (Def. Exs. 1-2–12-2, ECF Nos. 211-2–211-
13).

Having read and considered the papers by the parties and other records in this
case as detailed below, the undersigned finds the Motion suitable for disposition
without a hearing.  *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the reasons set
forth below, the Court **GRANTS in part** and **DENIES in part** the Motion.

## II.     FACTUAL BACKGROUND

### A.     BCS's Allegations

BCS brought this action under the Computer Fraud and Abuse Act (18
U.S.C. § 1030) ("CFAA"), and the California Computer Data Access and Fraud Act
(Cal. Penal Code § 502) ("CDAFA") ("Complaint").  (Compl., ECF No. 2.)  Based
on the Joint Stipulation to Strike Allegations and Limit Claims, the parties agreed to
narrow the claims asserted in the Complaint to the allegation that Defendants
accessed a BCS computer or account without authorization, or in excess of
authorized access, and caused BCS's website (breakingcodesilence.org and/or
breakingcodesilence.com) to be de-indexed.  (ECF Nos. 146–47.)

---

[3] To distinguish between Defendants' first and second sets of Exhibits 1 through 13,
the Court denotes the second set by adding "-2" to each exhibit number.

According to the Complaint,[4] on or about March 10, 2022, Defendants accessed BCS's website account with Google without permission or authorization from BCS and caused the website to be deindexed on Google.  (Compl. 10.)  The effect of the deindexing was that no one could find BCS's website on Google.  (*Id.* at 11.)  The timing of the deindexing was problematic for BCS because, earlier that day, BCS had been featured on a television show and expected a rise in website traffic and, in turn, donations.  (*Id.*)  In addition, a made-for-TV film about the stories of two troubled-teen industry survivors that highlighted BCS's work was being promoted around this same time and was scheduled to debut on March 12, 2022, which also was expected to result in a rise in website traffic and donations.  (*Id.*)  Instead, from the date of the deindexing, Google Analytics reported a significant and dramatic drop in traffic to the BCS website.  (*Id.*)  The de-indexing was investigated by Jesse Jensen and Noelle Beauregard—two BCS Board Members.  (Mot. 24–25.)  During the investigation, Jensen became concerned about the security of BCS's systems and recommended to BCS's leadership team that they communicate any sensitive information through personal emails and Signal, a messaging application.  (*Id.* at 25.)  Based on that investigation, Jensen and Beauregard concluded that Defendants were responsible for the de-indexing.  (Compl. 12.)  This lawsuit followed.

### B.    The Electronic Discovery Order

On September 6, 2022, the parties sought a Stipulated Order re: Amended E-Discovery Plan and Protocol for Discovery of Electronically Stored Information

///

---

[4] In summarizing the alleged claims, the Court neither opines on the veracity or merit of the allegations and claims, nor makes any findings of fact.  Indeed, any such opinions or findings would be unnecessary as the case was dismissed on May 8, 2024, before the Court had an opportunity to rule on the Motion.

(ECF No. 40), which the Court granted on September 13, 2022 ("EDO").[5]  (EDO,
ECF No. 41.)  The EDO details the process to which the parties agreed for the
preservation, search, and production of electronically stored information ("ESI").
(*See generally* EDO.)  The sections of the EDO that are relevant to the Motion are
as follows:

Section 7.1, which, as a starting point, requires that the parties produce ESI
from the custodians specified in Section 4.3 and the data sources specified in
Section 4.4.  (*Id.* ¶ 7.1.)

Section 4.3, which specifies the custodians from whom the parties agreed to
collect ESI, a list that includes specific names—Vanessa Hughes, Jennifer Magill,
Katherine McNamara, Jeremy Whiteley, Jesse Jensen, Noelle Beauregard, Lenore
Silverman, Eugene Furnace, Bobby Cook, Megan Hurwitt, Arianna Conroyd, and

---

[5] Although BCS now claims that the Court entered the EDO over its objections
(Mot. 29, n.9), the facts show otherwise.  Through its July 14, 2022 Scheduling
Order, the Court required the parties to submit a joint e-discovery plan addressing a
number of e-discovery terms identified by the Court.  (ECF No. 31 at 3.)  The Court
noted that if the parties could not agree on certain terms, they were to note this
disagreement in their joint filing and the Court would set an informal discovery
conference "to address any issues and to assist the parties in finalizing the Joint E-
Discovery Plan" that would govern e-discovery in this case.  (*Id.* at 4.)  On August
12, 2022, the parties filed the required e-discovery plan noting disagreements
regarding:  the applicable date range; the number of custodians Plaintiff would have
to search; the inclusion of back-ups, deleted/overwritten files, and RAM in the data
sources to be searched; the requirement of an agreed-upon set of search terms that
would be run by both parties alike; the requirement to collect, review, and produce
duplicates; and the requirement to preserve a forensic copy of each device or drive
with its costs to be borne by the party that owned the device.  (ECF No. 35, ¶¶ 4.2,
4.3, 4.4, 5.1, 8.3, 10.1, 10.2.)  In response, the Court held an informal discovery
conference during which some, but not all disputes, were resolved by the parties.
(ECF No. 39.)  The Court ordered the parties to continue meeting and conferring to
resolve the remaining disputes and to file another e-discovery plan, again noting
areas of disagreement.  (*Id.*)  On September 6, 2022, the parties filed a second e-
discovery plan, this time with no areas of disagreement.  (ECF No. 40.)  The Court
entered that plan as the EDO.  (ECF No. 41.)

Shelby Kirchoff—as well as two general categories of persons—"the entire BCS Board of Directors" and "anyone else who had administrative permissions on the website or any of BCS's accounts or systems at the time the alleged hacking took place"—(collectively, "Custodians").  (*Id.* ¶ 4.3.)  According to information obtained by Defendants from BCS through a different lawsuit, BCS's Board of Directors at the time of the EDO was comprised of Jennifer Magill, Vanessa Hughes, Apryl Alexander, Lenore Silverman, Denette Boyd-King, Dorit Saberi, and Dee Anna Hassanpour.  (Mot. 14–15.)

Section 4.4, which specifies the data sources from which BCS agreed to collect ESI provided the ESI was "in the possession, custody or control of any of the Parties and reasonably accessible".    (EDO ¶ 4.4.)  The term "Party" is defined as "any party to this Action, including all its officers, directors, employees, consultants, retained experts, and Outside Counsel (and their support staffs)."  (*Id.* ¶ 2.13.)  The data sources from which ESI was to be collected are listed as:

> E-mail accounts, cell phones, Facebook accounts, Twitter accounts, Skype accounts, and Slack accounts, Google Drives, cell phones (including any backups of the cell phones and all personal and BCS-controlled computing devices of Vanessa Hughes, Jennifer Magill, Jesse Jensen, Bobby Cook, Katherine McNamara, and Jeremy Whiteley), text messages, Apple Messages, computers, Zoom accounts, Hootsuite logs, Hootsuite audit data, Hootsuite billing history, Instagram logs, Instagram audit history, PayPal audit logs, Slack audit logs, server logs, Cloudways databases, server and audit and access logs (including all backups of the Cloudways web server 90 days before and after the alleged incidents), WordPress databases, server and audit and access lots (including all backups of the Wordpress files 90 days before and after the alleged incidents), WhatsApp chat logs, Telegram chat logs, Google admin audit logs, system logs, TikTok audit logs, Facebook messages, Facebook audit logs for BCS page, YouTube audit logs, Signal chatlogs and any other tech-based communications exchanged between

6

1  |  custodians pertinent to this matter or the alleged hacking
2  |  incident.

3  ("Data Sources").  (*Id.* ¶ 4.4.)

4      Section 3, which details the parties' preservation duties.  Specifically, the

5  parties represented to each other that they had "taken reasonable steps to preserve

6  reasonably accessible sources of ESI with respect to the Custodians set forth in

7  paragraph 4.3 and the data sources set forth in paragraph 4.4."  (*Id.* ¶ 3.1.)  The

8  parties further agreed "to disable any automatic deletion program with respect to

9  discovery sources of ESI" to the extent they already had not done so.  (*Id.* ¶ 3.2.)

10      Sections 4 and 6, which jointly subject the parties' obligations under the

11  EDO to the tenets of the Federal Rules of Civil Procedure and relevant industry

12  standards.  Specifically, Section 4.1 requires the parties "to identify, collect, and

13  produce responsive documents and ESI *in accordance with the Federal Rules of*

14  *Civil Procedure*," and Section 6.1 requires the parties "to take into account *the*

15  *proportionality considerations in [the] Federal Rules of Civil Procedure* for

16  purposes of preservation and production of ESI and hard copy documents in this

17  Action," noting that the EDO "is not intended to expand the Parties' obligations

18  *under Federal Rules of Civil Procedure 1, 26, and 34*."  (*Id.* ¶¶ 4.1, 6.1 (emphases

19  added).)  The EDO requires the producing party to "design and implement the

20  *industry standard* and approved methods it uses to identify, cull, and review its

21  potentially responsive ESI based on its knowledge and understanding of its own

22  data, the facts and issues involved in the Action . . . ."  (*Id.* ¶ 4.5 (emphasis added).)

23  Finally, the EDO allows the producing party to use data analytics to identify and

24  review potentially responsive ESI and to conduct targeted collections of sources

25  "likely to contain responsive materials (e.g., file folders on a given hard drive)."

26  (*Id.*)

27      Section 8, which provides that a production of documents and ESI includes a

28  production of their metadata.  (*Id.* ¶ 8.1.)

C.    **The Discovery Dispute**

During the early course of discovery, on a date unknown to the Court, Defendants propounded document requests to BCS, which production was to be governed by the EDO.  (*See* EDO Section 1.)  The specifics of Defendants' documents requests are not relevant to the Motion because the crux of the discovery dispute is not simply whether BCS improperly withheld responsive documents, but rather whether BCS's antecedent preservation of and searches for documents complies with the terms of the EDO.  (*See generally* Mot.)  Specifically, the dispute centers on whether the EDO requires BCS to preserve, search for, and produce documents from both its organizational Data Sources, including those assigned to the Custodians, (collectively, "BCS Data Sources") and the personal Data Sources of the Custodians ("Personal Data Sources"), as Defendants contend, or whether the EDO requires BCS to preserve, search for, and produce documents only from the BCS Data Sources, and then only if BCS, in its sole discretion, believed that a search through those BCS Data Sources was likely to yield responsive documents, as BCS contends.  (*See generally id.*)[6]

---

[6] Defendants also contend that, in addition to the EDO, BCS violated three Court orders:  (1) the order resulting from the April 18, 2023 informal discovery conference, which required BCS to create a table of Custodians and Data Sources and detail for each intersecting cell whether, and to what extent, that particular data source had been searched, which Defendants contend BCS violated by failing to include Custodians Apryl Alexander, Denette Boyd-King, Dorit Saberi, and De Anna Hassanpour (Mot. 60); (2) the order resulting from the April 24, 2024 informal discovery conference, which required BCS to inform the Court whether each of the Custodians had one or more of the Personal Data Sources, which Defendants contend BCS violated by failing to provide information for Jennifer Magill, Noelle Beauregad, Ariana Conroyd, Shelby Kirchoff, Apryl Alexander, Lenore Silverman, Denette Boyd-King, Dorit Saberi, and Dee Anna Hassanpour (*id.* at 61); and the order resulting from the May 1, 2023 informal discovery conference, which required BCS to inform the Court about each Custodian's association with BCS and whether each Custodian would voluntarily provide

During a series of informal discovery conferences ("IDC") preceding the filing of the Motion—IDC 3[7] on April 18, 2023, IDC 4 on April 24, 2023, IDC 5 on May 1, 2023, and IDC 6 on May 3, 2023—BCS held steadfastly to its position that its preservation of, and search through, some, but not all, of the BCS Data Sources (including those assigned to the Custodians) satisfied its discovery obligations under the EDO.  (*See generally* Transcript ("Tr.") IDC 3, ECF No. 83; Tr. IDC 4, ECF No. 80; Tr. IDC 5, ECF No. 84; Tr. IDC 6, ECF No. 85.)  Defendants disagreed and instead contended that the EDO required a broader search that would include the Personal Data Sources of the Custodians.  (*See id.*)  In that the parties were unable to resolve the dispute informally, the Court issued an order permitting Defendants to file a discovery motion under Rule 37.  (IDC 6 Order, ECF No. 58 ¶ 2.)  This Motion followed.  (*See generally* Mot.)

Through the Motion, Defendants ask the Court to issue evidentiary sanctions for BCS's failure to comply with the EDO in its document production, and to award Defendants the reasonable expenses (including attorneys' fees) they incurred as a result of BCS's failure to comply with the EDO.  (*See generally* Mot.)[8]

---

documents responsive to Defendants' discovery from their Personal Data Sources, which Defendants contend BCS violated by failing to provide information for April Alexander, Lenore Silverman, Denette Boyd-King, Dorit Saberi, or Dee Anna Hassanpour (*id.*).  While the Court agrees that BCS failed to comply with these orders by providing incomplete information to each, the Court need not address these violations separately as they are part and parcel of BCS's ultimate violations of the EDO, which violations are sufficient, standing alone, to warrant the sanctions requested here.

[7] The Court named the IDCs numerically.  The first two IDCs—IDC 1 and IDC 2—do not involve the disputes raised in the Motion.

[8] Defendants also request an order compelling the production of documents in the control of BCS's current officers and directors.  In light of the voluntary dismissal of the case (ECF No. 210), the Court **DENIES** the request to compel discovery and for evidentiary sanctions **as moot**.  Nevertheless, the Court provides the

9

Specifically, Defendants contend evidentiary and monetary sanctions are warranted under Rule 37(b)(2)(C) because, despite the clear language of the EDO, BCS failed to preserve, search for, collect, and produce documents from the BCS Data Sources assigned to Lenore Silverman, Apryl Alexander, Denette Boyd-King, Dorit Saberi, and Dee Anna Hassasnpour, and from all the Personal Data Sources of all the Custodians, including critical screen shots—related to Jensen's and Beauregard's investigation of the de-indexing blamed on Defendants—which BCS concedes were held only in the Personal Data Sources of Jensen and Beauregard. (*See generally* Mot.)

In opposition, BCS argues that neither evidentiary nor monetary sanctions are warranted because (1) BCS did not violate the EDO in the first instance, and (2) even if the Court were to find a violation, (a) BCS's failure to comply with the EDO was substantially justified, and (b) and award of sanctions would be unjust under the attendant circumstances. (*See generally* Mot.)

### D.    Post-Motion Efforts to Resolve or Narrow the Dispute

The Court's review of the Motion upon its filing revealed that, although it was clear that BCS had violated the EDO as Defendants argued, the nature and extent of Defendants' resulting prejudice—information needed for resolution of the evidentiary sanctions request—was neither clear nor self-evident. (*See* Tr. IDC 10, ECF No. 124, at 12–15.) To address this evidentiary shortfall, and, in the process, to give BCS one final opportunity to resolve the dispute short of the draconian evidentiary sanctions and substantial monetary sanctions that could befall it—the Court convened IDC 10 on August 9, 2023. (*See id.* at 14–19.) With this in mind, the Court ordered "[a]ll attorneys in any way involved with the Motion and the

---

background information associated with those document requests to inform the question of monetary sanctions.

discovery that [was] the subject matter of the Motion," as well as a decision-making representative of BCS, "to appear in person." (ECF No. 114.)

At IDC 10, the Court advised the parties of its tentative ruling that BCS had violated the EDO and that the only remaining questions to resolve the Motion were (1) the nature and extent of Defendants' prejudice, which would inform the Court's decision regarding the requested evidentiary sanctions, and (2) the amount of monetary sanctions that would be awarded to Defendants for BCS's violation of the EDO. (*See* Tr. IDC 10, at 12–15.) The Court also advised BCS that it would be given one final opportunity to minimize, or eliminate altogether, the prejudice to Defendants (and, relatedly, the evidentiary sanctions) by working with the Custodians to identify the extent of documents thus far withheld and produce them once and for all. (*See id.* at 14–19.) Any existing, responsive documents not produced through this opportunity would become the basis for the Court's prejudice assessment and, ultimately, its evidentiary sanctions order. (*See id.*) The Court advised that it would bifurcate the Motion into the evidentiary sanctions request, which would be resolved first, and the monetary sanctions request, which would be resolved second. (*See id.* at 15.) With that, the Court invited the parties to design a process for resolution of the evidentiary sanctions request. (*See id.* at 18.)

At the suggestion of the Court, and working cooperatively at IDC 10, the parties reached an agreement through which the evidentiary sanctions request would be resolved in two phases, described as follows:

> **Phase 1** will involve joint efforts by the parties to obtain the discovery at issue in the Motion from the officers and directors of Plaintiff ("Discovery at Issue"), with or without the need for subpoena discovery. Phase 1 will serve three purposes: (a) for Defendants to obtain the Discovery at Issue, (b) to inform the Court regarding the nature and extent of prejudice to Defendants from the inability to obtain the entirety of Discovery at Issue, and (c) to inform the Court whether any of the Discovery at Issue has been spoliated. During this

informal discovery conference, the parties reach an agreement
regarding the process for carrying out Phase 1.  The reasonable
attorneys' fees and costs incurred by Defendants in any
necessary subpoena discovery related to obtaining the
Discovery at Issue—whether incurred as part of Phase 1 or
heretofore—shall be borne by Plaintiff, upon order of this
Court on a motion by Defendants at the conclusion of Phase 1.

**Phase 2** will involve the Court's decision regarding the
requested evidentiary sanctions, which decision will be
informed by further briefing of the parties, as may be ordered
by the Court, regarding the outcome of Phase 1.  To the extent
Defendants incur reasonable expenses (including attorneys'
fees) in supplementing the Motion to reflect the outcome of
Phase 1, the Court will consider a request for such fees upon a
process and schedule to be set by the Court at the appropriate
time.

(IDC 10 Order, ECF No. 120, at 1–2.)

     To implement Phase 1, the parties entered into a stipulation that, upon the
parties' request, the Court issued as the Interim Order on August 9, 2023 Informal
Discovery Conference re: Joint Stipulation for Evidentiary and Monetary Sanctions
Under FRCP 37(b) ("IDC 10 Agreement").  (IDC 10 Agm't, ECF No. 132.)   The
IDC 10 Agreement generally set forth the following two sub-phases—"Voluntary
Discovery" and "Subpoena Discovery."  During the "Voluntary Discovery," first
BCS would work with each of the Custodians to obtain a declaration stating
whether they had any Personal Data Sources and, if so, whether the Personal Data
Sources contained BCS-related documents and whether they would make the
Personal Data Sources available to BCS for collection of such documents (*id.* ¶ 2);
next, BCS would collect any such documents, review them for responsiveness to
Defendants' document requests, and produce them together with a privilege log
indicating the basis for any withheld documents (*id.* ¶ 3).  During the "Subpoena
Discovery," Defendants first would issue subpoenas to any Custodian who either
refused to participate in the Voluntary Discovery or who participated but who

1   Defendants had a reasonable basis to believe was withholding documents, and

2   thereafter prosecute those subpoenas, including any necessary motions to compel

3   production under the subpoenas.  (*Id.* ¶¶ 4–5.)  The attorneys' fees and costs

4   incurred by Defendants in connection with the prosecution of the subpoenas issued

5   to BCS's officers and directors (issuance and enforcement motion practice),

6   whether incurred as part of Phase 1 or theretofore, would be borne by BCS upon

7   order of the Court pursuant to a motion by Defendants at the conclusion of Phase 1.

8   (*Id.* ¶ 7.)

9        At IDC 12, held on September 12, 2023 for another purpose, the Court

10  obtained an impromptu update regarding the progress of Phase 1.  Upon the parties'

11  agreement, the Court extended the dates by which the Voluntary Discovery would

12  be completed.  (IDC 12 Order, ECF No. 138, at 2.)  In addition, Defendants advised

13  to the Court that one Custodian—Megan Hurwitt—already had advised she would

14  not participate in the Voluntary Discovery and requested leave to commence the

15  Subpoena Discovery as to her, which the Court granted.  (*Id.* at 2.)

16       To monitor the progress of Phase 1, the Court convened IDC 13 on October

17  5, 2023.  (ECF No. 141.)  At IDC 13, Defendants informed the Court that they were

18  not satisfied with the responses to the Voluntary Discovery from certain

19  Custodians—Jesse Jensen, Arianna Conroyd, Vanessa Hughes, Eugene Furnace,

20  Shelby Kirchoff, and Lenore Silverman—and requested leave to commence the

21  Subpoena Discovery as to them, which the Court granted.  (IDC 13 Order, ECF

22  No. 142.)

23       On February 15, 2024, Defendants filed a status report regarding the outcome

24  of Phase 1 ("Phase 1 Status Report").  (Status Rpt., ECF No. 168.)  BCS filed a

25  response through which it disputes Defendants' factual representations and

26  conclusions.  ("Response to Status Report").  (Resp. to Status Rpt., ECF No. 192.)

27  At bottom, Phase 1 did not entirely achieve its goal of incentivizing the Custodians

28  to voluntarily turn over their responsive documents to BCS for production.

1   Summarizing, some Custodians provided the requested declaration stating they

2   would allow BCS to search their Personal Data Sources for responsive documents,

3   for whom, according to Defendants, BCS produced some documents but not all;

4   some provided a declaration stating they did not have responsive documents; and

5   some refused to execute a declaration at all.  (Status Rpt. ¶¶ 2–3.)  BCS does not

6   dispute these facts.  (Resp. to Status Rpt. 2.)  As to the six Custodians for whom

7   Defendants were given leave to commence the Subpoena Discovery, Defendants

8   noted that three actively avoided service while the remaining three who were served

9   with subpoenas either ignored the subpoena altogether, executed a Certification of

10  No Records, or produced some documents.  (Status Rpt. ¶ 4.)  BCS does not dispute

11  these facts but advances two defensive arguments:  (1) that some of the subpoenas

12  were issued to persons Defendants knew were unlikely to possess responsive

13  documents or were not material witnesses, and (2) that Defendants have offered no

14  evidence concerning evasion of service.  (Resp. to Status Rpt. 2–3.)

15      In light of the issues raised in the Phase 1 Status Report and their

16  implications on the Motion, the Court convened a Status Conference on March 25,

17  2024 which was extended to April 5, 2024 (together, the "March/April Status

18  Conferences").  (ECF Nos. 180–81, 193, 196.)  There, the Court concluded that the

19  Motion required supplementation regarding the outcome of Phase 1 and set a

20  briefing schedule.  (ECF No. 196.)

21      Before Defendants could file their opening supplemental brief, BCS filed a

22  Request for Voluntary Dismissal with Prejudice Pursuant to FRCP 41(a)(2)

23  ("Dismissal Request").  (Dismissal Req., ECF No. 198.)  After full briefing, the

24  Court granted BCS's Dismissal Request, noting that the dismissal mooted the

25  evidentiary sanctions portion of the Motion, but neither mooted nor stripped the

26  Court of jurisdiction to decide the monetary sanctions portion of the Motion

27  ("Dismissal Order").  (Dismissal Order, ECF No. 210.)  On this basis, the Court

28  denied the evidentiary sanctions portion of the Motion as moot and ordered

14

1    supplemental briefing to update the monetary sanctions portion of the Motion to

2    include a comprehensive request for attorneys' fees, including for the work

3    performed after the filing of the Motion.  (*Id.* at 4–5.)  The Motion Supplement

4    followed.  (*See* Mot. Suppl.)

5

6    **III.    DISCUSSION**

7        Through the Motion and the Motion Supplement, Defendants request

8    monetary sanctions against BCS and its counsel pursuant to Rule 37(b)(2)(C) "to

9    cover the costs of the IDCs that Defendants' counsel was forced to attend and the

10    costs associated with the instant Motion."  (Mot. 64; *see* Mot. Suppl. 7–10.)  BCS

11    opposes this request, noting that it did not violate any Court order, and asks that, if

12    the Court is inclined to impose monetary sanctions, it reduce the fees requested as

13    unreasonable and/or unrecoverable.  (Mot. Suppl. 11–12.)

14

15        **A.    Legal Standard**

16        Pursuant to Rule 37(b), a party may seek monetary and nonmonetary

17    sanctions for another party's failure to comply with a discovery order.  Fed. R. Civ.

18    P. 37(b)(2).  Rule 37(b)(2)(C) requires that a district court, instead of or in addition

19    to nonmonetary sanctions allowed in Rule 37(b)(2)(A), "order the disobedient

20    party, the attorney advising that party, or both to pay the reasonable expenses,

21    including attorney's fees, caused by the [discovery] failure, unless the failure was

22    substantially justified or other circumstances make an award of expenses unjust."

23    Fed. R. Civ. P. 37(b)(2)(C).  Thus, for fees to be awarded pursuant to Rule

24    37(b)(2)(C), there must be a "causal connection" between a litigant's discovery

25    misconduct and the legal fees incurred by the opposing party.  *Goodyear Tire &*

26    *Rubber Co. v. Haeger*, 581 U.S. 101, 108 n.5 (2017).  "That kind of causal

27    connection . . . is appropriately framed as a but-for test: the complaining party . . .

28    may recover 'only the portion of his fees that he would not have paid but for' the

15

1    misconduct." *Id.* at 109 (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)).  As

2    explained by the Supreme Court in *Haeger*:

3              This but-for causation standard generally demands that a

4              district court assess and allocate specific litigation expenses—

              yet still allows it to exercise discretion and judgment.  The

5              court's fundamental job is to determine whether a given legal

6              fee . . . would or would not have been incurred in the absence

              of the sanctioned conduct.  The award is then the sum total of

7              the fees that, except for the misbehavior, would not have

8              accrued."

9    *Id.* at 109–10.

10         Trial courts, however, "need not, and indeed should not, become green-

11   eyeshade accountants."  *Id.* at 110.  "'The essential goal' in shifting fees is 'to do

12   rough justice, not to achieve auditing perfection.'  Accordingly, a district court

13   'may take into account [its] overall sense of a suit, and may use estimates in

14   calculating and allocating an attorney's time.'"  *Id.* (alteration in original) (internal

15   citations omitted) (quoting *Fox*, 563 U.S. at 838).  The disobedient party shoulders

16   the burden of avoiding such sanctions by establishing substantial justification for

17   the discovery misconduct or that special circumstances make the award of expenses

18   unjust.  *See* 1970 Advisory Comm. Notes to Rule 37(b).

19

20       **B.    Analysis**

21            1.    <u>BCS violated the EDO</u>.

22         Defendants argue that BCS's failure to preserve, search for, and produce

23   documents from all the BCS Data Sources and from the Personal Data Sources

24   violates the EDO.  (*See* Mot. 14–16, 22–27.)  They contend that the EDO's

25   language is unambiguous in this requirement:

26              [F]ist [sic], Section 7.1 of the stipulated EDO provides

27              that "The Parties will produce, on a rolling basis, ESI

              from the data sources and Custodians identified in

28              paragraph 4.3 and 4.4" . . . Second, paragraph 4.4 states

that "The Parties agree that the data sources include the following, so long as they are in the possession, custody, or control **of any of the Parties** and reasonably accessible" . . . Finally, the stipulated EDO defines the term "Party" as "any party to this Action, including all of its **officers, directors** employees, consultants, retained experts, and Outside Counsel (and their support staffs).["]

(Mot. 26 (citing EDO) (internal citations omitted).)

BCS contends that it did not violate the EDO for a litany of reasons. (Mot. 16–22, 27–40; Mot. Suppl. 18.) The Court addresses each in turn and concludes that, consistent with its tentative ruling as stated at IDC 10, BCS violated the EDO.

> a.   *BCS violated the EDO by not searching for and collecting documents from all the BCS Data Sources.*

Defendants contend that BCS violated the EDO by not searching through and collecting documents from the BCS Data Sources assigned to Lenore Silverman, Apryl Alexander, Denette Boyd-King, Dorit Saberi, and Dee Anna Hassanpour. (Mot. 15.) As detailed below, the Court agrees in part.

Lenore Silverman: Although Silverman is identified by name as a Custodian (EDO ¶ 4.3), BCS never produced documents from the BCS Data Sources related to any accounts assigned to her. BCS explains that, despite having formerly been a member of BCS's Board of Directors, Silverman never was assigned a BCS Data Source. (Mot. 22.) Defendants offer no evidence to the contrary. With this, the Court is satisfied that BCS did not have an obligation under the EDO to collect documents from the BCS Data Sources for Silverman. According, its failure to do so does not constitute a violation of the EDO.

Apryl Alexander, Denette Boyd-King, Dorit Saberi, and Dee Anna Hassanpour: The EDO does not identify Alexander, Boyd-King, Saberi, and Hassanpour by name as Custodians. (EDO ¶ 4.3.) However, Defendants argue that they qualify as Custodians through the EDO's general category of "the entire BCS

Board of Directors." (*Id.*)  They point to BCS's under-oath discovery responses in a related state court matter wherein BCS identified the four as members of its Board of Directors during the relevant period.  (Mot. 14–15; Def. Ex. 1, at 5–6 (Special Interrogatory No. 19:  "IDENTIFY all members of YOUR Board of Directors from March 2021 to the present"; BCS's Supplemental Response listing "Dr. Apryl Alexander; . . . Dr. Denette Boyd-King; Dr. Dorit Saberi;[] and Dee Anna Hassanpour").)  Despite this, BCS consistently has maintained in this litigation that Boyd-King, Saberi, and Hassanpour never were members of its Board of Directors.  (Mot. 17.)  However, nothing in this litigation has explained this discrepancy.  Nevertheless, in support of its position, BCS has submitted under-oath declarations of Boyd-King, Saberi, and Hassanpour affirming that they never were Board members and explaining that, although they were considered for Board positions, they never assumed them.  (*See generally* King Decl., Hassanpour Decl., Saberi Decl..)  With this, the Court is satisfied that BCS did not have an obligation under the EDO to collect documents from the BCS Data Sources for Boyd-King, Saberi, and Hassanpour.  Accordingly, its failure to do so does not constitute a violation of the EDO.[9]

The same result cannot be reached regarding the BCS Data Sources assigned to Alexander.  BCS concedes that Alexander was a Board member and that it issued her "a Google email and Drive account," both BCS Data Sources.  (Mot. 21.)  However, BCS argues that it was not obligated to collect documents from those

_____

[9] Defendants insist that this discrepancy is more than a mere mistake in the state court case and instead constitutes an affirmative misrepresentation to this Court for which sanctions are warranted.  (Mot. 15.)  The Court is not convinced.  While late in the game, BCS clarified at IDC 6 that the list of Board members from which Defendants were working appeared to be "a list of people who were once considered . . . as potential Board members of the organization . . . but all three of them refused, for various reasons."  (Tr. IDC 6, at  30.)  Thus, despite BCS's missteps and delay on this issue, the Court declines to accept Defendants' characterization of BCS's discovery conduct as sanctionable malfeasance.

18

BCS Data Sources because Alexander "was not a member of Plaintiff's Board of Directors until June 2022, months after the allegations in the Complaint." (*Id.*) BCS explains that it made the decision to not collect those documents because "Alexander would not have been a custodian pursuant to section 4.3 during the relevant time period and because Alexander's account was not reasonably likely to yield responsive ESI." (*Id.*)  But this defies the clear language of the EDO, co-authored by BCS, which captures Alexander within the definition of Custodians as part of "the entire BCS Board of Directors" for the period February 1, 2020 through September 13, 2022, the date of the EDO.  (EDO ¶¶ 4.2, 4.3.)  And there is no exception in the EDO that would allow BCS to exclude from collection any Data Source it, in its sole discretion, believed was not reasonably likely to yield responsive ESI.  (*See generally* EDO; *see also* Section III.B.2 *infra*.)  To the extent BCS relies on the language in Paragraph 4.5 for this proposition—"A Producing Party may conduct a targeted collection of sources likely to contain responsive materials (e.g., file folders on a given hard drive)—the Court disagrees.  The Court reads this sentence as an additional method of searching through the Data Sources, not as an unbridled license to unilaterally limit searches.  On this basis, the Court concludes that BCS violated the EDO by not searching through and collecting documents from the BCS Data Sources assigned to Alexander.

        b.     *BCS violated the EDO by not searching for and collecting documents from all the Personal Data Sources of all the Custodians.*

It cannot be disputed that BCS failed to search for and produce documents from all the Personal Data Sources of all the Custodians and that even the Phase 1 efforts did not save BCS from this failure.  Indeed, BCS conceded as early as in IDC 3 that it did not search for and produce documents from the Personal Data Sources of the Custodians.  (*See generally* Tr. IDC 3; Def. Ex. 5 (indicating that BCS only searched the BCS Data Sources).)  Defendants' Phase 1 Status Report

reveals that the final opportunity given to BCS to work with the Custodians to shore up its production shortfall was successful only as to Alexander, Bobby Cook, Noelle Beauregard, Boyd-King, Saberi, and Hassanpour.  (*See* Status Rpt. 3–5.)  As a starting point, Defendants report that the Voluntary Discovery did not have the desired results.  Specifically, although Arianna Conroyd and Jesse Jensen declared they would search for documents, BCS never produced any such documents; although Jennifer Magill and Vanessa Hughes produced some documents, Defendants contend these productions are incomplete; and Eugene Furnace, Shelby Kirchoff, Hurwitt, and Silverman refused to participate in the Phase 1 process altogether.  (*See id.*)  BCS does not dispute these facts.[10]  (*See* Resp. to Status Rpt. 2.)  Defendants further report that the Subpoena Discovery also was not completely productive.  Specifically, of the six Custodians whose documents were subpoenaed under Phase 1:  only two responded satisfactorily—Hurwitt by executing a Certification of No Records, and Silverman by producing some documents; one— Kirchoff—ignored the subpoena altogether; and three were not served—Furnace because the process server could  not gain access to his gated community, and Jensen and Hughes because, according to Defendants, they actively evaded service. (Status Rpt. 5–6.)  BCS does not dispute these facts but instead offers two arguments as to why they should be disregarded:  (1) that Defendants should not have issued the subpoenas to Silverman, Kirchoff, and Furnace to begin with because Defendants knew "that each of them was *highly* unlikely to possess

---

[10] BCS characterizes Defendants' contention that the productions of Jensen, Conroyd, Magill, and Hughes were unsatisfactory as "specious" and "frivolous" efforts "to drum up additional examples of alleged order violations," including of a Phase 1 violation, noting that Defendants' purported concerns were resolved by the Subpoena Discovery as to these Custodians.  (Mot. Suppl. 18.)  But as noted in footnote 6 above, the Court need not consider violations of orders beyond the EDO for purposes of this Motion.  In any event, as detailed here, the Subpoena Discovery did not resolve the dispute regarding the documents of these Custodians.

1    responsive documents [as] Silverman is a former BCS Board member who was not

2    involved in the March 2022 events giving rise to this lawsuit . . . [and] Defendants

3    do not even attempt to explain how Kirchoff or Furnace [are] material witness[es],

4    particularly since Furnace was only briefly a BCS member for a few months," and

5    (2) that Defendants offer no evidence of Jensen's and Hughes's purported evasion

6    of service.  (Resp. to Stat Rpt. 2–3.)  But, BCS's arguments, even if fully credited,

7    do not mitigate the fact that BCS did not itself search for and produce these

8    documents outside of the Phase 1 process, which was created for the very purpose

9    of rescuing BCS from its failings.  Moreover, BCS's unilateral and unsupported

10   belief that Silverman, Kirchoff, and Furnace were unlikely to have responsive

11   documents does not preclude Defendants from testing that theory.  *See* Fed. R. Civ.

12   P. 26(d) (providing that each party may conduct whatever discovery a party chooses

13   and in any sequence the party desires).  In sum, although BCS was given multiple

14   opportunities to produce responsive documents, the evidence is clear that it fell

15   short with respect to the documents from the Personal Data Sources of Custodians

16   Conroyd, Jensen, Magill, Hughes, Furnace, and Kirchoff.

17        Despite this overwhelming evidence, BCS contends that it did not violate the

18   EDO because, under its interpretation of the EDO and the applicable discovery

19   rules, it was not obligated to produce documents from the Personal Data Sources of

20   the Custodians in the first instance.  (*See generally* Mot.)  BCS advances many

21   arguments in support of this position, all of which the Court finds unavailing.

22        *First*, BCS argues that the disparity between the obligations of the parties

23   under the EDO—requiring BCS to collect and produce the ESI of at least fifteen

24   Custodians while Defendant was required to collect and produce the ESI of only

25   two Custodians—militates against Defendants' broad interpretation of the EDO.

26   (Mot. 28–29; n.9.)  However, BCS provides no legal support for this proposition.

27   (*See generally* Mot., Mot. Suppl.)  Moreover, BCS not only entered into this EDO

28   with full knowledge of its obligations—or at least there is no evidence to the

contrary—but, as detailed above, it actually participated in the crafting of the EDO and agreed to its terms. (*See* Section II.B., n. 5, *supra*.)  BCS cannot now be heard to complain about its terms, even if they are disparate.  Moreover, it is logical and expected that BCS would have to collect from more Custodians than Defendants— BCS is an organization that has a number of officers and directors who, with the exception of a few, were directly involved in the claims BCS raises in the Complaint while Defendants are merely two individuals.  (*See generally* Compl.) This argument does not persuade the Court that BCS did not violate the EDO.

*Second*, BCS argues that the EDO is subject to the Federal Rules of Civil Procedure, which limit BCS's obligations. (Mot. 12, 29.)  Specifically, BCS points to the provisions of the EDO proclaiming that the EDO "is not intended to expand the Parties' obligations under Federal Rules of Civil Procedure 1, 26, and 34," and that "[t]he Parties agree to take into account the proportionality considerations addressed in Federal Rules of Civil Procedure for purposes of preservation and production of ESI . . . ." (*Id.* at 29 (citing EDO ¶ 6.1.)  BCS urges that, based on these provisions, the EDO is limited to discovery that is proportional to the needs of the case. (*Id.* at 29–30 (citing Fed. R. Civ. P. 26(b).)  But a proportionality argument is of no avail to BCS because, despite the Court's many attempts to obtain clarity regarding the nature and extent of the missing ESI (*see generally* Tr. IDC 3; *see generally* Tr. IDC 4; *see generally* Tr. IDC 5; *see generally* Tr. IDC 6), BCS has yet to provide an answer and, in fact, fails to provide non-conclusory facts to support a proportionality argument here. (*See generally* Mot.; *see generally* Pl. Suppl. Memo.; *see generally* Resp. to Status Rpt.)  This argument does not persuade the Court that BCS did not violate the EDO.

*Third*, BCS argues that the EDO is subject to "industry standard practices" which also limit BCS's obligations. (Mot. 12, 29.)  Specifically, BCS points to provisions of the EDO proclaiming that "[e]ach producing party shall design and implement the industry standard and approved methods it uses to identify, cull, and

review its potentially responsive ESI based on its knowledge and understanding of its own data, the facts and issues involved in the Action," and that "[a] producing party may also conduct a targeted collection of sources likely to contain responsive materials (e.g., file folders on a given hard drive." (*Id.* at 29 (citing EDO ¶ 4.5).) But BCS's "industry standard" argument is equally unavailing given that BCS fails to either (1) explain how its ability to design and implement its search somehow militates against the definitions of the EDO that form the contour of the data sources to be searched, or (2) otherwise cite a specific industry standard that would limit the EDO in any other way. (*See generally* Mot.; *see generally* Pl. Suppl. Memo.; *see generally* Resp. to Status Rpt.) Moreover, as stated above, the Court is not persuaded that the EDO's sentence allowing a targeted collection of sources limits the discovery as BCS suggests. This argument does not persuade the Court that BCS did not violate the EDO.

*Fourth*, BCS argues that the proportionality rules do not require a party to search in places where responsive information is unlikely to exist. (Mot. 30.) But the legal authorities BCS offers in support of this proposition are inapposite. Neither *Patagonia, Inc. v. Anheuser-Busch, LLC,* No. CV 19-02702 VAP (JEMx), 2020 WL 12175722 (C.D. Cal. Feb. 26, 2020), nor *Thompson v. Costco Wholesale Corp.*, No. 3:14-CV-2778-CAB-WVG, 2015 U.S. Dist. LEXIS 201270 (S.D. Cal. Sep. 21, 2015), involve a discovery dispute where the parties entered into an electronic discovery order that specified the custodians and data sources to be searched, as is the case here. Nor do the facts that BCS avers—that the Custodians' Personal PayPal and Venmo accounts "have absolutely nothing to do with the allegations in this case because there is no allegation that any personal account was hacked"—support this proposition. (Mot. 30–31.) Indeed, while the Court does not decide the relevance of these data sources, BCS's assertion begs the question: then why did BCS agree to include these data sources in Section 4.4 to begin with? Having agreed to include these accounts in the definition of Data Sources, BCS

created its own obligation to preserve and search them.  This argument does not
persuade the Court that BCS did not violate the EDO.

*Fifth*, BCS argues that the definition of "Party"—which includes a party's
officers and directors—should be disregarded because it renders meaningless the
agreed-upon list of Custodians and the explicit limitation that a Data Source must
be in the party's possession, custody, or control.  (Mot. 31.)  To the contrary, the
Court interprets the definition of Party as a helpful, shorthand means to include
categories of persons whose identities were unknown or uncertain to Defendants at
the time of the EDO's writing, relevant here BCS's officers and directors.  Had
BCS been willing to share these names at that time—as only BCS could have—it
easily could have included them in the list of Custodians and eliminated the need
for the general categorical descriptions of "Party."  It did not do so.  It now must
live with its language.  This argument does not persuade the Court that BCS did not
violate the EDO.

*Sixth*, BCS argues that the EDO's definition of "Party" also defies legal
authority holding that the personal accounts of a principal's agent or representative
are not considered to be within the possession, custody, or control of the principal.
(Mot. 33–35.)  But BCS fails to properly frame the issue.  The proper inquiry for
this Motion is whether a principal—here BCS—is deemed to have control over the
Personal Data Sources of its agents or representatives—here BCS's officers and
directors—where the latter use their Personal Data Sources to conduct the business
of the former—here, the use of personal Signal and email accounts to communicate
about BCS's sensitive matters at the express direction of Jensen (one of BCS's two
investigators of the complained-of de-indexing) to "the entire leadership team of
BCS" because, in the aftermath of the de-indexing, he feared BCS was under cyber-
attack.  (Def. Ex. 4 at 3–4, 6–7.)

As aptly noted by Defendants and supported by their authorities, the answer
to this inquiry is a resounding "yes."  (Mot. 51–52.)  *See, e.g., Waymo LLC v. Uber*

*Techs, Inc.*, No. 17-cv-00939-WHA (JSC), 2017 U.S. Dist. LEXIS 108165, at *7 (N.D. Cal. July 12, 2017) (ordering corporation to "produce responsive documents in the custody, control or possession of its officers" and explaining that "[i]t cannot hide responsive documents simply because these officers' work for [the corporation] was done using their personal email accounts"); *Tradeshift, Inc. v. BuyerQuest, Inc.*, No. 20-cv-01294-RS (TSH), 2021 U.S. Dist. LEXIS 78658, at *7–8 (N.D. Cal. Apr. 23, 2021) (ordering corporation to produce emails sent from an officer's personal email to conduct business because to hold otherwise would "gut Rule 34 and make it way too easy for high-level executives to hide evidence"); *Matter of Skanska USA Civ. Se. Inc*., No. 3:20-CV-05980-LC/HTC, 2021 U.S. Dist. LEXIS 208691, at *36 (N.D. Fla. Aug. 5, 2021) (finding that corporation had an obligation to produce information on an officer's personal cell phone because it "cannot shuck its discovery obligations simply because it did not issue the cell phone to" the officer); *Miniace v. Pacific Maritime Ass'n*, No. C 04-03506 SI, 2006 U.S. Dist. LEXIS 17127, *7 (N.D. Cal. Feb. 13, 2006) ("[n]umerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession."); *Allen v. Woodford*, No. CV-F-05-1104 OWW LJO, 2007 WL 309945, at *2 (E.D. Cal. Jan. 30, 2007) ( "'Control' may be established by the existence of a principal-agent relationship"); *JPMorgan Chase Bank, N.A. v. KB Home*, No. 2:08-CV-1711-PMP-RJJ, 2010 U.S. Dist. LEXIS 56519, at *18 (D. Nev. May 18, 2010) ("agency relationship is sufficient to find control for purposes of Rule 34").

BCS's authorities to the contrary are distinguishable and do not compel a different result. (Mot. 33–34.) *In re Citric Acid Lit*., 191 F.3d 1090, 1107–108 (9th Cir. 1999), is inapposite because the question before the court was whether a U.S. company had control over the documents of its Swiss affiliate, not its officer and directors, and did not involve an electronic discovery order pre-establishing its discovery obligations. *Matthew Enterp., Inc. v. Chrysler Group LLC*, No. 13-cv-

04236-BLF, 2015 U.S. Dist. LEXIS 166553 (N.D. Cal. Dec. 10, 2015), also is unavailing because the question before the court was whether a corporation had control over the personal email account of a person who did minimal work for the company but was neither an officer nor a director, and did not involve an electronic discovery order. *U.S. v. Int'l Un. of Petroleum Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989), is equally distinguishable because it involved the question whether a non-principal international union had control over a non-agent local union's documents, and did not involve an electronic discovery order. *Thermal Design, Inc. v. Am. Soc. of Heating, Refrigerating and Air-Condition Eng., Inc.*, 755 F.3d 832 (7th Cir. 2014), also falls short because the question before the court was whether an organization had control over the documents of its non-leadership volunteer committee members, and did not involve an electronic discovery order. *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, No. 3:12-cv-1058-SI, 2018 U.S. Dist. LEXIS 204118, at *11 (D. Or. Dec. 3, 2018), is inapplicable because the question before the court was whether the union had control over the email accounts of its officers, agents, or members that were not used for more than a *de minimus* amount, and, further to Defendants' argument, resulted in a finding that "a company's officer or agent should not be able to avoid the rules of discovery by using personal email . . . for work purposes."

This argument does not persuade the Court that BCS did not violate the EDO.

*Seventh*, BCS argues that the definition of "Party"—which also includes a party's counsel—should be disregarded because it leads to absurd results, such as requiring, for example, a search of Defendants' counsel's documents. (Mot. 31.) The Court does not disagree. But BCS's proposed solution—to disregard the definition altogether—is unworkable given that the parties saw fit to use the terms "Party" and "Parties" in the EDO in excess of sixty times. (*See generally* EDO.) BCS can rest assured that this Court is fully capable of identifying and avoiding

absurd results.  Other than this limited circumstance, which, notably, BCS helped create and is not at issue here, the Court is aware of no other absurd result.  This argument does not persuade the Court that BCS did not violate the EDO.

*Eighth*, BCS argues that, contrary to Defendants' assertions that BCS did not produce "anything from the custodians other than emails on Plaintiff's server and documents form Plaintiff's Google drive," it did produce Hughes's text messages, Magill's personal cellphones and emails, Jensen's emails, and Hughes's Signal messages.  (Mot. 66; Pl. Suppl. Memo. 2.)  BCS also notes that it collected ESI from the BCS Data Sources for, and the Personal Data Sources of, fourteen Custodians "*if* (1) [BCS] had a reasonable belief that they may contain responsive ESI, and (2) the custodian agreed to grant access thereto . . . ." (*Id.* at 67 (emphasis added).)  BCS further notes that it produced the screenshots taken during the investigation by Jensen and Beauregard that it found attached to emails. (*Id.* at 66–67.)  But these assertions miss the point entirely.  BCS was required to (1) collect and produce much more than what it produced from Hughes, Magill, and Jensen—both in the way of Data Sources and Custodians; (2) search through the *all* the Data Sources (BCS and Personal) related to *all* the Custodians, not just of those Custodians who BCS, in its sole discretion, believed would have documents or of those Custodians who voluntarily agreed to a search; and (3) produce original documents, not merely screenshots attached to emails without metadata.  BCS's partial production does not satisfy its obligation to make a complete production.  *See* Fed. R. Civ. P. 34(b)(2)(B) (requiring complete document productions).  This argument does not persuade the Court that BCS did not violate the EDO.

\* \* \*

In sum, the Court concludes that that the EDO required BCS to preserve, search for, and produce the ESI from all the BCS Data Sources assigned to the Custodians, and from all the Personal Data Sources of all the Custodians, and that ///

1  its failure to do so constitutes a violation of the EDO, sanctionable under Rule

2  37(b)(2).

3         2.    <u>BCS's failure to comply with the EDO was not substantially</u>

4                <u>justified and no circumstances exist here that would make an</u>

5                <u>award of expenses unjust.</u>

6        BCS seeks refuge from the imposition of sanctions under the two exceptions

7  to Rule 37(b)(2)(C), which allow the Court to decline an award of sanctions where

8  "the [discovery] failure was substantially justified or other circumstances make an

9  award of expenses unjust." (Mot. Suppl. 5, 19–20 (citing Fed. R. Civ. P.

10  37(b)(2)(a), (c)).) For the reasons set forth below, BCS is not entitled to this

11  protection.

12        The first exception—that the failure to comply with a court order is

13  substantially justified—does not save BCS. Both the Ninth Circuit and the

14  Supreme Court have offered guidance regarding the standard for establishing

15  "substantial justification" sufficient to avoid a discovery sanction. In *Hyde &*

16  *Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994), the Ninth Circuit stated that "a

17  good faith dispute concerning a discovery question might, in the proper case,

18  constitute 'substantial justification . . . .'" (citation omitted). The Supreme Court

19  has explained that the standard is "satisfied if there is a 'genuine dispute'. . . or 'if

20  reasonable people could differ as to the appropriateness of the contested action.'"

21  *Pierce v. Underwood*, 487 U.S. 552, 565 (1998) (citations and alterations omitted).

22        Here, BCS contends that the Court should decline to impose sanctions

23  because its interpretation of the EDO was reasonable, legally-supported, and made

24  in good faith. (Mot. 74, Mot. Suppl. 5, 19–20.) For the multiple reasons set forth

25  above—which need not be repeated here—the Court disagrees with BCS's

26  contention that its interpretation was reasonable and legally-supported. In addition,

27  the presence or absence of a disobeying party's good or bad faith "is relevant to the

28  choice of sanctions rather than to the question whether a sanction should [be]

imposed." *Marquis v. Chrysler Corp.*, 577 F.2d 624, 642 (9th Cir. 1978); *see also Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 208 (1958) (finding that, because Rule 37 requires only a failure to obey an order and not a refusal, the question of willfulness is "relevant only to the path which the district Court might follow in dealing with" the failure to comply). "[E]ven negligent failures to allow reasonable discovery may be punished." *Marquis*, 577 F.2d at 642.

The second exception—that the attendant circumstances would make an award of sanctions unjust—also does not save BCS.  BCS first argues that the imposition of sanctions would be unjust because it "undert[ook] significant efforts to collect and provide extensive discovery pursuant to the [EDO]," and that the Court's subsequent disagreement with BCS's position should not be grounds for a pecuniary penalty.  (Mot. Suppl. 19–20.)  But the transcripts of IDCs 3 through 6 and 10, together with their related documents, the Court's orders, and the outcome of Phase 1, combine to tell a different story.  These documents reveal in painstaking detail the early struggles of Defendants and the Court to disavow BCS of its untenable legal position that it was not obligated to produce the vast majority of documents required under the EDO—to which it held steadfastly since at least IDC 3 in April 2023—and to convince BCS to even *start* the required search process. The documents also reveal the multiple opportunities given to BCS to convince its officer and directors to cooperate so that it, as the organization, could comply with its discovery obligations and the repeated—albeit apparently ignored— admonishments by the Court to the BCS leadership that its discovery failures could have costly effects on the organization's treasury and devastating effects on this litigation.  (*See generally* Tr. IDC 3; Tr. IDC 4; Tr. IDC 5; Tr. IDC 6; Tr. IDC 10, at 8, 11, 16 (warning BCS that "the financial impact on BCS [could] be very severe, and the evidentiary impact . . . even more so," that it was "almost 100 percent certain that there [would] be evidentiary sanctions and monetary sanctions," and

1  that the lack of cooperation by BCS's officers and directors "[would] cost BCS a lot

2  of money" and that it "[would] be very expensive . . . quite a bit of money.").)

3  Finally, the documents reveal that, despite these opportunities and warnings, some

4  of the Custodians—the very guardians of the organization's donated funds, charged

5  with making decisions in the best interests of the organization's mission—dug in

6  their heels and affirmatively created the circumstances that now warrant sanctions.

7  The Court cannot conclude on these facts that the imposition of sanctions would be

8  unjust.

9         BCS next argues that any non-de minimis award of sanctions would be unjust

10  because it could be "ruinous" for the organization while providing no gain to

11  Defendants who, in any event, were not prejudiced.  (Mot. Suppl. 20.)  But, other

12  than its conclusory assertions, BCS offers no evidence of its purported dire

13  financial straits. (*See generally* Mot. Suppl.)  Moreover, whether an award of

14  sanctions would benefit the recipient is not the correct question; rather, the proper

15  question is whether the imposition of sanctions would be unjust to the sanctioned

16  party.  *See* Fed. R. Civ. P. 37(b)(2)(C).  In any event, BCS is mistaken that

17  "Defendants will gain nothing from the imposition of fees."  (Mot. Suppl. 6, 20.)

18  To the contrary, an award of fees will allow Defendants to recover, at least in part,

19  the enormous quantum of fees and costs they were forced to incur as a result of the

20  obstinate discovery position BCS and its officers and directors took and held for

21  well over one year.  Indeed, but for BCS's failure to comply with the EDO,

22  Defendants would have obtained the requested documents in early 2023 and would

23  not have been forced to expend the resources that have brought the parties to this

24  point.  Further, even liberally construing BCS's contention that its conduct did not

25  prejudice Defendants (Mot. 71–72) as an argument under the second exception, it is

26  unpersuasive.  As a starting point, BCS cites no authority to support its position that

27  lack of prejudice somehow renders unjust an award of expenses under Rule

28  37(b)(2)(C).  (*See generally* Mot.; *see generally* Mot. Suppl.)  Moreover, the

authorities known to the Court are to the contrary, holding that "[f]ailure to produce documents as ordered . . . *is* considered . . . prejudice." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990) (internal citation omitted) (emphasis added).

For these reasons, the Court finds that neither of the Rule 37(b)(2)(C) exceptions save BCS from the imposition of sanctions.

### C.    Defendants Are Entitled to an Award of $34,986.50.

#### 1.    Legal Standard

When an award of attorneys' fees is authorized, the court must calculate the proper amount of the award to ensure that it is reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). In the Ninth Circuit, the court must perform a two-step process to determine the reasonableness of any fee award. *Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000). First, the Court determines the "lodestar figure." *See Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (citation omitted). Second, where appropriate, the Court may adjust the lodestar amount based on several factors adopted by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), known as the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the

1
2

> case, (11) the nature and length of the professional
> relationship with the client, and (12) awards in similar
> cases.

3  *Kerr,* 526 F.2d at 70.

4        A strong presumption exists "that the lodestar figure represents a reasonable

5  fee." *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996).  The

6  Ninth Circuit has made clear that "[o]nly in rare instances should the lodestar figure

7  be adjusted on the basis of other considerations." *Id.* (citations omitted).  "Under

8  the lodestar approach, many of the *Kerr* factors have been subsumed as a matter of

9  law." *Id.* (citation omitted).  The *Kerr* factors that are subsumed within the initial

10 lodestar calculation are the novelty and complexity of the issues, the special skill

11 and experience of counsel, the quality of representation, the results obtained in the

12 action, and the contingent nature of the fee agreement. *Id.* at 364 n.9 (citations

13 omitted).  "Adjusting the lodestar on the basis of subsumed reasonableness factors

14 after the lodestar has been calculated, instead of adjusting the reasonable hours or

15 reasonable hourly rate at the first step . . . is a disfavored procedure." *Id.*  (citation

16 omitted).

17       The party seeking the award of fees must submit evidence to support the

18 request.  *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000).

19 Specifically, the party must support the request with evidence regarding the

20 "number of hours worked and the rates claimed." *Id.*  The party opposing the fee

21 request bears the "burden of rebuttal that requires submission of evidence to the

22 district court challenging the accuracy and reasonableness of the hours charged or

23 the facts asserted by the prevailing party in submitted affidavits." *Common Cause*

24 *v. Jones*, 235 F.Supp.2d 1076, 1079 (C.D. Cal. 2002) (quoting *Gates*, 987 F.2d at

25 1397).

26 ///

27 ///

28 ///

2.    Analysis

a.    *The Attorney/Other Hourly Rates Claimed by Defendants Are Reasonable and Commensurate with the Prevailing Rate.*

Defendants claim the following hourly rates for their counsel:  $470.00 in 2023 and $510.00 in 2024 for Mr. M. Adam Tate; $450.00 in 2023 and $475.00 in 2024 for Ms. Catherine Close; $300.00 for Mr. Adam J. Schwartz; and $150.00 in 2023 and $185.00 in 2024 for Ms. Rebekah Chamberlain.  (Tate Third Decl. ¶¶ 9.a.; 9.b.; 9.c.; 9.d.)  Defendants also claim an hourly rate of $200.00 in 2023 and $210.00 in 2024 for Ms. Helene Saller, a paralegal.  (*Id.* ¶ 9.e.)  BCS does not dispute these rates.  (*See generally* Mot.; *see generally* Mot. Suppl.)

The Court fully analyzed the reasonableness of these rates in its July 25, 2024 order on Defendants' request for attorneys' fees in connection with another discovery motion ("Slack Fees Order").  (*See* ECF No. 212.)  Although the 2024 rates requested here are slightly higher than the 2023 rates approved in the Slack Fees Order, the difference is neither appreciable nor consequential to the analysis here.  For the reasons detailed in the Court's July 25, 2024 order, the Court finds the rates requested by Defendants to be reasonable for purposes of an attorneys' fees award.  (*See id.* at 20–24.)

b.    *Some of the Hours Billed Are Excessive and/or Unrecoverable Under Rule 37.*

Defendants' request for $72,445.50[11] in attorneys' fees is based upon the following lodestar calculation of stated hours multiplied by the hourly rates detailed (and approved) above.  For ease of reference, the Court organizes the fees according to the challenges presented by BCS, detailed below.

---

[11] Both parties assert that Defendants seek fees in the amount of $72,779.00.  (Mot. Suppl. 6, 10–11.)  The Court calculates the total fees sought as $72,445.50.  The

| Biller | Hours Billed | Rate Billed | Sub-Total |
|---|---|---|---|
| **ATTENDANCE AT DISCOVERY CONFERENCES** | | | |
| Tate (IDCs 3-6) | 8.2 | $470.00 | $3,854.00 |
| Tate (IDC 10) | 12.5 | $470.00 | $5,875.00 |
| Tate (March/April Status Conferences) | 15.0 | $510.00 | $7,650.00 |
| Close (IDCs 3-6) | 6.2 | $450.00 | $2,790.00 |
| Close (IDC 10) | 8.5 | $450.00 | $3,825.00 |
| Close (IDC 13) | 1.4 | $450.00 | $630.00 |
| Close (March/April Status Conferences) | 1.0 | $475.00 | $475.00 |
| Schwartz (IDCs 3-6) | 6.2 | $300.00 | $1,860.00 |
| Schwartz (IDC 10) | 5.0 | $300.00 | $1,500.00 |
| Schwartz (IDC 13) | 1.0 | $300.00 | $300.00 |
| Chamberlain (IDC 10) | 10.1 | $150.00 | $1,515.00 |
| **Subtotal:  Discovery Conferences** | 71.1 | | **$30,274.00** |
| | | | |
| **PREPARATION OF MOTION FILINGS** | | | |
| Tate (Motion) | 15.0 | $470.00 | $7,050.00 |
| Close (Motion) | 3.7 | $450.00 | $1,665.00 |
| Chamberlain (Motion) | 28.3 | $150.00 | $4,245.00 |
| Saller (Motion) | 4.0 | $200.00 | $800.00 |
| Tate (Tate Supplemental Declaration) | 0.5 | $470.00 | $235.00 |
| Close (Tate Supplemental Declaration) | 3.5 | $450.00 | $1,575.00 |
| Chamberlain (Tate Supplemental Declaration) | 4.0 | $150.00 | $600.00 |
| Saller (Tate Supplemental Declaration) | 0.5 | $200.00 | $100.00 |
| Tate (Motion Supplement) | 6.5 | $510.00 | $3,315.00 |
| Close (Motion Supplement) | 10.7 | $475.00 | $5,082.50 |
| **Subtotal:  Motion Filings** | **76.7** | | **$24,667.50** |
| | | | |

Court identifies three errors that account for this negative $333.50 difference:  (1) the grand total fees based on the fees breakdown is $72,308.50, not $72,779.00 (*see* Mot. Suppl. 7–10); (2) the sub-total fees for "Preparing the accounting for the Subpoena Discovery Fees" are $1,989.00, not $1,852.50 (*see id.* at 10); and (3) the sub-total fees for "Drafting the Instant Joint Statement" are $8,397.50, not $8,397.00 (*see id.*)  The Court proceeds based on its own calculations.

| Biller | Hours Billed | Rate Billed | Sub-Total |
|---|---|---|---|
| **PREPARATION OF SUBPOENA DISCOVERY FILINGS** | | | |
| Tate (Phase 1 Status Report) | 0.4 | $470.00 | $188.00 |
| Tate (Phase 1 Status Report) | 9.2 | $510.00 | $4,692.00 |
| Tate (Motion re Subpoena Discovery Fees) | 9.6 | $510.00 | $4,896.00 |
| Close (Phase 1 Status Report) | 0.9 | $450.00 | $405.00 |
| Close (Phase 1 Status Report) | 3.0 | $475.00 | $1,425.00 |
| Close (Motion re Subpoena Discovery Fees) | 11.4 | $475.00 | $5,415.00 |
| Saller (Phase 1 Status Report) | 0.5 | $210.00 | $105.00 |
| Saller (Motion re Subpoena Discovery Fees) | 1.8 | $210.00 | $378.00 |
| **Subtotal:  Subpoena Discovery Filings** | **36.8** | | **$17,504.00** |
| | | | |
| **GRAND TOTAL** | | | **$72,445.50** |

(Mot. Suppl. 7–10.)

BCS challenges the fees requested by Defendants on multiple grounds.  *First,* BCS argues that $20,279.00 should be deducted from the requested fees because that amount corresponds to work associated with the Subpoena Discovery and a different discovery dispute ("Slack Discovery"), both of which are the subject of separate fees requests.  (Mot. Suppl. 11.)  *Second*, BCS contends that, of the remaining $52,500.00 in fees, Defendants may recover only those fees incurred in drafting the Motion, the Tate Supplemental Declaration, and the Motion Supplement, and that those fees, which total $24,667.50,[12] should be reduced to $8,386.78 or less.  (*Id.* at 15–16.)  *Third*, BCS argues that neither (1) the fees incurred in (1) the preparation for and attendance of IDCs and hearings

///

///

---

[12] Per the table above, the Court's calculation yields a total of $24,667.50 for the drafting of the Motion, the Motion Supplement, and the Tate Supplemental Declaration, in comparison to BCS's total of $24,667.50.  (Mot. Suppl. 11.)  The Court proceeds based on its own calculation.

($9,995.00[13]), nor (2) the fees for the work related to the Subpoena Discovery ($17,367.50[14]), are recoverable under Rule 37(b)(2) in the first instance and, even if they were, the imposition of these fees is not warranted because there is no evidence that BCS's discovery violations caused Defendants to incur those fees, as required under Rule 37(b).  (*Id.* at 17–19.)

The Court addresses each challenge in turn and, for the reasons stated below, concludes that the some of the fees requested by Defendants are excessive and/or unrecoverable under Rule 37(b)(2) and reduces the requested attorneys' fees from $72,445.50 to **$34,986.50**.

(i)    <u>A blanket reduction of $20,279.00 for fees related to the Slack Discovery and the Subpoena Discovery is not warranted.</u>

Pointing to the Court's admonition to Defendants that "they may not request fees that are duplicative of those already requested as to the Subpoena Motion and the Slack Motion," BCS argues that $20,279.00 of the $72,779.00 requested fees is for the Slack Discovery and the Subpoena Discovery and should not be considered here.  (Mot. Suppl. 16 (citing ECF No. 210 at 4).)  However, other than its conclusory assertion, BCS offers no evidence of this overlap.  (*See generally* Mot. Suppl.)  Indeed, the basis of BCS's claimed $20,279.00 overlap is unclear given that $20,279.00 is the amount Defendants sought for the Slack Discovery only, not any work related to the Subpoena Discovery.  In any event, the Court already has adjudicated the fees request for the Slack Discovery and will account for any

---

[13] Although Plaintiff does not explain this figure, the Court believes it represents the difference between the $30,274.00 fees for "Attendance at IDCs and Hearings" and the $20,279.00 fees requested in connection with the Slack Discovery, which BCS contends should not be awarded twice.  (Mot. Suppl. 16.)

[14] This $17,367.50 figure contains a calculation error identified above; the correct amount for the "Subpoena Discovery Filings" is $17,504.00.

overlap in this order.  And, when the Court adjudicates the fees request for the
Subpoena Discovery, it will do the same.  A blanket $20,279.00 reduction is not
warranted.  On this basis, the Court **DENIES** this request.

> (ii) <u>The $30,274.00 requested for time spent on
> informal discovery conferences and status
> conferences is not fully warranted.</u>

Defendants request a combined 75.1 hours for preparing for and attending
IDCs 3 through 6 (held before the filing of the Motion) and IDCs 10 and 13 and the
March/April Status Conferences ("Discovery Conferences").  (*See supra*.)  BCS
objects to any award of fees for hours related to the Discovery Conferences on two
grounds:  (1) this Court's statement that such fees are not recoverable; and (2) that
Defendants fail to explain how BCS's violations caused Defendants to incur the
requested fees.  (Mot. Suppl. 17–19.)

Addressing first the statement attributed to this Court, the Court agrees that it
stated at IDC 10 that the time Defendants sought under the Motion for meeting and
conferring and attending informal discovery conferences is not recoverable.  (Tr.
IDC 10, at 55.)  However, the Court stands persuaded by Defendants' argument
providing authority to the contrary.  (Mot. Suppl. 12–14.)  Indeed, Courts in this
Circuit have awarded attorneys' fees under Rule 37 for time spent preparing for and
attending informal discovery conferences.  *See, e.g., MP Nexlevel of Cal, Inc. v.
CVIN, LLC*, No. 1:14-cv-00288-LJO-EPG, 2016 U.S. Dist. LEXIS 139407, at *10
(E.D. Cal. Oct. 5, 2016) (awarding attorneys' fees under Rule 37(b)(2)(C) for time
spent preparing for and participating in informal discovery conference); *Andreoli v.
Youngevity Int'l, Inc.*, No. 16-cv-02922-BTM-JLB, 2019 U.S. Dist. LEXIS 100298,
at *25 (S.D. Cal. June 14, 2019) (awarding attorneys' fees for meet and confer
efforts under Rule 37(b)(2)(C)); *Premiere Innovations, Inc. V. Iwas Indus., LLC*,
No. 07cv1083-BTM(BLM), 2009 U.S. Dist. LEXIS 142894, at *8 (S.D. Cal. May
8, 2009) (same).

Here, Defendants prepared for and attended four telephonic pre-Motion IDCs that involved BCS's production under the EDO—IDC 3 on April 18, 2023, IDC 4 on April 24, 2023, IDC 5 on May 1, 2023, and IDC 6 on May 3, 2023. IDC 3 lasted two hours (*see* IDC 3 Order, ECF No. 52); IDC 4 lasted two hours and ten minutes (*see* IDC 4 Order, ECF No. 54); IDC 5 lasted two hours and ten minutes (*see* IDC 5 Order, ECF No. 56), and IDC 6 lasted two hours (*see* IDC 6 Order), for a total of eight hours and twenty minutes. However, the Court notes that these conferences addressed more than just the issues raised in the Motion; rather, they addressed significant issues related to depositions and the Slack Discovery (for which fees already have been awarded). Accordingly, the Court will reduce the 8.3 hours attributed to this Motion by two-thirds, for a total of 2.7 hours. In addition, the Court notes that Defendants seek to recover these hours for three attorneys. The Court finds this excessive as one attorney would have been sufficient. The Court will allow 2.7 hours for appearance at the conferences plus one hour for preparation, for a total of 3.7 hours, at the 2023 rate of Defendants' lead counsel— Tate at $470.00—for a total of **$1,739.00.**

In addition, Defendants prepared for and attended four post-Motion informal conferences—IDC 10, IDC 13, and the March/April Conferences. IDC 10 lasted three hours and ten minutes (*see* IDC 10 Order); IDC 13 lasted 45 minutes (*see* IDC 13 Order); and the March/April Conferences combined lasted four hours (*see* March/April Conferences Order, ECF No. 196), for a total of seven hours and fifty-five minutes, all of which concerned solely the subject matter of this Motion.

As to the fees sought for IDC 10, the Court notes that it ordered "[a]ll attorneys involved in any way with the Motion and the discovery that is the subject of the Motion" to appear in person at IDC 10 (ECF No. 114), and advised the parties that the attorneys' fees for attending IDC 10 would be recoverable as part of the sanctions requested in the Motion (Tr. IDC 10, at 55). BCS argues that the Court's IDC 10 comment should be disregarded at this time because "in the nine

months between that IDC and [submission of the Motion Supplement], there have been significant developments and the parties' circumstances have changed drastically . . . ." (Mot. Suppl. 18, n.2.) But what happened *after* IDC 10 is not the question here; rather, the Rule 37(b) causation inquiry is whether Defendants should recover the fees for the work expended to resolve the dispute that created the need for IDC 10. On this basis, the Court will award Defendants 26 hours for attending IDC 10[15] at the respective hourly rates for the four attorneys who attended as ordered—Tate, Close, Schwartz, and Chamberlain—for a total of **$8,990.00**. It is unclear to the Court what preparation would have been necessary for IDC 10, for either counsel or the paralegal, given that the Court convened IDC 10 in response to the filing of the Motion merely three weeks earlier. (*See generally* IDC 10 Transcript.) Thus, the Court does not award any fees for preparation for IDC 10.

As to IDC 13 and the March/April Conferences, the Court again finds excessive the appearance of multiple attorneys when one attorney would have been sufficient. The Court will allow 4.75 hours for the appearances and 2.5 hours of preparation, for a total of 7.25 hours, at the rate of Defendants' lead counsel—again

---

[15] Seven hours for each of Tate at $470.00 per hour, Close at $450.00 per hour, and Chamberlain at $150.00 per hour, and five hours for Schwartz at $300.00 per hour. This includes travel time, which is recoverable under Rule 37(b)(2)(C). *See, e.g.*, *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.3d 1538, 1547 (9th Cir. 1988) (upholding district court's imposition of various sanctions under Fed. R. Civ. P. 37(b)(2)(C), including terminating sanctions, attorneys' fees, and travel expenses); *Cadles of West Virginia, LLC*, No. 0-CV-2534-TWR-WVG, 2022 WL 5133478, at *11 (S.D. Cal. Oct. 4, 2022) (including "travel expenses" for client representative's appearance at OSC hearing in award of fees and costs under Rule 37(b)(2)(C)); *Stewart Title Guar. Co. v. 2485 Calle del Oro, LLC*, No. 15-CV-2288-BAS(WVG), 2017 U.S. Dist. LEXIS 124510 *, at *38–39 (S.D. Cal. Aug. 7, 2017) (finding that "Rule 37(b)(2)(C) mandates an award of expenses related to the instant sanctions motion," including expenses for the plaintiff's attorney to "travel to, and appear at, the sanctions hearing"), *adopted in relevant part by* 2017 U.S. Dist. LEXIS 182845 (S.D. Cal. Nov. 3, 2017).

Tate at $470.00 per hour—for a total of **$3,697.50**.

For these reasons, the Court **GRANTS in part** and **DENIES in part**
Defendants' request for attorneys' fees expended in Discovery Conferences. The
Court will award a total **$14,426.50** for this category of work.

> (iii)  The $24,667.50 requested for the preparation of
> this Motion and its related filings is not fully
> warranted.

Defendants request a combined total of 76.7 attorney and paralegal hours for
preparation of the Motion and related filings, of which 51 hours were spent on the
Motion, 8.5 hours on the Tate Supplemental Declaration, and 17.2 hours on the
Motion Supplement and the Tate Third Declaration (collectively, "Motion
Filings"). (Mot. Suppl. 7–10.)

BCS does not dispute the recoverability of the fees related to the Motion
Filings. (Mot. Suppl. 11.) However, BCS asks the Court to reduce the fees to
$8,386.78 or substantially less. (*Id.* at 11–12.) BCS argues that charging 60 hours
for the Motion and the Supplemental Declaration is unreasonable because, although
the Motion "presented only a handful of discovery issues," Defendants structured
the Motion "in a way that made it redundant, inefficient, and unnecessarily long,"
requiring counsel to "spend[] far too much time," rather than the fraction of time it
should have taken. (Mot. Suppl. 20–21.) In addition, BCS argues that the 17.2
hours sought for the preparation of the Motion Supplement is unreasonable given
that Defendants' cut and pasted the section regarding fees from the Slack Discovery
motion (for which Defendants separately sought, and have been awarded, fees) and
otherwise compiled and summarized invoices and time entries, an administrative
task that that could have been handled by a paralegal rather than two lawyers. (*Id.*
at 20.)

As a starting point, the documented 59.5 hours for the Motion and the Tate
Supplemental Declaration exceed those awarded in this district for the preparation

of a discovery motion by at least fifty-three percent (53%). *See, e.g., Nguyen v. Regents of the Univ. of Cal.,* No. 8:17-cv-00423-JVS-KESx, 2018 U.S. Dist. LEXIS 226622, at *9–12 (C.D. Cal. May 18, 2018) (approving 38.9 hours for the preparation of a joint stipulation); *Dish Network L.L.C. v. Jadoo TV, Inc.*, No. 2:18-cv-9768-FMO (KSx), 2019 U.S. Dist. LEXIS 221869, at *18 (C.D. Cal. Nov. 8, 2019) (approving 32 hours for the preparation of a discovery motion).  And, although the Motion and the Supplemental Tate Declaration came accompanied by exhibits, the Court finds, based on its own experience, that the supporting documentation does not exceed that of a typical discovery motion.  In addition, the Court notes that the time entries for Tate, Close, Chamberlain, and Saller related to the Motion include entries for the filing of a request to seal documents, which did not occur in connection with the Motion.  (*See* Def. Ex. 1-2, at 2, 5, 11, 12.)  For these reasons, the Court finds that 59.5 hours does not represent a reasonable amount of time for the preparation of the Motion and the Tate Supplemental Declaration.  On this basis, the Court finds it appropriate to reduce the 59.5 hours by 50%, for a total of 29.75 hours and **$8,135.00 in fees** based on the applicable hourly rates detailed above.

With respect to the 17.2 hours sought for the Motion Supplement, the Court agrees with Plaintiff that the vast majority of the Motion Supplement and the Tate Third Declaration appears to involve cutting and pasting and administrative tasks. For this reason, the Court will award five attorney hours at Ms. Close's hourly rate of $475.00 and twelve paralegal hours at Ms. Saller's hourly rate of $200.00, for a total of **$4,775.00 in fees.**

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' request for attorneys' fees expended in the preparation of the Motion Filings.  The Court will award a total **$12,910.00**, for this category of work.

///

///

///

           (iv)    <u>The $17,504 requested for the preparation of the</u>
                           <u>Phase 1 Status Report and the briefing on the</u>
                           <u>Subpoena Fees Motion is not fully warranted</u>.

Defendants request a combined 36.8 hours for the preparation of the Phase 1 Status Report and the opposition to Plaintiff's motion to reduce fees related to the Subpoena Discovery.  (*See supra*.)[16]   BCS objects to the award of any fees related to this work because it "ha[s] nothing to do with the [Motion]."  (Mot. Suppl. 19.)

As a starting point, BCS cannot dispute that Phase 1, which included the Subpoena Discovery, was the product of IDC 10 which was convened by the Court in response to the Motion.  (*See generally* Tr. IDC 10.)  Nor does BCS dispute that the Court ordered Defendants to file the Phase 1 Status Report to apprise it of the outcome of Phase 1, including the Subpoena Discovery.  (*See generally* Mot. Suppl.; *see also* IDC 10 Order ¶ 5.)   Nor does BCS dispute that the parties agreed through the IDC 10 Agreement that the attorneys' fees expended in the Subpoena Discovery would be adjudicated pursuant to motion practice at the conclusion of Phase 1.  (*See generally* Mot. Suppl.; *see also* IDC 10 Agm't ¶ 7.)  Thus, it cannot

---

[16] To be clear, the fees requested here are distinct from the fees and costs incurred by Defendants in prosecuting the subpoenas.  Those fees, which are the subject of separate motion practice that will be adjudicated after the adjudication of this Motion, are limited by Court order to the fees Defendants expended in the prosecution of subpoenas issued to the uncooperative officers and directors of BCS. (*See* Tr. IDC 10; *see also* IDC 10 Agm't ¶ 7 (limiting the motion for recovery of the expenses associated with the Subpoena Discovery to those "attorneys' fees and costs incurred by Defendants in any subpoena and related motion practice necessary to obtain or compel the production of the discovery at issue in the Motion from the officers and directors of BCS.").)  The fees requested here, on the other hand, involve the reporting of the outcome of Phase 1, as ordered by the Court, and the briefing of Plaintiff's motion to reduce the subpoena prosecution fees.  Thus, there is no overlap between the fees requested here and the fees requested by Defendants to prosecute the subpoenas.

be said that these filings "have nothing to do with the [Motion]." To the contrary, Defendants would not have engaged in Phase 1 activity but for BCS's failure to comply with the EDO. On this basis, the Court concludes that Defendants are entitled to an award of the fees expended in the preparation of the Phase 1 Status Report and in responding to BCS's motion to reduce Defendants' Phase 1 subpoena prosecution fees.

That said, the Court nevertheless must determine whether the fees requested for the Subpoena Discovery are reasonable. Defendants claim 14 hours for the preparation of the Phase 1 Status Report, for a total of $6,815.00 in fees, and 22.8 hours for the preparation of the opposition to Plaintiff's motion to reduce Subpoena Discovery fees, for a total of $10,689.00 in fees. Both are excessive.

As to the Phase 1 Status Report, the Court notes it consists of a five-page compilation and recitation of the results of the Subpoena Discovery, which Defendants had to monitor as part of Phase 1 (and for which monitoring Defendants seek fees through a separate fees motion) and could have been prepared by a paralegal alone, while the remaining eight pages consist of legal analysis regarding prejudice to Defendants, requiring the attention of an attorney. (*See generally* Status Rpt.) The Court concludes that a reasonable amount of time for the preparation of the Phase 1 Status Report, is seven hours, which the Court will award at the 2024 hourly rate of Defendants' lead attorney—Tate at $510.00 per hour—for a total of **$3,570.00**.

As to Defendants' opposition to Plaintiff's motion for Subpoena Discovery fees, the Court notes that Defendants seek work for two attorneys, while the work could have been completed by one attorney. On this basis, the Court reduces the attorney hours by 50%, from 22.8 hours to 11.4 hours. In addition, the Court notes that approximately three of the Defendants' approximately ten pages (30%) of that motion (ECF No. 211) are dedicated to an affirmative request for sanctions against BCS and its counsel, an impermissible practice as courts in this and other districts

have concluded that a request for affirmative relief raised for the first time in an opposition is not proper. *See, e.g.*, *Interworks Unlimited, Inc. v. Digital Gadgets, LLC*, No. CV 17-04983 TJX (KSx), 2019 U.S. Dist. LEXIS 167149, at *3–4 (C.D. Cal. June 11, 2019) (party responding to motion "cannot seek affirmative relief by way of an opposition brief")*, Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2015 U.S. Dist. LEXIS 74566, at *13 n.8 (N.D. Cal. June 2, 2015) (asking to strike infringement theories is not "a request for relief properly presented in an opposition brief"); *Pac. Coast Steel v. Stoddard*, No. 11cv2073 H(RBB), 2013 U.S. Dist. LEXIS 199213, at *41 (S.D. Cal. Feb. 15, 2013) (declining to grant affirmative relief, "precluding an expert witness from testifying at trial, based on a request included in an opposition to a motion"); *Thomason v. GC* Servs. *L.P.*, No. 05cv0940-LAB (CAB), 2007 U.S. Dist. LEXIS 54693, at *21 (S.D. Cal. July 16, 2007) ("[T]he court rejects any discovery-related or other requests for affirmative relief Plaintiffs attempt to piggy-back on their Opposition as inappropriate, untimely, and obfuscating."); *Karma Auto. LLC v. Powersource Llc*, No. CV 16-00530 TJH (MRWx), 2017 U.S. Dist. LEXIS 235557, at *3–4 (C.D. Cal. July 27, 2017) (denying request for sanctions made in an opposition brief and citing Local Rule 6-1 for the proposition that courts may decline to rule on a request that is not brought as a properly noticed motion). On this basis, the Court reduces the 11.4 hours by 30%, for a total of 8 hours, and awards them at the 2024 hourly rate of Defendants' lead counsel—Tate at $510.00—for a total of **$4,080.00.**

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' request for attorneys' fees expended in the Subpoena Discovery. The Court will award a total **$7,650.00**, for this category of work.

(v) The fees sought here were necessitated by BCS's failure to comply with the EDO.

BCS argues that, even if the fees requested here could be recoverable under some circumstances, they are not here because the work that generated these fees

44

1    *///*

2    was not "caused by" BCS's alleged violations of the EDO, as required by Rule

3    37(b)(2).  (Mot. Suppl. 19.)

4        It is not a common occurrence for the undersigned to be taken aback by a

5    party's argument.  Yet, here, the Court is forced to take a deep breath and simply

6    say:  no statement could be further removed from reality.  The history of this

7    dispute paints an indelible picture of BCS's discovery violations for which

8    Defendants were forced to seek Court intervention and, in the process, exercise

9    every ounce of patience in their beings as the Court insisted on holding BCS's hand

10   for over a year in an effort to guide it into compliance—all out of the deepest

11   respect for the mission of the organization.  (IDC 10 Tr. 8.)  Still, the docket in this

12   case, the transcripts of the IDCs, the tables and charts generated through this

13   dispute, the depositions and declarations of BCS's leadership, the lack of

14   responsiveness to Court orders (including subpoenas), and the Court's deepening

15   admonishments, all bear witness to the persistent and unyielding refusal of BCS's

16   officers and directors to comply with BCS's discovery obligations from the

17   beginning of this dispute.  For over a year, in a steady crescendo, each response

18   raised more questions, each partial production suggested more missing or spoliated

19   documents, each conference compelled a follow-up, each filing required updates,

20   each extension necessitated more time, all to culminate in the disappointing finale

21   that, because some of BCS's highest ranking officers and directors refused to

22   produce their documents, the only remaining path forward was adjudication of

23   Defendants' Motion and its request for monetary sanctions.

24       Lest BCS have forgotten, the Court recounts the ordeal under the Rule 37(b)

25   sanctions standard.  But for BCS's failure to comply with the EDO in its document

26   production, IDC 3 would not have been necessary and those fees would not have

27   been incurred.   But for BCS's inability at IDC 3 to provide a timeline for the

28   expected completion of its searches and production (*see* Tr. IDC 3; IDC 3 Order),

IDC 4 would not have been necessary and those fees would not have been incurred. But for BCS's admission at IDC 4 that it had not completed its search and document production of the BCS Data Sources and had not searched at all through any of the Personal Data Sources (*see* Tr. IDC 4; Defs.' Ex. 5; IDC 4 Order), IDC 5 would not have been necessary and those fees would not have been incurred. But for the inability of BCS to obtain information from some of its officers and directors to respond at IDC 5 to the Court's inquiry of whether they personally had any of the Data Sources and voluntarily would produce their BCS-related documents contained therein (*see* Tr. IDC 5; Defs.' Exs. 7–9; IDC 5 Order), IDC 6 would not have been necessary and those fees would not have been incurred.  But for the written confirmation from some of BCS's officers and directors at IDC 6 that, although they had Personal Data Sources, they would not voluntarily produce BCS-related documents therefrom, and the refusal of other BCS officers and directors to respond to the Court's inquiry altogether (*see* Tr. IDC 6; Defs.' Ex. 10; IDC 6 Order), the Motion would not have been necessary and those fees would not have been incurred.  But for the overarching lack of cooperation by BCS's officers and directors in providing the facts needed for the Court to properly assess the Defendants' claim of prejudice in the Motion, (*see* Tr. IDC 10; IDC 10 Order), IDC 10 and Phase 1 would not have been necessary and those fees would not have been incurred.  But for the refusal of some of BCS's officers and directors to cooperate in the Phase 1 Voluntary Discovery (*see* IDC 13 Order; Status Rpt.), the Phase 1 Subpoena Discovery would not have been necessary and those related fees would not have been incurred.  But for the failure of some of BCS's officers and directors to accept service of the subpoenas they knew were forthcoming and/or comply with their subpoena obligations once served (*see* Status Rpt.), the Phase 1 Status Report and Subpoena Discovery motion practice would not have necessary and those fees would not have been incurred.   To now hear BCS's contention that the misconduct of its officers and directors was not the cause of the fees expended by Defendants—

all to obtain the benefits of the EDO that BCS itself co-authored—is nothing short of bewildering.  BCS's officers and directors need look no further than among their own ranks to find the architects of the circumstances that have compelled the award of sanctions here.  The Court is not persuaded by BCS's "lack of causation" argument and readily imposes the sanctions discussed above.

> c.    *The re-calculated Lodestar results in an attorneys' fees award of $34,986.50 and no Kerr adjustment is necessary*.

The Court re-calculates the lodestar for a total of $34,986.50 as follows:

| Work Performed | Sub-Total |
|---|---|
| Subtotal:  Discovery Conferences | $14,426.50 |
| Subtotal:  Motion Filings | $12,910.00 |
| Subtotal:  Subpoena Discovery | $7,650.00 |
| **TOTAL** | **$34,986.50** |

Neither party requests an adjustment to the lodestar based on the *Kerr* factors.  (*See generally* Mot.)  Indeed, upon a review of the *Kerr* factors not already subsumed within the lodestar, the Court sees no reason to make such an adjustment.  On this basis, the final attorneys' fee award pursuant to Rule 37(b)(2)(C) is **$34,986.50**.

### D.    **BCS Is Responsible for Paying the Sanction.**

Defendants request that the Court impose the requested monetary sanctions against BCS and its counsel, but sets forth no argument as to why counsel, in addition to BCS, should be sanctioned.  (Mot. 64.)  Beyond stating that the requested sanctions are not warranted, BCS does not address who should be responsible for paying any awarded monetary sanctions.  (*Id*. at 73–74.)  Based on its review of the record, the Court imposes the sanctions ordered herein against BCS only.  The Court finds no reason to order BCS's counsel to pay the mandated

sanctions. *See, e.g., Lee v. Dennison*, No. 2:19-cv-1332-KJD-DJA, 2020 U.S. Dist. LEXIS 185985, at *13 (D. Nev. Oct. 7, 2020) (declining to impose sanctions against counsel in addition to sanctioned party because the "parties expressed no opinion on this aspect" and the court found "no reason to include Plaintiff's counsel" in the monetary sanctions order).

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion and **ORDERS** as follows:

1.     Defendants' request for an order compelling BCS to produce documents from the BCS Data Sources and the Personal Data Sources not already produced is **DENIED as moot**.

2.     Defendants' request for evidentiary sanctions against BCS for its failure to comply with the EDO is **DENIED as moot**.

3.     Defendants' request for monetary sanctions is **GRANTED in part** and **DENIED in part**.  BCS is **ORDERED** to pay Defendants' attorneys' fees in the amount of **$34,986.50** by **no later than January 15, 2025** or on a later date or dates by agreement of the parties or further order of the Court upon properly-noticed motion.

4.     BCS is **ORDERED** to (a) serve, pursuant to Rule 4, a copy of this Order on every person who, as of the date of this Order, held or holds a position as Member of BCS's Board of Directors ("Current Board Member") or Officer of BCS ("Current Officer") by **no later than fourteen (14) days after the date of this Order**, and (b) file either (i) a proof of such service, or (ii) an under-oath declaration by the highest ranking Current Board Member or Current Officer as to why any such service has not been made, by **no later than twenty-one (21) days after the date of this Order**.

5.    BCS is **ORDERED** to (a) serve, pursuant to Rule 4, a copy of this Order on every person who, subsequent to the date of this Order, takes on a position as Member of BCS's Board of Directors ("Future Board Member") or Officer of BCS ("Future Officer") by **no later than seven (7) days after such person takes on such position**, and (b) file either (i) a proof of such service, or (ii) an under-oath declaration by the then highest ranking Board Member or Officer as to why such service has not been made, by **no later than fourteen (14) days after such person takes on such position**.  This is an ongoing obligation that expires only at such time as BCS has fully complied with the Order to pay to Defendants the sum of $34,986.50.

6.    **BCS is hereby cautioned that failure to obey this Order, including making payment on a _timely_ basis, may result in the imposition of further sanctions pursuant to Rule 37(b), including treating its failure to obey this Order as contempt of court.  BCS also is cautioned that instead of or in addition to the above sanctions, the Court could order BCS, its attorney, or both, to pay the reasonable expenses, including attorneys' fees, caused by their failure to comply with this Order.**

7.    **BCS's Current and Future Officers and Board Members are hereby cautioned that, under certain circumstances, they too could be held personally liable for sanctions, including sanctions for contempt of court, for BCS's failure to comply with this Order.**

DATED:  September 6, 2024

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

49