1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11    BREAKING CODE SILENCE,            Case No. 2:22-cv-02052-MAA

12                    Plaintiff,        **ORDER GRANTING IN PART AND**
                                        **DENYING IN PART PLAINTIFF'S**
13            v.                        **MOTION TO REDUCE**
                                        **DEFENDANTS' REQUESTED**
14                                      **ATTORNEYS' FEES AND COSTS**
      KATHERINE MCNAMARA, et al.,       **RELATED TO SUBPOENA**
15                                      **DISCOVERY (ECF NO. 203)**
16                    Defendants.

17

18

19    **I.      INTRODUCTION**

20            Filed on April 24, 2024 and presently before the Court—in this now-

21    dismissed matter[1]—is Plaintiff Breaking Code Silence's ("BCS") Motion to

22    Reduce Defendants' Requested Attorneys' Fees and Costs Related to Subpoena

23    Discovery ("Motion").  (Mot., ECF No. 203).  In support of the Motion, Plaintiffs

24    ///

25    _____

26    [1] On April 8, 2024, almost three weeks before the filing of the instant motion,
      Plaintiff filed a request for voluntary dismissal of the case with prejudice pursuant
27    to Federal Rule of Civil Procedure ("Rule") 41(a)(2).  (ECF No. 198.)  The Court
      granted the request on May 8, 2024.  (ECF No. 210.)
28

filed the Declaration of Jason Lueddeke (Lueddeke Decl., ECF No. 203-1) and its accompanying BCS Exhibits A and B (each BCS Ex., ECF Nos. 203-2 and 203-3).

Defendants Katherine McNamara and Jeremy Whiteley (collectively, "Defendants") filed an opposition to the Motion ("Opposition").  (Opp., ECF No. 205.)  In support of the Opposition, Defendants file the Declaration of M. Adam Tate (ECF No. 205-1) and its accompanying Defendants' Exhibits 1 and 2 (ECF Nos. 205-2, 205-3)

With this, the Motion is fully briefed.  Having read and considered the papers by the parties and other records in this case as detailed below, the undersigned finds the Motion suitable for disposition without a hearing.  *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the reasons set forth below, the Motion is **GRANTED in part and DENIED in part.**

## II.    FACTUAL BACKGROUND

The Court has by now (after three heavily-contested discovery orders – ECF Nos. 212, 221, 224), fully described the allegations in this matter and the resulting discovery disputes, one of which is the basis for this Motion.  Accordingly, the Court sets forth here only those facts relevant to the Motion.

### A.    BCS's Allegations[2]

Generally, BCS sues Defendants under the Computer Fraud and Abuse Act (18 U.S.C. § 1030) and the California Computer Data Access and Fraud Act (Cal. Penal Code § 502) for accessing a BCS computer or account without authorization, or in excess of authorized access, and causing BCS's website to be de-indexed.  (Compl., ECF No. 2; ECF Nos. 146–47.)  The effect of the deindexing was that no

///

---

[2] The Court summarizes the parties' allegations.  In so doing, the Court neither opines on the veracity or merit of the allegations and claims, nor makes any findings of fact.

one could find BCS's website on Google, as a result of which BCS lost expected charitable donations.  (Compl. 11.)  This lawsuit followed.

### B.    The Dispute at Issue

#### 1.    <u>The EDO, IDC 10, and the Resulting Agreement</u>

During the course of discovery, as more fully detailed in the Court's discovery order of September 6, 2024 ("September 6 Order") (Sept. 6 Order, ECF No. 221), the parties participated in a series of informal discovery conferences ("IDC") to resolve multiple disputes related to BCS's responses to Defendants' document requests and compliance with the parties' Electronic Discovery Order ("EDO," ECF No. 41.)   Among other things, the EDO contained the parties' agreement regarding the persons from whom documents and electronically stored information ("ESI") would be collected and the data sources that would be searched for those documents and ESI.  (*See generally*, EDO.)

Ultimately, and relevant here, Defendants filed a motion for evidentiary and monetary sanctions in connection with BCS's failure to comply with the EDO in its document productions ("Sanctions Motion").  (ECF No. 98.)  The Court's preliminary review of the Sanctions Motion revealed that, although it appeared clear BCS had violated the EDO as Defendants argued, the nature and extent of Defendants' resulting prejudice—information needed for resolution of the evidentiary sanctions request—was neither clear nor self-evident.  (*See* Transcript ("Tr."), ECF No. 124, at 12–15.)  To address this evidentiary shortfall, and, in the process, to give BCS one final opportunity to resolve the dispute short of the draconian evidentiary sanctions and substantial monetary sanctions that could befall it—the Court convened the tenth informal discovery conference in this case ("IDC 10") on August 9, 2023.  (*See id.* at 14–19.)

At IDC 10, the Court advised the parties of its concerns and that it intended to bifurcate resolution of Defendants' evidentiary sanctions request into two phases:

3

"Phase 1" would give BCS one final opportunity to supplement the document production at issue and, if the dispute were not then fully resolved, its outcome would inform the question of prejudice to Defendants from this document production shortfall.  (*See id.*)  "Phase 2" would, if necessary, adjudicate the pending Sanctions Motion, based on information obtained through Phase 1.  At the suggestion of the Court, and working cooperatively at IDC 10, the parties reached an agreement regarding the two phases, summarized in the Court's IDC 10 order as follows:

> **Phase 1** will involve joint efforts by the parties to obtain the discovery at issue in the Motion from the officers and directors of Plaintiff ("Discovery at Issue"), with or without the need for subpoena discovery.  Phase 1 will serve three purposes:  (a) for Defendants to obtain the Discovery at Issue, (b) to inform the Court regarding the nature and extent of prejudice to Defendants from the inability to obtain the entirety of Discovery at Issue, and (c) to inform the Court whether any of the Discovery at Issue has been spoliated.  During this informal discovery conference, the parties reach an agreement regarding the process for carrying out Phase 1.  The reasonable attorneys' fees and costs incurred by Defendants in any necessary subpoena discovery related to obtaining the Discovery at Issue—whether incurred as part of Phase 1 or heretofore—shall be borne by Plaintiff, upon order of this Court on a motion by Defendants at the conclusion of Phase 1.
>
> **Phase 2** will involve the Court's decision regarding the requested evidentiary sanctions, which decision will be informed by further briefing of the parties, as may be ordered by the Court, regarding the outcome of Phase 1.  To the extent Defendants incur reasonable expenses (including attorneys' fees) in supplementing the Motion to reflect the outcome of Phase 1, the Court will consider a request for such fees upon a process and schedule to be set by the Court at the appropriate time.

(IDC 10 Order, ECF No. 120, at 1–2.)

///

Pursuant to this plan, the parties entered into a written agreement detailing the steps of Phase 1, upon which an order was entered on August 22, 2023 ("Agreement"). (Agreement, ECF No. 132). Specifically, the Agreement provides as follows:

- The persons identified by the parties as "Custodians"—Apryl Alexander, Ariana Conroyd, Bobby Cook, Deanna Hassanpour, Denette King, Dorit Saberi, Eugene Furnace, Jennifer Magill, Jesse Jensen, Lenore Silverman, Megan Hurwitt, Noelle Beauregard, Shelby Kirchoff, and Vanessa Hughes—would be given one final opportunity to cooperate with BCS in responding to Defendants' document requests ("Voluntary Discovery");

- Defendants would issue document subpoenas to those Custodians who either (a) did not participate in the Voluntary Discovery at all, or (b) participated in the Voluntary Discovery but, based on Defendants' reasonable belief, were withholding documents ("Subpoena Discovery");

- BCS would bear the reasonable attorneys' fees and costs incurred by Defendants in the Subpoena Discovery, whether incurred as part of carrying out the Agreement or through Defendants' earlier subpoenas, including the fees and costs incurred in the issuance and service of the subpoenas and in any related motion practice necessary to enforce the subpoenas.

(Agreement, ¶¶ 2, 4, 5, 7.)

The attorneys' fees and costs provision of the Agreement is consistent with the Court's admonition to BCS at IDC 10 that, if the parties were to enter into the Agreement and Defendants were forced to engage in the Subpoena Discovery:

> [e]very dime in attorneys' fees and costs that [Defendants] spend on these subpoenas will be paid for by BCS, from preparing the subpoenas to serving them if [the Custodians] choose to not accept service the nice way, and to fighting every single motion to quash, every single motion for protective

order.  Every single discovery fight that arises from these
subpoenas, the fees and costs that Defendants will incur will be
paid for by BCS.

(Tr. 15:14–22.)

To effectuate the terms of the Agreement related to BCS's reimbursement to
Defendants of the attorneys' fees and costs Defendants incurred in the Subpoena
Discovery, the Court issued an order on April 10, 2024 (1) instructing Defendants
to submit an accounting to BCS for its fees and costs, and (2) setting a briefing
schedule should BCS contest the quantum of fees and costs for which Defendants
sought reimbursement ("Accounting Order").  (ECF No. 200, at 4–5.)

### 2.    The Outcome of Phase 1

To monitor the progress of the Agreement, the Court convened the thirteenth
informal discovery conference in this case ("IDC 13").  (IDC 13 Order, ECF No.
142.)  There, the Court found that Defendants had satisfied their Voluntary
Discovery obligation of attempting to obtain the discovery at issue without resort to
subpoenas.  (*Id.*)  On this basis, the Court authorized Defendants to commence the
Subpoena Discovery as to those Custodians who had not cooperated during the
Voluntary Discovery.  (*Id.*)

As set forth in Defendants' Phase 1 Status Report (Status Rpt., ECF No.
168), Phase 1 did not entirely achieve its goal of incentivizing the Custodians to
voluntarily turn over their responsive documents to BCS for production.  Of the
fourteen Custodians at issue:

- Five executed declarations agreeing to search for documents and BCS's
  related production was as follows:
  - April Alexander:  documents were produced to Defendants'
    satisfaction;
  - Ariana Conroyd and Jesse Jensen:  no documents were produced;

///

6

- o Jennifer Magill and Vanessa Hughes:  some documents were produced, but Defendants contend the production was incomplete;
- Three—Deanna Hassanpour, Denette King, and Dorit Saberi—executed declarations stating they did not have BCS-related documents;
- Four—Eugene Furnace, Lenore Silverman, Megan Hurwitt, and Shelby Kirchoff—failed to execute declarations or otherwise participate in the Voluntary Discovery; and
- Two—Bobby Cook and Noelle Beauregard—were excused from the Voluntary Discovery because they previously had, pursuant to earlier subpoenas, produced documents and sat for deposition.

(Stat. Rpt. ¶¶ 2–3.)  BCS's Response to Status Report does not dispute these facts. (*See generally* Resp. to Status Rpt., ECF No. 192.)

After the Voluntary Discovery process, Defendants issued six subpoenas with the following reported results:

- Eugene Furnace:  Five attempts to serve, including short stakeouts, were unsuccessful because Mr. Furnace lives in a gated apartment complex;
- Jesse Jensen:  Numerous attempts to serve were unsuccessful in that Mr. Jensen refused to answer the door at times it appeared he was home;
- Vanessa Hughes:  Numerous attempts to serve were unsuccessful in that Ms. Hughes refused to answer the door at times it appear she was home;
- Lenore Silverman:  after successful service, Ms. Silverman produced some documents;
- Megan Hurwitt:  after successful service, Ms. Hurwitt executed a Certification of No Recods; and
- Shelby Kirchoff:  after successful service, Ms. Kirchoff ignored the subpoena.

(Status Rpt. ¶ 4.)  BCS's Response to Status Report does not dispute these facts. (*See generally* Resp. to Status Rpt.)

3. <u>Defendants' Attorneys' Fees and Costs for the Subpoena
Discovery</u>.

On April 17, 2024, after the conclusion of Phase 1 and further to the Court's
Accounting Order, Defendants provided to BCS an accounting of the fees and costs
they incurred in conducting the Subpoena Discovery ("Phase 1 Accounting").
(Acctg., ECF No. 203-3.)  Through the Phase 1 Accounting, Defendants sought
reimbursement in the amount $30,253.00, comprised of $26,265.00 in attorneys'
fees and $3,988.00 in costs.  (*Id.* at 6.)  The Phase 1 Accounting included
Defendants' counsel's itemized fees invoices totaling $26,265.00 as well as
invoices from Defendants' process server Array totaling $3,988.00.  (*Id.* at 7–81.)
In response, BCS filed the instant Motion seeking a reduction of the claimed fees
and costs from $30,253.00 to "**$9,290.15** or substantially less . . . ."  (Mot. 5.)

BCS does not challenge Defendants' entitlement to fees and costs under the
Agreement; rather, it "challenges only the reasonableness of the attorneys' fees and
costs requested by Defendants."  (*Id.* at 9.)  In support of the requested reduction,
BCS advances six challenges to the reasonableness of Defendants' Phase 1 fees and
costs, arguing that they include:

1. fees for four attorneys, rather than one, to travel to and attend IDC 10, a
   conference held *before* the parties entered into the Agreement, and fees
   for one attorney to travel to and attend IDC 13, a discovery conference
   regarding unrelated matters;

2. fees and costs associated with five[3] subpoenas issued to non-material
   witnesses—Dorit Saberi, Lenore Silverman, April Alexander, Eugene
   Furnace, and Shelby Kirchoff;

___

[3] BCS states twice in the Motion that six, not five, subpoenas were issued to non-
material witnesses.  (*Id.* at 6, 14 n.3.)  However, when arguing regarding the non-
material witnesses, BCS identifies only five.  (*Id.* at 14–15.)  The Court proceeds
here as to five, rather than six, such witnesses.

3.  fees for thirty-two (32) block-billed entries ("Block-Billed Entries") that
    suffer from the following infirmities:

    a.  some contain duplicative work;

    b.  some involve administrative work performed by an attorney that
        should have been performed by a paralegal;

    c.  some involve work unrelated to the Subpoena Discovery; and

    d.  all are impermissible *per se* because they are block-billed.

(*Id.* at 5–6, 9–17.)

## III.   DISCUSSION

### A.   Legal Standard

Before discussing the legal standard applicable to this Motion, the Court clarifies what this Motion is <u>not</u>.  BCS argues in a footnote that the Court may not order the payment of fees under Rule 37(a)(5)(A) because it "acted with substantial justification because it diligently sought to obtain ad facilitate the discovery disclosures at issue . . . [and] . . . BCS is financially unable to pay any non-de minimis expenses."  (*Id.* at 9 n.1.)  However, this is not a motion brought pursuant to Rule 37(a)(5); rather, it is a motion to recover attorneys' fees under the Agreement.  Accordingly, the exceptions to the mandatory attorneys' fees provision of Rule 37(a)(5)(A) do not apply here.  In any event, as more fully set forth in the Court's September 6 Order involving Defendants' request for evidentiary sanctions in connection with this discovery, the Court already has found that BCS did not act with substantial justification in the discovery at issue and that there was insufficient evidence to convince the Court that such an order would be unjust.  (Sept. 6 Order 28–31.)

The Court turns now to the legal standard applicable here.  In the Ninth Circuit, a court must perform a two-step process to determine the reasonableness of any fee award.  *Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000).

First, the Court determines the "lodestar figure." *See Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (citation omitted). Second, where appropriate, the Court may adjust the lodestar amount based on several factors adopted by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), known as the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr,* 526 F.2d at 70.

A strong presumption exists "that the lodestar figure represents a reasonable fee." *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996). The Ninth Circuit has made clear that "[o]nly in rare instances should the lodestar figure be adjusted on the basis of other considerations." *Id.* (citations omitted). "Under the lodestar approach, many of the *Kerr* factors have been subsumed as a matter of law." *Id.* (citation omitted). The *Kerr* factors that are subsumed within the initial lodestar calculation are the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, the results obtained in the action, and the contingent nature of the fee agreement. *Id.* at 364 n.9 (citations omitted). "Adjusting the lodestar on the basis of subsumed reasonableness factors

10

after the lodestar has been calculated, instead of adjusting the reasonable hours or reasonable hourly rate at the first step . . . is a disfavored procedure." *Id.* (citation omitted).

The party seeking the award of fees must submit evidence to support the request. *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). Specifically, the party must support the request with evidence regarding the "number of hours worked and the rates claimed." *Id.* The party opposing the fee request bears the "burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in submitted affidavits." *Common Cause v. Jones*, 235 F.Supp.2d 1076, 1079 (C.D. Cal. 2002) (quoting *Gates*, 987 F.2d at 1397).

### B. Defendants Are Entitled to Recover $11,900.83 in Attorneys' Fees Incurred in the Subpoena Discovery.

1. The Attorney/Other Biller Hourly Rates Claimed by Defendants Are Reasonable and Commensurate with the Prevailing Rate.

Defendants claim the following hourly rates for their counsel: $470.00 in 2023 and $510.00 in 2024 for Mr. M. Adam Tate; $450.00 in 2023 and $475.00 in 2024 for Ms. Catherine Close; $300.00 for Mr. Adam J. Schwartz; and $150.00 in 2023 and $185.00 in 2024 for Ms. Rebekah Chamberlain. (*See generally* BCS Ex. A.) Defendants also claim an hourly rate of $200.00 in 2023 and $210.00 in 2024 for Ms. Helene Saller, a paralegal. (*Id*. at 5.) BCS does not dispute these rates. (*See generally* Mot.)

In addition, the Court already fully analyzed the reasonableness of these rates in its July 25, 2024 order on Defendants' request for attorneys' fees in connection with another discovery motion. (*See* ECF No. 212.) For the reasons detailed in that
///

11

order (*see id.* at 20–24), the Court finds the rates requested by Defendants to be reasonable for purposes of an attorneys' fees award here.

        2.    <u>The Total Number of Hours Claimed by Defendants Is Not Reasonable</u>.

Defendants' request for $26,265.00 in attorneys' fees, as follows:

| Work Performed | Sub-Total |
|---|---|
| Attendance at IDCs 10 and 13 | $11,787.00 |
| Other Work | $14,478.00 |
| **TOTAL** | **$26,265.00** |

(*See generally* Mot.)

The Court addresses each of BCS's challenges below and, for the reasons stated, reduces the requested fees from $26,265.00 to **$11,900.83**.

        a.    *A reduction of the $11,787.00 in fees related to IDC 10 and IDC 13 is warranted*.

Of the $26,265.00 total attorneys' fees requested, $11,787.00 are for the preparation for, travel to, and attendance at two informal discovery conferences—IDC 10 and IDC 13—as follows:

| Biller | Hours Billed | Rate Billed | Sub-Total |
|---|---|---|---|
| Tate (IDC 10) | 10.5 | $470.00 | $4,935.00 |
| Close (IDC 10) | 7.2 | $450.00 | $3,240.00 |
| Schwartz (IDC 10) | 5.0 | $300.00 | $1,500.00 |
| Chamberlain (IDC 10) | 7.5 | $150.00 | $1,125.00 |
| Tate (IDC 13) | 2.1 | $470.00 | $987.00 |
| **Subtotal:  Discovery Conferences** | 32.3 | | **$11,787.00** |

(Mot. 9–11.)

However, the Court already has adjudicated Defendants' request for the IDC 10 fees in its September 6 Order.  (Sept. 6 Order at 37–40.)  As such, the Court will not award these fees twice.

In contrast, the Court has not previously adjudicated a request for Mr. Tate's fees in preparing for and attending IDC 13.  As noted above, IDC 13 was convened by the Court to monitor the progress of the Voluntary Discovery.  (*See generally* IDC 13 Order.)  And it was at IDC 13 that the Court authorized the commencement of the Subpoena Discovery.  (*See generally id.*)  However, because the Agreement provides for recovery of fees associated with the Subpoena Discovery (the issuance, service, and prosecution of the subpoenas), and because the Subpoena Discovery had not yet commenced, the Court does not consider these fees recoverable under the Agreement.[4]

On this basis, the Court **GRANTS** BCS's request to reduce the claimed IDC fees by $11,787.00.

> b.    *A blanket 67% reduction for fees related to five of the subpoenas is not warranted.*

After deducting $11,787.00 from the $26,265.00 requested fees, $14,478.00 remains to be adjudicated.  BCS seeks a blanket sixty-seven percent (67%) deduction of the remaining $14,478.00—or approximately $9,700.26—on the ground that five of the subpoenas at issue—to Dorit Saberi, Lenore Silverman,

---

[4] The Court acknowledges that the Agreement includes reimbursement of fees related to subpoena discovery that preceded the Agreement (provided it involved the agreed-upon Custodians).  (Agreement ¶ 7.)  However, the evidence related to Mr. Tate's attendance at IDC 13 is insufficient for the Court to determine if any of Mr. Tate's preparation for and participation in IDC 13 involved the earlier-served subpoenas.  (*See* Lueddeke Decl. at 7 ("Prepare for and attend informal discovery conference.  Conferences with C. Close and A. Schwartz regarding strategy and next steps.  Emails with clients regarding subpoenas.").)  On this basis, the Court finds this entry too vague to justify an award of the requested fees.

April Alexander, Eugene Furnace, and Shelby Kirchoff —were unnecessary in that Defendants knew that these persons "[were] not material witnesses and that each of them was *highly* unlikely to possess responsive documents." (Mot. 14 n.3.) They explain: "Saberi was never an officer or director of BCS, and is therefore not a 'Custodian' under the EDO or for purposes of Phase 1"; "Silverman is a former BCS Board member who was not involved in the March 2022 events giving rise to this lawsuit"; "Alexander was not an officer or director of BCS at the time of the March 2022 events giving rise to this lawsuit, and is therefore not a 'Custodian' under the EDO or for purposes of Phase 1"; "Defendants have made no attempt to explain how Furnace is a material witness or how subpoenaing him is proportional to the needs of the case [in that] Furnace was only a BCS member for a few months"; and "Defendants have made no attempt to explain how Kirchoff is a material witness or how subpoenaing her is proportional to the needs of the case." (*Id.* at 15.)

But the ship upon which BCS rests its argument has sailed. The time to oppose the Subpoena Discovery as to these persons was *before* BCS entered into the Agreement allowing that discovery, or *before* the Court issued the order to proceed with those subpoenas at IDC 13 (IDC 13 Order 2), not *after* the discovery was completed. Significantly, the Agreement explicitly provides that these five persons would be part of the Subpoena Discovery if they did not cooperate in the Voluntary Discovery. (Agreement ¶ 1.) Moreover, as Defendants point out, these persons were included in the EDO's definition of "Custodians" through the general category of Board Members and BCS's identifying them during the litigation as board members, or "persons with knowledge of DEFENDANTS' actions to unlawfully access or block access of BCS's account or computer," or "persons with knowledge of the termination of McNamara's rights [to the accounts at issue]." (Opp. 13–14 (citing EDO ¶ 4.3; ECF No. 98-1 ¶ 3; ECF No. 98-2 Ex. 1; ECF No. 152–64, pp. 18, 22–23; ECF No. 202-13 at 9; ECF No. 202-14 at 4).) On this basis,

BCS can hardly argue their lack of import to the case.  In addition, even if it were true that they were "highly unlikely to possess responsive documents," as BCS claims, Defendants are not required to take BCS's word for this and have the right to test that theory.  Finally, any claim by BCS that the October 25, 2023 stipulation—limiting the claims in the case to only those regarding the deindexing of its website—renders these persons "unnecessary" to the case is unavailing since the discovery commenced in May 2023 and progressed through IDC 10 on August 9, 2023 and IDC 13 on October 5, 2024.  (Mot. 13 (citing ECF No. 146).)

On this basis, the Court **DENIES** BCS's request to reduce the remaining $14,478.00 in fees by sixty-seven percent (67%).

### c.    *A $2,577.17 reduction of the Block-Billed Entries is warranted.*

BCS challenges the Block-Billed Entries, representing 26.8 hours of work and $9,550.00 in fees.  (BCS Ex. B at 7–17.)   According to BCS, the Block-Billed Entries should be reduced because they suffer from four infirmities:  (1) some are for duplicative work; (2) some are for administrative work performed by an attorney that should have been performed by a paralegal at a lower hourly rate; (3) some are for tasks unrelated to the Subpoena discovery, and (4) all are block-billed, which prevents the Court from adequately assessing the reasonableness of the time claimed for each task.  (Mot. 5, 11–14.)

The Court's analysis starts with a dissection of each of the Block-Billed Entries into their respective discrete tasks, as detailed in Attachment 1 to this Order. (*See* Attachment 1.)  To facilitate the analysis that follows, the Court has grouped the individual tasks into sixteen (16) distinct categories.  (*Id.*)  Giving equal unit

15

value to each individual task,[5] the Court calculates the total number of task units claimed across each of the sixteen categories.  (*Id.*)  In sum, the number of discrete tasks in the Block-Billed Entries ranges from a minimum of two and a maximum of six, for a total of ninety-four (94) billed task units.  (*Id.*)

The Court addresses each claimed infirmity in turn and, in Attachment 2, notes its adjustments to Attachment 1.  (*See* Attachment 2.)

(i)    Duplicative work

BCS seeks a reduction for the "significant overlap and duplication of tasks between [Attorney] Close and [Paralegal] Saller."  (Mot. 13.)  It offers two entries as evidence of this duplication:

> Ms. Close's billing of June 22, 2023 for which Ms. Close billed one (1) hour at an hourly rate of $450.00:  Email correspondence with H. Saller and Array regarding status of service of subpoenas on custodians.  Email correspondence (numerous) with clients regarding same.  Legal research regarding manner of service of third-party subpoenas.  Email correspondence with clients regarding same and requesting that the custodians accept service.  Draft proposed email to custodians regarding accepting service.  Email correspondence with clients regarding revisions to same.
>
> Ms. Saller's billing of June 22, 2023 for which Ms. Saller billed one (1) hour at an hourly rate of $200.00:  Review status report re: attempts on service of federal subpoenas.  Email to clients with status updates.  Email to Array regarding same.  Emails (multiple) regarding service of subpoenas.

(Mot. 13.)

---

[5] In the absence of further information—a natural occurrence in block-billed entries–the Court has no other way to apportion time.

The Court agrees with BCS that these entries are duplicative, but only in part. Ms. Close's entry includes two tasks not included in Ms. Saller's entry: (1) legal research regarding service, and (2) correspondence with the Custodians regarding acceptance of service. In the interest of fairness, the Court deducts the time claimed for the other tasks—which the Court agrees are duplicative—from the time of the higher biller—Ms. Close.

Although the Court makes this adjustment for this particular pair of billing entries, it is unable make similar adjustments to account for the "significant overlap and duplication" claimed by BCS. (*Id.*) This is because BCS identifies no other such entries. To the extent BCS expects the Court to take on the burden of identifying each purported duplication in the challenged entries, such expectation is misplaced. It is BCS's burden, as the party opposing the requested fees, to submit the evidence necessary to support its specific challenges. *See Common Cause*, 235 F.Supp.2d at 1079. This, BCS has not done.

The Court deducts four (4) task units, identified in Attachment 2 as "DUP," and their corresponding value of $300.00, from Defendants' claimed fees as duplicative work. (*Compare* Attachment 1 *with* Attachment 2.)

(ii)    Administrative work by an attorney

BCS also seeks a reduction of the Block-Billed Entries on the ground that "Ms. Close billed repeatedly for administrative tasks that should have been performed by Ms. Saller at a significantly lower rate." (Mot. 14.) It argues that communications with the process server regarding subpoena service and assemblage of the service package for the subpoenas are administrative tasks that Ms. Saller, not Ms. Close, should have performed. (*Id.*) The Court agrees, but only as to the tasks related to preparation of the subpoena packets. There is no reason that an attorney should be involved in the preparation of subpoena packets—an important, but wholly administrative, task. For this reason, the Court deducts five

(5) task units from Ms. Close's entries, valued at approximately $808.50, as follows:  one (1) task unit of Ms. Close's September 19, 2023 entry valued at approximately $120.00; two (2) task units of Ms. Close's September 20, 2023 entry valued at approximately $486.00; one (1) task unit of Ms. Close's September 21, 2023 entry valued at approximately $90.00; and one (1) task unit of Ms. Close's October 13, 2023 entry valued at approximately $112.50.  (*See* Attachment 2.)

The Court does not reach the same conclusion for Ms. Close's communications with the process server because the Court can envision many topics worthy of discussion between an attorney and a process server in a situation where, as here, there are allegations of evasion of service by subpoenaed parties.  (*See* Stat. Rpt. 6 (setting forth efforts to serve Jesse Jensen and Vanessa Hughes and their respective refusals to answer the door and other allegedly evasive conduct).)  While Defendants' billing entries do not identify the precise subject of these communications, the Court finds that such communications are plausible—indeed necessary—under the circumstances.  On the other hand, BCS does nothing to challenge the subject matter of the discussions.  (*See generally* Mot.)  On this basis, the Court cannot concluded that a deduction for these communications is warranted.

The Court deducts five (5) task units, identified in Attachment 2 as "ADMIN," and their corresponding value of $808.50 from Defendants' claimed fees as administrative work performed by an attorney.  (*Compare* Attachment 1 *with* Attachment 2.)

### (iii)   Work unrelated to the Subpoena Discovery

BCS also seeks a reduction of the Block-Billed Entries on the ground that some involve tasks that are unrelated to the Subpoena Discovery.  (Mot. 11–14.)  The compass for analyzing whether a task is related to the Subpoena Discovery is the Agreement and this Court's admonishments to BCS, both straightforward: because Defendants should not have been forced to subpoena the records of BCS's

officers and directors to begin with, and instead the work of gathering their documents, organizing them, and producing them should have been undertaken by BCS as part of its discovery obligations, all fees incurred by Defendants in that effort will be reimbursed by BCS ("Reimbursable Tasks").[6] (*See* Agreement; Tr. 15:14–22; IDC 10 Order.)  The obvious corollary to this rule is that tasks that would have been performed regardless of the Agreement and that do not directly comprise the effort of obtaining documents from BCS's officers and directors are not reimbursable under the Agreement ("Non-Reimbursable Tasks").

Of the sixteen categories of work, the Court finds the following eleven to be Reimbursable Tasks:  (1) communications regarding the subpoenas with: (a) clients, (b) co-counsel, (c) process server Array, (d) opposing counsel, (e) unidentified persons, and (f) the persons served or otherwise identified as Custodians for purposes of the Subpoena Discovery; (2) legal research regarding the subpoenas; (3) preparation of the subpoenas and service packets; (4) tracking the status and results of the subpoenas; and (5) review of documents produced under subpoena; and (6) review of IDC orders regarding the subpoena procedure. (*See* Attachment 1.)  None of this work would have been necessary had BCS produced, as part of its own discovery obligations, the documents of its officers and directors that ultimately became the subject of the Subpoena Discovery. Accordingly, the fees claimed by Defendants for work within these eleven task categories will be awarded.  The Reimbursable Tasks are denoted in green highlighting in Attachment 2.  (*See* Attachment 2.)

///

---

[6] So too would all fees associated with enforcement of the subpoenas, such as motions to compel, motions for contempt, responses to motions to quash, and the like.  The Court does not address these tasks because none became necessary and no fees are sought for that work.  (*See generally* Mot.; Opp.)

1    BCS offers one entry as evidence of Defendants' attempt to recover fees for

2    Non-Reimbursable Tasks:

3        Ms. Close's billing of September 20, 2023 for which Ms.
         Close billed 2.7 hours at an hourly rate of $450.00:
4        Email correspondence with Jeremy Whiteley (several)
5        regarding custodian declarations and subpoenas to
         custodians.  Telephone conferences with A. Tate and A.
6        Schwartz regrading same.  Preparation of subpoena,
7        notice of subpoena, and attachment A for Eugene
         Furnace and Lenore Silverman.  Review Court's order
8        regarding issuance of subpoenas and assemble service
9        package of all required documents for each subpoena.

10   (Mot. 12–13.)

11       As noted in Attachment 1, the Court has dissected this entry into five task

12   units, of which the Court already has discounted two as non-attorney-administrative

13   (ADMIN) work—"[p]reparation of subpoena, notice of subpoena, and attachment

14   A for Eugene Furnace and Lenore Silverman" and "assemble service package of all

15   required documents for each subpoena."  (*Compare* Attachment 1 *with* Attachment

16   2.)  This leaves three task units in this entry—communications with Defendant

17   regarding the subpoenas to the Custodian and their declarations; communications

18   among counsel regarding same; and review of the Court's order regarding issuance

19   of the subpoenas—all of which unquestionably are related to the Subpoena

20   Discovery and, thus, constitute Reimbursable Tasks.  On this basis, the court will

21   make no further deductions from this entry.

22       And, while BCS avers that there are a "significant number of time entries . . .

23   that do not bear on the Subpoena Discovery" (Mot. 12), it does not identify any

24   other such entries for the Court's consideration (*see generally* Mot.).  As previously

25   noted, it is BCS's burden to specify its challenges.  *See Common Cause*, 235

26   F.Supp.2d at 1079.  BCS has not done so.

27       That said, the Court cannot ignore the billing entries that—glaringly—

28   contain fees for tasks obviously unrelated to the Subpoena Discovery and, thus, are

20

1    Non-Reimbursable Tasks—specifically: drafting the Tate Supplemental

2    Declaration regarding fees, communications regarding the Tate Supplemental

3    Declaration, communications regarding the postponement of an in-person hearing,

4    downloading the IDC 10 transcript and emailing same to client, and an

5    unintelligible entry. The Court addresses each in turn.

6            The drafting of the Tate Supplemental Declaration regarding attorneys' fees

7    and communications with clients about same are not related to the Subpoena

8    Discovery. The Tate Supplemental Declaration involved a voluntary—and notably

9    unsolicited—filing by Defendants to supplement an earlier motion requesting

10   monetary sanctions in the form of attorneys' fees and argue that certain of those

11   fees were recoverable under Rule 37(b). (*See* ECF No. 209.) These tasks are not

12   related to the Subpoena Discovery; rather, they involve an effort by Defendants to

13   recover sanctions for BCS's violation of the EDO. Moreover, Defendant's request

14   for the fees incurred in preparing the declaration already has been adjudicated in the

15   Court's September 6 Order. (Sept. 6 Order 40–41.) Defendants are not entitled to

16   these fees under the Agreement.

17           Similarly, counsel's communication with Defendants regarding the

18   postponement of an in-person hearing is not a task related to the Subpoena

19   Discovery. While not altogether clear in the billing invoices, the Court believes,

20   based on its August 18, 2023 date, that this billing entry refers to an order issued by

21   the undersigned on August 17, 2024 related to a motion by a third-party movant,

22   Chelsea Papciak, to quash a subpoena issued to her by Defendants, in which the

23   Court ordered the motion withdrawn upon Ms. Papciak's request. (ECF No. 126.)

24   Although the mention of a subpoena might, at first glance, appear to involve the

25   Subpoena Discovery at issue here, it does not because Chelsea Papciak is not one of

26   the Custodians listed in the Agreement. (*See* Agreement ¶ 1.) Defendants are not

27   entitled to these fees under the Agreement.

28   ///

Likewise, the fees incurred by counsel in downloading the transcript for IDC 10 and sending it to Defendants is not a task related to the Subpoena Discovery. While IDC 10 involved the creation of Phase 1 and, thus, set the scene for the Subpoena Discovery, the tasks of downloading a document and forwarding it to a client do not constitute work related to the Subpoena Discovery; rather, it is work related to client management and maintenance.  Defendants are not entitled to these fees under the Agreement.

Finally, an entry that is not comprehensible to the Court cannot, for obvious reasons, qualify as a Reimbursable Task.  Such is the case with Ms. Saller's September 26, 2023 task described as "Finalize same."  This is because the Court is unable to determine its meaning as a follow-up to the two block-billed tasks that precede it:  reviewing a status report and exchanging emails with Array—neither of which would appear to need "finalization."  Defendants are not entitled to these fees under the Agreement.

Identifying these entries as "NON-R" in Attachment 2, the Court deducts five (5) task units and their corresponding value of $1,468.67 from Defendants' claimed fees as work unrelated to the Subpoena Discovery, as follows:  three (3) task units from Mr. Tate's August 18, 2023 entry valued at $1,410.00; one (1) task unit from Ms. Saller's September 8, 2023 entry, valued at $32.00; and one (1) task unit from Ms. Saller's September 26, 2023 entry, valued at 26.67.  (*Compare* Attachment 1 *with* Attachment 2.)

(iv)    <u>Blanket deduction for block-billed entries</u>

Having deducted from Defendant's Block-Billed Entries the foregoing fourteen (14) task units, 5.8 hours, and related $2,577.17 fees, there remain eighty (80) discrete task units in the Block-Billed Entries, carried out in twenty-one (21) hours, totaling $6,972.83.  (*See* Attachment 2.)  The Court turns now to BCS's ///

request that "all block billed entries be reduced by two-thirds, or 67%, at the least." (Mot. 14.)

BCS argues that block-billing "is fundamentally at odds with the lodestar method because it render[s] it virtually impossible to break down hours, leaving the court without the ability to accurately determine whether a reasonable amount of time was spent by counsel on a discrete task." (Mot. 11 (citations omitted, internal quotation marks omitted).) On this basis, BCS urges the Court to either discount the Block-Billed Entries by a reasonable percentage—which BCS suggests as 67%—or ignore them altogether. (Mot. 11.)

Defendants counter, noting that block-billing is not *per se* objectionable and reductions for block-billing are not required where "'individual tasks are specified' and the entries are 'detailed enough for the Court to assess the reasonableness of the hours billed.'" (Opp. 10–11 (citing *Campbell v. Nat'l Passenger R.R. Corp.*, 718 F.Supp.2d 1093, 1103 (N.D. Cal. 2010).)

The Court agrees with Defendants. "The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *See Gates v. Deukmejian*, 987 F.2d at 1937. "Block billing is a practice where the amount of time spent by an attorney on each discrete task is not identified, but instead all hours spent during the course of a day on multiple tasks are billed together." *Yeager v. Bowlin*, No. CIV. 2:08-102 WBS JFM, 2010 U.S. Dist. LEXIS 49427, at *2 (E.D. Cal. Apr. 23, 2010). Block billing makes it more difficult for a court "to determine how much time was spent on particular activities." *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007).

A party seeking attorneys' fees should "maintain its billing records in a manner that will enable the reviewing court to identify distinct claims." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). While California law allows a court to exercise its discretion as to block-billed hours or simply cast them aside, federal

1  law requires the court to provide an explanation for any reduction in fees due to

2  overbilling or duplication.  *Yeager*, 2010 U.S. Dist. LEXIS 49427, at *3 (internal

3  citations omitted).

4          Although block-billing may be disapproved by some courts because of the

5  inefficiencies it could hide, its inverse—task billing—also has been criticized by

6  Associate Justice (Retired) Sandra Day O'Connor (sitting by designation at the

7  Second Circuit) as creating a "pretense of mathematical precision." *Universal*

8  *Elecs., Inc. v. Universal Remote Control, Inc.*, 130 F.Supp.3d 1331, 1340 (C.D.

9  Cal. 2015) (aff'd 669 Fed. Appx 575 (Fed. Cir. 2016)) (citing *Arbor Hill*

10 *Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2nd

11 Cir. 2007)).  Another criticism of task billing is that it improperly converts courts

12 into "green eyeshade accountants." *See Goodyear Tire & Rubber Co. v. Haeger*,

13 581 U.S. 101, 110 (2017) (trial courts "'need not, and indeed should not, become

14 green-eyeshade accountants' (or whatever the contemporary equivalent is.)'"

15 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2014)).  Instead, "[t]he essential goal" in

16 fee shifting is to achieve "rough justice."  *Id.* (internal quotations omitted).

17         Here, the remaining eighty task units found within the Block-Billed Entries

18 are sufficiently detailed such that the Court is able to determine in the first instance

19 that each of these billing entries contain tasks that are related to the same nature of

20 work—the Subpoena Discovery—and that the amount billed in each entry is

21 reasonable for the grouped related tasks.  As Defendants note, all but four of the

22 block-billed entries are for one hour or less.  (Opp. 11.)  Indeed, the Court notes

23 that only four (4) of the Block-Billed Entries exceed one hour, while two (2) are for

24 exactly one hour and twenty-six (26) are for less than one hour, ranging from 3/10

25 of an hour to 9/10 of an hour.  (*See* Attachment 2.)  Given that the remaining eighty

26 task units were completed in twenty-one (21) hours (*see id.*), this represents an

27 average of 0.263 hour (slightly more than 15 minutes) per task.  Having unwillingly

28 turned into the "green-eyeshade accountant" against which Associate Justice

O'Connor cautioned, the Court finds that these entries are reasonable for the work done.  Accordingly, the Court declines to make the requested across-the-board 67% deduction to the Block-Billed Entries.

* * *

On the basis of the foregoing, the Court **GRANTS in part** BCS's request to reduce the Block-Billed Entries, reducing these by **$2,577.17** ($300.00 for duplicative work; $808.50 for administrative work performed by an attorney; and $1,468.67 for fees associated with Non-Reimbursable Tasks).

> d. *The re-calculated Lodestar results in an attorneys' fees award of $11,900.83 and no Kerr adjustment is necessary.*

The Court re-calculates the lodestar for a total of **$11,900.83** as follows:

| Work Performed | Fees |
|---|---|
| Fees claimed by Defendants | $ 26,265.00 |
| Reduction for IDC-related fees | ($ 11,787.00) |
| Reduction for fees associated with subpoenas to five persons BCS claims are non-material witnesses | $0.00 |
| Reduction for duplicative work found in block-billing | ($ 300.00) |
| Reduction for administrative work performed by attorney found in block-billing | ($ 808.50) |
| Reduction for Non-Reimbursable Tasks found in block-billing | ( $1,468.67) |
| Reduction for block-billing | $0.00 |
| **TOTAL FEES AWARDED AFTER REDUCTIONS** | **$ 11,900.83** |

Neither party requests an adjustment to the lodestar based on the *Kerr* factors.  (*See generally* Mot.)  Indeed, upon a review of the *Kerr* factors not already subsumed within the lodestar, the Court sees no reason to make such an adjustment.  On this basis, the final attorneys' fee award under the Agreement is **$11,900.83**.

///

///

25

### C.  Defendants Are Entitled to Recover the $3,988.00 in Costs Incurred in the Subpoena Discovery.

Defendants' request for $3,988.00 in costs associated with the Subpoena Discovery is based upon the expense incurred in serving the following persons: Lenore Silverman ($701.50), Jesse Jensen ($640.00), Jennifer Magill ($590.00), Vanessa Hughes ($440.00), Eugene Furnace ($400.00), Dorit Saberi ($390.00), Shelby Kirchoff (345.00), Megan Hurwitt ($251.50), and Apryl Alexander ($230.00).  (Mot. 8–9.)  As it did in connection with the attorneys' fees associated with these subpoenas, and for the same reasons, BCS argues that the costs associated with the service of Saberi, Silverman, Alexander, Furnace, and Kirchoff should be stricken.

For the same reasons as stated above, which need not be restated here, the Court declines to deduct the costs associated with the service of these subpoenas. Moreover, the Court adds that these service costs could have been avoided altogether if these persons had agreed to accept service of the subpoenas in the first instance, whether or not they had responsive documents.  Their lack of responsive documents, as they now claim, easily could have been resolved by so stating under oath upon service of the subpoena rather than by forcing Defendants to spend resources in their service.  (*See* BCS Ex. B 21–81.)  Indeed, while not part of the original discussion at IDC 10, the Court made this very suggestion in its IDC 10 Order:

> Though not part of the agreement reached during the informal discovery conference, but in an effort to reduce the costs associated with this process (which, as ordered above, will be borne by Plaintiff), the Court encourages the parties to build into the process a procedure to facilitate service of the subpoenas for those officers and directors who elect not to cooperate with this discovery voluntarily, including allowing counsel for Plaintiff to

1
2

accept service on their behalf or providing an address and convenient date and time for service of the subpoenas.

3   (IDC 10 Order 2.)  BCS's officers and directors did not take heed.  They, and in

4   turn BCS, now are accountable for this decision.  On this basis, the Court **DENIES**

5   BCS's request to strike the costs associated with service of these five individuals.

6

7   **D.    BCS, Not its Counsel, Is Responsible for Paying the Attorneys'**

8   **Fees and Costs for the Subpoena Discovery.**

9        Defendants request that the Court issue these "sanctions" against both BCS

10  and its counsel.  (Opp. 15.)  They argue that their "hands are . . . forced" to make

11  this request because "BCS is taking the position that it has no material assets . . . ."

12  (*Id.*)  In support of the request, Defendants accuse BCS's counsel of arguing that it

13  was unnecessary for BCS to collect documents from its officers and directors and

14  lying to the Court about the document collection efforts (or lack thereof, according

15  to Defendants) that ultimately resulted in the Subpoena Discovery.  (*Id.* at 15–17.)

16       Defendants' request must be denied for three reasons.  As a starting point,

17  Defendants may not seek affirmative relief through their Opposition.  Courts in this

18  and other districts have concluded that a request for affirmative relief is not proper

19  when raised for the first time in an opposition. *See, e.g.*, *Interworks Unlimited, Inc.*

20  *v. Digital Gadgets, LLC*, No. CV 17-04983 TJX (KSx), 2019 U.S. Dist. LEXIS

21  167149, at *3–4 (C.D. Cal. June 11, 2019) (party responding to motion "cannot

22  seek affirmative relief by way of an opposition brief")*, Finjan, Inc. v. Blue Coat*

23  *Sys., Inc.*, No. 13-cv-03999-BLF, 2015 U.S. Dist. LEXIS 74566, at *13 n.8 (N.D.

24  Cal. June 2, 2015) (asking to strike infringement theories is not "a request for relief

25  properly presented in an opposition brief"); *Pac. Coast Steel v. Stoddard*, No.

26  11cv2073 H(RBB), 2013 U.S. Dist. LEXIS 199213, at *41 (S.D. Cal. Feb. 15,

27  2013) (declining to grant affirmative relief, "precluding an expert witness from

28  testifying at trial, based on a request included in an opposition to a motion");

*Thomason v. GC Servs. L.P.*, No. 05cv0940-LAB (CAB), 2007 U.S. Dist. LEXIS 54693, at \*21 (S.D. Cal. July 16, 2007) ("[T]he court rejects any discovery-related or other requests for affirmative relief Plaintiffs attempt to piggy-back on their Opposition as inappropriate, untimely, and obfuscating.").

Next, even if Defendants' request were procedurally proper, the Court notes that their mischaracterization of the fees sought here as "sanctions" creates confusion leading to an improper legal basis for the requested relief. The fees sought and awarded under the Agreement are not sanctions for discovery misconduct that could, under certain circumstances, be imposed against counsel. *See* Fed. R. Civ. P. 37(a)(5)(A), 37(b)(2)(C), 37(d)(3), 37(f) (all allowing sanctions to be imposed against both a party and its attorney). Rather, they are attorneys' fees and costs that are recoverable by Defendants pursuant to a written agreement of the parties. The Court is unaware of any authority that would permit the conversion of BCS's attorneys' fees obligation into a joint-and-several obligation with its attorneys in the absence of such a provision in the Agreement, and Defendants offer none. (*See generally* Opp.) And, to the extent Defendants seek to characterize the Agreement as a discovery order the non-compliance of which would be sanctionable under Rule 37(b) merely because the Court signed it into order, such an argument would fail because the Court is unaware of a violation of that purported order. The Agreement simply put into place a phased process for obtaining certain discovery from certain persons. (*See generally* Agreement.) Defendants point to no violation of that process. (*See generally* Opp.) To the contrary, all of the accusations leveled by Defendants against BCS's counsel are for matters that preceded the Agreement. (Opp. 15–17.)

Finally, it appears to the Court that Defendants are looking for the proverbial "deep pocket" in which to reach for their fees. This is not a proper basis upon which to hold a party's attorney liable for the party's attorneys' fees obligations. To be clear, the Court is not unsympathetic to Defendants' lamentable predicament

of being awarded attorneys' fees—on other occasions and now—that BCS claims it cannot pay. (*See* Opp. 15; ECF No. 212; Sept. 6 Order; ECF No. 224.) However, while this circumstance may open several avenues of recourse for Defendants against BCS and/or its officers and directors, pursuing BCS's counsel for this money is not such. Indeed, had Defendants desired such an outcome, they could have negotiated it as part of the Agreement. They did not.

For these reasons, the Court **DENIES** Defendants' request that BCS's counsel be ordered to pay any amount of the fees and costs ordered here.

## IV.  CONCLUSION

On the basis of the foregoing, the Court **GRANTS in part** and **DENIES in part** BCS's Motion and **ORDERS** as follows:

1.  BCS is **ORDERED** to pay Defendants' attorneys' fees and costs associated with the Subpoena Discovery in the amount of **$15,888.83** ($11,900.83 in fees and $3,988.00 in costs) by **no later than March 31, 2025**, or on a later date or dates by agreement of the parties or further order of the Court upon properly-noticed motion.

2.  BCS is **ORDERED** to (a) serve, pursuant to Rule 4, a copy of this Order on every person who, as of the date of this Order, held or holds a position as Member of BCS's Board of Directors ("Current Board Member") or Officer of BCS ("Current Officer") by **no later than fourteen (14) days after the date of this Order**, and (b) file either (i) a proof of such service, or (ii) an under-oath declaration by the highest ranking Current Board Member or Current Officer as to why any such service has not been made, by **no later than twenty-one (21) days after the date of this Order**.

3.  BCS is **ORDERED** to (a) serve, pursuant to Rule 4, a copy of this Order on every person who, subsequent to the date of this Order, takes

on a position as Member of BCS's Board of Directors ("Future Board

Member") or Officer of BCS ("Future Officer) by **no later than seven

(7) days after such person takes on such position**, and (b) file either

(i) a proof of such service, or (ii) an under-oath declaration by the then

highest ranking Board Member or Officer as to why such service has

not been made, by **no later than fourteen (14) days after such

person takes on such position**.  This is an ongoing obligation that

expires only at such time as BCS has fully complied with the Order to

pay to Defendants the sum of $15,888.83.

4.    **BCS is hereby cautioned that failure to obey this Order, including
making payment on a <u>timely</u> basis, may result in the imposition of
sanctions, including treating its failure to obey this Order as civil
or criminal contempt of court resulting in, without limitation,
coercive and compensatory sanctions.  BCS also is cautioned that
instead of or in addition to the above sanctions, the Court could
order BCS to pay the reasonable expenses, including attorneys'
fees, caused by BCS's failure to comply with this Order.**

5.    **BCS's Current and Future Board Members and Officers are
hereby cautioned that, under certain circumstances, they too could
be held personally liable for sanctions, including sanctions for civil
or criminal contempt of court, for BCS's failure to comply with
this Order, resulting in, without limitation, coercive and
compensatory sanctions.**

DATED:  December 10, 2024

_____

HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE